1
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

2
_____

3
United States of America,    ) Criminal Action
                            ) No. 1:16-cr-00030-KBJ

4
             Plaintiff,   )
                            ) **Sentencing**

5
vs.                        )
                            )

6
Charles Hillie,            ) Washington, D.C.
                            ) April 2, 2019

7
             Defendant.   ) Time:  2:30 p.m.

_____

8

9
                Transcript of **Sentencing**
                     Held Before

10
        The Honorable Ketanji Brown Jackson
            United States District Judge

11
_____

12
             A P P E A R A N C E S

13
For the Plaintiff:     Andrea Lynn Hertzfeld
                      Kenechukwu O. Okocha

14
                      U.S. ATTORNEY'S OFFICE FOR THE
                      DISTRICT OF COLUMBIA
                      555 Fourth Street, Northwest

15
                      Washington, D.C. 20530

16
For the Defendant:     Joanne D. Slaight
                      LAW OFFICES OF JOANNE D. SLAIGHT

17
                      400 Seventh Street, Northwest, Suite 206
                      Washington, D.C. 20004

18
_____

19
Court Reporter:        Nancy J. Meyer
                      Official Court Reporter

20
                      Registered Merit Reporter
                      Certified Realtime Reporter

21
                      United States Courthouse, Room 6509
                      333 Constitution Avenue, Northwest

22
                      Washington, D.C. 20001
                      (202) 354-3118

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE DEPUTY CLERK:  Your Honor, this is Criminal Case

3   16-030, United States of America vs. Charles Hillie.  We have

4   from the probation department Kelli Willett.  I'm going to ask

5   counsel, please approach the podium and state your appearance

6   for the record.

7          MS. HERTZFELD:  Good afternoon, Your Honor.  Andrea

8   Hertzfeld for the United States of America.

9          THE COURT:  Good afternoon, Ms. Hertzfeld.

10          MR. OKOCHA:  Good afternoon, Your Honor.  Kene Okocha

11   for the United States of America.

12          THE COURT:  Mr. Okocha.

13          MS. SLAIGHT:  Good afternoon, Your Honor.  Joanne

14   Slaight for Mr. Hillie.

15          THE COURT:  Ms. Slaight and Mr. Hillie.

16          We are here for the sentencing of the defendant,

17   Mr. Charles Hillie, who was found guilty after a jury trial of

18   six counts of sexual exploitation and attempted sexual

19   exploitation of a minor, one count of possession of child

20   pornography, nine counts of first- and second-degree child

21   sexual abuse with aggravating circumstances in violation of

22   D.C. law.  The first child sexual exploitation and possession

23   of child pornography counts were under federal law.

24          As you are aware, this hearing was originally

25   scheduled for July of last year, but there were certain

1    disputes regarding the facts within the PSR, and the Court also

2    ordered that the defendant undergo a psychosexual evaluation.

3    Since that time, we have received the results of BOP's

4    evaluation and probation has filed an updated and final

5    presentence report.  Defense counsel has filed a supplemental

6    memoranda in aid of sentencing.  The Court has received and

7    reviewed all of these materials, as well as the sentencing

8    memoranda that both parties had previously filed.  It appears

9    that the parties have engaged in the process of reviewing the

10   revised presentence report and that the final report is

11   complete.

12          Mr. Hillie, this sentencing hearing will essentially

13   proceed in four steps.  The first step of today's hearing is

14   for the Court to determine whether you have reviewed the final

15   presentence report and whether there are any objections to the

16   facts and calculations in the PSR and, if so, to resolve those

17   objections.

18          The second step is for the Court to determine what

19   sentencing guideline range applies to your case based upon your

20   criminal history, the facts that are presented in the PSR and

21   that the Court understands from the trial and other record

22   evidence, and considering any mitigating and aggravating

23   factors that might warrant a departure under the *Sentencing*

24   *Guidelines Manual*.

25          The third step is for the Court to hear from

1    government counsel, from any witnesses that either side would

2    like to present, from your counsel, and from you, if you wish

3    to be heard, about the sentence in this case.

4           The last step requires the Court to fashion a

5    sentence, a fair and just sentence, in light of various factors

6    set forth in federal law and D.C. law.  As part of this last

7    step, the Court will actually impose the sentence, along with

8    other required consequences of the offense.

9           Now, I do realize that as we go through this process

10   it's sometime hard for nonlawyers and for defendants to follow

11   some of the more mechanical procedures that we have to

12   undertake, but as you listen, it is important for you to keep

13   in mind why we're here and what this process is all about.

14          We are here because you have been found guilty of

15   committing conduct that constitutes criminal behavior under

16   federal and state law.  Today's proceeding is a serious matter

17   because it is fundamentally about the consequences that you

18   will have to face as a result of your decision to engage in

19   criminal behavior.

20          All right.  So let's begin by taking a look at the

21   final presentence report.  The revised presentence report was

22   filed in this matter March 18th of 2019.  Let me start by

23   asking Ms. Hertzfeld and Mr. Okocha if the government has any

24   objections to the factual determinations set forth in the

25   presentence report.

```
 1              MS. HERTZFELD:  No, Your Honor.

 2              THE COURT:  Let me ask you if you are expecting any

 3    witnesses.  Are we having an evidentiary hearing of any kind?

 4              MS. HERTZFELD:  No, Your Honor.

 5              THE COURT:  All right.  Mr. Hillie, before I address

 6    your counsel, let me ask you whether you are satisfied with

 7    your attorney in this case.

 8              THE DEFENDANT:  Yes.

 9              THE COURT:  All right.  Do you feel that you've had

10    enough time to talk with her about the presentence report and

11    the papers filed by the government in connection with this

12    sentencing?

13              THE DEFENDANT:  Yes.

14              THE COURT:  Ms. Slaight, have you and your client

15    read and discussed the presentence report?

16              MS. SLAIGHT:  Yes, Your Honor.

17              THE COURT:  And at this time does the defendant have

18    any objection to the factual representations in that report?

19              MS. SLAIGHT:  Yes, Your Honor.  We maintain our

20    objections as filed in the September report --

21              THE COURT:  All right.

22              MS. SLAIGHT:  -- that were --

23              THE COURT:  Some of them were -- I just -- I'm going

24    to need to go through and resolve any of your objections.  Some

25    of them have to do with the facts.  Some of them have to do
```

1    with the -- with the law, and we have two different presence

2    reports that are at issue.  So you're going to have to help me

3    to figure out exactly what it is that you maintain you continue

4    to object to.

5          At this point I'm mostly concerned -- and we'll turn

6    to the calculation, and I'm going to actually have the

7    probation department walk us through the guideline calculation,

8    but I'm interested in any objections to the characterization of

9    the facts, either with respect to the -- of the offense --

10   offenses or Mr. Hillie's background.

11         MS. SLAIGHT:  Your Honor, paragraph 14 is disputed as

12   stated in --

13         THE COURT:  Is this the new?  The new or the old?

14         MS. SLAIGHT:  All of my references will be to the

15   March 18th presentence report.

16         THE COURT:  The March 18th.  Okay.

17         MS. SLAIGHT:  And the paragraph -- page 6, paragraph

18   14.

19         THE COURT:  All right.  And I'm just trying -- and so

20   where is it listed that -- what particular objection do you

21   have to this?

22         MS. SLAIGHT:  In -- in brackets, in paragraph 14, the

23   probation office notes that the parties continue to disagree as

24   to whether the defendant -- what is said in that bracketed

25   language, and that -- that meets the -- the objections filed in

1      the September report, joint report.

2             THE COURT:  All right.  All right.  Your objection is

3      noted, and it's overruled based on the Court's memory of the

4      testimony that was provided at trial, which the Court found

5      credible.

6             MS. SLAIGHT:  Paragraph 15.

7             THE COURT:  I'm sorry.  You're objecting to paragraph

8      15?

9             MS. SLAIGHT:  Yes.

10             THE COURT:  All right.  Let me ask, Ms. Slaight,

11      about the -- which the defendant is asserting presumably that

12      at trial J.A. did not state that she had told -- sorry --

13      J.A.A. did not state that she had told J.A. that she'd been

14      touched?

15             MS. HERTZFELD:  It's actually the other way around,

16      Your Honor; that J.A. reported telling J.A.A.  And she did at

17      trial testify to the fact that she had told her sister about

18      the abuse, as well as other people in her family.  That was one

19      of the elements of her trial testimony.

20             THE COURT:  All right.  So the representation on page

21      40 of the PSR, which has it the other way around, may have it

22      mistaken.  I'm looking at page 40 where it says, paragraph 15,

23      "The defense asserts JAA did not state that she told JA that

24      she had been touched . . ."  But the actual paragraph in the

25      report says, "JA also reported telling her sister, JAA, about

1    her abuse."  And that does comport with the Court's memory with

2    respect to J.A.'s testimony regarding telling other people,

3    including her sister.  Is that the objection?  The PSR

4    statement on page 40 pertaining to paragraph 15 appears to

5    invert the victims.  So what exactly is the defendant's

6    objection?

7        MS. SLAIGHT:  As I stated in the September statement,

8    that it's immaterial what one told the other -- what one person

9    told the other person, and it shouldn't be included in the

10   statement of facts under any circumstances.

11       THE COURT:  Well, the testimony at trial was to that

12   effect, and the Court's understanding is that the PSR is to

13   indicate the facts that have been established or alleged

14   regardless of whether or not they're material directly to any

15   legal issue.  So the objection is overruled.

16       MS. SLAIGHT:  Paragraph 17 is that the -- noted in

17   the presentence report.  The defense objects to the last line

18   in that paragraph because it's redundant and --

19       THE COURT:  Overruled.  The last sentence comports

20   with testimony at trial that the Court found credible.

21       MS. SLAIGHT:  Paragraph 20, ". . . there have been no

22   allegations of abuse regarding KA," and that should not be in

23   the report.  The report characterizes it as no disclosures, but

24   the fact is that there have been -- never been any allegations

25   of abuse.

1          THE COURT:  The report's statements with respect to,

2     quote -- I'm looking at paragraph 20, "KA did not make any

3     disclosures of abuse" is an accurate statement of the facts as

4     the Court understands them, notwithstanding the defendant's

5     suggestion that the report not say anything or that the report

6     say something about whether or not there were allegations.  So

7     I'm going to overrule the objection.

8          MS. SLAIGHT:  Then I would ask that the report also

9     include the fact that there have not been any allegations of

10    abuse against K.A.

11         THE COURT:  Ms. Hertzfeld, does the government have

12    an objection to including that fact?

13         MS. HERTZFELD:  Well, yes, Your Honor, only insofar

14    as we have no idea if in all of the world there have been

15    allegations of abuse against K.A.  I don't know what the answer

16    to that question is, and I don't think there's any way for the

17    Court, Ms. Slaight, or anybody else in the room to have a sense

18    whether that's a correct statement.  What we know is she was

19    forensically interviewed at the Children's Advocacy Center and

20    that in the context of that interview she made no disclosure.

21         THE COURT:  But we also know that no allegations have

22    been made by her, at least in the context of this interview,

23    that pertain to Mr. Hillie abusing her.

24         MS. HERTZFELD:  Well, I think if that's -- I think

25    that's just the flip side of the coin of there have been

1    disclosures.  If we were to limit it to, say, no allegations

2    were made in the context of the Children's Advocacy interview

3    against Mr. Hillie, I think that would be a fair statement.  I

4    think -- I -- as I said, I have no idea whether she's made any

5    allegations to anyone, and I think that would be an unfair

6    characterization.  That would be the only objection.

7            MS. SLAIGHT:  Certainly the government is aware that

8    there have been no allegations made to the government of any

9    abuse by -- regarding her and that that should be in the

10   report.

11           THE COURT:  All right.  So we'll have the probation

12   office include as a part of this paragraph that -- the

13   statement right now is "KA did not make any disclosures of

14   abuse."  And we can say something to the effect of nor did she

15   make any allegations of abuse regarding Mr. Hillie.  And to the

16   extent that it is in the paragraph talking about what happened

17   at the center, I think that covers the scope of it.

18           MS. HERTZFELD:  It does.  Thank you, Your Honor.

19           MS. SLAIGHT:  Paragraph 23 regards -- references the

20   arrest of Mr. Hillie and the seizure of the Dell laptop, and

21   it -- the objection at this point is to the references to J.A.

22   and the -- in the video.

23           THE COURT:  Yes, we saw the videos at trial.  J.A.

24   appeared in the videos.  The Court understands the defendant's

25   objection to be no charges have been brought in relation to

1    J.A. with respect to child pornography or otherwise, which is

2    true, but this is also an accurate statement insofar as J.A.

3    did appear in the videos.  So it will be overruled.

4         MS. SLAIGHT:  Paragraphs 24 through 29 are to the

5    counts of the videos, the video counts, and regarding all of

6    the counts in which Mr. Hillie is charged with attempted

7    pornography, and there was no pornography recovered and no

8    alleged pornography recovered from the videos; that the defense

9    asserts that -- that should be included in the counts, the

10   relevant counts.

11        THE COURT:  That's a legal determination, the counts

12   as being -- the information that's being described in these

13   paragraphs are factual representations of what is viewable in

14   the videos.

