```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,        .
                                       .  Case Number 16-CR-030
 4              Plaintiff,             .
                                       .
 5         vs.                         .
                                       .  Washington, D.C.
 6    CHARLES HILLIE,                  .  March 22, 2018
                                       .  2:40 p.m.
 7              Defendant.             .
      - - - - - - - - - - - - - - - - -
 8

 9              TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
             BEFORE THE HONORABLE KETANJI BROWN JACKSON
10                   UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    For the Government:       ANDREA HERTZFELD, AUSA
                                KENECHUKWU OKOCHA, AUSA
14                              United States Attorney's Office
                                555 Fourth Street Northwest
15                              Washington, D.C. 20530
                                202-252-7808
16
      For the Defendant:        JOANNE D. SLAIGHT, ESQ.
17                              Law Offices of Joanne D. Slaight
                                400 Seventh Street Northwest
18                              Suite 206
                                Washington, D.C. 20004
19                              202-408-2041

20

21    Official Court Reporter:  SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
22                              U.S. Courthouse, Room 4704-B
                                Washington, D.C. 20001
23                              202-354-3284

24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

```
 1                  P R O C E E D I N G S
 2          (Call to order of the court.)
 3              THE COURTROOM DEPUTY:  Your Honor, this is Criminal
 4      Case Number 16-030, the United States of America versus Charles
 5      Hillie.
 6          Will counsel please approach the lectern and state your
 7      appearances for the record.
 8              MS. HERTZFELD:  Good afternoon, Your Honor.  Andrea
 9      Hertzfeld for the United States.
10              THE COURT:  Good afternoon, Ms. Hertzfeld.
11              MR. OKOCHA:  Good afternoon, Your Honor.  Kene Okocha
12      on behalf of the United States.
13              THE COURT:  Mr. Okocha.
14              MS. SLAIGHT:  Good afternoon, Your Honor.  Joanne
15      Slaight for Charles Hillie.
16              THE COURT:  Mr. Slaight and Mr. Hillie.
17          We are here for the final pretrial conference to prepare
18      for Mr. Hillie's jury trial on the 17-count criminal superseding
19      indictment that was filed against him in January of last year.
20      The trial is scheduled to commence, as you know, next Thursday,
21      March 29th.
22          I have issued a trial procedures order.  Included with that
23      order was a copy of the voir dire questions that the Court
24      proposes to use in this matter, and I also e-mailed the parties
25      a complete set of draft jury instructions, which I trust that
```

1    you've received and seen.  The hope is that you have had some

2    time to review those materials, because we will be touching upon

3    some of them in our discussion today.

4        Let me tell you what I have on my agenda.  I want to talk a

5    little bit, just sort of close the loop on plea negotiations,

6    discovery.  I want to talk about the trial schedule, voir dire,

7    a couple of points with respect to the draft jury instructions.

8    I wanted to clarify where we are with respect to the pending

9    motions, which I think are the two motions that have been held

10   in abeyance at the parties' request.  Evidentiary issues, I just

11   want to clarify if there's anything more that we can address

12   ahead of the trial.  And then there are some final miscellaneous

13   matters that I would like to make sure we address before trial.

14       I know my little agenda is very broad.  So it may cover

15   anything that you might want to add.  But is there anything in

16   particular that either of you is thinking of right now?

17            MS. HERTZFELD:  No, Your Honor.  I think that probably

18   covers it.

19            THE COURT:  Ms. Slaight?

20            MS. SLAIGHT:  I think that the questions that I have

21   are all within your --

22            THE COURT:  All right.  And if they're not, you can

23   raise them at the end.

24       So let me start with plea negotiations.  Because of the

25   Supreme Court's decision in *Missouri v. Frye* and

1    *Lafler v. Cooper*, it's my practice to just get on the record

2    where we are with respect to plea offers.

3       Ms. Hertzfeld, it's my understanding from the prior

4    pretrial conferences that the Court has had in this matter, that

5    the government was at least initially informally considering

6    whether or not to extend another plea offer to Mr. Hillie.  So I

7    just want -- maybe you can tell me for the record what was

8    offered and whether or not we are still going to trial.

9       MS. HERTZFELD:  We are, Your Honor, still going to

10   trial.  The parties have not had any further plea negotiations

11   since our last pretrial conference, and there's been no further

12   plea offer extended since Ms. Slaight became counsel of record

13   in this case.

14       THE COURT:  Okay.  Ms. Slaight, is that your

15   understanding?  Have you had a chance to discuss the possibility

16   of a nontrial disposition with your client, and has he rejected

17   any such further negotiations?

18       MS. SLAIGHT:  Yes, Your Honor.

19       THE COURT:  Okay.  With respect to discovery, I just

20   want to confirm that all discovery has been exchanged at this

21   point.  Let me ask government counsel, is there anything that I

22   need to be aware of with respect to discovery?

23       MS. HERTZFELD:  There's not, Your Honor.  All the

24   discovery has been disclosed at this point.  There are a few

25   materials that were provided in redacted form to the defense at

1    an earlier stage in this litigation, and I think that we will be

2    providing unredacted copies.  Most of the redactions have been

3    answered in questions between counsel about what the redactions

4    were.  But I think to the extent that there are any remaining

5    materials that still have redactions, we will provide the

6    unredacted copies, I think, this afternoon is our expectation.

7         And we've provided a couple additional materials to the

8    defense today that we've received, largely having to do with

9    documents to establish dates of birth, and those were turned

10   over this afternoon.  And that was the last new piece of

11   evidence that the government had to disclose.

12        This relates tangentially to discovery, I think, and wasn't

13   on the Court's list, so I think now might be the time to raise

14   it, which is to say, as we've gotten a couple new pieces of

15   information and had some discussions about stipulations, we've

16   been in kind of a continual revision of the exhibit list that we

17   submitted to the Court.

18             THE COURT:  Yes.

19             MS. HERTZFELD:  It's, by and large, the same.  There's

20   no major revisions to it.  But we have been making some tweaks.

21   I provided the most recent copy to your courtroom deputy and to

22   Ms. Slaight today with updated exhibit numbers.  There may be

23   minor revisions to that still before we begin on Thursday.  But

24   by the time we have the jury selection underway, I think I will

25   have a final list for the Court.  I can pass up an additional

1  copy of it.

2          THE COURT:  That would be great, if you have another.

3          MS. HERTZFELD:  I do.  It's, like I said, largely in

4  the ballpark of what was filed.  It's just some minor -- there

5  was a couple places we merged together some of the video clips

6  we intend to show into one larger clip so it would be fewer

7  exhibits.  We added one additional photograph of the second

8  victim.  We had one proposed photograph of the older victim that

9  we had some negotiations and, I think, agreed to a cropped

10  version of that photograph.

11          THE COURT:  Is this the one with the family that we

12  talked about before?

13          MS. HERTZFELD:  It was.  We are still trying to -- the

14  second victim, we have a photograph we propose using, which I

15  will share with Ms. Slaight today.  We're trying to get one that

16  doesn't have anybody else in it.  But that's still -- minor

17  things like that are still in flux, but I expect it will all be

18  squared away by Monday, and I don't think the numbers will

19  change much.

20          THE COURT:  All right.  Thank you for giving me this

21  updated list.

22      Ms. Slaight, do you have any other issues related to what

23  you have received in discovery?

24          MS. SLAIGHT:  Your Honor, I received lease information

25  today concerning one of the addresses that the complainants

lived at, and also, I had asked the government to provide the name of a social worker for one of the documents.  It's a long document.  It's at least 15 pages, but the social worker is not listed.  It just lists the person in first person, "she talked to me," "I talked to her," et cetera, et cetera, et cetera.  But it doesn't list the name of the social worker, and so I've asked for the name of the social worker.

THE COURT:  And the government says it will give it to you?

MS. SLAIGHT:  They're going to --

MS. HERTZFELD:  Yes, Your Honor.  Just to be clear, so what we obtained from Child and Family Services is what the records are pertinent to.  We've disclosed all the records that we have in our possession at this time from that organization. To the extent that there's social workers' names and information in those records, we've provided the unredacted copies.

If there's additional information that Ms. Slaight wants us to try to obtain from CFSA, we can make inquiry to see if we can find out more information, but everything we have in our possession now has been turned over.

Ms. Slaight made this request yesterday, and I'm fine with trying to figure out the answer to the question that she's asking.  It's not in our possession now, but I think to the extent we can find it out, I certainly will.

THE COURT:  All right.  Ms. Slaight, are you prevented

from also inquiring of the author of the record who this person
is?

    MS. SLAIGHT:  To find out who the author of the record
is?

    THE COURT:  No, I'm sorry.  The author, I understood,
is there, but they're referencing someone.

    MS. SLAIGHT:  No, no, that's who I wanted to find out.
The social worker is the author of the records.  So I wanted to
find out who that person is.

  For example, there were two separate reports, one for each
complainant.  One complainant, the social worker's name is at
the top of each page.  This particular one that I've shown the
government, the social worker's name isn't at the top of each
page.

  One of the complainants made a report to that social worker
that I would want to -- gave information to that social worker,
and so I would want to find -- the report is there, and I think
that it's *Brady*, and -- I don't know what the complainant is
going to say about it, but obviously, if she were to say she
gave this information to the social worker, that would solve
things, but if I have to complete the impeachment, I would want
to have her there or a stipulation.

    THE COURT:  Well, it's very hard for me to understand
in the abstract, not having seen the report, what you're saying.
I hear you saying that there's some report that doesn't have the

1    author's name on it or indicates who is writing it, but it's

2    pertaining to information given to that person, whoever authored

3    the report, by one of the complainants in this case?

4            MS. SLAIGHT:  Uh-huh.

5            THE COURT:  Is that what you were saying?

6            MS. SLAIGHT:  Right, uh-huh.  And it may be a prior

7    inconsistent statement.  I suspect it will be.  So if I need to

8    call to complete the impeachment, I need to know who the name

9    is.

10           THE COURT:  All right.  And I don't hear the

11   government objecting to you getting that information.  We just

12   have to figure out the best way to go about it.  Right?

13           MS. HERTZFELD:  That's right, Your Honor.  I don't

14   think the actual information that was provided will be in

15   dispute in the trial.  The government accepts the facts that are

16   in the report that was turned over.

