```
              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA        :
                                :
            Plaintiff,          :  Criminal Action
                                :  No. 16-030
v.                              :
                                :
CHARLES HILLIE,                 :  March 28, 2018
                                :  3:30 p.m.
                                :
                                :
            Defendant.          :  Washington, D.C.
                                :
.............................. :
```

**TRANSCRIPT OF FINAL PRETRIAL CONFERENCE PROCEEDINGS**
**(BY TELECONFERENCE)**
**BEFORE THE HONORABLE KETANJI B. JACKSON,**
**UNITED STATES DISTRICT COURT JUDGE**


APPEARANCES:

For the United States:     **Andrea Lynn Hertzfeld, Assistant**
                           **U.S. Attorney**
                           U.S. ATTORNEY'S OFFICE FOR THE
                           DISTRICT OF COLUMBIA
                           555 Fourth Street, NW
                           Washington, DC 20530
                           (202) 252-7808
                           Fax: (202) 353-7634
                           Email: Andrea.hertzfeld@usdoj.gov


For the Defendant:         **Joanne D. Slaight, Esq.**
                           LAW OFFICES OF JOANNE D. SLAIGHT
                           400 Seventh Street, NW
                           Suite 206
                           Washington, DC 20004
                           (202) 408-2041
                           Fax: (202) 628-0249
                           Email: Jslaight@att.net

APPEARANCES:  Cont.


**Court Reporter:**                    **Scott L. Wallace, RDR, CRR**
                                       Official Court Reporter
                                       Room 6503, U.S. Courthouse
                                       Washington, D.C. 20001
                                       202.354.3196
                                       scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**AFTERNOON SESSION, MARCH 28, 2018**</u>

(4:35 p.m.)

THE COURT:  Good afternoon.  This is Ketanji Jackson.
Thank you all for agreeing to meet by teleconference this
afternoon as we get prepared for tomorrow's trial.  I just want
to ensure that we're all on the same page, and that, you know,
any outstanding issues that the Court needs to address prior to
trial, we can at least have on our radar screen at this point.

Sorry.  Hello?

MS. HERTZFELD:  Yes.

MS. SLAIGHT:  Yes.

THE COURT:  So I have a couple things I want to talk
about, including the government's recent e-mail pertaining to
some of the issues we were discussing last week.

But first let me just ask a preliminary question.
Ms. Hertzfeld, you mentioned at our conference that you thought
that it would be appropriate for everyone to start calling the
victims by their first names, I guess, but I wanted to just be
clear as to what your proposal was, when we should start doing
that and whether you're suggesting both first and last names?

MS. HERTZFELD:  Yes, Your Honor.  I actually think that --
it's going to become clear throughout the trial, the last name of
both victims.  One of them is not a minor any longer.  The other
one is 15 years old.  We've met with both of them, and I think
we're comfortable at this point that when the trial commences --

1    and by that, I mean even in voir dire -- we can refer to them as

2    Jaden and Janika Asiamah.

3         THE COURT:  All right.  Can you pronounce for me their

4    last names?

5         MS. HERTZFELD:  Sure.  It's Asiamah.

6         THE COURT:  Asiamah.  And can you spell it?  We do have a

7    court reporter here with us right now recording this.

8         MS. HERTZFELD:  Sure.

9         THE COURT:  Yes.

10        MS. HERTZFELD:  Sure.  A-S-I-A-M-A-H.

11        THE COURT:  Asiamah.  Okay.  All right.

12        So I will prepare to call them by their names, as opposed

13   to the initials.  I think that would be easier for everyone to

14   follow as well.

15        MS. SLAIGHT:  Your Honor.

16        THE COURT:  Yes.

17        MS. SLAIGHT:  In terms of the reference to the two minors,

18   I would -- I'm requesting that they not be referred to by the

19   Court or the parties as victims at this time because they are --

20   this is what the charges are.  They have not been -- you know,

21   Mr. Hillie has not been convicted, and I would ask that they just

22   be referred to by the first names rather than as victims.

23        THE COURT:  All right.  Is there a place in any of the

24   written documents that we've received where we do this --

25        MS. SLAIGHT:  I don't think so.

1          THE COURT:  -- that you have seen?

2          Okay.  So I will be careful to just refer to them as their

3     names.  All right?

4          MS. SLAIGHT:  Thank you.

5          THE COURT:  Okay.  So let me just go through a few things

6     that I had written down, and then, of course, if either of you

7     have anything that you want to address, this would be a good

8     time.

9          One of them is that I looked at the case summary

10    instruction as a part of my preliminary instructions.  This is

11    after the jury has been sworn and before opening statements when

12    the Court gives sort of the preliminary instructions to the jury

13    and I mention something about the case.

14         We've looked at the pattern instructions, and they do say

15    that the Court can read the indictment, but I appreciate

16    Ms. Slaight's objection that the instructions that I've given you

17    in the distribution draft did seem to emphasize the government's

18    allegations in a way that wasn't, I think, entirely necessary.

19    So I've reworded that slightly so that I'm not reading the entire

20    indictment, and instead, I'm going to just list the statutory

21    violations alleged in each count and then talk about the elements

22    of each of the counts as is listed there in the document, instead

23    of reading the entire indictment and then going into all of the

24    elements, which I think will take a long time and isn't

25    necessary.

1        And, of course, at the end in the final instructions I

2   will be going through the charges in the indictment as written

3   and the elements again.  So I just wanted to let you know that

4   because there is some variation between what I had distributed

5   and what I intend to say for the case summary, so that was one

6   thing.

7        Now, let me move to the government's e-mail from

8   yesterday, which had three proposed additions to the jury

9   instructions and stated that Ms. Slaight opposed them.  And so

10  maybe we can just talk about each of them and let me understand

11  the parties' positions.

12       The 413, 414 evidence instruction that the government has

13  provided comes from a Tenth Circuit case.  We actually found our

14  own language that is substantially similar from the Eighth

15  Circuit.  You know, as you know, the D.C. Circuit doesn't have

16  such an instruction, and I actually think it's helpful.

17       So, Ms. Slaight, maybe you can tell me why you object to

18  the 413, 414 evidence instruction.

19       MS. SLAIGHT:  Well, my objection is that it emphasizes --

20  to me, it puts more -- since it's considered as any other

21  evidence, it's -- it shouldn't get a special instruction.  It

22  doesn't have a special place anymore, and it emphasizes that

23  those -- those allegations.

24       I think that the instruction, proposed instruction as it

25  is here, makes it sound like it -- the testimony is a given and

1    that the acts were proven.  At a minimum, it should be an alleged

2    act, but I think that it puts too much emphasis on the -- that

3    testimony which is not supposed to be considered more heavily

4    than other testimony.

5         THE COURT:  Yeah.  I understand that point, but I think

6    I'm going to overrule the objection, and the reason is because

7    we're talking about a series of other acts that the government

8    intends to introduce under 404(b) to prove certain various other

9    things.  And so with respect to the physical assault -- which is

10   not this particular evidence, but I'm just saying by

11   comparison -- the Court would be instructing the jury that you

12   can only consider it for, you know, the limited purpose of

13   deciding whether the assault helps to explain the delay or

14   whatever.

15        And so there are limiting instructions with respect to

16   certain evidence, and the concern is that unless the Court says

17   something about the 413, 414 evidence, the jury may be confused

18   about how and to what extent that evidence can be used.

19        I do understand your point about, you know, suggesting

20   that it doesn't say enough related to what they have to find or

21   what they can find and how the evidence should be used, and I

22   think the Eighth Circuit instruction that I'm considering says

23   more in terms of suggesting -- making clear that, you know, that

24   the defendant is not charged with this conduct, that you may

25   consider this evidence only if you find it's more likely true

1    than not true, this is a lower standard of proof than beyond a

2    reasonable doubt, but if you find that these offenses have not

3    been proved you must disregard them, et cetera.  And remember,

4    he's only on trial for the crimes charged, and you may not

5    convict a person simply because you believe he may have committed

6    similar acts in the past.

7         So it has a fair amount that pertains to this notion of

8    making sure that the jury doesn't put too much emphasis on this

9    kind of evidence in terms of it proving the crimes that are

10   actually charged; but it also makes clear what the rule is, which

11   is that unlike some other bad acts evidence that can only be used

12   for a limited purpose, this evidence can be used to decide any

13   matter to which they are relevant, and that is the rule to which

14   these acts are relevant or this act.

15        So I'm going to overrule that objection.  I'm going to

16   allow the instruction.  And what I'll do is get the language to

17   you so that you all can review it and can be ready to make your

18   final suggestions related to it in the context of the charging

19   conference that we will have.

