```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


   UNITED STATES OF AMERICA        :
                                   :
                   Plaintiff,      :   Criminal Action
                                   :   No. 16-030
   v.                              :
                                   :
   CHARLES HILLIE,                 :   March 29, 2018
                                   :   9:15 a.m.
                                   :
                                   :
                   Defendant.      :   Washington, D.C.
                                   :
   ........................... :
```

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS
### (VOIR DIRE)
### BEFORE THE HONORABLE KETANJI B. JACKSON,
### UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the United States:        **Andrea Lynn Hertzfeld, Assistant**
                              **U.S. Attorney**
                              U.S. ATTORNEY'S OFFICE FOR THE
                              DISTRICT OF COLUMBIA
                              555 Fourth Street, NW
                              Washington, DC 20530
                              (202) 252-7808
                              Fax: (202) 353-7634
                              Email: Andrea.hertzfeld@usdoj.gov

                              **Kenechukwu O. Okocha, Assistant**
                              **U.S. Attorney**
                              U.S. ATTORNEY'S OFFICE-DISTRICT OF
                              COLUMBIA
                              Sex Offense and Domestic Violence
                              555 Fourth Street, SW
                              10th Floor
                              Washington, DC 20530
                              (202) 252-6604
                              Email: Kenechukwu.okocha@usdoj.gov

```
APPEARANCES:  Cont.


For the Defendant:        Joanne D. Slaight, Esq.
                          LAW OFFICES OF JOANNE D. SLAIGHT
                          400 Seventh Street, NW
                          Suite 206
                          Washington, DC 20004
                          (202) 408-2041
                          Fax: (202) 628-0249
                          Email: Jslaight@att.net

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6503, U.S. Courthouse
                          Washington, D.C. 20001
                          202.354.3196
                          scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

1          <u>**MORNING SESSION, MARCH 29, 2018**</u>

2     (9:27 a.m.)

3          THE COURTROOM CLERK:  Your Honor, this is Criminal Case

4     Number 16-030, *United States of America versus Charles Hillie.*

5          Would counsel please approach the lectern and state your

6     appearances for the record.

7          MS. HERTZFELD:  Good morning, Your Honor.  Andrea

8     Hertzfeld for the United States.

9          THE COURT:  Ms. Hertzfeld.

10          MR. OKOCHA:  Good morning, Your Honor.  Kenechukwu Okocha

11     for the United States.

12          THE COURT:  Mr. Okocha.

13          MS. SLAIGHT:  Good morning, Your Honor.  Joanne Slaight

14     for Mr. Hillie.  Your Honor, I had brought clothes for

15     Mr. Hillie, but -- the sizes that I thought were the right sizes,

16     but apparently they're a little small for him.

17          THE COURT:  All right.

18          MS. SLAIGHT:  And the -- there's -- an agent has an extra

19     blazer, which he's getting right now and he's going to bring over

20     for him.

21          THE COURT:  All right.

22          MS. SLAIGHT:  So I would ask that we not start

23     panelling -- bring the panel in until he gets here with the

24     blazer.

25          THE COURT:  Okay.  All right.  What else do we need?  Do

1  we need a tie that's longer maybe, or do we think his tie is all

2  right?

3      MS. SLAIGHT:  Well, I think the tie will be okay with the

4  blazer.

5      THE COURT:  With the blazer?  All right.

6      MS. SLAIGHT:  Once we get the blazer, the tie will be all

7  right.

8      THE COURT:  Okay.

9      THE DEFENDANT:  And some pants, you know, because the

10  pants are tight, too.

11      THE COURT:  All right.  Well, here's what we'll -- we may

12  not be able to do that for today, but the blazer could cover you.

13      THE DEFENDANT:  Right.

14      THE COURT:  Ms. Slaight, for the remainder of the trial

15  we're going to have to try to see what we can do.  Maybe you can

16  work with the defender.  I know they have clothes.

17      MS. SLAIGHT:  They do.  They do.  I know they have larger

18  shirts over there, but I thought that was the size.  And I'm sure

19  they have pants, too, so I can --

20      THE COURT:  Do they have an office here?  Can we contact

21  them and ask them to bring someone?

22      THE COURTROOM CLERK:  I'm calling someone from the office

23  right now to see if we have anything here, and if not we can

24  reach out to the probation officer to see if they have any

25  clothes on the second floor.

1          THE COURT:  That'd be great.  Thank you.

2          MS. SLAIGHT:  I don't think they have anything here of the

3    right size in the satellite office because I had talked to them.

4          THE COURT:  They might be able to send someone, though, to

5    sort of observe Mr. Hillie.

6          MS. SLAIGHT:  At the public -- at their main office --

7          THE COURT:  Yes.

8          MS. SLAIGHT:  -- they have -- they have extra, extra large

9    shirts.  I just didn't bring it over because I thought it would

10   be too big for him.  I don't know what they have in pants because

11   I didn't check.  I had gotten the pants elsewhere.

12         THE COURT:  Right.  The question is whether we can

13   communicate with them to see if they can bring something over, if

14   not for today and this proceeding, but at least he'll have it for

15   the remainder of the trial.

16         MS. SLAIGHT:  Right.  And the main office number, I can

17   call, too.

18         THE COURT:  Maybe -- why don't you take a second and do

19   that.

20         Do we have any other preliminary matters?

21         MS. HERTZFELD:  No, Your Honor, not from the government.

22         THE COURT:  All right.  So we'll --

23         MS. SLAIGHT:  Your Honor, I was just going to note that I

24   did have a couple of matters to bring up, but we don't need to

25   bring them up now because it's regarding testimony, so we can do

1    it at the end of the day.

2         THE COURT:  Okay.  Great.  Thank you.

3         (Thereupon, a break was had from 9:32 a.m. until

4    10:31 a.m.)

5         THE COURTROOM CLERK:  Your Honor, this is Case Number

6    16-CR-030, the *United States of America versus Charles Hillie*.

7         THE COURT:  Good morning.

8         ALL PARTIES PRESENT:  Good morning.

9         THE COURT:  Ladies and gentlemen, I am Ketanji Brown

10   Jackson, and you have been called here for the possible selection

11   to be a juror in the criminal case of *United States versus*

12   *Charles Hillie*.

13        I'm going to begin today's process by introducing the

14   court staff and explaining to you what we're going to be doing

15   here today.  As I said, I am Judge Jackson, and I will be

16   presiding over this matter.

17        Assisting me is Mr. Jean Claude Douyon, who's right here;

18   and Ms. Gwen Franklin.  They're my courtroom deputy clerks, and

19   you have met them.

20        We also have Mr. Scott Wallace, who is the court reporter

21   for the case.  He's not a news reporter with the press, but a

22   court reporter who will keep track of the proceedings, a record

23   for me and for the people who are involved in this trial.

24        Also at the bench is Mr. Brian Kelly, who is one of my law

25   clerks.

1          I will also introduce the people that you see at these

2    tables, which are the lawyers and the parties, in a moment, but

3    first I want to explain briefly why you are here.  We've called

4    you today because in order to try this case, we need to select

5    from among you a panel of jurors.

6          Those of you who studied government and our nation's

7    history, will recall that a jury is a fundamental part of our

8    system of justice, which was instituted by the framers to protect

9    individual liberty.

10         Our constitution guarantees the right to a jury trial in

11   criminal cases, and our justice system is designed so that when a

12   person is accused of committing a crime, fair and impartial

13   citizens of the community make the determination of guilt or

14   innocence based solely upon the evidence presented in the

15   courtroom and the law as the judge instructs.

16         Service on a jury is one of the most important duties that

17   we perform as citizens of the United States, and it is a service.

18   You all have taken time away from your daily lives and

19   responsibilities to respond to this call of duty, and I want to

20   thank you for being here today.

21         Now let me talk to you a bit about the process.  The

22   process of jury selection is known as the voir dire process.  And

23   the object is to select 12 jurors and 2 alternates who have no

24   prior knowledge about the case and no bias toward either side.

25   In short, it is our aim to select a jury that will reach a

1    verdict based solely on the evidence presented in this courtroom

2    and the law that I will instruct you about.

3         During the voir dire process, you will be introduced to

4    all of the participants in the trial, and I will ask you a series

5    of questions.  Please listen carefully, and if your answer to any

6    of the questions that I ask you is yes, please write the number

7    of that question on the note card that you have been given.

8    Again, you will write down the number of the question only if

9    your answer to the question is yes.

10        Once I have finished asking all of the questions, you will

11   be called up to the bench where you will discuss with me and the

12   lawyers privately any of the questions that you have indicated on

13   your note card.

14        If at any time you're unable to hear a question, please

15   raise your hand and I will repeat the question for the entire

16   group.  Please also remember that there are no right or wrong

17   answers to the questions that I will ask you, only truthful ones,

18   and the only thing that you have to write down on the card is the

19   question number.  You will have time to explain your answer when

20   I see you up here at the bench.

21        Once the questioning is done, the lawyers will make a

22   decision about who will serve on the jury for this case, and the

23   prospective jurors who are not selected will return to the jury

24   lounge.

25        I want to warn you that unfortunately the jury selection

1    process and the process of serving on a jury can involve periods

2    of waiting.  While you're waiting, please sit quietly.  You can

3    read and talk quietly among yourselves, but please do not discuss

4    any aspect of this case, including the voir dire questions that I

5    will be asking you.  I will try to keep the waiting to a minimum,

6    but I do thank you in advance for your patience with process.

7         Okay.  At this time everyone should have a note card and a

8    pencil, and if you have not already done so, please write your

9    juror number on the top of the note card.

10        Before I begin the questioning, I am going to ask

11   Mr. Douyon to administer the oath.

12        (Jury venire sworn.)

13        THE COURT:  Thank you.  Many of my initial questions

14   relate to your knowledge of the alleged crimes at issue in this

15   case, so listen carefully as I first describe the case.  This

16   matter is a criminal trial and the defendant, Mr. Charles Hillie,

17   has been charged in an indictment.  An indictment is just the

18   formal way of bringing charges in a case, and you are not to

19   consider the indictment as any indication of guilt.

20        In this case, the indictment charges Mr. Hillie with the

21   following 17 counts:  Two counts of sexual exploitation of a

22   minor; one count of possession of images of a minor engaging in

23   sexually explicit conduct; four counts of attempted sexual

24   exploitation of a minor; one count of first degree child sexual

25   abuse with aggravating circumstances, eight counts of second

1    degree child sexual abuse with aggravating circumstances; and one

2    count of sexual -- excuse me, of second degree sex abuse of a

3    minor with aggravating circumstances.

4         The government alleges that on multiple occasions between

5    2007 and 2014, Mr. Hillie sexually abused Janika Asiamah, and

6    Jaden Asiamah, by touching them on their breasts, buttocks, and

7    genitalia, and in one instance penetrating Janika's vulva with

8    his finger.  Janika and Jaden are sisters, and the government

9    alleges that this sexual abuse occurred when Janika was between

10   ages 10 and 17 and Jaden was between ages 9 and 10.

11        The government also alleges that this conduct happened

12   when Mr. Hillie was living with Janika, Jaden and their mother,

13   who was Mr. Hillie's girlfriend at the time as alleged in the

14   indictment.

15        The defendant denies the alleged sexual abuse.

16        The government also alleges that when Janika was between

17   the ages of 10 and 15 years old, Mr. Hillie surreptitiously video

18   recorded Janika in various stages of undress while she was

19   grooming herself in her bedroom and bathroom.

20        The government alleges that Mr. Hillie surreptitiously

21   recorded Janika for the purpose of capturing sexually explicit

22   conduct involving Janika.

23        In two out of the six surreptitious recordings that the

24   government has charged in the indictment, the government alleges

25   that the video recordings constitute lascivious exhibition of

1    Janika's genital and pubic area, and thus, that Mr. Hillie's

2    conduct violated a federal law that prohibits the making of child

3    pornography.

4        In the remaining four surreptitious recordings that have

5    been charged, the government alleges that Mr. Hillie attempted to

6    violate that same federal law.

7        The defense asserts that these allegations are false.

8        I will now ask you a series of questions.  Again, if your

9    answer to any of these questions is yes, please write down the

10   number of that question on your note card.

11       Question Number 1:  First, from what I have told you so

12   far, does anyone believe that they've heard or read anything

13   about this case, or do you believe you know anything about the

14   facts and circumstances of this case?  If your answer's yes,

15   please write Question 1 on your card.

16       Question Number 2:  The United States is represented in

17   this case by Assistant United States Attorneys Andrea Hertzfeld

18   and Kenechukwu Okocha.  Please stand.

19       Do you know Ms. Hertzfeld or Mr. Okocha, either personally

20   or professionally?  If so, please write question number 2.

21       Also at the prosecutor's table is FBI Agent Edward

22   Moschella.  Agent Moschella, please stand.

23       If you know Agent Moschella, please write number 2 on your

24   card.

25       The defendant in this trial is Mr. Charles Hillie.

1   Mr. Hillie, please stand.

2        Do you know the defendant, or have you had any contact

3   with the defendant?  If the answer is yes, please write 3 on your

4   card.

5        You may have a seat.

6        Mr. Hillie is represented in this case by Joanne Slaight.

7   Ms. Slaight, please stand.

8        Do you know her either personally or professionally?  If

9   so, please write number 4.

10       Question Number 5:  You may hear testimony from or about a

11  number of people during the course of this trial.  Ms. Hertzfeld

12  will now identify for you the names of the people who may testify

13  for the government.  Listen carefully, and if you know any of the

14  people named, please mark number 5 on your note card.

15       MS. HERTZFELD:  Good morning.  The United States expects

16  that you'll hear testimony in this case from two individuals from

17  the Metropolitan Police Department.  Their names are Officer

18  Edward Hansohn, and Retired Police Detective Doretha Johnson.

19  You'll also hear from a Deputy United States Marshal by the name

20  of Christopher Schwartz.  And then from -- a criminal

21  investigator from the United States Attorney's Office by the name

22  of John marsh.  We expect we'll also call civilian witnesses

23  whose names are Tameka Davis, Jaden Asiamah, Janika Asiamah, and

24  Josephine Asiamah.

25       THE COURT:  If you know any of those individuals who were

1    just named, or think you know them, please write number 5 on your

2    card.

3         The defendant, Mr. Hillie, has no obligation to present

4    any evidence or witnesses.  However, if Mr. Hillie and his

5    attorney choose to call a witness or witnesses, you may hear

6    testimony from certain people.

7         Ms. Slaight will now identify for you the names of people

8    who may testify for the defense.  Listen carefully, and if you

9    know any of the people named, please mark your note card with

10   number 6.

11        MS. SLAIGHT:  Thank you.  In addition to the witnesses who

12   have been named, the defense may call Donna Wright Miller, Dale

13   Vaughn, and Oliver Johnson.  Thank you.

14        THE COURT:  If you know any of those people or think you

15   know them, please write number 6 on your card.

16        Do you know or do you recognize any other member of the

17   prospective jury panel?  That's question number 7.  And you can

18   take a moment to look around on your row.  If you need to stand

19   slightly to be able to see everyone, please do so.  It's

20   important that the Court knows whether you know any other person

21   on the panel, and if you do, please write number 7 on your card.

22        Question Number 8:  Do you know anyone else who is in the

23   courtroom today, such as any of the other courtroom clerks, the

24   court reporter, me, or any of the other staff that you see in the

25   courtroom here?  If you think you know any of us, please write

1   number 8 on your card.

2        Question Number 9:  This case involved events that

3   occurred at 2323 Good Hope Court Southeast, Washington, D.C.  Do

4   you, a member of your family or a close personal friend have any

5   connection to the area around 2323 Good Hope Court?  If so,

6   please write number 9 on your card.

7        Question Number 10:  The lawyers have predicted that the

8   presentation of evidence in this trial should last approximately

9   five days, and I think that's a fair estimate, but it could run

10  shorter or longer.  The jury will sit from Monday through Friday

11  from 9:30 a.m. to 4:30 p.m. for as long as it takes to hear

12  evidence in this case.

13       The length of jury deliberations following the

14  presentation of evidence at trial will be determined by the jury

15  itself.

16       Do you have an urgent or extremely important matter to

17  attend to, such that you could be faced with a hardship if

18  selected for the jury in this case?  If so, you're going to write

19  number 10 on your card.

20       Number 11:  Do you have any vision or hearing problems or

21  any other physical or medical problems that might interfere with

22  your ability to hear or understand what the witnesses say in this

23  case, or ability to hear tape recordings, to view photographs, or

24  to give your full attention to this matter?  If you have any of

25  those issues, please write number 11 on your card.

1           Number 12:  Do any of you have any other health problems

2      which would interfere with your ability to sit as a juror in this

3      case?  That's question number 12.

4           Question Number 13:  Do any of you have any difficulty

5      reading, speaking or understanding English?  That would be

6      question number 13.

7           Question Number 14:  Have you or any of your friends or

8      relatives ever studied law, had any legal training, or been

9      employed by a lawyer or a law firm, worked in a courthouse, been

10     a paralegal, served as a legal secretary, or performed legal

11     investigative work?  All of those legal jobs for either you or

12     friends or relatives are covered by question number 14.

13          Question Number 15:  Have you or any of your friends or

14     relatives ever been employed by a local, state, or federal law

15     enforcement agency or ever applied for such employment?  For

16     example, this work at the -- this includes work at a police

17     department, the FBI, sheriff's department, CIA, Department of

18     Justice, Marshal Service or the like.  Any law enforcement

19     position or application should be noted on question 15.

20          Question 16:  Have you or any of your friends or

21     relatives -- excuse me -- ever been employed by a court, a

22     probation or parole office, any Department of Corrections, any

23     jail, prison, or any other type of penal institution, or have you

24     ever applied for any such employment?  That question covers you

25     or any of your friends and relatives and penal institution

1    employment.  If so, please write number 16.

2         Question Number 17:  Have you or any of your friends or

3    relatives ever been employed by a defense attorney or defender

4    organization or ever applied for any such employment?  That is

5    question number 17.

6         Question Number 18:  Have you or any of your friends or

7    relatives ever belonged to any group or organization that is

8    active in law enforcement or crime prevention matters?  For

9    example, this includes the Fraternal Order of Police, Crime

10   Watch, Crime Stoppers, crime victim's groups, and the like.  That

11   was question number 18.

12        Question Number 19:  Have you ever served as a juror at a

13   civil or criminal trial or on a grand jury?  If you've had jury

14   service before, please mark number 19 on your card.

15        Question Number 20:  If you have ever served on a jury

16   before, was there anything about your service that might affect

17   your ability to serve fairly and impartially in this case?  If

18   so, please write number 20.

19        Number 21:  Have you or any of your friends or relatives

20   ever been accused, arrested, charged, or convicted of a crime,

21   been a victim of a crime, been a witness to a crime, testified in

22   court or before a grand jury as a witness to a crime, or been

23   required to appear in court for any reason?  If any of those

24   circumstances, victim, witness, testimony, please write number 21

25   on your card.

1          Number 22:  Have you formed any opinions of criminal

2     defense attorneys, prosecutors, or accused persons that would

3     affect your ability to be impartial in deciding this case?  If

4     so, write 22.

5          Number 23:  Have you or any of your friends or relatives

6     had any experiences with law enforcement, with a law enforcement

7     agency or the government, that might cause you to favor or

8     disfavor the government or law enforcement?  If so, please write

9     number 23.

10         Number 24:  Have you ever filed a complaint against a

11    police officer or anyone in law enforcement?  If so, please

12    write 24.

13         Number 25:  If you had to choose who to believe, a police

14    officer or a witness called by a defendant, are you more likely

15    to believe the police officer simply because he or she is a

16    police officer?  If that describes you, please write 25.

17         Number 26:  Do you think that you will be unable to follow

18    my instruction that you are not to give any greater or lesser

19    weight to the testimony of a witness merely because he or she is

20    a government or law enforcement officer?  If you think you cannot

21    follow that instruction, please write number 26 on your card.

22         Number 27:  Do you have any training or specialized

23    knowledge in the field of processing and recovering digital

24    evidence or in computer forensic analysis?  If you have any

25    training in those areas, please write 27.

1   Number 28:  Do you work with children sexual assault

2   victims or sex offenders?  If so, number 28 should go on your

3   card.

4   Number 29:  Have you or any of your friends or relatives

5   ever been associated with a group or organization that assists

6   people who have experienced sexual abuse?  That's question

7   number 29.

8   Question Number 30:  Have you or any of your immediate

9   family members studied or had any training or experience in the

10   areas of psychiatry, psychology, or mental health therapy or

11   counseling as it relates to sexual offenses or abuse involving

12   children?  That was question 30.

13   Question 31:  Have you or any of your friends or relatives