15        MS. SLAIGHT:  Well, I would submit to the Court that

16   the -- this -- these paragraphs don't distinguish between the

17   facts showing -- claiming that the complainant was in -- was --

18   there was a less vicious photo in the -- included in the video

19   and those that did not include such.  And so for -- certainly

20   that's an important factor in sentencing.  Either the videos

21   show the person in a less vicious posture or not, and it -- and

22   it's certainly an important factor in sentencing.

23        THE COURT:  All right.  So I guess I don't quite

24   understand the nature of your objection with respect to factual

25   paragraphs that describe what is going on in the video.  If

1  your point is that with respect to the attempt ones, which is

2  Count 4 through 7, the videos don't actually show what the

3  government is claiming here, that's one thing.

4        But you seem to be objecting to the fact that the

5  government has not also included their legal determination

6  about whether or not the video constitutes child pornography as

7  opposed to an attempted child pornography, and I don't think

8  that's material to this section of the report where we're just

9  talking about what the videos show.  If your objection is the

10  video does not show these things, then that's one thing and we

11  can talk about it, but if it's just you think that the ones

12  that were ultimately charged as attempts rather than completion

13  should be somehow so designated, that's overruled.

14        MS. SLAIGHT:  Specifically as to paragraph 24.

15        THE COURT:  24 is not an attempt; right?  24 goes to

16  Count 1 --

17        MS. SLAIGHT:  Right.

18        THE COURT:  -- which --

19        MS. SLAIGHT:  And that video says that the video was

20  29 minutes and 42 seconds in duration, and if the government --

21  if the -- if the duration of the video is included, then the --

22  then the part showing that the -- her in undress should be

23  included also, which is only a few seconds.  It should be made

24  clear it was only a few seconds of video.

25        THE COURT:  Do you know how long the part showing her

1    in a state of undress was?

2              MS. SLAIGHT:  Not off the top of my head right now.

3              THE COURT:  We can make an -- the government,

4    Ms. Slaight, and the probation office will work together to

5    come up with a sentence that is added to what is there that

6    indicates the amount of time that relates to her state of

7    undress with respect to the videos, all of them.  To the extent

8    that you -- if you talk about the time anyplace else -- I don't

9    know if you do -- then each one where it talks about the time

10   will have a sentence that says the portion of the video that

11   depicts her undressed is whatever the time is; all right?

12             MS. HERTZFELD:  Yes, Your Honor.

13             THE COURT:  Does that take care of it, Ms. Slaight?

14             MS. SLAIGHT:  Your Honor, the defense continues to

15   object to in paragraph 25 the references to the other persons

16   in the bathroom.

17             THE COURT:  All right.  That objection is overruled.

18             MS. SLAIGHT:  And that applies to paragraph 27 also.

19             THE COURT:  Which has another person or you're

20   talking about the time?

21             MS. SLAIGHT:  Right, another person.  You said -- the

22   Court said that we would look at all of these videos from

23   paragraphs 20 -- 24 to 29 in terms of the time period.  So I'm

24   not going to repeat that.

25             THE COURT:  Correct.  So 27 also has another person,

1    and the Court is also overruling the defendant's objection to

2    the inclusion of the statement pertaining to the other person

3    in that paragraph.

4              MS. SLAIGHT:  Also paragraph 29 --

5              THE COURT:  All right.

6              MS. SLAIGHT:  -- is the same objection.

7              THE COURT:  Yep.  And same overruling.

8              Let me just ask with respect -- I'm reading the

9    bracket that describes the disagreement on page 30 -- sorry,

10   paragraph 30.  The -- the Court is going to overrule this

11   objection to the extent that the defendant appears to be trying

12   to relitigate the facts that were presented at trial.  The

13   defendant went to trial because he obviously disagrees with the

14   testimony that was being presented by the prosecution and the

15   jury's verdict in this case, but the Court found the witnesses

16   credible to the extent that they talked about the search

17   warrant.  The victims who testified credibly talked about their

18   experiences in terms of Mr. Hillie's behavior.  The Court

19   believed them and certainly, for the purposes of sentencing,

20   finds that by a preponderance of the evidence their testimony

21   was credible and to be believed.  So to the extent that the

22   objection arises from Mr. Hillie's contesting the statements

23   made by those witnesses, it's overruled.

24             MS. SLAIGHT:  Well, the -- the -- the contest was

25   on -- contesting the evidence was on -- or the statements was

1   on two factors, and one of them was a relevance factor.  So

2   even if they were relevant at trial, they certainly would not

3   be relevant in this report.  That's our position.  And they are

4   misleading in that it appears that there may be -- that they

5   may be looked at as the subject of this video when the

6   government certainly didn't allege that at trial.

7           THE COURT:  All right.  Let me just say for the

8   record that the scope of relevancy at sentencing is much larger

9   than it is at trial than it is in terms of the admission of

10  evidence.  Anything related to Mr. Hillie's background, to the

11  crime at issue, to the charges made by the -- the prosecution,

12  anything is fair game in terms of the presentation at

13  sentencing.  And the parties then, when trying to persuade the

14  judge how this case should be sentenced, highlight certain

15  things or tell me not to look at certain things, and you can

16  certainly make the argument that the Court should not take that

17  into account, but in terms of its presence in the PSR, it

18  relates to this case and, therefore, it is perfectly within the

19  bounds of acceptability to be put in the report.

20          MS. SLAIGHT:  The -- we maintain our objection to

21  paragraph 30 as stated in the -- in page 10 of the -- the

22  probation report -- or the presentence report.  Again, this is

23  not relevant and -- I -- I understand the Court's position.

24  We'll just make for the record our position that it's not

25  relevant.  It doesn't --

```
 1              THE COURT:  Are you talking about 30a?

 2              MS. SLAIGHT:  30.

 3              THE COURT:  30.  Okay.  What about 30a, that -- I

 4    think I excluded that from trial, correct, Ms. Hertzfeld?  30a

 5    was the other video.  I can't even remember if you offered it,

 6    but it came -- it was in the record of proceedings, so far as

 7    it was extracted from the laptop, but I don't think it came in

 8    at trial.

 9              MS. SLAIGHT:  It -- the government didn't offer that.

10    It was regarding an adult --

11              THE COURT:  Yes.  Right.

12              MS. SLAIGHT:  -- at most.  The government never

13    offered that video.

14              THE COURT:  Right.

15              MS. SLAIGHT:  And it's our position that there's no

16    way to determine whether that's a crime.  There was no way to

17    determine who -- who -- who took that video, and it should be

18    excluded.

19              THE COURT:  Ms. Hertzfeld.

20              MS. HERTZFELD:  Well, again, Your Honor, to the

21    Court's prior point, this is -- it's true this wasn't offered

22    as part of the evidence at trial.  It wasn't relevant to the

23    crimes that were charged and for which Mr. Hillie was tried.

24    It is relevant conduct from the government's perspective in

25    terms of the totality of the forensic evidence that was
```

1    available to inform the defendant's history, characteristics,

2    and other conduct.  And it's offered here as part of the

3    presentence report and a description of what appeared in that

4    video, which Ms. Slaight had an opportunity to observe.  I'm

5    not sure there's any objection of the characterization of the

6    facts, and if that's the case, I think it is appropriate to

7    include and for the government to point to it as a relevant

8    piece of evidence to consider in terms of his relevant conduct

9    at sentencing.

10              THE COURT:  Ms. Slaight.

11              MS. SLAIGHT:  I did look at the video and I don't --

12   I don't see how the government -- and I realize the government

13   is saying that they -- there were tattoos.  I didn't see any

14   tattoos in this video.  It's my position that we don't even

15   know who took this video.

16              THE COURT:  Is it your position that the defendant,

17   Mr. Hillie, is not in the video?  It is not Mr. Hillie in the

18   video?

19              MS. SLAIGHT:  I don't know who's in the video.

20              THE COURT:  Or you don't know.

21              MS. HERTZFELD:  It's -- it's my position that we

22   don't know who's in the video.  It's not identifiable.  And I

23   realize that the government says that there were tattoos on the

24   hands.  That -- I did not see that.  So I did look at the

25   video.

1          THE COURT:  All right.  Well, I may have to look at

2     the video in order to determine because I didn't -- it wasn't

3     introduced at trial.  So, therefore, I don't have a clear

4     recollection of the Court's perspective.  I know I had looked

5     at all the videos prior to trial, but it's been a long time.

6          MS. HERTZFELD:  I think we did submit it, Your Honor,

7     with the original sentencing memo for the Court to review.

8          THE COURT:  I think you did, but I don't know whether

9     we crossed this bridge before in terms of Ms. Slaight's

10    objection.  I don't know if we ever focused on this, because I

11    think the government said they weren't intending to offer it at

12    trial.  So we didn't really engage as to whether or not it was

13    Mr. Hillie in the video or not.

14         MS. SLAIGHT:  And I would just note that this is --

15    nobody disputes that this was an adult in the video.  The

16    female in the video was an adult.

17         THE COURT:  Understood, but that's why the government

18    didn't charge it as any sort of sexual assault.  Nevertheless,

19    given the Court's position and the law's position with respect

20    to the broader scope of information pertaining to sentencing,

21    the only question I would think is whether it actually is

22    Mr. Hillie in the video, because if it is, then it does clearly

23    indicate -- or is relevant to the Court's considerations in

24    terms of relevant conduct.  It doesn't have to be charged

25    conduct.  It doesn't have to be conduct for which a defendant

1    has been found guilty in order to be considered at sentencing.

2              The question I guess is just whether it is, in fact,

3    Mr. Hillie who is depicted in the video in the way that it is

4    described.  And I can't answer that because I haven't seen it

5    with an eye toward focusing on that yet.  So I'm going to have

6    to table that one question, and for now, let's not have that

7    factor into the Court's sentencing determination.

8              That's it for the facts, I think.  We're at the point

9    of the report where there's an offense level computation.  Is

10   that all for the factual representations?

11             MS. SLAIGHT:  Yes, Your Honor.

12             THE COURT:  All right.  So I made my rulings with the

13   exception of the video one, the last video that has been

14   discussed pertaining to the facts.  Let me do this:  In the

15   interest of sort of making sure that we're all clear on the

16   calculation, I'm going to ask Ms. Willett to come forward and

17   walk us through what the probation office has proposed with

18   respect to a fairly complicated guideline calculation.

19             THE PROBATION OFFICER:  Good afternoon, Your Honor.

20             THE COURT:  Good afternoon.

21             THE PROBATION OFFICER:  For the purposes of the

22   guidelines, for violations of the U.S. Code convictions, which

23   are listed in Counts 1 through 7, the probation office's

24   position as -- with the exception of Counts 2 and 3 -- each of

25   those other remaining counts involve separate harms occurring

1   on different dates.  Those -- those counts don't group under

2   the provisions of 3D1.2.

3          We do believe that Counts 2 and 3 group because they

4   involve essentially the same conduct, and we did group those

5   provisions under 3D1.2(a) and (b).  Under our analysis, we have

6   a total of six resulting groups.

7          Group 1, which is Count 1, sexual exploitation of a

8   minor, in which the prevailing guideline is 2G2.1(a).  Group 2,

9   which is the combination -- or the grouped counts of Counts 2

10  and 3, the prevailing guideline is also 2G2.1.  For both of

11  those groups, the base offense level we have determined is 32

12  with enhancements or specific offense characteristics of two

13  levels for a minor having attained the age of 12 but not the

14  age of 16 and an additional two levels because the minor was in

15  the custody, care, or supervisory control of the defendant.

16  That applies to both groups, Groups 1 and 2.

17          THE COURT:  All right.

18          THE PROBATION OFFICER:  Groups 3, 4, 5, and 6 relate

19  to Counts 4, 5, 6, and 7, which are convictions for attempted

20  sexual exploitation of a minor.  For those counts, the

21  prevailing guideline is 2G2.1.  The calculation listed for each

22  of those groups are the same for each group with a base offense

23  level of 32, a two-level enhancement because the offense

24  involved a minor who had attained the age of 12 but had not

25  attained the age of 16, and a two-level enhancement because the

1    minor was in the custody, care, or control of the -- of the

2    defendant.

3              Under 3D1.4, a total of six units result, and that

4    causes an offense level increase of five and a -- and a

5    combined adjusted offense level of 41.

6              THE COURT:  And that's five above the 36, which was

7    the amount for the highest group.  They're all the same, but --

8              THE PROBATION OFFICER:  That's correct, Your Honor.

9              THE COURT:  All right.

10             THE PROBATION OFFICER:  There is a Chapter 4

11   enhancement that applies for repeat and dangerous sex offenders

12   against minors under 4B1.5(b)(1), and that is applied because

13   the defendant engaged in a pattern of activity involving

14   prohibited sexual conduct.  That -- with that enhancement, the

15   total offense level is 46.

16             However, in Chapter 5, there -- in rare instances

17   where the total offense level is above a 43, the offense level

18   is treated -- the total offense level is treated as a 43.  So

19   the default offense level -- total offense level is 43 --

20             THE COURT:  All right.

21             THE PROBATION OFFICER:  -- for the federal counts,

22   Your Honor.

23             THE COURT:  All right.  Let me just ask you a couple

24   of things because I know Ms. Slaight has objected to a couple

25   of aspects of this, and I'm going to give you the opportunity

1    to respond to the objection before I hear from her.