17       We produced the records as they were produced to us from

18   Child and Family Services with the information that they gave to

19   us.  As I said, to the extent we need -- I'm happy to help try

20   and contact them and get additional information for Ms. Slaight,

21   if that --

22           THE COURT:  Yeah, I think we're going to need -- if

23   there's some report in the discovery that was written by an

24   unknown person and given to the government -- I'm not disputing

25   your representation that you've turned over everything you have,

1   but it sounds as though there is pertinent information missing

2   from the records that you have, namely the author of this

3   particular report.  I think the government should engage in an

4   inquiry as to who wrote this and see if we can come up with the

5   name.

6           MS. HERTZFELD:  We will, Your Honor.

7           THE COURT:  Does that satisfy you, Ms. Slaight?

8           MS. SLAIGHT:  Yes.  I think that we are going to be

9   able to resolve this.  I just wanted to let the Court know since

10  the trial is just a week away.

11          THE COURT:  Right.  All right.  Anything else,

12  Ms. Slaight, in the discovery bucket of information?

13          MS. SLAIGHT:  No, Your Honor.  I have the other

14  information on -- no.  It's just issues about what's admitted,

15  but I have the information.

16          THE COURT:  Okay.  So with respect to the trial,

17  turning to the trial schedule, you have my trial procedures

18  order.  We're going to begin next Thursday.  As my order says,

19  we start at 9:30.  The parties should be here a little early

20  just in case there are things we need to discuss.  I ordinarily

21  have jury instruction -- sorry, jury selection sort of

22  stand-alone, but because of the tight time frame we're working

23  on here, I am thinking that if we are able to pick a jury

24  expeditiously -- and we may not be.  But if we are, I think the

25  parties should be prepared to proceed to opening statements on

1     the first day, because I don't want to waste any time since

2     we're worried about making sure we get everything in in the

3     window of time that we've set forward.

4          So we won't go past opening statements.  You don't have to

5     have your witnesses.  I don't think it's realistic to think that

6     we will get into evidence.  But it may be that we swear the jury

7     and start with the openings on Thursday.  All right?

8          Also, I think it's a good idea for us to check in, perhaps,

9     by phone maybe on Wednesday in the afternoon.  I'm going to be

10    traveling through the morning and getting back midday, but maybe

11    we can have a teleconference sort of in the 4:00 to 4:30 range

12    just so that if there are any last-minute things, for example if

13    we haven't found the name of this person and there's some issue

14    with regard to the evidence, I would like to know about these

15    things before we get into trial, if I can.

16         So are you available, let's say, 4:30 next Wednesday, the

17    28th?

18                    MS. HERTZFELD:  The government is, yes, Your Honor.

19                    MS. SLAIGHT:  Yes, Your Honor.

20                    THE COURT:  I will get to you, probably via e-mail,

21    the dial-in information for our conference line, and we can

22    convene at that time just to finalize things before we go to

23    trial.

24         All right.  So let's turn to the voir dire that I attached

25    as an appendix to the trial procedure order.  Let me just

clarify for the record my process for addressing the parties'
disputes about things like voir dire and jury instructions.  The
parties gave me a joint pretrial statement.  Indicated in that
document were a number of disputes about various things, the
language of various instructions and voir dire questions.

And my clerk and I carefully combed through all of the
parties' objections and made a decision.  So to the extent that
I have now given back to you my proposed voir dire and jury
instructions, what you see there is my resolution of the
disputes that appeared in your prior filings.

That is not to say that, you know, if you feel strongly
enough about something and you see that what I have proposed is
inconsistent with the law or your understanding of the facts,
that you shouldn't raise it, but you can consider anything that
was previously raised to be preserved in terms of appeal or
whatever else.  But I would like to try to get it right.  So if
there are certain things that you think are problematic, it
would be good if you raised them again in this context so that
we can address them.

So with respect to the voir dire, does anyone have any
questions, concerns, or objections to what you see there?

The resolution of the statement of the case, which I know
had some objections and concerns, is in the first -- I guess the
second and third, third and fourth paragraphs.  You see it
there.  I went through and decided the language that I thought

1    was proper.

2         Does either party want to discuss the voir dire, either the

3    statement of the case in it or the questions or anything else

4    about voir dire?

5              MS. HERTZFELD:  No, Your Honor.

6              MS. SLAIGHT:  No, Your Honor.  We just preserve our --

7              THE COURT:  You preserve -- everything you previously

8    put on the table is preserved.

9              MS. SLAIGHT:  Right.  I don't have anything additional

10   to add.

11        If I could have the Court's indulgence.

12             THE COURT:  Yes.

13        (Pause.)

14             MS. SLAIGHT:  Thank you.

15             THE COURT:  Thank you.  Does anyone have any questions

16   about how voir dire is conducted?  I wrote it out.  I think it's

17   pretty standard in terms of the index card method, and my

18   courtroom staff will make sure that people are seated in a way

19   that you can follow the process and know which jurors are where,

20   and we do a version of the struck method where you do

21   simultaneous strikes and then you exchange.

22        Ms. Slaight, are you familiar with this process, voir dire

23   process?

24             MS. SLAIGHT:  Yes.  The only issue that I am asking

25   the Court to consider is I know that you -- when the

1    peremptories are -- when people use their peremptories, you keep

2    the people in the box -- or I'm sorry, in the --

3            THE COURT:  Yes.

4            MS. SLAIGHT:  It's just that it's really hard to,

5    then, figure out who is where.  Usually -- and obviously, this

6    is your decision and final decision.  But usually, the

7    peremptory -- if somebody has a peremptory strike, those people

8    are taken out of the --

9            THE COURT:  If you have judges who do it in the box, I

10   find it's very disruptive to have people popping in and out of

11   the box.  If you have a list and we keep people seated in the

12   same places, it's not actually that hard to follow.

13       I mean, I understand, judges do it differently.  Some, as

14   soon as the strikes for cause are done, will sit people in the

15   box, and then they do the peremptories, and then those people

16   leave and new people come in.

17       But that takes time, and if you follow what's happening in

18   the list, it actually turns out not to be that hard to keep

19   track of who has been struck and who hasn't.  I also find it's

20   kinder to the jurors, because they're not being sort of made to

21   sit up and then made to walk away, clearly having been struck by

22   the parties.  We just do it in a much more innocuous way, I

23   think.

24           MS. SLAIGHT:  Well, I was thinking actually about the

25   fact that even if they're sitting in the jury -- not in the jury

1    seat, in the witness seats --

2            THE COURT:  In the well?

3            MS. SLAIGHT:  -- that if they could be separated if

4    the peremptories are used, because it gets a little confusing --

5    I have never done it that way where people stay there after

6    their peremptories are used, and I'm just afraid I'm going to be

7    looking -- it's hard to look at people and say did we kick this

8    person off.  It's just -- you know, I've just never done it that

9    way.  If we could separate out those people who have the

10   peremptories --

11           THE COURT:  I will consider it.  I think it's

12   unlikely.  I think if you keep everybody exactly where they are

13   and you have a list where you've named and numbered each person,

14   that I've never had anybody get confused.

15           MS. SLAIGHT:  Wow.  You may have a first here.  And do

16   the peremptories leave or the peremptories stay also?

17           THE COURT:  The cause or the peremptories?

18           MS. SLAIGHT:  I'm sorry.  Do the strikes for cause

19   also --

20           THE COURT:  Strikes for cause leave.  Or do they stay?

21   I thought they left.  No.

22           THE COURTROOM DEPUTY:  Because when you have eight

23   people on the row, still those eight people are there.  And when

24   you go down your list, if 5 or 6 are stricken for cause, then

25   they're still there.

1          THE COURT:  Right.  So you just keep -- everybody

2     always stays where they are so there's not shuffling.  We find

3     it that the shuffling is harder, because then you have to move

4     people in your list.  When you look out there, everybody is

5     always staying where they are.  So when you strike people, you

6     know that 2, 3, 4, and 8 are gone, and you just keep counting.

7          MS. SLAIGHT:  All right.  Does the Court call every

8     juror, regardless of whether they have answered any --

9          THE COURT:  Yes, every juror gets called up until

10    we've qualified enough.

11         MS. SLAIGHT:  And just confirm that they have

12    answered?

13         THE COURT:  Yes.  Even when they have nothing, I say,

14    are you sure you have nothing, and then the parties can follow

15    up if you have particular questions.  But then as soon as that

16    person leaves, we say, I think that person should be struck for

17    cause, you agree, and then you cross them off your list.  But

18    they go back to sit exactly where they are, and you keep

19    everybody constant.

20         MS. SLAIGHT:  That's all the questions I have for

21    that.  Thank you.

22         THE COURT:  All right.  Thank you.

23      So turning to the jury instructions draft, what I have

24    given you is what I call internally the "initial distribution

25    draft," which again resolves many, if not all -- most, if not

1    all, of the disputes that I saw in your jury instructions.

2    Obviously, jury instructions remain a work in progress up until

3    pretty much the end, because there are lots of contingencies and

4    we don't know whether certain evidence will come in, whether

5    certain instructions will have to be stricken.  So we will have

6    a charging conference toward the end of the trial before I give

7    these to the jury.  And as a result, we don't need to kind of go

8    through them one by one right now.

9         Let me just call your attention to a couple of them, which

10    will help me as I prepare and look forward to what it is we are

11    going to be doing.

12         Do you all have your copies of the initial distribution

13    draft?

14             MS. HERTZFELD:  Yes, Your Honor.

15             MS. SLAIGHT:  Yes.

16             THE COURT:  Okay.  So let's turn to the instruction on

17    page 60 of the draft.  I had a question for the government.  In

18    looking at the evidence that was proposed at least previously --

19    I haven't looked at your new list that you just gave me, but

20    there were some transcripts that were on the actual evidence

21    list as it was previously given to me, and then there were also

22    some recordings.  I think the recordings were of officers.  And

23    also, I see -- sorry.  I'm looking at number 20 of your new

24    list, for example, witness 1 audio interview.  21 is JAA audio

25    interview.  But then 22 is a transcript of JAA's audio

1    interview, if necessary.