20        I think from sort of here on out I intend to -- if there

21   are any changes made to any of the instructions as you have in

22   your draft there or in your packet there, just distribute the

23   particular instructions that changes have been made to.  And so

24   this one will be one.  It's basically what the government has

25   proposed, but it has more language, and it's coming from -- I'm

1  just looking -- it's coming from the pattern criminal jury

2  instruction of the Eighth Circuit, Instruction 2.08(a).  And I

3  might tweak it a little bit, but this is kind of basically what

4  it is that I'm thinking we need to do with respect to the

5  Indecent Exposure Act, which is the one that implicates 413 and

6  414.

7       Let me ask Ms. Hertzfeld and Mr. Okocha:  Is that the only

8  act of a sexual nature that you intend to introduce, other than

9  what --

10       MS. HERTZFELD:  Well, Your Honor, I --

11       THE COURT:  Yeah, uh-huh.

12       MS. HERTZFELD:  Oh, sorry.  I'm sorry.  I didn't mean to

13  cut you off.

14       I think in terms of the specific acts that rise to that

15  level, those are the two -- the primary ones, the indecent

16  exposure.

17       There is also evidence that I think the jury should hear

18  from primarily the older victim, Janika, about kind of the

19  atmosphere of what's going on in this house at the time that

20  Mr. Hillie was residing with them.  And it's not bad acts in the

21  sense of like chargeable conduct or something like that.  It's

22  more like, you know, comments that he would make to her, him kind

23  of creeping in and out of, you know, rooms of the house when

24  she's in them.  Coming in and out of the -- like, when she's

25  taking a shower in the bathroom, you know, her hearing a door

1    open, and she'd look out the curtain, and there's Mr. Hillie

2    sneaking in the bathroom.  Things like that.  Nothing that would

3    rise to the level of, you know, other, like, chargeable bad acts

4    type, indecent exposure type evidence.

5         But I think atmospherically there's a lot going on that

6    creates sort of this, you know, sexually charged environment that

7    has been made and created by making comments and, you know,

8    referring to the children in ways that seem inappropriate, given

9    his relationship as their mother's paramour.

10        THE COURT:  And so, Ms. Slaight, do you object to those

11   sorts of questions that pertain to the circumstances of the -- of

12   their living situation, from this witness's --

13        MS. SLAIGHT:  Yes, because those aren't -- those aren't

14   even charges.  Those are not -- I mean, those -- everybody would

15   agree that those are not -- not only not charges, but those are

16   not criminal offenses, and it's just -- it's really just

17   establishing an atmosphere for the trial, where to, you know,

18   bias the jurors against Mr. Hillie.

19        THE COURT:  Yeah.  Well, I'm going to overrule that

20   objection as well, because I do think that the circumstances of

21   the living situation, as these witnesses say they experienced it,

22   is relevant to the charges of sexual abuse that they have

23   maintained in this case.

24        You know, the government is entitled to lay the groundwork

25   for the allegations that are being made, and these are the

1    witnesses who say they are familiar with the circumstances under

2    which they all lived together.  And so I see this as relevant

3    evidence that is admissible unless the rules preclude it, and I

4    don't see it as any, you know, unduly prejudicial or anything

5    like that.  Nor to the extent it, you know -- that we're not

6    necessarily talking about, you know, inadmissible hearsay or

7    anything else, as far as the rules are concerned.

8         So I think -- I think it's fine.  The question is whether

9    or not there has to be an instruction pertaining to that in

10   particular, and I -- I'm not sure that there does.  I mean, the

11   issues with respect to indecent exposure were ones that we

12   addressed earlier, and that the government asked the Court to

13   rule on in its 404(b) motion, I think because -- precisely

14   because they allege conduct that could rise to the level of a

15   crime, and so it was -- it needed to be made clear that, even

16   though this wasn't charged conduct, Congress has said that it can

17   be considered.  And so the Court thought it necessary to rule on

18   that.

19        And then with respect to the physical assault, certainly

20   the rules of evidence indicate that I should limit the extent to

21   which the jury considers that evidence, and so there has to be an

22   instruction related to that.

23        But I'm not inclined to give any sort of particular

24   instruction pertaining to the atmospheric conduct or comments

25   that Ms. Hertzfeld raises, but you can talk about them.  I'm just

1    not, I think, going to say anything about them.  All right.

2         With respect to the government's second point, lascivious

3    exhibition, Ms. Hertzfeld, tell me what you think is missing from

4    what the Court had put forward.  I mean, I have an idea of what

5    it is that I would to address what I think is your concern, but

6    maybe you can say a little bit more about it.

7         MS. HERTZFELD:  Yes.  So I think, you know, the proposal

8    that we had and is included in the Court's draft includes this

9    list of adopted factors, which I think is a very -- it's been a

10   very useful guide in cases, and there's both -- a number of

11   courts have adopted these factors and a number of courts -- a

12   couple of courts have rejected them.  There's some dispute about

13   how they come into play.  Your Honor's already made a ruling on

14   this, and I thought it's very reasonable to charge the jury to

15   talk -- that they can consider these factors.

16        But I think that, as I was looking back over these, you

17   know, they're all factors that go to what's actually depicted in

18   the image itself, and I think what this citation from *Price*

19   adds -- and there a couple of other cases that get at the

20   issue -- is that the jury isn't limited in its consideration of

21   making its decision about lascivious exhibitions to whether or --

22   to what's fully within the picture themselves.  They could

23   consider what's the intent of what the photographer is meaning to

24   capture, and there's nothing in the instruction as it stands now

25   that makes it clear to them that they aren't limited just to

1    observing what -- the actual content of the image.

2         And I think what we're suggesting is just an additional

3    sentence to make it clear that they're going to hear evidence of

4    intent and motive, in part because it's related to the sex abuse

5    that's ongoing at the same time.  And I think that once they hear

6    how those things interrelate, it'll be helpful to them to have

7    some instruction on how they can consider those factors when

8    they're -- or that issue on sort of what is the defendant

9    intending to do and what is his motive in capturing this video.

10   It just certainly -- it certainly is relevant to whether or not

11   it's lascivious exhibition, and I think the current instruction

12   doesn't make it clear that they can consider it that way.

13        MS. SLAIGHT:  I think that this is -- should not be

14   included.  I mean, the defense of course objected to the

15   instructions that the Court is giving, the Dost instructions, but

16   this adds an additional -- the intent in the statute is the

17   intent of the defendant to -- that is -- that's already described

18   here.  To say that the intent of the fact the photographer is

19   relevant in whether an image is actually lascivious or not,

20   really goes way too far.

21        And, I mean, the person could be -- under this

22   instruction, the person could be fully clothed, and it would

23   still be, you know, a consideration.  This is -- I think that the

24   circuits have rejected this -- not all circuits follow this, and

25   it's appropriate to reject it because it -- it really violates

1    the whole idea of what pornography is.

2         THE COURT:  Well, I have --

3         MS. SLAIGHT:  It's a visual.

4         THE COURT:  I have accepted the Dost factors, which many

5    courts have held to be the primary considerations when deciding

6    whether a visual depiction is a lascivious exhibition.  And the

7    sixth Dost factor does get at this point, which is whether the

8    depiction appears to have been designed to elicit a sexual

9    response in the viewer.

10        So we do have some, you know, idea of the, you know,

11   design behind the image and not just the four corners of the

12   image itself.  And what my suggestion is, is rather than having a

13   whole other sentence that's come from the Seventh Circuit and,

14   you know, it sort of injects an entire Seventh consideration, one

15   would say or could say, just tweaking that last one to say

16   something like "whether the depiction appears to have been

17   intended to or designed to elicit a sexual response in the

18   viewer," and so it takes --

19        MS. HERTZFELD:  Your Honor.

20        THE COURT:  Yeah.  Go ahead.

21        MS. HERTZFELD:  I'm sorry.  I don't think -- the only

22   thing I'm concerned about in terms of that phrasing, it's a

23   little different than I think what *Price* is saying -- and there's

24   case law about this point -- is that when you're evaluating

25   something -- whether or not something depicts child pornography

1    and whether a child's being used to create child pornography,

2    you're not to look at what the child is doing, you're to look at

3    what the photographer is intending.  And so what I'm worried

4    about is that that may sound as though, whether it appears to

5    intend an elicit or sexual response, the jury may be confused

6    into thinking it's what the child is doing that's depicted

7    intending to elicit a sexual response.

8        But you can imagine a child pornography image where a

9    child is posed in a way -- it's not what we have here, but just

10   imagine that situation -- you know, where an adult -- you as a

11   child is posed in a way, taking a picture.  The question wouldn't

12   be:  Is it intended to elicit a sexual response because the child

13   is doing something sexual?  The question is:  What is the intent

14   of the person taking the picture?  And I think that that might

15   confuse the issue, slightly.

16       And so the reason the *Price* language is helpful is because

17   it's redirecting the jury to examine, not is it designed to

18   showing intent of the child, it's the intent and motive of the

19   photographer in taking the images in the first place.