14   ever been a victim of or a witness to a crime related to child

15   pornography, sexual abuse of a minor, or other sex crimes or

16   abuse?  That's question number 31.

17   Question Number 32:  Have you or any of your friends or

18   relatives ever been accused, arrested, charged, or convicted of a

19   crime related to child pornography, sexual abuse of a minor, or

20   other sex crime or abuse?  That was 32.

21   Number 33:  Would you be unable to give the testimony of a

22   teenager, child, or young person the same consideration that you

23   give to any other witness?  If you think you would be unable to

24   do that, write number 33.

25   Number 34:  Do you believe that teenagers, children or

1    young people, tell lies about important matters more often than

2    adult witnesses?  If you believe that that's the case, please

3    write number 34.

4         Number 35:  Do you have any feelings about people of

5    different races, genders, nationalities or religions that would

6    affect your ability to be a fair and impartial juror?

7         That was question number 35.

8         Question Number 36 is similar:  Do you believe that a

9    person's race, gender, nationality or religion could affect your

10   ability to judge that person's credibility or his or her guilt or

11   innocence?  If you think those factors might influence your

12   ability to be impartial in judging a person's credibility, please

13   write number 36.

14        Number 37:  Do you believe that sexual abuse, sexual

15   assault, sexual harassment or domestic violence is a bigger

16   problem within the black or African American community than in

17   the general population?  If your answer is yes, please write

18   number 37.

19        Number 38:  This case involves the alleged production and

20   possession of child pornography and the alleged sexual abuse of

21   two minor females.  Does anyone have such strong feelings about

22   these charges that it would be difficult to be fair and impartial

23   or to render a judgment based solely upon the evidence in this

24   case?  Please write number 38 if that describes you.

25        Number 39:  Would hearing testimony about the alleged

1    sexual assault of a minor make it difficult for you to sit fairly

2    and impartially as a juror in this case?  That's question

3    number 39.

4        Question Number 40:  Are you uncomfortable with hearing

5    about, reading or viewing sexually-related materials, including

6    alleged child pornography, such that you could not fairly and

7    impartially serve as a juror in the case?  That was number 40.

8        Number 41:  Do you have any opinions about laws governing

9    child pornography or laws prohibiting adults from seeking to

10   engage in sexual activity with minors that would prevent you from

11   being fair and impartial on this jury?  This is opinions about

12   laws that govern child pornography or the prohibition of adults

13   with minors.  That was question 41.

14       Question 42:  Do you believe that pornography involving

15   minors should be available on the Internet or commercial online

16   services?  Number 42.

17       Next is Question 43:  Do you believe that the First

18   Amendment protects people who produce pornography involving

19   minors?  If you believe that to be the case, write number 43.

20       Question 44:  Would it be difficult for you to follow the

21   Court's instruction if the Court instructed you that pornography

22   involving minors is not protected by the First Amendment of the

23   United States Constitution as a matter of law, or by any other

24   provision of the constitution?  Would it be hard for you to

25   accept that instruction?  If so, please write 44.

1      Question 45:  Do you believe that sexual relations between

2  adults and minors are or should be legally permissible?  If so,

3  write question 45.

4      Question 46:  This question concerns your knowledge of

5  publications, groups, whether in person or online, chat rooms, or

6  other social media that advocate or condone sexual relations

7  between adults and minors.  Are you aware of any such

8  publications or groups, or do you have knowledge of their

9  positions or practices?  If you are aware of any such group,

10  write question 46 on your card.

11      Question 47:  Do you believe that someone who would be

12  interested in child pornography is more likely to sexually abuse

13  a minor?  I'm going to read that one again.  Question 47:  Do you

14  believe that someone who would be interested in child pornography

15  is more likely to sexually abuse a minor?  If your answer is yes,

16  please write question 47 on your card.

17      Question 48:  Do you believe that someone who would

18  sexually abuse a minor is more likely to be interested in child

19  pornography?  If your answer is yes, please write number 48 on

20  your card.

21      Question 49:  Do you believe that victims of sexual

22  assault always promptly report the assault?  If you believe that

23  to be the case, please write number 49 on your card.

24      Number 50:  Do you believe that if an alleged sexual

25  assault is not promptly reported, it is likely that it did not

1    occur?  If you believe that to be the case, please write number

2    50 on your card.

3         Number 51:  If Mr. Hillie or his lawyer asks questions

4    designed to cast doubt on the credibility of child or teenager

5    witnesses who say they were sexually abused, would you hold that

6    against Mr. Hillie or his lawyer?  Would you hold questions about

7    the credibility of these witnesses against the defendant?  If so,

8    you're going to write question 51 on your card.

9         Number 52:  Persons who have been charged with crimes are

10   presumed to be innocent.  The prosecution has the burden of

11   proof.  This means that the jury cannot return a guilty verdict

12   against a defendant unless the prosecution has proven beyond a

13   reasonable doubt that the defendant is guilty of the particular

14   crime.  Would you have any difficulty accepting and applying this

15   principle?  If you would have difficulty with what I just said,

16   write number 52 on your card.

17        Number 53:  Because the burden of proof is on the

18   government, the law does not require a defendant to offer any

19   evidence or take the stand and testify on his own behalf.  Would

20   you have any difficulty following my instruction that a person

21   charged with a crime is not required to present any evidence or

22   to testify at trial on his own behalf?  If you have a problem

23   with that, you should write 53 on the card.

24        Number 54:  Do you believe that because Mr. Hillie is

25   charged with crimes, Mr. Hillie is probably guilty of something?

1    If that's your belief, please write number 54 on your card.

2         Number 55:  As jurors, you are not to decide this case

3    based on your passions, concerns, prejudices or emotions; rather,

4    you will be required to decide the case solely based on the

5    evidence presented in court and the instructions given to you by

6    this Court.  Would you have any difficulty complying with that

7    requirement?  If you would, please write number 55 on your card.

8         Number 56:  To reach a verdict, every juror must agree on

9    the verdict; that is, any verdict in a criminal trial must be

10   unanimous.  In deliberations, you must consider the opinions and

11   points of your fellow jurors.  In the final analysis, however,

12   you must follow your own conscience and be personally satisfied

13   with any verdict.  Would any of you have difficulty expressing

14   your own opinions and thoughts about this case to your fellow

15   jurors?  If you think you would have trouble with that, please

16   write number 56 on your card.

17        Number 57:  Do any of you feel that you will be

18   uncomfortable or have difficulty discussing with fellow jurors

19   the evidence you will hear in this case concerning the alleged

20   sexual abuse of a minor or alleged pornographic images of a

21   minor?  If you think you would have difficulty talking about this

22   case and the evidence that has been presented, please write

23   number 57 on your card.

24        Number 58:  Do any of you feel that it would be difficult

25   to maintain your belief that the defendant is innocent or guilty

1   because you were in the minority and the only juror who held such

2   a belief?  If you would have trouble in that scenario, if you

3   were the only one who felt one way or the other, would that be

4   hard for you?  If so, please write 58.

5       Number 59:  Do you have any moral, religious or ethical

6   beliefs that prevent you from sitting in judgment of another

7   person?  If the answer is yes, write number 59.

8       Number 60:  Do you have any personal, cultural or

9   religious bias that would prevent you from treating the testimony

10  of all individuals equally and fairly?  Personal, cultural or

11  religious biases that would prevent you from treating the

12  testimony of all individuals equally and fairly, if so, you want

13  to write 60.

14      Number 61:  Is there any other question or issue that I

15  have not asked or addressed that you would like to discuss when

16  you come here to the bench?  If you have another issue or

17  question, please write 61 on your card.

18      And finally, Question Number 62:  Do you know of any

19  reason or has anything occurred to you during this questioning

20  that might in any way prevent you from following my instructions

21  on the law, from being completely fair and impartial as a juror,

22  or rendering a verdict that was based solely upon the evidence in

23  this case?  If anything has occurred to you or you now think of a

24  reason and you may have forgotten it in the numbers that I've

25  previously indicated, write number 62.

1        All right.  Ladies and gentlemen, we have finished the

2   general questions.  You all should have a card with various

3   numbers written down.  Ms. Franklin will escort each of you to

4   the bench for follow-up questioning.  I'll have counsel approach.

5        I'm going to put on a mechanism that's called the husher,

6   which will make it so that our conversations at the bench will be

7   private and your fellow jurors will not hear.  As I said earlier,

8   you may read, you may talk quietly, but please do not talk about

9   the questions that I've asked or the facts of this case as I've

10  mentioned them to you.

11       (Following sidebar discussion had on the record:)

12       MS. SLAIGHT:  Your Honor, we didn't get a headset check,

13  so --

14       THE COURT:  All right.  So do you want to start by

15  saying --

16       MS. SLAIGHT:  Hello.

17       THE COURT:  Oh, he doesn't have it on.  Maybe -- he

18  doesn't have it on, yeah.

19       (Brief pause in proceedings.)

20       MS. SLAIGHT:  Okay.  Do you hear me, Mr. Hillie?

21       THE COURT:  Yes.  He's giving a thumb's up.  He's giving a

22  thumb's up.

23       Brian, do you hear?

24       THE LAW CLERK:  Yes, Judge.

25       THE COURT:  Okay.  I think we're all set.  So I have the

1    first group of cards here.  We'll have each person come up, and

2    if you have a strike for cause, you're going to tell me right as

3    they exit and we will take note of it.

4          (Discussion had off the record.)

5          THE COURT:  Okay.  I'm ready.  The first is juror number

6    1145.  I'm not going to read all of these -- should I read all of

7    them into the record?  There's a lot of numbers.  We'll just talk

8    about them, but here, here's the card.  All right.

9          MS. SLAIGHT:  Just as a note, I think we don't have enough

10   lawyers on the panel.  There's only like 50 percent.

11         THE COURT:  I know.  That's the fate of D.C., but -- all

12   right.  Thank you.

13         THE COURTROOM CLERK:  Are you going to call the number,

14   Judge, or do you want me to call?

15         THE COURT:  Oh, should I call?

16         THE COURTROOM CLERK:  You want to call the number?

17         THE COURT:  Yes.

18         THE COURTROOM CLERK:  Okay.

19         (Sidebar discussion concluded.)

20         THE COURT:  Juror number 1145, you may approach, please.

21         (Prospective juror approached the bench.)

22         PROSPECTIVE JUROR:  Morning.

23         THE COURT:  Good morning.  So here's our -- let me have

24   defense counsel come right here.  This is our microphone, so you

25   can speak right into it because this is being recorded.

1        PROSPECTIVE JUROR:  Okay.

2        THE COURT:  I see you've written a number of things.

3        PROSPECTIVE JUROR:  Yes, I have.

4        THE COURT:  So why don't you tell me what you think, first

5   of all, is the most important thing that's going to prevent you

6   from serving on this jury.

7        PROSPECTIVE JUROR:  I have a personal experience with a

8   friend who was a victim of a sexual assault.

9        THE COURT:  Was a victim?

10       PROSPECTIVE JUROR:  Was a victim of a sexual assault.  She

11  declined to press charges, so it was an actual -- it was done by

12  another personal friend who committed the assault, so I probably

13  am too biased to serve on this jury --

14       THE COURT:  Okay.

15       PROSPECTIVE JUROR:  -- because I have a tendency to

16  believe the victim over anything else, so --

17       THE COURT:  You have -- and this friend who had -- what's

18  the relationship of the friend to you; in other words, how do you

19  know this person?

20       PROSPECTIVE JUROR:  She was a roommate in my college and

21  my friend in college.

22       THE COURT:  And was this alleged sexual assault happening

23  at college?

24       PROSPECTIVE JUROR:  Yes.  It happened while she was at the

25  other -- the assaulter's house.  I was not at the house, but she

1    was attacked by him.

2         THE COURT:  All right.  Let me just ask you a couple of

3    these other questions, and then I'll have defense --

4         PROSPECTIVE JUROR:  Okay.

5         THE COURT:  First of all, does either counsel want to

6    speak to that particular issue?

7         MS. SLAIGHT:  No, Your Honor.

8         THE COURT:  Okay.

9         MS. HERTZFELD:  No, Your Honor.

10        THE COURT:  All right.  So you also have studied law or

11   someone you know?

12        PROSPECTIVE JUROR:  My husband is actually in the

13   courtroom next door covering the AT&T trial for his legal -- for

14   legal news that he works with.  He works with Law360.

15        THE COURT:  With Law360?  All right.  And what about law

16   enforcement?

17        PROSPECTIVE JUROR:  My father-in-law worked as a police

18   officer for the DMV in Connecticut.

19        THE COURT:  And you say you've formed opinions of criminal

20   defense attorneys or prosecutors?

21        PROSPECTIVE JUROR:  Not the -- not the attorneys

22   themselves, but their clients.  I think that was the question, if

23   it was an attorney or the client.

24        THE COURT:  Or accused person.

25        PROSPECTIVE JUROR:  Yes, exactly.

1     THE COURT:  And what is your opinion of the accused

2 person?

3     PROSPECTIVE JUROR:  I have a tendency to believe the

4 victims over the accused party.

5     THE COURT:  And you also work with children's sex victims?

6     PROSPECTIVE JUROR:  Not sex victims in particular, but I

7 work with children.  I am a volunteer at the Natural History

8 Museum, in their interactive exhibits, so I come into contact

9 with kids all the time.

10     THE COURT:  And have you studied psychiatry or psychology?

11     PROSPECTIVE JUROR:  I have not personally, but my

12 grandfather is a psychiatrist -- was a psychiatrist.

13     THE COURT:  And I suspect this number 32 is the friend

14 who's been convicted of --

15     PROSPECTIVE JUROR:  He wasn't convict, but he was accused.

16     THE COURT:  Sorry.

17     PROSPECTIVE JUROR:  Yeah.

18     THE COURT:  The friend who was accused, and also another

19 friend who was the victim?

20     PROSPECTIVE JUROR:  Yeah.

21     THE COURT:  Is that the same circumstance?

22     PROSPECTIVE JUROR:  Yes, exactly.

23     THE COURT:  All right.  And that is the source of your

24 strong feeling --

25     PROSPECTIVE JUROR:  Yes.

1          THE COURT:  -- number 38?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And you think it would be difficult for you to

4     sit fairly and impartially in this case?

5          PROSPECTIVE JUROR:  I do believe it would be.  I'm very

6     passionate in my wanting to believe victims over the accuser or

7     the accused.

8          THE COURT:  What about these questions related to someone

9     who's interested in child pornography more likely abusing?  What

10    is your knowledge of that?

11         PROSPECTIVE JUROR:  Um, I -- I mean, don't have any

12    actual, like, legal knowledge or anything or any psychiatry

13    knowledge.  I just have my own personal beliefs.

14         THE COURT:  About it?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  And you think it would be hard to accept the

17    legal principle that a defendant is --

18         PROSPECTIVE JUROR:  I do.

19         THE COURT:  -- innocent until proven guilty?

20         THE DEFENDANT:  I do.

21         THE COURT:  And --

22         PROSPECTIVE JUROR:  In this particular case.

23         THE COURT:  And because of the nature of the crime?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  You couldn't separate your passions, concerns

1   or prejudices?

2         PROSPECTIVE JUROR:  I really don't think I could.

3         THE COURT:  What is the personal cultural or religious

4   bias?  Is it the same thing?

5         PROSPECTIVE JUROR:  It's the same thing, yes.

6         THE COURT:  As well as your reason for being able --

7   unable to sit being impartially?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  Okay.

10        PROSPECTIVE JUROR:  And then I remembered you'd asked a

11  question if anyone in my family ever been a witness or accused of

12  a particular sex crime.  One of my relatives was prosecuted for

13  sleeping with a patient, so --

14        THE COURT:  For sleeping with a patient?

15        PROSPECTIVE JUROR:  Yes.

16        THE COURT:  All right.  Do either of the lawyers have any

17  follow-up questions for the juror?

18        MS. HERTZFELD:  No.

19        MS. SLAIGHT:  No.

20        THE COURT:  All right.  You may be excused from here.

21  Please go have a seat.

22        (Prospective juror left the bench.)

23        MS. SLAIGHT:  I move to strike for cause.

24        THE COURT:  Based on her inability to act impartially in

25  this manner?

1           MS. SLAIGHT:  Yes.

2           THE COURT:  May I ask the prosecution if they have object

3      to that?

4           MS. HERTZFELD:  No objection.

5           THE COURT:  All right.

6           Juror number 696.

7           (Prospective juror approached the bench.)

8           THE COURT:  Hello.

9           PROSPECTIVE JUROR:  Hello.

10          THE COURT:  How are you?

11          PROSPECTIVE JUROR:  I'm fine.  How are you?

12          THE COURT:  All right.  So you answered five questions

13     yes, including scheduling circumstances?

14          PROSPECTIVE JUROR:  Yeah.  I had requested, and it was

15     approved for -- to not -- on the 5th and the 6th I have a project

16     due, and I have plane tickets down to Florida on the 6th.

17          THE COURT:  When?  I'm sorry.

18          PROSPECTIVE JUROR:  April 5th and 6th, next Thursday and

19     Friday.

20          THE COURT:  Next Thursday and Friday?

21          PROSPECTIVE JUROR:  Yes, ma'am.

22          THE COURT:  All right.

23          PROSPECTIVE JUROR:  And I confirmed that that was approved

24     with the court last week.

25          THE COURT:  So if you sat, you could only sit through

1    Wednesday of this -- Wednesday of next week?

2            PROSPECTIVE JUROR:  Yes, ma'am.

3            THE COURT:  All right.  Let me ask you about the other

4    questions.

5            PROSPECTIVE JUROR:  Sure.

6            THE COURT:  You say law firm connection or a law

7    connection?

8            PROSPECTIVE JUROR:  I have multiple friends who are

9    lawyers.  I have one who's currently in school, but my neighbor

10   upstairs, as well as multiple other friends are lawyers in the

11   D.C. area.

12           THE COURT:  Okay.

13           PROSPECTIVE JUROR:  None are criminal attorneys, but they

14   are in the law industry.

15           THE COURT:  All right.  And what about law enforcement,

16   number 15?

17           PROSPECTIVE JUROR:  Yeah.  I'm friends with an MPD

18   officer.

19           THE COURT:  Okay.  How close is your friendship?

20           PROSPECTIVE JUROR:  I mean, I'm Facebook friends with him.

21   I see him probably once every six weeks, probably.

22           THE COURT:  All right.  And you have written that someone

23   has been accused of a crime or victim of a crime?

24           PROSPECTIVE JUROR:  Yeah.  I have multiple neighbors who

25   have been robbed in the last six months.

1          THE COURT:  In your neighborhood?

2          PROSPECTIVE JUROR:  Yeah.

3          THE COURT:  No sexual abuse charges that you are aware of?

4          PROSPECTIVE JUROR:  No, no.

5          THE COURT:  All right.  And then --

6          PROSPECTIVE JUROR:  55's questionable.  I needed that one

7    repeated.

8          THE COURT:  Oh.  Are you able to decide this case based on

9    your -- on the evidence solely and not your passions, concerns,

10   prejudices or emotions?

11         PROSPECTIVE JUROR:  That was a no.  I just -- I wasn't

12   sure whether --

13         THE COURT:  You didn't know what the question was.

14         PROSPECTIVE JUROR:  Yeah, yeah.

15         THE COURT:  All right.  So the primary issue for you, you

16   think is the scheduling?

17         PROSPECTIVE JUROR:  The schedule, yes, ma'am.

18         THE COURT:  All right.  Let me ask:  Any follow-up

19   questions?

20         MS. HERTZFELD:  No, thank you.

21         MS. SLAIGHT:  Do you talk to the officer about --

22         THE COURT:  Come closer.

23         MS. SLAIGHT:  Do you talk to the officer about your

24   work -- about his work, the officer that you're Facebook friends

25   with?

1        PROSPECTIVE JUROR:  I mean, mostly it's just what's going

2   on in the neighborhood.  I mean, I ask him what's going, if --

3   you know, if there's anything that, you know, is important that

4   he wants to share, but not particular -- I mean, he's not going

5   to give me any details.  I mean, it's more of a, "Hey, how's your

6   neighborhood?"  You know, "Here's what's going on in the

7   neighborhood."  You know, that kind of thing.

8        MS. SLAIGHT:  And do you think that based on your

9   interactions with him that you would credit the testimony of

10  officers more than other people?

11       PROSPECTIVE JUROR:  No, ma'am.

12       MS. SLAIGHT:  Okay.

13       THE COURT:  All right.  Thank you.

14       PROSPECTIVE JUROR:  Thank you.

15       (Prospective juror left the bench.)

16       MS. SLAIGHT:  Your Honor, I'm going to move to strike her

17  because of not being available on Wednesday or Thursday.  I think

18  that this trial could -- not the trial, but the jury -- the jury

19  would be deliberating, I'm afraid, and --

20       THE COURT:  Well, let me get the schedule.

21       MS. SLAIGHT:  On Thursday and Friday, I'm sorry, not

22  Wednesday and Thursday.

23       THE COURT:  This is Thursday and Friday.

24       MS. SLAIGHT:  Yeah.  So if --

25       THE COURT:  How many days of evidence does the

1   government --

2        MS. HERTZFELD:  Well, I think we would expect to call both

3   of the child victims on Monday, so assuming we can get through

4   their testimony, we have one other civilian that would come after

5   that.  It depends on the length of cross, but I think we would

6   expect to be able to put them on Monday, maybe the last witness

7   Tuesday, and close Tuesday afternoon.  So I don't know what the

8   defense case is, but I think we would -- if there's a short

9   defense case, I would expect we would close around Tuesday

10  afternoon.

11       THE COURT:  I don't know if we should strike her just yet.

12  We have a big panel.  We might decide to skip her in terms of the

13  peremptories.  We may come back to it, but I'd like to hold her

14  for now.

15       MS. SLAIGHT:  We can put her at the end.

16       THE COURT:  Or put her down at the end.  How about we do

17  that?

18       MS. SLAIGHT:  And I'm still -- I'm still asking to strike

19  her, but I think at a minimum right now --

20       THE COURT:  All right.  So we'll move her down for

21  scheduling purposes.  All right.

22       MS. HERTZFELD:  And, Your Honor, before you call in the

23  next juror, I just want to put on the record that Mr. Hillie is

24  not wearing the headphone.  So I don't know if that's because

25  they're not -- if he's having a problem or he's just choosing not