2              One of them is the concern that we have six separate

3    groups rather than maybe two.  Why is it that the probation

4    office believes that Counts, for example, 4, 5, 6, and 7 should

5    not be grouped?

6              THE PROBATION OFFICER:  Okay.  Your Honor, I believe

7    that the defense had an objection to Counts 4 through 7

8    pursuant -- that those offenses should be grouped but also the

9    prevailing guideline under that guideline should be 2X1.1.

10             THE COURT:  Yes, that was going to be my second

11   question, but my first question is:  Why don't they all group?

12   You mentioned having distinct times and that sort of thing, but

13   what is it about these offenses that caused them not to be

14   grouped together under the guidelines?

15             THE PROBATION OFFICER:  That's correct, Your Honor.

16   It's our view that each of those counts -- the conduct in each

17   of those counts represents a distinct and composite harm to

18   each of the victims -- or of the victim, said victim, and they

19   can't be grouped under the provisions of 3D1.2, which was the

20   argument.  They also can't be grouped under the provisions of

21   3D1.2(d) because those groups -- or those counts are

22   specifically included under the grouping rules.  And I believe

23   all of those guidelines come back to 2G2.1, Your Honor.

24             THE COURT:  So -- so -- sorry.  3D1.2(d) tells us

25   what can be grouped, and it's not included in that listing; is

1    that correct?

2              THE PROBATION OFFICER:  That's correct, Your Honor.

3              THE COURT:  And, in addition, the probation also sees

4    that these are separate instances and, therefore, represent

5    distinct harms?

6              THE PROBATION OFFICER:  That's correct, Your Honor.

7              THE COURT:  All right.  Why are they -- since they

8    have been charged as attempts are not 2X1.1?

9              THE PROBATION OFFICER:  Okay.  So that would apply.

10   The argument applies to Counts 4 through 7, which are the

11   attempted sexual exploitation counts.  According to the

12   guideline under 2X1.7, the reduction doesn't apply for a

13   defendant who's completed all the acts that he believes

14   necessary to -- to complete the offense, which is this

15   scenario.  And in this case the defendant's -- was unable to

16   get -- the problems resulted from problematic lighting, camera

17   angles, and victim's movements, not because of his attempts or

18   the acts that he believed that he was completing to get the --

19   the footage that he wanted to get.  So we did not apply 2X1.1.

20             THE COURT:  All right.  So -- and I guess another way

21   of putting this is that even if you had applied 2X1.1, as I

22   read that guideline, it says use the base offense level from

23   the guideline for the substantive offense, plus any adjustments

24   from such guideline for any intended offense conduct that can

25   be established with reasonable certainty.  So it gives you the

1    same result.  The only issue would be whether the specific

2    offense characteristics in 2X1.1 would apply to mitigate

3    because of the decrease, and you're saying there is no decrease

4    because under 2X1.1(b)(1), Mr. Hillie believed that he had done

5    everything that was necessary for successful completion.  So he

6    doesn't get any decreases under 2X.

7           THE PROBATION OFFICER:  That's our understanding,

8    Your Honor.

9           THE COURT:  All right.  Ms. Hertzfeld, do you have a

10    view -- and then I'll go to Ms. Slaight -- as to whether this

11    should be 2X1.1 without any decrease which comes out to the

12    same thing because you've charged it as an attempt, or is the

13    guideline that is operative with respect to Counts 4 to 7

14    2G2.1?

15           MS. HERTZFELD:  Yes, Your Honor, I think the

16    operative guideline is 2G1.1.  Although I think Your Honor is

17    correct that if you were to -- I don't think 2X1.1 applies for

18    the very reasoning that Your Honor described, but I think

19    you're correct that even if it were applied, the result would

20    be the same in either instance.

21           THE COURT:  Right.  Because it's -- it's

22    incorporating the substance of any other applicable guideline,

23    which would be the 2G2.1.

24           MS. HERTZFELD:  Yes, Your Honor.

25           THE COURT:  Okay.  Ms. Slaight, so I guess my

1   question is whether and to what extent you are proceeding with

2   respect to the objections you have made regarding the guideline

3   calculation.

4            MS. SLAIGHT:  We are 100 percent proceeding.

5            THE COURT:  All right.  Do you have any additional

6   argument that you would like to make?

7            MS. SLAIGHT:  No.  The -- the counts should be

8   grouped.  Counts 1 through 7 should be grouped because it's the

9   same criminal objective, part of the same common scheme or

10  plan, and -- and the 2G2.1 commentary note states, as in the

11  commentary, for example, that the multiple videos involving one

12  minor should be -- well, it's stated that multiple counts

13  involving separate minors are not to be grouped together.  So

14  the implication is that multiple -- multiple videos involving

15  one minor should be grouped together.

16           Concerning the attempt, as I stated in the memo, my

17  sentencing memorandum, it -- to treat Mr. Hillie as if he had

18  completed the offense and not under the attempt guideline,

19  which is -- which does not include this offense, would be to

20  make absolutely no difference between attempt and to really

21  undermine the attempt guidelines completely.

22           In this case Mr. Hillie didn't try to influence

23  the -- to say that Mr. Hillie had done everything he could have

24  done, and so the offense was completed, I think, is not -- is

25  not accurate because he didn't try -- there are differences

1    between his case and other cases.  He didn't try to influence

2    the complainant in this case.  He didn't have any influence.

3    He didn't even influence whether they entered the room.  He

4    didn't entice them.

5         And I pointed to the rabbi case as a classic example

6    of a video where the person was -- even though the person

7    didn't -- the rabbi didn't know when he entered the room --

8    when these people entered the room for sure whether they would

9    undress, the rabbi enticed them to enter the room to undress.

10   Mr. Hillie didn't do any of that, which makes -- and the

11   offense was not completed.  Nobody argues that the offense was

12   completed, and that under these circumstances, the attempt

13   guidelines would qualify.

14        THE COURT:  All right.  The Court is going to

15   overrule the objection.  I concur with the probation office's

16   analysis.  This notion of the videos all being part of a common

17   scheme or plan, the language that you use, Ms. Slaight, appears

18   to come from the relevant conduct guideline, but when we're

19   talking about grouping, there is a guideline that covers

20   whether or not offenses group.  It is found in Section 3D of

21   the *Guidelines Manual*.  It tells us when you have aggregate

22   offenses or you have offenses that appear to be similar in

23   nature, whether they are treated in the aggregate in this case,

24   and at 3D1.2(d) there is a specific listing of the offenses

25   that are to be grouped.

1        And offenses under 2G2.1, such as those we have here,

2   are not listed.  The -- the Court concurs with the probation

3   office's view that although we have the same minor, these are

4   separate instances.  They're different times.  Therefore, they

5   represent different harms and not the type that can be

6   aggregated as the guideline indicates.

7        I will also note that in that same guideline

8   provision there is a listing of specifically excluded from the

9   operation of grouping guidelines, and it is there that we find

10  2G2.1.  So the Court would be hard-pressed to conclude that

11  these offenses group under the guideline as it is currently

12  written.

13       I also concur with the probation office's view that

14  2X1.1 is not the relevant guideline provision, and that even

15  so, it leads to the same result.  If we turn to 2X1.1, we see

16  that it incorporates as the base offense level -- the base

17  offense level from the guideline for the substantive offense,

18  which in this case would be the Base Offense Level 4, the

19  completed production of child pornography offenses at 2G2.1 and

20  any adjustments from those guidelines.

21       So this notion that attempt is treated differently

22  under the guidelines is not necessarily so.  One would think,

23  you know, in general as sort of the theoretical matters that

24  attempts should have a different outcome, but in many cases in

25  the law that is not the case, and with respect to the

1    calculation of the guidelines, the way attempts get treated

2    differently is with respect to the operation of the specific

3    offense characteristic in 2X1.1, which does not apply, the

4    Court finds, in this circumstance.

5            I am referencing 2X1.1(b)(1), which does allow for

6    decreases in attempt circumstances, but only if the defendant

7    did not complete all of the acts that he believed necessary for

8    successful completion of the substantive offense.  And in this

9    case, as the Court remembers all of the videos that we showed

10   at trial, and for which Mr. Hillie has been charged and now

11   convicted, he placed the camera in exactly the same way.  He

12   was clearly attempting to produce the same kinds of images that

13   he successfully produced on other occasions, and it just so

14   happened that because of the lighting or because of the

15   circumstances, he was not successful.  So that is not a

16   situation that under the guidelines warrants the three-level

17   decrease for attempt.  Therefore, the Court does agree with the

18   probation office that the total offense level in this case

19   prior to the Chapter 4 enhancement is 41 based on the grouping

20   rules and the operation of 3D1.4, and then we have the Chapter

21   4 enhancement.

22           Ms. Slaight, I don't know if you want to say anything

23   more about that, because we didn't discuss it.  The probation

24   office adds five for pattern of activity involving prohibited

25   sexual contact -- or conduct under 4B1.5(b)(1).  Is the

1      defendant maintaining his objection to that increase?

2             MS. SLAIGHT:  Absolutely.  This is really getting

3      into triple counting here.  They are -- the government --

4      the -- under the guidelines, as they're interpreted, the --

5      the -- according to the interpretation by the probation office,

6      it is not a pattern of activity for grouping, but it is for

7      enhancements, and it's -- it's just really piling on.  And I

8      have -- I'm trying to refer to the -- page 7 of my sentencing

9      memo refers to the -- the enhancement for pattern of activity,

10     and that would -- by enhancing and triple counting these

11     offenses, it would violate Section 3D1.2(c), provides for

12     grouping where there's -- where the count is considered an

13     offense characteristic for a different guidelines enhancement.

14            THE COURT:  All right.  The Court is also going to

15     overrule that objection.  As far as we can tell, the sentencing

16     commission, per 4B1.5, intended for there to be an additional

17     enhancement for individual defendants who could be construed as

18     repeat and dangerous sex offenders against minors and that the

19     predicate determination is whether the instant offense of

20     conviction is a covered sex crime, which these are, and the

21     defendant engaged in a pattern of activity involving prohibited

22     sexual conduct, which the Court finds that the defendant has

23     insofar as he has been now convicted of many instances of

24     sexual conduct -- prohibited sexual conduct with respect to the

25     victims at issue.

1              So the total offense level as the probation office

2       indicated was 46.  It will be treated under the guidelines as a

3       Level 43 because that is the cap.  The probation department in

4       the report goes on to discuss the D.C. voluntary guideline

5       computation with respect to the classification of Counts 8, 9,

6       10, 12, 13, 14, 15, 16, and 17.  As you know, Count 11 was

7       dismissed at trial for lack of evidence, and so we're just

8       dealing with those remaining D.C. counts.

9              Let me ask the parties if there's any objection to

10      the classification under the D.C. guidelines that is listed in

11      paragraphs 97 through 100 of the presentence report.

12              MS. HERTZFELD:  No, Your Honor.  Thank you.

13              MS. SLAIGHT:  No, Your Honor.

14              THE COURT:  All right.  So for the purpose of the --

15      oh, the next stage then is to review the criminal history

16      calculation.  With respect to the federal guidelines, the

17      presentence investigation has found that Mr. Hillie has two

18      prior convictions that received criminal history points in the

19      federal *Guidelines Manual* and that these convictions result in

20      a criminal history subtotal of four.  In addition, there are

21      two points added because the instant offense -- offenses were

22      committed while Mr. Hillie was under sentence for those prior

23      convictions, which means that the criminal history point total

24      is six.  This puts Mr. Hillie in criminal history Category III.

25      Is there an objection to this criminal history calculation

1    under the federal guidelines?

2                    MS. HERTZFELD:  No, Your Honor.

3                    MS. SLAIGHT:  No, Your Honor.

4                    THE COURT:  All right.  Per the D.C. guidelines,

5    Mr. Hillie's prior conviction yielded a criminal history

6    category score of 1.25, which places him in criminal history

7    Category B.  Is there an objection to that classification?

8                    MS. HERTZFELD:  No, Your Honor.

9                    MS. SLAIGHT:  No, Your Honor.

10                   THE COURT:  All right.  So for the federal counts,

11   given the criminal history category of III and an adjusted

12   offense level of 43, the applicable sentencing range under this

13   case -- in this case under the federal guidelines is life

14   imprisonment.  Now, what we know is that when there's a

15   statutory max -- mandatory minimum and maximum, that impacts

16   what the guideline range is in any given case.

17                   So in a minute I'll talk about the applicable

18   statutory maximum for the federal counts, but at least under

19   the guidelines is there -- other than the objections that have

20   already been voiced, is there any objection to the calculation

21   that the Court has indicated under the federal guidelines.

22                   MS. HERTZFELD:  No, Your Honor.

23                   THE COURT:  Understanding you're preserving all of

24   your objections to the calculations as --

25                   MS. SLAIGHT:  Right.  I'm preserving all of my

1   objections.

2              THE COURT:  All right.  The defendant will preserve

3   all their objections but appears to agree that I have at least

4   read the sentencing table correctly with respect to the

5   determinations that the Court has made.