2         Let me just understand what the government's intentions

3    are, because there are times when transcripts are introduced as

4    evidence and then there are times when transcripts are allowed

5    just as aids.  And this instruction, I think, pertains to that

6    scenario.  So I'm trying to understand.

7         MS. HERTZFELD:  Yes, Your Honor.  I should have said

8    this when I first handed this up.  So the Court can see that

9    there's a break after Government's Exhibit 17.  There's a page

10   break there.

11        THE COURT:  Yes.

12        MS. HERTZFELD:  The government only intends to

13   introduce Exhibits 1 through 17 in its case-in-chief.

14        THE COURT:  All right.

15        MS. HERTZFELD:  The additional exhibits that are

16   listed after the page break, so 18 through 39, are exhibits

17   that, depending on the testimony, if they were required either

18   to refresh recollection or for impeachment purposes, the

19   government may introduce.  So we marked them so the Court and

20   defense counsel have a record.  But I don't expect they're very

21   likely going to come into play at the trial.

22        To the extent that there is --

23        THE COURT:  So let me just stop you there.  Are there

24   any tape-recordings in 1 through 17?

25        MS. HERTZFELD:  There is not, Your Honor.

1    THE COURT:  So we are already in the contingency world

2    of the possibility of tape-recordings?

3    MS. HERTZFELD:  We are.

4    THE COURT:  All right.  So assuming you get to the

5    point of deciding to introduce a tape-recording, would you be

6    playing a recording or introducing the transcript or both?

7    MS. HERTZFELD:  I think we would probably expect to do

8    both.  Again, it's hard to know for sure until we saw the

9    context it came in and sort of what portion of the recording

10   would be used, in part because, with respect to some of these

11   recordings, the quality of the audio is better or worse.  So I

12   think it's possible we would want to use both, but if possible,

13   we would use the recording itself.

14   I think we should keep the instruction as a possibility as

15   if we were going to use the transcript, because, for example,

16   with respect to one of the audio recordings, it's a little

17   harder to hear than others.  So I think if we needed it, we

18   might want to use the transcript.

19   THE COURT:  And if you wanted to use the transcript,

20   would you seek to introduce it as evidence or just -- because

21   you see this -- you understand what I mean --

22   MS. HERTZFELD:  I understand.

23   THE COURT:  -- that the instruction says, you have a

24   transcript to help you, listen to the recording, if there's any

25   discrepancy between the two it is the recording that is the

1    evidence.  But having listed it here as an evidentiary item, it

2    isn't clear to me whether the government is seeking to have it

3    introduced as evidence, the transcript.

4            MS. HERTZFELD:  Yes, I understand, Your Honor.  I

5    think, in all likelihood, we would be introducing the audio

6    recording itself and then the transcript as an aid, unless for

7    some reason there was some portion of it that -- I can't even

8    really imagine the circumstances.  We always caveat everything

9    just in case.  But I think the overwhelming likelihood is if we

10   use any of this material, it would be the audio recording would

11   be the evidence.

12           THE COURT:  And the transcript would be the aid, which

13   then would make this instruction at page 60 relevant.

14           MS. HERTZFELD:  Yes, Your Honor.

15           THE COURT:  But all the transcripts that you would use

16   have been turned over to the defense and provided as a part of

17   this exhibit?

18           MS. HERTZFELD:  Yes, Your Honor.

19           THE COURT:  Ms. Slaight, so you have seen the

20   transcripts that they intend to use?

21           MS. SLAIGHT:  Just to clarify, so I think what we are

22   talking about here is the two complainants' transcripts?

23           THE COURT:  I'm looking at number 22 and number 24.

24           MS. HERTZFELD:  That's true.  And then there is a

25   transcription of the defendant's arrest interview which has also

1    been disclosed.  It's not marked on this list, because that's a

2    very clear recording.  So we have transcribed it.  We've turned

3    it over to the defense.  It's not put on this list as a

4    potential exhibit.

5              THE COURT:  I see.

6              MS. SLAIGHT:  If I could have the Court's indulgence.

7              THE COURT:  Sure.

8         (Government counsel and defense counsel conferred.)

9              MS. SLAIGHT:  Your Honor, the defense position is that

10   the transcript should not be used, but -- certainly not admitted

11   into the evidence, which the government is agreeing that they

12   shouldn't be admitted into evidence; is that right?

13             THE COURT:  The government is agreeing that they will

14   not seek to introduce them as evidence.

15             MS. SLAIGHT:  Right.

16             THE COURT:  They may ask, if the recording, they

17   think, is not clear enough, to have the jury use them while they

18   listen to the recording, at which point I would read the

19   particular instruction here that makes it clear that the

20   recording is the evidence and not the transcript.

21             MS. SLAIGHT:  Right.  And the defense position is that

22   the transcript isn't necessary, that the --

23             THE COURT:  That the recording is good enough?

24             MS. SLAIGHT:  Yes.

25             THE COURT:  All right.  Well, this is all contingent,

1    in any event, because the government is not seeking to include

2    this in their case-in-chief, but we now know what the positions

3    are related to it.  All right?  Good.

4        Let me turn your attention to page 61.  This instruction,

5    as I have it set out here, is taken from the D.C. Criminal Jury

6    Instructions, and it is contingent upon which type of

7    photograph.  So let me get a sense from the government if you

8    have an idea of what you plan to admit in terms of photographs

9    of the defendant.

10           MS. HERTZFELD:  Yes, Your Honor.  The only photograph

11   of the defendant we would intend to introduce would be a still

12   photograph taken as an excerpt from the video exhibits that the

13   government's going to introduce.

14           THE COURT:  All right.

15           MS. HERTZFELD:  So for example, Government's

16   Exhibit 4B on the updated exhibit list -- I'm sorry.  That's

17   wrong.  It's actually 4E is the still.  I'm sorry.

18           THE COURT:  Okay.

19           MS. HERTZFELD:  So Exhibit 4E is a still screen shot

20   essentially from the larger video that is just a depiction of

21   the defendant's face in the context of being in the child's

22   bedroom.

23           THE COURT:  All right.  So does that mean that -- I'm

24   looking at the instruction.  I'm trying to determine whether

25   it's relevant, because the photographs of the defendant that are

being discussed in both paragraphs on page 61 are photographs
that have been obtained by the police, and the instruction is
trying to mitigate any, you know, arrest inferences or anything
that relate to that.  But since you're talking about photographs
that are not coming from the police in this way --

MS. HERTZFELD:  I don't think we need it.

THE COURT:  -- I don't know that we need it.
Ms. Slaight?

MS. SLAIGHT:  I agree that this doesn't seem --
neither of these seem appropriate because these are not used --
I think these are in anticipation of identification.

THE COURT:  Correct.  So out.  Okay.  Good.  As much
as we can do ahead of time, I think, is helpful.  All right.

Page 62, this is a little tricky.  So let me try to explain
what it is that I'm thinking about.  I know that the government
intends to introduce, based on our previous discussions, certain
other crimes evidence, and my records indicate this is the
alleged assault of JAA, I believe it is.  Sorry.  No.  Let me
just get this straight.

This is in the government's motion to admit other crimes
evidence in ECF number 52, that the government may seek to
introduce evidence of, number 1, Mr. Hillie's indecent exposure
of himself to JAA; number 2, Mr. Hillie's physical assault of
JA; and number 3, the sexually explicit Internet search terms.

I ruled on the search terms, essentially saying it couldn't

1    really be done in the context in which we were addressing it at

2    the time.  And then I also granted the government's motion with

3    respect to the indecent exposure and the physical assault.

4        What I need to know again, perhaps from the government at

5    this point, is whether it still intends to introduce those types

6    of evidence or make mention of those other crimes and what they

7    would be offering to show with respect to it.

8        I know it's a little tough to sort of ferret that out now.

9    So let me give you a moment.

10       MS. HERTZFELD:  Thank you, Your Honor.  So we have had

11   some discussions about this.  I think with respect to the

12   government, the evidence the government intends to introduce, we

13   do intend to introduce the evidence of the defendant striking

14   JA, as well as the evidence of the indecent exposure.

15       I think with respect to the indecent exposure evidence, all

16   three of the first three enumerated items go to the government's

17   intent for -- its purpose for introducing that evidence, which

18   is to say, it goes to motive, it goes to the acts -- the

19   offenses similar enough to be indicia that the defendant also

20   committed the other crimes, the crimes that are alleged, as well

21   as to the common scheme or plan.

22       With respect to the simple assault, it's all sort of part

23   and parcel of the disclosure of the assaults.  And so I think

24   that goes both to the motive and to the scheme or plan, which is

25   1 and 3.  It's in the context of her disclosure of the sexual

1    assaults that that --

2              THE COURT:  So I have to go back and look at this

3    carefully.  I think you might be right with respect to the

4    simple assault, but I'm not committed to that right now.

5         Let me tell you why it matters:  Because my understanding,

6    at least in the ruling that I made with respect to this, which

7    was an oral ruling -- I don't have the date on me, but I orally

8    ruled on the government's motion to admit other crimes evidence.

9    And I had understood, based on that motion, that the government

10   was also seeking introduction of at least the indecent exposure

11   evidence pursuant to Rule 413 and Rule 414.

12             MS. HERTZFELD:  That's right.

13             THE COURT:  The reason why it matters is because we

14   have found that at least one circuit, the Third Circuit, has

15   indicated that you should not give an other crimes evidence

16   instruction in a situation in which you're dealing with 413 or

17   414 evidence.

18        Let me read you what the Third Circuit's pattern

19   instruction says, and I think the D.C. Circuit -- I'm sorry, the

20   D.C. Court of Appeals has just not discussed this.

21        The Third Circuit says, Other acts evidence admitted under

22   Rule 413 or 414.  This instruction should not be given when the

23   other acts evidence was admitted under those two rules.  Those

24   rules allow the prosecution to introduce evidence of similar

25   acts in prosecutions for sexual assault or child molestation.