20       MS. SLAIGHT:  And my objection is that it's re-focussing

21   the juror away from the actual image.  And pornography is about

22   the image, and this is -- this really redirects it away from it.

23   I think that the factors that are listed here more than

24   adequately describe what is the elements, and it should not be

25   directed.  The image is important.  The image is crucial, and

1   it --

2        THE COURT:  Well, I don't think -- I mean, in all

3   fairness, though, Ms. Slaight, it's not as though the government

4   is recommending that we eliminate all the factors that talk about

5   the image.  And, in fact, if you look at my language, you know,

6   leading into all of this, it's very clear that I say to the jury,

7   "You must determine whether the visual depiction is lascivious

8   based on its overall content."  Then I say, "In deciding whether

9   it's lascivious exhibition, you may consider these factors."

10  This is the way it's been set up, you know, in other courts that

11  consider the Dost factors.  They do fairly clearly say these

12  factors are an aid of evaluating the image.

13       And Ms. Hertzfeld's point appears to be that in evaluating

14  images involving child pornography, courts have accepted that the

15  intention of the photographer matters and that it's a

16  consideration.  This is not to say don't look at the image.  This

17  is not to say, you know, the image is not important when

18  determining whether or not it counts as pornography.  But you are

19  not to look at the image to the exclusion of any consideration of

20  the person who took the picture.

21       I don't know whether I'm going to feel comfortable enough

22  with the Seventh Circuit language.  Let's talk about this one

23  again in the context of our charging conference.  What I'll do is

24  research it and propose something to you, maybe taking all of the

25  Seventh Circuit, maybe running down the rabbit hole of looking at

1   the cases it cites and seeing whether we can come up with

2   something that's not so separate sentence-like, but that still

3   addresses what I think is the reasonable point of the government,

4   which is there is an -- a factor when one considers whether or

5   not an image counts as child pornography.

6       One of the factors is the intent of the photographer.  I

7   don't think that's disputed, really.  I think there might be one

8   case, one circuit we found that is -- or I'm sorry, it wasn't

9   even a federal case, it was a state case, that was saying don't

10  look at the intent of the photographer at all.  But every federal

11  case we found considers the intention of the photographer in a

12  child pornography case.  And so the question is just whether what

13  we've said here is sufficient to convey that to the jury.  And I

14  will look at it, and we will -- we will put something together

15  for your review and continue discussion for our charging

16  conference.  All right.

17      The final one from the government is the proposal

18  regarding lesser included offenses, which I have to say I don't

19  understand at all.  So maybe you can explain it to me,

20  Ms. Hertzfeld or Mr. Okocha, whoever is proposing this.

21      MS. HERTZFELD:  Well, I think -- I think only that the --

22  that the jury, should they find for some reason that the

23  defendant did not actually capture child pornography in the video

24  that he captured that are in Counts 1 and 2, that they could

25  still find that it's an attempt to capture child pornography.  So

1    essentially that if they didn't find the lewd lascivious

2    exhibition depicted here, they could find there's something to

3    capture.

4          THE COURT:  I'm not sure they can.  I'm actually going to

5    need more before I'm convinced that that is a possibility,

6    because it strikes me that in this context it's not your typical

7    case where you're talking about a lesser-included offense.  I

8    mean, the government has made its own determination with respect

9    to certain of these videos and has said, "We don't think there's

10   enough here for the jury to find lascivious exhibition as a

11   completed offense, and so we're going to charge them as

12   attempts."

13         And so with respect to the ones where you think that the

14   photo has captured what it's going to capture and so therefore it

15   qualifies, I don't know that you're entitled to any sort of a

16   lesser-included offense instruction anymore than any criminal

17   case a person could say, "Well, here are the elements of the

18   offense that we think this defendant committed, but if you don't

19   think that he got X element, then just charge it -- just find

20   attempt."  I'm not sure that that's a valid charging practice,

21   and so -- a jury instruction charging practice, so I'm going to

22   need more from the government if you're really intent on pursuing

23   that, because it strikes me just off the top of my head as

24   something that really is not permissible.

25         MS. HERTZFELD:  Understood.  We can take a look at that

1    again, Your Honor.

2         THE COURT:  Yeah.  I would do so.  You know, I'm not going

3    to give that now, and if you find evidence or cases that suggest

4    that it's appropriate, then bring them forward, but my reaction

5    is that probably not in this situation.

6         All right.  So with respect to -- so those were the things

7    that the government gave me.  Now, there was one thing that I was

8    expecting that I didn't get, which was a revised verdict form,

9    given what we talked about last time with respect to the

10   significant relationship and the couple of different ways in

11   which it could be proved.  I think you may have mentioned at one

12   point or acknowledged, Ms. Hertzfeld, that it was government

13   oversight in not having both of the residing and paramour forms

14   of significant relationship in the instructions.  And so -- but

15   that we probably needed a special verdict form with respect to at

16   least Count 12, which is the one in which significant

17   relationship is an element of the offense, so that the jury is --

18   we're clear that they're all on the same page about which form of

19   these, or both, occurred, so --

20        MS. HERTZFELD:  Yes, Your Honor.  And we actually did

21   prepare a verdict form which we sent to Ms. Slaight.  I'm

22   actually in Mr. Okocha's office and he's looking.  And it may be

23   that I inadvertently sent it to Ms. Slaight and did not copy the

24   Court, and that was just my error in sending.  We actually did do

25   that on this.

1          THE COURT:  Oh, okay.

2          MS. HERTZFELD:  I'm afraid it might have just an oversight

3     on the e-mail.  I'm so sorry about that.

4          THE COURT:  That's all right.  That's all right.

5          Well, let me ask you -- that's fine.  I'm happy to receive

6     it when you -- when you're able to redirect it.

7          Did you also -- did you also take a look at significant

8     relationship as an aggravating circumstance, which -- at least on

9     the prior version of this looked -- as though only the residing

10    form of significant relationship was included and not the

11    paramour form?  So it was the mirror image or the opposite of

12    what was happening in the instructions.

13         MS. HERTZFELD:  Yes.  And I'll say, it's a little

14    different.  So one thing that I have been looking at this more

15    closely and realized is that it kind of was getting by me and the

16    Court, was that with respect to Count 12, because it's sexual

17    abuse of a minor as opposed to of a child, it's actually of a

18    minor -- because she's over 16 at this point, and it's actually

19    an element of the offense.  It's not an aggravating circumstance

20    with respect to Count 12.

21         THE COURT:  Right.

22         MS. HERTZFELD:  And so I -- in the revision, which I know

23    the Court obviously can't see since I messed up the e-mail, but

24    the way we phrased it was that, "In order to find the defendant

25    guilty of Count 12, you must answer that he was to one of the

1    following" -- and then there's a place to mark -- "At the time

2    that he committed the sexual abuse against Janika, the defendant

3    was or was not more than four years older than Janika and

4    residing permanently or intermittently in the same dwelling."

5        And then Part B, this says, "At the time that the

6    defendant committed sexual abuse against Janika, the defendant

7    was or was not the paramour of the person charged with any duty

8    or responsibility for the health, welfare or supervision."

9        And then underneath that there's a place to make a finding

10   with respect to the aggravating circumstance, which is that he's

11   guilty of committing sex offenses against two or more victims,

12   Jaden and Janika.  And then they define guilty or not guilty with

13   respect to that.

14       THE COURT:  And that's all -- that's all within Count 12,

15   but isn't significant relationship an aggravating circumstance

16   with respect to the other sexual abuse counts as well, or am I

17   confused about that?

18       MS. HERTZFELD:  No, it is, Your Honor.

19       THE COURT:  All right.  So with respect to those, how do

20   you propose we deal with this paramour versus residing issue?