```
 1    to wear them, but I just wanted to note.

 2           MS. SLAIGHT:  Can I speak to him, please?

 3           THE COURT:  Yes.

 4           (Discussion had off the record between attorney and

 5    client.)

 6           THE COURT:  All right.

 7           MS. SLAIGHT:  He wants to keep them on, so --

 8           THE COURT:  He wants to.

 9           MS. SLAIGHT:  To wear them.

10           THE COURT:  Okay.

11           MS. SLAIGHT:  So if -- thank you for informing the Court,

12    so if that happens, if anybody sees that again, if you could let

13    me know.

14           THE COURT:  Yes.  We will let you know.

15           Juror number 1496.

16           (Prospective juror approached the bench.)

17           THE COURT:  Hello, sir.

18           PROSPECTIVE JUROR:  Hi.

19           THE COURT:  I'm going to have you come right in here.

20           PROSPECTIVE JUROR:  Sure.

21           THE COURT:  This is our microphone.  So this is being

22    recorded, and counsel will close in on either side.

23           PROSPECTIVE JUROR:  Okay.

24           THE COURT:  All right.  So you have answered a number of

25    questions.  You say that you recognize someone else on the jury
```

```
1    panel?

2         PROSPECTIVE JUROR:  Oh, yes, yes.  Chris Dawe.

3         THE COURT:  I'm sorry?

4         PROSPECTIVE JUROR:  Chris Dawe, somebody I know.

5         THE COURT:  What's his name?

6         PROSPECTIVE JUROR:  Chris Dawe.

7         THE COURT:  D-A --

8         PROSPECTIVE JUROR:  A-W-E.

9         THE COURT:  And how do you know him?

10        PROSPECTIVE JUROR:  He's the husband of one of my

11   coworkers.

12        THE COURT:  All right.  And are you -- are you familiar

13   with him in terms of -- do you socialize?

14        PROSPECTIVE JUROR:  I think we've gone to dinner a couple

15   of times and I've seen him at work events, yeah.

16        THE COURT:  At work events.  Okay.  You say as well that

17   you have law connections, either you or friends or relatives?

18        PROSPECTIVE JUROR:  So I work for a United States senator

19   who's a lawyer.  My best friend, her father is a defense

20   attorney, and her brother was a -- is a defense attorney.  I know

21   many lawyers from work.