6              For the D.C. charges, in light of the D.C. guideline

7   criminal history category of B, Mr. Hillie faces a guideline

8   range of 102 to 192 months of incarceration for Count 8; 24 to

9   99 months for Counts 9 and 10; 18 to 63 months for Count 12;

10  and 24 to 99 months for Counts 13 to 17.  Have I accurately

11  stated the ranges applicable under the *D.C. Voluntary*

12  *Guidelines*?

13             MS. HERTZFELD:  You have, Your Honor.

14             MS. SLAIGHT:  Yes, Your Honor.

15             THE COURT:  All right.  The next step is to consider

16  departures.  The PSR did not include any departure grounds.

17  Neither party mentioned any with specificity in your sentencing

18  memoranda.  So let me ask now if there are any bases for a

19  departure as distinguished from a variance that each -- any of

20  the parties wishes to assert.

21             MS. HERTZFELD:  No, Your Honor.

22             MS. SLAIGHT:  Your Honor, as the Court knows, the

23  defense listed a number of reasons that the Court should go

24  below the guidelines but fashioned them as variances rather

25  than departures, so...

1          THE COURT:  Yes, I do know.  And we'll be discussing

2    variances momentarily.  I just wanted to know if there were

3    specified departure grounds under the *Guidelines Manual*.

4          MS. SLAIGHT:  They were not listed as departures.

5          THE COURT:  Okay.  All right.  So -- good.

6          Section 3553 requires the Court to consider a variety

7    of factors, including the guideline ranges that I have just

8    articulated, and also the applicable penal statutes.  So at

9    this point in my sentencings, I generally describe the

10   applicable statutory and guideline penalties for the offenses

11   at issue.  The federal charges, which are Counts 1 and 2 --

12   1 through 7, actually -- for Counts 1 and 2 and 4 through 7,

13   Mr. Hillie has been charged of -- charged with and now

14   convicted of sexual exploitation and attempted sexual

15   exploitation of a minor in violation of Title 18, Sections

16   2251(a) and (e).  These charges carry a statutory maximum

17   penalty of 30 years of imprisonment.  They also carry a

18   statutory mandatory minimum of 15 years of imprisonment.

19         Count 3 charges Mr. Hillie with possession of images

20   of a minor engaging in sexually explicit conduct in violation

21   of Title 18, Sections 2252(a)(4)(B) and (b)(2).  This count

22   carries a statutory maximum penalty of ten years of

23   imprisonment and no statutory mandatory minimum.

24         In addition, because the offenses charged as Counts 1

25   through 7 constitute Class B felonies under federal law, a

1    sentence of probation is expressly prohibited by statute.

2          Mr. Hillie faces a statutory supervised release range

3    following imprisonment of counts -- on Counts 1 through 7.  The

4    supervised release range is up to life.  These charges also

5    carry a statutory mandatory minimum period of supervised

6    release of at least five years.  That is also the range

7    prescribed by the guidelines.

8          And with respect to the federal counts, the statutes

9    of conviction for Counts 1 through 7 set a maximum fine of up

10   to $250,000, while the guideline fine range is between 25,000

11   and 250,000 dollars.  Additionally, Mr. Hillie will have to pay

12   a mandatory special assessment of $100 per count for counts --

13   $100 for Counts 1 through 7 for a total of $700.

14          Let me pause and ask the government whether or not

15   the special assessment is applicable to the D.C. counts as

16   well.  Do you know?

17          MS. HERTZFELD:  There is a special assessment.  I

18   think it's $50, is applicable for the D.C. offenses.

19          THE COURT:  All right.  Ms. Slaight, are you aware of

20   the special assessment for the D.C. counts?

21          MS. SLAIGHT:  Right.  It's -- it's called --

22          THE COURT:  It's called something else.

23          MS. SLAIGHT:  Probably called something else, but,

24   right, there's an assessment for the counts.

25          THE COURT:  All right.  We'll have to figure that

```
 1      out.  Ms. Willett, are you aware of --

 2              THE PROBATION OFFICER:  Yes, Your Honor.  There's a

 3      special assessment between the amount of a hundred and 5,000

 4      dollars for each felony conviction for the D.C. Code offenses.

 5              THE COURT:  Between a hundred and --

 6              THE PROBATION OFFICER:  The range is 100 and 5,000

 7      dollars -- $100 to $5,000.  So the Court can impose a minimum

 8      of $100 or a maximum of $5,000 as a special assessment under

 9      the D.C. Code charges, and that's for the Victims of Violent

10      Crime Compensation Emergency Amendment Act of 1996.  That's

11      under the statute, but it's not a guidelines provision under

12      the D.C.

13              THE COURT:  All right.  I'm wondering whether that's

14      a special assessment, or is that more of like a restitution

15      kind of provision for D.C. law?

16              THE PROBATION OFFICER:  We generally look at it as a

17      special assessment, as it's required as -- as a component of

18      the -- of the sentence under the -- under the D.C. Code

19      offenses, which is our understanding, Your Honor.

20              THE COURT:  All right.  Let me ask, Ms. Hertzfeld,

21      does that comport with your understanding of --

22              MS. HERTZFELD:  I agree that it is a requirement, and

23      I believe it is a special assessment that's required to be

24      imposed by the Court.  Those are -- and I was just talking to

25      Mr. Okocha about this because he's dealt with the D.C. Code
```

1    offenses more recently.  My understanding was it was a $50

2    minimum fine.  I can't remember if that's --

3               THE COURT:  But are you referencing --

4               MS. HERTZFELD:  -- changed.

5               THE COURT:  Are you referencing the same provision

6    that she's talking about?

7               MS. HERTZFELD:  Yes.  Yes.  I'm just not sure of the

8    numbers.

9               THE COURT:  Okay.  But that is considered a special

10   assessment under D.C. law?

11              MS. HERTZFELD:  Yes, Your Honor.

12              THE COURT:  All right.  Okay.  With respect to the

13   D.C. charges in terms of the imprisonment, Count 8 charges

14   Mr. Hillie with first-degree child sexual abuse with

15   aggravating circumstances in violation of Title 22 of the

16   D.C. Code, Section 3008, 3020(a)(2) and (5).  This charge

17   carries a statutory maximum of life imprisonment, and under the

18   *D.C. Voluntary Guidelines*, this charge -- this charge carries a

19   range of imprisonment from 102 to 192 months.

20              Counts 9 and 10 charge Mr. Hillie with second-degree

21   child sexual abuse with aggravating circumstances in violation

22   of 22 D.C. Code 3009, 3020(a)(2) and (5).  These charges carry

23   a statutory maximum of 15 years of incarceration.  Under the

24   *D.C. Voluntary Guidelines*, this charge carries a range of

25   imprisonment from 24 months to 99 months.

1          Count 12 charges Mr. Hillie with second-degree sexual

2    abuse of a minor with aggravating circumstances in violation of

3    Title 22, D.C. Code 3009.02 and 3020(a)(5).  This charge

4    carries a statutory maximum penalty of 11 years and three

5    months of incarceration.  Under the *D.C. Voluntary Guidelines*,

6    the range is 18 to 63 months.

7          And Counts 13 through 17 charge Mr. Hillie with

8    second-degree child sexual abuse with aggravating circumstances

9    in violation of Title 22, D.C. Code 3009 and 3020(a)(2) and

10   (5).  These charges carry a statutory maximum penalty of 15

11   years, and under the *D.C. Voluntary Guidelines* the applicable

12   range is 24 months to 99 months.

13         Unlike the federal counts for Counts 8 through 10 and

14   12 through 17, Mr. Hillie is eligible for a term of probation

15   not exceeding five years for each count.  And if a term of

16   imprisonment is imposed on the state charges, the D.C. statutes

17   provide that Mr. Hillie faces a supervised release range

18   following imprisonment.  For Count 8, the statutory maximum

19   period of supervised release is life.  Count 8 also carries a

20   statutory mandatory minimum of supervised release of five

21   years.

22         For Counts 9 and 10 and 12 through 17, if the Court

23   imposes a sentence of imprisonment of more than one year, the

24   D.C. statutes provide for a maximum period of supervised

25   release of ten years.  Counts 9 and 10 and 12 through 17 also

1    carry a statutory mandatory minimum period of supervised

2    release of three years.  Multiple terms of supervised release

3    are required to run concurrently.  The *D.C. Voluntary*

4    *Guidelines* do not prescribe any requirement regarding the

5    imposition of a supervised release term, in terms of its

6    concurrence versus consecutive imposition.

7            The statutes of conviction for D.C. set a maximum

8    fine of up $125,000 for Count 8 and up to $37,500 for Counts 9

9    and 10 and 12 through 17.  In addition, Counts 8 through 10 and

10   12 through 17 carry a mandatory special assessment.  This is

11   what Ms. Willett was discussing, between $100 and $5,000 for

12   each count.

13           Finally, there are applicable restitution provisions

14   under both federal and state law.  For the federal counts,

15   Counts 1 through 7, restitution is mandatory under both the

16   statutory provisions and the guidelines.  For the state counts,

17   the Court may require restitution under state law.

18           I know I was talking quickly, and there were a lot of

19   provisions, but as far as you can tell, have I stated

20   accurately the statutory and guideline framework under which we

21   are operating?

22           MS. HERTZFELD:  You have, Your Honor.

23           MS. SLAIGHT:  Yes, Your Honor.

24           THE COURT:  All right.  We've reached the point where

25   the parties now have an opportunity to address the sentencing

1    guideline calculation and the Court's considerations under

2    3553(a).

3              Let me ask Ms. Hertzfeld whether the government would

4    like to speak about the application of the factors and to

5    supplement the information already presented in your memo.

6              MS. HERTZFELD:  Yes, Your Honor, I would.  Thank you.

7              Your Honor, first, I would like to point out that

8    generally at one of these sentencings we take the first

9    opportunity to have the Court hear victim impact statements

10   from the victims in the case.  In this case, neither one of the

11   two victims who testified at the trial wanted to be here in

12   Court with Mr. Hillie again today.  Both of them were able to

13   testify at trial so the Court could have a full appreciation of

14   what they had suffered in terms of the conduct at Mr. Hillie's

15   hands, and I think both had an opportunity to tell the Court in

16   some measure about the impact that that's had on them and their

17   family, which has certainly been a vast impact.

18             We've been in constant contact with the two victims,

19   Mr. Okocha and I, since the trial to talk to them about their

20   right to be here today, and as I said, neither one of them

21   wanted to be in the same room with Mr. Hillie for reasons that

22   I think are apparent from their testimony at trial.  It was a

23   feat for either one of those children to walk into this

24   courtroom on the day that they testified in front of the jury

25   and to be in the same room with him again after what they've

1    suffered, and I think that was the extent of the conduct

2    that -- the contact they wanted to have, and the reasons for

3    that are evident.

4         They did both give us updates in terms of what's

5    going on with them, and I think it's -- at sentencing there's

6    not a lot of hopeful things sometimes to say, but I think one

7    hopeful thing to say is both of these girls since they have

8    come out from living under the weight of being in a house with

9    Mr. Hillie have made tremendous progress and really great turns

10   in their lives.

11        J.A.A. is doing very well.  We just spoke to her.

12   She's accepted a new job at a security firm.  She's doing well.

13   She's still extremely traumatized by the impact of this on her

14   family.  The damage that's been caused to the relationships, I

15   think, with her aunt, her mother, and her sister were apparent

16   at trial, and those are still things that she's struggling to

17   resolve and move forward with in her life.

18        We spoke to J.A. as well.  She's still in high

19   school.  She has, since she has testified at this trial,

20   managed to continue successfully publishing poetry.  She is in

21   a college prep program and is college bound.  She's found

22   tremendous support living with her father and sibling there and

23   I think is -- by all counts seems to be a tremendous success

24   story in light of what she suffered at Mr. Hillie's hand before

25   she even reached double digits in her age.  So that's really a

1    testament to what both of these girls have been able to

2    achieve, I think, despite what Mr. Hillie inflicted on them.

3         Up until there was a criminal prosecution of this

4    defendant, they had received very little reinforcement in their

5    lives at what the defendant was doing was just not wrong and

6    abusive, but it was actually illegal, and I think one of the

7    important things for them to know is that it was important to

8    them in going forward at this trial is to receive some

9    reinforcement from the government and I hope today from the

10   Court that, in fact, what Mr. Hillie did is wrong, that it is

11   criminal.  I think the jury affirmed that for them and that

12   it's deserving of a significant punishment.

13        These were two kids who I'm sure, as Your Honor

14   heard -- and I'm not going to belabor what we've put into our

15   sentencing memo -- but their lives were turned upside down by

16   this defendant.  His sexual abuse and his production of child

17   pornography involving J.A.A. are by themselves enough to

18   warrant a really significant punishment.  And the damage that

19   he did to the kids and to their family, I think, was palpable

20   from them, it was palpable from their aunt who testified at

21   trial, and that -- that -- his actual criminal charge found

22   that this jury convicted him of was not the totality of it.