The evidence of prior conduct admitted under those rules may be considered on any matter to which it is relevant.  As a result, no limiting instruction should be given.  Because the content of the other crimes evidence instruction is essentially a limiting instruction, you can only use this for certain purposes.  To the extent that other sexual assault-type behavior has been admitted under Rule 413 or 414, you're not, as the jury, limited to considering it only with respect to intent or motive or whatever.

And so I think, depending upon the government's intention with respect to the introduction of the evidence, I may have to word it differently whether we're talking about the physical assault or the indecent exposure.

MS. HERTZFELD:  I agree, Your Honor.  I'm not sure specifically what case Your Honor is -- is that from the pattern instructions?

THE COURT:  Third Circuit Pattern Instruction 2.23 for bad acts evidence.

MS. HERTZFELD:  So I did some research into whether or not there was an instruction that is generally given with respect to 413 or 414 and didn't find anything immediate.  I can take another look.

When I got this from the -- I didn't really understand this -- how this was going to be used.  I think with respect -- I agree with Your Honor that the government can introduce the

1    indecent acts evidence, as Your Honor ruled, with respect to any

2    issue to which it's relevant.

3           THE COURT:  Right.

4           MS. HERTZFELD:  I wasn't sure how this was intended to

5    play in.  I agree with Your Honor that the most precise way to

6    instruct the jury would be an instruction like this as to the

7    simple assault and then to give some instruction indicating the

8    less limited purpose for which -- the broader purpose for which

9    they can use the --

10          THE COURT:  We will have to think about it; right?

11   One, if it was only the indecent exposure, then perhaps give no

12   instruction, says the Third Circuit.  If all the evidence at

13   issue was 413 or 414 evidence, then as long as it's relevant,

14   the jury can consider it for any purpose.

15       The quirk here is that we have some other acts evidence

16   that can only be used for a limited purpose under the 404(b)

17   scenario and some, I guess, coming in under 413.

18       So the question is, do we just not talk about the indecent

19   exposure evidence at all, or should there be some instruction

20   saying it can be used for a broader purpose, unlike the simple

21   assault evidence.  Maybe we don't resolve this here, but it's

22   something that should be on all of our radar screens as we move

23   toward trial and think about final instructions.

24          MS. HERTZFELD:  Maybe we could take a look at this,

25   Your Honor, and just revisit it on our call on Wednesday, if

1    that's agreeable to the Court.

2           THE COURT:  Yes, I think that's right.  And if you

3    come to some agreement on both sides as to how to deal with it,

4    if you have proposed language, that would be helpful.  I just

5    think that -- I'm worried about including either of these

6    alternatives for limiting the scope of the use of the indecent

7    exposure evidence, to the extent that it's been admitted under

8    413 or 414.

9       I think you understand the issue.  So we will talk about it

10   when we meet again.

11          MS. HERTZFELD:  Yes.  Thank you, Your Honor.

12          THE COURT:  Ms. Slaight, I didn't know if you want to

13   comment on this now or whether you will be a part of the

14   discussion when we are on the phone.

15          MS. SLAIGHT:  I don't have anything else to add.

16          THE COURT:  All right.  Moving on, on page 96, this is

17   the instruction with respect to Count 12.  This is another

18   question for the government.

19       In looking at the indictment, which the language in the

20   indictment we inserted into the instruction, we noted that the

21   element of this offense is that the defendant is in a

22   significant relationship with the victim and that it appears

23   from the indictment that there were two different bases that the

24   grand jury found for significant relationship.

25       And the instruction, pattern instruction bears this out,

1    that you can find a significant relationship if the defendant is

2    more than four years older than the victim and resides in the

3    same dwelling, or you can find a significant relationship if the

4    defendant is the paramour of the person who was in charge of the

5    victim.

6         But in your joint instructions, you focused on only the

7    paramour reason.  So I didn't know whether that was an oversight

8    or whether that was intentional or what, because the instruction

9    now permits the jury to find either basis for significant

10   relationship, even though that wasn't in your original charge.

11        Ms. Hertzfeld?

12             MS. HERTZFELD:  Yes, Your Honor, I think it was an

13   oversight.  I think -- so probably the most correct thing to do

14   would be to have the jury be instructed that they could find on

15   either basis.  I think if we did that, we would probably need to

16   amend the verdict form for a finding as to the basis on which

17   they made that determination, if they find significant

18   relationship, so that we don't have a unanimity problem in terms

19   of what it was that they actually agreed on, if they make that

20   finding.

21        So I agree with Your Honor that they should be instructed

22   as to both bases and that we may need to make an amendment -- my

23   proposal would be that we make an amendment to the verdict form

24   to allow them to make a choice.

25             THE COURT:  As well.  All Right.

1     Ms. Slaight, do you have any comment on this?

2          MS. SLAIGHT:  Your Honor, I object to both, the same

3     dwelling instruction and, particularly, the paramour

4     instruction, paramour aspect.  The statute is only significant

5     relationship, and the --

6          THE COURT:  Doesn't the statute also have these

7     definitions of "significant relationship"?

8          MS. SLAIGHT:  It does not have paramour certainly, and

9     I do not think it has living in the same dwelling.  I did not

10    bring the statute with me, but I can look it up right now.  My

11    memory is that it does not.

12         THE COURT:  All right.

13         MS. SLAIGHT:  But certainly, paramour is not in there.

14         THE COURT:  Uh-huh.  I'm pretty sure that the -- well,

15    the defendant did object to this, in any event, I understand.

16         MS. SLAIGHT:  Yes.

17         THE COURT:  So your point is that neither of them

18    should be included?

19         MS. SLAIGHT:  Right.

20         THE COURT:  Now, why would not the significant

21    relationship/same dwelling, if that is in the statute, why would

22    that be inappropriate?

23         MS. SLAIGHT:  And again, I'm just going off the top of

24    my head.  I did not look at this before I came over, this

25    particular same dwelling.  But my memory is that it's not in

1      there.

2           So if it was that it is in the same dwelling, then it's,

3      obviously, a different issue, but definitely, paramour is not in

4      that statute.

5                THE COURT:  All right.  Well, we will have to trace

6      where we got paramour from.  I, too, am not as well-versed with

7      the statutes.  Oh, yeah, it's in the code.  It's in the code.

8      So I am looking at -- and we can all research this afterwards.

9      I'm looking at -- it's in the "definitions" section of the

10     statute.  So you have the first-degree child sex abuse statute,

11     which is D.C. 22-3008.  I'm trying to follow this through.  Hold

12     on.

13          Sorry.  I'm looking at second-degree sexual abuse of a

14     minor, which is 22-3009.02, and it says, "Whoever being 18 years

15     of age or older is in a significant relationship with a minor

16     and engages in a sexual contact with that minor or causes that

17     minor to engage in a sexual contact shall be imprisoned for not

18     more than seven-and-a-half years and may be fined not more than

19     the amount set forth" in this other statute.  So the pertinent

20     language is "whoever being 18 years of age or older is in a

21     significant relationship with a minor and engages in a sexual

22     contact with that minor."

23          And as you continue on in the statute, at Section 22-3001,

24     which is the "definitions," it says, "For the purpose of this

25     chapter," including the section that I just read, "significant

relationship," and this is in sub 10, "includes," and then it
has (a), (b), (c), and (d).  Sub 10(b) for the definition
of "significant relationship" "includes a legal or de facto
guardian or any person more than four years older than the
victim who resides intermittently or permanently in the same
dwelling as the victim."  That's 10(b).

Then 10(c), "Significant relationship includes the person
or the spouse, domestic partner, or paramour of the person who
is charged with any duty or responsibility for the health,
welfare, or supervision of the victim at the time of the act."

What I was inquiring of the government is that they appear
to have focused on 10(c) with respect to the jury instruction,
even though the indictment appears to charge both 10(b) and
10(c) as the basis of the significant relationship finding.  So
I didn't know whether or not the jury instruction just missed
the 10(b) basis.

I hear Ms. Hertzfeld saying that it did, and then as a
result, we're going to need to amend not only the jury
instruction, as the Court has indicated in its draft, but also
the verdict form to make sure that all the jurors are in
agreement as to either 10(b) or 10(c) with respect to the
finding of significant relationship.

Now, given that, Ms. Slaight, do you have any objection to
the government's contention that we need to get it right in
terms of the instruction and the verdict form?

1          MS. SLAIGHT:  Your Honor, we preserve our objections

2     as previously filed.

3          THE COURT:  All right.  So I will be amending those to

4     include both potential bases for a jury finding of significant

5     relationship with respect to Count 12.

6          Ms. Hertzfeld?

7          MS. HERTZFELD:  Thank you, Your Honor.  Just to make

8     sure I know what we need to do, with respect to the verdict

9     form -- it sounds like Your Honor is going to amend the jury

10    instructions.  With respect to the verdict form, does the Court

11    wish that the government make a proposal -- a proposed amendment

12    to the verdict form that would account for that and then submit

13    it to the Court?

14         THE COURT:  I think that would be helpful.  Share it

15    with the defense, and then submit it to me.

16         MS. HERTZFELD:  Yes, Your Honor.

17         THE COURT:  Thank you.  All right.  We're almost done.

18    So there are three instructions that, in the D.C. jury

19    instructions book, have a notation that they should only be

20    given if requested by the defendant in the D.C. model

21    instructions.

22    So I just wanted to touch base with you, Ms. Slaight, to

23    determine whether you were requesting them or what.  These are,

24    if you look at your initial distribution draft, page 50, which

25    pertains to the defendant's right not to testify.

1          Obviously, it will only be given if applicable, I guess.

2     If the defendant decides not to testify, then would you like the

3     Court to give this instruction about the right not to testify?

4               MS. SLAIGHT:  Yes.

5               THE COURT:  All right.  So I will consider that one

6     requested.

7          Page 51, this is if the defendant decides to testify.

8     Would you wish the Court to give this?

9               MS. SLAIGHT:  Yes.

10               THE COURT:  All right.  So we will have these both

11     available in case -- in those two contingencies.