21       MS. HERTZFELD:  We did this, I think, on -- what we did on

22   the verdict form was we gave a place to check guilty or not

23   guilty with respect to both.  So first the offense, the substance

24   of the offense, and then two subheadings of aggravating

25   circumstance:  One for a significant relationship, and one for

```
1    multiple victims.  I'm just scrolling through this now.

2         THE COURT:  Right.  So --

3         MS. HERTZFELD:  And I think what Your Honor's

4    suggesting -- and maybe I didn't catch the nuance -- that Your

5    Honor's suggesting that in the aggravating circumstances, also

6    there's two bases.

7         THE COURT:  I mean, I think so because it's the same

8    significant relationship language, which is elsewhere defined in

9    the way that we've been describing as having two potential

10   possibilities.  And so it looks -- I'm looking at your verdict

11   form for Count 8 where you have the aggravating circumstance, and

12   it look like resided is the only one that is reflected there, and

13   the age.

14        MS. HERTZFELD:  One question I'm not -- one question I'm

15   not sure about what Your Honor's raising, it should allow them to

16   find on either basis.

17        I don't know the answer to the question of whether or not

18   with respect to an aggravating circumstance you would have to

19   have the same unanimity concerns that you would with the element

20   in Count 12, but it may be possible that you do, and then we

21   would have to give them both options.  That's --

22        THE COURT:  Yeah, I don't -- I don't know.  It's possible

23   that you don't, but the question is whether you're intending to

24   give them either/or because the or is not in here.

25        You understand what I'm saying?
```

1          MS. HERTZFELD:  Yeah.  They should -- yeah.  They should

2     be able to find either/or.  Let me look at whether or not it's

3     possible.  I mean, it's getting complicated enough that maybe one

4     thing to do if they don't -- if there's not the unanimity

5     concerns on an aggravating circumstance, for them to just find,

6     you know, that -- make a finding the defendant did or did not

7     have a significant relationship, and allow us just to explain to

8     them what that means in our closing and instructions, and they

9     would make one finding.  I don't know if that's acceptable.  I'd

10     have to just do a little research as to whether or not that would

11     create a problem if the jury made that finding without

12     transparency as to which basis they were finding it on or both,

13     if it comes -- if it's a situation of an aggravating -- I just --

14          THE COURT:  Well, let me -- let's all look into it.  I

15     mean, I don't know the answer.  I could definitely see a world in

16     which an aggravating circumstance becomes an element, because it

17     probably leads to a bigger penalty, you know, Scalia and *Aprendi*.

18          MS. HERTZFELD:  Right.

19          THE COURT:  And so to the extent that the jury is making

20     an additional factual finding that's going to augment the penalty

21     structure applicable to this offense, my gut is that they

22     probably have to do so in the same way as an element, that it

23     effectively becomes an element.

24          But, you know, you might be able to talk with someone in

25     your office that can comment on that quickly.

1        MS. HERTZFELD:  Yeah.  I'll do some research and have

2    somebody in our appellate division take a look at it, and see if

3    we can come up with a decision on that.

4        THE COURT:  But in any event, I assume that your intent is

5    to give them the option of determining either potential

6    significant relationship basis, and you weren't here

7    intentionally just picking the resided one?

8        MS. HERTZFELD:  Yes.

9        THE COURT:  Okay.  So we'll wait to hear from you on the

10   extent to which the form needs to reflect the unanimity concern.

11   But in any event, we'll have to have it revised once more to

12   capture that significant relationship, that second significant

13   relationship basis.

14       MS. HERTZFELD:  Well, and the Court -- so the idea is that

15   we'll look into doing research and speak to appellate and propose

16   something to the Court?

17       THE COURT:  Yes.

18       MS. HERTZFELD:  Okay.

19       THE COURT:  Because I don't have -- I mean, we'll have to

20   have the form revised again, right, because in any event, whether

21   it is or not, we don't have any language in here related to the

22   paramour version.  And so hopefully the next revision will

23   reflect the intelligence that you gather as to whether or not

24   there has to be unanimity on aggravating circumstances.

25       MS. HERTZFELD:  All right.  Thank you, Your Honor.

```
 1            THE COURT:  Um-hmm.  Okay.  So then there was the
 2    outstanding issue that was sort of discussed last time, although
 3    the government raised it previously in their -- in a notice that
 4    they filed in July of 2016, which is the issue of the prior
 5    reports of sexual abuse that Janika and Jaden made to various
 6    people.
 7            Let me just be clear, Ms. Hertzfeld.  The government was
 8    intending to introduce those reports through detective -- through
 9    the detective and perhaps even the -- Janika and Jaden
10    themselves, right, in your case-in-chief and not as rebuttal
11    evidence?
12            MS. HERTZFELD:  Yes, Your Honor.
13            THE COURT:  Okay.  And, Ms. Slaight, you object to that?
14            MS. SLAIGHT:  Yes.
15            THE COURT:  All right.  We did --
16            MS. SLAIGHT:  Prior consistent statement.
17            THE COURT:  Yes.  We did -- we did discuss this at the
18    last hearing, and the Court said it would look into it, and I'm
19    ready to rule on the admissibility of these statements.  I have
20    decided that the government can proceed to introduce the fact of
21    Jaden and Janika's reports of the abuse in the case-in-chief.
22    And the reason is because those statements are not hearsay.  I've
23    looked into the law on this.  As you know, the law defines
24    hearsay as, "An out-of-court statement that a party offers in
25    evidence to prove the truth of the matter asserted."  And I found
```

1    several cases in which the kind of out-of-court statements that

2    the government is saying it would like to use here, that is the

3    reports of sexual abuse in the past, were not -- were found not

4    to constitute hearsay when they were offered for purposes other

5    than their truth, including being offered to explain the effect

6    of hearing those reports on the listener and to explain the

7    origins of a police investigation.

8         Some of the cases pertaining to this were actually cited

9    by the government in their notice, which is ECF Number 15, but I

10   found, for example, in the case of *United States versus Running

11   Horse*, which is an Eighth Circuit case from 1999, that the Eighth

12   Circuit permitted the alleged victim's teacher to testify that

13   the person who had said that they were sexually abused had told

14   her of the abuse.  Also permitted the social worker to whom the

15   case was referred to testify about reports of abuse and moving

16   the individual to a different residence as a result.  The Eighth

17   Circuit held that preliminary information concerning the origin

18   of an investigation admitted only for that purpose is not

19   hearsay, and noted with approval the court's -- the trial court's

20   jury instruction that testimony was not being offered to prove

21   the matters -- that the matters reported had occurred.

22        This is also consistent with what the advisory committee

23   says in Rule 801.  It states that, "If the significance of an

24   offered statement lies solely in the fact that it was made, no

25   issue is raised as to the truth of anything asserted and the

1    statement is not hearsay."

2         So based on the government's representations during our

3    final pretrial conference, the fact that Jaden and Janika

4    reported the alleged abuse will be offered as background

5    information to assist the jury in understanding the origins of

6    the investigation; and the government maintains that it will not

7    be offered to prove that what was being alleged, that is the

8    sexual abuse, actually happened.

9         And so, because they're not being offered for truth, the

10   Court finds that the statements indicating that this conduct had

11   been reported by Jaden and Janika is not hearsay.

12        Let me say as well that these reports are probative and

13   not unfairly prejudicial, and thus also satisfy Rule 403.  The

14   jury has to have sufficient context to understand the origins and

15   timelines of the investigation, and this is specially so because

16   of the time lag between the initial investigation and the

17   eventual arrest that occurred in this case.  And any potential

18   prejudice or risk that the jury would consider the prior reports

19   for a purpose beyond the limited one for which they would be

20   admitted, can be mitigated by this Court's instructing the jury

21   that the prior reports may not be considered as evidence that the

22   claimed abuse actually occurred.  And I intend to give such an

23   instruction at the time in which any such evidence would be

24   offered.

25        So that's what I'm going to rule with respect to the

1    evidence and the way in which the government indicates that it

2    intends to use it.  This ruling does not reach whether the prior

3    reports are admissible for other purposes, for example, as prior

4    consistent statements or for identification purposes.  If the

5    government seeks to use the statements for any purpose other than

6    background or as a reason for the investigation, then I'll

7    entertain any objections related to that at the time and make a

8    decision.

9         But, again, hearsay is a particular thing, and to the

10   extent that the government is not seeking to use these

11   out-of-court statements to prove the truth of what they assert,

12   then they're going to be allowed.  All right.

13        So, Ms. Hertzfeld, does that explain to you what you are

14   able to do with the information at this time?

15        MS. HERTZFELD:  Yes, Your Honor.  Thank you.

16        THE COURT:  Okay.  The only other thing that I have right

17   now is just to close the loop on whether you all were able to get

18   the information related to the report.

19        Ms. Slaight, you were -- you said there was information

20   that had been given in discovery and you were looking at a name?

21        MS. SLAIGHT:  Right.  Right.  Your Honor, the government

22   did give me a name, I think it was yesterday, and I did get in

23   touch with the social worker, and she -- who was supposed to have

24   made the report and who has said that she would get back to me

25   this afternoon about whether she sort of said that maybe she

1    didn't make the report after I talked to her.

2         But I have talked to the government, and -- this

3    afternoon, and they would -- if it turns out that she is not the

4    person who made the report or some -- or the -- and it was based

5    on several different interviews, if she didn't either make -- do

6    one of the interviews in question or any of the interviews in

7    question, the government said that it would stipulate to the

8    statements, that the statements were made to the witness -- the

9    statements were made by the witness.

10        So I think that we can work this out without -- as long as

11   the government's willing to stipulate to the -- that the

12   witnesses -- that they're having testimony had made these prior

13   statements to the social worker, I think we can work this out,

14   regardless of whether I can get the social worker in or not who

15   actually made the statement.

16        THE COURT:  All right.  Ms. Hertzfeld, I hope that you can

17   work it out.  Do you think there's hope there?