22        THE COURT:  Okay.  But you're not a lawyer?

23        PROSPECTIVE JUROR:  I am not a lawyer.

24        THE COURT:  Okay.  And what about the court corrections

25   probation?
```

1          PROSPECTIVE JUROR:  I have a cousin who's a prison guard.

2          THE COURT:  Okay.  And how close are you with this cousin?

3          PROSPECTIVE JUROR:  Not very.  I see him twice a year.

4          THE COURT:  And this -- you say that you have

5    employment -- you know someone who's a defense attorney.  Is it

6    the same attorney that you're talking about?

7          PROSPECTIVE JUROR:  Yeah.  Yeah.

8          THE COURT:  And you served before as a juror?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Where?

11          PROSPECTIVE JUROR:  D.C. Superior Court.  It was a civil

12    case.

13          THE COURT:  And how long ago?

14          PROSPECTIVE JUROR:  Four years maybe.

15          THE COURT:  Were you able to reach a verdict in that case?

16          PROSPECTIVE JUROR:  No.  They settled before we got the

17    case.

18          THE COURT:  Did you -- so you didn't get the case at all?

19    It was never --

20          PROSPECTIVE JUROR:  No.  We were on the jury for like two

21    days, and then they sent sus home.

22          THE COURT:  All right.  And you say that someone has been

23    accused, arrested, charged or convicted of a child pornography

24    sex abuse or sex crime?

25          PROSPECTIVE JUROR:  Yeah.  My brother-in-law's been

1  convicted several times of both -- I think it's rape of a minor

2  and sex abuse of a minor, and he's currently in prison in the

3  State of Massachusetts.

4          THE COURT:  Brother-in-law, your sister's husband?

5          PROSPECTIVE JUROR:  My wife's brother.

6          THE COURT:  Your wife's brother.

7          And do you have any -- have you formed any opinions about

8  this conviction, this case, his guilt?

9          PROSPECTIVE JUROR:  Yeah.  I've formed opinions about his

10 guilt, yeah.

11         THE COURT:  And you think he is?

12         PROSPECTIVE JUROR:  I feel very comfortable and confident.

13         THE COURT:  Confident that they've gotten the right

14 person?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  And do you have any feelings about the crime

17 itself, about child pornography?

18         PROSPECTIVE JUROR:  I mean, it's clearly terrible, but a

19 lot of crimes are terrible, so --

20         THE COURT:  But you have no particular strong beliefs

21 related to this crime?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  One way or the other?

24         PROSPECTIVE JUROR:  I think it's -- no.  It's been

25 something that we've talked about in the family, but like --

1          THE COURT:  And how have you talked about it, just in

2     relation to --

3          PROSPECTIVE JUROR:  Are there issues of recidivism and the

4     like, because as I said, my brother-in-law's been arrested --

5     convicted.  I think it's three times.

6          THE COURT:  Three times in State Court or Federal Court,

7     if you know?

8          PROSPECTIVE JUROR:  He's in the Massachusetts prison

9     system, so I don't know whether that's federal or state.

10         THE COURT:  Do you have follow-up?

11         MS. HERTZFELD:  Is there anything about what you know

12    about that crime that would make you feel like you couldn't be

13    fair and impartial in this case?

14         PROSPECTIVE JUROR:  No.

15         MS. HERTZFELD:  Knowing that the charges are related or

16    similar?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Anything else, Ms. Slaight?

19         MS. SLAIGHT:  You said that you talked among the family

20    about that.  Did you hear any details about that case or --

21         PROSPECTIVE JUROR:  Yes.  I heard details about -- yeah,

22    details about the case.

23         MS. SLAIGHT:  And did the case involve allegations of

24    pornography?

25         PROSPECTIVE JUROR:  No.

1          MS. SLAIGHT:  Did they involve allegations of child sexual

2    abuse?

3          PROSPECTIVE JUROR:  Yes.

4          MS. SLAIGHT:  And do you think that when you're

5    considering this case, if you were to be on the jury, you would

6    be thinking about, like, comparing this case to the --

7          PROSPECTIVE JUROR:  I don't think so.

8          THE COURT:  You would be able to look only at the evidence

9    in this case?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  And the Court's instructions about it?

12         PROSPECTIVE JUROR:  Yeah.

13         MS. SLAIGHT:  And you said that you also know defense

14   attorneys?

15         PROSPECTIVE JUROR:  Um-hmm.

16         MS. SLAIGHT:  And do you talk to the attorneys about their

17   cases?

18         PROSPECTIVE JUROR:  About their cases?

19         MS. SLAIGHT:  Yes.

20         PROSPECTIVE JUROR:  Only -- no, not specifics.

21         MS. SLAIGHT:  Do you think there's anything about that in

22   particular that --

23         PROSPECTIVE JUROR:  Oh, no.

24         THE COURT:  Any other?

25         MS. HERTZFELD:  No.

```
 1          THE COURT:  All right.  Thank you, sir.
 2          (Prospective juror left the bench.)
 3          THE COURT:  Are we ready?  The next person has only two.
 4   Number 358.
 5          (Prospective juror approached the bench.)
 6          THE COURT:  I'll have you come right here.  This is our
 7   microphone, and this is being recorded.  All right?
 8          PROSPECTIVE JUROR:  Okay.
 9          THE COURT:  And we'll have counsel come in on both sides.
10          PROSPECTIVE JUROR:  Sure.
11          THE COURT:  So you have written that you have legal
12   training or someone in your family or someone you know?
13          PROSPECTIVE JUROR:  I have friends that are attorneys.
14          THE COURT:  All right.  What do you do?
15          PROSPECTIVE JUROR:  Sorry?
16          THE COURT:  What do you do?
17          PROSPECTIVE JUROR:  I'm in an economist.
18          THE COURT:  And do you ever work with lawyers?
19          PROSPECTIVE JUROR:  No.
20          THE COURT:  No?
21          PROSPECTIVE JUROR:  No.  They're just personal
22   acquaintance and an ex-girlfriend.
23          THE COURT:  How close -- you say ex-girlfriend?
24          PROSPECTIVE JUROR:  Yes.
25          THE COURT:  I don't know if that means anything.
```

1          PROSPECTIVE JUROR:  I talked to her once in the last, I

2     don't know, four or five years.

3          THE COURT:  What kind of law do your friends -- do you

4     know?

5          PROSPECTIVE JUROR:  She's a public defender in New

6     Hampshire, and he's -- he works for a national lab in science

7     policy.

8          THE COURT:  And have you ever talked to either of them

9     specifically about the work that they do, the cases that they

10    handled?

11         PROSPECTIVE JUROR:  Yeah, in the past.  That was like

12    2011, though.

13         THE COURT:  Was when you were with your girlfriend --

14         PROSPECTIVE JUROR:  Yes, yes.

15         THE COURT:  -- and talking about these kinds of things?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Do you know if she ever handled any cases

18    involving child sex abuse?

19         PROSPECTIVE JUROR:  She wasn't out of law school at that

20    time, so no.

21         THE COURT:  Oh, I see.  So did she start practicing as a

22    criminal defense attorney after your relationship?

23         PROSPECTIVE JUROR:  She started -- well, I mean -- right.

24    So like three months we dated while she was --

25         THE COURT:  In law school.

1        PROSPECTIVE JUROR:  No, a practicing attorney.

2        THE COURT:  Oh, I see.  And in the time that you dated

3   while she was a practicing attorney, did you discuss the cases?

4        PROSPECTIVE JUROR:  The cases?  No.

5        THE COURT:  Do you know if she had any child sex abuse or

6   child pornography cases?

7        PROSPECTIVE JUROR:  I don't know.  I don't think so.

8        THE COURT:  But you don't know?

9        PROSPECTIVE JUROR:  No.

10        THE COURT:  All right.  You also -- is she the one who's

11   been employed by the defense attorney or defense organization?

12        PROSPECTIVE JUROR:  Right, correct.

13        THE COURT:  All right.  So that's all that you put.  Is

14   there anything about the nature of the charges that you heard

15   here that would make it difficult for you to be impartial in this

16   case?

17        PROSPECTIVE JUROR:  No.

18        THE COURT:  Any follow-up questions?

19        MS. HERTZFELD:  No.

20        MS. SLAIGHT:  No.

21        THE COURT:  All right.  Thank you.

22        PROSPECTIVE JUROR:  Sure.

23        (Prospective juror left the bench.)

24        THE COURT:  Number 712.

25        (Prospective juror approached the bench.)

```
1          THE COURT:  All right.  Come right up.  This is our

2     recording device.

3          PROSPECTIVE JUROR:  All right.

4          THE COURT:  You have written that you have legal training

5     or someone you know?

6          PROSPECTIVE JUROR:  I used to working in a law firm a long

7     time ago.

8          THE COURT:  What kind of law firm?

9          PROSPECTIVE JUROR:  It was a corporate law firm.  I was a

10    paralegal.

11         MS. SLAIGHT:  What?

12         PROSPECTIVE JUROR:  I was a corporate paralegal.

13         THE COURT:  And how long did you work in this law firm?

14         PROSPECTIVE JUROR:  Almost three years.

15         THE COURT:  And they didn't handle any criminal cases?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  And what do you do now?

18         PROSPECTIVE JUROR:  I work in a museum.

19         THE COURT:  What is your role?

20         PROSPECTIVE JUROR:  I work in the education department on

21    project management and digital projects.  I work at the Holocaust

22    museum.

23         THE COURT:  And you work for the museum?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Do you work -- because you're in the
```

1    educational department, do you have any direct contact with

2    children in that capacity?

3         PROSPECTIVE JUROR:  I don't.

4         THE COURT:  So you're sort of operations?

5         PROSPECTIVE JUROR:  Yeah.  I work on digital things online

6    and things like that.

7         THE COURT:  Do you have any training in digital evidence,

8    extractions or anything like that?

9         PROSPECTIVE JUROR:  I don't, no.

10        THE COURT:  Is it more like web-based management?

11        PROSPECTIVE JUROR:  Web-based, yeah, video production,

12   things like that.

13        THE COURT:  What do you mean by video production?  Tell us

14   about that.

15        PROSPECTIVE JUROR:  I did course work in film and video at

16   American University, so I can edit videos, films and things like

17   that.

18        THE COURT:  And you do this for the museum?

19        PROSPECTIVE JUROR:  Part of my job, yes.

20        THE COURT:  All right.  You also say that you served as a

21   juror before?

22        PROSPECTIVE JUROR:  Yes, D.C. Superior Court, last fall.

23        THE COURT:  And were you on a criminal or a civil case?

24        PROSPECTIVE JUROR:  It was a criminal case.

25        MS. SLAIGHT:  I'm sorry, what?

1          PROSPECTIVE JUROR:  It was a criminal case.

2          THE COURT:  And how long was the case?

3          PROSPECTIVE JUROR:  I served, I think, two days.  It ended

4    up getting dismissed.  The jurors ended up getting dismissed.

5          THE COURT:  So you did not deliberate?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  All right.  That's all you've written.  Is

8    there any other thing from either counsel?

9          MS. HERTZFELD:  No.

10          THE COURT:  Ms. Slaight, do you have anything to comment?

11          MS. SLAIGHT:  NO.

12          THE COURT:  ALL right.  Thank you.

13          PROSPECTIVE JUROR:  Good.  Thanks.

14          (Prospective juror left the bench.)

15          THE COURT:  Juror number 456.

16          (Prospective juror approached the bench.)

17          THE COURT:  You can come right here.

18          PROSPECTIVE JUROR:  Sure.

19          THE COURT:  You're going to microphone.

20          PROSPECTIVE JUROR:  Okay.

21          THE COURT:  You have written that you have a law

22    connection.  Are you a lawyer?

23          PROSPECTIVE JUROR:  No.  No.  It asked about had I ever

24    applied for MPD, which I did.

25          THE COURT:  Oh, I see.  Oh, I'm sorry.  This is law

1    enforcement agents.

2            PROSPECTIVE JUROR:  Right.

3            THE COURT:  What did you apply to do?

4            PROSPECTIVE JUROR:  As a police officer, but I changed my

5    mind.

6            THE COURT:  And how long ago was this?

7            PROSPECTIVE JUROR:  '80s, in the '80s.

8            THE COURT:  And what do you do now?

9            PROSPECTIVE JUROR:  I'm a on-site property manager.

10           THE COURT:  Is this for a --

11           PROSPECTIVE JUROR:  Housing cooperative.

12           THE COURT:  Okay.  And how long have you been in that

13   role?

14           PROSPECTIVE JUROR:  I've been there for 12 years.

15           THE COURT:  You also wrote that you've served as a juror?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  And where?  Do you know where?

18           PROSPECTIVE JUROR:  D.C.

19           THE COURT:  This court or the other court across the --

20           PROSPECTIVE JUROR:  This court.

21           THE COURT:  And was it a criminal or civil case.

22           PROSPECTIVE JUROR:  It was a criminal.

23           THE COURT:  And did you get a verdict in that case?

24           PROSPECTIVE JUROR:  Yes, we did.

25           THE COURT:  How long did you sit as a juror?  Do you know

1    how long the case was?

2         PROSPECTIVE JUROR:  The case went for a week.

3         THE COURT:  And how long ago was this?

4         PROSPECTIVE JUROR:  This would have been back in the '90s.

5         THE COURT:  So a while.

6         PROSPECTIVE JUROR:  Yeah, it's ban a while.

7         THE COURT:  Do you remember anything about that case, what

8    the charges were?

9         PROSPECTIVE JUROR:  Drugs.

10        THE COURT:  And you did go to verdict?

11        PROSPECTIVE JUROR:  Correct.

12        THE COURT:  Okay.  And did you have any difficulties

13   serving as a juror and deliberating with the other jurors?

14        PROSPECTIVE JUROR:  No, ma'am.

15        THE COURT:  All right.  You also wrote that you -- someone

16   has been accused, arrested, charged, convicted of a crime or a

17   victim of a crime?

18        PROSPECTIVE JUROR:  My brother was arrested, drug charges

19   also.

20        THE COURT:  And how long ago was that?

21        PROSPECTIVE JUROR:  That was back in the '90s.

22        THE COURT:  And was he convicted?

23        PROSPECTIVE JUROR:  Yes, he was.

24        THE COURT:  And did he serve time in jail?

25        PROSPECTIVE JUROR:  Yes, he did.

```
1          THE COURT:  And is he out now?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Is there anything about that experience,

4   having a relative accused of a crime and sent to jail, that would

5   make it difficult for you to sit in judgment of someone else in a

6   criminal case?

7          PROSPECTIVE JUROR:  No.  No.

8          THE COURT:  Was your brother's conviction before or after

9   your service as a juror, do you remember?

10         PROSPECTIVE JUROR:  Before.

11         THE COURT:  Before you served on the other case?  All

12  right.  You also said that you've filed a complaint against a

13  police officer or someone in law enforcement?

14         PROSPECTIVE JUROR:  Yes, I did.

15         THE COURT:  And when was that?

16         PROSPECTIVE JUROR:  2003.

17         THE COURT:  And what was it concerning?

18         PROSPECTIVE JUROR:  Domestic violence.  My husband had

19  assaulted me, and the officer refused to arrest him because he

20  said that if he arrested him, then I wouldn't do anything but let

21  him back in my house.

22         THE COURT:  So you filed a complaint in the legal system

23  against this officer?

24         PROSPECTIVE JUROR:  Well, through a citizen's complaint.

25         THE COURT:  And what ever became of it?  Did it end up
```

```
1    being -- anything happen --

2         PROSPECTIVE JUROR:  No.

3         THE COURT:  -- that you're aware of?

4         PROSPECTIVE JUROR:  No.

5         THE COURT:  All right.  Now, you've heard about the nature

6    of this case, that it involves allegations of child sexual abuse.

7    Is there anything about that, that would make it difficult for

8    you to serve in this case?

9         PROSPECTIVE JUROR:  No, ma'am.

10        THE COURT:  Any follow-up questions?

11        MS. HERTZFELD:  No.

12        MS. SLAIGHT:  If you've already answered this, I

13   apologize, but did you -- what was your brother convicted of, if

14   you know?

15        PROSPECTIVE JUROR:  Drugs and possession.

16        MS. SLAIGHT:  Okay.  And you said that in -- you filed a

17   complaint concerning your husband; is that right?

18        PROSPECTIVE JUROR:  Against the officer, yes.

19        MS. SLAIGHT:  Okay.  And you had wanted to take out a

20   protection order against your husband?