23        Your Honor heard testimony about his just day-to-day

24   harassment of these kids, and, you know, there's some instances

25   mentioned in the government's sentencing memorandum where they

1    really witnessed terrible acts of violence as a result of the

2    defendant being in their home.  We described some of those

3    things.  But the bottom line is, you know, these children saw

4    and experienced things in their early, formative years because

5    of Charles Hillie that no child should have to witness or to

6    bear themselves.  And the reason they experienced them is

7    because the defendant had an opportunity, because of their

8    mother, to live in the same small apartment with them, and he

9    took advantage of every opportunity he had to do those things

10   to them.

11        Consider for a second what it must have been like for

12   them and what they describe in these court proceedings and in

13   other court proceedings cited in the government's memo where

14   they had absolutely no place to escape this person living in

15   their home.

16        It's clear, I think, both from his extensive criminal

17   record and the arrest record which goes back almost two decades

18   that Mr. Hillie is at best volatile and unpredictable and at

19   worst extremely violent.  His criminal history, I think, vastly

20   understates his contacts with the criminal justice system given

21   the number of domestic-related offenses that were committed

22   beyond those which -- which he's convicted, you know, in his

23   prior record in large part because some of those victims didn't

24   come forward and testify at trial.  The children -- the child

25   victims' here mother was a victim of some of those assaults,

1    and the record makes clear there's been multiple family members

2    who have had to go to the Court to seek orders of protection

3    from Mr. Hillie.

4           It's very little wonder in light of all of that

5    background that these were two kids who were just afraid to be

6    living in their own home, and I think their testimony at trial

7    captured that better than anything I could say about that, and

8    it's obvious that even though they have seemed to manage, to

9    forge successful lives despite it, that the damage to them

10   throughout their childhood is going to be irreparable.

11          It's clear why both J.A. and J.A.A. didn't want to be

12   in court to testify against him.  I mean, the last time that

13   J.A. saw Mr. Hillie before she had the courage to come up here

14   and testify at trial was the day she tried to verbalize to her

15   mother the abuse that she was suffering and he struck her in

16   the face knocking her to the ground.  I mean, the idea that

17   that's the last time she saw him all those years ago and she

18   came back in despite all that and was able to tell her story, I

19   think, is truly remarkable.  These kids had the courage to get

20   up on the witness stand and testify against Mr. Hillie even

21   when they didn't have very much support for doing so and at

22   times even the opposition of their mother.

23          And I think it's important that the reason that they

24   had to do that is because Mr. Hillie didn't accept

25   responsibility for what he had done to those kids, and even

1  after conviction by a jury, 12 people, unanimously, of guilt

2  beyond a reasonable doubt of his crimes, he has continued to

3  this day to refuse to express remorse, to refuse to accept any

4  kind of responsibility for what he's done, or to in any way

5  make apologies to the two girls whose lives he's so seriously

6  destroyed.

7          I think it's clear from the nature and the

8  circumstances of the offense here, just based on that, there's

9  no reason for the Court to vary from the guidelines here, and

10  so the government has recommended, I know, a very high sentence

11  in this case.  And I think it's a truly small number of cases

12  where the only real option in light of a defendant's history,

13  characteristics, the offense is just incapacitation.  It's very

14  rare that the government comes in asking for pure

15  incapacitation, where there's nothing else to be done.

16          But I think here Mr. Hillie is somebody who clearly

17  has been unable to conform his behavior to the requirements of

18  the law.  He's got a criminal record to prove it.  He has

19  assaultive conduct that goes back over decades.  He was on

20  supervised release on other offenses at the time he committed

21  these offenses, which just shows that there isn't some amount

22  of monitoring or watching Mr. Hillie that's going to keep him

23  from reoffending.  He's -- he's engaged in other criminal

24  conduct that I already described a bit here today and also in

25  our sentencing memorandum, and I think the Court can even look

1    at his behavior when he was in court here at trial to

2    understand there's someone who is not -- who's not bound by

3    appropriate conduct under the law and also just by the

4    circumstances with which he's in.

5         He sat here before a jury who was going to decide his

6    guilt or innocence on very significant charges -- and in light

7    of the conviction now Your Honor who was going to decide what

8    an appropriate sentence in light of that was -- and he couldn't

9    even then manage to be on his best behavior and even behave

10   appropriately.  The government pointed out in its sentencing

11   memorandum when one of the deputy U.S. marshals was testifying,

12   he was making gun gestures to try to threaten the marshal.

13        One of the jurors had to approach Your Honor at one

14   point during J.A.'s testimony to point out that his behavior

15   was so inappropriate that the jury noticed that he was looking,

16   you know, threateningly and trying to intimidate this child

17   witness who came in here to tell her story to the Court and to

18   the jury.  And on the day after her -- end of the day of her

19   testimony, he goes into the back and, you know, so can't behave

20   himself that he -- he draws a marshal response and so

21   physically unable to be restrained that he ends up sending a

22   marshal to the hospital to -- with a broken bone as a result of

23   trying to restrain him.

24        It's like here he is, the day that his fate is going

25   to be decided by a jury, and he can't even then abide by just

1   the rules and the legal requirements that are -- that apply and

2   knowing that his behavior is going to be judged by the jury and

3   the Court.  There's just some -- nothing about that kind of

4   conduct that merits any kind of variance below the sentencing

5   guideline range.

6        THE COURT:  But you admit the sentencing guideline

7   range is at life and we have a statutory maximum at issue.  So

8   is this why the government is asking for 30 years?

9        MS. HERTZFELD:  It is, Your Honor.  I think it's --

10  it's -- what I hope the government's recommended is a sentence

11  that -- the way we framed in our sentencing memorandum -- is

12  one that comports with the statutory maximums but I think is

13  attempting to embody what the guidelines would require, which

14  would be something that would be very close to a life sentence

15  for Mr. Hillie in light of his age at this point.  But it does

16  conform to the statutory requirements that bar this Court from

17  following the guidelines.

18        I think -- I want to just spend one moment on the

19  psychosexual report that came back from the Bureau of Prisons.

20  The government made a sentencing recommendation in light of

21  everything that it knew about Mr. Hillie before getting back

22  this really pretty abysmal report from the Bureau of Prisons

23  doctor, Dr. Channell.  The doctor found -- and I'm just going

24  to quote this.  It's on page 9 of the doctor's report.  "There

25  are public safety concerns for Level 3 offenders," which is

1    what he found Mr. Hillie to be.  "In Mr. Hillie's case, he

2    presents a public safety concern with regard to both sexual

3    assault of minor and adult females.  He presents with

4    significant issues of sexual deviance."  Your Honor, the result

5    and the recommendation for offenders like the defendant,

6    according to the doctor that evaluated him, is, quote,

7    meaningful investments and structured programming to decrease

8    recidivism risk.  That's the recommendation of the doctor.

9         In this case that kind of a recommendation presents a

10   real problem because what -- what we already know about the

11   defendant's conduct and that -- I think the report details in

12   greater detail is he shows no remorse, no insight, no

13   acceptance of responsibility and no express desire to deal with

14   anything that's problematic about his conduct.  In fact, he

15   expressed direct antagonism to the idea of receiving sex

16   offender treatment.  He told the doctor that he would have,

17   quote, a problem with being in sex offender treatment because

18   he has, quote, never sex offended anyone.

19        The bottom line here, Your Honor, is this is a

20   defendant who just doesn't see anything wrong with his conduct,

21   what he's done in this case, and it appears what he's done even

22   beyond the conduct in this case.  The doctor found considering

23   all that, quote -- that Mr. Hillie, quote, shows no evidence of

24   feeling guilty or ashamed of any of his sexual behaviors and

25   that, quote, he does not need help to control his sexually

1    impulsive behavior.  Those are incredible findings, Your Honor,

2    in light of what we know after a trial in this matter.  And as

3    a result, of course the doctor found, unsurprisingly, a poor

4    prognosis that, quote, Mr. Hillie's defensiveness about

5    acknowledging his sexual deviance and his belief he does not

6    need treatment to control his sexual impulses and behavior did

7    not suggest a good prognosis for treatment.

8            Your Honor, the poor prognosis for any sort of

9    treatment indicates a real unlikelihood of any kind of

10   rehabilitation in a case like this, and it's another factor

11   that I think weighs in favor of incapacitation and a lengthy

12   sentence of incarceration.  In the end, I think the statutory

13   mandatory minimums in this case and what the guidelines would

14   suggest, were they not limited by those -- the statutory

15   maximums, that significant punishment should be imposed on the

16   defendant in light of the conduct constituting the offenses for

17   which he was convicted in light of his criminal history.

18           He's demonstrated no remorse, no acceptance of

19   responsibility, and no interest or potential for

20   rehabilitation.  There's simply nothing to suggest that

21   anything short of incapacitation is appropriate in this case to

22   protect the community from Mr. Hillie, and as a result, the

23   government makes the recommendation that is set forth in the

24   sentencing memorandum that I think accomplishes that end.

25           THE COURT:  All right.  Let me ask you one question,

1    which is:  Given the lag between Mr. Hillie's arrest initially,

2    which was on the D.C. charges, and the federal indictment that

3    was -- the initial federal indictment, I calculated that he was

4    incarcerated for a little over six months.  I don't think he'll

5    get credit for that in the current system.  Am I right about

6    that?

7              MS. HERTZFELD:  For the time served on the local

8    charges?

9              THE COURT:  On the local charge.

10             MS. HERTZFELD:  I think that's right.

11             THE COURT:  So what I've done in other previous

12   situations is adjusted the final sentencing determination that

13   I make by the amount of time that the person served in state

14   custody on the same charges so that they get credit for the

15   amount of time they've been incarcerated since their initial

16   arrest.

17             MS. HERTZFELD:  I think that's generally what's done,

18   Your Honor.  I think that's fair and appropriate here as well.

19             THE COURT:  All right.  Thank you.

20             Ms. Slaight.

21             MS. SLAIGHT:  Your Honor, there are a number of

22   reasons in this case that the government -- that the Court

23   should go below the guidelines.  This is a very atypical case.

24             THE COURT:  Ms. Slaight, can I have you speak right

25   into the microphone so you can be heard?

```
 1              MS. SLAIGHT:  Yes.  This is a very atypical case in
 2     federal court, and I refer to the statistics about cases such
 3     as this.  Despite the fact that the government keeps referring
 4     to apparently that Mr. Hillie should get life without parole
 5     because he doesn't have enough remorse, the fact is this is a
 6     very atypical case.  First of all, the videos that -- for -- he
 7     is required to serve a maximum -- a mandatory minimum, as the
 8     Court pointed out, 15-year sentence, which is a very long
 9     sentence.  He's in his 30s right now.  So he would not get out,
10     even with that, until his late 40s.  The -- this is an atypical
11     case because it -- they were surreptitious videos.  No one
12     was -- he did not try to engage the minors in sexual activities
13     while the -- these videos were being taped.  He didn't
14     encourage the persons to engage in sexual activity or -- or
15     anything like that.  He --
16              THE MARSHAL:  Calm down.
17              THE DEFENDANT:  Don't tell me to calm down.
18              THE MARSHAL:  Stop.  Sit back in your chair.
19              MS. SLAIGHT:  In other cases where there was
20     surreptitious videos, it's usually called voyeurism.  And, in
21     fact, there was a rabbi -- and I'd refer to that case in
22     court -- Rabbi Freundel who had taped 152 women.  He did put
23     these people in the place of making these videotapes, and he
24     did it -- he got a six-and-a-half-year sentence.
25              In addition, in this case, the images, the videos,
```

1    which also makes this case atypical, is the images were not

2    distributed.  Not only were they not distributed, they were

3    deleted from the computer.  The government had to take these

4    videos off from the deleted files, and they had to forensically

5    recover them.  In other cases, as the Court knows -- and really

6    the reason that pornography cases are -- are considered so

7    serious is the -- is the distribution of the videos and the

8    fact that if the images are made of the videos that people

9    could see them.

10          Another thing that makes this case out of the realm

11   of the usual cases and the reason that Mr. Hillie should get a

12   variance in this case, there were no threats involved.  There

13   was no obstruction.  I have pointed out a number of cases both

14   in my sentencing memo and in the supplementary memo where not

15   only were the videos not surreptitious, they -- they -- the --

16   the -- the person wanted to engage the minor in making the

17   videos, encouraging the videos, but they threatened the

18   videos [sic].  Case after case they threatened people in the

19   videos.  They committed obstruction of justice.

20          This is not such a case, and regardless of what the

21   government says about Mr. Hillie, you can't change that.  You

22   can't change the fact that this is an atypical case.  And it is

23   much less -- the facts of the case are much less serious than

24   the typical case.  As far as the D.C. Code violations go, that

25   is, those -- those are not a mandatory sentencing violations.

1      The cases -- that I would suggest to the Court that those were

2      also atypical cases.  The first-degree case, it was not sexual

3      intercourse.  Even that particular incident was over the

4      clothes, as the Court can remember.  It was not -- it was --

5      and it was not a -- a sexual intercourse incident.  Most of the

6      incidents were over the clothes.  There was no intercourse

7      involved.  There was no violence involved.