12          What about -- oh, we've already taken out 61.  That was the

13     last one that I had.  So we're not going to worry about what's

14     on page 61 about the photo.  Okay.

15          Now, let me just say for the record, there was one

16     persistent dispute that came up in the parties' joint pretrial

17     statement, and it relates to the government's request that the

18     Court include certain instructions, and these are the force,

19     threat, resistance, and corroboration instructions that come up

20     in all of the substantive counts.

21          The Court went through pretty carefully and consistently

22     rejected the force, threat, and resistance instructions that the

23     government requested but accepted the corroboration instruction,

24     and I just wanted to be clear on the record why I did that.

25          In the Court's view, the force, threat, and resistance

instructions are not appropriate when the victim is a minor, because regardless of whether or not the minor resisted or whatever or whether the defendant used force or threats, the minor cannot consent to sexual conduct.

So these instructions are inapplicable.  They pertain to a circumstance typically -- you know, in an adult sex assault scenario where the question is whether or not the victim consented or the defendant forced the defendant -- the victim, and so there's a need to instruct the jury that even if the defendant didn't force her, you could still have sexual assault.

I don't find those issues to be material in this context where you're talking about minors, because regardless, you know, it would still be criminal conduct.  So I thought it was too confusing and unnecessary.

On the other hand, where the testimony is of underage victims would be a central issue, the Court finds it appropriate to instruct the jury that a minor's testimony does not require independent corroboration.  And in fact, the D.C. Code specifically sets that out.  It says at Section 23-114 that, for the purposes of prosecutions brought under this title, independent corroboration of the testimony of a child victim is not required to warrant a conviction.

And so to avoid any mistake by the jury that the testimony of the alleged victims in this case is enough, the Court found the corroboration instruction to be appropriate but not the

others.

All right?  So that's all I have for the moment related to
the draft instructions.  Is there any other issue that the
parties would like to discuss at this time?  Again, we will have
a chance during our charging conference to make sure that we've
covered everything and that we're not introducing error, but if
there's something that you are concerned with now, please let me
know.

MS. HERTZFELD:  Thank you, Your Honor.  Just a couple
of things from the government's perspective.

With respect to what Your Honor just said about the
resistance/force instructions, threats instructions in the
context of a child case, I certainly understand the Court's
ruling.

I would just ask the Court to permit us, if it becomes
applicable, to just reraise whether or not this may be
appropriate.  The reason that I say that is, while I agree with
Your Honor that none of those things are required elements and
that, because it's a child and consent is not at play, they can
seem like extraneous instructions, the reason that we proposed
them is because whether or not that's the case in terms of how
consent obviates those concepts, legally, oftentimes in these
cases we still hear lines of questioning or arguments with
respect to child witnesses along the lines of, you know, you
didn't tell, did you run away, did you try to get away.  Those

kinds of questions get asked of children all the time in these kinds of cases.

And I think what's important is for the jury -- and I don't know what the defense is going to be in this case.  We put them in there as sort of a just in case kind of to preserve them as a request.  And it may be the case that none of those lines of questioning or arguments get made and that they aren't required and that the simple, you know, consent is not a defense is enough.

I think that the reason they're important, depending on the way that a child gets cross-examined or the kind of arguments that get made, is because it's important for the jury to be reminded of the fact that, as part and parcel of this concept that consent -- you can't get consent from a child, is that you also can't require that if they don't tell it's because they had to be threatened or if they don't try to wrestle their way away from an adult who is sexually abusing them it is because there was force used.

So while I don't think we necessarily need to resolve it at this stage and it may not become relevant, I do think that there are reasons why those instructions are sometimes given in cases involving children.

THE COURT:  Well, I understand your point.  I think that you may have to tailor the language a little bit more.

MS. HERTZFELD:  Understood.

1        THE COURT:  If there's a particular concern that is

2   raised by what you think is an improper inference coming from

3   the actual testimony, this would be a situation in which you

4   need to have language specific to the circumstances that you

5   could present during the charging conference to address this

6   issue.

7        I think the way that the language is laid out here, it's

8   not sufficient to just replace, you know, "victim" with "JAA"

9   and "defendant" with "Mr. Hillie," because I couldn't

10  understand, given what we know of the alleged facts in this

11  circumstance, the threat or fear.  Much of the evidence is

12  involving surreptitious recording.  So it was hard to even

13  understand what that had to do with anything.  And I found it

14  confusing, and I don't want to confuse the jury.

15       But if you think, based on the testimony that unfolds, that

16  there's a possibility of the inference being -- the questioning,

17  as you say, suggests that she should have done something more or

18  whatever and that you feel like that needs to be countered, then

19  you should certainly feel free to bring forward language that is

20  specific to that with any citations footnoted about that legal

21  issue.

22       MS. HERTZFELD:  That's all we would ask at this point

23  is to reserve that.  Thank you, Your Honor.

24       THE COURT:  Thank you.

25       MS. HERTZFELD:  May I raise a couple of other points

1    that we had with respect to the instructions?

2           THE COURT:  Yes.

3           MS. HERTZFELD:  As a sort of initial matter, once the

4    trial begins, we're going to want to refer to the victims here

5    by their first names as opposed to "JA" and "JAA."

6           THE COURT:  Okay.

7           MS. HERTZFELD:  Up until now we've done that to

8    protect their identities.  So we would propose that once we

9    begin the trial, we can refer to them -- I think this is clear

10   from the records, but in case it's not, "JAA" is Janika, which

11   is J-a-n-i-k-a, and "JA," is Jaden, J-a-d-e-n.

12          THE COURT:  Okay.  So tell me what you mean "when the

13   trial begins."  Even -- in voir dire or no?

14          MS. HERTZFELD:  I think we can refer to them by name

15   in voir dire, Your Honor, from the outset.

16          THE COURT:  So do they have the same last name?

17          MS. HERTZFELD:  They do, Your Honor.  Their last name

18   initial is "A."

19          THE COURT:  So we would say "Janika A." and "Jaden

20   A."?

21          MS. HERTZFELD:  Yes, Your Honor.  Throughout the --

22   past voir dire, I think we will just refer to them as Janika and

23   Jaden.

24          THE COURT:  All right.

25          MS. HERTZFELD:  And then in terms of the substance of

1    the instructions, just a couple of issues I wanted to raise.

2        On page 6 in the statement of the case, the very first full

3    paragraph, it says, "The government alleges that on multiple

4    occasions."

5        THE COURT:  Hold on one second.  Let me just get to

6    where you are.  On page 6, yes.

7        MS. HERTZFELD:  We would just make the minor amendment

8    that it says, "Mr. Hillie sexually abused JAA and JA by touching

9    them."  It currently reads "on their breasts and genitalia."  I

10   think for completeness, we should have it say there "on their

11   breasts, buttocks, and genitalia," because there is one charge

12   that involves hand to buttocks contact.

13       THE COURT:  Okay.  All right.

14       MS. HERTZFELD:  And then the second thing would be

15   that with respect to the instruction on -- the initial

16   instruction on Count 2, which is on page 16, this has to do with

17   the attempted sexual exploitation of a minor.

18       THE COURT:  Yes.

19       MS. HERTZFELD:  The Court summarized -- I understand

20   summarized the counts as saying that these multiple attempt

21   counts together, the jury has to find these things.  I think the

22   language needs to be modified slightly, because the way it reads

23   now, it says, "I just told you the elements for the underlying

24   offense of a completed crime of sexual exploitation of a minor,

25   except here there are two additional elements to show the

1   attempt."

2        And I think the way it is phrased now it makes it sound as

3   if the jury has to find the completed crime plus two additional.

4             THE COURT:  I see.

5             MS. HERTZFELD:  I think we need to rework the language

6   to make that more clear.  And I don't have a specific proposal

7   yet.  I am happy to propose something, if the Court would find

8   that helpful, that I can provide to Ms. Slaight and see if we

9   can agree and then submit to the Court.

10            THE COURT:  Why don't you do that.  We will be working

11  on it internally as well, and we will make sure to revisit it.

12  Is this in the preliminary instructions?

13            MS. HERTZFELD:  It is.

14            THE COURT:  So we need to talk about this on Friday

15  when we discuss to make sure that we have nailed it before.

16            MS. HERTZFELD:  If I can have the Court's indulgence

17  to confer.

18        (Government counsel conferred.)

19            MS. HERTZFELD:  One other thing Mr. Okocha just

20  reminded me of.  So in the same section in the initial

21  instructions, Your Honor summarizes all of the -- each of the

22  counts sort of in these groups of offenses.  And I think the

23  only thing that's sort of missing is a summary of the fact that

24  all these hands-on sex assault charges involve this aggravating

25  circumstance.

1       And so I think it might be helpful that at the very end,

2   after you -- so this would probably go somewhere around the end

3   of page 18 or 19, after Your Honor summarizes all of the

4   offenses, to say that a number of these charges have associated

5   with them that the government is alleging that these crimes were

6   committed with aggravating circumstances, and the aggravating

7   circumstances alleged are that Mr. Hillie was in a significant

8   relationship with the victims and that there's more than one

9   victim of sexual abuse or something to that effect, just some

10  kind of summary to explain the aggravating circumstance piece.

11          THE COURT:  To address aggravating circumstances.  All

12  right.  And then, of course, it gets fleshed out more at the

13  end, you know, in the actual jury instruction.

14          MS. HERTZFELD:  Yes, Your Honor.

15          THE COURT:  Ms. Slaight?

16          MS. SLAIGHT:  Your Honor, I would just note that the

17  charges go on for four pages here just in the voir dire, and the

18  case summary is -- and then there's an additional case summary

19  that's a page.  I don't think it's appropriate to keep using the

20  initial introduction to the jury to basically state the

21  government's case again and again.  We had objected as to the

22  detail, and I think that that is unnecessary detail for the

23  initial preliminary instructions.

24          THE COURT:  So what -- I'm sorry.  So what would you

25  like to cut out?  What is your specific proposal as to what --

1          MS. SLAIGHT:  Well, I think that the initial statement

2     included -- and I'm preserving what our position was, and there

3     should not be another additional aggravating circumstances

4     definition in the initial instructions.