18        MS. HERTZFELD:  Your Honor, I actually think that this is

19   probably not actually going to come into play because what is in

20   the report, the inconsistencies in terms of what the witnesses

21   will testify -- I'll give you an example.  Specifically this is

22   Janika telling the social worker that the abuse didn't happen at

23   one point in time.  I don't expect she's going to deny that on

24   the stand.  In fact, we've talked to her pretty extensively about

25   her testimony, and she's indicated that she acknowledges that she

1    didn't tell the truth about that then.

2         So I think as the first line of defense, I think this is

3    not going to be an issue at trial and there won't be any

4    impeachment to complete.

5         But, secondly, to the extent that there is any problem, we

6    have identified the person we believe wrote those reports.  It

7    sounds like there is some confusion at CFSA about how the running

8    log went, and it's -- we are -- we have agreed that if for any

9    reason the testimony doesn't come out as we expect, then we will

10   stipulate that those prior reports reflect an accurate statement

11   of what the witness said to the social worker at the time that it

12   was made.

13        THE COURT:  All right.  So it sounds like that's not any

14   sort of issue that I need to address.

15        Do you all have anything else that we need to focus on

16   before trial tomorrow?

17        MS. SLAIGHT:  Yes, Your Honor.  I looked at the

18   government's videos.  There are seven videos at issue that the

19   government's introducing either for attempt pornography or

20   pornography, and they have -- they propose introducing also clips

21   from the videos or stills from the videos.  I don't object to the

22   government showing clips of the videos, to the extent that the

23   witness, Janika, identifies herself or Mr. Hillie.

24        I do object to clips of the videos being -- and I object

25   to any clips or stills going back to the jury in final

1    deliberations.  But I also object to any clips or stills shown to

2    the jury of these videos, other than the ones for identification

3    purposes, because the pornography statute and the instructions,

4    particularly as to lascivious exhibition, for example, one of the

5    factors is whether the focal point of the visuals is a depiction.

6    If the government clips these videos and shows clipped videos,

7    they are changing the focal point, and they are altering the

8    videos to emphasize the -- what they consider to be less vicious

9    content.  And so I object to any clipping of the videos and any

10   clipped videos going back to the jury and certainly to any still

11   pictures.  That's not the -- to emphasize, that changes the focal

12   point, which is a factor in the definition of pornography.

13          THE COURT:  Ms. Hertzfeld.

14          MS. HERTZFELD:  So, to be clear, there's really two

15   categories of clips that have been made.  So there are six videos

16   in total that are the subject of the two production and the four

17   attempt production charges.  It's the government's intention that

18   John Marsh, the forensic investigator, would introduce those

19   exhibits through him, and that the jury would be given a full

20   video of everything that was recovered for each of those six

21   alleged counts in the indictment.

22          So the jury would have original versions, Government's

23   Exhibit 4, 5, 6, 7, 8 and 9, the full video extraction that was

24   obtained off the laptop by Investigator Marsh.

25          The clips are numbered, you know, 4A through F, et cetera.

1    The clips do two things.  For each video we clipped a place where

2    you can see the defendant setting up and taking down the camera,

3    and -- so that the victim can identify -- Janika can identify

4    that that's Charles Hillie; and then a clip where -- each of the

5    other participants in the video, so in the bedroom video Janika

6    can identify herself.

7         Those clips where Janika's being asked to identify

8    herself.  Our idea was that we did not want to make a child

9    witness sit on the stand and watch the entire video, and so that

10   she would be given a clip of herself still clothed.  You know,

11   she hasn't seen the contents of these videos fully.  She doesn't

12   know that her -- I mean, she knows generally what's on them, that

13   there's nude content, but she doesn't -- she's never had to sit

14   there and watch them all.

15        So I think that -- they've been authenticated and brought

16   in, in their full form by John Marsh.  Janika will look at a

17   clip, identify Charles Hillie, and then herself clothed to say

18   "That's me."  There's a couple other videos form the bathroom

19   where the sisters are -- and the mother are depicted.  So we

20   clipped the place where she could say -- everybody's clothed --

21   you know, "That's Camaria, my little sister; that's Jaden, my

22   little sister; and that's my mother."

23        THE COURT:  All right.  And to be clear, I did not hear

24   Ms. Slaight objecting to those.  That was the one she said she

25   thought was okay, the ID clips, correct, Ms. Slaight?

1         MS. SLAIGHT:  Right.

2         THE COURT:  Okay.

3         MS. HERTZFELD:  All right.  And then the other category of

4    clips are ones where we have tried to take these videos -- one is

5    29 minutes and change.  The shortest is, I think, seven minutes

6    or something like that.  And the idea was to clip the places

7    where there's relevant conduct in terms of child pornography

8    being generated.  So it -- the idea was to shorten, if we were

9    having discussions in clothing or in directing the witness's --

10   the jury's attention -- I'm sorry -- to a particular piece of

11   video, that we would be able to play just a clip of that without

12   having to kind of shuffle back and fort in the video.

13        I think we would make it very clear to the jury that these

14   are clips that are depicting a particular thing, and here's the

15   reason we're showing that.

16        THE COURT:  Well, let me just ask you --

17        MS. HERTZFELD:  This is simply for --

18        THE COURT:  Let me ask you a few things.  First of all,

19   would the authentication piece of this and the getting it in

20   through John Marsh, is it your intention to play the entire

21   video?

22        MS. HERTZFELD:  Yes, Your Honor.  We would play the video

23   through him, and then have him also testify that clips were taken

24   from each video to depict, you know, certain things.  He doesn't

25   need to explain what they are.  I think the other witnesses will.

1        But he will say, "Here's an entire video that's

2   Government's Exhibit 4.  Let's play it."

3        I also watched Government's Exhibit 4A through 4F, and

4   they are fair and accurate clips taken from Government's

5   Exhibit 4.

6        THE COURT:  All right.  And so the clips are just for the

7   purpose -- what I'm trying to understand, too, is whether the

8   clips are just demonstrative -- demonstratives used during the

9   trial so that we don't have to wait while you fast forward the --

10  you know, the 25-minute videotape to the relevant portion when

11  you start talking about it.

12       Is that your point?

13       MS. HERTZFELD:  In part.  And then there's also the place

14  where we have still images that we want to be able to point the

15  jury to the place where they should be directing their attention

16  in deciding if this is the image of -- when they're deciding if

17  it's a lascivious exhibition, here's the place on this video

18  we're talking about.  So you know where to look, and you know

19  where apply those facts.

20       MS. SLAIGHT:  And my objection is, if they can't find it,

21  then the -- then that -- and if they have to have it pointed out

22  to them by clips, they have changed the evidence in this case.

23       So the issue is whether -- one of the issues and one of

24  the factors is whether the focal point of the visual depiction is

25  on the minor's genitalia.  If they're clipping it, then they're

1  changing the focal point.

2        THE COURT:  Well, I agree.  I agree from the standpoint of

3  the actual stills, because the evidence that they are evaluating

4  is not in still form, right?  I mean, the child pornography that

5  is at issue here are not photographs.  They are videos.  So I'm a

6  little concerned, in light of Ms. Slaight's objection, about any

7  stills.

8        Now, with respect to the video clips, I appreciate the

9  government's concern to the extent that we're talking about a

10  long video, and we're trying to line the numbers up to get to the

11  point where they want to discuss something with someone.  So, you

12  know, I think a clip that, you know, takes out the long periods

13  of time where the camera has been placed but no one has come in

14  yet and sort of condenses it down to the relevant action, doesn't

15  strike me as problematic.

16        But I understand Ms. Slaight's concern, which is if we

17  have a clip that reduces to the focal point being in the

18  particular place that, you know, makes it allegedly child

19  pornography, that it's a different depiction than the one that

20  was actually produced in a way that could impact the jury's

21  assessment.  So, I would --

22        MS. SLAIGHT:  And I would --

23        THE COURT:  Yeah.

24        MS. SLAIGHT:  I'm sorry.  And I would point out that, for

25  example, on the first, Count 1, there is no -- I don't think

1    there is really any dead time.  There's people coming in and out

2    and -- throughout that video.  And so, you know, there's only one

3    of the six videos that has any dead time.  I mean, there's things

4    going on in the video.  There's people there.  There's -- the

5    complainants are there, or other people are there.  So it's not

6    an issue except for -- I think there's -- like I said, there's

7    one video where there's a little -- there's a little bit of dead

8    time, but other than that, there's something going on all the

9    time.

10         THE COURT:  Well, let me ask you, though, Ms. Slaight,

11   you're not objecting -- so to the extent they have the full

12   video, is it your argument that the government could never stop

13   it in production and sort of -- you know, as it's being

14   displayed, and say, "Wait a minute, you know, hold it right

15   there, you know, witness whoever, what do you see there, what's

16   happening?"  They -- surely they can pause it to discuss certain

17   aspects of it, can't they?