21        PROSPECTIVE JUROR:  Correct.

22        MS. SLAIGHT:  Okay.  And are you -- this case, there are

23   allegations of assault.  Do you think that -- and you would be

24   able to separate the allegations in this case, or do you think

25   that you would be thinking about this -- your situation?
```

1          PROSPECTIVE JUROR:  I have no problems.  I've let it all

2     go.

3          MS. SLAIGHT:  Okay.  And are you still married or no?

4          PROSPECTIVE JUROR:  No.  I'm divorced.

5          MS. SLAIGHT:  Would you -- because of that experience, do

6     you think that you would be more inclined to give credibility to

7     a complainant in a case?

8          PROSPECTIVE JUROR:  No, ma'am.

9          MS. SLAIGHT:  You would be able to keep an open mind?

10         PROSPECTIVE JUROR:  Yes, ma'am.

11         MS. SLAIGHT:  Thank you.

12         THE COURT:  All right.  Thank you.

13         (Prospective juror left the bench.)

14         THE COURT:  Juror number 369.

15         (Prospective juror approached the bench.)

16         THE COURT:  How are you, sir?  You have to speak right

17    into this microphone so you can be heard.  So you listed that you

18    have health problems that might influence this?

19         PROSPECTIVE JUROR:  I just -- it's just to mention that I

20    have a diagnosis of narcolepsy, and I've served on juries.  I can

21    serve on juries, but I read of a judge in Chicago jailing a juror

22    for falling asleep, so I mentioned it.

23         THE COURT:  Well, tell me about your service.  You served

24    on a jury where?

25         PROSPECTIVE JUROR:  Three, on Superior Court here in D.C.

1      THE COURT:  And for how long?

2      PROSPECTIVE JUROR:  Oh, one trial was over a week.

3      THE COURT:  And did your condition impact your ability to

4  take in the evidence?

5      PROSPECTIVE JUROR:  No, but it's -- you know, if something

6  goes on all day long, it's difficult to sit there for a long

7  time.  I'm a little bit more prone to fall asleep still.  I used

8  to do it 30 times a day, but those days are passed.

9      THE COURT:  Are you on medication for it?

10      PROSPECTIVE JUROR:  No.

11      THE COURT:  No?  But you're able to control it, you think?

12      PROSPECTIVE JUROR:  The form of it that I have, yes.

13      THE COURT:  All right.

14      PROSPECTIVE JUROR:  I assume, you know, like, during the

15  trials, if we take breaks and stuff like that, I'll be fine.

16      THE COURT:  Okay.  You also said that your friends,

17  relatives, someone has either been accused or victim of a crime?

18      PROSPECTIVE JUROR:  A victim.  Yeah, I've -- I was mugged

19  once, and I -- my house has been broken into a couple of times,

20  but they're all relatively minor.

21      THE COURT:  Is there anything about that experience of

22  victimization that would make it difficult for you to serve?

23      PROSPECTIVE JUROR:  No.

24      THE COURT:  When you say you served on a jury in Superior

25  Court, do you remember the kinds of cases that you served on?

1          PROSPECTIVE JUROR:  Sure.

2          THE COURT:  What were they?

3          PROSPECTIVE JUROR:  Well, they're all criminal cases.

4     They're all violence.  Three of them.  One I ended up being an

5     alternate, so I was excused.  They convicted him in one case and

6     acquitted on another.

7          THE COURT:  So you went to verdict in two of the three --

8     you went to -- got the verdict on two of the three?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  And did any of them involve sexual abuse?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  There was violence?

13          PROSPECTIVE JUROR:  Well, it wasn't kids.  It was a

14     domestic violence case, but I --

15          THE COURT:  But it wasn't child sexual abuse?

16          PROSPECTIVE JUROR:  No, nothing about a child.

17          THE COURT:  All right.  That was one.  Was that both for

18     the other cases, the ones that you went to verdict in?

19          PROSPECTIVE JUROR:  Both -- both of them involved

20     violence.  One domestic abuse.  None -- neither of them with

21     children.

22          THE COURT:  Okay.  And then you also said that there has

23     been an accusation, arrest, a charge or conviction related to

24     child pornography, sexual abuse of a minor, or a sex crime for

25     someone you know.  Who's that?

1          PROSPECTIVE JUROR:  Two people, both of whom are people

2     that I met only after this was resolved.  Both of them -- well,

3     one of them served some time.  I didn't meet them until later,

4     but I do.

5          THE COURT:  And who are these people to you?  How do you

6     know them?

7          PROSPECTIVE JUROR:  It's just a acquaintance.  One is a

8     neighbor, or was.  He moved away.  And the other one is one I

9     didn't have a personal relationship with.

10          THE COURT:  And what was the charge, do you know?

11          PROSPECTIVE JUROR:  Sexual battery.  It was very

12     undefined.  I never had a conversation with him about it.

13          THE COURT:  And did he do time for that?

14          PROSPECTIVE JUROR:  I don't think so.  I think it was, in

15     his case, kind of a probation thing.

16          THE COURT:  And the other one?

17          PROSPECTIVE JUROR:  The other one was a person that did

18     time.  He was -- again, when I met him afterwards, he was

19     somebody who worked at quite a high-level job.  I knew a neighbor

20     who employed him in that job, and so I got -- I met him through

21     that because his neighbor was very -- tried to be helpful to him.

22     It was a serious crime, but it was relatively benign compared to

23     the usual charges.  It was for -- he had an addiction to viewing

24     child pornography.  He was never accused of distribution or any

25     activity, and he served a few years, I know.

1        THE COURT:  And then you say you met him afterwards.  Did

2   you have a follow-up relationship with him?  How friendly were

3   you after that?

4        PROSPECTIVE JUROR:  Yeah, I would say because of the

5   group, that there's a support group for him and I was peripheral

6   to it.  But I helped him get a job, and I helped him -- in fact,

7   I housed him for a week.

8        THE COURT:  How does your relationship and work with this

9   person impact how you view the crime of child pornography, if at

10  all?

11       PROSPECTIVE JUROR:  Well, I don't -- I wouldn't say

12  there's any situation which my view of it's impacted by knowing

13  him.  It's a horrible crime.

14       THE COURT:  Did you ever talk to him specifically about

15  the crime that he had committed?

16       PROSPECTIVE JUROR:  I talked to him about his addiction,

17  his condition, but it wasn't -- I know nothing about the

18  specifics of the charge or what he did.  He acknowledged it.  I

19  think he pleaded guilty or had a deal, and I was not interested

20  in --

21       THE COURT:  Do you think of any conversation or view that

22  you have of him would impact your ability to serve as a juror in

23  a case involving an allegation of child pornography?

24       PROSPECTIVE JUROR:  No, I don't.  I mean, I can reflect on

25  the experience of this, and it has no -- it doesn't affect my

1    view of the crime or my thought of punishment.  I mean, I'm aware

2    of the obligation of a juror not to think of those things.  It's

3    the facts.  And so I'm confident I'll be able to do that.  And I

4    have done it, except that no cases involved any of these kinds of

5    charges.

6         THE COURT:  Yes.  Any other questions?

7         MS. HERTZFELD:  No, Your Honor.

8         MS. SLAIGHT:  You said that you had narcolepsy?

9         PROSPECTIVE JUROR:  Yes.

10        MS. SLAIGHT:  Would you just sometimes while you're

11   sitting on the jury -- while you're sitting on the jury, would

12   you sort of -- isn't that defined by sometimes sleeping?

13        PROSPECTIVE JUROR:  You know, 30 years ago I couldn't have

14   stayed awake through this for very long, but I have a form of it

15   that tends to delay in middle age.  It has with me.  I'm a little

16   more prone to other people to be to fall asleep, but I'm past the

17   severity.

18        THE COURT:  Are you working now?  Are you still working?

19        PROSPECTIVE JUROR:  I am.  I'm semiretired.  I do work.

20        THE COURT:  And do you do office work?

21        PROSPECTIVE JUROR:  Yeah.  My work has been in media

22   production, but I spend a lot of time at the computer.

23        THE COURT:  And you find that it interferes with your

24   ability to work as you sit?

25        PROSPECTIVE JUROR:  No, not at all anymore.

1        THE COURT:  Right?

2        PROSPECTIVE JUROR:  I mean, I work on my own schedule,

3   so --

4        THE COURT:  Right.

5        PROSPECTIVE JUROR:  But my answer is I -- there is no

6   problem.

7        THE COURT:  You don't think that that would be a problem.

8        Ms. Slaight.

9        MS. SLAIGHT:  Do you think that there could be times when

10  you fall asleep and don't realize it?

11       PROSPECTIVE JUROR:  No.

12       MS. SLAIGHT:  For a few seconds or --

13       PROSPECTIVE JUROR:  Oh, no.  I would say no.

14       MS. SLAIGHT:  When's the last time that that happened?

15  You don't realize it, so I guess --

16       PROSPECTIVE JUROR:  Well, I guess I can't make an absolute

17  definitive yes to that, but I'm quite confident that I'm as

18  capable as anybody to stay awake.  I mean, I've lived with it for

19  a long time, and I don't have any -- as sincerely as I can say

20  it, I'm confident in my ability to stay awake.

21       MS. SLAIGHT:  Do you know when the most recent time that

22  you --

23       THE COURT:  Here, we have to hear everybody speaking.

24       MS. SLAIGHT:  Do you know when was the most recent time

25  that you -- that somebody -- either you found out yourself or

1   somebody pointed out to you that you had lost -- you had gone to

2   sleep or whatever?

3          PROSPECTIVE JUROR:  Well, it does happen a lot.  I mean, I

4   was at --

5          THE COURT:  It does or does not?

6          PROSPECTIVE JUROR:  It does.  I mean, I was at a

7   performance last night, and I fell asleep.

8          MS. SLAIGHT:  At what time?

9          PROSPECTIVE JUROR:  I dozed.  In the evening.

10          MS. SLAIGHT:  I have done that before.

11          PROSPECTIVE JUROR:  Yeah.  But that's the nature of the

12   disorder.

13          MS. HERTZFELD:  What was the performance?

14          PROSPECTIVE JUROR:  I would recommend to you the Jazz Jam

15   at Mr. Henry's every Wednesday night.

16          MS. HERTZFELD:  Okay.

17          THE COURT:  Any other questions?

18          MS. HERTZFELD:  No, Your Honor.

19          MS. SLAIGHT:  So that's a music performance?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Did you realize after you -- how did you

22   realize that you had fallen asleep?

23          PROSPECTIVE JUROR:  I -- you know, I -- I awoke.  And I do

24   it for -- as you say, it can be for seconds or a minute at a

25   time, and that happened.  I was aware of waking up.  But, you

1    know, it's just sort of doze off and come back.  You know, it

2    does happen, and I'm aware that it happens, but in a kind of

3    setting like this, this doesn't -- this doesn't happen to me.

4         THE COURT:  All right.  Thank you very much.

5         MS. SLAIGHT:  Thank you.

6         MS. HERTZFELD:  Thank you.

7         (Prospective juror left the bench.)

8         MS. SLAIGHT:  Your Honor, I'm going move to strike this

9    witness.  I think he just did it last night.  He dozed off.

10         THE COURT:  The juror, juror.  Not witness, juror.

11         MS. SLAIGHT:  I'm sorry.  He just did it last night, and I

12    admire his enthusiasm about serving on a jury, but we can't have

13    somebody who goes to sleep for a minute and then realizes he's

14    awoken.  I mean, he's acting like it's under control, but then

15    when I asked him the most recent time, it was last night.  He

16    might not catch it.

17         THE COURT:  Ms. Hertzfeld?

18         MS. HERTZFELD:  I would not strike him for cause.  It

19    sounds like he's sat on a jury.  He's been able to -- a couple of

20    times he's been able to complete the process.  I think it sounds

21    like he can manage it.  I think he's being very careful and

22    diligent and can let us know about it, but I don't think he

23    thinks --

24         THE COURT:  I share Ms. Slaight's concern because I think,

25    especially in a case like this, where we know there's going to be

1   a lot of waiting and there's going to be information that's

2   presented visually, that if there's time, a minute or so, that

3   he's not conscious, it would be difficult, so I think I will

4   strike him for cause.

5        Juror number 40.

6        (Prospective juror approached the bench.)

7        THE COURT:  Come right up here, and here's our microphone

8   so people can hear.  You have legal training or someone you know?

9        PROSPECTIVE JUROR:  Family.  My parents are both lawyers

10   and two of my siblings.

11        THE COURT:  And what kind of law?  Do you know what they

12   practice?

13        PROSPECTIVE JUROR:  My mom does bankruptcy.  My dad does

14   like land title work, I think.  My other -- my oldest brother, I

15   think --

16        THE COURT:  You're not sure?

17        PROSPECTIVE JUROR:  -- does bankruptcy, too.  I'm not

18   sure.  And my sister does -- she represents, I guess, products

19   liability.

20        THE COURT:  So nobody criminal, as far as you know?

21        PROSPECTIVE JUROR:  No criminal.

22        THE COURT:  And you have no other answers, so you don't

23   know anyone in law enforcement, you don't --

24        PROSPECTIVE JUROR:  No.

25        THE COURT:  Do you have any concerns about your ability to

1    follow the Court's instructions related to a case of this nature?

2    You heard what it was about.

3           PROSPECTIVE JUROR:  Correct.

4           THE COURT:  And what do you do?

5           PROSPECTIVE JUROR:  Currently nothing.  I was a

6    contractor, so I finished a contract in the fall and I'm looking

7    for work right now.

8           THE COURT:  Contracting in what area?

9           PROSPECTIVE JUROR:  Inter-American Development Bank, a

10   multilateral development bank.

11          THE COURT:  You've never served on a jury before?

12          PROSPECTIVE JUROR:  I have not.

13          THE COURT:  Do you know anything about criminal cases or

14   cases of this nature having to do with sex offenses or anything?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Any questions?

17          MS. HERTZFELD:  No, Your Honor.

18          MS. SLAIGHT:  No, Your Honor.

19          THE COURT:  All right.  Thank you.

20          (Prospective juror left the bench.)

21          THE COURT:  So that was the first row.

22          Juror number 283.

23          (Prospective juror approached the bench.)

24          THE COURT:  Hello.  If you come right here and come to

25   this side.  You have legal training or someone you know?

1      PROSPECTIVE JUROR:  Yes.  I attended law school many years

2 ago at George Washington and dropped out.

3      THE COURT:  Okay.  And why is that?

4      PROSPECTIVE JUROR:  It's a story.  I didn't realize I was

5 turning into an attorney.

6      THE COURT:  And what is it that you now do?

7      PROSPECTIVE JUROR:  That's actually the next question as

8 well.  I work for the Department of Justice as an IT computer

9 specialist.

10      THE COURT:  All right.

11      PROSPECTIVE JUROR:  And I have for 30-some years.

12      THE COURT:  And do you ever work on the substance of this?

13      PROSPECTIVE JUROR:  I really don't.  It's strictly just

14 system management and keeping things up, so I don't have any --

15      THE COURT:  And in your -- go ahead.

16      PROSPECTIVE JUROR:  It's the civil division, I wanted to

17 say.

18      THE COURT:  Civil division?

19      PROSPECTIVE JUROR:  Yeah.

20      THE COURT:  In your work civil division with IT, do you

21 have any familiarity with the extraction of digital evidence

22 from --

23      PROSPECTIVE JUROR:  I don't really work on that kind of

24 thing at all, no.

25      THE COURT:  For just what, what's it's for?

1          PROSPECTIVE JUROR:  Just, you know, keeping the systems up

2     and running, giving people access to the Internet and access to

3     their files.

4          THE COURT:  Not any sort of forensic evaluation of

5     people's computer systems or anything like that?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  All right.

8          PROSPECTIVE JUROR:  So I didn't answer yes to that

9     question.

10          THE COURT:  Right, right.  You served as a juror before?

11          PROSPECTIVE JUROR:  I have.  Not here in the District

12     Federal Court, but in the Superior Court in D.C. several times.

13     I've lived in D.C. for 40 years, so that takes -- well, I've been

14     here almost 32 years.

15          THE COURT:  So tell us about some of your prior service.

16     Were any of them criminal?

17          PROSPECTIVE JUROR:  I have done several criminal trials.

18     The closest one to this, I did do a rape case one time.

19          THE COURT:  All right.  And were you able to reach a

20     verdict?

21          PROSPECTIVE JUROR:  We were.

22          THE COURT:  And how long ago would you say the rape trial

23     was?

24          PROSPECTIVE JUROR:  Oh, that's been 20 years, I'd say.

25          THE COURT:  And would you have any difficulty with that

1    subject matter as you listen to that evidence?

2         PROSPECTIVE JUROR:  Not difficulty being fair.  I mean,

3    it's a difficult subject area, but --

4         THE COURT:  And you all deliberated, you thought the

5    deliberations went all right with respect to --

6         PROSPECTIVE JUROR:  They were difficult.

7         THE COURT:  Because of the subject matter?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  All right.  And that's all that you have

10   written.  So have you ever served on a jury here in Federal

11   Court?

12        PROSPECTIVE JUROR:  I have not.

13        THE COURT:  Have you ever been called to serve?

14        PROSPECTIVE JUROR:  I haven't, strangely.

15        THE COURT:  You haven't?

16        PROSPECTIVE JUROR:  My wife's been called.

17        THE COURT:  Our list must not be very good.

18        Any follow-up?

19        MS. HERTZFELD:  No, thank you.

20        MS. SLAIGHT:  Do you talk to any agents about the work

21   that they do?

22        PROSPECTIVE JUROR:  Again, I work in the civil division,

23   so it's all civil and no criminal law involved.  And I deal with

24   the attorneys, but really just strictly on computer-related

25   subjects.

1        MS. SLAIGHT:  And do you think that you would be able

2   to -- that, as you said, that the case that you had served on

3   before, it was difficult, you said?

4        PROSPECTIVE JUROR:  Yes.

5        MS. SLAIGHT:  Do you think that you would bring your

6   experience with the -- with that case into this case in terms of

7   evaluating witnesses or determining what the law is?

8        PROSPECTIVE JUROR:  No.  I'd like to think I could be

9   objective and view just the facts of this case.

10        THE COURT:  All right.  Thank you.

11        PROSPECTIVE JUROR:  All right.  Thanks.

12        (Prospective juror left the bench.)

13        THE COURT:  Juror number 694.

14        (Prospective juror approached the bench.)

15        THE COURT:  Come right here.  How are you?

16        PROSPECTIVE JUROR:  I'm good.  How are you?

17        THE COURT:  Good.  So you have written that you might have

18   a scheduling conflict?

19        PROSPECTIVE JUROR:  Yes.  My grandfather's funeral is a

20   week from today in Puerto Rico.

21        THE COURT:  I'm sorry.

22        PROSPECTIVE JUROR:  It was expected.  Thank you.  He -- so

23   I have to fly away Wednesday.

24        THE COURT:  Of next week?

25        PROSPECTIVE JUROR:  Of next week, and I'm planning to stay

1    through the weekend.

2         THE COURT:  All right.  I think the schedule might

3    preclude you from being a part of this trial.  Do we agree?

4         MS. SLAIGHT:  Yes, Your Honor.  All right.  So you'll be

5    excused.

6         PROSPECTIVE JUROR:  Thank you.

7         THE COURT:  Thank you.

8         (Prospective juror left the bench.)

9         THE COURT:  Juror number 970.

10        (Prospective juror approached the bench.)

11        THE COURT:  Good morning.

12        PROSPECTIVE JUROR:  Good morning, ma'am.

13        THE COURT:  Come right here.

14        PROSPECTIVE JUROR:  I also brought this piece of paper.

15        THE COURT:  All right.  So you are -- maybe I messed up

16   the names.  Are you 970?  I have 790 written at the top of my

17   card.  Do you think you might have written that -- is this your

18   handwriting?

19        PROSPECTIVE JUROR:  Yes, ma'am.  I wrote it wrong.

20        THE COURT:  Okay.  That's all right.  You wrote 790.  It's

21   970, correct?

22        PROSPECTIVE JUROR:  Okay.

23        THE COURT:  Okay.  So you say you might have a scheduling

24   issue?

25        PROSPECTIVE JUROR:  Yes.  What it is -- can I hand you

1    this?

2          THE COURT:  Sure.

3          PROSPECTIVE JUROR:  Okay.  On my job I'm a salaried

4    employee, and my supervisor is saying -- telling me that I have

5    to use my leave time to do this, and they're also stipulating

6    that they are not required to pay me to serve.  I have no problem

7    with serving.  That's not a issue.  The thing is, is that being

8    on salary, should they still be paying me even if I'm not at

9    work?

10         THE COURT:  So you're saying -- I'm trying to read this

11   and listen to you at the same time.

12         PROSPECTIVE JUROR:  No, you're fine.

13         THE COURT:  That your employer has notified you that

14   they're not going to pay if you work for less than one week?

15         PROSPECTIVE JUROR:  He says he doesn't have to pay --

16   okay.  You see the top part?  They don't stipulate the bottom

17   part.  They kind of just stuck where it says they don't have to

18   pay, but for this particular captain, he printed this out.

19         THE COURT:  Um-hmm, um-hmm.

20         PROSPECTIVE JUROR:  So I said I wanted to bring it in and

21   be able to bring something back to them.

22         THE COURT:  All right.  I'm going to quickly read so that

23   the lawyers can hear what this says --

24         PROSPECTIVE JUROR:  Yes, ma'am.

25         THE COURT:  -- and we can make a decision.  All right.  So

1    this is from John Fennel to Nedd -- Francine Nedd, that's you?

2         PROSPECTIVE JUROR:  Yes, ma'am.

3         THE COURT:  "Most employers believe that an employee has a

4    civic responsibility to serve when called as a juror or witness,

5    and many states prohibit discrimination against employees who

6    serve as a juror or witness.  Although most employers pay

7    employees on leave for jury service, the federal Fair Labor

8    Standards Act does not require employers to pay nonexempt

9    salaried employees or hourly employees while on leave for jury

10   service.  However, employers must pay full salaries to exempt

11   employees who are absent from work for less than one week to

12   perform jury service."

13        And then it says "Summary for your state," but there's

14   nothing underneath it.

15        So let me ask you:  Are you an exempt or nonexempt

16   employee, do you know, under the FOSA?

17        PROSPECTIVE JUROR:  I'm not really sure.  I just know that

18   I'm salary.  I just get paid salary.  I work at the IMF via

19   contract.

20        THE COURT:  Is this in response to your saying to them,

21   "I've been called in to jury service?"  There's no prior

22   discussion here, so I don't --

23        PROSPECTIVE JUROR:  No.  What it was, he told me, he said,

24   "You have to" -- "You can serve jury duty," he say, "but we don't

25   have to pay you."

1          THE COURT:  Um-hmm.

2          PROSPECTIVE JUROR:  And this particular captain -- he

3    said, "Wait a minute.  Let me look it up," he say, "because I

4    think I saw somewhere where they have to pay you."  So I don't

5    really know what the law is or what's correct.

6          THE COURT:  So he was saying he thinks you don't get paid?

7          PROSPECTIVE JUROR:  They said that a lot of times it's up

8    to the employer whether or not he wants to pay you, but I'm

9    saying as a salaried employee, does that make me exempt from that

10   particular --

11         THE COURT:  Yeah, I can't comment.  I don't know your

12   particular circumstances.  Let me ask you, absent the payment

13   issue, is there any other reason why the schedule would prevent

14   your being here and being able to serve on this jury?

15         PROSPECTIVE JUROR:  No, ma'am.

16         THE COURT:  It's the salary, that would be the concern?

17         PROSPECTIVE JUROR:  It's just the salary.  I mean, I have

18   money in savings and everything, you know, but the thing is, what

19   I'm concerned about is, that he's taking my vacation time in

20   order for me to get compensated.

21         THE COURT:  Is that what he said he was going to do?

22         PROSPECTIVE JUROR:  He said I had to use my leave.

23         THE COURT:  Okay.  Let me ask you the other questions and

24   then we'll come back.

25         PROSPECTIVE JUROR:  Yes, ma'am.