8          And if you compare this case to other cases -- and

9      other D.C. cases are brought up to the Court in my sentencing

10      memo -- the maximum case in D.C., sentence case, in the first

11      instance that I -- that I brought up to the Court in the

12      sentencing memos was 22 years.  Twenty-two years maximum for

13      much more serious cases than this.  I brought up in my -- and

14      when I say "serious," I mean much more violence, much more harm

15      to the complainants, much more distribution.

16          And an example I have of comparative cases was in the

17      supplementary memo.  The first supplementary was *U.S. v.*

18      *Franklin Torres*.  That case, Defendant Torres was convicted

19      after trial.  He received a 21-year sentence.  He -- according

20      to the government, the -- Mr. Torres raped the minor in that

21      case, and he took a number of photos of the minor and he

22      threatened the minor in that case.  The minor cried while

23      testifying at trial.  The -- according to the government, in

24      that case the -- the defendant possessed a staggering number of

25      pornographic images of other minors.  This is not true in

1    Mr. Hillie's case.  There is no other -- no indication that

2    Mr. Hillie had other child pornography anyplace.  In the *Torres*

3    case there were 1200 images of minors, and including evidence

4    that he instructed minors to take explicit photos.  Now, in

5    that case, the -- after a trial the defendant received a

6    21-year sentence in 2000, and that was a 2015 case.  That's in

7    page 3 of my supplementary -- my first --

8              THE COURT:  Supplementary memo dated what?

9              MS. SLAIGHT:  The motion -- the -- the sentencing

10   memo that I filed -- I believe it was -- I don't have the date

11   that I filed that memo.  I think -- I believe it was in

12   September of this year, a reply memo.

13             THE COURT:  Of last year?

14             MS. SLAIGHT:  Of last year; right.  I'm sorry.

15             Another comparative case in which -- in that case,

16   the -- the defendant in that case did receive a 45-year

17   sentence.  That person had 12 prior convictions, including

18   violent sexual assaults.  He had -- he went to trial for a

19   mandatory 25-year sentence.

20             THE COURT:  Which case is this, Ms. --

21             MS. SLAIGHT:  I'm sorry.

22             THE COURT:  Which case are you referring to?

23             MS. SLAIGHT:  That was *U.S. v. Andre Drew*.

24             THE COURT:  All right.

25             MS. SLAIGHT:  And in that case Mr. Drew faced a

1    mandatory 25-year sentence for enticing a minor.  He had a

2    history and -- of convictions for assaulting minors.  He would

3    look for minors as young as 17 -- as 7 years old -- I'm

4    sorry -- entice them with money, alcohol, and marijuana.  He

5    committed first-degree sexual abuse against a number of minors,

6    photographed them, and then threatened to blackmail one of

7    them -- at least one of them.  And he faced a mandatory 25-year

8    sentence after conviction.  That is a much more egregious case

9    than this one, and in that case, that was the one case there

10   was a 45-year sentence.

11          Another case where there was a -- the only case I

12   could find actually where there was a surreptitious recording

13   was *United States v. Holmes.*  And when I refer to surreptitious

14   recordings, that's what happened in this case.  In that case --

15   that was a 2016 case -- the defendant went to trial in that

16   case, and that was in the Eleventh Circuit case.  And he

17   received the mandatory 15 years, no more than the mandatory 15

18   years.  He recorded a stepdaughter in his -- in the bathroom

19   over a period of five months, and there does not appear that

20   those videos were deleted from the computer.  There were 23

21   videos, certainly a lot more videos.

22          THE COURT:  Was he alleged of sexually abusing the

23   stepdaughter at the same time as he was --

24          MS. SLAIGHT:  Well, in this case he's not alleged to

25   be abusing the stepdaughter on the videos.

1          THE COURT:  Not on the video?

2          MS. SLAIGHT:  Right.

3          THE COURT:  At the same time?  In the same time frame

4    as he is taking the photos?

5          MS. SLAIGHT:  I don't have any information that he

6    was.

7          THE COURT:  All right.

8          MS. SLAIGHT:  For the pornography, the -- the Court

9    says that the guideline sentence just for the pornography

10   charges is life.  So I'm looking at these pornography charges.

11   Even if you -- you know, the courts -- the Court is -- the --

12   the probation office's calculation of the guidelines is life in

13   prison even absent any -- anything other than recording.

14          So, I mean, these -- what I'm trying to say is that

15   this -- the guideline sentence is just completely out of

16   perspective to what happened in this case and what other

17   sentences were.  Even if the Court added -- this case, even if

18   the Court -- was a 15-year mandatory sentence after a trial,

19   even if the Court added separately the other counts of the

20   indictment, it certainly would be a lot less than 45 years.

21          And other counts of the indictment, the D.C. Code

22   counts, none of those are mandatory counts, and as I said,

23   those counts did not involve sexual intercourse that -- either

24   one.  First-degree sexual assault count was over the clothes,

25   and many of those counts were over the clothes.

1          Your Honor, the government pointed to the report, the

2     psychosexual report, that was done.  First, I'd like to note

3     that the -- the level that the psychologist placed Mr. Hillie

4     at was in the middle -- midlevel -- middle risk of distribution

5     for reoffending.  So despite what the government says, the

6     bottom line in this report is that he is in the middle level of

7     the risk of distribution.  He is not in the high-level risk of

8     distribution.  And that makes sense because his -- the offense

9     that he was convicted of is so atypical.  And it -- and, in

10    fact, for the offense that he served, if he were to take -- and

11    he --

12         And contrary to what the government says, Mr. Hillie

13    told both the presentence report writer and the -- and the

14    psychologist that he would be willing to go to -- to sex

15    offender treatment or whatever treatment programs that were

16    required of him -- or that he was asked to go to, and I think

17    that is a good sign.  He did not want to do -- he did not want

18    to have medical treatment.  He did not want to have

19    prescription medications, but he is amenable to treatment, and

20    that is significant.

21         THE COURT:  Sorry.  Where did it say he was amenable

22    to treatment?  In the report?

23         MS. SLAIGHT:  Yes.  He said he would go to treatment.

24    He told the presentence reporter he would go to treatment if --

25    if required and he said to the --

1           THE COURT:  To the report writer?

2           MS. SLAIGHT:  -- his psychologist that he would do

3    that.

4           THE COURT:  I'm looking at page 10 of the report

5    where the -- at least the report writer indicates -- I'm

6    looking in this Section 4, second paragraph:  Mr. Hillie's

7    defensiveness about acknowledging his sexual deviance and his

8    belief he does not need treatment to control his sexual

9    impulses and behavior do not suggest a good prognosis for

10   treatment.

11          MS. SLAIGHT:  Well, he did say he would go to

12   treatment, though.  He did not say he would refuse treatment,

13   and, I mean, the -- I guess the government or -- can cherry

14   pick lines from the report to say he's not amenable to

15   treatment or he doesn't have a good prognosis for treatment,

16   but the testing they did suggests -- says that he's in the

17   middle level of the risk range; so that he is not a high risk

18   for offending -- reoffending.  And the report also says that he

19   doesn't have -- that the -- that the -- this his insight and

20   judgment were good in the report, page -- page 5, paragraph 3.

21          THE COURT:  All right.

22          MS. SLAIGHT:  So there's -- while one could cherry

23   pick parts of this report and say he's -- he's a good -- he's

24   not amenable to treatment, he is amenable to treatment, the

25   bottom line is that he's middle risk.  He's listed as a

1    middle-risk offender.  He's not listed as a high-risk offender.

2              THE COURT:  For whom the report writer says presents

3    a public safety concern.

4              MS. SLAIGHT:  Well, I'm sure that's true for low-risk

5    offenders.

6              THE COURT:  All right.

7              MS. SLAIGHT:  But that doesn't change what the

8    testing results were, and the -- the -- that says that he is

9    a -- that he is not a high-risk offender.

10             THE COURT:  All right.

11             MS. SLAIGHT:  And he does not appear, according to

12   this evaluator, to have a delusional disorder or any -- it says

13   his -- it doesn't appear that from the written report that he

14   has a chronic mental health disorder that -- that is

15   aggravating his behavior.

16             The defendant -- and it says page 11 -- page 10, the

17   defendant does not meet the criteria for a major mental

18   illness.

19             THE COURT:  All right.

20             MS. SLAIGHT:  So the fact -- the bottom line is

21   that's consistent with the diagnosis that's done by the Bureau

22   of Prisons.

23             THE COURT:  All right.

24             MS. SLAIGHT:  In the report I looked at the life

25   expectancy for Mr. Hillie, and if he would receive a -- on

1    page 6, if he were to receive a sentence of, I believe, even 30

2    years, he would die in prison before he was -- he was ever

3    released from prison.

4              THE COURT:  How old -- he's 35; right?

5              MS. SLAIGHT:  Yes.

6              THE COURT:  And so the life expectancy tables

7    indicate that 65 would be beyond his life expectancy at this

8    point?

9              MS. SLAIGHT:  Life expectancies for black males,

10   according to the tables, is at 60 years.

11             THE COURT:  All right.  So the defense recommendation

12   with respect to sentencing is the 15-year mandatory minimum?

13             MS. SLAIGHT:  Yes, Your Honor.

14             THE COURT:  All right.

15             MS. SLAIGHT:  Your Honor, the -- and I would point

16   out that in the -- in the 1990s, the -- Congress had sentences

17   for drug offenders that were -- we now agree, I think, and

18   Congress has agreed -- were way out of proportion.  The people

19   in varying degrees of culpability for drug offenses were all

20   sentenced as if they were the same.  And I was here for that.

21   People who were low-level drug distributors received sentences

22   of life in prison as well as people who had murdered people or

23   distributed kilos and kilos.  And they -- eventually Congress

24   realized what a mistake that was, and the reason that

25   60 percent of the people -- persons sentenced under the

1    pornography statistics are -- statutes are sentenced below the

2    guidelines is there seems to be this same mistake here now in

3    the pornography statutes.

4         And the courts fortunately in 2018 and 2019 and since

5    2005 can do something about the guidelines.  It can -- the

6    guidelines are voluntary.  They're not mandatory.  They can

7    look at all the factors.  They can grant that.  They do not

8    have to lump all persons who are convicted of pornography the

9    same.  It is completely outrageous that someone such as he who

10   was not involved in any kidnapping, was not involved in any

11   continuing violence against these girls, did not threaten them,

12   did not obstruct justice, did not traffic them, did not --

13   did -- did not distribute the photos or the videos, deleted

14   them should get a life sentence, should be recommended for a

15   life sentence.  All of those factors would, I would suggest to

16   the Court, lead one to believe that he should be -- he should

17   actually receive the minimum sentence, as did the person in the

18   Eleventh Circuit.

19        I would submit to the Court that the psychological

20   study, the bottom line is he's not a high-risk offender

21   according to this study, does not have a major mental illness,

22   a 15-year sentence is sufficient.  As to his D.C. charges, they

23   are also outlier cases because of the fact that it did not --

24   the first-degree sexual assault was not intercourse.  It was

25   over the clothes.  The other case -- the other offenses were

1    mostly over the clothes, and because of that, Mr. Hillie should

2    receive the mandatory minimum sentence.

3              Your Honor, I've also discussed with the

4    government -- and the government is going to go in to redact

5    references that were in its -- in its own sentencing report

6    that are referred to the neglect -- publicly referred to as the

7    neglect proceedings, which are actually confidential

8    proceedings.

9              THE COURT:  All right.  Ms. Hertzfeld, you're going

10   to make some redactions?

11             MS. HERTZFELD:  Yeah.  I have no objection to that.

12             THE COURT:  Okay.  All right, Ms. Slaight.

13             Mr. Hillie, you have something that you would like to

14   say to the Court regarding the sentence to be imposed in this

15   case, now would be the time.

16             THE DEFENDANT:  No.

17             THE COURT:  You have nothing to say?

18             THE DEFENDANT:  (Shakes head.)

19             THE COURT:  All right.  I'm going to take five

20   minutes and I will return for sentencing.

21             (Recess taken.)

22             THE DEPUTY CLERK:  Your Honor, we are recalling

23   Criminal Case 16-030, United States of America vs. Charles

24   Hillie.  Probation officer is Kelli Willett.

25             THE COURT:  All right.  After calculating the

1      sentencing guidelines and hearing statements made by counsel

2      and considering all of the materials that have been submitted

3      in this case over the past many months, the Court must now

4      consider the relevant factors set out by Congress in 18 U.S.C.

5      Section 3553(a) and set out by the D.C. Council in the relevant

6      D.C. Code provisions in order to ensure that it imposes a

7      sentence that is "sufficient, but not greater than necessary,

8      to comply with the purposes of sentencing."

9              Under federal sentencing law, these purposes include

10     the need for the sentence imposed to reflect the seriousness of

11     the offense, to promote respect for the law, and to provide

12     just punishment for the offense.  The sentence should also

13     deter criminal conduct, protect the public from future crimes

14     of the defendant, and promote rehabilitation.  In addition to

15     the guidelines and policy statements, the Court must consider

16     the nature and circumstances of the offense, the history and

17     characteristics of the defendant, the types of sentences

18     available, the need to avoid unwarranted sentencing disparities

19     among defendants with similar records who have been found

20     guilty of similar conduct, and the need to provide restitution

21     to any victims of the offense.