5          THE COURT:  Right.  But I guess I'm confused now,

6     because I'm trying to understand.  On page 15, you say I have a

7     case summary.  Are you objecting to that, or is it all of the

8     first, second, and third that goes from 16 to 18 that you want

9     to cut out?

10          MS. SLAIGHT:  Do I have the right ones?  I'm looking

11     at page 6 that has the initial summary, not page 15.

12          So what I'm saying is, you have a summary on page 6 --

13          THE COURT:  All right.  The summary that you're

14     talking about on page 6 is given at voir dire.  So these are

15     people out in the audience.  We're not a jury.  They have to

16     know enough about the case to answer my questions in terms of,

17     you know, do you have any sensitivity to sexual themes, whatever

18     the voir dire questions are.

19          So by the time I get to the end of page 6, that's what I've

20     said before voir dire.  Then we go through the whole process,

21     and then the preliminary instructions are once we have the

22     jurors seated.  Now they've been sworn.  Now you are the jury

23     panel, and I'm giving you the initial instructions with respect

24     to this particular case at a level of detail that will allow you

25     to receive the evidence and know what to do with it.

1          MS. SLAIGHT:  And what I'm saying is, they already

2     heard what I -- well, that's my position.

3          THE COURT:  Okay.

4          MS. SLAIGHT:  They've already heard it in the initial

5     instructions.  Now they're hearing it again.  I don't think they

6     need to hear more.  That's what I'm saying.

7          THE COURT:  Okay.  That objection is overruled.  I

8     will be taking a look at the extent to which the preliminary

9     instruction, once the jury is sworn, might go too far, because

10    there's this suggestion that I read the indictment.  I don't

11    know if I'm going to do that.  So I will have to see what makes

12    sense in terms of making sure they understand the elements of

13    the offense.

14         But it's pretty standard to make sure that sworn jurors

15    have the elements of the offense before the evidence comes in.

16    And so that's my intention with respect to what is listed in

17    pages 15 through 18.  And the government's suggested --

18    suggestion that in that context the aggravating circumstances

19    element is also included is sustained, and I will try to figure

20    out how to work it into my description of the elements, however

21    it comes.  All right?

22         Ms. Hertzfeld, I didn't know if you had anything else at

23    this time.  Again, we will be dealing with this in some detail

24    in the charging conference.

25         MS. HERTZFELD:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Ms. Slaight, do you have any

2    instructions related, any additional concerns or issues that you

3    wanted to bring to the Court's attention, particularly with

4    respect to the preliminary instructions, because those will be

5    given at the outset, before the charging conference?

6          MS. SLAIGHT:  No, Your Honor, not beyond what I just

7    mentioned.

8          THE COURT:  I'm sorry.  You may have to say it a

9    little louder.

10          MS. SLAIGHT:  No, Your Honor, not beyond what I just

11    mentioned.

12          THE COURT:  So that's it with regard to instructions,

13    at least for now.

14      Let me just quickly touch upon the two pending motions.  We

15    have the defendant's motion to suppress his own custodial

16    statement and the government's notice of intent to admit JA's

17    prior report of abuse as nonhearsay evidence.  The first is ECF

18    21; the second is ECF 15.  The Court was under the impression

19    that the parties asked me to hold these motions in abeyance,

20    which I did.

21      Ms. Slaight, you weren't around for the first motion.  So I

22    didn't know whether you -- what your position is on the

23    defendant's motion to suppress his own custodial statements.

24    Let me represent to you that Mr. Miles indicated that the

25    defendant's objection or motion was conditioned on the

1    government's intent to use the statement.

2         So let me start, perhaps, by asking Ms. Hertzfeld whether

3    the government intends to use any of the statements of

4    Mr. Hillie while he was in custody.

5              MS. HERTZFELD:  No, Your Honor, not in its

6    case-in-chief.

7              THE COURT:  Okay.  So I guess that may obviate any

8    need, Ms. Slaight, for you to respond.  But the question is

9    whether I just continue to hold this motion or deny it without

10   prejudice and it can be reraised if the government changes its

11   position.

12        They say they're not intending to use the statement.  So

13   doesn't that sort of moot the motion, to some extent?

14             MS. SLAIGHT:  At this point, yes.

15             THE COURT:  All right.  So I am going to deny that

16   motion without prejudice.  You can raise it again if the

17   government changes its mind or somehow the statements come in.

18        With respect to the government's notice of intent to admit

19   the prior reports, Ms. Hertzfeld, there was some representation

20   about the government seeking to admit the prior reports as prior

21   inconsistent statements -- prior consistent statements.  I

22   suppose they wouldn't come in unless there's an issue with that.

23        But did you want to say something about that?

24             MS. HERTZFELD:  I think -- in terms of each victim

25   making statements about reports of sexual abuse by the

1   defendant, there's a couple of different issues.  There's one

2   sort of formal report of sexual abuse that was made at the

3   outset to Detective Dorothea Johnson, and the government intends

4   to call that detective as a witness to introduce evidence that,

5   in fact, both of the -- that there was an initial report made

6   that was investigated that was earlier in time than when

7   ultimately the investigation came to fruition and the defendant

8   was arrested and these charges were brought.  And that, I think,

9   was the main subject of the government's motion.

10          THE COURT:  So it was not conditional?  You were going

11   to use that in your case-in-chief?

12          MS. HERTZFELD:  Yes, Your Honor.

13          THE COURT:  All right.

14          MS. HERTZFELD:  I want to raise this -- this is sort

15   of a related issue, and I've spoken to Ms. Slaight about this,

16   and I'm not sure we've gotten her position yet on whether she

17   objects.

18       There were, throughout the time that this was all going on

19   leading up to the defendant's ultimate arrest, a number of times

20   where each victim made a report of her own sexual abuse to

21   various other individuals, including their mother, their father,

22   one another, and said that Mr. Hillie was their abuser.

23       I expect that each victim would testify during her

24   testimony in the case-in-chief that there were times when she

25   reported that this was happening to her.  And the statement

would be a statement both of -- not as to the details of what

she told anyone else.  So I don't think it's hearsay in that

respect of here's exactly what Mr. Hillie was doing to me, but a

statement of the fact that she was being sexually abused is

something that, I think, each victim would testify to, that she

made that disclosure.

And so I think that comes in as a report of prior sexual

abuse under some of the cases that are cited in the government's

brief, but also as statements of identification as to the person

that was perpetrating the crime against her.

So I think it meets the hearsay exception.  So I don't

think it is hearsay, but I want to put it out there, even though

it's not the subject of a formal motion, in terms of report of

rape and the particulars of the disclosure.  I just want to flag

it to make sure that we don't have any issues with it at the

time of trial.

THE COURT:  I need to think it through.  So are you

saying that you are offering it for the truth that each -- the

alleged victim's on the stand, and you are asking questions

about when and under what circumstances she previously reported

this abuse, and she says, for example, I talked to Detective

Johnson on X day.

Are you offering that for the truth of the matter?

MS. HERTZFELD:  We're offering it for the truth of the

fact that she made the report, yes, but we're not offering any

statements about the content of the abuse itself for the truth.

So for example, I expect Jaden, if she were on the witness stand, will report -- will testify that she reported to her mother and to her sister that Mr. Hillie sexually abused her.

The government would not be offering any testimony from her as to what specifically she told them about the abuse for the truth of those facts, but it would be offered as evidence of a prior report of sexual abuse, and it would be offered as a statement of identification as to the perpetrator of the sexual abuse against her.

THE COURT:  And therefore, potentially not even hearsay; it's in the nonhearsay possibly category of things?

MS. HERTZFELD:  Yes, Your Honor.

THE COURT:  Ms. Slaight, do you have a reaction to that?

MS. SLAIGHT:  Yes, Your Honor.  I don't see how that can be anything but hearsay.  It's for the fact that they prior -- that they made a prior report that -- a prior consistent statement that Mr. Hillie had abused them.  I mean, that's the only reason that the government wants it in.  They can dress it up any way they want, but they want to say, well, she told me before, she told me before, she told me before.

THE COURT:  But I wonder if it matters that they're not introducing the statement.  In other words, isn't what causes it to be hearsay the subsequent question, what did you

say to your mother about Mr. Hillie's abuse, as opposed to, did you tell your mother, answer, yes?

MS. SLAIGHT: The fact that it's a summary of the hearsay doesn't make it any less hearsay.

THE COURT: It's not a summary of the statement. The question is, did you tell anyone about the abuse? Answer, yes.

Would you say hearsay at that point?

MS. SLAIGHT: That's a summary of, did you tell anybody -- no matter who says the word "abuse," whether it's the questioner or the person responding, once you say that, it's a summary of the hearsay.

THE COURT: All right. I mean, I think I understand the dispute. The defendant's position is that it would be hearsay. I'm glad you flagged this for me, Ms. Hertzfeld, because I will have to look in my evidence treatises and try to figure it out.

But as I understand the government's position, the government is seeking to offer it as evidence that -- of the fact that the victim previously made -- disclosed this information, but not the full statement of what was said at the time to the mother or to the father or to someone else.

And so it may be that it fits under one of those this is not hearsay, I don't know, or it may be a summary, as you have addressed. I will need to think about it. But I'm anticipating the objection. So thank you.

1        All right.

2            MS. SLAIGHT:  I just wanted to note, I think the

3    government is talking about -- the government's motion only

4    discussed that to -- regarding the father of Jaden, and I think

5    the government mentioned in its argument just now -- I don't

6    know if the government is talking about any other statements to

7    anybody else.

8            MS. HERTZFELD:  So Your Honor, I think the only other

9    statement that in substance would be -- the government would be

10   seeking to introduce in the case-in-chief would be the

11   statements to the detective, the initial investigating

12   detective.

13       So at the time when the very first disclosure of sexual

14   abuse was made, there was a detective with the Metropolitan

15   Police Department Youth Investigations Division who took an

16   initial report of -- resulting from Jaden making her disclosure

17   about sexual abuse.  And there was an investigation that ensued

18   as a result of that.  It was largely inconclusive for reasons

19   having to do with access to the children and things the

20   detective would testify to as to why she was not able to really

21   complete her investigation into the sexual abuse at that time

22   and the case was closed out.