18         MS. SLAIGHT:  Well, I would argue that they -- there's no

19   evidence that that was done in -- that the -- that the video was

20   paused when it was being made, so they shouldn't be allowed to do

21   that.

22         THE COURT:  No, they have to be able to discuss certain

23   aspects of the evidence, whether -- you know, any sort of video

24   evidence.  I mean, that -- your argument cannot be that a video

25   of a particular thing, whatever it is, can't be paused so the

1    government can ask questions about it if the issue is what's on

2    the video or whether or not what's on the video constitutes

3    criminal activity.

4         So obviously they can pause it.  The question is whether

5    they can clip it and have it presented as a separate thing that

6    just focuses on the 5 seconds or 10 seconds or 20 seconds or

7    whatever it is that they find most significant.  And I think you

8    have a good point that if they are producing other video files

9    with a condensed version that focuses in on just what they find

10   to be the significant part of this, that they may be presenting

11   different evidence from the standpoint of the rules of evidence

12   and what is probative and prejudicial.

13        But, Ms. Hertzfeld, what is your response to that?

14        MS. HERTZFELD:  Well, no, there's no -- what I'm

15   understanding by the phrase condensed, look, there's no clips

16   where we've taken the first three minutes, cut out a couple

17   minutes, smushed them with the next five minutes, cut out a

18   couple minutes.  Like, there's nothing where we've strung

19   together pieces of the video that aren't consecutive with one

20   another to make a clip.  It's just places where we've taken out,

21   you know, a three-minute interval.

22        And that -- and the idea is not that we would present this

23   to the jury in lieu of saying, "Watch the entire video."  The

24   idea is that we would just have these clips available so that a

25   witness could testify, "You know, there's a three-minute span

1    where the defendant can be seen, you know, setting up the video

2    camera, let's direct the jury's attention to that part."  And we

3    could play that clip, as opposed to playing the entire video and

4    having them searching back and forth for those three minutes.

5        THE COURT:  Well, here's one thing.  I'm going to rule

6    that Ms. Slaight's objection is sustained with respect to what

7    goes back to the jury room.  I think the jury gets the entire

8    video, and they can, you know, fast forward, rewind, go to

9    whatever section they think is relevant, but I don't think the

10   jury in its deliberations gets the clips as though, you know, the

11   video was in pieces in this way.

12       So I think we mitigate some of the risk, Ms. Slaight, by

13   at least saying -- making sure that the jury understands that the

14   entire video is the evidence that's being presented and that was

15   what was extracted off the laptop, et cetera.

16       Ms. Hertzfeld, I think Ms. Slaight's point, if I am

17   understanding her correctly, is that the defendant's theory, in

18   part, is that what was being taped here was not, in fact,

19   lascivious exhibition, but people using the bathroom and just

20   comings and going.  And so to the extent that you have clips that

21   focus on the naked part, you have taken it out of context in

22   terms of the way in which the video actually transpired.  And,

23   you know, that's not to say you have to play the entire video

24   every time you talk about it, because I do believe it can be

25   paused, that you can say, "Okay, let me talk about this part

1    where he's placing the camera, let's just play those three

2    minutes."  But I'm trying to quickly in my mind evaluate whether

3    there's any material difference between having the entire video

4    and you all just knowing where in the string of numbers you need

5    to go to next in order to pull out the section -- in order to

6    have the witness address the section you want to talk about now,

7    and whether just clipping that section out for the purpose of

8    questioning a witness, whether that makes any difference.  I

9    don't know.  But I do -- I am inclined to agree, and have agreed

10   with Ms. Slaight, on the jury doesn't get the clips.

11       MS. HERTZFELD:  Understood.  I think maybe one

12   possibility, Your Honor -- would the Court consider if we -- and

13   our intent was to send back the entire video for the jury's

14   review because I do think it's pertinent there is a

15   determination.

16       But I think -- would the Court consider allowing us to use

17   the clips in order to facilitate being able to start and stop the

18   video, and perhaps giving an instruction to the jury that when

19   they're considering the counts related to the video evidence --

20   almost like a redaction type of instruction but the reverse --

21   that, you know, certain clips have been shown to you, when you go

22   back to deliberate, and for purposes of Counts, you know, 1

23   through 7, you would -- you are to consider the entirety of the

24   video as its presented in Government's Exhibit 4, 5, 6, 7, 8 and

25   9?

1          THE COURT:  Yeah.

2          MS. HERTZFELD:  Something like that?

3          THE COURT:  I think that could work to mitigate the

4     concern, along with not having them have access to just the

5     clips.

6          But, Ms. Slaight, you know, your objection is overruled to

7     the extent that you're suggesting that they -- for every witness

8     that they want to talk about the video, they have to play the

9     entire thing and can never focus the jury's attention on any

10    particular portion of it.  I think they can, and I think that

11    if we -- if they choose to do so for technical reasons in the

12    form of pulling out the three minutes that they want to talk

13    about with this witness and having it saved as a separate file

14    rather than...

15         You know, back in the old days we'd have the counter

16    going, and they would know that at a certain, you know, minute is

17    the point where they wanted to start talking.  Rather than doing

18    that, I suppose computer technology today has you just able to

19    excerpt the relevant portions that you want to talk about.  And

20    Ms. Hertzfeld is suggesting that if they have those excerpts with

21    regard to particular witnesses, they play that three minutes,

22    they do their questioning, and then I make sure that the jury is

23    informed that the clips are not going back, and that you saw

24    those clips but the clips were not -- you have to consider the

25    entire video and not any particular clip when you are making your

1    determination about lascivious exhibition.

2         Ms. Slaight?

3         MS. SLAIGHT:  I understand.  Yeah, I understand the

4    ruling.

5         THE COURT:  All right.  So that's what I'm going to do.

6         It might be helpful if we could get some language to that

7    effect.  I mean, we'll try something, but this is probably going

8    to be -- do you know, Ms. Hertzfeld, who the witnesses are that

9    you're likely to show these parts of the video to?

10         MS. HERTZFELD:  Only to Investigator Marsh and Janika.

11         THE COURT:  Okay.  So I'll probably give this instruction

12    contemporaneously with your showing it after you've shown it, and

13    then again as a part of my final instructions.  All right?

14         MS. HERTZFELD:  Thank you.

15         THE COURT:  Okay.  Anything else?

16         MS. SLAIGHT:  Your Honor, this is just a small matter.  I

17    just wanted to confirm that if I introduce evidence, that does

18    not waive my MJOA, except for to the extent of considering that

19    evidence, if I introduce any exhibits or?

20         THE COURT:  During your cross-examination of the

21    witnesses --

22         MS. SLAIGHT:  Right.

23         THE COURT:  -- that the government proposes?

24         MS. SLAIGHT:  Right.  I'm sorry.  During the government's

25    case-in-chief, right.

1          THE COURT:  I don't consider it to be the case.  Let me

2     ask Ms. Hertzfeld if she's ever seen it done that way?

3          MS. HERTZFELD:  I'm not sure I understand.  Would the

4     introduction of the evidence on cross-examination negate the MJOA

5     motion at the close of the government's case?  Is that the

6     question?

7          MS. SLAIGHT:  Um, in other words, if I were to -- during

8     cross-examination, if I were to introduce an exhibit, my position

9     is that that does not waive my right to an MJOA request --

10         THE COURT:  To say that the government --

11         MS. SLAIGHT:  -- except to the extent --

12         THE COURT:  To say that the government has not proven --

13     has not provided sufficient evidence to meet an element?

14         MS. SLAIGHT:  Right, um-hmm.

15         THE COURT:  Are you asking whether the Court would

16     instruct the jury -- no, because this is for me.

17         MS. SLAIGHT:  No, no.  It's -- yes, it's for you.

18         THE COURT:  Yeah, yeah.

19         MS. SLAIGHT:  It's a judicial ruling.  I think that most

20     courts today don't consider that to have waived MJOA, but I just

21     wanted to confirm it.

22         THE COURT:  I don't consider that to waive.  I've never

23     had anybody raise the issue before, which is why I'm a little

24     less than coherent in responding, but it's not my inclination to

25     consider it to be waived.

1        That said, I have not often had defendants who introduced

2    exhibits that the plaintiff -- I'm sorry, that either the

3    plaintiff in a civil case or the government hasn't already put in

4    the evidence binder.  So what I'm trying to understand, as a

5    separate issue, is the extent to which exhibits that you intend

6    to introduce are going to be made known to the government and to

7    the Court.

8        MS. SLAIGHT:  Right.  I -- it just may be photographs from

9    the house, from the apartment would be -- I had looked at -- the

10   government's photographs I think that the government's going to

11   introduce, and I may have a couple of extra photos there, but

12   that would be probably the extent.