```
1        THE COURT:  You say that someone is a law enforcement
2   agency connection.  Who?
3        PROSPECTIVE JUROR:  It's my friend, someone I just started
4   seeing.  He's a retired is secret service.  Yes, ma'am, a friend.
5        THE COURT:  Okay.  And how long have you been seeing him?
6        PROSPECTIVE JUROR:  Oh, two months.
7        THE COURT:  Okay.  And then what about someone employed by
8   probation, parole, corrections?  You wrote number 16, any of your
9   friends or relatives been employed by a court, probation, or
10  parole office.
11       PROSPECTIVE JUROR:  That might have been the wrong one.  I
12  think it was the one about had you ever served on a jury or
13  something.
14       THE COURT:  Yeah.  You wrote 15 was the law enforcement
15  connection.
16       PROSPECTIVE JUROR:  Okay.
17       THE COURT:  16 is the court probation office corrections
18  officer.  No one that you're aware of?
19       PROSPECTIVE JUROR:  No.
20       THE COURT:  19 is have you ever served, so have you ever
21  served as a juror before?
22       PROSPECTIVE JUROR:  About 20 years ago.
23       THE COURT:  And where were you?
24       PROSPECTIVE JUROR:  I was a petit juror.
25       THE COURT:  Here in D.C. or elsewhere?
```

1        PROSPECTIVE JUROR:  Um-hmm.

2        THE COURT:  In this courthouse or the courthouse across

3   the street?

4        PROSPECTIVE JUROR:  It was across the street on -- what is

5   that?

6        THE COURT:  The Superior Court.

7        PROSPECTIVE JUROR:  Yes.  At that time we were going

8   there.

9        THE COURT:  What kind of case, do you remember?

10       PROSPECTIVE JUROR:  It was a gentleman that had been

11   seeing this woman.  He was married.  He had been seeing this

12   woman.  He moved in with her, but then he decided about Christmas

13   he went to visit his family.  And then he decided he wanted to go

14   back to his family, and she accused him of attacking her.

15       THE COURT:  Do you know if it involved any charges of

16   sexual abuse, or was it more --

17       PROSPECTIVE JUROR:  No.

18       THE COURT:  Okay.  And did you reach a verdict in the

19   case?

20       PROSPECTIVE JUROR:  We did.  Everything was based on the

21   evidence that was presented.

22       THE COURT:  And how long did you sit, do you know?

23       PROSPECTIVE JUROR:  It was about three or four days, I

24   think.

25       THE COURT:  And that's the only other time that you've

1   been on a jury?

2        PROSPECTIVE JUROR:  Yes, ma'am.

3        THE COURT:  And it also says at the end of this here that

4   there are other -- there's a question that I hadn't asked?

5        PROSPECTIVE JUROR:  Oh, it was that one.

6        THE COURT:  Okay.

7        PROSPECTIVE JUROR:  It was that, yes, ma'am.

8        THE COURT:  Oh, And you also said someone has been

9   accused, arrested, charged, convicted of a crime or a victim of a

10  crime, number 21.  Have you or any of your friends or relatives

11  ever been cued, arrested, charged or convicted of a crime, been a

12  victim of a crime, or been a witness to a crime?

13       PROSPECTIVE JUROR:  It was back in 1979.  It was me.  I

14  was riding in a stolen car with another guy, and they used us as

15  a witness.  It was no papers.

16       THE COURT:  So were you arrested originally?

17       PROSPECTIVE JUROR:  I wasn't arrested.  I was just used as

18  a witness.

19       THE COURT:  Against the person you were riding with?

20       PROSPECTIVE JUROR:  Um-hmm, because we didn't know that he

21  had stolen that particular vehicle.

22       THE COURT:  I see.  Did you go to court?

23       PROSPECTIVE JUROR:  Yes.  I just testified on -- it was

24  like, I think, a grand jury or something.

25       THE COURT:  And did anything ever become of those charges,

1    that you know of?

2         PROSPECTIVE JUROR:  Not for me.  I know that my document

3    just says no papers.

4         THE COURT:  And as your experience in that situation,

5    would that influence in any way your ability to be fair and

6    impartial with regard to sitting in a criminal case like this?

7         PROSPECTIVE JUROR:  No.  I'd be fine.

8         THE COURT:  Any follow-up?

9         MS. HERTZFELD:  No, Your Honor.

10         MS. SLAIGHT:  Do you think that if you were placed on the

11    jury, would it be -- would you be distracted because of the issue

12    of pay?

13         PROSPECTIVE JUROR:  No, ma'am.

14         MS. SLAIGHT:  Do you think that -- do you think that in

15    any way you would be a little resentful, or do you think you'd

16    still be able to be fair?

17         PROSPECTIVE JUROR:  I could be fair, yes, ma'am.

18         MS. SLAIGHT:  Okay.  And --

19         THE COURT:  Let me make sure you take this back.

20         PROSPECTIVE JUROR:  Oh, thank you.

21         MS. SLAIGHT:  So the employer's taking the position that

22    you're going to have to use your vacation time; is that right?

23         PROSPECTIVE JUROR:  It's a chance that I'm going to have

24    to use it -- well, no, it's not a chance.  I will have to use it.

25         MS. SLAIGHT:  All right.  Thank you.

1          PROSPECTIVE JUROR:  Because what it is, they have -- it's

2     like if you have leave without pay, they won't allow you to do

3     the leave without pay, which I would have opted for, to take the

4     leave without pay, but he said you can't use it until you've

5     exhausted your leave -- all of your leave.

6          THE COURT:  All of your vacation.

7          PROSPECTIVE JUROR:  Um-hmm, sick leave and everything.

8          THE COURT:  They still pay you for that time, but they're

9     also counting it down so you won't be able to take a vacation if

10    you use it all.  Is that what you're saying?

11         PROSPECTIVE JUROR:  Um-hmm.

12         THE COURT:  All right.  Thank you.

13         PROSPECTIVE JUROR:  Yes, ma'am.

14         (Prospective juror left the bench.)

15         MS. SLAIGHT:  I'm going to move to strike her.  She's

16    concerned about the money, and I know she said she wouldn't find

17    it as a distraction, but --

18         THE COURT:  I don't see a reason that she would find it as

19    a distraction, but I would consider moving her down the list.  I

20    don't think a work hardship in this way is a valid reason for

21    striking someone, but we can push her down.  All right.

22         Number 683.

23         (Prospective juror approached the bench.)

24         THE COURT:  Hello.  I'll have you come right up.  And this

25    is our microphone.  Some people are listening.  You have written

1    that you have legal training or someone you know?

2         PROSPECTIVE JUROR:  I've been a lawyer.

3         THE COURT:  What kind of law do you practice?

4         PROSPECTIVE JUROR:  Do?

5         THE COURT:  Or did.

6         PROSPECTIVE JUROR:  Did.  I was an environmental legal

7    consultant for a couple of large corporations.

8         THE COURT:  Did you ever practice --

9         PROSPECTIVE JUROR:  Business.

10        THE COURT:  Business.  Did you ever do any criminal law?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  Did you ever go to court in your capacity?

13        PROSPECTIVE JUROR:  In my capacity as an attorney, I was

14   at a number of judicial hearings but never in a court process.

15        THE COURT:  All right.  And you say you've served on a

16   jury?

17        PROSPECTIVE JUROR:  I have served on a jury.  That was for

18   a local street crime.  I was a witness -- or, excuse me.  I

19   was -- yes.

20        THE COURT:  There are different questions here, but first

21   let me ask you:  Have you served on a jury?

22        PROSPECTIVE JUROR:  No.

23        THE COURT:  No?  All right.  So number 19 I wrote, have

24   you ever served on a jury in a civil or criminal jury trial or

25   grand jury.

1          PROSPECTIVE JUROR:  It says I was a juror?  As a juror,

2   no.  I was a witness.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  I must have misheard the question.  I

5   have been both a victim and a witness.

6          THE COURT:  Okay.  So tell us about those.

7          PROSPECTIVE JUROR:  I was a victim of a street crime, a

8   mugging many years ago, maybe 10 or 12 years ago.

9          THE COURT:  Here in the District of Columbia?

10          PROSPECTIVE JUROR:  In the District of Columbia, in D.C.

11   on Capitol Hill.

12          THE COURT:  And were you injured in that --

13          PROSPECTIVE JUROR:  No.  No, I wasn't.

14          THE COURT:  And did -- was there any follow-up in terms of

15   criminal charges being brought against you?

16          PROSPECTIVE JUROR:  No.  They never caught the guys.

17          THE COURT:  And is there anything about your experience as

18   a victim of a mugging that would make it difficult for you to

19   judge criminal charges being brought --

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  -- in this case?

22          PROSPECTIVE JUROR:  No, I don't think so.

23          THE COURT:  All right.  And then you said you were a

24   witness as well?

25          PROSPECTIVE JUROR:  A witness.  I know there was a -- just

1  a street crime, someone stealing a cell phone, and I happened to

2  see the guys as they were running away.

3          THE COURT:  Did you have to testify?

4          PROSPECTIVE JUROR:  I testified at a grand jury and a

5  jury.

6          THE COURT:  And where was this testimony?

7          PROSPECTIVE JUROR:  It was in the District.

8          THE COURT:  In Superior Court across the street?

9          PROSPECTIVE JUROR:  It was in Municipal Court.

10          THE COURT:  Yeah, not this courthouse?

11          PROSPECTIVE JUROR:  Not this Court.

12          THE COURT:  Okay.  And how long did your testimony take?

13  Were you there for more than one day?

14          PROSPECTIVE JUROR:  I was there for a day.  Um, I don't

15  know.  It took 20 minutes since I got on the stand.

16          THE COURT:  Did you work with the government's attorneys

17  in preparing you for your testimony?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Was there anything about that experience that

20  would make you favor the prosecutors in this particular case?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Or influence the way you saw the evidence

23  here?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Any follow-up?

1         MS. SLAIGHT:  You said that the -- that experience

2    wouldn't influence you in terms of hearing other witnesses

3    testify.  You wouldn't favor civilian witnesses?

4         PROSPECTIVE JUROR:  I can't imagine that, no.  I can't

5    think of why.

6         THE COURT:  Anything else?  All right.  Thank you.

7         PROSPECTIVE JUROR:  Okay.

8         (Prospective juror left the bench.)

9         MS. SLAIGHT:  Your Honor, could we take a restroom break

10   at some point soon?

11        THE COURT:  Yes.  Why don't we do it.  What time is it

12   now?  Okay.  What time did I say I was going to break for lunch,

13   12:30 or 1:00?  Okay.  Why don't we take -- we're going to take

14   five minutes now for you to go, and we'll try to come back and

15   finish this row.  All right.

16        (Thereupon, a break was had from 12:10 p.m. until

17   12:14 p.m.)

18        THE COURT:  Are you ready?

19        MS. SLAIGHT:  Thank you.

20        THE COURT:  Juror number 1256.

21        (Prospective juror approached the bench.)

22        THE COURT:  Good afternoon.  I'll have you speak right

23   into this.  This is the microphone.

24        PROSPECTIVE JUROR:  Okay.

25        THE COURT:  You say you know someone who was named in this

1    process?

2          PROSPECTIVE JUROR:  I said I don't know if that's her, but

3    I do security, and I know a Tameka Davis.

4          THE COURT:  Tameka Davis?

5          PROSPECTIVE JUROR:  Yes.  I said I do security, and I do

6    know a Tameka Davis.  I don't know if that was her or not.

7          THE COURT:  What kind of security do you do?

8          PROSPECTIVE JUROR:  School security.

9          THE COURT:  With what school?

10         PROSPECTIVE JUROR:  Security, security.

11         THE COURT:  At which school?

12         PROSPECTIVE JUROR:  Oh, she's not at the same school I'm

13   in, though.

14         THE COURT:  Yeah, but what school are you in?

15         PROSPECTIVE JUROR:  I'm at Cardozo.

16         THE COURT:  At Cardozo?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And where is this Tameka Davis that you know?

19         PROSPECTIVE JUROR:  She was at HD Woodson.

20         THE COURT:  And this is just like securing the campus,

21   walking around?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Does that mean you're ex-law enforcement?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  What?