22             Under the D.C. Codes statutory mandate, the Court is

23     required to impose a sentence that reflects the seriousness of

24     the offense and the criminal history of the offender, provides

25     for just punishment, and affords adequate deterrence to

1    potential criminal conduct of the offender and others, and

2    provides the offender with needed educational or vocational

3    training, medical care, and other correctional treatment.

4         The *D.C. Voluntary Guidelines* also state that while

5    "[a]ny legal sentence may be imposed[,]" the Court should

6    consider "the principle proportionality, reserving the maximum

7    sentence for the worst offenses and offenders and the minimum

8    sentence for the least serious offenses and least culpable

9    offenders," and should "depart[] from the grid options and

10   ranges only to the extent necessary to account for the

11   aggregating or mitigating factor[s]" that may have warranted a

12   departure.

13        This Court has taken all of these factors and

14   considerations into account when deciding what the appropriate

15   sentence is in this case, and in accordance with my ordinary

16   practice, I won't detail my considerations with respect to each

17   factor orally here today.  However, I do think it is important

18   for the Court to say something for the record about its

19   considerations and the sentence that it will be imposing in

20   this case and to also say something to you, Mr. Hillie, so that

21   you will understand the Court's sentence and hopefully in the

22   future be able to conform your behavior to the requirements of

23   the law.

24        I begin with the nature of the offenses that you have

25   been convicted of committing.  Like the jury, this Court sat

1  through the trial in this case.  I saw all of the evidence

2  pertaining to your reprehensible behavior with respect to the

3  two children with whom you lived.  To summarize briefly, based

4  on the evidence that I observed, you engaged in a pattern of

5  sexual abuse and harassment with respect to the two daughters

6  of the woman with whom you were romantically involved, and this

7  abuse consisted not only of leering at them suggestively,

8  including while at least one of the daughters was sleeping, but

9  also grabbing them on the breast and the buttocks, inserting

10 your fingers into and around their genitals on multiple

11 occasions.  Ms. Slaight suggests that these things were over

12 the clothes, but they were, nevertheless, sexual abuse.

13      You also repeatedly hid a video camera under one of

14 the daughter's beds or in a vent in the bathroom, and in the

15 videos we see you doing this very thing.  You appear to be

16 intent upon capturing her naked images when she is finished

17 showering and is engaged in self-grooming.  During the trial,

18 the jury and the Court watched the videos that you made which

19 clearly depicted you sneaking into the room, placing the

20 camera, and returning to retrieve the device once the child had

21 left the room.

22      Perhaps, unfortunately for you, I remember the

23 evidence vividly.  There's no need to recount it all here, nor

24 is it necessary to linger on the absolutely unacceptable and

25 vile nature of this conduct.  What I care about most at this

1    moment is the impact of this reprehensible behavior on the

2    lives of the victims who were children at the time, and from

3    the testimony that was presented, it was crystal clear to this

4    Court that their lives will never be the same as a result of

5    your offenses.  The true nature of these offenses lies in how

6    they affected the children who you tormented for nearly a

7    decade when you lived on and off with their mother.  That is a

8    substantial portion of their childhood, and the government's

9    sentencing memoranda says much better than I can how

10   destructive this behavior was to the psyches of these young

11   girls.

12           I'm quoting excerpts from pages 18 and 19 of the

13   government's memoranda.  Quote, "The defendant took advantage

14   of the access he had to two young girls . . . in the most

15   opportunistic way . . . It was through his position as a

16   step-father -- a permanent fixture in their lives and their

17   mother's boyfriend -- that the defendant was able to gain a

18   position of trust and the power that he premeditatedly

19   exploited as a means of gratifying his own sexual desires . . .

20   [And he] created an environment of fear and intimidation in the

21   place where J.A. and J.A.A. should have felt the safest.  In

22   the place where they should have felt protected, the defendant

23   instead preyed upon them, leaving the two girls in constant

24   fear and anticipation of the next time they would be

25   victimized.  These two children carried a burden no child

1    should have to shoulder -- the burden of protecting themselves

2    from a man charged with their care, but who instead exploited

3    them.  This burden shaped the[ir] childhoods, and undoubtedly

4    the[ir] lives . . . in ways that the defendant, to this day,

5    has failed to acknowledge and for which he has failed to accept

6    responsibility," end quote.

7           Now, I chose that passage because it captures for me

8    exactly how this Court feels about the nature of the offenses

9    and why, as I'll get to in a moment, your case, this case, is

10   distinguishable from the other cases that Ms. Slaight puts

11   forth, but, unfortunately, that's not all in terms of the

12   impact on these victims.

13          The inappropriate touching, the sexual abuse, and the

14   harassment that these children endured in their own home was

15   not the only trauma.  J.A.A. later discovered that her

16   tormenter -- that's you, Mr. Hillie -- had also been secretly

17   videotaping her at times when she was the most vulnerable, when

18   she was naked and preparing to get dressed after stepping out

19   of the shower.  That knowledge alone must have been devastating

20   to her, making her feel even less safe in her own home.  And

21   there's more.  Beyond that indignity was the fact that, as the

22   government says, these children were effectively required to,

23   quote, "normalize what happened to them given the reaction of

24   their mother when they disclosed their abuse," end quote.

25          It is one thing to be a child having to endure sexual

1    abuse by an authority figure in your house.  It is yet another

2    to finally summon the courage to tell the truth about it and to

3    have your own mother deny that reality.  During the trial,

4    J.A.A., who was visibly and obviously furious, suggested that

5    the most hurtful thing of all to her was the fact that her

6    mother believed you, Mr. Hillie, when you denied what you had

7    done and not her own daughters who repeatedly tried to tell her

8    what was going on and how you were abusing them.

9         You were there.  You heard the testimony.  This

10    family has been torn apart by your criminal actions.  You saw

11    it on the faces of those women.  You heard it in their voices.

12    And the impact of your acts on those very real victims who are

13    still struggling to recover to this day makes your crimes among

14    the most serious criminal offenses that this Court has ever

15    sentenced.

16         Now, your counsel's sentencing memoranda focuses in

17    on what you did in terms of the surreptitious placement of the

18    video cameras in J.A.A.'s room and bathroom to capture her

19    images at times when you knew she would be naked, and the memo

20    argues, as Ms. Slaight did here today, that the conduct was

21    more like voyeurism, which has a one-year statutory maximum

22    under state law, rather than the production of child

23    pornography, which has a 15-year mandatory minimum.

24         This Court strongly disagrees primarily because of

25    the context in which you were filming J.A.  This wasn't

happening in a vacuum as an isolated incident with respect to

someone you barely knew.  As I have already emphasized, J.A.A.

was a child with whom you were living and with whom you had

personal contact on a daily basis.  That alone makes this

different from the rabbi case, from the other cases from the

standpoint of the victim.  Moreover, and importantly, she was

one of the subjects of your sexual abuse, groping, sexually

suggestive behavior.  This abuse was going on at the same time,

although not simultaneously with the filming, but it was going

on at the same time generally as you were planting the cameras

in her bedroom and bathroom.

        In this regard, you were invading her space and her

life.  This was not a temple where she was going and there

happened to be cameras there.  You were inside her home, and,

again, you were invading her space, not only with the camera

but also with your hands and your looks and your efforts to

exert control over her as a helpless child to whom you had

unfettered access.  And those facts make your surreptitious

taping of her for your own sexual gratification an order of

magnitude worse than the cases that your counsel cites, other

cases involving mere voyeuristic behavior.

        And just to be perfectly clear, this Court easily

finds that planting the camera in the way that you did to

capture depictions of J.A.A. unclothed was indicative of your

intent to produce illicit photos of a minor in sexually

1    suggestive positions.  Your counsel has disputed this,

2    repeatedly suggesting that the videos of J.A.A.'s returning to

3    her room after coming out of the shower and grooming herself

4    are not child pornography and should not be treated as such.

5    But intent and context matter in criminal law, Mr. Hillie.  And

6    it was your clear sexual interest in the child who you were

7    otherwise sexually abusing that transform these images from

8    innocent videos into lascivious exhibitions in violation of

9    federal law.

10         No, unlike other child porn producers, you weren't

11   actively touching or abusing J.A. at the moment that you made

12   the videos, but the broader context of the sexually abusive

13   relationship that you had with this very child and your intent

14   to make those videos of her for your own sexual gratification

15   makes this case much more like the serious production of child

16   pornography crimes for which the federal law prescribes a

17   lengthy mandatory minimum than the less serious state voyeurism

18   laws to which your counsel refers.

19         Turning to your characteristics as an offender, the

20   PSR and the government's sentencing memoranda recount several

21   prior instances of inappropriately aggressive and even violent

22   behavior, and there was trial testimony from the victims in

23   this case about regular instances of domestic violence that you

24   engaged in with respect to their mother.  These children

25   testified that they heard their mother screaming when you --

1    and saw you attacking her on multiple occasions, and one of

2    them even experienced your wrath personally when you struck her

3    as she tried to tell her mother about your abuse.

4          The government also relates acts of aggression on

5    your part that occurred contemporaneously with the trial, your

6    attempts to intimidate the victims who were testifying and

7    other witnesses by glaring at them and gesturing in a

8    threatening manner, and also physical altercations that you had

9    with the U.S. marshals who were escorting you to and from the

10   courtroom.  The Court finds it difficult to even know what to

11   say about what is clearly a pattern of unacceptably aggressive,

12   abusive, and violent behavior by you.  But what I will say is

13   that what is even more striking is the fact that you have not

14   managed to muster an ounce of remorse.  It's almost as if you

15   don't have the ability to appreciate how your conduct impacts

16   other people or the ability to conform your behavior to

17   acceptable or normal standards of conduct, which underscores

18   the government's point about the need for incapacitation.

19         The psychosexual evaluation that this Court ordered,

20   which was performed late last year, bears this out.  In the

21   forensic report, which was issued on January 15th, the examiner

22   indicates that you denied even knowing the victims, much less

23   engaging in any inappropriate sexual contact with them.  And,

24   again, let me remind you that we saw your face on the video in

25   one of the victim's bedrooms.  You suggested that you had

1    really no idea why you were found guilty.  You denied engaging

2    in sex acts in your cell, apparently, while you were at the

3    facility even though you had been observed doing so.

4           And the tests that you were administered revealed a

5    lot about your mental status and your risk of offending.

6    Ms. Slaight says, well, we can cherry pick parts of the report,

7    and that may be so, but there's a lot in that report that

8    doesn't bode well for your possibility of treatment and

9    rehabilitation.

10          The examples -- examiner states that you exhibited a

11   high level of denial of your past interests and urges, that

12   your scores were moderately similar to adult male offenders who

13   use force during sexual assaults, and that while your scores

14   put you in the middle of the risk distribution, there are

15   public safety concerns with offenders in your offense level and

16   that you in particular present with significant issues of

17   sexual deviance.

18          The examiner also diagnosed you with something called

19   paraphilic disorder, which, according to the report, is an

20   abnormal persistent sexual interest, the satisfaction of which

21   has entailed personal harm or risk of harm to others.  This is

22   not good, Mr. Hillie, as it suggests that you pose a danger to

23   other people as far as sexual deviance is concerned, and the

24   report further states that you were defensive about

25   acknowledging your sexual deviance and do not believe that you

1    need treatment to control your sexual impulses, which, again,

2    does not suggest a good prognosis for treatment of this

3    disorder.  In short, the report indicates that you have serious

4    problems with sexual deviance that you're unwilling to

5    acknowledge and that may cause harm to others.

6            This evidence, too, strongly suggests that a

7    significant period of incarceration is warranted to

8    incapacitate you and to prevent you from committing additional

9    sex-related crimes.

10           Now, let me just say a word about the sentencing

11   memoranda that your counsel drafted.  It mentions your

12   background and the psychosexual evaluation in various ways.  In

13   one memo your counsel notes that you were accepted into the

14   Peace Corps twice, that you've taken college-level courses, and

15   earned various certificates, and this Court has taken these

16   bright spots in an otherwise unremarkable work history into

17   account.

18           Another memo speaks to the psychosexual evaluation in

19   particular.  It points out that the results of the tests that

20   were administered might not be accurate due to their length and

21   your concentration difficulties, and it emphasizes that you do

22   not meet the criteria for a major mental illness, nor are you

23   considered a high-risk offender.  That may be true, but as I

24   have explained, the report also gives the Court a lot to worry

25   about in terms of your lack of remorse and the danger you might

1    pose to others due to your violent tendencies, your sexual

2    desires, and this paraphilic disorder.  And the fact that you

3    do not appear to believe that you need any help makes it even

4    more likely that you're going to need treatment while in prison

5    and also treatment during the supervised release period.

6           The bottom line question that this Court has had to

7    grapple with all of this time is what this all means in terms

8    of an appropriate sentence.  I've considered all of the

9    evidence presented at trial, the sentencing factors, including

10   the nature of your offenses, and the history and

11   characteristics, the sentences imposed in the cases to which

12   defense counsel points, and the arguments that the parties have

13   made both in their memoranda and here today.  And, quite

14   frankly, because I understand that 45 years is a very long

15   time, I have struggled to decide what a fair and just sentence

16   is in this case.