23       The relevance of this is that these children reported what

24   happened.  It was investigated by the police.  And because the

25   investigation was not concluded, some time passed before

ultimately the disclosure was made again and action was taken by
the police and Mr. Hillie was arrested, et cetera.

I think that's all pertinent information for the jury to
understand.  And so the government would anticipate calling this
detective to say essentially that I received a report through
the victim's father.  What happened is the day that the
defendant -- the punch in the face to Jaden happened, the father
was called.  A report of what had been happening in terms of the
sexual abuse was made to him by the children, and police were
called to the scene that day.  And the report was made to police
as to sexual abuse as being sort of the spark that caused this
assault.

When the police investigated, this detective I mentioned,
Dorothea Johnson, was assigned to investigate the case.  And I
think her testimony would be, I received an assignment to
investigate sexual abuse of these children, I interviewed the
children, spoke to the mother, both children -- well, Jaden at
the time made a disclosure of sexual abuse by Mr. Hillie, an
interview was conducted, she described the sexual abuse, and
ultimately, as I tried to investigate further, I ran into some
obstruction by the mother in terms of not allowing access to the
kids.  And she would testify to the circumstances under which
she tried to re-interview these children and was not given
access to them by their custodial parent at the time, which was
their mother.

1    So again, we're not -- and I think in terms of her

2    testimony, it is sort of less offered for the truth of what the

3    children were saying at the time as opposed to sort of what the

4    effect on her was and the investigation of the Metropolitan

5    Police Department.

6         THE COURT:  Ms. Slaight, we do have effect on the

7    listener, right, as one of the ways in which similar scenarios

8    come in despite their potential characterization as hearsay.

9         MS. SLAIGHT:  Well, Your Honor, I would just point out

10   a couple of things.  Number 1, the government declined to

11   prosecute when the prosecutor brought this -- when the detective

12   brought this case to the U.S. Attorney's Office, the U.S.

13   Attorney's Office declined to prosecute.  So it wasn't just a

14   question of, you know, I don't -- I just never brought this

15   forward, as the government is saying.  The government -- the

16   U.S. Attorney's Office declined to prosecute.

17        THE COURT:  Understood.  Why wouldn't you just say

18   that to the jury?  This is an evidentiary question.

19        MS. SLAIGHT:  Right, that would certainly be

20   admissible.  And I think that -- it sounds like what the

21   government is trying to do is tell the jury, in case they have

22   any questions, why they didn't prosecute earlier, and I don't

23   see how that's relevant.

24        THE COURT:  All right.  I mean, I understand the

25   issue.  I will rule on the motion, but not today.  We will talk

 1    about it next Wednesday when we talk on the phone.

 2         MS. SLAIGHT:  And I would certainly say any

 3    characterization by the detective as to that the mother was

 4    obstructing or -- is certainly an opinion, and it certainly

 5    should not be presented to the jury, that characterization.

 6         THE COURT:  If it goes to a legal conclusion such as

 7    that, perhaps you're right, but let me -- I appreciate having

 8    this debate now so that I can formulate my views.  But thank

 9    you.

10         Yes, Ms. Hertzfeld?

11         MS. HERTZFELD:  I just want to, I think, narrow the

12    dispute.  The government doesn't expect to ask the detective

13    what was her view of how the mother handled it or anything like

14    that.  Me saying that the mother was obstructing is my sort of

15    spin on, I think, how the testimony is going to come out.

16         What I expect the detective in more specific sort of

17    nuanced terms would say is that I made X number of attempts to

18    contact this mother and to arrange interviews with these

19    children, here's what happened on each occasion when I made

20    efforts to contact her, and to describe sort of each point along

21    the way over the course of months that she made efforts to

22    investigate this and was not able to pursue her investigation.

23         THE COURT:  All right.  Thank you.

24         Okay.  So let me -- I'm almost done here.  In terms of the

25    evidentiary issues that I had, it was the family photograph

1    piece.  So now, Ms. Hertzfeld, we're not doing the family

2    photograph anymore?  There was an objection to that, which the

3    Court tried to mediate the dispute by asking you could we get

4    just the girl.

5            MS. HERTZFELD:  We did crop the photograph down to a

6    photograph of just her.  I believe Ms. Slaight has seen that.

7    May I ask the Court's indulgence?

8            THE COURT:  Yes.

9        (Government counsel and defense counsel conferred.)

10           MS. SLAIGHT:  I actually brought photographs to court

11   with me, but I'm not sure exactly which one --

12           MS. HERTZFELD:  The Court's indulgence.  I have it

13   here.

14           THE COURT:  Yes.

15       (Government counsel and defense counsel conferred.)

16           MS. HERTZFELD:  So Your Honor, for the record, I just

17   showed Ms. Slaight what would be -- on the current exhibit list,

18   this would be Government's Exhibit --

19           THE COURT:  11?

20           MS. HERTZFELD:  -- 11, yes, Your Honor.  Thank you.

21   And it's a cropped-out version of just the complainant, the

22   older child.  I'm happy to pass it up to the Court, if Your

23   Honor would like to see it as well.

24           THE COURT:  Sure.

25           MS. HERTZFELD:  And I think that resolves the dispute

1    as to that exhibit.

2             THE COURT:  Does it, Ms. Slaight?

3             MS. SLAIGHT:  Well, that certainly -- in terms of

4    objection, it certainly clears -- covers a lot of the objection.

5    My only additional objection is that it's not necessary to have

6    any additional photos of the complainants because they're

7    testifying.  So it certainly meets the objection of including

8    other people.

9             THE COURT:  The family and everything, all right.

10            MS. SLAIGHT:  Right.  So the objection now is just

11   whether it's necessary at all.

12            THE COURT:  All right.  I understand the objection,

13   and I'm going to overrule it, given the fact that at the time of

14   the events in question the alleged victim was a child, that

15   significant time has passed, and so the person who is testifying

16   doesn't appear in the same way as she did at the time of the

17   alleged incidents.

18       And given the video evidence in this matter, I think it's

19   relevant to have a picture of her at the time for the jury to

20   see in comparison to the video files, et cetera.

21            MS. HERTZFELD:  Thank you, Your Honor.  And the last

22   thing I will add relevant to this is that the government did add

23   to its exhibit list Exhibit 17, which we expect will be a

24   photograph of the younger child as well at a contemporaneous age

25   to the assault.  That photograph -- I guess because she's the

1    second child, there weren't as many photographs.  We have, I

2    think, now procured a photograph that is from the appropriate

3    time.  It, too, is a family photograph.  So we are in the

4    process of getting someone to crop that out.  And I will send

5    that over to Ms. Slaight, I expect, today.

6              THE COURT:  Ms. Slaight, I assume that you have the

7    same objection?

8              MS. SLAIGHT:  Yes, Your Honor.

9              THE COURT:  All right.  I am going to overrule it for

10   the same reasons, assuming that the photograph is ultimately

11   cropped so that it just shows the girl.  All right?

12      Okay.  Is there anything else about evidence that you

13   anticipate now that you think can be resolved at this time or

14   that you would like to put on the table for our resolution

15   during the conference call that we intend to have on Wednesday?

16             MS. HERTZFELD:  I don't think so at this time, Your

17   Honor.

18             MS. SLAIGHT:  Your Honor, I did have a couple of

19   additional issues, but I think I can talk to the government

20   about them.  We don't have to do it now.  We may be able to work

21   it out.

22             THE COURT:  All right.  And if you can't, please let

23   me know, perhaps in the call that we have, just so that if we

24   need to come a little teeny bit early the next day to work it

25   through or stay late, I will be aware of that.  Okay?

1      Ms. Slaight, is there something else you wanted at this

2  moment?

3           MS. SLAIGHT:  No, Your Honor.  I'm just looking down

4  my list here.

5           THE COURT:  All right.  So finally, let me just touch

6  on some miscellaneous things here.

7      With respect to Mr. Hillie's right to be present at bench

8  conferences, the Court's typical practice is to have the

9  defendants have earphones and to waive the actual right to be

10  present, because it takes too much time and movement to have the

11  defendant actually come up to the bench.

12      Ms. Slaight, have you discussed with Mr. Hillie this right

13  and whether or not he agrees to waive it?

14      Sorry.  Ms. Slaight, you were --

15           MS. SLAIGHT:  No, I heard what you said.  I didn't

16  have an opportunity for him to waive it because we called the

17  hearing quickly, but --

18           THE COURT:  Do you want to take a moment --

19           MS. SLAIGHT:  He has no objection to having the trial

20  on the 29th.

21           THE COURT:  Oh, no, I'm sorry.  You must have misheard

22  me.  What I was asking is his right to waive his presence at the

23  bench during bench conferences.

24           MS. SLAIGHT:  Oh, I'm sorry.  I thought it was about

25  the previous phone conference.  I did not discuss it with him.

1          (Defense counsel conferred with defendant.)

2              MS. SLAIGHT:  Your Honor, assuming that he will have

3     headphones to be able to listen to the conversation, he waives

4     his right to have -- be at the bench.

5              THE COURT:  All right.  So I will -- we will make sure

6     he has headphones.

7          And Ms. Slaight, I'm sure as a seasoned defense counsel,

8     you will have clothes for him and everything for the trial;

9     correct?

10             MS. SLAIGHT:  Yes.

11             THE COURT:  Let me ask about whether or not the

12    defendant intends to call an expert.  I know that we have the

13    list of witnesses and that the defense typically doesn't need to

14    disclose the witnesses, but under the federal rules, the

15    government has the ability to -- needs to prepare for expert

16    testimony, even by the defendant.

17         So at this time, Ms. Slaight, do you anticipate calling any

18    experts in this case?

19             MS. SLAIGHT:  No, Your Honor.

20             THE COURT:  All right.  Now, turning to the

21    government, the last time we met, I understood, and also from

22    your joint pretrial statement, that you have one expert,

23    Mr. Marsh, who is a criminal investigator.  You, I think, have

24    turned over your expert testimony related to defendant --

25    materials to the defendant at this point?