13       THE COURT:  In your -- in your practice, Ms. Slaight, when

14   you have extra evidence that you introduce in the course of the

15   government's case, when do you ordinarily let them know that or

16   let them see that?  Do we have to take time to allow them to

17   review it before you --

18       MS. SLAIGHT:  I can -- these are exhibits from that, so I

19   can give it to them.  I can tell them the specific ones that I

20   might introduce tomorrow.

21       THE COURT:  All right.  I think that would be helpful so

22   that they could be prepared.

23       MS. SLAIGHT:  It's not any big item.

24       THE COURT:  I'm sorry?

25       MS. HERTZFELD:  I'll just make a general request, Your

1    Honor.  That -- you know, I -- the materials that we turned over

2    in discovery, I -- I'd imagine that whatever we do you'd be

3    familiar with.  But just to the extent that it may impact sort of

4    the ability of the witness to have an opportunity to see

5    something and review it and make sure they're familiar with it,

6    just if we could be alerted to what it might be, and if there's

7    any objection like that, we have a chance to vet that prior to

8    the start of the cross-examination just to keep things moving

9    along in that respect?

10          THE COURT:  Yeah.  I think we're going to need to do that,

11   Ms. Slaight.  So, I mean, the earliest possible moment that you

12   can get it to them, even before whatever witness, would be

13   helpful; but at a minimum before you start to -- I think at a

14   minimum you should let them know what photographs you might

15   introduce on cross-examination.

16          MS. SLAIGHT:  I don't have any problem with that.

17          THE COURT:  Sorry?

18          MS. SLAIGHT:  I don't have any problem with that.

19          THE COURT:  Okay.  And if you could do that before the

20   witness starts to testify, that would be helpful.

21          MS. SLAIGHT:  Sure.

22          THE COURT:  Okay?

23          MS. SLAIGHT:  Yes.

24          THE COURT:  Ms. Hertzfeld, does that take care of it?

25          MS. HERTZFELD:  I think so, Your Honor.  Thank you.

1      THE COURT:  Okay.  All right.  Anything else?

2      MS. SLAIGHT:  The only reason I bring it up is because if

3  I don't introduce it, then the jury -- then it can't be an

4  exhibit for the jury, so -- so I prefer to introduce it if I show

5  it to a witness.

6      THE COURT:  You mean introduce it into evidence so the

7  jury can see it?

8      MS. SLAIGHT:  Yes.

9      THE COURT:  Yes, understood.  What we're just trying to

10 avoid is having information that had been turned over to you in

11 discovery but not necessarily shown to the witness because the

12 government wasn't aware that it was going to be at issue in the

13 trial at all, and so the witness is not familiar and now we have

14 to take time.

15     If you could tell Ms. Hertzfeld, "Here are things I might

16 use with this witness ahead of time," then she can make sure that

17 the witnesses understand that it might be coming, but then it

18 might not.  You know, there's no -- we're not binding you to it,

19 but at least they could potentially be prepared.

20     MS. SLAIGHT:  Uh-huh.

21     THE COURT:  All right.  So let me say one other thing,

22 which is tomorrow we're going to do jury instructions -- sorry,

23 jury selection.  I always say jury instruction.  Jury selection.

24 We have a bigger panel than usual because of the nature of the

25 charges in this case.  I've been talking with my courtroom deputy

1    about the process.  We think it should be sufficiently clear, and

2    we'll try to make sure that everyone keeps track of who is who.

3         I think it's possible that when there are strikes for

4    cause, we will excuse the juror completely, but we'll keep track

5    of it very clearly on the list, so that by the time that you go

6    to do peremptories, we'll know exactly who's sitting out there

7    and who is available to be stricken.  All right.

8         I haven't had anybody have a problem with this, so we'll

9    go slowly and carefully and make sure we do this right, but I

10   just wanted to let you know, because I think at the pretrial

11   conference we talked about strikes for cause, going to sit back

12   down, and being there even during the peremptory process.  And I

13   think it might be less confusing if strikes for cause are

14   completely gone, and that we work, you know, with peremptories

15   sort of as a separate step of this.  All right?

16        So, but we'll -- no, you'll let me know if it's getting

17   out of hand, but it hasn't worked -- it has worked pretty well in

18   the other trials that I have done.  All right?

19        So I will see you all tomorrow morning.

20        MS. HERTZFELD:  Your Honor, I'm sorry.

21        THE COURT:  Yes.

22        MS. HERTZFELD:  May we just brief two quick issues --

23        THE COURT:  Yes.

24        MS. HERTZFELD:  -- from the government before tomorrow.

25        THE COURT:  Yes.

1          MS. HERTZFELD:  One is a small one.  I wanted to alert the

2    Court that we've again made some additions to our exhibit list.

3    They're all in the form of photographs from the execution of the

4    arrest and search warrant at Good Hope Road.  They're all, you

5    know -- it's additional A, B, Cs, it's additional exhibits in

6    that series.

7          We've shown them all to Ms. Slaight.  We had a meeting

8    today, and so we've gone -- we cleared them all with her as

9    exhibits we intend to introduce, but I just wanted to let the

10   Court know that we will submit tonight yet another update to

11   exhibit list adding these additional photos.

12         THE COURT:  Okay.  Thank you.

13         MS. HERTZFELD:  And then the second thing I wanted to

14   raise just briefly, and I'm raising this now because it's going

15   to come in with our very first witness who is a law enforcement

16   person.  It's one of the U.S. Marshals that was supervising the

17   execution of the arrest and search warrant at Good Hope Road.

18         We have turned over to the defense, for the police

19   officers and the law enforcement that are testifying, *Giglio*

20   information from the Metropolitan Police Department PPMS database

21   which is their internal investigations of any officer,

22   allegations of use of force or loss of -- any type of allegations

23   of wrongdoing by officers.

24         So this -- the officers -- two officers who are MPDs that

25   are testifying, we made disclosures as to their *Giglio* materials

1   in that respect.  We did not believe any of it was pertinent to

2   any issue on which the defense would be able to cross-examine

3   them.  But I wanted to just raise in advance that that was not

4   going to be an issue when they testify, so that if there are

5   differences of opinion on that, we can flush those out.

6          And then the more significant one is that the very first

7   witness is Deputy U.S. Marshal Christopher Schwartz, who at the

8   time that the warrant was executed for Mr. Hillie, the mother of

9   the victims made a series of allegations on the scene about how

10  the marshals that were executing the warrant were, you know,

11  doing all kinds of things, but among them, she was yelling a lot

12  of stuff out, yelling that she was being sexually assaulted.

13  The -- there was an extensive internal investigation by the

14  Marshal Service to make sure that that was not the case and that

15  everybody was interviewed, and ultimately they were all

16  exonerated, any of the U.S. Marshals, from committing any kind of

17  sexual assault on Jo Asiamah, the mother's name.

18         And I wanted to alert the Court of that because it's the

19  government's position that it isn't relevant or it doesn't go to

20  any issue in this case, and that he should not be permitted to be

21  cross-examined on that.  It sounded to me from some of the

22  discussions with Ms. Slaight that she may be intending to use

23  that information, and I just thought we should flag it and try to

24  resolve it now so that we don't run into an issue when he's on

25  the witness stand.

1        I want to be clear that the only role that Christopher

2   Schwartz had in this case was to execute this warrant.  So in

3   terms of what actually happened on the scene, he's been cleared

4   of any -- he and all the marshals have been cleared of any actual

5   misconduct in terms of the execution of the warrant, and he's had

6   no further involvement since he was exonerated of that conduct.

7   And his other involvement would be to testify tomorrow.  So at no

8   point during any pending investigation by Internal Affairs was he

9   involved in the case, and so there's no bias or, you know,

10  currying favor, or anything like that, I think, evidence that

11  would be at play here.

12       So it's our position that any reference to this is --

13  because it's been -- you know, it's been unfounded -- would be

14  inappropriate.  And I just wanted to raise that issue as well

15  with the Court today.

16       THE COURT:  All right.  Ms. Slaight?

17       MS. SLAIGHT:  Your Honor, the government is introducing

18  the marshal or having the marshals testify to say that Mr. Hillie

19  was hiding in the closet.  And so I think that the fact that they

20  broke into the apartment; she's screaming and yelling -- which

21  everybody agrees -- that "People are assaulting me, raping me,

22  robbing me, call 9-1-1," is very relevant to what actions

23  Mr. Hillie would have taken.  They're going to say that he was

24  hiding in the closet.  I assume it's consciousness of guilt,

25  otherwise it's not relevant.  And there are other reasons that he

1   would be in the closet, including that the police have broken in

2   and that Mrs. -- Ms. Asiamah is screaming and yelling that the

3   police are assaulting her.  So I think it's absolutely relevant.

4        THE COURT:  Now, let me just -- let me just be clear,

5   because I heard Ms. Hertzfeld to suggest that there were

6   particular charges being made, whether in the form of the

7   screaming or perhaps even otherwise, about sexual assault by this

8   particular executing search warrant officer that Ms. Asiamah

9   was -- while he was executing the warrant and that he was

10  ultimately cleared.