```
1          PROSPECTIVE JUROR:  I do security on SPO as a security
2     officer.
3          THE COURT:  And how did you get that position?  In other
4     words, are you a former law enforcement officer of some kind?
5          PROSPECTIVE JUROR:  I work under SPO -- police officer.
6          THE COURT:  You --
7          PROSPECTIVE JUROR:  I work under the D.C. government
8     police officer.
9          THE COURT:  Have you ever been a police officer?
10          PROSPECTIVE JUROR:  No.
11          THE COURT:  Okay.
12          PROSPECTIVE JUROR:  Under the school with a contract, but
13     under the police officers with the school system.
14          THE COURT:  Okay.  You say you also you have some vision
15     or hearing problems?
16          PROSPECTIVE JUROR:  No.  Sometimes I'm hard of hearing,
17     sometimes.
18          THE COURT:  Sometimes?
19          PROSPECTIVE JUROR:  Um-hmm.
20          THE COURT:  Is this a diagnosed condition, or you just
21     find it difficulty to hear?
22          PROSPECTIVE JUROR:  Sometimes I find it difficulty to
23     hear.  Sometimes I have to read lips or, you know, look at the
24     face.
25          THE COURT:  Let me have you speak here.
```

1          PROSPECTIVE JUROR:  Read lips or look in your face and I

2     can hear.

3          THE COURT:  And how often does that happen?

4          PROSPECTIVE JUROR:  Ma'am, it happens sometimes.

5          THE COURT:  Okay.  And you said that you -- somebody has

6     studied law that you know?

7          PROSPECTIVE JUROR:  No.  I said I do.  I be working in --

8     we do have to do law enforcement work and law enforcement and

9     paperwork and stuff.

10         THE COURT:  And do you ever read cases or --

11         PROSPECTIVE JUROR:  No.  When I was working Superior

12    Court, when I was coming out of school in the 12th grade, I did

13    probation office over there and in Superior Court building.

14         THE COURT:  You did --

15         PROSPECTIVE JUROR:  Probation officer.

16         THE COURT:  You did probation office work?

17         PROSPECTIVE JUROR:  Yes, ma'am.  I was working under

18    probation officer for the summer.

19         THE COURT:  Oh, just for the summer?

20         PROSPECTIVE JUROR:  Um-hmm.

21         THE COURT:  And what kind of work did you do in that?

22         PROSPECTIVE JUROR:  I'd jot and write it down, and they

23    send it back and give it to the probation officer.

24         THE COURT:  So administrative work?

25         PROSPECTIVE JUROR:  Yeah, clerical work.

1      THE COURT:  Clerk work.  And you say that you -- somebody

2 has applied to or worked in law enforcement.  You mean your work

3 as a security --

4      PROSPECTIVE JUROR:  Yeah.

5      THE COURT:  Do you know anybody else in law enforcement,

6 other than the other security officers you've work with?

7      PROSPECTIVE JUROR:  No, not that I know of.

8      THE COURT:  And Cardozo is a high school; is that correct?

9      PROSPECTIVE JUROR:  Yeah, um-hmm.

10      THE COURT:  And are you -- in connection with your work as

11 a security office, have you ever worked on any situations

12 involving sexual abuse of any --

13      PROSPECTIVE JUROR:  Sometimes, sometimes.  I mean, I have,

14 you know, heard it, and -- but I hadn't worked -- when I heard it

15 and seen things that, you know, went down and stuff, but I try

16 not to get involved in it.

17      THE COURT:  Have you ever been -- actually worked on any

18 matters that involved it, or you just see it around?

19      PROSPECTIVE JUROR:  I just see it around.

20      THE COURT:  And do you have any feelings about --

21      PROSPECTIVE JUROR:  Yes, I do.

22      THE COURT:  Tell me what you feel.

23      PROSPECTIVE JUROR:  I feel that -- you know, I don't know

24 what the child like or the person -- the child like or the person

25 is like.

1          THE COURT:  You don't know which one?

2          PROSPECTIVE JUROR:  No, no.

3          THE COURT:  Do you have strong feelings about these kinds

4     of charges?

5          PROSPECTIVE JUROR:  Yes, I do.

6          THE COURT:  What are the strong feelings?

7          PROSPECTIVE JUROR:  Because I don't know which one is

8     telling the truth and which one is telling a lie.

9          THE COURT:  So does that mean that you could be fair when

10    you evaluate this?

11         PROSPECTIVE JUROR:  I'm -- I would -- I would not consider

12    myself.  I'm not for sure because if it happened to my child or

13    my grandchild, then I would be, you know, like -- I got to trust

14    her or trust him, a person.  Who I got to trust?  I don't -- I'm

15    not for telling her, like, I don't know who telling the truth and

16    who not telling a lie.

17         THE COURT:  Would you be more inclined to believe your

18    granddaughter or the victim in the situation?

19         PROSPECTIVE JUROR:  Yeah.  At the time, yeah, I'm going to

20    believe my granddaughter because I'm going to believe her before

21    I believe the victim.

22         THE COURT:  What if someone in your family was accused of

23    sexual abuse, would you believe that -- the family member or

24    would you believe that they had actually done it?

25         PROSPECTIVE JUROR:  I got to -- I got to really know.  If

1    I know that person, my granddaughter, or one of my grandchildren

2    or whatever lie, lie, I would probably believe the other victim.

3    But I got to know if they really do a lot of lying or telling the

4    truth.

5         THE COURT:  All right.  Let me just finish going through

6    these questions.  You say that you believe that teenagers or

7    children or young people tell lies?

8         PROSPECTIVE JUROR:  Yes.  I've seen them in schools.  I

9    seen them tell lies on a lot of people and some more.

10        THE COURT:  So you think that a teenager is more likely to

11   not tell the truth?

12        PROSPECTIVE JUROR:  Sometimes they don't tell the truth.

13        THE COURT:  What about being uncomfortable with viewing

14   sexual material?

15        PROSPECTIVE JUROR:  That's what I just told you just now,

16   what I just now explained.  I just told you a few minutes ago.

17        THE COURT:  But you didn't tell me you were uncomfortable

18   viewing the materials.  Are you uncomfortable viewing the

19   material?

20        PROSPECTIVE JUROR:  Yeah, because I wouldn't want to see

21   nothing really bad or something like that, just see somebody

22   touching a child.  I probably would -- you know, I'd probably get

23   mad and really upset.

24        THE COURT:  And what about the belief that someone who's

25   interested in child pornography is likely to abuse --