17          The government requests a combined total of 45 years

18   of imprisonment consisting of 30 years for the federal counts

19   of completed and attempted production of child pornography and

20   possession of child pornography, 8.5 years for sexual abuse of

21   J.A.A., and 6.5 years for the sexual abuse of J.A.; while the

22   defense argues that the 15-year mandatory minimum penalty that

23   must be imposed for the federal counts is sufficient to account

24   for all of the conduct at issue.

25          Having looked at this all carefully, I have to say

1      that I have a disagreement with both sides.  On the one hand, I

2      believe that 30 years of imprisonment for the child pornography

3      production and the attempted production counts, which is fully

4      twice the mandatory minimum and at the statutory maximum is

5      greater punishment for these counts than necessary for these

6      surreptitious videos.  Yes, they qualified as child pornography

7      and Mr. Hillie produced them, but I believe that these actions

8      as indicated by the victims and in the record do not involve

9      the most egregious circumstances related to this kind of

10     offense and, thus, do not warrant the statutory maximum

11     penalty.

12            On the other hand, the 15-year mandatory minimum for

13     the child pornography offenses alone would not be sufficient to

14     account for the child sex abuse and harassment that these

15     victims endured and that has clearly impacted their lives.

16     There is no question that additional prison time is warranted

17     separate and apart from the videos and that the purposes of

18     punishment will not be fulfilled unless separate prison time is

19     imposed consistent with the *D.C. Voluntary Guidelines*.  The

20     Court will give effect to the government's well-founded views

21     about the obvious need for incapacitation by running the terms

22     for the child porn crimes consecutive to those for the sex

23     abuse crimes.

24            So here is what the Court has concluded.  I will lay

25     out the details with respect to particular counts when I impose

1    the sentence.  The Court will impose three combined sentences

2    consecutively:  180 months, or 15 years, of imprisonment for

3    the federal counts to run consecutively to a combined 102

4    months, or 8.5 years, for the counts relating to the sexual

5    abuse of J.A.A., and a combined 78 months, or 6.5 years, for

6    the counts relating to the sexual abuse of J.A.  The 102 months

7    is at the low end of the D.C. voluntary guideline range for the

8    most serious offense that has been charged related to the

9    sexual abuse of J.A.A., and the Court is imposing that part of

10   the sentence to reflect the seriousness of your conduct in

11   abusing J.A.A. over an extended period of time under the

12   circumstances presented and also in light of the need to avoid

13   unwarranted sentencing disparities given that the D.C.

14   guidelines commission recommends a sentence within this range

15   for similar cases.  The Court is also mindful of the evidence

16   at trial that related to the abuse of J.A.A. and its impact on

17   her, as well as the serious need for deterrence and

18   incapacitation.

19            With respect to the 78-month sentence for the sexual

20   abuse conduct related to J.A., the Court agrees with the

21   government that a low end of the guideline sentence for the

22   most serious offense charged, which is 24 months, would not be

23   sufficient to account for your egregious and repeated sexual

24   and abusive contact with J.A., behavior that included stalking

25   her and touching her while she was sleeping and hitting her

1    when she attempted to tell her mother about this abuse.  The

2    Court believes that only a sentence that is well above the

3    bottom of the applicable D.C. voluntary guideline range would

4    adequately promote the purpose of punishment with respect to

5    these crimes.

6            As mentioned in my colloquy with Ms. Hertzfeld, the

7    Court also needs to adjust the total sentence to account for

8    the six months that you have spent in state custody at the

9    outset before the federal charges were imposed and with respect

10   to which you would not otherwise get credit toward the ultimate

11   sentence.  So I will reduce the 78-month sentence for the

12   sexual abuse counts related to J.A. by six months to give you

13   credit for this period of incarceration that you previously

14   served.

15           So if you are doing the math, this Court will impose

16   a total penalty of 354 months, or 29.5 years, of imprisonment,

17   which is the total months of imprisonment I just discussed for

18   all offenses, including the six-month reduction to account for

19   the prior state period of incarceration.  This will be followed

20   by 240 months, or 20 years, of supervised release on the

21   federal offenses and 120 months, or ten years, of supervised

22   release on the D.C. offenses to run concurrently.  The Court

23   believes that this penalty is sufficient but not greater than

24   necessary to reflect the seriousness of the instant offenses to

25   promote deterrence and, most importantly, to protect the public

1    from future crimes that may be committed by you as a defendant.

2        This sentence also avoids unwarranted disparities

3    among defendants convicted of similar crimes and permits you to

4    get the treatment you so desperately need.  Therefore, based on

5    my consideration of all of the 3553(a) factors, as well as the

6    D.C. statutory factors, I will now state the sentence to be

7    imposed.

8        Mr. Hillie, please stand.  It is the judgment of the

9    Court that you, Charles Hillie, are hereby committed to the

10   Bureau of Prisons for the following terms of imprisonment,

11   which I have organized by count.  On each of Counts 1 and 2 and

12   4 through 7, you are sentenced to 180 months of imprisonment,

13   and these sentences are to run concurrently to one another.

14       On Count 3, you are sentenced to 120 months of

15   imprisonment, and this sentence is to run concurrently to the

16   sentences imposed for Counts 1 and 2 and 4 through 7.  Thus,

17   the sentences imposed in Counts 1 through 7 are to run

18   concurrently with one another.

19       On Count 8, you are sentenced to 102 months of

20   imprisonment.  That sentence is to run consecutively to the

21   sentences imposed for Counts 1 through 7.  On each of Counts 9,

22   10, and 12, you are sentenced to 24 months of imprisonment, and

23   these sentences are to run concurrently to one another and to

24   the sentence imposed in Count 8.  Thus, the sentences for

25   Counts 8, 9, 10, and 12 run concurrently to one another and

1  consecutively to Counts 1 and 7.

2           On each of Counts 13 through 17, you are sentenced to

3  72 months.  And these sentences are to run concurrently to one

4  another.  Counts 13 through 17 are to run consecutively to the

5  sentences imposed for Counts 1 through 7 and consecutively to

6  the sentences imposed for Counts 8, 9, 10, and 12.

7           Thus, with the 180 months for Counts 1 through 7; 102

8  months combined on Counts 8, 9, 10, and 12; and the 72 months

9  on Counts 13 through 17, you are sentenced to a total term of

10  incarceration of 354 months.

11           You are further sentenced to serve a term of 240

12  months, or 20 years, of supervised release on each of Counts 1

13  through 7 and 120 months, or ten years, of supervised release

14  on Counts 8 through 10 and 12 through 17 to run concurrently.

15  You must also pay a $100 special assessment for each of the

16  counts, both federal and state, for a total of $1600 as a

17  special assessment.

18           The Court finds that you do not have the ability to

19  pay a fine and, therefore, waives the imposition of a fine in

20  this case.

21           The special assessment is immediately payable to the

22  Clerk of the Court for the U.S. District Court for the District

23  of Columbia.  Within 30 days of any change of address, you

24  shall notify the clerk of -- the Clerk of Court of the change

25  until such time as the financial obligation is paid in full.

1    The Court waives any interest or penalties that may accrue on

2    unpaid balances.

3          The Court will also recommend to BOP that you be

4    considered eligible for educational and vocational programs,

5    including a program that treats -- excuse me -- educational and

6    vocational programs while you are incarcerated.

7          Within 72 hours of release from custody, you shall

8    report in person to the probation office in the district in

9    which you are released.  While on supervision, you shall submit

10   to the collection of DNA.  You shall not possess a firearm or

11   other dangerous weapon, you shall not use or possess an illegal

12   controlled substance, and you shall not commit another federal,

13   state, or local crime.  You shall also abide by the general

14   conditions of supervision adopted by the U.S. Probation Office,

15   as well as the following special conditions which I will state

16   and then describe the reasons for as the D.C. Circuit requires.

17         Sex offender assessment and treatment:  You shall

18   participate in a program of sex offender assessment and

19   treatment, as directed by the U.S. Probation Office.  At the

20   direction of the U.S. Probation Office, you shall pay for all

21   or any portion of the treatment program.  You shall waive your

22   right of confidentiality and treatment and sign any necessary

23   releases for all records imposed as a consequence of this

24   judgment to allow the U.S. Probation Office to review your

25   course of treatment and progress with treatment providers.

1          This condition is imposed because it is the least

2     restrictive means of providing you with treat to rehabilitate

3     yourself so you can move forward from the underlying offense,

4     and it will also deter future conduct involving sex

5     offenders -- offenses.

6          Sex offender testing:  You must submit to periodic

7     polygraph testing at the discretion of the probation office as

8     a means of ensuring that you are in compliance with the

9     requirements of your supervision or treatment program.

10    Imposing this requirement as a condition of supervised release

11    is the least restrictive means of protecting the public from

12    further sex crimes.

13         Sex Offender Registration:  You shall comply with the

14    Sex Offender Registration requirements for convicted sex

15    offenders in any state or jurisdiction where you reside, are

16    employed, carry on a vocation, or are a student.  Imposing

17    registration as a condition of supervised release is the least

18    restrictive means of protecting the public from further sex

19    crimes.

20         Contact restrictions:  Your contact with minors will

21    be restricted during the period of supervision.  You shall have

22    no direct contact with any child you know or reasonably should

23    know to be under the age of 18 without the permission of the

24    probation office.  Direct contact includes written

25    communication, in-person communication, or physical contact.

1    In the event you have such contact, you must report it to the

2    probation officer within 24 hours.  This restriction includes

3    working in any facility for the care or education of children

4    and is the least restrictive means necessary of protecting the

5    public from future sex crimes against minors, of deterring

6    future offenses, and encouraging registration.

7         Computer, internet search, and monitoring:  You must

8    allow the probation officer to install computer monitoring

9    software on any computer as defined in 18 U.S.C. 1030(e)(1)

10   that you use.  You must submit your computers as defined in

11   18 U.S.C. 1030(e)(1) or other electronic communications or data

12   storage devices or media to a search.  You must further warn

13   any other people who use these computers or devices capable of

14   accessing the internet that the device may be subject to

15   searches pursuant to this condition.

16        Given that the offense of conviction involved the use

17   of a computer to store illegal pornographic images, this

18   condition is the least restrictive means of protecting the

19   public from future offenses, deterring from committing any

20   future offenses, and aiding in treating your correctional

21   needs.

22        Mental health treatment:  You shall participate in a

23   mental health treatment program which may include outpatient

24   counseling or residential placement as approved and directed by

25   the probation office.  Given the connection between your

1    diagnosed mental health condition, paraphilic disorder, and the

2    crimes for which you have been convicted, this condition is the

3    least restrictive means possible of protecting the public from

4    future offenses, deterring you from committing any future

5    offenses, and ensuring that you remain in good mental health in

6    the name of rehabilitation.

7            The probation office shall release the presentence

8    investigation report to all appropriate agencies in order to

9    execute the sentence of the Court.  Treatment agencies shall

10   return the presentence report to the probation office upon the

11   defendant's completion or termination from treatment.

12           Mr. Hillie, you have the right to appeal the sentence

13   imposed by this Court.  If you choose to appeal, you must file

14   an appeal within 14 days after the Court enters judgment.

15           Are there any objections to the sentence imposed that

16   are not already noted on the record?

17           MS. HERTZFELD:  No, Your Honor.  Thank you.

18           MS. SLAIGHT:  No, Your Honor.

19           THE COURT:  All right.  This concludes the Court's

20   judgment in this case.

21           Ms. Slaight, do you have any recommendations for an

22   incarceration facility, or would you like to notify the Court

23   later?

24           MS. SLAIGHT:  We would request Petersburg.

25           THE COURT:  I'm sorry?

1          MS. SLAIGHT:  Petersburg.

2          THE COURT:  All right.  The Court will make a

3    recommendation to BOP that Mr. Hillie be housed at BOP

4    Petersburg.

5              Is there anything else that we should address today?

6          MS. HERTZFELD:  No, Your Honor.  Although

7    Ms. Franklin is pointing at me.

8          THE COURTROOM DEPUTY:  The government needs to

9    dismiss all the remaining counts that are pending in the case.

10         THE COURT:  Are there remaining counts pending, or

11   did they supersede the indictment?

12         THE COURTROOM DEPUTY:  They superseded but they're

13   still pending.  So you have to dismiss all of those.

14         MS. HERTZFELD:  So we did supersede the indictment.

15   I -- I would have thought that would have replaced anything

16   that was remaining, but if not, to the extent there is anything

17   else remaining, we would move to dismiss.

18         THE COURT:  All right.  If there's anything else

19   remaining at this point, the government's motion is granted.

20         MS. HERTZFELD:  Thank you.

21         THE COURT:  Anything else, Ms. Slaight?

22         MS. SLAIGHT:  No, Your Honor.

23         THE COURT:  All right.  Thank you.

24              (Proceedings concluded.)

25

1                  <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3            I, Nancy J. Meyer, Registered Professional Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                       Dated this 24th day of July, 2019.

10

11                      /s/ Nancy J. Meyer
                        Nancy J. Meyer
12                      Official Court Reporter
                        Registered Professional Reporter
13                      Certified Realtime Reporter
                        333 Constitution Avenue Northwest, Room 6509
14                      Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25