1          MS. HERTZFELD:  Yes, Your Honor.

2          THE COURT:  All right.  And I'm wondering if the Court

3     can get a copy of those materials as well.  Is it a long report,

4     or is it a summary, or what is it?

5          MS. HERTZFELD:  It's a very brief, I think, like

6     two-page summary of what was extracted from a computer that

7     includes the videos.

8          THE COURT:  You could e-mail it, if you would, unless

9     you have it here.

10         MS. HERTZFELD:  I can forward it to Your Honor.

11     I will also say, the government has made -- for purposes of

12     the record, the government has made Mr. Marsh available to the

13     defense for consultation as to any questions they may have about

14     his testimony based on the expert notice and the contents of

15     that report.  I believe that there's been some conversations

16     between the defense and Mr. Marsh to clarify any questions that

17     remained outstanding based on what was already noticed.

18         THE COURT:  All right.  So we're pretty comfortable

19     with his testimony at this point.

20     Let me ask you about whether or not you have eliminated any

21     of your witnesses.  You previously stated that the government

22     was looking, and that you might be able to pair it down.

23         MS. HERTZFELD:  I do think that, just based on my

24     conversations today with Ms. Slaight, we've eliminated at least

25     one of the records custodians, which is the one with respect to

1    the birth certificates of each of the two victims and

2    Mr. Hillie.  The parties, I think, will be resolving that issue

3    by stipulation.

4              THE COURT:  When will I see those stipulations?  Do

5    you know?

6              MS. HERTZFELD:  We've just learned of our agreement on

7    this today.  So I think I can submit something to Ms. Slaight to

8    make sure she agrees to the language and hopefully e-mail to the

9    Court before our conference on Wednesday so Your Honor can see

10   those.

11             THE COURT:  Great.  And are there any other

12   stipulations that you're aware of?

13             MS. HERTZFELD:  I don't think so.  The only other

14   proposed stipulation had been with respect to the records

15   custodian for the Douglas apartment, the dates of the lease

16   there.  And Ms. Slaight has indicated that she would prefer to

17   have a records custodian testify as to that information, and so

18   the government will call that person as a witness.

19             THE COURT:  All right.  Let me just be clear.  In your

20   government witness list under "civilians" at (e), you have

21   "custodian of records."  Is that the rental person, or is

22   that --

23             MS. HERTZFELD:  That's the rental person, Your Honor.

24             THE COURT:  Do you know the name of the other person

25   who might be eliminated by stipulation?

1          MS. HERTZFELD:  Well, there would have been two

2     custodians of record, one from the Department of Health, the

3     vital statistics records custodian for the birth certificates.

4     That person is eliminated.

5          THE COURT:  I see.  But he would have been folded into

6     the category "custodian of records" as well, I see.

7          MS. HERTZFELD:  Yes.

8          THE COURT:  So we really had 12, perhaps.

9          MS. HERTZFELD:  Yes.  But I do think at this stage

10     we've narrowed it down to really likely to -- sort of the heart

11     of the case, and there may be others, depending upon how things

12     go.

13          But the bottom line is we will have Detective Dorothea

14     Johnson that we already mentioned, the two victims, the

15     custodian of records regarding the Douglas Street apartment,

16     Deputy U.S. Marshal Chris Schwartz regarding the arrest warrant

17     execution, the MPD Officer Hanson regarding recovery of the

18     laptop.  He will be a very brief witness.  And then John Marsh,

19     the expert regarding the extraction of evidence from the device,

20     from the laptop computer.  And the last witness will be the --

21     listed as "Josephine" on the witness list, we expect she will

22     testify as well.

23          THE COURT:  Who is Garrett Short?

24          MS. HERTZFELD:  That's the victim's father.  I don't

25     think he will be required to testify.

```
 1            THE COURT:  Okay.  And what about Retired Detective
 2   Rosnick?
 3            MS. HERTZFELD:  Also, I don't think -- the government
 4   will not need to call him.
 5            THE COURT:  And Detective Kathleen Buck?
 6            MS. HERTZFELD:  Also, I don't think we will be
 7   required.
 8            THE COURT:  So then the others -- those are the ones
 9   that you hadn't mentioned in your -- I'm sorry.  Who is
10   Josephine Asiamah?
11            MS. HERTZFELD:  That's the aunt of the victims.  I do
12   think that the government will have her testify.
13            MS. SLAIGHT:  Your Honor, I'm sorry.  I didn't hear
14   what the government said.
15            MS. HERTZFELD:  I do expect Josephine Asiamah will
16   testify, the aunt of the victims.
17            THE COURT:  She's on the list.  I was just going
18   through the government's witness list and trying to identify
19   people who are likely to testify or not, given what we know now,
20   because it's helpful in terms of figuring out how long this is
21   going to take and where we're going.
22         Will the government be able to provide an order of
23   witnesses at the start of trial?
24            MS. HERTZFELD:  Yes, Your Honor.  I think we may need
25   to -- so the only accommodation the government would really ask
```

1   for in terms of the ability to call these witnesses is that each

2   of the two victims testify only on one day.  So what I mean by

3   that is, I would prefer not to have either one of them begin

4   their testimony at, say, 3:00 in the afternoon and have to come

5   back the following day.

6           THE COURT:  Yes.

7           MS. HERTZFELD:  And so I think, now knowing that it's

8   likely we may open on the first day, I think we will be able to

9   organize the witnesses in such a way to have each victim

10  start -- start in a morning session.

11          THE COURT:  I can't promise the openings.  It's

12  unclear, because we do have a long preliminary instruction

13  segment, and we've pulled more jurors than we normally do

14  because of the nature of this case.  So there might be more

15  strikes for cause or whatever.  I just don't know.  But I'm

16  going to try my darnedest, because I would like to make sure we

17  get through everybody.

18          MS. HERTZFELD:  And I think we can propose what we

19  would expect to be the order of witnesses before our call and

20  then may just move things around if it helps to accommodate not

21  having either of the victims go over into a second day during

22  the course of the trial because of the way things go, if that

23  becomes necessary.  But we can propose what we expect the order

24  would be.

25          THE COURT:  Great.  All right.  Thank you.

1    The last thing that I wanted to point out and that you may

2  be aware of is that the Court has been granted a new

3  audio/visual system.  You see the screens that have been

4  installed and, hopefully, a new microphone.  I haven't tried it

5  yet.  We were having problems with bench conferences in terms of

6  the microphone, and they assure me that it is now working.

7    So with respect to the video evidence and information that

8  you intend to show to the jury, they will have their individual

9  screens in the box.

10   Yes?

11   MS. HERTZFELD:  I will just say, Your Honor, I think

12 that was a lot of the concern the government had about how the

13 presentation of evidence would go.  We actually met with

14 Mr. Cramer before the Court took the bench today and sort of

15 worked out how we might present that evidence.  I think the new

16 equipment resolves the issues I raised at a prior conference

17 about trying to be careful not to publish certain materials.

18   THE COURT:  Right.  What did he say about the big one

19 we have out in the audience?  Would it just be turned to these

20 little ones?

21   MS. HERTZFELD:  Yes.  He told us, we can't cut the

22 feed off to just that device, but we can just turn that one off

23 so that there's no power, and then everything would just show to

24 the jurors' screens, to the Court, and to the parties.

25   THE COURT:  All right.  Ms. Slaight, did you have any

1   occasion to take a look at the new technology and have any ideas

2   one way or the other about it?

3          MS. SLAIGHT:  I just got here as the -- I didn't know

4   that it was going to be discussed.  So I just got here as it was

5   finishing up.  But I did talk to Mister --

6          THE COURT:  Cramer.

7          MS. SLAIGHT:  -- Cramer, thank you, and I can get in

8   touch with him during the week if I need to.

9          THE COURT:  If you need to.  All right.  I think the

10  government's proposal is that the one large screen out to the

11  audience be turned off so that we don't have excessive

12  publication of the sensitive materials in this matter.  And now

13  that we have the small screens, the jury can see it right there

14  and not have to worry about publicizing things in the way that

15  we had before.

16      And this is new to the Court.  Literally, this is my first

17  day back in the courtroom since they finished it.  So hopefully,

18  it all works.

19      Now is the time if you all have anything else that you

20  would like to raise prior to our call on Wednesday.

21          MS. HERTZFELD:  Just one very small matter.  Does Your

22  Honor allow the parties to step away from the podium during

23  witness examination?

24      And the reason I'm asking is, for example, I've had some

25  cases where with a child victim, we've sought permission to

1    stand someplace out of this line of vision, so maybe over closer

2    to the jury box so the child can turn away from the defendant or

3    whatever else.  I'm wondering if Your Honor permits that.  I

4    don't know that it will be necessary, but if --

5              THE COURT:  Yes.  If you make those requests, it's

6    certainly not off the table for me.  You might want to -- I

7    don't know how you would go about making it.  I'm fine with it

8    in terms of your placement somewhere in this area to make sure

9    that the jury can still see and hear, but I don't mind you

10   moving away from the podium.

11             MS. HERTZFELD:  Thank you.  That's all from the

12   government.

13             THE COURT:  Ms. Slaight, do you have anything more?

14             MS. SLAIGHT:  No, Your Honor.

15             THE COURT:  All right.  So we will get to you the

16   conference call information related to the number that you would

17   call next week when we talk, and we will have figured out

18   internally my position on the outstanding issues that we raised

19   here to give you some indication as to where the Court is going

20   to go on those few things that we discussed.  And then we will

21   be in trial next Thursday.

22        All right?  Anything else?

23             MS. HERTZFELD:  No, Your Honor.

24             MS. SLAIGHT:  No, Your Honor.

25             THE COURT:  All right.  I will be speaking to you next

1    week.  Thank you.

2         (Proceedings adjourned at 4:21 p.m.)

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6              CERTIFICATE OF OFFICIAL COURT REPORTER

7

8         I, Sara A. Wick, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13

14   /s/ Sara A. Wick                July 24, 2019

15   SIGNATURE OF COURT REPORTER           DATE

16

17

18

19

20

21

22

23

24

25