11       I don't -- I guess I don't understand what the actual

12  statements that she made, why they were relevant to your point

13  that Mr. Hillie was hiding in the closet or whatever, as opposed

14  to the broader issue of she was screaming and yelling.  I mean,

15  yeah, she was screaming and yelling, and there was a lot of

16  commotion, and they broke the door down.  And all of that seems

17  to be something that, at least on its face and my hearing this

18  for the first time right now, could be relevant to an explanation

19  of Mr. Hillie's response.  But what she was actually saying about

20  what the officers were doing, I'm not sure was relevant.  And

21  it's certainly --

22       MS. SLAIGHT:  I think that her accusations and her

23  screaming and yelling, the substance of it is relevant.

24       THE COURT:  How so?

25       MS. SLAIGHT:  I mean, if she was screaming, "He's giving

1     me flowers," then obviously he wouldn't be doing that.  But she's

2     screaming something specific.  They're assaulting her.  They're

3     robbing her.  They're raping her.  So they're committing actions

4     that --

5          THE COURT:  Well, first of all, why isn't that -- why

6     isn't that hearsay, first of all, the actual substance of the

7     comments, because --

8          MS. SLAIGHT:  It's not for the truth of the matter.

9          THE COURT:  Okay.

10         MS. SLAIGHT:  I'm not arguing that they did assault her --

11    that they did rape her.  I -- you know, I don't have any

12    objection to the government saying that they were cleared of any

13    allegations, but it is the actions that -- it's the effect on the

14    listener that Mr. Hillie was hearing this.

15         MS. HERTZFELD:  Maybe I can just clarify.  I think there's

16    two separate issues.  One, we don't contest the idea that when

17    the marshals knocked and announced, Ms. Asiamah did not open the

18    door.  The testimony we expect from U.S. Marshal Schwartz is that

19    they knocked on the door.  They could hear her kind of scuffling

20    around on the inside.  They gave -- you know, five minutes went

21    by while they waited for the door to open.  And when nobody

22    opened, they finally did breach the door.  And when they entered

23    the apartment, Ms. Asiamah -- what I expect him to testify to is,

24    the fact that she was yelling and she was screaming, she didn't

25    want them to come into the apartment and she was kind of

1    obstructing with her body them entering into the apartment.  But

2    the fact of her yelling and screaming and all this commotion, I

3    think, without implicating any hearsay, is something that would

4    be testified to by Deputy U.S. Marshal Schwartz.

5         But there's -- and there's two things.  What she was

6    yelling is, "I'm being robbed.  I'm being raped."  All those

7    things, so I think that's one sort of way the allegation was

8    made.

9         But it went further than that, because Ms. Asiamah carried

10   on this allegation that the marshals had assaulted her, and it

11   was more general than this particular officer.  It just so

12   happened that he was the one that put the handcuffs on her when

13   they had to subdue her so they could get into the apartment.  So

14   I think the investigation became -- he was the one like actually

15   had to deal with her.

16        But she carried this allegation on into her grand jury,

17   and so what I think is not relevant is the fact that she

18   continued to pursue this, not at all in the context of the

19   marshals coming into her house, and in the end every single

20   person on the U.S. Marshal's team that was there that day was

21   cleared of any wrongdoing.

22        And I think it's totally inappropriate to allow him to

23   be -- Marshal Schwartz to be cross-examined on the existence of

24   this allegation against him that was found to be completely false

25   and then he was exonerated from --

1      THE COURT:  Yeah.  So --

2      MS. SLAIGHT:  -- because that doesn't go to any relevant

3 issue.

4      THE COURT:  So I hear Ms. Hertzfeld being a little more

5 nuanced, perhaps, than you were, Ms. Slaight, by saying the whole

6 commotion of the breaking and entering, and her screaming, and

7 perhaps even what she said in the context of the screaming is not

8 what the government is objecting to, but that this seemed to be a

9 charge that lingered, and then there was a whole investigation

10 related to it, and then people were ultimately exonerated.  And

11 it's that kind of aftermath piece of it that she's saying

12 shouldn't be the subject of any cross-examination.

13      Do you object to that?

14      MS. SLAIGHT:  Um...

15      THE COURT:  How is that possibly relevant?  It's certainly

16 not relevant to the issue that you just put forward.  I mean,

17 fine, let's hear about what happened on the day of the break --

18 of the execution.

19      MS. SLAIGHT:  Right.  That's what I was -- that's what I

20 was getting at, right, the -- what occurred on that date --

21      THE COURT:  So, Ms. Hertzfeld, to the extent --

22      MS. SLAIGHT:  -- rather than what happened afterwards,

23 that subsequent investigation.

24      And then in terms of any investigation, I would certainly

25 have no objection to the government saying, you know, it was --

1    they were not -- they were not -- whatever the result was.  I

2    don't know whether it was unfounded or whatever the result was.

3          THE COURT:  But I guess the government's point is, we

4    don't even need to go there.  Let's limit the testimony to the

5    day of the execution of the warrant.  What happened when they got

6    there, what -- you know, the scene at the time.  That may include

7    what people were saying when they were screaming and thrashing

8    and had to be arrested and all of that.  All of that I expect

9    will come out on direct, because the government has this witness

10   talking about the search warrant.

11         What they didn't -- I think I hear Ms. Hertzfeld saying --

12   want, is for a cross-examination that went beyond that by the

13   further question of and Officer Schwartz, "After the -- you

14   executed the search warrant, some time later, weren't you

15   investigated for the sexual assault of Ms. Asiamah, and didn't

16   she pursue this charge against you?"

17         And then I hear you say, "Yeah, but they can come back and

18   say he was exonerated, but the government is asking me to rule

19   that we don't even go into any sort of, you know, subsequent

20   allegation against him arising out of it, that we just leave it

21   to the day of the execution."

22         So what do you say about that, Ms. Slaight?

23         MS. SLAIGHT:  Well, I guess my position is that there's

24   no -- I don't see the -- I don't see the harm or the -- why it

25   wouldn't be -- what the harm to the government is in pursuing it

1    in saying that she pursued it, but that it was --

2         THE COURT:  Because it is completely prejudicial.  It's

3    irrelevant to any, you know, legitimate issue in this case.  It's

4    not a claim or a charge that then was ultimately sustained, like

5    a conviction against a witness or any of the other evidentiary

6    things that are allowed to test a witness's credibility.  It goes

7    to nothing, and I'm going to sustain the government's objection

8    to any discussion of the pursuit of charges against Mr. Schwartz,

9    Officer Schwartz, on this basis.

10        Everybody can talk about the execution of the warrant, how

11   this -- Ms. Asiamah reacted, how Mr. Hillie reacted, what people

12   said at the time, but we're leaving it there with respect to this

13   particular witness.  There's no need to introduce any kind of

14   other subsequent thing that ultimately was found to be unfounded.

15   And so I'm not going to require that the government rebut with

16   the whole -- it's like a rabbit hole that takes the jury off on

17   to something that makes no difference to the issues in the case.

18        So that's my ruling.  The government's objection in this

19   way or this issue is sustained.  We can talk about the day of the

20   execution of the warrant with this witness, but that's -- but

21   that's it.

22        MS. SLAIGHT:  And what the witness said can be discussed

23   on that day; is that right?

24        THE COURT:  Yes, because it's all a part of the execution

25   of the warrant.  What she said was fine, but any future or

1  further claims or charges that she made after that point are

2  irrelevant and are not to be discussed.

3       All right.  Anything else?

4       MS. HERTZFELD:  No, Your Honor.  Thank you.

5       THE COURT:  Mrs. Slate, anything?

6       MS. SLAIGHT:  No.  I don't know of anything else, Your

7  Honor.

8       THE COURT:  All right.  So we will be convening officially

9  at 9:30.  That is when the jury is to be called to the courtroom,

10  but if you all could plan to be in my courtroom at 9:15, that

11  would be helpful.

12       And we will get from the government tonight the other

13  pieces that you said you would be putting together.  Maybe you

14  can send the verdict form that you had previously intended to

15  send to us, but we'll know that another one is coming in light of

16  the issues that we discussed.  All right?

17       MS. HERTZFELD:  Understood.  Thank you, Your Honor.

18       THE COURT:  Okay.  Thank you.  See you in the morning.

19  Bye-bye.

20       (Proceedings adjourned at 4:58 p.m.)

21

             **C E R T I F I C A T E**

22

23       I, Scott L. Wallace, RDR-CRR, certify that
   the foregoing is a correct transcript from the record of

24     proceedings in the above-entitled matter.

25

    /s/ Scott L. Wallace

1     _____     _____
                Scott L. Wallace, RDR, CRR              Date
2               Official Court Reporter