```
1          PROSPECTIVE JUROR:  I don't think that's fair.  I don't
2     think they should be taking no kind of pictures of a minor
3     because I don't really think that's fair.
4          THE COURT:  So you have a strong belief that that's not a
5     good thing?
6          PROSPECTIVE JUROR:  No, no.
7          THE COURT:  What about the sexual -- you believe that if a
8     sexual assault is not reported, then it didn't happen?
9          PROSPECTIVE JUROR:  In some people they scared because
10    they think that, like -- they probably scared, like, they go and
11    they say that they been sexual -- or having sex with -- somebody
12    touched them in the wrong way, they might think somebody won't
13    believe them.
14         THE COURT:  So you think that they don't have to --
15         PROSPECTIVE JUROR:  Sometimes people keep it in their mind
16    or keep it to themselves because they don't want -- because they
17    think another person won't believe them.
18         THE COURT:  And you would have a hard time discussing with
19    other jurors those kinds of issues, you say?
20         PROSPECTIVE JUROR:  Well, I don't blame -- because I
21    know -- you know, they might not understand what I'm saying, like
22    I'm trying to explain to you, ma'am, because some people don't
23    understand kids.  Some people, you know -- kids can keep things
24    to their self.  I done seen a lot of kids keep thing to
25    themselves.
```

1          THE COURT:  Do you think your experience with teenagers

2   and kids and your grandchildren will influence how you hear the

3   evidence in this case?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Yeah?

6          PROSPECTIVE JUROR:  Um-hmm.

7          THE COURT:  Anything further?

8          MS. HERTZFELD:  No, Your Honor.

9          MS. SLAIGHT:  No, Your Honor.

10         THE COURT:  All right.  Thank you.

11         PROSPECTIVE JUROR:  Um-hmm.  Sure.

12         (Prospective juror left the bench.)

13         MS. HERTZFELD:  I move for cause.

14         THE COURT:  I think I would strike her for cause.

15         Juror number 1210.

16         (Prospective juror approached the bench.)

17         THE COURT:  I'll just have you come right here.  This is

18   our microphone so people can hear you.  You have answered that

19   you know someone in the courtroom?

20         PROSPECTIVE JUROR:  Yes.  The first officer marshal that

21   was sitting on the left looks familiar.

22         THE COURT:  Let me -- looks familiar because?

23         PROSPECTIVE JUROR:  I go to a gym regularly, and he looks

24   a lot like the guy.

25         THE COURT:  Do you know what his name, by any chance?

1          PROSPECTIVE JUROR:  I don't, no.

2          THE COURT:  Okay.  But you think you know him.  And what

3     about the schedule that would make it difficult for you to serve?

4          PROSPECTIVE JUROR:  My father lives in Nicaragua, visits

5     about twice a year.  He's scheduled to come down the middle of

6     next weekend, the 7th.  I have a plane ticket booked to Miami to

7     go see him, and it would overlap the Monday and Tuesday morning.

8          THE COURT:  If this case were over by Wednesday or

9     Thursday of next week, would that be a problem?

10         PROSPECTIVE JUROR:  That would not be a problem at all.

11         THE COURT:  All right.

12         PROSPECTIVE JUROR:  I also thought I heard you say 25

13    days, not 5 days.

14         THE COURT:  Oh, no, five days is what I said.  Five days.

15         PROSPECTIVE JUROR:  Okay.

16         THE COURT:  Sorry.  I should have been clearer.

17         Someone has legal training?

18         PROSPECTIVE JUROR:  Myself.

19         THE COURT:  And what kind of law do you practice?

20         PROSPECTIVE JUROR:  Acquisition law, so I'm a contract --

21         THE COURT:  Acquisition.

22         PROSPECTIVE JUROR:  Contract attorney for the Navy.

23         THE COURT:  Have you ever had any criminal work?

24         PROSPECTIVE JUROR:  I do not.

25         THE COURT:  You're not in JAG or anything, so you never

1    represented a criminal defendants?

2         PROSPECTIVE JUROR:  No.

3         THE COURT:  And do you have anyone in your family who's

4    been in criminal experience?

5         PROSPECTIVE JUROR:  Criminal defense?  No.  My brother was

6    a states attorney in Florida.

7         THE COURT:  Prosecution?  Has he ever talked with you

8    about his work in that regard?

9         PROSPECTIVE JUROR:  So he was, and back then about ten

10   years ago, he spoke topically about some of the cases.

11        THE COURT:  Did he ever handle any cases involving sexual

12   abuse --

13        PROSPECTIVE JUROR:  Not that I recall.

14        THE COURT:  And is there anything about your relationship

15   with him or your discussions with him that would make you favor

16   the word of a police officer or the prosecution in this matter?

17        PROSPECTIVE JUROR:  I don't think so.

18        THE COURT:  You think you could be fair and unbiased as to

19   both parties in this case?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  You also say that you -- someone has been

22   accused or arrested of a crime or a victim of a crime?

23        PROSPECTIVE JUROR:  Victim of a crime.  Family members

24   with break-ins and car robberies, all of that, but no --

25        THE COURT:  Anything remotely involving sexual violence,

1    sexual abuse, child pornography?

2         PROSPECTIVE JUROR:  No.

3         THE COURT:  And would any of their experiences, in terms

4    much being victims, influence your ability to sit impartially in

5    this case?

6         PROSPECTIVE JUROR:  I don't think so.

7         THE COURT:  And you've not served on a jury before?

8         PROSPECTIVE JUROR:  I have not.

9         THE COURT:  And you filed a complaint against a police

10   officer or someone in law enforcement?

11        PROSPECTIVE JUROR:  I don't know if it qualifies as law

12   enforcement.  They were very disrespectful TSA officers years

13   ago, which I did file complaints against.

14        THE COURT:  In the context of an airport --

15        PROSPECTIVE JUROR:  His demeanor during airport security

16   check-point inspection.

17        THE COURT:  All right.  And would that experience make you

18   be less inclined to believe the word of law enforcement agents in

19   this context?

20        PROSPECTIVE JUROR:  No, probably not.

21        THE COURT:  And you say that you believe teenagers,

22   children, or young people tell lies more often than adults?

23        PROSPECTIVE JUROR:  I was on the fence about that one.  My

24   experience with teenagers is they're a little more prone to

25   stretch the facts.

1      THE COURT:  What's your experience with teenagers?

2      PROSPECTIVE JUROR:  Cousins, nieces who are, well, younger

3  than teens, but --

4      THE COURT:  And do you think that your experience with

5  them would make you less inclined to believe teenagers in this

6  context, if they were to testify?

7      PROSPECTIVE JUROR:  I don't know how to apply it to this

8  context, to be honest.  This is a little different, I think.

9      THE COURT:  Well, this case involves witnesses who may be

10  teenagers, so we have to assess whether you're going to be able

11  to look at their testimony and listen to it and treat them fairly

12  and not be thinking about your cousins and the extent to which --

13      PROSPECTIVE JUROR:  I'm sure I will give them the

14  honest -- or the fair hearing.

15      THE COURT:  And you wouldn't be inclined to believe -- to

16  disbelieve them because of their age?

17      PROSPECTIVE JUROR:  Probably not.

18      THE COURT:  What about your belief about someone who's

19  interested in child pornography being more likely to sexually

20  abuse a minor?  What's that based on?

21      PROSPECTIVE JUROR:  I think if someone has a proclivity

22  towards certain hobbies, they're going to be inclined to

23  participate in them --

24      THE COURT:  And is that based on something you've read or

25  seen or where are you getting that viewpoint from?

1          PROSPECTIVE JUROR:  Just personal experience.  You're

2     seeking out magazines for guns and ammo, so you're probably going

3     to be a gun hobbyist or enthusiast.

4          THE COURT:  Would you be able to follow the Court's

5     instruction if the Court told you that those are separate

6     charges?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  They're separate things, and just because one

9     might be interested in one, that doesn't necessarily mean that

10    they're guilty of the other?

11         PROSPECTIVE JUROR:  I would do my best to follow those

12    instructions.

13         THE COURT:  You also said the opposite, which is someone

14    who'd sexually abuse a child is more likely to be interested in

15    pornography.  Are we talking about the same kind of thought

16    process?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And finally you said you'd be uncomfortable

19    discussing these kinds of issues with other jurors?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Why do you feel that way?

22         PROSPECTIVE JUROR:  Because I think the description you

23    gave of the case in particular is unsettling, at least for me,

24    and I think I would have -- I would be uncomfortable

25    discussing -- discussing the level of detail I assume we would go

1    into in a trial regarding this charge.

2         THE COURT:  Any follow-up questions?

3         MS. HERTZFELD:  No, Your Honor.

4         MS. SLAIGHT:  No.

5         THE COURT:  All right.  Thank you.

6         PROSPECTIVE JUROR:  Thank you, Your Honor.

7         (Prospective juror left the bench.)

8         MS. SLAIGHT:  I move to strike for cause.

9         MS. HERTZFELD:  I concur.

10        THE COURT:  All right.  We probably have time for one more

11   here before we break.

12        Number 550.

13        (Prospective juror approached the bench.)

14        THE COURT:  Hi.  How are you?  You're going to talk right

15   into that microphone so you can be heard.

16        PROSPECTIVE JUROR:  Okay.

17        THE COURT:  So you say that you -- you have legal training

18   or someone you know?

19        PROSPECTIVE JUROR:  Yeah.  I have a cousin who's a lawyer

20   and a friend who's a paralegal.

21        THE COURT:  And the cousin, what kind of law does he or

22   she practice?

23        PROSPECTIVE JUROR:  It's not criminal.  I'm not sure

24   beyond that what she specifies in.

25        THE COURT:  All right.  But you haven't really heard her

```
1   talk about criminal cases in criminal law?
2           PROSPECTIVE JUROR:  No.
3           THE COURT:  What about the paralegal, what kind of firm?
4           PROSPECTIVE JUROR:  I know that she works at a firm.  I'm
5   not sure what kind of cases they do.  I've just heard general
6   information from her.
7           THE COURT:  And what do you do?
8           PROSPECTIVE JUROR:  I work in public relations.
9           THE COURT:  And in what capacity are you --
10          PROSPECTIVE JUROR:  Oh, so I --
11          THE COURT:  -- is your position?
12          PROSPECTIVE JUROR:  It's an agency, so we work with
13  whatever organizations hire us.  It's actually similar to a law
14  firm, just for public relations.
15          THE COURT:  All right.  And you also say that someone has
16  either been accused of a crime or a victim of a crime?
17          PROSPECTIVE JUROR:  Yes.  I have a good friend in
18  Montgomery County who was in an abusive relationship, ended up
19  pursuing charges against her ex-boyfriend, and had to appear in
20  court multiple times just to get the protective order.
21          THE COURT:  She had to?
22          PROSPECTIVE JUROR:  Yes.
23          THE COURT:  And when you say "an abusive relationship,"
24  was it a romantic relationship?
25          PROSPECTIVE JUROR:  Yes.
```

```
1          THE COURT:  And does she ever talk to you about the

2   specifics of their --

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  -- situation?  And do you know whether it

5   involved sexual abuse, as opposed to any other kind?

6          PROSPECTIVE JUROR:  It was mostly emotional, but there was

7   some physical and sexual incidences.

8          THE COURT:  Do you think that your relationship with this

9   friend and the circumstances that you discussed with her would

10  influence your ability to be fair and impartial in considering

11  the evidence in this case?

12         PROSPECTIVE JUROR:  I don't think it would affect it.  I

13  think I could be impartial, even if --

14         THE COURT:  Do you know how old your friend was as a part

15  of this relationship?

16         PROSPECTIVE JUROR:  Yes, this was just in the last two

17  years, so she was 27, 28.

18         THE COURT:  So it wasn't involving a child --

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  -- or a children situation?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Those are the only two things that you've

23  written on your card.  Let me ask if there's any follow-up from

24  either --

25         MS. HERTZFELD:  No, Your Honor.
```

1    MS. SLAIGHT:  Did you say that you went to court for that
2  case?

3    PROSPECTIVE JUROR:  I did not.  She did.

4    MS. SLAIGHT:  Okay.  So did you talk to her about details
5  of the case?

6    PROSPECTIVE JUROR:  Yes.

7    MS. SLAIGHT:  And details -- and did you talk with her
8  about details about the sexual and physical abuse allegations?

9    PROSPECTIVE JUROR:  Yes.

10    MS. SLAIGHT:  Do you know what happened with that case?

11    PROSPECTIVE JUROR:  I believe I know there was no trial,
12  no criminal trial, and she's considering a civil suit.  And she
13  does have an active protective order against him, as does another
14  woman.

15    THE COURT:  Would your relationship with her and the
16  details and information that you heard make it more likely that
17  you would believe people who are alleging sexual abuse in the
18  context of this case?

19    PROSPECTIVE JUROR:  I don't think so.

20    THE COURT:  So you think you could be fair and
21  impartial --

22    PROSPECTIVE JUROR:  Yes.

23    THE COURT:  -- in looking at, the evidence from both
24  sides?

25    PROSPECTIVE JUROR:  Yes.

1          MS. SLAIGHT:  And you said that was two years ago?

2          PROSPECTIVE JUROR:  Uh, yes.  So 2016, yes.  And a lot of

3     the court issues were last year and into this year.

4          MS. SLAIGHT:  Okay.  And has she filed the civil suit?

5          PROSPECTIVE JUROR:  No, she hasn't.  I think she's still

6     deciding whether she wants to pursue that or not.

7          MS. SLAIGHT:  And do you talk to her about that?

8          PROSPECTIVE JUROR:  I haven't gotten the latest details

9     from her.

10          THE COURT:  How often do you talk with her?

11          PROSPECTIVE JUROR:  About once a month, but not just about

12     this, so...

13          MS. SLAIGHT:  And would you be a witness in that case?

14          PROSPECTIVE JUROR:  If anything, maybe a character

15     witness.  I don't -- we weren't as close during the time of the

16     relationship, but I have known her for over a decade, so I would

17     definitely be called as a character witness, I believe.

18          MS. SLAIGHT:  Do you think that the -- she was treated

19     fairly in the -- was she in criminal court?

20          PROSPECTIVE JUROR:  I know she was.  She actually worked

21     for Montgomery County, so she had very great support from her

22     lawyer, who was pro bono.  He also works for the county, so she

23     felt very comfortable.  But I think it was just -- as far as I

24     know, they just declined to proceed with the case.

25          MS. SLAIGHT:  Okay.

1          THE COURT:  All right.  Thank you.

2          (Prospective juror left the bench.)

3          THE COURT:  We'll just finish this woman.  We have one

4    more on this row, and then I think we can -- all right.  We have

5    one more person on this row, so I'd like to go ahead and finish

6    and then we'll break for lunch.  All right.

7          Number 732.

8          (Prospective juror approached the bench.)

9          THE COURT:  Good afternoon.

10         PROSPECTIVE JUROR:  Good afternoon.  Hello.

11         THE COURT:  Please speak right there, and then the lawyers

12   will come in on either side.

13         PROSPECTIVE JUROR:  Sure.

14         THE COURT:  So you say someone has been employed by a

15   court, probation office, Department of Corrections?

16         PROSPECTIVE JUROR:  My cousin, not a close relative, but

17   she was a federal probation officer, retired.

18         THE COURT:  And have you ever talked with her about the

19   work that she did in that context?

20         PROSPECTIVE JUROR:  In very general terms.

21         THE COURT:  And would anything about your relationship

22   with her or those discussions make you favor or disfavor a

23   criminal defendant?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  You say that you served as a juror before?

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  In this court or Superior Court?

3        PROSPECTIVE JUROR:  Both.

4        THE COURT:  How many times have you been in those --

5        PROSPECTIVE JUROR:  It's been like probably two or three

6   times, and that was like 20 years ago.

7        THE COURT:  And when was the last time you were a juror?

8        PROSPECTIVE JUROR:  It was in the '90s, so maybe '97 or

9   '98.

10        THE COURT:  Were either of the cases criminal?

11        PROSPECTIVE JUROR:  They were both criminal.

12        THE COURT:  And what kind of charges, do you recall, were

13   involved?

14        PROSPECTIVE JUROR:  One was the possession of a stolen

15   bicycle; and the other was a gun charge, possession of a firearm.

16        THE COURT:  So no charges involving sexual abuse with

17   minors or anything like that?

18        PROSPECTIVE JUROR:  No.

19        THE COURT:  And -- but you say that someone has been

20   associated with a group organization that assists people who

21   would have experienced sexual abuse?

22        PROSPECTIVE JUROR:  So my cousin -- a different cousin is

23   a social worker, and she has -- she works with children who

24   have -- perpetrators or victims of sexual abuse.

25        THE COURT:  So the children could either be the

1    perpetrator or the victim?

2         PROSPECTIVE JUROR:  Yeah.

3         THE COURT:  And have you talked with her about her work in

4    that regard?

5         PROSPECTIVE JUROR:  Her work.  Um, in general terms,

6    and --

7         THE COURT:  Are you close with this cousin?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  And would anything about your discussions with

10   her influence your ability to be fair and impartial in looking at

11   the evidence in this case and deciding a case of alleged child

12   sexual abuse only on the evidence?

13        PROSPECTIVE JUROR:  No, it would not influence me.

14        THE COURT:  You think you would be able to leave aside

15   anything you might have heard from her?

16        PROSPECTIVE JUROR:  Yes, yes.

17        THE COURT:  You also say that someone has training or

18   experience in psychiatry, psychology, mental health?

19        PROSPECTIVE JUROR:  So that's my cousin --

20        THE COURT:  The same cousin?

21        PROSPECTIVE JUROR:  -- who's the social worker, yes.

22        THE COURT:  And how often would you say you've discussed

23   her work or the work with children?

24        PROSPECTIVE JUROR:  Oh, I mean, it's not every time I talk

25   with her, but there are, you know, a couple times a year that we

1   talk about --

2        THE COURT:  Has she talked about any particular cases, any

3   particularly disturbing issues or cases?

4        PROSPECTIVE JUROR:  Um, no, nothing -- no particularly

5   disturbing cases.

6        THE COURT:  Has she talked to you about any cases?

7        PROSPECTIVE JUROR:  Like, just kind of in, like, general

8   terms she might discuss something.

9        THE COURT:  But no details?

10       PROSPECTIVE JUROR:  Nothing in detail, no.

11       THE COURT:  Any questions?

12       MS. HERTZFELD:  No questions.

13       THE COURT:  Anything?

14       MS. SLAIGHT:  Did she give you an impression -- from

15   talking with her, did you get any impression about whether either

16   the children are more believable or the people accusing or, you

17   know, somebody who's possibly a defendant or an adult is more

18   believable?

19       PROSPECTIVE JUROR:  No, not one way or the other, not that

20   it -- not that anybody would be more believable or not, no.

21       MS. SLAIGHT:  Did she talk to you about her experiences

22   with, you know, children and whether they should be believed more

23   than --

24       PROSPECTIVE JUROR:  No, no, no, not that children should

25   be believed more or not, no.

1          THE COURT:  All right.  Thank you.

2          (Prospective juror left the bench.)

3          THE COURT:  All right.  Thank you all for your patience.

4     We are going to break now for lunch.  We'll have an hour, and

5     Ms. Franklin will direct you as to exactly where you need to go

6     and what you need to do, but you should expect -- for those of

7     you coming back, you should expect that we will start again at

8     1:30.

9          (Jury venire out at 12:37 p.m.)

10                        **C E R T I F I C A T E**

11

12               I, Scott L. Wallace, RDR-CRR, certify that
           the foregoing is a correct transcript from the record of
13         proceedings in the above-entitled matter.

14
           /s/ Scott L. Wallace                7/26/19
15         ---------------------------        ----------------
           **Scott L. Wallace, RDR, CRR**            **Date**
16         **Official Court Reporter**

17

18

19

20

21

22

23

24

25