UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**      :
                                  :
            **Plaintiff,**        :   Criminal Action
                                  :   No. 16-030
**v.**                            :
                                  :
**CHARLES HILLIE,**               :   March 29, 2018
                                  :   1:30 p.m.
                                  :
                                  :
            **Defendant.**        :   Washington, D.C.
                                  :
.............................. :


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**(VOIR DIRE)**
**BEFORE THE HONORABLE KETANJI B. JACKSON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:      **Andrea Lynn Hertzfeld, Assistant**
                            **U.S. Attorney**
                            U.S. ATTORNEY'S OFFICE FOR THE
                            DISTRICT OF COLUMBIA
                            555 Fourth Street, NW
                            Washington, DC 20530
                            (202) 252-7808
                            Fax: (202) 353-7634
                            Email: Andrea.hertzfeld@usdoj.gov

                            **Kenechukwu O. Okocha, Assistant**
                            **U.S. Attorney**
                            U.S. ATTORNEY'S OFFICE-DISTRICT OF
                            COLUMBIA
                            Sex Offense and Domestic Violence
                            555 Fourth Street, SW
                            10th Floor
                            Washington, DC 20530
                            (202) 252-6604
                            Email: Kenechukwu.okocha@usdoj.gov

```
     APPEARANCES:  Cont.


     For the Defendant:          Joanne D. Slaight, Esq.
                                 LAW OFFICES OF JOANNE D. SLAIGHT
                                 400 Seventh Street, NW
                                 Suite 206
                                 Washington, DC 20004
                                 (202) 408-2041
                                 Fax: (202) 628-0249
                                 Email: Jslaight@att.net

     Court Reporter:            Scott L. Wallace, RDR, CRR
                                 Official Court Reporter
                                 Room 6503, U.S. Courthouse
                                 Washington, D.C. 20001
                                 202.354.3196
                                 scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

<u>**AFTERNOON SESSION, MARCH 29, 2018**</u>

1

2  (1:42 p.m.)

3      THE COURT:  Welcome back, ladies and gentlemen.  Thank you

4  again for your service.  We're going to continue.

5      Counsel.

6      (Following sidebar discussion had on the record:)

7      MS. SLAIGHT:  I have a report that Mr. Hillie is talking

8  to himself at the table seat, and I'm sure that he's thinking

9  really hard, but I just want to get on the record that there are

10  reports that he's -- the jurors can see this, so --

11      THE COURT:  Should we have him turn a different way or --

12      MS. SLAIGHT:  I can -- I can do that.  It's just that it's

13  difficult for the jurors when he does turn the other way, so I

14  can --

15      THE COURT:  Why don't you ask him to angle this way so he

16  can see who's coming to the bench.

17      MS. SLAIGHT:  Okay.

18      THE COURT:  All right.  The other thing we're going to do

19  is try to speed it up a little bit in terms of making sure that

20  we get through everybody.  Okay.

21      (Sidebar discussion concluded.)

22      THE COURT:  Juror number 1167.

23      (Prospective juror approached the bench.)

24      THE COURT:  Come in here.  Thank you very much.  So you

25  say that you have health problems that may be difficult for you

1    to sit?

2          PROSPECTIVE JUROR:  Well, yes, and I have needed a

3    colonoscopy for a few months, but I had to have a hysterectomy at

4    the end of December, so I have the colonoscopy scheduled, but the

5    fact is I just have uncontrollable bowels.  And I'm living with

6    Depends, but yesterday if I had been called in, I couldn't have

7    been here or Monday.  So I'm fine to serve, but it's subject to

8    my being here or having to just leave.

9          THE COURT:  I see.  And you're having to --

10         PROSPECTIVE JUROR:  And I talked with my

11   gastroenterologist about it, and he said he -- because I had

12   checked with the office here.  I would need a letter from the

13   doctor, and since it is something that comes and goes he said,

14   you know, I can't just do a blanket letter saying you can't

15   appear.  And, actually, he said to leave it up to the judge,

16   so --

17         THE COURT:  But you feel like it's a situation where you

18   had this medical issue occurring, you'd have to, like, leave in

19   the middle of what everybody is doing?

20         PROSPECTIVE JUROR:  Yes.  I mean, my schedule has not been

21   my own for the last four months.  I mean, I just had to cancel

22   doctor's appointments.  My social life is --

23         THE COURT:  I understand.

24         PROSPECTIVE JUROR:  So it's -- well, anyway.

25         THE COURT:  Due to the uncertainty, we're going to let you

```
 1   not have to commit to this because of your situation.

 2        PROSPECTIVE JUROR:  Yeah, and I -- I think I could be

 3   objective on this jury, but I just -- I can't guarantee that I

 4   can be here.

 5        THE COURT:  Understood.  Understood.  So we'll strike you

 6   from the list, but you should go sit back down and the

 7   Ms. Franklin will come and excuse you.  Okay?

 8        PROSPECTIVE JUROR:  Okay.

 9        THE COURT:  And thank you.

10        PROSPECTIVE JUROR:  Sorry.

11        THE COURT:  That's all right.  Thanks.

12        (Prospective juror left the bench.)

13        THE COURT:  All right.  Juror number 703.

14        (Prospective juror approached the bench.)

15        PROSPECTIVE JUROR:  Good afternoon.

16        THE COURT:  Good afternoon.

17        PROSPECTIVE JUROR:  Hi.

18        THE COURT:  I see right here it says you have legal

19   training or someone you know --

20        PROSPECTIVE JUROR:  I'm a lawyer.

21        THE COURT:  And what do you practice?

22        PROSPECTIVE JUROR:  I do real estate law.  I represent

23   mostly mortgage companies.

24        THE COURT:  And have you ever done any criminal work?

25        PROSPECTIVE JUROR:  When I was in college, I interned at
```

```
1    the State's Attorneys Office at Montgomery County, Maryland; and
2    to be fair, I also interned at the Public Defender's Office in
3    Montgomery County, Maryland.  I also applied to the FBI for a
4    summer internship when I was in college.  I was interviewed at
5    the Buffalo field office but was not accepted.
6         THE COURT:  So that answers some of the --
7         PROSPECTIVE JUROR:  That's right.
8         THE COURT:  -- whether you applied.  Is there anything
9    about your experience in terms of working in criminal law or the
10   work that you do right now that would influence your ability to
11   be fair and impartial in a case like this?
12        PROSPECTIVE JUROR:  None.
13        THE COURT:  You did also answer that there is some other
14   question that I didn't ask.
15        PROSPECTIVE JUROR:  I'm counsel of record in a case
16   pending before Your Honor right now.  I don't know if anyone
17   cares, but I thought I'd mention it.
18        THE COURT:  Have you ever appeared before me?
19        PROSPECTIVE JUROR:  No.
20        THE COURT:  Do you intend to appear before me?
21        PROSPECTIVE JUROR:  I may, if the case is pending before
22   you and the case has been assigned to you.
23        THE COURT:  I've never seen you before.
24        PROSPECTIVE JUROR:  Right.
25        THE COURT:  Have you seen me?
```

1         PROSPECTIVE JUROR:  I have not.

2         THE COURT:  All right.  Counsel.

3         MS. SLAIGHT:  No questions.  Thank you.

4         MS. HERTZFELD:  No questions.

5         MS. SLAIGHT:  You don't think that would influence your

6    deliberations?

7         PROSPECTIVE JUROR:  I don't think so, no.

8         THE COURT:  All right.

9         PROSPECTIVE JUROR:  Thank you.

10        (Prospective juror left the bench.)

11        MS. SLAIGHT:  Thank you.  Your Honor, while you're calling

12   the next witness, I'm just going to talk to Mr. Hillie.

13        THE COURT:  Yes.

14        Number 1052.

15        (Prospective juror approached the bench.)

16        THE COURT:  Hello.  Good afternoon.  You can come right

17   here so we can hear you.

18        PROSPECTIVE JUROR:  Okay.

19        THE COURT:  Have you served as a juror before?

20        PROSPECTIVE JUROR:  Yes, for the D.C. District Court.

21        THE COURT:  Okay.  It's the one right across the street?

22        PROSPECTIVE JUROR:  Yes, on Indiana Avenue.

23        THE COURT:  Yes.  Yes, Superior Court.

24        PROSPECTIVE JUROR:  Yes, Superior Court.

25        THE COURT:  And what kind of case was it?

1          PROSPECTIVE JUROR:  It was a criminal trial.  It involved

2     drug paraphernalia, gun, and ammo charges.

3          THE COURT:  And did you reach a verdict?

4          PROSPECTIVE JUROR:  Yes.  We did reach a verdict within an

5     hour or so.

6          THE COURT:  And how long was the trial?

7          PROSPECTIVE JUROR:  The trial was four days.

8          THE COURT:  Is there anything about that experience that

9     would make it difficult for you to serve as a juror in this case?

10          PROSPECTIVE JUROR:  No.  I actually liked the experience,

11     which was funny, but...

12          THE COURT:  How long ago was it?

13          PROSPECTIVE JUROR:  That was actually probably

14     two-and-a-half years ago, early 2016.

15          THE COURT:  And you say that someone has been a victim or

16     a witness to a crime related to child pornography, sex abuse of a

17     minor or sex crimes?

18          PROSPECTIVE JUROR:  So, yes.  You asked if I knew someone

19     who may have been a witness, and I do.  I don't know much about

20     the situation, other than I do know the person.

21          THE COURT:  Okay.

22          PROSPECTIVE JUROR:  But not the detail of the sex crime.

23          THE COURT:  Who was the person?

24          PROSPECTIVE JUROR:  The person is my husband's sister.

25          THE COURT:  Okay.  And was she a victim or accused?

1        PROSPECTIVE JUROR:  She was a victim.

2        THE COURT:  And do you know if it resulted in any criminal

3    charges?

4        PROSPECTIVE JUROR:  No.  She actually just expressed what

5    happened probably about a month ago to my husband, who then

6    advised me of what was happening.  I don't know the details of

7    the situation or what occurred when the alleged abuse took place.

8    The only relationship I've had between her and my mother-in-law

9    and just helping them build a relationship, because it stems from

10   something that happened between them, where she came out and said

11   that this alleged abuse happened.

12       THE COURT:  And do you know whether or not the -- what she

13   alleges occurred when she was an adult or a child?

14       PROSPECTIVE JUROR:  When she was a child.

15       THE COURT:  And do you know anything about the person that

16   she's accused of this?

17       PROSPECTIVE JUROR:  What I know of the gentleman, he was

18   in relations with her mom for some time, and that's all I know.

19       THE COURT:  Is there anything about your knowledge, such

20   as it is, that would impact your ability to look at the evidence

21   in this case and to judge only the evidence in this case?

22       PROSPECTIVE JUROR:  So, no.  And the reason why not is

23   because the type of person I am, I need to know the facts.

24   That's just me in my personal life, professional life and

25   everything.  I need you to tell me what it is so I can come up

1   with my own conclusion.  So I'm not quick to make a judgment.  I

2   mean, of course I have natural feelings, but as far as passing

3   judgment, no.  And then the experience I had with the prior jury

4   kind of helped me kind of come to that conclusion.

5        THE COURT:  So there's nothing about what little you know

6   about that situation that you think would influence in any way

7   how you look at the facts of this case?

8        PROSPECTIVE JUROR:  No, because I know little to nothing

9   about what happened.

10       THE COURT:  Because you know?

11       PROSPECTIVE JUROR:  I know little to nothing about that

12   situation, so I don't have anything to go off to kind of make a

13   judgment.  I mean, I feel bad for my sister-in-law, and my

14   support is basically for the feelings that I have for her and

15   seeing what she goes through.

16       THE COURT:  But you don't have a judgment about the

17   particular accusations or circumstances?

18       PROSPECTIVE JUROR:  No, not the particular circumstances.

19       MS. HERTZFELD:  Nothing?

20       PROSPECTIVE JUROR:  Huh-uh.

21       MS. SLAIGHT:  You're going to hear testimony that

22   Mr. Hillie was the -- had a relationship with the mother of these

23   two witnesses who are going to testify.  Does that affect

24   anything?  It sounds like that's the charges -- that's the

25   allegation in your case?

```
 1          PROSPECTIVE JUROR:  When you say "affect anything," you
 2     mean as far as like how I look at the case or just with me
 3     personally?
 4          MS. SLAIGHT:  Right.
 5          THE COURT:  How you would view the facts or the
 6     circumstances in this case.
 7          PROSPECTIVE JUROR:  Um, honestly, no.  I mean, I'm
 8     really -- it's uncomfortable to talk about, and that's my honest
 9     feeling.  It's an uncomfortable case.  It's an uncomfortable
10     situation.  The same as my external, it's an uncomfortable
11     situation, but if I'm asked to give my opinion based off the
12     facts, then I would have to give my opinion based off the facts.
13          MS. SLAIGHT:  And you would keep an open mind and listen
14     to all the witnesses and --
15          PROSPECTIVE JUROR:  Yes.
16          MS. SLAIGHT:  -- not predetermine that it was either a
17     child, the person is guilty, or if it was a trial, the person is
18     innocent?
19          PROSPECTIVE JUROR:  Right now I don't have -- I mean, my
20     feel is that if it's a bad situation, then I come up with -- do I
21     think like this moment what I think before I hear the facts to
22     find out if he's guilty or not?  No, I don't -- I can't make that
23     determination right now.  I mean, it's a bad situation.
24          THE COURT:  You can make that determination if you were on
25     this jury based only on the facts in the case?
```

1     PROSPECTIVE JUROR:  Based on the facts.  I mean, the

2  facts -- if the facts show that he did something wrong, if he did

3  what he's accused of, then he's guilty; or if not, then he's not

4  guilty based off the facts.

5     MS. SLAIGHT:  So you would maintain the presumption of

6  innocence for Mr. Hillie?

7     PROSPECTIVE JUROR:  Unfortunately, yes, I have to.

8     MS. SLAIGHT:  Unfortunately?

9     PROSPECTIVE JUROR:  Yes.  And the only reason I say that

10  is because my feelings is that it's a bad situation, but yes, if

11  I'm asked to sit on the jury, I have to go based off the facts.

12     THE COURT:  All right.  Anything else?

13     MS. SLAIGHT:  No.

14     MS. HERTZFELD:  Thank you.

15     PROSPECTIVE JUROR:  Thank you.

16     THE COURT:  Thank you.

17     (Prospective juror left the bench.)

18     MS. SLAIGHT:  I move to strike her.  She said

19  "unfortunately I can maintain the presumption of innocence and

20  it's a bad situation."

21     THE COURT:  I didn't read her response to be one that

22  negated her ability.  I think she was saying that she feels bad

23  personally, and that's the unfortunate situation, but she would

24  have to look at the facts impartially and fairly.  And I think we

25  asked her that several different ways, so I'm not going to strike

1   her for cause.

2       THE COURTROOM CLERK:  Excuse me, Judge.  Juror 0703, he

3   said he failed to also mention his work history and thought that

4   was something that he should bring up.  He was the attorney who

5   had a case that's been assigned to us.  0703.

6       THE COURT:  So let's have him come back.  He was the one

7   that left just right now?

8       THE COURTROOM CLERK:  Yes.

9       THE COURT:  Yeah.  All right.  We're going to go back one.

10  We're going to go back one.  Okay?

11      MS. SLAIGHT:  Um-hmm.

12      THE COURT:  Juror number 0703.

13      (Prospective juror approached the bench.)

14      PROSPECTIVE JUROR:  I'm sorry.

15      THE COURT:  That's all right.

16      PROSPECTIVE JUROR:  I forgot something on my résumé.  I

17  should have brought my résumé with me.  After the first year of

18  law school, during the summer I worked at DOJ in the tax

19  division, and I worked on civil and criminal cases.  That was

20  20-plus years ago, but I wanted to mention it because I forgot

21  about that.  I'm sorry.

22      THE COURT:  And that criminal work had nothing to do with

23  sex crimes, right?

24      PROSPECTIVE JUROR:  Nothing to do with sex crimes.  I've

25  had nothing to do with criminal law since that summer job at DOJ.

1        THE COURT:  All right.  Thank you.

2        MS. SLAIGHT:  Thank you.

3        (Prospective juror left the bench.)

4        THE COURT:  Juror number 356.  You can come right here.

5        (Prospective juror approached the bench.)

6        PROSPECTIVE JUROR:  Okay.

7        THE COURT:  How are you?

8        PROSPECTIVE JUROR:  Fine.  Thank you.

9        THE COURT:  So you say you might have some health problems

10   that would affect this?

11        PROSPECTIVE JUROR:  Well, I have -- I have a recent --

12   some recent health symptoms that make it difficult for me to sit

13   for a long period of time, and I wanted -- I was debating on

14   whether to put that down, but if I get a break every three hours

15   or so to use the restroom, I should be okay, but if it's longer

16   than that --

17        THE COURT:  I think that's what we typically do.  We start

18   at 9:30, and we break for lunch at 12:30, but we have a break in

19   the middle of that three-hour period as well.

20        PROSPECTIVE JUROR:  Okay.

21        THE COURT:  So then that's not going to be an issue?

22        PROSPECTIVE JUROR:  No.

23        THE COURT:  All right.  What about people studies or

24   your --

25        PROSPECTIVE JUROR:  I work at the Department of Justice in

1    the bankruptcy -- in the EOUST program, the trustee program.  I'm

2    not a lawyer, but I have investigated financial crimes and been a

3    witness for bankruptcy crimes.

4        THE COURT:  All right.  And whoever worked -- have you

5    done any sort of work that involved the kinds of crimes that were

6    involved in this case?

7        PROSPECTIVE JUROR:  No.

8        THE COURT:  And you say somebody you know has been

9    employed by federal law enforcement agency.  Is this at the DOJ?

10        PROSPECTIVE JUROR:  Well, yes.  Yes.

11        THE COURT:  And that you have served as a juror before?

12        PROSPECTIVE JUROR:  Yes.

13        THE COURT:  And where is that?

14        PROSPECTIVE JUROR:  Most recently I was on the grand jury

15    here in the District of Columbia.

16        THE COURT:  In this courthouse or the one across the

17    street?

18        PROSPECTIVE JUROR:  No, the one -- well, it wasn't here.

19    It was over in the FBI building.

20        THE COURT:  In the FBI building?

21        PROSPECTIVE JUROR:  Yes.

22        THE COURT:  Was it for federal cases or --

23        PROSPECTIVE JUROR:  Um-hmm.

24        THE COURT:  All right.

25        PROSPECTIVE JUROR:  No, it was for district cases.

1          THE COURT:  Yes.

2          PROSPECTIVE JUROR:  District crimes.

3          THE COURT:  Oh, I see.  At the U.S. Attorney's Office?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  So, and how long was that?

6          PROSPECTIVE JUROR:  Six weeks.

7          THE COURT:  And how long ago was that?

8          PROSPECTIVE JUROR:  It was about three or four years ago.

9          THE COURT:  And are any of the cases that you looked into

10    during that service, cases involving sex crimes?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Child pornography?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  And you say someone has been accused of or a

15    victim of a crime?

16          PROSPECTIVE JUROR:  That's just with my work.

17          THE COURT:  Oh, with the work.  Not any -- not

18    personally --

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  -- but in the context of your work?

21          PROSPECTIVE JUROR:  I think a witness was in there, too,

22    and I've been --

23          THE COURT:  Oh, you've been a witness?

24          PROSPECTIVE JUROR:  I've been a witness for my work.

25          THE COURT:  For the bankruptcy trustee work?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  All right.  Any other questions?

3          MS. SLAIGHT:  Is there anything that you heard in the

4     grand jury that would affect your ability to -- in terms of

5     believing one person, the complainant more than another person?

6          PROSPECTIVE JUROR:  No, I think I could be very fair.

7          MS. SLAIGHT:  Thank you.

8          THE COURT:  Thank you.

9          (Prospective juror left the bench.)

10          THE COURT:  Juror Number 82.

11          (Prospective juror approached the bench.)

12          THE COURT:  Good afternoon.  There is our microphone.

13          PROSPECTIVE JUROR:  Okay.

14          THE COURT:  You say that you recognize someone on the jury

15     panel?

16          PROSPECTIVE JUROR:  Yes, two people.

17          THE COURT:  All right.

18          MS. SLAIGHT:  I'm sorry?

19          THE COURT:  She recognizes two people in the jury panel.

20     Do you know who they are?

21          PROSPECTIVE JUROR:  Yes.  The first person -- do you want

22     his name?

23          THE COURT:  Yes, if you know it.

24          PROSPECTIVE JUROR:  His name is Mark McKinnon.  The second

25     person his Jimmy.  I can't recall his last name, but he's sitting

1    on your left side, second to last row, closest to the wall.

2          THE COURT:  And how do you know these people?

3          PROSPECTIVE JUROR:  Mark I know from the home town.  We

4    went to the same home town.  And Jimmy, just through my home

5    state events.

6          THE COURT:  Tell me where that is.

7          PROSPECTIVE JUROR:  Mississippi.

8          THE COURT:  And, obviously, you live in the District now?

9          PROSPECTIVE JUROR:  I do, yes.

10         THE COURT:  What do you do?

11         PROSPECTIVE JUROR:  I am a lawyer.

12         THE COURT:  You're -- that's the next question.  What sort

13   of law do you practice?

14         PROSPECTIVE JUROR:  Criminal law.

15         THE COURT:  Where are you, in a firm?

16         PROSPECTIVE JUROR:  Yes, Hunton & Williams.

17         THE COURT:  Okay.  Have you ever done any criminal law

18   work?

19         PROSPECTIVE JUROR:  I have not, just capital markets,

20   general corporate work.

21         THE COURT:  What was the second thing?  You said capital

22   markets.

23         PROSPECTIVE JUROR:  Capital markets in a general corporate

24   work.  And then I do some pro bono work but not criminal.

25         THE COURT:  Nothing criminal in the pro bono context?

1          PROSPECTIVE JUROR:  No, no.

2          THE COURT:  And is there anything about your work as a

3    lawyer or your knowledge of legal cases maybe in the context of

4    the firm or otherwise that would make it difficult for you to sit

5    as a juror in this case?

6          PROSPECTIVE JUROR:  Nothing I can think of, no.

7          THE COURT:  And have you ever served as a juror?

8          PROSPECTIVE JUROR:  I have not.

9          THE COURT:  But you do say that someone has been accused,

10   charged, convicted of a crime or witness to a crime or --

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Who is that?

13         PROSPECTIVE JUROR:  It was my paternal grandfather.  He

14   had a store, and he was robbed and he was shot.

15         THE COURT:  Did he survive?

16         PROSPECTIVE JUROR:  He did not.

17         THE COURT:  Oh, I'm sorry to hear that.  And do you think

18   that your experience with having that very difficult circumstance

19   would make it hard for you to sit in judgment of someone who's

20   accused of --

21         PROSPECTIVE JUROR:  I personally do not, because I was

22   very young when it happened, so I was -- I was very young.

23         THE COURT:  So there's nothing about that, that you think

24   would make it hard for you to be a juror?

25         PROSPECTIVE JUROR:  No.

```
1        THE COURT:  Anything other questions?

2        MS. SLAIGHT:  Did you hear any details about that case?

3        PROSPECTIVE JUROR:  My grandfather's?

4        MS. SLAIGHT:  Yes.

5        PROSPECTIVE JUROR:  No, I didn't.  I was a young child.

6        MS. SLAIGHT:  Okay.

7        THE COURT:  Okay.  Thank you.

8        PROSPECTIVE JUROR:  Thank you.

9        (Prospective juror left the bench.)

10        THE COURT:  Juror number 958.

11        (Prospective juror approached the bench.)

12        THE COURT:  This is a microphone, so you can use that.  So

13  you have legal training or someone you know?

14        PROSPECTIVE JUROR:  Yeah.  I used to work for a defense

15  attorney, and then I also -- my minor in college -- actually, my

16  major for a while was criminal justice, and I almost finished

17  that.

18        THE COURT:  You have to speak so that other people are

19  listening.

20        PROSPECTIVE JUROR:  Oh, okay.  My minor in college was

21  criminal justice.  I was like six hours short of that being my

22  second major.  I used to work for a defense attorney.

23        THE COURT:  Criminal defense?

24        PROSPECTIVE JUROR:  Yes.

25        THE COURT:  And what kind of cases did he handle or she
```

1     handle?

2             PROSPECTIVE JUROR:  It was usually financial, but -- I

3     mean, I don't know.  He used to be George W. Bush's lawyer for a

4     while, so kind of that sort of thing.

5             THE COURT:  In the context of your work for this criminal

6     lawyer, did you ever come across any cases of a nature like the

7     one I described --

8             PROSPECTIVE JUROR:  No.

9             THE COURT:  -- sex abuse, child pornography or anything

10    like that?

11            PROSPECTIVE JUROR:  No.

12            THE COURT:  All right.  And you say that you have some

13    connection to law enforcement or someone you know?

14            PROSPECTIVE JUROR:  To law enforcement?

15            THE COURT:  Yes.  Friends, relatives, employed or applied

16    to a law enforcement agency, police department, FBI.

17            PROSPECTIVE JUROR:  God, I'm trying to remember.

18            THE COURT:  Maybe not someone close to you then, huh?

19            PROSPECTIVE JUROR:  Well, I mean, I was close like with

20    the lawyer, but maybe I got confused on that one.  There are

21    some -- like, a couple of different things.

22            THE COURT:  What do you do now?

23            PROSPECTIVE JUROR:  I work on the Hill.  I'm a scheduler

24    for a congressman.

25            THE COURT:  And you say that you have been employed by --

1   oh, that's you, employed by defense attorney, defendant

2   organization.

3        What about a citizen watch group, victim prevention group,

4   Crime Stoppers?

5        PROSPECTIVE JUROR:  I am a former rape crisis counselor.

6        THE COURT:  Rape crisis counselor.  How did you get into

7   that kind of work?

8        PROSPECTIVE JUROR:  That was -- it was an internship that

9   I did in college, and then after -- I mean, they're always like

10  strapped for people.  So after my internship was up, I continued

11  to do it for about another year because they needed help with it.

12  So, yeah, I was the person that the police would call that was

13  there whenever they had the rape kits done, stuff like that.

14       THE COURT:  So given your experience with this difficult

15  subject, do you think that you would find it difficult to -- or

16  that you'd be more likely to credit the word of an alleged victim

17  of sexual abuse than you would --

18       PROSPECTIVE JUROR:  Yeah.  I mean, that's what I've been

19  trained to do, so --

20       THE COURT:  So you would find it hard to hear the evidence

21  in a case involving sexual assault?

22       PROSPECTIVE JUROR:  Yeah.

23       THE COURT:  And automatically credit one side or the

24  other?

25       PROSPECTIVE JUROR:  I mean, not always, but it's -- that's

1    generally my first go-to.

2         THE COURT:  And do you think you could set that aside in a

3    case like this?

4         PROSPECTIVE JUROR:  It'd have to be some pretty compelling

5    evidence for me to set it aside.

6         THE COURT:  Even if it's the government's burden and

7    there's a presumption of innocence --

8         PROSPECTIVE JUROR:  Yeah.  I mean, if I felt like it was

9    like, oh, he was just this guy that was like walking on the

10   street and they picked him up and we don't really know, then

11   yeah, sure, I wouldn't be like, okay, he's guilty.  But if it's

12   like some of the stuff I've seen, I'm probably more likely to

13   believe the victim.

14        THE COURT:  All right.  Any follow-ups?

15        MS. HERTZFELD:  No, thank you.

16        MS. SLAIGHT:  No.

17        THE COURT:  All right.  Thank you.

18        (Prospective juror left the bench.)

19        MS. SLAIGHT:  Move to strike.

20        THE COURT:  I'll strike her.

21        (Prospective juror approached the bench.)

22        THE COURT:  Number 604.

23        PROSPECTIVE JUROR:  Hello.

24        THE COURT:  Hello.  So you've had legal training or

25   someone you know?  This is our microphone.

1        PROSPECTIVE JUROR:  I'm sorry.  Yes, ma'am.  I do.

2        THE COURT:  All right.  So you practice law?

3        PROSPECTIVE JUROR:  Yes, ma'am.

4        THE COURT:  What do you do?

5        PROSPECTIVE JUROR:  I'm currently a contractor for the

6   Department of Justice.  I do litigation support for D.C. Office

7   of Attorney General.

8        THE COURT:  And what kinds of cases do you work on,

9   criminal, civil?

10        PROSPECTIVE JUROR:  We do civil through the office of

11   Attorney General.  I just started the job in January, so --

12        THE COURT:  What were you doing before?

13        PROSPECTIVE JUROR:  I was doing private law.  I worked at

14   a firm in Baltimore.  We were a criminal defense firm, but I did

15   more like civil issues for clients there.

16        THE COURT:  And did you ever have a case in which you

17   represented a criminal defendant in the criminal context?

18        PROSPECTIVE JUROR:  No, ma'am.

19        THE COURT:  So you were working for criminal defendants

20   but on their civil cases?

21        PROSPECTIVE JUROR:  Yes, ma'am.

22        THE COURT:  And did the firm that you work for, did you

23   handle criminal cases involving sex abuse, child pornography or

24   anything like that?

25        PROSPECTIVE JUROR:  Not while I was there, no, ma'am.

1          THE COURT:  Are you familiar at all with these kinds of

2     cases or the issues that arise in this context?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  How so?

5          PROSPECTIVE JUROR:  I clerked for a staff attorney for a

6     trial judge in Ohio for two years, and we handled criminal cases,

7     and a few of them were cases like this.

8          THE COURT:  Was there anything about your experience as a

9     clerk for a judge who handles similar cases that would make it

10    difficult for you to be fair and impartial when you consider the

11    facts of this case?

12         PROSPECTIVE JUROR:  No, ma'am.

13         THE COURT:  You also say someone has been employed by a

14    court probation office.  Is that you in the context of the

15    clerks?

16         PROSPECTIVE JUROR:  Yes, ma'am.

17         THE COURT:  And then a defender organization, that's you

18    in terms of the firm that you were at?

19         PROSPECTIVE JUROR:  The firm, and I interned at the Public

20    Defender Service.

21         THE COURT:  Where?

22         PROSPECTIVE JUROR:  Here in D.C. during law school.

23         THE COURT:  And did the Public Defender Service handle

24    similar cases while you were there, and did you work on any cases

25    like this?

1      PROSPECTIVE JUROR:  Nothing similar to this.  It was

2  criminal, but it was in the Community Defender Division, and we

3  just did representations for inmates in their -- when they were

4  incarcerated, and their hearings for behavioral issues.

5      THE COURT:  So not --

6      PROSPECTIVE JUROR:  Not similar to this.

7      THE COURT:  -- like this?  Okay.

8      Ms. Hertzfeld?

9      MS. HERTZFELD:  No questions.  Thank you.

10      MS. SLAIGHT:  No questions.

11      THE COURT:  All right.  Thank you.

12      PROSPECTIVE JUROR:  Thank you.

13      (Prospective juror left the bench.)

14      THE COURT:  Ms. Hertzfeld, it says that juror number

15  712 -- I don't know who that is -- oh, 95, says she's traveling

16  next Friday, so she didn't tell us that.

17      MS. SLAIGHT:  Which one is that?

18      THE COURT:  Number 5, fifth down.  All right.

19      Number 1212.

20      (Prospective juror approached the bench.)

21      THE COURT:  You can come right here to our microphone.  So

22  you have written nothing on your card.  Tell me about your work.

23  Are you working now, and if so what do you do?

24      PROSPECTIVE JUROR:  Yes.  I'm a teacher, and I teach on

25  the university level.

1       THE COURT:  On the university level, not child level?

2       PROSPECTIVE JUROR:  Yes.

3       THE COURT:  All right.  And how long have you been doing

4  that work?

5       PROSPECTIVE JUROR:  17 years.

6       THE COURT:  And you had no experience with the criminal

7  justice system, either yourself or a family member as a witness,

8  as a victim?

9       PROSPECTIVE JUROR:  None.

10       THE COURT:  Do you have any experiences that you think

11  would make it difficult for you to consider the kinds of evidence

12  in a case such as this one which involved accusations of sex

13  abuse and child pornography?

14       PROSPECTIVE JUROR:  Nothing that would make it difficult

15  for me.

16       THE COURT:  And you have no health problems or anything

17  that would prevent you from sitting?

18       PROSPECTIVE JUROR:  No.

19       THE COURT:  Or scheduling issues?

20       PROSPECTIVE JUROR:  No.

21       MS. HERTZFELD:  No questions.  Thank you.

22       MS. SLAIGHT:  I just have one question.

23       THE COURT:  Yes.

24       MS. SLAIGHT:  What do you teach?

25       PROSPECTIVE JUROR:  History.

```
 1              THE COURT:  All right.  Thank you.

 2              PROSPECTIVE JUROR:  Thank you.

 3              (Prospective juror left the bench.)

 4              THE COURT:  Juror number 1442.

 5              (Prospective juror approached the bench.)

 6              THE COURT:  Hello.

 7              PROSPECTIVE JUROR:  Hi.

 8              THE COURT:  This is our microphone.  So you have legal

 9       training or one someone you know?

10              PROSPECTIVE JUROR:  Well, I wanted to reply that I work

11       for a public relations company that's currently advising the

12       legal time that's representing AT&T in the case next door, so I

13       personally do have legal training, but I am interacting with

14       lawyers on a daily basis and on-site with them and I've also been

15       in court for the case for a couple of days.

16              THE COURT:  All right.

17              PROSPECTIVE JUROR:  So it's not like this, but I just

18       wanted to flag that.

19              THE COURT:  Well, thank you.  How long have you been doing

20       this kind of work working with lawyers and that type of thing?

21              PROSPECTIVE JUROR:  I started working on like litigation

22       related, advising, probably -- probably been a year and a half,

23       on and off, as opposed to a different company where we work on a

24       whole bunch of different industries, so litigation is just one of

25       the various practices that we have.
```

1      THE COURT:  And have you ever worked with any criminal

2 lawyers, criminal defense counsel that you can recall?

3      PROSPECTIVE JUROR:  No.

4      THE COURT:  All right.  You also say that you've been a

5 juror in a similar criminal case?

6      PROSPECTIVE JUROR:  Yes.  I believe it was a -- I believe

7 it had to do with a hit-and-run case, so I'm not quite sure which

8 one that would be, but I was an alternate so I was let go right

9 before they went to make the final deliberations.  I was in court

10 for the case, but I didn't actually -- I wasn't involved in

11 making the --

12      THE COURT:  And was this in Superior Court across the

13 street?

14      PROSPECTIVE JUROR:  No.  It was actually in Baltimore, so

15 that was in my old residence.

16      THE COURT:  And how long ago was that?

17      PROSPECTIVE JUROR:  That was probably two -- somewhere

18 between three and four years ago.

19      THE COURT:  But you didn't deliberate?

20      PROSPECTIVE JUROR:  No.

21      THE COURT:  And is there anything about that service in

22 general that would make it difficult for you to be impartial and

23 fair in this case?

24      PROSPECTIVE JUROR:  I don't think so, no.

25      THE COURT:  All right.  That's all you wrote.

1         Any questions?

2         MS. HERTZFELD:  No.

3         MS. SLAIGHT:  No.

4         THE COURT:  All right.  Thank you.

5         PROSPECTIVE JUROR:  Thank you.

6         (Prospective juror left the bench.)

7         THE COURT:  Number 388.

8         (Prospective juror approached the bench.)

9         THE COURT:  Hello.  Speak right into this microphone.  You

10   say that you might have a scheduling issue that would make it

11   difficult for you to serve?

12        PROSPECTIVE JUROR:  Yes.  April 14th I have a flight.

13   I've been saving up for a trip to Costa Rica where my father

14   lives for a couple of years now, and this was the only date that

15   worked with an affordable flight.

16        THE COURT:  And that's two weeks from now, I think, right?

17        PROSPECTIVE JUROR:  Yeah.

18        THE COURT:  All right.

19        PROSPECTIVE JUROR:  And if I missed that, that would be

20   huge, huge financial blow, so --

21        THE COURT:  Yes.

22        PROSPECTIVE JUROR:  So, yeah, that's the --

23        THE COURT:  That's the one thing.  If I said to you that

24   this case was likely to be over middle of next week, would that

25   be a problem?

```
 1        PROSPECTIVE JUROR:  Um, I'd just be nervous.  I'm a very
 2   anxious person.  I am on anxiety medication, and --
 3        THE COURT:  Do you think that either your nerves about the
 4   schedule would make it hard for you to pay attention and be a
 5   good juror and deliberate fairly?
 6        PROSPECTIVE JUROR:  I think that it could, yeah.  When I
 7   get nervous, it's hard for me to talk and hard for me to think
 8   straight sometimes, so I do worry that it might make me too
 9   nervous, so --
10        THE COURT:  Let me ask you about other things that you
11   have here.  You say someone is employed by law enforcement?
12        PROSPECTIVE JUROR:  Yes.  My father was a police officer
13   for 30 years in New Jersey where I grew up.  And I also have a
14   neighbor who is a volunteer -- he's a friend now, but he's a
15   volunteer D.C. police officer.
16        THE COURT:  Would those experiences with your father and
17   with your neighbor make you more likely to credit the testimony
18   of law enforcement, to believe that they're telling the truth
19   just because they're law enforcement officers?
20        PROSPECTIVE JUROR:  Um, I think more than the average
21   person.  I feel like the news -- a lot of people are questioning
22   police officers, but I always try to see it from their view.  So
23   I think more than the average person, I like see it from the
24   police officer's perspective more often than not.
25        THE COURT:  And if the Court told you that you had to see
```

1    everybody's perspective equally, would you be able to do that?

2         PROSPECTIVE JUROR:  Um, in theory, but I know I have,

3    like, unconscious biases.  I know I could even tell myself that

4    I'm think- -- I'm being fair in my thinking, but I could still,

5    like, have some reserve -- like, unknown biases towards the

6    police officers.

7         THE COURT:  Is that what you were referencing when you

8    answered 23, that you might favor or disfavor law enforcement?

9         PROSPECTIVE JUROR:  Yeah.

10        THE COURT:  It would be favor?

11        PROSPECTIVE JUROR:  Yeah.

12        THE COURT:  And you also said that you believe that

13   someone who'd be interested in child pornography is more likely

14   to abuse a minor.  What's the basis for that belief?

15        PROSPECTIVE JUROR:  To me, it's just common sense that --

16   I think, like if you took a pool of people convicted of sexual

17   assault, took a pool of people not convicted, the pool with the

18   people convicted might have more people interested in child

19   pornography.

20        THE COURT:  But that's just your gut reaction and it's

21   not --

22        PROSPECTIVE JUROR:  That's just me.

23        THE COURT:  -- based on anything you read or --

24        PROSPECTIVE JUROR:  It's not based on fact.

25        THE COURT:  All right.  Ms. Hertzfeld?

```
1              MS. HERTZFELD:  No, Your Honor.

2              MS. SLAIGHT:  No, Your Honor.

3              THE COURT:  Thank you.

4              (Prospective juror left the bench.)

5              MS. SLAIGHT:  I move to strike her.

6              THE COURT:  Ms. Hertzfeld?

7              MS. HERTZFELD:  Agreed.

8              THE COURT:  All right.  So we will strike her.

9              Juror Number 416.

10             (Prospective juror approached the bench.)

11             THE COURT:  Hello.  So you wrote on your card that someone

12    has legal training.  Is that you?

13             PROSPECTIVE JUROR:  Yes, it's me.

14             THE COURT:  And what do you practice, what kind of law?

15             PROSPECTIVE JUROR:  Government contracts.

16             THE COURT:  Is it all corporate-related civil work?

17             PROSPECTIVE JUROR:  Yes.  I'm in-house counselor.

18             THE COURT:  At a government contracting firm?

19             PROSPECTIVE JUROR:  Um-hmm.

20             THE COURT:  Have you ever done any criminal work?

21             PROSPECTIVE JUROR:  No.  I put that -- like, have I worked

22    in a court?  I interned at D.C. Superior, so in that --

23             THE COURT:  You interned?

24             PROSPECTIVE JUROR:  Um-hmm.  So in that aspect, I was

25    doing criminal law work there, but --
```

1       THE COURT:  Did you see any cases when you were at

2  Superior Court that are similar to this one in terms of what you

3  heard?

4       PROSPECTIVE JUROR:  I sat on a rape case.

5       THE COURT:  As a juror?

6       PROSPECTIVE JUROR:  Yes -- no, no, no, as --

7       THE COURT:  Oh, sorry.  As an intern?

8       PROSPECTIVE JUROR:  As an intern.  So, I mean, it's

9  somewhat familiar because it was a younger female college

10  student, but not exactly these facts.

11      THE COURT:  So it wasn't children in that case?

12      PROSPECTIVE JUROR:  No.

13      THE COURT:  And was there anything about your experience

14  as an intern in this way that would make it difficult for you to

15  be fair and impartial and listen to the facts and -- in regard to

16  the facts in this case?

17      PROSPECTIVE JUROR:  No.

18      THE COURT:  You also wrote that you -- so it's you who's

19  been employed by a court --

20      PROSPECTIVE JUROR:  Um-hmm.

21      THE COURT:  -- and an intern, and that someone who's been

22  accused, arrested, been a victim of a crime, or witness to a

23  crime.

24      PROSPECTIVE JUROR:  Okay.  That was me in that regard.

25      THE COURT:  What happened?

1      PROSPECTIVE JUROR:  So that was possession of

2 paraphernalia, and I got in trouble with the University of

3 Maryland in P.G. County, and then I did community service as

4 well.

5      THE COURT:  Were you arrested?

6      PROSPECTIVE JUROR:  No, but I was -- an officer was

7 present.  I did go to court.

8      THE COURT:  And that experience, would it make you take it

9 out on law enforcement in this context?  Would you be less

10 inclined to believe a law enforcement officer?

11     PROSPECTIVE JUROR:  No.

12     THE COURT:  You also say that you believe that someone who

13 is interested in child pornography is more likely to sexually

14 abuse a minor.  What's the basis for your belief?

15     PROSPECTIVE JUROR:  I mean, if you are -- if you are

16 watching it and something about that does something for you, you

17 may want to act on that with a child.  And I think people that

18 are older that watch porn also have sex with people that are

19 older or similar to the age.  I feel like, I don't know, I just

20 think, if you watch something like that, you probably want to do

21 it as well.

22     THE COURT:  Well, if the Court were to tell you that those

23 charges are different, somebody sexually abusing and somebody

24 having child pornography, would you be able to set aside any

25 beliefs that you had about that?

```
 1        PROSPECTIVE JUROR:  I think so.

 2        THE COURT:  All right.

 3        PROSPECTIVE JUROR:  I could -- I believe I can be

 4  impartial, but I can't say that I wouldn't think that -- I mean,

 5  naturally I would look at, okay, this person who watches child

 6  pornography has an interest in it, then I can imagine him wanting

 7  to do -- like imagine them doing something with a child.

 8        THE COURT:  Would you be able to look at the facts and the

 9  law, as the Court directs you, about what is necessary --

10        PROSPECTIVE JUROR:  Yes.

11        THE COURT:  -- to prove that someone was guilty of one

12  crime or the other?

13        PROSPECTIVE JUROR:  Yes.

14        THE COURT:  And not just assume that he's guilty of one --

15        PROSPECTIVE JUROR:  Yes.

16        THE COURT:  -- if you think he's guilty of another?

17        PROSPECTIVE JUROR:  I can look at the elements only, but

18  naturally it would be in my head, but I can separate that out.

19        THE COURT:  Ms. Hertzfeld?

20        MS. HERTZFELD:  No questions.  Thank you.

21        MS. SLAIGHT:  If one of the elements is intent, would you

22  be more likely then to find intent, for either the sex abuse or

23  the pornography, because they're charged -- differently charged?

24        PROSPECTIVE JUROR:  Not based just off of my belief on

25  that card.  I would have to have other facts to have that, so I
```

1    guess not.

2            MS. SLAIGHT:  You could separate your --

3            PROSPECTIVE JUROR:  I think so.  I think so.  But I can't

4    say 100 percent, but I believe I can.  I believe I can be

5    impartial.

6            THE COURT:  All right.  Thank you.

7            PROSPECTIVE JUROR:  Thank you.

8            (Prospective juror left the bench.)

9            MS. SLAIGHT:  I move to strike her.

10           THE COURT:  Grounds?

11           MS. SLAIGHT:  Pardon?

12           THE COURT:  On the grounds?

13           MS. SLAIGHT:  On the grounds that she said that she's more

14   likely to have a belief that someone who did either the

15   pornography would commit the sex acts or vice versa.

16           MS. HERTZFELD:  I actually disagree with this one.  I

17   think she said she could be fair and impartial.  I think it's --

18   she actually allowed -- on the intent questions, she's allowed to

19   consider intent, and that she'll be instructed that she can

20   consider that.  And I think she was -- it sounded to me like she

21   was talking about just someone who -- kind of like viewing the

22   pornography is not really an issue in this case, in the first

23   place, so I'm not sure.  We did ourselves a great service on that

24   question, but --

25           THE COURT:  I agree.  I didn't see anything in her answers

1    that troubled me and made it a strike for cause.  I think she

2    said that when questioned about her ability to set aside any

3    views that she has in this way, I thought she said she could be

4    fair and impartial, so I'm going to leave her.

5         Juror number 1114.

6         (Prospective juror approached the bench.)

7         THE COURT:  Hello.  Come right in the middle, and that's

8    your microphone.  You say that you have a scheduling issue?

9         PROSPECTIVE JUROR:  Tomorrow is Passover, and my mother's

10   hosting a Seder in the New York suburbs, so it'd be great if I

11   could get there.

12        THE COURT:  What time do you have to leave for that?

13        PROSPECTIVE JUROR:  It's like 5:00 in New York, so I'd

14   probably have to be out tomorrow.

15        THE COURT:  In the afternoon, or have to be gone tomorrow?

16   You said you'd be here.

17        PROSPECTIVE JUROR:  I'd probably have to jump on Amtrak

18   beforehand.  I'm here all next week.  Just tomorrow I'd have to

19   be on Amtrak by noon.

20        THE COURT:  Yeah, yeah.  All right.  Well, Counsel.  We're

21   going to sit tomorrow, unfortunately because of our schedule, so

22   I think we'll have to excuse you because you won't be available.

23        MS. SLAIGHT:  My mother would be very upset.

24        THE COURT:  Give her our best.

25        PROSPECTIVE JUROR:  Thank you.

```
1          THE COURT:  Thank you.

2          (Prospective juror left the bench.)

3          THE COURT:  Juror number 149.

4          (Prospective juror approached the bench.)

5          PROSPECTIVE JUROR:  Hi.  How are you?

6          THE COURT:  How are you?  You're going to talk right into

7     the microphone here.

8          PROSPECTIVE JUROR:  Sure.

9          THE COURT:  You say that you are a lawyer or someone you

10    know?

11         PROSPECTIVE JUROR:  I am.  I am a lawyer, and I know

12    dozens, tens, hundreds.

13         THE COURT:  Do you practice criminal law or any --

14         PROSPECTIVE JUROR:  Not criminal -- oh, some of them, yes,

15    some of my friends do, but I don't.

16         THE COURT:  What is your practice?

17         PROSPECTIVE JUROR:  I practice mostly corporate M&A and

18    national security.

19         THE COURT:  And the friends who work in the criminal

20    realm, is there anything about their work as a criminal lawyer

21    that you would think in any way would have an impact on --

22         PROSPECTIVE JUROR:  Oh, no.

23         THE COURT:  -- your view on this case?

24         PROSPECTIVE JUROR:  An impact?  No.  I think -- nothing --

25         THE COURT:  Do any of them do the kinds of work that --
```

1    PROSPECTIVE JUROR:  Some of them are prosecutors and some

2    of them are defense lawyers, so they would come across these

3    kinds of cases, but there's nothing about my relationship with

4    any of them or even accumulatively with them that would suggest

5    that I couldn't be impartial.

6    THE COURT:  Have you ever talked with them about cases

7    that have similar facts to what we're thinking about here?

8    PROSPECTIVE JUROR:  Not to my recollection.  If so, many

9    years ago.

10   THE COURT:  You also say somebody has a connection with

11   law enforcement, maybe?  There's a question mark next to it.

12   PROSPECTIVE JUROR:  I want to make sure.  I was at the

13   State Department for a long time, and I don't really think of

14   that as a classic law enforcement agency, but I was engaged in

15   some prosecutions in spy cases in those days.  Again, that's long

16   ago, and we are not classically a prosecutorial organization,

17   hence the question mark.

18   THE COURT:  All right.  I think that covers my questions

19   about that.  You say that someone who's been employed by the

20   court, probation office, corrections.

21   PROSPECTIVE JUROR:  Yes.

22   THE COURT:  And who was that?

23   PROSPECTIVE JUROR:  Well, I have a relative who works as

24   a -- he was the guardian for the state, so he was being charged

25   with the protection of minors or even adults who needed

 1   protection, and he was sort of -- he was not a lawyer, but he was

 2   appointed by the Court to take care of people and make sure they

 3   had representations so on and so forth, but that's back in our

 4   home state.

 5          THE COURT:  And where's that?

 6          PROSPECTIVE JUROR:  Delaware.

 7          THE COURT:  And how close are you with this relative?

 8          PROSPECTIVE JUROR:  Brother.

 9          THE COURT:  Brother.  And did you ever talk to him about

10   these cases?

11          PROSPECTIVE JUROR:  Oh, of course.  Oh, yeah.

12          THE COURT:  Did he have any guardians who had sex abuse --

13          PROSPECTIVE JUROR:  I don't recall.  He may have had, but

14   I've never discussed one that I recall.  We discussed mostly --

15   most of his cases were elder cases, rather than children.

16          THE COURT:  You also say that someone has been employed by

17   a defense attorney or defender organization.  Are these the

18   friends that --

19          PROSPECTIVE JUROR:  Yeah, a lot of friends and my -- not

20   really a defender organization.  My son is currently working for

21   an immigration law firm in Texas, doing work for -- that's funded

22   by the Justice Department to help underage illegals in south

23   Texas.

24          THE COURT:  But, again, no issues --

25          PROSPECTIVE JUROR:  No.

1          THE COURT:  -- with that, that you think would implicate

2     what we're talking about here?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Based on your son's work, would you be more

5     inclined or less inclined to believe the testimony of a juvenile

6     or a minor or anything like that?

7          PROSPECTIVE JUROR:  Oh, I think not one way or the other.

8     I didn't answer that question, I don't think, did I?

9          THE COURT:  No, no.  I'm just following up.  Have you

10    served as a juror?

11         PROSPECTIVE JUROR:  I have.

12         THE COURT:  Where?

13         PROSPECTIVE JUROR:  I was here in the District in the D.C.

14    court many years ago for a petty jury, and I've been a witness at

15    a grand jury.

16         THE COURT:  In this courthouse or the one across the

17    street?

18         PROSPECTIVE JUROR:  In this courthouse for the grand jury

19    witness.

20         THE COURT:  And was it a criminal case that involved

21    crimes of a sexual nature?

22         PROSPECTIVE JUROR:  No, no.  It was a criminal case, but

23    it was white collar.

24         THE COURT:  And you say that you've been -- you've

25    testified as a witness, an expert in a case?

```
 1          PROSPECTIVE JUROR:  I was an expert witness in a trial in
 2     the northern district a few years -- many years ago.  And we
 3     never went to trial.  It settled on the day of trial, so I was
 4     deposed as an expert witness in diplomatic relations and
 5     diplomatic immunity.
 6          THE COURT:  Is there anything about your deposition in
 7     that matter that would make you credit the expert testimony if
 8     you saw it in a case like this?
 9          PROSPECTIVE JUROR:  No.
10          THE COURT:  And, finally, you say that you believe that
11     someone who'd be interested in child pornography is more likely
12     to sexually abuse a minor.
13          PROSPECTIVE JUROR:  Right.
14          THE COURT:  Tell me what the basis for that is.
15          PROSPECTIVE JUROR:  In just the sense that if you're
16     interested in that, and given that sex minors is prohibited,
17     child pornography's prohibited, because it just seems there's a
18     higher statistical probability.  I'm quite willing to be
19     persuaded otherwise if that were the case, but that's my
20     inclination.
21          THE COURT:  The general impression that --
22          PROSPECTIVE JUROR:  It's my general impression.
23          THE COURT:  And would you be able to follow the Court's
24     instructions if the Court told you --
25          PROSPECTIVE JUROR:  Oh, sure.
```

1          THE COURT:  -- that the law was otherwise?

2          PROSPECTIVE JUROR:  Yes.  I didn't mean to interrupt.

3          THE COURT:  No, no.  That's quite all right.

4          Ms. Hertzfeld?

5          MS. HERTZFELD:  No questions.  Thank you.

6          MS. SLAIGHT:  So you could set those general impressions

7  aside?

8          PROSPECTIVE JUROR:  Yes, I believe so.

9          MS. SLAIGHT:  And judge the case based on fact?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  All right.  Thank you.

12          PROSPECTIVE JUROR:  Darn, I don't think I was

13  disqualified.

14          MS. SLAIGHT:  What did he say?

15          THE COURT:  He said, "Darn, I don't think I was

16  disqualified."

17          (Prospective juror left the bench.)

18          THE COURT:  Number 858.

19          (Prospective juror approached the bench.)

20          PROSPECTIVE JUROR:  I just got something in my eye, so if

21  I act a little weird that's why.

22          THE COURT:  That's all right.

23          PROSPECTIVE JUROR:  Sorry.

24          THE COURT:  Are you a lawyer or someone you know?

25          PROSPECTIVE JUROR:  Someone I know.  I have a lot of

1    friends who are lawyers.

2         THE COURT:  And do any of them do criminal work?

3         PROSPECTIVE JUROR:  No.  But I forgot to tell the Court --

4    I think it was question 5 about defense attorneys.  I'm not -- I

5    thought about it more.  I'm not good friends with any, but I know

6    a lot in my work and just through friends.

7         THE COURT:  Criminal defense attorneys?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  And do you know whether their work involves

10   the kinds of cases that we're talking about here, sex abuse,

11   child pornography?

12        PROSPECTIVE JUROR:  No.  I think it's more like theft and

13   robbery cases.

14        THE COURT:  And where do they work, do you know?

15        PROSPECTIVE JUROR:  So a couple work in the Maryland PD's

16   office, and a couple work in private practice.

17        THE COURT:  And what kind of work do you do?

18        PROSPECTIVE JUROR:  I'm a reporter at the *Washington Post*.

19        THE COURT:  A reporter?

20        PROSPECTIVE JUROR:  Yeah, but I don't cover any law

21   enforcement or anything.

22        THE COURT:  And somebody has been employed by a law

23   enforcement agency?

24        PROSPECTIVE JUROR:  Yeah.  My father was a police officer,

25   but he's -- but he passed away like in '94, and from that, he --

```
1   but he retired so, when and I ten, and my mom was a 9-1-1

2   operator, so --

3           THE COURT:  Is there anything about your relationship with

4   your father or the fact that he was a police officer that would

5   make you believe a police officer's testimony just because he's a

6   police officer?

7           PROSPECTIVE JUROR:  No.  I think it's actually important

8   to look critically at police officers, so I mean --

9           THE COURT:  And why do you say that?

10          PROSPECTIVE JUROR:  Because they have the power to arrest

11  people, and I think it's important to look at what the government

12  says and what defense attorneys say to have a fair trial.

13          THE COURT:  Do you think that you would be able to weigh

14  both sides evenly and not give anybody more weight or less weight

15  just because they are a police officer or not?

16          PROSPECTIVE JUROR:  Yes, ma'am.

17          THE COURT:  And somebody belongs to a crime victim's

18  organization, Crime Stoppers?

19          PROSPECTIVE JUROR:  Yeah.  I was wasn't sure how to answer

20  that.  So a friend of mine used to work for this organization,

21  RAINN.  I don't know what the acronym stands for, but I went to a

22  5K run that it sponsored, so I don't know if that counts, but

23  I --

24          THE COURT:  But you weren't really involved?

25          PROSPECTIVE JUROR:  No.  I just wasn't -- I just put it
```

1    down because I wasn't sure.

2         THE COURT:  So if someone's been accused of a crime, a

3    victim of a crime or a witness to a case that you're aware of?

4         PROSPECTIVE JUROR:  So I was thinking more recently would

5    be like, I had a box of toilet paper stolen off my front porch,

6    so like --

7         THE COURT:  Like an Amazon theft?

8         PROSPECTIVE JUROR:  Yeah, like an Amazon theft type of

9    thing, and that just happened so that's why I was thinking of it.

10   But I've never -- I've never testified in court.

11        THE COURT:  And you've never been a juror?

12        PROSPECTIVE JUROR:  No.  I've been through voir dire,

13   like, a million times, but in Superior Court, no.

14        THE COURT:  Not here?

15        PROSPECTIVE JUROR:  No.

16        THE COURT:  And you say you filed a complaint against a

17   police officer or someone in law enforcement?

18        PROSPECTIVE JUROR:  Yeah.  It was really not -- I

19   shouldn't have.  It was -- my dog got bit by someone else, and I

20   was upset, and I called the local police precinct and the police

21   officer was, I thought, very rude and nasty, so I brought him out

22   to his superior.

23        THE COURT:  Anything about that circumstance that would

24   make it difficult for you to listen and be impartial about an

25   officer's testimony in this case?

1          PROSPECTIVE JUROR:  No.  I was just having a bad day

2     because my dog had to go to the hospital.

3          THE COURT:  I'm sorry.  And you have friends and relatives

4     or you associate with a group or organization that assists people

5     that experience sexual abuse?

6          PROSPECTIVE JUROR:  Oh, no.  My mom -- after my mom

7     retired from her job, she did a lot of -- what is that, McGruff

8     the Crime Dog, crime prevention stuff, so it wasn't sexual abuse.

9     That's just what she did.

10          THE COURT:  So you haven't heard anything in connection

11    with her volunteer work that would give you an impression of

12    victims of sexual abuse or --

13          PROSPECTIVE JUROR:  No.  This is more like keeping lights

14    on in the neighborhood on the front porch sort of thing.

15          THE COURT:  All right.  And you also answered that you

16    have knowledge of publication groups, et cetera, that advocate or

17    condone sexual relations between adults and minors?

18          PROSPECTIVE JUROR:  Because I just sort of heard of, I

19    think, NAMBLA.  I don't know, I just --

20          THE COURT:  You know of it?

21          PROSPECTIVE JUROR:  I know of it.  That's all I knew,

22    so --

23          MS. HERTZFELD:  No questions.

24          MS. SLAIGHT:  No questions.

25          THE COURT:  Thank you.

1          PROSPECTIVE JUROR:  Yeah.  Thanks.

2          (Prospective juror left the bench.)

3          THE COURT:  Number 56.

4          (Prospective juror approached the bench.)

5          THE COURT:  Hello.  Speak right here.  Are you a lawyer or

6     somebody that you know?

7          PROSPECTIVE JUROR:  I am not a lawyer, but many, many

8     people that I know are lawyers.

9          THE COURT:  You say you're not?

10         PROSPECTIVE JUROR:  I am not personally.

11         THE COURT:  Do you know any criminal lawyers?

12         PROSPECTIVE JUROR:  I know some folks who have been

13    criminal lawyers in their past.

14         THE COURT:  Have you ever talked with those folks about

15    their cases?

16         PROSPECTIVE JUROR:  Some of their cases.  They were not in

17    this arena.  They were like environmental criminal lawyers.

18         THE COURT:  So nobody that you're friends with or that you

19    know of works at this kind of criminal --

20         PROSPECTIVE JUROR:  Correct.

21         THE COURT:  What about law enforcement?

22         PROSPECTIVE JUROR:  I do know some people in law

23    enforcement as well, and my first cousin is a police detective.

24         THE COURT:  And has he ever talked to you about his cases?

25         PROSPECTIVE JUROR:  He does.

1          THE COURT:  Does he have any cases that involve sex abuse,

2     child pornography or anything like that?

3          PROSPECTIVE JUROR:  That I don't know, but he has not

4     talked to me about those types of cases.

5          THE COURT:  All right.  And is there anything about his

6     experience in law enforcement that would cause you to credit or

7     believe the word of a law enforcement officer more than anybody

8     else?

9          PROSPECTIVE JUROR:  Not that I'm aware of.  I mean, I

10    don't think so.

11         THE COURT:  Yeah, yeah.

12         PROSPECTIVE JUROR:  I mean, I don't think so.  I mean, if

13    it were him --

14         THE COURT:  Personally, I get it.

15         What about being involved in a crime prevention group or

16    organization that's active in law enforcement?

17         PROSPECTIVE JUROR:  Just same, my same cousin, he's

18    involved in --

19         THE COURT:  He's involved in those groups?

20         PROSPECTIVE JUROR:  Right.

21         THE COURT:  And you say that someone's been accused of, a

22    victim of, or witness to crime?

23         PROSPECTIVE JUROR:  Right.  So I was mugged once, and my

24    car was stolen once.

25         THE COURT:  And how long ago was that?

```
1        PROSPECTIVE JUROR:  Well, my car was actually stolen once
2    and attempted to be stolen a couple of other times.  I had a Jeep
3    Cherokee, not --
4        THE COURT:  What a nice car.
5        PROSPECTIVE JUROR:  It was old, but apparently it was easy
6    to steal.  So that -- the most recent thing was when somebody
7    attempted to steal it, which was in November of '16.
8        THE COURT:  And the mugging, when did that happen?
9        PROSPECTIVE JUROR:  That happened a long time ago.  That
10   was probably -- I don't know if I can come up with a year, but
11   like 12 to 15 years ago.
12       THE COURT:  Is there anything about that experience being
13   a victim of a crime that will make it difficult for you to sit in
14   judgment of somebody who is a criminal defendant?
15       PROSPECTIVE JUROR:  Not to my knowledge.  I don't think
16   so.
17       THE COURT:  And you've ever in served on a jury?
18       PROSPECTIVE JUROR:  No.
19       THE COURT:  You answered that you think that someone who's
20   interested in child pornography is more likely to sexually abuse
21   a minor?
22       PROSPECTIVE JUROR:  Um-hmm.
23       THE COURT:  What's the basis for that?
24       PROSPECTIVE JUROR:  I am not saying that it is a good
25   basis, but the basis for me giving an answer is probably things
```

1    like -- that I have read in the newspaper or seen on TV, that may

2    or may not, I guess, be valid studies, but that's why I said

3    that.

4         THE COURT:  So could you listen to the law and the facts

5    presented in this case and set aside any preconceived notions

6    that you might have from the newspaper or what you read?

7         PROSPECTIVE JUROR:  I think so.

8         THE COURT:  Ms. Hertzfeld.

9         MS. HERTZFELD:  I don't have any questions.  Thank you.

10        MS. SLAIGHT:  When you say you think so, is there -- do

11   you have any hesitation about that?

12        PROSPECTIVE JUROR:  No.

13        MS. SLAIGHT:  Okay.  You'll forget about the newspapers

14   and the other things and just listen to the evidence here and the

15   jury instructions?

16        PROSPECTIVE JUROR:  (Nodded head affirmatively.)

17        THE COURT:  "Yes"?

18        PROSPECTIVE JUROR:  Yes.

19        THE COURT:  All right.  Thank you.

20        (Prospective juror left the bench.)

21        THE COURT:  Number 952.

22        (Prospective juror approached the bench.)

23        THE COURT:  How are you?  You're going to come right here.

24   And you have written that someone has been accused of, arrested

25   for, a victim of a crime, a witness to a crime?  Is it you or

1   somebody that you know?

2         PROSPECTIVE JUROR:  Say that again.  I'm sorry.

3         THE COURT:  That's all right.  You answered number 21,

4   which is whether or not anyone you know, friend, relative or

5   yourself, has been a victim of a crime, a witness to a crime,

6   accused of a crime?

7         PROSPECTIVE JUROR:  Oh, yeah.  My son has been accused of

8   a crime.  My daughter was a victim of a crime.  And I have five

9   children, four of them are adults, and I have an eight-year old.

10  So my 21-year old was a victim of a crime.

11        THE COURT:  So let's go through each one.

12        PROSPECTIVE JUROR:  Okay.

13        THE COURT:  Victim of a crime, what kind of crime?

14        PROSPECTIVE JUROR:  He was like stuck up.

15        THE COURT:  With a gun?

16        PROSPECTIVE JUROR:  With a gun.

17        THE COURT:  Okay.

18        PROSPECTIVE JUROR:  Okay.  The 22-year-old daughter,

19  27-year-old daughter, a couple of years ago she got shot in the

20  back, but she's fine now.

21        THE COURT:  She's okay?

22        PROSPECTIVE JUROR:  Yeah, not paralyzed or anything like

23  that.

24        THE COURT:  All right.

25        PROSPECTIVE JUROR:  And then my oldest son, 29, he has

1   been in and out of jail.

2        THE COURT:  On what kind of charges?

3        PROSPECTIVE JUROR:  Not violent charges, but he was -- you

4   know, when you try to threaten a witness.

5        THE COURT:  Obstruction of justice?

6        PROSPECTIVE JUROR:  Yeah.  He did that.  And I used to

7   work in a convenient store.  I was a cashier, and I got stuck up

8   in the store.

9        THE COURT:  So you were a victim?

10        PROSPECTIVE JUROR:  I was a victim of a crime.

11        THE COURT:  All right.  Well, thinking about all of those

12   experiences, on both sides, victim and accused, is there anything

13   about them that would give you -- make it difficult for you to

14   sit in judgment of someone else in a criminal case?

15        PROSPECTIVE JUROR:  No, because I just felt like that was

16   just part of the culture, part of the -- that was just part of

17   the culture.

18        THE COURT:  Are you more likely to believe a police

19   officer who is giving testimony about a crime or less likely, as

20   a result of this, or neither?

21        PROSPECTIVE JUROR:  I mean --

22        THE COURT:  It doesn't make one way or the other.

23        PROSPECTIVE JUROR:  Right.  I just -- I can't -- I can't

24   really say because with all that's going on with the police and

25   everything going on in society, I really can't say.  It's just --

1    I really can't answer that, I don't think.

2         THE COURT:  I mean, do you believe police officers or are

3    you likely not to believe them?

4         PROSPECTIVE JUROR:  They're human.  I mean, they tend to

5    lie just as I'm standing here in front of you could be lying,

6    so --

7         THE COURT:  Would you believe that a police officer is

8    lying if he testified just because he was a police officer?

9         PROSPECTIVE JUROR:  Nah.

10         THE COURT:  You also answered that you have a strong

11    feeling about charges related to sexual abuse of minors.  What is

12    that feeling?

13         PROSPECTIVE JUROR:  I have three daughters.  I mean, not

14    to say I'm not concerned about my sons either, but I just -- it's

15    just a distaste in my mouth when I -- when I read or hear --

16         THE COURT:  Would that strong feeling make it hard for you

17    to sit impartially and look at evidence and be fair to someone

18    who had been accused of that?

19         PROSPECTIVE JUROR:  But -- ask that question again.

20         THE COURT:  Could you be fair --

21         PROSPECTIVE JUROR:  I could be fair.

22         THE COURT:  -- in a case involving allegations of sex

23    abuse?

24         PROSPECTIVE JUROR:  I can be fair in that situation

25    because I'm getting evidence; whereas, if I'm reading an article

1   and not having no evidence, and I'm just like, "Oh, that's messed

2   up what he did or what you did or whatever."  So having evidence

3   to prove a right or wrong, that's different.

4          THE COURT:  And would you be able to look at the evidence

5   and not --

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  And decide only based on the evidence?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And you could find either guilty or not

10  guilty, even if the case involves sex abuse?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  You also said that you have opinions about

13  child pornography laws, and -- what are your opinions about child

14  pornography laws and laws prohibiting sex with minors?

15         PROSPECTIVE JUROR:  So I was like reading the news the

16  other day, I mean, watching the news, and they was like, "Well,

17  sex trafficking, they gonna pass the law that it's okay to do

18  that."  I felt like -- I felt offended.  Like, it's already been

19  a crime since forever and a day, and now they want to make it

20  legal.  I was --

21         THE COURT:  So you don't think it should be?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  What about the testimony of a minor who

24  said -- I asked you, "Would hearing testimony about the alleged

25  sexual assault of a minor make it difficult for you to sit."  Is

1   this the same sort of feeling that if we're talking about sexual

2   assault of a minor, you would have difficulty with that?

3          PROSPECTIVE JUROR:  I must have misconstrued a question

4   that you -- another question that you asked, like, would it be

5   harder to believe a child or adult or something like that.

6          THE COURT:  Um-hmm.  What's your answer to that?

7          PROSPECTIVE JUROR:  I think I meant to put no.  I didn't

8   mean to write a number for that --

9          THE COURT:  I see.

10          PROSPECTIVE JUROR:  -- because I have children, and I know

11   children lie.

12          THE COURT:  But do you believe they're more likely to lie

13   than -- just because they're teenagers?  Do you think teenagers

14   lie more than adults?

15          PROSPECTIVE JUROR:  I don't know, but I've been both, so I

16   been --

17          THE COURT:  What about anyone who'd be interested in child

18   pornography is more likely to sexually abuse a minor, do you

19   think that's the case?

20          PROSPECTIVE JUROR:  So I had to put myself in that

21   situation.  If I'm watching pornography, I'm going to want to

22   have sex, and if I'm watching --

23          THE COURT:  How do you know this, based on what?

24          PROSPECTIVE JUROR:  That's what I'm saying.  If I'm

25   watching it, I'm getting enticed by it, I'm like, "Oh, I like

1    that," so that'd give me the feeling to want to --

2         THE COURT:  Do you have any experience with this?  How do

3    you know this?

4         PROSPECTIVE JUROR:  I'm just saying.

5         THE COURT:  You're just --

6         PROSPECTIVE JUROR:  I'm not into it.  I'm not on to it.

7    But I'm just -- I mean, kind of like think that a little bit,

8    yes.

9         THE COURT:  All right.  So you think it's more likely that

10   someone would actually touch a child if they were interested in

11   child pornography?

12        PROSPECTIVE JUROR:  Um-hmm.

13        THE COURT:  Ms. Hertzfeld?

14        MS. HERTZFELD:  I wanted to make sure.  Were you saying

15   about pornography generally or about child pornography?

16        PROSPECTIVE JUROR:  Because I'm not -- I'm just saying

17   about pornography in general.  That's why I say I had to put

18   myself in that situation as an adult watching pornography.  I

19   couldn't put myself on a child pornography, because I'm not

20   there.  So I had to put myself in the situation of the question.

21   Does that make --

22        THE COURT:  I think I understand.

23        PROSPECTIVE JUROR:  Because if I'm an adult, if I like men

24   and I want to be entertained, then I'm going to watch that type

25   of movie.

```
 1          THE COURT:  Do you think it'd be hard for you to have this

 2   conversation in the jury room about the evidence in this case?

 3          PROSPECTIVE JUROR:  Um-hmm.

 4          THE COURT:  Ms. Slaight?

 5          MS. SLAIGHT:  So you're saying that if you -- you think

 6   that if somebody watches child pornography, they're more likely

 7   to engage in --

 8          PROSPECTIVE JUROR:  I think so.

 9          MS. SLAIGHT:  -- sexual abuse?

10          PROSPECTIVE JUROR:  Um-hmm.

11          THE COURT:  And would you be able to set that aside if the

12   Court were to instruct you to put those feelings aside and to

13   decide the case based on only the evidence and the law that was

14   presented to you?

15          PROSPECTIVE JUROR:  Yes, ma'am.

16          THE COURT:  You'd be able to look at only the evidence and

17   the law and not --

18          PROSPECTIVE JUROR:  My feelings.

19          THE COURT:  -- your feelings?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  All right.  Anything else?  Thank you.

22          PROSPECTIVE JUROR:  You're welcome.

23          (Prospective juror left the bench.)

24          MS. SLAIGHT:  Just for the record, I move to strike her.

25          THE COURT:  I'm sorry?
```

1          MS. SLAIGHT:  Just for the record, I move to strike her.

2     She said pornography, she's -- you know, she thinks that if you

3     watch pornography, you're more likely to have sex.  I understand

4     that she said she could put it aside, but she said yes.

5          MS. HERTZFELD:  I would object to strike her.  I think

6     what she was trying to convey is, she thinks if you're watching a

7     particular kind of pornography reflects something about your

8     sexual interest, and I don't think there's anything -- whether if

9     you're interested in men or if you're interested in children, I

10    think she's indicating it reflects something about what your

11    sexual interest is, and I don't think there's anything improper

12    about that.  I think she certainly answered, and she --

13         THE COURT:  The question is obviously problematic because

14    it's creating a lot of issues.

15         MS. HERTZFELD:  Yeah.

16         THE COURT:  But let me just say that I think I'm going to

17    move her down and here's why.  One thing that she said that was

18    concerning to me is the statements about putting herself in the

19    shoes of a question, and that -- and in this circuit, as we know,

20    there's this golden rule problem where, you know, the parties at

21    least are not supposed to argue to the jury that they should put

22    themselves in the shoes and of the defendant or the alleged

23    victims or whatever, and that's actually reversible error.

24         So what I'm a little bit concerned about is her perceiving

25    this as a situation in which she's supposed to put herself in the

1    shoes, even though that's not an argument that has been made,

2    it's pretty clear that that's not supposed to be done, and I'm

3    worried that she might.

4        So I'm going to at least drop her down.  I think we have

5    enough people that we'll get through without putting her on.

6        All right.  Next row.  Let's see how we're doing on time

7    and whether we need to take a break.  Do you need to take a

8    break?

9        MS. SLAIGHT:  I don't need a break.  I don't need a

10   restroom break.

11       THE COURT:  All right.  All right.  Let's just see how

12   many more --

13       MS. SLAIGHT:  I need another kind of break.  I need -- you

14   know, if we're going to take a break soon, that would be good.  I

15   just need to clear my --

16       THE COURT:  Clear your head, I understand.  Let's see if

17   we can get through these next few, and then we'll --

18       MS. SLAIGHT:  Sure.

19       THE COURT:  Number 551.

20       (Prospective juror approached the bench.)

21       PROSPECTIVE JUROR:  Hi.

22       THE COURT:  So you have only that you served as a juror?

23       PROSPECTIVE JUROR:  Yes.

24       THE COURT:  Where did you serve?

25       PROSPECTIVE JUROR:  The other building.

1          THE COURT:  And in what kind of case?

2          PROSPECTIVE JUROR:  Um, it was a sexual case with a guy,

3     like, attempted rape or something.

4          THE COURT:  And how long ago was this?

5          PROSPECTIVE JUROR:  About three years ago.

6          THE COURT:  And did you reach a verdict in your case?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  And how long did you serve as a juror?

9          PROSPECTIVE JUROR:  One week.

10          THE COURT:  And was it difficult to evaluate the evidence

11     in a case of that nature?  Did you find it hard?

12          PROSPECTIVE JUROR:  No, it wasn't hard.

13          THE COURT:  And you don't have anything else that you have

14     written down in terms of my long questions.

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  No conflicts that would make it difficult for

17     you to serve here?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Ms. Hertzfeld?

20          MS. HERTZFELD:  No questions.  Thank you.

21          MS. SLAIGHT:  Is there anything about that case that

22     you -- do think you would be able to separate that -- did that

23     case involve a minor or no?

24          PROSPECTIVE JUROR:  No.

25          MS. SLAIGHT:  Okay.  Do you think you would be able to

```
1    separate the facts in that case from this case?

2           PROSPECTIVE JUROR:  Yes.

3           MS. SLAIGHT:  Okay.

4           THE COURT:  All right.  Thank you.

5           PROSPECTIVE JUROR:  Thank you.

6           (Prospective juror left the bench.)

7           THE COURT:  Number 93.

8           (Prospective juror approached the bench.)

9           THE COURT:  Hi.  Come right here.  How are you?

10          PROSPECTIVE JUROR:  Okay.

11          THE COURT:  You have legal training or someone you know?

12          PROSPECTIVE JUROR:  Um, I work with lawyers.  I -- yeah.

13   Sorry.  I have a mom friend who just went back to law school, and

14   she's clerking.  I don't know if she's clerking at this court or

15   some other, you know, federal D.C. court.

16          THE COURT:  When you work with lawyers, what kind of

17   lawyers do you work with?

18          PROSPECTIVE JUROR:  I'm in regulatory law.

19          THE COURT:  And have you ever talked with any of the

20   lawyers you've worked with or your friend about criminal law in

21   any way?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  And you have some connection to law

24   enforcement?

25          PROSPECTIVE JUROR:  Sort of, yeah.  When I was applying
```

1    for federal jobs, I did apply for at least one job at the FBI.  I

2    no longer remember anything about the job.  I'm now with the

3    Treasury Department doing economic sanctions, and I didn't know

4    if that would count as law enforcement or not because we, like --

5    we can issue fines, and we can seize your money, but we don't

6    arrest people.  And I'm not personally involved in targeting or

7    anything.

8         THE COURT:  I see.  You have corrections or court or

9    probation or parole office?

10        PROSPECTIVE JUROR:  Um, my father-in-law worked for the

11   New Jersey State Court system.  He retired about a decade ago.

12        THE COURT:  And did he ever talk to you about his cases?

13        PROSPECTIVE JUROR:  No.  I mean, he worked in court

14   administration, so like --

15        THE COURT:  I see.

16        PROSPECTIVE JUROR:  -- he talked about whether they gave

17   early dismissal on Good Friday.

18        THE COURT:  I see.  Have you ever served as a juror?

19        PROSPECTIVE JUROR:  Yes.

20        THE COURT:  And where so?

21        PROSPECTIVE JUROR:  D.C. -- I mean, the local court here

22   in D.C.

23        THE COURT:  Yes.

24        PROSPECTIVE JUROR:  I can remember three times.  It's

25   possible there have been more.  I've lived in D.C. more than 20

1    years, so --

2        THE COURT:  And have any of the cases that you remember

3    been criminal cases?

4        PROSPECTIVE JUROR:  Yes, all three of them were criminal

5    cases.  They -- they all involved drug possession to one degree

6    or another, and one --

7        THE COURT:  Any of them have sexual charges --

8        PROSPECTIVE JUROR:  No.

9        THE COURT:  -- in them at all?

10       PROSPECTIVE JUROR:  No.

11       THE COURT:  And say somebody has been accused, arrested,

12   convicted, or a victim of a crime or a witness?

13       PROSPECTIVE JUROR:  Oh, yeah.  I wasn't quite sure.  Like,

14   my car has gotten broken into.  My husband was assault once on

15   the street.  Like, just kind of like the background noise of

16   crime in D.C.

17       THE COURT:  And does any of that experience -- would that

18   affect the way in which you view your service on the jury --

19       PROSPECTIVE JUROR:  I don't think so.

20       THE COURT:  -- or evidence in this case?

21       PROSPECTIVE JUROR:  No, I don't think so.  Yeah, it

22   happens to everybody, I feel like.

23       THE COURT:  So it would not be a factor at all in your --

24       PROSPECTIVE JUROR:  I don't think so, no.

25       THE COURT:  -- position in this case?

1        Ms. Hertzfeld?

2        MS. HERTZFELD:  I don't of anything.

3        MS. SLAIGHT:  (Shook head negatively.)

4        THE COURT:  Okay.  Thank you.

5        (Prospective juror left the bench.)

6        MS. SLAIGHT:  She was on three juries?

7        THE COURT:  It could have been more, she said.

8        Number 409.

9        (Prospective juror approached the bench.)

10        THE COURT:  Hello.

11        PROSPECTIVE JUROR:  Hi.  How are you?

12        THE COURT:  Good.  Come right in the middle here.  And you

13   are a lawyer or someone you know?

14        PROSPECTIVE JUROR:  Well, no.  I'm a paralegal.

15        THE COURT:  Aha.  Paralegal.

16        PROSPECTIVE JUROR:  Yeah.

17        THE COURT:  Are you with a firm?

18        PROSPECTIVE JUROR:  Yeah, in D.C., Senior Litigation

19   Paralegal.

20        THE COURT:  What kind of law do you handle?

21        PROSPECTIVE JUROR:  Litigation.

22        THE COURT:  Criminal litigation or --

23        PROSPECTIVE JUROR:  Criminal, white collar -- not really

24   that much criminal, no.  Mostly commercial.

25        THE COURT:  Have you ever then worked on any cases that

1    involved sex abuse or child pornography?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  How long have you been a paralegal?

4            PROSPECTIVE JUROR:  13 years.

5            THE COURT:  And in talking with any of the lawyers that

6    you worked with, have you developed any opinions about child

7    pornography or sex abuse cases?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  You also have a connection to -- oh, I thought

10   you said law enforcement, but no, right?

11           PROSPECTIVE JUROR:  I'm sorry?

12           THE COURT:  No connection to law enforcement?

13           PROSPECTIVE JUROR:  No, no.

14           THE COURT:  If you had to choose who to believe, a police

15   officer or a witness called by the defendant, you said that you

16   would be more likely to believe a police officer?

17           PROSPECTIVE JUROR:  I think you have the wrong --

18           THE COURT:  Are you --

19           PROSPECTIVE JUROR:  409?

20           THE COURT:  Oh, so sorry.  I am so sorry.

21           PROSPECTIVE JUROR:  Sure.  I wanted to make sure I didn't

22   put the wrong --

23           THE COURT:  No, no.  Thank you.

24           PROSPECTIVE JUROR:  -- question number.

25           THE COURT:  Too many cards.

1        PROSPECTIVE JUROR:  Yeah.  I understand.

2        THE COURT:  But you did say you believed that someone who

3   would sexually abuse a minor is more likely to be interested in

4   child pornography?

5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  Tell me the basis for that.

7        PROSPECTIVE JUROR:  Well, I would think that's what

8   they're probably sexually attracted to, regardless of whether

9   it's -- obviously, I'm glad that there is a law that -- there is

10  no abusing of a minor.  You shouldn't be attracted to them, but I

11  think as an individual, if it was legal, that person would still

12  be attracted to that type of individual and that age group, so --

13       THE COURT:  And do you think that you could set aside any

14  beliefs that you've had about people's interests or proclivities

15  or whatever and look only at --

16       PROSPECTIVE JUROR:  Well, sure.  I mean --

17       THE COURT:  -- the facts and evidence in this case?

18       PROSPECTIVE JUROR:  Yes, but when you say "likely," I

19  think like -- yes, I could put that aside, I think likely.

20       THE COURT:  You think when I asked you is it likely,

21  that --

22       PROSPECTIVE JUROR:  Yes.  It would be likely that he would

23  be interested in porn in that --

24       THE COURT:  If they were an abuser?

25       PROSPECTIVE JUROR:  Yes.

```
1          THE COURT:  Ms. Hertzfeld?

2          MS. HERTZFELD:  No questions.  Thank you.

3          MS. SLAIGHT:  I'm sorry.  I don't understand.  You said

4     you think it is more likely, but could you -- would you keep

5     those -- if the Judge instructed you that you are not to do that,

6     do you think you could follow that?

7          PROSPECTIVE JUROR:  Well, yes.  Yes.

8          MS. SLAIGHT:  Do you still think that -- would you still

9     think in the back of your head they go together?

10         PROSPECTIVE JUROR:  Well, I probably -- I'd probably still

11    think likely that.

12         THE COURT:  But would you be able to --

13         PROSPECTIVE JUROR:  Well, of course, I could, like,

14    differentiate through the facts and make a non-biased decision, I

15    think, but I think that's still in the back of my head probably.

16         THE COURT:  Because -- tell me.  Say more.

17         PROSPECTIVE JUROR:  Well, any other sexual preference, if

18    you -- if you're gay, I think you'd watch gay porn.  If you're --

19    I don't know.  If you're proclivity to liking young kids, you

20    probably are going to want to like --

21         THE COURT:  But I noticed that you didn't answer the other

22    question.  You didn't answer yes when you said --

23         PROSPECTIVE JUROR:  You said knowing a known -- you said a

24    known child abuser.

25         THE COURT:  Right.
```

1       PROSPECTIVE JUROR:  Right.

2       THE COURT:  So there were two questions.  One was:  If

3  you're interested in child pornography, are you more likely to

4  sexually abuse a minor?  You did not answer that question yes.

5  Just because someone's interested in child pornography, you did

6  not answer yes.

7       PROSPECTIVE JUROR:  Yeah, I don't know if you could

8  actually act on that, yeah.

9       THE COURT:  But you did answer that if you would sexually

10  abuse a minor, you think they're more likely to --

11      PROSPECTIVE JUROR:  I think they're more likely to watch

12  porn.

13      THE COURT:  -- be interested in child pornography?

14      PROSPECTIVE JUROR:  Watching and doing are two different

15  things.

16      THE COURT:  All right.  Ms. Hertzfeld?

17      MS. HERTZFELD:  No questions.  Thank you.

18      MS. SLAIGHT:  So if the person is charged with abusing,

19  you found the person guilty of any abuse counts, you would find

20  them likely guilty of the pornography?

21      PROSPECTIVE JUROR:  Not necessarily, but I think they are

22  likely, more likely.

23      THE COURT:  But not necessarily.

24      PROSPECTIVE JUROR:  Not necessarily.

25      THE COURT:  Would you be able to base your ruling on the

1    evidence and the law as the Court instructed you --

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  -- on the child pornography --

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  -- count?

6           MS. SLAIGHT:  Would you be able to preserve the

7    presumption of innocence for the pornography counts?

8           PROSPECTIVE JUROR:  Yes, yes.

9           THE COURT:  All right.  Thank you.

10          (Prospective juror left the bench.)

11          THE COURT:  Number 546.

12          (Prospective juror approached the bench.)

13          THE COURT:  Come right to the middle here.

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  So are you a lawyer or someone you know?

16          PROSPECTIVE JUROR:  I am not an attorney.  I work for a

17    law firm.  I manage files for a law firm.

18          THE COURT:  And how long have you been doing that?

19          PROSPECTIVE JUROR:  Ten years.

20          THE COURT:  And is the law firm one that handles criminal

21    cases at all?

22          PROSPECTIVE JUROR:  They do some white collar crime, but

23    that's the extent of it.  It's primarily a corporate law firm.

24          THE COURT:  So no child porn cases that you're familiar

25    with?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  And you said that you might choose to believe

3    a police officer simply because he or she is a police officer?

4          PROSPECTIVE JUROR:  Well, I'm predisposed to respecting

5    the profession, so, yeah.

6          THE COURT:  But if they were testifying in a case, and the

7    Court instructed you that you have to listen to the evidence as

8    it's presented, would you be more likely to believe a police

9    officer just because they were a police officer?

10          PROSPECTIVE JUROR:  Well, if I was instructed to take all

11    the testimony at face value, then I would do so, just -- but if

12    you asked me that question on the street, would I take the word

13    of a police officer, then I'd --

14          THE COURT:  Over some other person, you would say yes,

15    just on the street?

16          PROSPECTIVE JUROR:  Without any other reason, yeah, yeah.

17          THE COURT:  What about whether or not somebody has been a

18    victim of a -- or a witness to a crime involving pornography, sex

19    abuse of a minor or sex crimes?  I think you answered yes to

20    that?

21          PROSPECTIVE JUROR:  Could you actually read the question?

22          THE COURT:  Yes.  Have you or any of your friends or

23    relatives ever been a victim of or a witness to a crime related

24    to child pornography, sex abuse of a minor or other sex crimes?

25          PROSPECTIVE JUROR:  Okay.  Yeah, the -- my husband was a

1    victim of sexual and physical abuse as a child, so I --

2         THE COURT:  As a child?

3         PROSPECTIVE JUROR:  Yeah.  And so I couldn't say anything

4    other than yes to this.

5         THE COURT:  And would -- do you know anything about the

6    circumstances of his abuse?

7         PROSPECTIVE JUROR:  Um, yeah.  Yeah.

8         THE COURT:  And would what you know about those

9    circumstances make it difficult for you to sit on a jury

10   involving crimes of child sex abuse?

11        PROSPECTIVE JUROR:  Not emotionally, no more so than

12   anyone else.  And it wouldn't predispose me one way or the other,

13   in terms of a person's guilt.  It's just that I happen to know a

14   victim.

15        THE COURT:  Would that make you more or less likely to

16   believe someone who is alleging sex abuse of a child, the fact

17   that you have this relationship with someone who --

18        PROSPECTIVE JUROR:  It wouldn't make you more likely.

19        THE COURT:  It would not?

20        PROSPECTIVE JUROR:  It would not make me more likely, but

21   I would take it very seriously.

22        THE COURT:  Ms. Hertzfeld?

23        MS. HERTZFELD:  No questions.

24        MS. SLAIGHT:  What do you mean by you would take it very

25   seriously?

```
 1        PROSPECTIVE JUROR:  Well, I mean, we need to.  I mean -- I
 2   mean, it's important that the truth come out in these
 3   circumstances and people who have made allegations of abuse in
 4   the past not be silenced or ignored, and so --
 5        THE COURT:  And would you -- do you think, therefore, you
 6   would credit somebody's accusation more than a denial?
 7        PROSPECTIVE JUROR:  No, I wouldn't say their more
 8   truthful.  It's just I would take what they have to say very
 9   seriously.
10        THE COURT:  You also say that you believe that someone
11   who'd be interested in child pornography is more likely to
12   sexually abuse a minor.  Why do you say that?
13        PROSPECTIVE JUROR:  I mean, to me it demonstrates some
14   level of sexual interest, so --
15        THE COURT:  But if the Judge instructed you that child
16   pornography and sexual abuse are two different things, would you
17   be able to separate them?
18        PROSPECTIVE JUROR:  Okay.  Now I see that distinction.
19   I'm just simply saying I would think that person would have a
20   higher likelihood than someone who's not --
21        THE COURT:  And that's just based on your general gut?
22        PROSPECTIVE JUROR:  That's just guts.  And you asked the
23   question, and I responded and answered.
24        THE COURT:  Ms. Hertzfeld?
25        MS. HERTZFELD:  No questions.
```

1      THE COURT:  Any further?

2      MS. SLAIGHT:  Would you take -- when you said you would

3  take it very seriously, you know, the -- the testimony of the

4  witness who says that they're abused, you would take that very

5  seriously, right?

6      PROSPECTIVE JUROR:  Yes.

7      MS. SLAIGHT:  Okay.  Would you also -- would you be as

8  serious about the defendant's rights in that case?

9      PROSPECTIVE JUROR:  Oh, yeah.  I mean, of course.

10      MS. SLAIGHT:  Okay.

11      THE COURT:  And you would take seriously any testimony of

12  either the defendant or other witnesses that indicated that the

13  defendant didn't do that?

14      PROSPECTIVE JUROR:  Oh, yeah.  Sure.

15      THE COURT:  All right.  Thank you.

16      (Prospective juror left the bench.)

17      THE COURT:  Number 384.

18      (Prospective juror approached the bench.)

19      THE COURT:  Hello.  You'll want to speak right into the

20  microphone.

21      PROSPECTIVE JUROR:  Okay.

22      THE COURT:  You say that you served as a juror.  Where so?

23      PROSPECTIVE JUROR:  In Nebraska.

24      THE COURT:  And how long ago was that?

25      PROSPECTIVE JUROR:  I was in college, so that would have

1    been 2008, I think, in the summer.

2         THE COURT:  And was it a criminal case or a civil case?

3         PROSPECTIVE JUROR:  Civil case.  It was a tenant suing a

4    landlord.

5         THE COURT:  So do you have any experience with criminal

6    cases at all?

7         PROSPECTIVE JUROR:  No.

8         THE COURT:  Nobody's a lawyer, or nobody --

9         PROSPECTIVE JUROR:  No.  No.  Some college friends, but

10   nobody that I keep in close touch with.

11        THE COURT:  You also answered the two questions about the

12   connection between child pornography and child sexual abuse.

13   Tell me what your views are based on in that regard.

14        PROSPECTIVE JUROR:  Um --

15        THE COURT:  The question is whether someone who would be

16   interested in child pornography is more likely to sexually abuse

17   a minor and vice versa?

18        PROSPECTIVE JUROR:  Yeah.  I mean, I think there's a clear

19   association that if one was to seek out material of child

20   pornography, which is -- I would say is, in essence, abusive --

21   that that would be a two-way street.  It would flow in both

22   directions.

23        THE COURT:  And if the Court instructed you that there is

24   no connection -- I don't know, I'm just saying if I were to say

25   that to you, would you be able to follow the law and not your own

1    instincts about it?

2        PROSPECTIVE JUROR:  I mean, I would do my best.  I guess I

3    would want evidence of that.  But as a pure instruction, I would

4    do my best to follow direction.

5        THE COURT:  And would you be able to follow the evidence

6    in this case about whether a defendant committed one crime versus

7    the other crime and not automatically link them together?

8        PROSPECTIVE JUROR:  Oh, I haven't thought about it that

9    way, but I -- yes, if there's -- if the charges are separate,

10   then the evidence would have to prove the charges separately.

11       THE COURT:  Ms. Hertzfeld?

12       MS. HERTZFELD:  No questions.

13       MS. SLAIGHT:  So you wouldn't require the defendant to put

14   on evidence that separates them?  In other words, you have -- you

15   talked about the evidence -- and maybe I misunderstood your

16   answer.  Would you require a defendant evidence to show that they

17   weren't linked?

18       PROSPECTIVE JUROR:  No.  I guess I was saying that if

19   there's separate charges, that one was -- the pornography versus

20   the abuse, then, as you said, it would be up to the prosecution

21   to prove both.

22       THE COURT:  And you'd have to have evidence for each

23   separate one?

24       PROSPECTIVE JUROR:  Yes, that's right.

25       THE COURT:  All right.  Thank you.

1        PROSPECTIVE JUROR:  Thank you.

2        (Prospective juror left the bench.)

3        THE COURT:  1475.

4        (Prospective juror approached the bench.)

5        THE COURT:  Good afternoon.

6        PROSPECTIVE JUROR:  Good afternoon.

7        THE COURT:  Speak right into the microphone.  So you might

8   have a conflict with the schedule?

9        PROSPECTIVE JUROR:  Yes, ma'am.  I have a toddler.  I'm

10   recently divorced, and I have no one to watch her.  I'm a

11   stay-at-home mom, and I got divorced May 12th -- I'm sorry, March

12   12th, so I don't have anybody to watch her.  My mom works full

13   time.  His mom -- his family doesn't like me very much right now.

14   And he's a D.C. firefighter, and he has to go away to a training

15   of some sort for HAZMAT, I think.

16        THE COURT:  So you're her only caregiver during the day?

17        PROSPECTIVE JUROR:  Um-hmm.

18        THE COURT:  She doesn't go to school?

19        PROSPECTIVE JUROR:  No, she doesn't.  She's not allowed to

20   go to school until she's three.  Well, she's three now, but in

21   August, that's when she'll go to school.

22        THE COURT:  So you're at home watching her, and there's no

23   other --

24        PROSPECTIVE JUROR:  I've been home since I had her.  That

25   was the plan.

```
 1        THE COURT:  All right.  Ms. Hertzfeld?

 2        MS. HERTZFELD:  No questions.

 3        THE COURT:  I think we'll let you go so that you don't

 4   have to worry about who takes care of your child.

 5        PROSPECTIVE JUROR:  Thank you.

 6        THE COURT:  All right.  Thank you.

 7        (Prospective juror left the bench.)

 8        THE COURTROOM CLERK:  After this one, are you going to

 9   break?

10        THE COURT:  How many more do we have, and how many will we

11   have?

12        THE COURTROOM CLERK:  We just go through.  So if the next

13   one qualifies, we'd have 26 that are qualified, but you have

14   three that you've moved down, so if you were to include that,

15   that would be 29.

16        THE COURT:  All right.  So we'll see where we're at.

17        493.

18        (Prospective juror approached the bench.)

19        THE COURT:  Hello.  Sir, how are you?

20        PROSPECTIVE JUROR:  I'm fine.  How are you?

21        THE COURT:  You say you might have scheduling conflict?

22        PROSPECTIVE JUROR:  Yes.  Your Honor, I have had a

23   longstanding commitment with my wife to be in Philadelphia a week

24   from tomorrow for the whole day.  That was to be my last day of

25   service.  I didn't think it was going to be a problem, but this
```

1    looks like it's going to be longer than a four-day.

2         THE COURT:  So tell me what you mean.  So Friday of next

3    week?

4         PROSPECTIVE JUROR:  It's the Friday of next week, a week

5    from tomorrow.

6         THE COURT:  Okay.  And you wouldn't be able to serve at

7    all on that day?

8         PROSPECTIVE JUROR:  I couldn't serve on that day.  And to

9    make matters worse, the following week we're -- we have another

10   kind of series of commitments in New Jersey and New York, so it's

11   a bit of an expense for me to --

12        THE COURT:  Let me ask you about the other couple of

13   questions that you have.

14        PROSPECTIVE JUROR:  Yes.

15        THE COURT:  It isn't clear that this is going to go that

16   long, but let me ask you about the connection to a lawyer or a

17   law firm.  Are you a lawyer or someone you know?

18        PROSPECTIVE JUROR:  No, no.

19        THE COURT:  Someone you know, maybe?

20        PROSPECTIVE JUROR:  But the answer to --

21        THE COURT:  That question --

22        PROSPECTIVE JUROR:  What was the question?

23        THE COURT:  Your friends, your relatives ever studied law,

24   been in legal training, a paralegal, a lawyer, of any kind?

25        PROSPECTIVE JUROR:  Oh, I didn't realize I -- that doesn't

1    sound --

2        THE COURT:  That don't sound.

3        PROSPECTIVE JUROR:  It may have been the fact that I had

4    spent time with NASD as an arbitrator.

5        THE COURT:  But you don't have legal training?

6        PROSPECTIVE JUROR:  I have no legal training, no.

7        THE COURT:  Okay.  And you answer the questions about the

8    connection between child pornography and sex abuse, and you think

9    they are linked in some way?

10       PROSPECTIVE JUROR:  Yes.  The question again was?

11       THE COURT:  Do you believe that someone who'd be

12   interested in child pornography is more likely to sexually abuse

13   a minor and vice versa?

14       PROSPECTIVE JUROR:  Yes, I think I do.

15       THE COURT:  Would you be able to set that belief aside and

16   look only at the facts and evidence in this case if you were to

17   serve as a juror?

18       PROSPECTIVE JUROR:  Yes.

19       THE COURT:  Ms. Hertzfeld?

20       MS. HERTZFELD:  No.

21       MS. SLAIGHT:  So if the Judge said consider them

22   separately, you would start with the presumption of innocence,

23   even if -- even if you found the defendant guilty of one of the

24   counts, you would go to presumption of innocence for the next

25   count and the next count and the next count; is that right?

1      PROSPECTIVE JUROR:  With confidence, I could do that.

2      THE COURT:  All right.

3      PROSPECTIVE JUROR:  My training as an arbitrator would --

4      THE COURT:  Will help you in that way?

5      PROSPECTIVE JUROR:  Um-hmm.

6      THE COURT:  All right.  Thank you, sir.

7      (Prospective juror left the bench.)

8      THE COURT:  So what should we do about his scheduling

9  conflict?

10      MS. SLAIGHT:  I guess put him at the end.

11      MS. HERTZFELD:  If we'd move this person to the end, that

12  would be fine.  I would be shocked if we have a problem getting

13  to him.

14      THE COURT:  All right.

15      MS. SLAIGHT:  I just -- I just had another case where we

16  just thought it would never happen, and then, you know.

17      THE COURT:  And then it did and --

18      MS. SLAIGHT:  And then we ran out of alternates.

19      THE COURT:  Yeah.

20      PROSPECTIVE JUROR:  I'd hate to -- if we have a chance to

21  put them --

22      THE COURT:  So let's move him down, and let's take a

23  break.  And then we need to think about how many more we should

24  qualify to do the -- maybe one more row.

25      THE COURTROOM CLERK:  That's 25, so it looks like we're

1    going to have 8.  That would give us 33.

2         THE COURT:  How many do we normally --

3         THE COURTROOM CLERK:  We need 32.

4         THE COURT:  That gives us 33 with the people that we moved

5    down?

6         THE COURTROOM CLERK:  No.  That's 33 without the people we

7    moved down.

8         THE COURT:  So we need to do one more row probably.

9         THE COURTROOM CLERK:  Do you want to do one more row?

10        THE COURT:  We can do one more row.

11        THE COURTROOM CLERK:  One more row and maybe half to give

12   us extras.

13        THE COURT:  All right.  So let's take, what, ten minutes,

14   3:15.  Okay.  Thank you.

15        (The following further proceedings were held in open

16   court.)

17        THE COURT:  Ladies and gentlemen, we're going to take a

18   ten-minute break, starting again at 3:15.  Thank you for your

19   patience.

20        (Thereupon, a break was had from 3:08 p.m. until

21   3:21 p.m.)

22        THE COURT:  All right.  We're at 392.  Juror number 392.

23   Thank you, sir.

24        (Prospective juror approached the bench.)

25        THE COURT:  Hello, sir.  You put that you have law

1    experience?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  You or someone you know?

4          PROSPECTIVE JUROR:  No.  My wife is a member of the D.C.

5    Bar.

6          THE COURT:  Does she practice law?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  What kind of law does she practice?

9          PROSPECTIVE JUROR:  Generally civil administrative.  Never

10   done criminal.

11         THE COURT:  Never done criminal?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  And do you have any familiarity with criminal

14   cases from a legal standpoint?

15         PROSPECTIVE JUROR:  When she was in law school, I used to

16   read the case books for the human interest involved, and I've

17   learned certain things, but --

18         THE COURT:  And you've served as a juror before?

19         PROSPECTIVE JUROR:  And I've served as a juror.

20         THE COURT:  Where?

21         PROSPECTIVE JUROR:  Here in this courthouse.

22         THE COURT:  In Federal Court?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  And was it a civil case or a criminal case?

25         PROSPECTIVE JUROR:  It was a criminal case.  It was a drug

1   case.

2        THE COURT:  Not a case involving sex abuse, child

3   pornography or anything of that kind?

4        PROSPECTIVE JUROR:  No, no.

5        THE COURT:  And is there anything about the nature of the

6   charges in this case that would --

7        PROSPECTIVE JUROR:  I'm sorry?

8        THE COURT:  Is there anything about the nature of the

9   charges in this case that would make it difficult for you to sit

10  as a juror?

11       PROSPECTIVE JUROR:  I don't think so.

12       THE COURT:  Ms. Hertzfeld?

13       MS. HERTZFELD:  No questions.

14       MS. SLAIGHT:  Do you work now?

15       PROSPECTIVE JUROR:  I'm retired.

16       MS. SLAIGHT:  And from?

17       PROSPECTIVE JUROR:  I was from the federal government, a

18  bureaucrat.  I used to work with commuters and things like that.

19       THE COURT:  Do you have any experience with extracting

20  computer data?

21       PROSPECTIVE JUROR:  Not the current stuff.  I've been

22  retired for a while, long before that became the primary -- it

23  was really a lot of administrative stuff and financial stuff at

24  that time.

25       THE COURT:  All right.  Thank you.

1           MS. SLAIGHT:  Can I just ask which agency you worked for?

2           PROSPECTIVE JUROR:  The last one was the Corporation for

3    National and Community Service.

4           MS. SLAIGHT:  Thank you.

5           THE COURT:  Thank you.

6           PROSPECTIVE JUROR:  Thank you.

7           (Prospective juror left the bench.)

8           THE COURT:  Juror number 275.

9           (Prospective juror approached the bench.)

10          THE COURT:  Hello.  Step right up.

11          PROSPECTIVE JUROR:  Okay.

12          THE COURT:  So you are a lawyer or someone you know?

13          PROSPECTIVE JUROR:  My brother-in-law.

14          THE COURT:  And what kind of law does he practice?

15          PROSPECTIVE JUROR:  Civil law.

16          THE COURT:  Do you know if he has ever practiced in

17   criminal at all, or if you have any --

18          PROSPECTIVE JUROR:  I don't know.

19          THE COURT:  Do you know any other lawyers that might do

20   criminal work?

21          PROSPECTIVE JUROR:  His partner and his firm.

22          THE COURT:  It's in a law firm setting?

23          PROSPECTIVE JUROR:  It's in a law firm, yes.

24          THE COURT:  Do you know if it's prosecutor or defense

25   counsel?

1     PROSPECTIVE JUROR:  Not that I'm aware of.

2     THE COURT:  But you do know one some law enforcement?

3     PROSPECTIVE JUROR:  Yes.  My other brother-in-law is a

4     retired marshal.

5     THE COURT:  U.S. Marshal?

6     PROSPECTIVE JUROR:  Yes, ma'am.

7     THE COURT:  And did he ever talk about his work with you?

8     PROSPECTIVE JUROR:  No.

9     THE COURT:  So you don't know if he had any defendants who

10    had been accused of or convicted of crimes of this nature?

11    PROSPECTIVE JUROR:  I would imagine, but --

12    THE COURT:  But you don't know?

13    PROSPECTIVE JUROR:  I don't know, no.

14    THE COURT:  And you work with children, sex assault

15    victims or sex offenders?

16    PROSPECTIVE JUROR:  Yes.

17    THE COURT:  How so?

18    PROSPECTIVE JUROR:  I'm a psychiatric nurse, and I work

19    with people who are homeless, have severe persistent mental

20    illness, and have substance abuse disorder diagnosis.

21    THE COURT:  So how does that play itself out in terms of

22    sex abuse in particular?

23    PROSPECTIVE JUROR:  Probably a vast majority of people I

24    work with have experienced sexual trauma throughout their lives.

25    THE COURT:  And so is your experience working with them

1  something that would influence your ability to be fair in a case

2  involving accusations of sexual abuse?

3      PROSPECTIVE JUROR:  I'd like to think not, but it's

4  sometimes difficult.  But I do work with people who are both sex

5  offenders, as well as those who are victims of sexual abuse.

6      THE COURT:  So it's both, alleged offenders and the

7  alleged victims.  Is there anything about that work that you

8  think might make it difficult for you to sit on a jury in a case

9  involving sex abuse?

10     PROSPECTIVE JUROR:  Yes.

11     THE COURT:  What?

12     PROSPECTIVE JUROR:  I've seen the life-long effect of

13  sexual trauma on people and how some people don't bounce back and

14  they're damaged and broken.  I know a woman who's currently

15  catatonic because she suffered long-term traumatic sexual abuse.

16     THE COURT:  Would your knowledge of those facts make it

17  hard for you to determine whether a charge of sexual abuse

18  occurred or not?  Because that would be your role in the jury,

19  not looking at the impacts, but determining whether it was true

20  in this case.

21     PROSPECTIVE JUROR:  I don't know.  It's hard to determine.

22     THE COURT:  Would you be more likely to credit the word of

23  the victim than -- the alleged victims than the defendant?

24     PROSPECTIVE JUROR:  My rational mind says yes, but my

25  emotional mind could tend to more favoring the victim.

1          THE COURT:  Would you be able to set your emotions aside?

2          PROSPECTIVE JUROR:  I'd like to say so, but I can't say

3     definitively.

4          THE COURT:  So this other question that you answered about

5     associated with groups or organizations that assists people

6     who've experienced sexual abuse, that's your work?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  And training in psychiatry, psychology, that's

9     your work?

10         PROSPECTIVE JUROR:  Um-hmm.

11         THE COURT:  It says here that you've had friends or

12    relatives that have been victims or witnesses.  Is this also

13    connected to the work that you do?

14         PROSPECTIVE JUROR:  No.  I have a number of friends who

15    have been victims of sexual assault through their lifestyle, both

16    as juveniles and as adults.

17         THE COURT:  Even in a child capacity?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  And would your relationships with them and

20    your knowledge of their circumstances make it difficult for you

21    to be fair in judging allegations of sexual abuse brought by a

22    minor?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  It would make it hard.  You also say that you

25    have strong feelings about the charges of sexual abuse against

1     minor females?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And what are those feelings?

4          PROSPECTIVE JUROR:  Again, I've just seen young women

5     destroyed, men as well, young women and men as well, just

6     destroyed by sexual trauma, to the point that they're unable to

7     function in society.

8          THE COURT:  And that would -- and you'd have a hard time

9     separating that out?

10         PROSPECTIVE JUROR:  I do.  I mean, it keeps me employed,

11    unfortunately, but it is very difficult sometimes to separate

12    that out.

13         THE COURT:  Ms. Hertzfeld?

14         MS. HERTZFELD:  No.

15         MS. SLAIGHT:  No.

16         THE COURT:  Thank you.

17         PROSPECTIVE JUROR:  Um-hmm.

18         (Prospective juror left the bench.)

19         THE COURT:  I'm going to strike her for cause.

20         Number 729.

21         (Prospective juror approached the bench.)

22         THE COURT:  Hello.  You can step right up.  How are you?

23         PROSPECTIVE JUROR:  Good.  How are you?

24         THE COURT:  So you say you've served on a jury?

25         PROSPECTIVE JUROR:  Yes.

1        THE COURT:  In what court?

2        PROSPECTIVE JUROR:  I think it was one of the courts right

3   behind --

4        THE COURT:  Across the street?

5        PROSPECTIVE JUROR:  Across the street, yeah.

6        THE COURT:  What kind of case?

7        PROSPECTIVE JUROR:  I served twice on two juries:  One of

8   them was a car theft; and the other one was -- it was a

9   drug-related arrest.

10       THE COURT:  And so neither having to do with sexual

11  charges of any nature?

12       PROSPECTIVE JUROR:  No.  No, not at all.

13       THE COURT:  And did you reach a verdict in the cases that

14  you were sitting on?

15       PROSPECTIVE JUROR:  Yeah.  Guilty on both.

16       THE COURT:  And is your experience in sitting on a jury in

17  those cases, would that be -- in any way influence your

18  experience here?

19       PROSPECTIVE JUROR:  No.

20       THE COURT:  No?

21       PROSPECTIVE JUROR:  No, not in any negative way, no.

22       THE COURT:  Okay.  You were fine serving on the jury?

23       PROSPECTIVE JUROR:  I was, yes.  Um-hmm.

24       THE COURT:  You say someone has been accused of, convicted

25  of, or been a victim or a witness to a crime?

1        PROSPECTIVE JUROR:  Yeah.  About seven years ago, my

2   partner and I, we were sitting in a McDonald's in northeast D.C.,

3   and we were assaulted -- physically assaulted by a gang of

4   teenagers.

5        THE COURT:  And were you hurt?

6        PROSPECTIVE JUROR:  Yeah.  I had to go to the hospital and

7   get my -- have an MRI done for a possible concussion.

8        THE COURT:  And would that make you -- how would that

9   experience affect you, if you had to hear the testimony of a

10  teenager right now?

11       PROSPECTIVE JUROR:  No, it wouldn't affect me.

12       THE COURT:  Do you think you would --

13       PROSPECTIVE JUROR:  I think I would remain unbiased.

14       THE COURT:  You wouldn't be more likely to discount the

15  testimony of the teenager just because of their age?

16       PROSPECTIVE JUROR:  No, not at all.

17       THE COURT:  Or because of the experience?

18       PROSPECTIVE JUROR:  No.

19       THE COURT:  What about being a victim of a crime?  Would

20  you be more likely to credit the word of a police officer just

21  because they were a police officer?

22       PROSPECTIVE JUROR:  No.  No, not -- no.

23       THE COURT:  You also say that you would choose to believe

24  a police officer more than the witness.  You wrote yes on that.

25  Why is that?

1          PROSPECTIVE JUROR:  Well, I think sometimes witnesses,

2     especially if they're from the same community, can be a little

3     biased sometimes or they could be coerced.

4          THE COURT:  Based on what?  What is your basis for that?

5          PROSPECTIVE JUROR:  Well, based on, you know, if they know

6     the litigant, if they know the litigant, if they're from the same

7     neighborhood, whatever.  I don't know.  Sometimes I think they

8     can -- I think that they can be swayed one way or the other,

9     whereas I think a police officer would probably be more, you

10    know, impartial and --

11         THE COURT:  Because he doesn't have familiarity with the

12    situation?

13         PROSPECTIVE JUROR:  Because he doesn't have -- right.

14         THE COURT:  But if you were listening to the testimony of

15    two different people who both had familiarity with the situation

16    and one was a police officer, would that -- would you be more

17    inclined to believe them just because they were a police officer?

18         PROSPECTIVE JUROR:  Well, because I don't think a police

19    officer has a stake in it.  I think a police officer is there

20    just to apply the law.  And why would they, like -- why would

21    they not be honest in their testimony?

22         THE COURT:  You also say that someone has been associated

23    with a group or organization that assists people who experience

24    sexual abuse?

25         PROSPECTIVE JUROR:  Yeah.  My partner worked at P.G.

1    County Hospital for ten years as a sexual assault counselor, so I

2    know that he saw a lot of victims, children, women --

3         THE COURT:  Did he ever talk to you about his work?

4         PROSPECTIVE JUROR:  Not specifically, but in general, kind

5    of like he would say he had a victim that was a child or

6    whatever, but he would never go into details.

7         THE COURT:  Do you know if he ever worked with people who

8    had been accused of sexual assault?

9         PROSPECTIVE JUROR:  No, because he only dealt with the

10   victims.

11        THE COURT:  And would anything about his work make you

12   more inclined to believe the word of someone who was an alleged

13   victim who was alleging sexual attack?

14        PROSPECTIVE JUROR:  No, I don't think so.

15        THE COURT:  Would you just follow the facts?

16        PROSPECTIVE JUROR:  Yeah, just the facts, yeah.

17        THE COURT:  And you also said that you think that there's

18   a connection between child pornography and sex -- child sexual

19   abuse?

20        PROSPECTIVE JUROR:  Oh, yeah, I think so.

21        THE COURT:  How so?

22        PROSPECTIVE JUROR:  Just because I've read so much about

23   it, and I think that if you are inclined to want to watch

24   pornography, child pornography, it's probably -- you're -- I

25   think that you're more likely to act on that desire if given the

1    opportunity.

2         THE COURT:  And if the Court were to say you have to set

3    aside any beliefs that you might have in that way and judge the

4    case only on the facts and the evidence, would you be able to do

5    that?

6         PROSPECTIVE JUROR:  I think -- yeah, I believe so.

7         THE COURT:  And would you believe that it's the

8    government's burden to establish that a person committed either

9    crime or both crimes?

10        PROSPECTIVE JUROR:  Yeah.

11        THE COURT:  And you wouldn't just assume that one had

12   happened because the -- if you believe that the other happened,

13   to remember the facts and the law?

14        PROSPECTIVE JUROR:  No.  I think I'm analytical enough

15   that I can only base it on facts.

16        THE COURT:  Ms. Hertzfeld?  No questions.

17        MS. SLAIGHT:  You've said that you read a lot about -- you

18   said child pornography and abuse?

19        PROSPECTIVE JUROR:  Yeah, just in the media.  Media's full

20   of stories of, like, teachers taking advantage of their students,

21   and, you know, all kind of stuff, yeah.

22        MS. SLAIGHT:  And do you think that you would take that

23   information into the -- into your -- into consideration when

24   you're deliberating in this case?

25        PROSPECTIVE JUROR:  No, I don't think so.  I think I

1    would -- I would be able to base it only on evidence.

2        MS. SLAIGHT:  And you said that the police are impartial,

3    that you feel less partial than who?

4        PROSPECTIVE JUROR:  I think -- yeah, I said than witnesses

5    sometimes.  I said because I think policemen are professionals,

6    they're -- they don't have a stake in the outcome, for the most

7    part, unless they're like crooked cops, you know.  And I tend to

8    respect, you know, law enforcement.

9        MS. SLAIGHT:  So you'd be more likely to believe the

10   police officers than the other witness?

11       PROSPECTIVE JUROR:  No.  No, I don't think so.  Well, I

12   mean, no.  If the evidence is there, then I would base it on the

13   evidence presented.

14       MS. SLAIGHT:  What is the whole case was based upon --

15   what if the case was based on testimony, the testimony of

16   civilian witnesses, testimony of police officers?

17       PROSPECTIVE JUROR:  Well, I think I'm a pretty good judge

18   of character on my own, that I would be able to discern if

19   somebody was, like, lying.  I think I'm a good judge of character

20   in that way.

21       THE COURT:  All right.  Thank you.

22       PROSPECTIVE JUROR:  Um-hmm.  Thank you.

23       (Prospective juror left the bench.)

24       MS. SLAIGHT:  I move to strike him for cause.  He -- he

25   just said that he thought that police are -- you know, a little

1    while ago, that police are impartial, that witnesses can be

2    biased, that he's read a lot about sex abuse cases, and, you

3    know, he's insisting that the police have no stake and --

4         THE COURT:  No, I'm not going to strike him.  We followed

5    up with many questions about the extent to which we could.

6         MS. SLAIGHT:  Your Honor, I just want to say for the

7    record that this is -- I'm repeating the motion to sever for the

8    sex offense crimes from the pornography.  Based on the responses

9    of the jurors, it seems like the jurors cannot keep this

10   separate, and I --

11        THE COURT:  I'm going to deny that motion.  First of all,

12   to the extent that those questions are in the voir dire, they

13   were offered by your predecessor, Mr. Miles, in order to address

14   and probe that very issue.  The Court also entertained Mr. Miles'

15   motion to sever, denying it on the basis that the evidence with

16   respect to each of these crimes would actually be admissible in

17   the other case, such that we wouldn't be saving anything.  The

18   jury was going to hear about the evidence even if we were

19   severing the trial.

20        So the motion to sever has no basis, and we have followed

21   up with every juror who has indicated some connection.  I think

22   it's logical in the way that they describe it, but every single

23   person says that if the Court were to instruct them that they

24   needed to find these crimes separately and not actually as one,

25   that they would be able to do so, so your motions are denied.

1        MS. SLAIGHT:  And I just -- if I can just make a record?

2        THE COURT:  Yes.

3        MS. SLAIGHT:  I -- my position is that because of the

4   number of answers that people linking the two together is

5   overwhelming and --

6        THE COURT:  Let me just make a record as well, by

7   restating for the record what the question is, and then making it

8   clear why I think that this question may be misleading in this

9   way, such that it's causing people to answer, but not in a way

10  that's prejudicial to this case or to the defendant.

11       Question Number 47 is:  Do you believe that someone who

12  would be interested in child pornography is more likely to

13  sexually abuse a minor?

14       Question Number 48 is:  Do you believe that someone who

15  would sexually abuse a minor is more likely to be interested in

16  child pornography?

17       There is on the facts a connection between those two kinds

18  of conduct, and so to the extent that people are connecting them,

19  I think that is not an irrational bias or, you know, circumstance

20  that suggests they couldn't look at child pornography charges and

21  the elements of the offenses and apply the facts to child

22  pornography, separate and apart from sex abuse of a minor.  And

23  that's the only thing that matters for this purpose.

24       And so, yes, there is some connection I think people are

25  saying, in terms of what those two crimes, but we follow up, and

1      every person indicates that they're able to separate them and to

2      apply the facts and the law to each charge and to hold the

3      government to its proof.

4            So we've made our record, but I'm going to overrule your

5      objections.

6            Now let me ask you about juror number 712.  We talked

7      about her.  She was the fifth person down, and I'm just

8      remembering that she needs to move down because she says she's

9      got to travel next Friday, and that was the same reason that we

10     had moved down the juror who's at line 39, number 493, who said

11     his wife told him that he had to be in Philadelphia on Friday.

12           So I think in fairness, number 712 needs to be moved down

13     as well.

14           MS. HERTZFELD:  Yes, Your Honor.

15           MS. SLAIGHT:  Number 712?

16           THE COURT:  Yes, the fifth line down.

17           MS. SLAIGHT:  Right.

18           THE COURT:  Because we got a note after she left that

19     she's got to travel next Friday as well.

20           MS. SLAIGHT:  Okay.

21           THE COURT:  All right.  Let's keep going so we can get

22     through this.

23           Number 951.

24           (Prospective juror approached the bench.)

25           THE COURT:  Hello.  If you could come to the microphone.

1          PROSPECTIVE JUROR:  Sure.

2          THE COURT:  You say you have a scheduling problem?

3          PROSPECTIVE JUROR:  Yes.  We have a delegation from

4     Thailand of 25 people coming in on Monday and Tuesday -- well,

5     it's the 8th and 9th, but I have to finalize the agenda and

6     prepare all the materials for the meeting next week and put them

7     at our interagency.

8          THE COURT:  Can you tell me what agency you're with?

9          PROSPECTIVE JUROR:  It's U.S. Trade Representatives.

10    We're part of EOP.

11         THE COURT:  So you're the one who's responsible for --

12         PROSPECTIVE JUROR:  I'm the one who -- yup.

13         THE COURT:  Yeah.

14         PROSPECTIVE JUROR:  I'm the lucky one.

15         THE COURT:  It's a hardship that you had to serve?

16         PROSPECTIVE JUROR:  Right.  Well, it just would be not

17    only in terms of writing the papers, but then clearing them with

18    the interagency.  It would be hard to do if I'm going to be here.

19         THE COURT:  All right.  I'm going to strike you on that

20    basis.

21         PROSPECTIVE JUROR:  Okay.

22         THE COURT:  All right.

23         PROSPECTIVE JUROR:  Thank you.

24         THE COURT:  Thank you.

25         (Prospective juror left the bench.)

1          THE COURT:  Number 1333.

2          (Prospective juror approached the bench.)

3          THE COURT:  Hello.

4          PROSPECTIVE JUROR:  Hi.

5          THE COURT:  So you've written nothing.  You're not a

6     lawyer.  You don't know lawyers?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  And there's nothing about this schedule that

9     would make it difficult for you to serve?

10         PROSPECTIVE JUROR:  No.  Only if it's in April, 18th.  I

11    have an appointment, that's all.

12         THE COURT:  No.  It's just next week.

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  What do you do?

15         PROSPECTIVE JUROR:  As employment wise?

16         THE COURT:  Employment wise.

17         PROSPECTIVE JUROR:  I work for Kaiser Permanente.  I work

18    in the member resolution center, so I handle complaints.

19         THE COURT:  And is there any -- what do you hear?  You

20    hear people complaining their bills?

21         PROSPECTIVE JUROR:  And their doctors.

22         THE COURT:  And their doctors.

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  And do you have anybody who calls you related

25    to sexual abuse for the area?

1           PROSPECTIVE JUROR:  With Kaiser, no.  They'll go to upper

2   management.

3           THE COURT:  Okay.  So you never handle any complaints

4   related to sex crimes or sex abuse?

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  Is there anything about a sex crimes case or

7   child pornography case that you think would be difficult for you

8   as a juror?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  You think you'd be able to look fairly and

11  impartially at the evidence and hear both sides and hear all

12  kinds of evidence and make a decision?

13          PROSPECTIVE JUROR:  Yes.  That's what I do every day in

14  the complaints.

15          THE COURT:  Ms. Hertzfeld?

16          MS. HERTZFELD:  No questions.  Thank you.

17          PROSPECTIVE JUROR:  Thank you.

18          MS. SLAIGHT:  Thank you.

19          (Prospective juror left the bench.)

20          THE COURT:  Number 944.

21          (Prospective juror approached the bench.)

22          THE COURT:  Hello.  How are you?

23          PROSPECTIVE JUROR:  Good.  How are you?

24          THE COURT:  This is our microphone so people can hear.

25          PROSPECTIVE JUROR:  Oh, okay.

```
 1          THE COURT:  So are you a lawyer or someone you know?

 2          PROSPECTIVE JUROR:  Yes, I'm a lawyer.

 3          THE COURT:  And what kind of law do you practice?

 4          PROSPECTIVE JUROR:  Labor employment law.

 5          THE COURT:  And have you ever done any criminal work in

 6  your career?

 7          PROSPECTIVE JUROR:  No, I have not.

 8          THE COURT:  But you took criminal law in college, in law

 9  school?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  And have you ever had a clinic working in

12  criminal?

13          PROSPECTIVE JUROR:  No.  I did immigration, but not -- I

14  didn't represent in criminal court.

15          THE COURT:  Okay.

16          PROSPECTIVE JUROR:  No.  I did an internship at House of

17  Ruth Maryland.

18          THE COURT:  At what?

19          PROSPECTIVE JUROR:  House of Ruth Maryland that --

20          THE COURT:  House of Ruth?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Yes.

23          PROSPECTIVE JUROR:  That represents domestic violence

24  victims in court, but I didn't represent them in court.

25          THE COURT:  And did you have -- do you recall, in working
```

1    with the House of Ruth, working with anybody who was alleged

2    sexual abuse victim?

3           PROSPECTIVE JUROR:  Not sexual abuse, no.

4           THE COURT:  You say that you also have a connection to law

5    enforcement, either yourself or friend or family?

6           PROSPECTIVE JUROR:  Yeah.  I don't know if this counts,

7    but before I started doing labor employment, I was doing Section

8    1983 work up in New York, so I primarily defended NYPD officers,

9    criminal correction offices.

10          THE COURT:  Defending them?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  And how long did you do that work?

13          PROSPECTIVE JUROR:  About two-and-a-half years.

14          THE COURT:  And in your work as a defender of law

15   enforcement and NYPD officers in New York, because of that work,

16   would you be more likely to credit the testimony of a police

17   officer in a criminal case, or would you be able to --

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  -- evaluate it fairly?

20          PROSPECTIVE JUROR:  Yeah, absolutely.  I'd be able to

21   evaluate it fairly, and, if anything, that's made me, you know,

22   more objective.

23          THE COURT:  You wouldn't automatically believe the person

24   who was testifying just because they were law enforcement?

25          PROSPECTIVE JUROR:  Absolutely not.

1      THE COURT:  And someone has been employed by a defense

2   attorney or a defender organization?

3      PROSPECTIVE JUROR:  Well, just actually what I just told

4   you.  I wasn't sure if that would count.  You know, it's not

5   criminal defense, but it's defense work, so I didn't know if that

6   would count.

7      THE COURT:  And you said something about someone

8   associated with a group or organization that assists people

9   who've have experienced sexual abuse?

10      PROSPECTIVE JUROR:  That, actually, I was just referring

11   to House of Ruth Maryland --

12      THE COURT:  I see.

13      PROSPECTIVE JUROR:  -- because I think they do sometimes

14   work with sexual abuse survivors.

15      THE COURT:  But you didn't --

16      PROSPECTIVE JUROR:  But I did not.

17      THE COURT:  You didn't?

18      PROSPECTIVE JUROR:  No.

19      THE COURT:  And you didn't form any opinions about sexual

20   abuse victims or anything in connection with that work?

21      PROSPECTIVE JUROR:  No, I did not.

22      THE COURT:  Ms. Hertzfeld?

23      MS. HERTZFELD:  No questions.  Thank you.

24      MS. SLAIGHT:  No.  Thanks.

25      PROSPECTIVE JUROR:  Thank you.

1        (Prospective juror left the bench.)

2        THE COURT:  Number 470.

3        (Prospective juror approached the bench.)

4        THE COURT:  Hello.

5        PROSPECTIVE JUROR:  Hello.

6        THE COURT:  We're going to have you talk right into the

7   microphone.

8        PROSPECTIVE JUROR:  Okay.

9        THE COURT:  Are you a lawyer or someone you know?

10        PROSPECTIVE JUROR:  I'm not a lawyer.  I have some friends

11   who are lawyers.

12        THE COURT:  And do they practice in criminal law?

13        PROSPECTIVE JUROR:  No, not -- let me make sure that's

14   right.  No criminal.

15        THE COURT:  Not that you're aware of?

16        PROSPECTIVE JUROR:  Not that I'm aware of.

17        THE COURT:  And do you have any connection with criminal

18   justice in any way that maybe I didn't touch upon with my

19   questions?

20        PROSPECTIVE JUROR:  No.  I do have one addition there.  I

21   do know someone here who's another potential juror.

22        THE COURT:  Tell me.

23        PROSPECTIVE JUROR:  It's Ricky Brown.  He's a coworker.

24        THE COURT:  Have you seen him here in the courtroom?

25        PROSPECTIVE JUROR:  Yeah.  I didn't see him when I did the

1    scan, but shortly afterwards I said, "Hey, I know you."

2        THE COURT:  Good.  And you also answered the questions

3    about someone being interested in child pornography more likely

4    to be interested in sexually abusing a minor and vice-versa.

5    Tell me what that's based on.

6        PROSPECTIVE JUROR:  Sure.  My -- that's based on my

7    thinking that the two are closely connected, child pornography

8    and potentially abuse of a minor.

9        THE COURT:  And if the Court were to tell you to look at

10   only the facts and the law, and to make sure that each of the

11   charges the government had proven its case beyond a reasonable

12   doubt, would you be able to do that?

13       PROSPECTIVE JUROR:  I'm sorry.  Can you repeat that?

14       THE COURT:  You mentioned that you think that there's a

15   connection between these two types of crimes.  And what I'm

16   asking you is:  If the Court were to instruct you that each crime

17   had to be proven by the facts, and the Court gave you the law

18   that applied to each crime, would you be able to apply it to each

19   crime separately and not assume that just because someone may be

20   guilty of one, they will be guilty of the other?

21       PROSPECTIVE JUROR:  Yes, yes.

22       THE COURT:  Ms. Hertzfeld?

23       MS. HERTZFELD:  No questions.

24       MS. SLAIGHT:  You work for D.C. schools; is that right?

25       PROSPECTIVE JUROR:  Um-hmm.

1          MS. SLAIGHT:  And do you have any interaction with

2     children?

3          PROSPECTIVE JUROR:  I don't in my current role.  I'm a

4     central office staff member.  I have been a teacher in the past.

5          MS. SLAIGHT:  And did you ever work with -- what grade did

6     you teach?

7          PROSPECTIVE JUROR:  7th grade.

8          MS. SLAIGHT:  Pardon?

9          PROSPECTIVE JUROR:  7th and 6th grade.

10         MS. SLAIGHT:  Okay.  And did you work with children who

11    were either suspected of being abused or --

12         PROSPECTIVE JUROR:  Not directly.  I had sort of general

13    education, 7th grade social studies.  However, I thought, I'd

14    say, 7- or 800 kids, so there were certain kids who were in and

15    out of that situation, but it wasn't something that I was sort of

16    a point person on.

17         THE COURT:  That you ever had to deal with as the teacher?

18         PROSPECTIVE JUROR:  Yeah.  It wasn't something where I --

19    I never had to do the -- sort of the mandated reporting where I

20    was someone who found out about abuse and reported it to another

21    staff member.  But there were certainly like stories within

22    students who I taught with parental issues and that sort of

23    issue.

24         MS. SLAIGHT:  Do you think that you would be -- this is

25    obviously a separate case.

1          PROSPECTIVE JUROR:  Um-hmm.

2          MS. SLAIGHT:  Do you think you'd be able to separate out

3     those stories that you heard from the allegations in this case?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Any others?  All right.  Thank you.

6          PROSPECTIVE JUROR:  Thanks.

7          (Prospective juror left the bench.)

8          THE COURT:  Number 969.

9          (Prospective juror approached the bench.)

10          THE COURT:  Great.  There's our microphone.  So you say

11     you recognize someone else on the jury panel?

12          PROSPECTIVE JUROR:  Yeah.  Two other people.

13          THE COURT:  Tell me, who are they?

14          PROSPECTIVE JUROR:  One's a -- one's a childhood friend.

15     Her name's Hannah.  Do you want their names?

16          THE COURT:  Yes, please.

17          PROSPECTIVE JUROR:  And the other one is --

18          THE COURT:  Hannah?  Do you know her last name?

19          PROSPECTIVE JUROR:  Yeah, Hannah Flint.

20          THE COURT:  Okay.

21          PROSPECTIVE JUROR:  And the other one, he hasn't gone up

22     yet.  His name is Jimmy Stringer.

23          THE COURT:  Jimmy?

24          PROSPECTIVE JUROR:  Jimmy Stringer.

25          THE COURT:  Stringer.  Okay.

1       PROSPECTIVE JUROR:  I knew him from high school.

2       THE COURT:  All right.  You also say that you are a lawyer

3  or someone you know is a lawyer?

4       PROSPECTIVE JUROR:  Yeah.  I've got a bunch of friends

5  that are lawyers.

6       THE COURT:  And do you know if any of them practice

7  criminal law?

8       PROSPECTIVE JUROR:  No.

9       THE COURT:  So you're not familiar with the criminal

10 justice system from the standpoint of being a lawyer or knowing

11 these friends?

12      PROSPECTIVE JUROR:  Not their work, per se, no.

13      THE COURT:  What about law enforcement?  You say that you

14 have a connection to law enforcement?

15      PROSPECTIVE JUROR:  So I spent four years with the FBI and

16 worked closely with the U.S. Attorney's Office, so I'm very --

17      THE COURT:  Were you an agent?

18      PROSPECTIVE JUROR:  No.  I was an analyst.

19      THE COURT:  And worked closely with FBI agents?

20      PROSPECTIVE JUROR:  Yes, directly supported their

21 investigations.

22      THE COURT:  And would you be more likely to credit the

23 testimony of an FBI agent or other law enforcement agent because

24 of your work?

25      PROSPECTIVE JUROR:  Not necessarily.

```
 1          THE COURT:  Would you be able to look impartially at the

 2     facts of the case and -- even though you work in law enforcement?

 3          PROSPECTIVE JUROR:  Yeah.  I mean, I would definitely take

 4     the word of the sworn statement of an FBI agent, but I'd also be

 5     very open-minded to civilian, if I believe they're being

 6     truthful.

 7          THE COURT:  And if that truthful -- if that statement of

 8     the civilian contradicted the law enforcement officer, would you

 9     necessarily believe the law enforcement officer because

10     they were --

11          PROSPECTIVE JUROR:  Not necessarily.

12          THE COURT:  No?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  You also say that you have friends or

15     relatives or you, someone has been employed by a defense attorney

16     or defender organization?

17          PROSPECTIVE JUROR:  Say that last part.

18          THE COURT:  Defense attorney or defender organization, do

19     you have a connection to?

20          PROSPECTIVE JUROR:  I don't recall that.  I think it was

21     like your family been involved was like a lawyer or an attorney.

22          THE COURT:  Oh, I see.

23          PROSPECTIVE JUROR:  There's a real estate issue with my

24     father, but it was --

25          THE COURT:  But it wasn't defense attorney?
```

1          PROSPECTIVE JUROR:  No, no, no.

2          THE COURT:  Okay.  And you've never been a juror?

3          PROSPECTIVE JUROR:  I was selected for Superior Court, but

4   I didn't have to serve.

5          THE COURT:  And have you had any -- this says experiences

6   with law enforcement that might cause you to favor or disfavor.

7   Is this your job, the favoring or disfavoring law enforcement?

8   Is the experience just having worked for the FBI?

9          PROSPECTIVE JUROR:  I don't understand the question.

10          THE COURT:  I'm sorry.  It's a long day.

11          PROSPECTIVE JUROR:  I understand.

12          THE COURT:  The question is:  Have you or any of your

13   friends or relatives had any experience with a law enforcement

14   agency or the government that might cause you to favor or

15   disfavor the government or law enforcement?

16          PROSPECTIVE JUROR:  I would probably favor law

17   enforcement.

18          THE COURT:  Why?

19          PROSPECTIVE JUROR:  Because having worked with them, the

20   class they have --

21          THE COURT:  But would you treat them neutrally just like

22   every other --

23          PROSPECTIVE JUROR:  Yeah, I would to take them neutrally

24   as well, but I would tend to take their word.

25          THE COURT:  More so than any other witness?

1      PROSPECTIVE JUROR:  Yeah.

2      THE COURT:  Because of your experience?

3      PROSPECTIVE JUROR:  Exactly.

4      THE COURT:  You also said that you'd have difficulty with

5  a case involving the alleged production and possession of child

6  pornography, that you have strong feelings about that.  Can you

7  tell me more?

8      PROSPECTIVE JUROR:  I don't recall answering that, but

9  yeah, I mean, it's very disturbing.

10      THE COURT:  What is your experience or thought?

11      PROSPECTIVE JUROR:  I've had minimal exposure working on

12  the FBI, which is a sickening crime and offense.

13      THE COURT:  Did you work on any child pornography or child

14  sex abuse cases?

15      PROSPECTIVE JUROR:  Not directly, but on the periphery you

16  have exposure to everybody's cases in the office.

17      THE COURT:  So you're familiar with these cases in that

18  way?

19      PROSPECTIVE JUROR:  Yeah, generally speaking.

20      THE COURT:  And you also were asked a question about the

21  link between child pornography and child sex abuse.  Is that

22  something that you came to as a result of your work as well?

23      PROSPECTIVE JUROR:  I think yes, and then anecdotally,

24  like, there's not child sexual abuse without the provision of

25  videos and photography and things of that nature.

```
1          THE COURT:  You think they're all one in the same?

2          PROSPECTIVE JUROR:  I don't necessarily think so, but

3     through all the instances that I've heard, they definitely seem

4     to be tied to one another.

5          THE COURT:  And you also answered that you believe that

6     just because Mr. Hillie is charged, that he's probably guilty of

7     something?

8          PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  Because you think that when the government

10    charges someone, they're likely to have committed the crime?

11         PROSPECTIVE JUROR:  Not necessarily, but I think their

12    chief for criminals probably not going to have an FBI agent here

13    and two AUSA's working indefinitely this long case if they don't

14    think they have a case.

15         THE COURT:  Would you be able to set those feelings side?

16         PROSPECTIVE JUROR:  It would be in the back of my mind,

17    but I would certainly try and be impartial.

18         THE COURT:  Ms. Hertzfeld?

19         MS. HERTZFELD:  No questions.

20         MS. SLAIGHT:  No questions.

21         THE COURT:  All right.  Thank you.

22         (Prospective juror left the bench.)

23         THE COURT:  All right.  I'm going to strike him for

24    expressed partiality with regard to law enforcement.

25         What do we have?
```

1          THE COURTROOM CLERK:  29.  I suggest we at least go half

2     through another row.

3          THE COURT:  Half through another row.

4          THE COURTROOM CLERK:  Yeah, because we have 29 right now,

5     and that's excluding the five individuals that you've put down at

6     the bottom.

7          THE COURT:  So should we do like three or four more

8     people?

9          THE COURTROOM CLERK:  Yes.

10         THE COURT:  Okay.

11         MS. SLAIGHT:  29 includes the people we're putting at the

12    end?

13         THE COURT:  Excluding.  You said excluding?

14         THE COURTROOM CLERK:  Right.  29 is what we qualified

15    excluding the five.

16         THE COURT:  Let's do three or four more, and then we'll

17    have -- including those people -- 39 or something, so that would

18    be fine.

19         THE COURTROOM CLERK:  That's fine.

20         MS. SLAIGHT:  I apologize.  It's 34 if everybody uses all

21    their strikes?

22         THE COURTROOM CLERK:  32 if everybody uses all their

23    strikes.

24         MS. SLAIGHT:  Thank you.

25         THE COURT:  Okay.  The next row.  We'll have number 1109

 1    come right up.

 2           (Prospective juror approached the bench.)

 3           THE COURT:  Hello.  You can speak right into the

 4    microphone here.

 5           PROSPECTIVE JUROR:  Yes.

 6           THE COURT:  Are you a lawyer or somebody that you know?

 7           PROSPECTIVE JUROR:  I am.

 8           THE COURT:  And what kind of law do you practice?

 9           PROSPECTIVE JUROR:  I practice patent law.

10           THE COURT:  And have you ever done any criminal law in

11    your experience?

12           PROSPECTIVE JUROR:  No.  I'm pretty ignorant about

13    criminal proceedings.

14           THE COURT:  Even -- what about friends, family members,

15    anybody in criminal, either prosecutor or defense counsel?

16           PROSPECTIVE JUROR:  Someone in my firm just took a pro

17    bono case, but I really don't know anything about it.

18           THE COURT:  So you really don't have any criminal justice

19    insight or experience?

20           PROSPECTIVE JUROR:  No.  I think before that my firm never

21    did anything like that, so --

22           THE COURT:  And you haven't sat as a juror before?

23           PROSPECTIVE JUROR:  Never.

24           THE COURT:  And the only other question that you answered

25    was:  Is there another question that I haven't asked that you

1    wanted to say something about?

2         PROSPECTIVE JUROR:  Well, yeah.  I don't know how this

3    works, but I noticed you were talking about finding -- coming to

4    a verdict, nothing about sentencing.  Is that something that

5    happens after --

6         THE COURT:  Sentencing is not the province of the jury.

7    That's what the Court does.

8         PROSPECTIVE JUROR:  Okay.  That's fine.  I had no idea,

9    but I was just curious about it.

10        THE COURT:  Yes.  No, the sentencing is the judge's

11   responsibility if the person is found guilty.

12        PROSPECTIVE JUROR:  Sounds good.  Yes.

13        THE COURT:  But the jury has to determine whether or not

14   the person who's been accused of the crime has committed the

15   crime, based only on the facts and the evidence presented at

16   trial and the instructions of the judge.  Do you think you'd be

17   able to do that?

18        PROSPECTIVE JUROR:  Sure.

19        THE COURT:  Ms. Hertzfeld?

20        MS. HERTZFELD:  No questions.

21        PROSPECTIVE JUROR:  Okay.  Thank you.

22        THE COURT:  Thank you.

23        (Prospective juror left the bench.)

24        THE COURT:  Number 1032.

25        (Prospective juror approached the bench.)

```
 1          THE COURT:  How are you?  So you -- are you a lawyer or
 2     someone you know?
 3          PROSPECTIVE JUROR:  No.
 4          THE COURT:  Someone you know maybe?
 5          PROSPECTIVE JUROR:  Yes, someone I know.
 6          THE COURT:  Who is the lawyer?
 7          PROSPECTIVE JUROR:  Lawyer?  Friends, I have a few friends
 8     who are lawyers.
 9          THE COURT:  And do you know if they do criminal work at
10     all?
11          PROSPECTIVE JUROR:  They don't.
12          THE COURT:  Okay.  Do you have any experience with the
13     criminal justice system?
14          PROSPECTIVE JUROR:  No.
15          THE COURT:  What about law enforcement?  You say that you
16     have some connection?
17          PROSPECTIVE JUROR:  Um-hmm.  Yeah, I have a friend who's
18     an FBI analyst.
19          THE COURT:  And does that person -- his experience as an
20     FBI analyst, would that make you more likely to believe a law
21     enforcement officer just because they're law enforcement?
22          PROSPECTIVE JUROR:  No.
23          THE COURT:  Or would you be able to weigh their
24     credibility just like any other witness?
25          PROSPECTIVE JUROR:  Um-hmm.
```

1          THE COURT:  "Yes"?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And you know someone who's been employed by a

4     court, probation office, correction office, penal institution?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Who's that?

7          PROSPECTIVE JUROR:  I know a friend who is a probation

8     officer.

9          THE COURT:  And did that person ever talk to you about his

10    or her work?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  So you're not familiar with what kinds of

13    people they were supervising?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  You also say that someone's been accused,

16    arrested, convicted, a victim of a crime or a witness to a crime?

17         PROSPECTIVE JUROR:  Victim of a crime, yeah.

18         THE COURT:  And who is that?

19         PROSPECTIVE JUROR:  Well, myself a victim of robbery, and

20    also --

21         THE COURT:  Personally at gun point or --

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Okay.  No guns?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  A mugging?

1          PROSPECTIVE JUROR:  No.  I wasn't there.

2          THE COURT:  Oh.

3          PROSPECTIVE JUROR:  And I have a friend who was raped,

4      and --

5          THE COURT:  How close a friend?

6          PROSPECTIVE JUROR:  Like one of my best friends.

7          THE COURT:  And did you go through the experience with him

8      or her in terms of hearing about it, and did the perpetrator get

9      caught and convicted?

10         PROSPECTIVE JUROR:  No, she didn't report it.

11         THE COURT:  She did not report it.  Would your connection

12     with this individual make you more likely to believe someone

13     who's accusing someone of sexual assault?

14         PROSPECTIVE JUROR:  Honestly, yes.

15         THE COURT:  Because you've had a personal experience in

16     dealing with someone?

17         PROSPECTIVE JUROR:  And I also understand that it takes so

18     much to report it, so that I think that -- well, if someone has

19     gone through the step of reporting it, that it's more likely to

20     have occurred.

21         THE COURT:  You think just because the accusation has been

22     made it's more likely true?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  And you'd have a hard time separating that

25     from --

```
 1          PROSPECTIVE JUROR:  Yeah.  I know that's not how it's
 2    supposed to be, but that's how I feel.
 3          THE COURT:  And you couldn't really set aside your
 4    feelings, even if the Court said you had to?
 5          PROSPECTIVE JUROR:  I don't know.  My hunch is no.
 6          THE COURT:  Any other questions?
 7          MS. HERTZFELD:  No, Your Honor.
 8          MS. SLAIGHT:  No, Your Honor.
 9          THE COURT:  Thank you.
10          (Prospective juror left the bench.)
11          THE COURT:  I'm going to strike her for cause based on her
12    answers related to the inability to separate out her personal
13    feelings related to victims of sexual assault.
14          Number 263.
15          (Prospective juror approached the bench.)
16          THE COURT:  You have answered the most popular question,
17    which is:  You are a lawyer or somebody that you know is a
18    lawyer?
19          PROSPECTIVE JUROR:  A lawyer or --
20          THE COURT:  263.
21          PROSPECTIVE JUROR:  -- been in court somehow?
22          THE COURT:  Let's see.  Studied law, legal training,
23    employed by a lawyer or a law firm, worked in a courthouse, is
24    that it?
25          PROSPECTIVE JUROR:  Yeah.  My sister-in-law's a clerk at a
```

1    courthouse.

2          THE COURT:  Clerk?

3          PROSPECTIVE JUROR:  Clerk.

4          THE COURT:  In which courthouse?

5          PROSPECTIVE JUROR:  Chesapeake, Virginia.

6          THE COURT:  All right.  And have you ever talked with her

7    about her work?

8          PROSPECTIVE JUROR:  I have no idea what she does.

9          THE COURT:  So you haven't talked with her about any of

10   the cases that come through the courthouse?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  What about connection to law enforcement?

13         PROSPECTIVE JUROR:  My husband's step dad is a police

14   officer.

15         THE COURT:  And have you ever talked to him about his

16   work?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  So you don't know what kinds of cases he's

19   worked on?

20         PROSPECTIVE JUROR:  I know he's in Norfolk, and he used to

21   be on the DEA before I was around, but I'm not sure otherwise.

22   We only see them about five times a year, so we don't talk that

23   often.

24         THE COURT:  And you're not -- you don't think he's

25   involved with sex crimes or anything like that?

1      PROSPECTIVE JUROR:  No.  I think it's drug enforcement

2 stuff.

3      THE COURT:  And you mentioned that someone that you know

4 has been accused, arrested, charged, convicted of a crime or been

5 a victim of a crime or been a witness to a crime?

6      PROSPECTIVE JUROR:  So I had a package stolen last year

7 that I had to report to the D.C. police, but that's it.

8      THE COURT:  All right.

9      PROSPECTIVE JUROR:  Nothing serious, just package theft.

10      THE COURT:  And you've never served on a jury?

11      PROSPECTIVE JUROR:  Never.

12      THE COURT:  Do you have any other connection to the

13 criminal justice system?

14      PROSPECTIVE JUROR:  (Shook head negatively.)

15      THE COURT:  And you work with children sexual assault

16 victims or sex offenders?

17      PROSPECTIVE JUROR:  No.

18      THE COURT:  You don't?

19      PROSPECTIVE JUROR:  Did I answer that one?

20      THE COURT:  Oh, you know what?  Sorry.  That was my fault.

21 That was my fault.  I looked at the wrong one.

22      What do you do?

23      PROSPECTIVE JUROR:  I'm a nurse practitioner.

24      THE COURT:  And you work with adults then?

25      PROSPECTIVE JUROR:  Adults.

1          THE COURT:  You answered that you believe that someone

2     who'd sexually abuse a minor is more than likely interested in

3     child pornography.  What's your basis for believing that?

4          PROSPECTIVE JUROR:  It's just felt logical to me.  If they

5     were abusing somebody in real life, they'd be more likely to

6     watch somebody abusing a child.

7          THE COURT:  But if the Court said that those are different

8     charges and that the government has to prove the charges beyond a

9     reasonable doubt with respect to each of those crimes, would you

10    be able to follow the Court's instruction?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Ms. Hertzfeld?

13         MS. HERTZFELD:  No questions.

14         MS. SLAIGHT:  Nothing.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR:  Thank you.

17         (Prospective juror left the bench.)

18         MS. SLAIGHT:  Your Honor, I don't want to keep repeating

19    the same thing, so I just -- when people answer the -- I would

20    object when people answer that question about --

21         THE COURT:  What's the question that you -- what question?

22         MS. SLAIGHT:  Whether pornography is related to sex

23    offense or sex offense is related to pornography.

24         THE COURT:  Yes.

25         PROSPECTIVE JUROR:  And I know you want to move along,

1    so --

2         THE COURT:  Yes.  You can have a standing objection to

3    anybody who answered the question in that fashion.

4         MS. SLAIGHT:  Yes.

5         THE COURT:  We'll do two more.

6         Number 87.

7         (Prospective juror approached the bench.)

8         THE COURT:  Hello.

9         PROSPECTIVE JUROR:  Hi.

10        THE COURT:  I have a microphone here.

11        PROSPECTIVE JUROR:  Sure.

12        THE COURT:  You answered question number 1?

13        PROSPECTIVE JUROR:  Yes.

14        THE COURT:  Do you know something about this case?

15        PROSPECTIVE JUROR:  I read your opinion on the motion to

16   dismiss.

17        THE COURT:  Oh.  You must be a lawyer?

18        PROSPECTIVE JUROR:  I am.

19        THE COURT:  You answered that.  What kind of work do you

20   do?

21        PROSPECTIVE JUROR:  I'm actually a tax attorney in-house

22   at an accounting firm, but I do pro bono work, guardian ad litem

23   in the D.C. Superior Court.

24        THE COURT:  So you're familiar with this case?

25        PROSPECTIVE JUROR:  Um, inasmuch as I know from your

1    opinions.  I have not read about it in the news or anything to

2    that effect.

3         THE COURT:  Right.  I think that you probably can't serve

4    in our jury, so thank you very much.

5         PROSPECTIVE JUROR:  Of course.  Do I go back or can I just

6    leave?

7         THE COURT:  You can leave.  Thank you.

8         (Prospective juror left the bench.)

9         THE COURT:  Number 707.

10        (Prospective juror approached the bench.)

11        THE COURT:  Hello.

12        PROSPECTIVE JUROR:  How are you?

13        THE COURT:  Are you a lawyer or someone you know?

14        PROSPECTIVE JUROR:  No.  I was saying I worked at a law

15   center for a couple of years, but I didn't think that would

16   actually be what you were getting at.  It was an administrative

17   position surely.

18        THE COURT:  In what kind of a law center?

19        PROSPECTIVE JUROR:  Georgetown Academic, Georgetown Law,

20   in their career center.

21        THE COURT:  I see.  So you didn't really work with cases

22   or people in --

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  -- criminal law in any way?

25        You also said that you might feel uncomfortable or have

1   difficulty discussing cases of this nature with your fellow

2   jurors?

3          PROSPECTIVE JUROR:  Just the nature of the topic is heavy

4   and disturbing, so nothing beyond that.

5          THE COURT:  Do you think you could work beyond that in

6   terms of, you know, your responsibility as a juror is to take

7   into account the evidence in the case?

8          PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  And if it's the kind of evidence that I talked

10  about, would you be able to put aside your squeamish feelings

11  about it?

12         PROSPECTIVE JUROR:  Yeah.  I think -- I mean, obviously,

13  like purely nonemotional, no; but I don't know if anybody can do

14  that.  So that was just my best answer at your question.  It's --

15  I would obviously would want to do my best, but, I mean --

16         THE COURT:  Let me rephrase my question.

17         PROSPECTIVE JUROR:  Sure.

18         THE COURT:  I think my question was getting at, you know,

19  in the jury room, would you feel so intimidated by the subject

20  that you wouldn't really speak your mind about the evidence and

21  what you thought the right answer should be in this case?

22         PROSPECTIVE JUROR:  Um, no.  I think I would be able to

23  participate and provide honest opinions and --

24         THE COURT:  Evaluate the evidence fairly, even though it's

25  a disturbing subject matter?

1        PROSPECTIVE JUROR:  Yeah.

2        THE COURT:  Ms. Hertzfeld?

3        MS. HERTZFELD:  No questions.  Thank you.

4        MS. SLAIGHT:  When you talk about being -- you know, the

5   subject matter being disturbing, does that affect your

6   presumption of innocence for Mr. Hillie in this case?  In other

7   words, can you maintain the presumption of innocence even if the

8   subject matter is --

9        PROSPECTIVE JUROR:  Yeah.  I wouldn't assume that he was

10  guilty just by being here.  It's just the content itself is what

11  it is.

12       THE COURT:  All right.  Thank you.

13       PROSPECTIVE JUROR:  Okay.

14       (Prospective juror left the bench.)

15       THE COURT:  Do we have enough?

16       THE COURTROOM CLERK:  Two more.  She said two more.

17       Number 1337.

18       (Prospective juror approached the bench.)

19       THE COURT:  Hello.

20       PROSPECTIVE JUROR:  Hi.

21       THE COURT:  How are you?

22       PROSPECTIVE JUROR:  Okay.

23       THE COURT:  So this is our microphone.

24       PROSPECTIVE JUROR:  Okay.

25       THE COURT:  And you -- are you all right?

1        PROSPECTIVE JUROR:  Sorry.

2        THE COURT:  You have written that you know something about

3  this case?

4        PROSPECTIVE JUROR:  I think I read about it in the paper.

5        THE COURT:  Interesting.

6        PROSPECTIVE JUROR:  Or there was a story about it, one of

7  the two.

8        THE COURT:  Tell me what you think you heard?

9        PROSPECTIVE JUROR:  Well, it was a boyfriend who assaulted

10  two daughters of a girlfriend, but I don't remember -- it was

11  probably years ago, but I -- some reason I --

12        THE COURT:  How many years ago, do you think?

13        PROSPECTIVE JUROR:  Two or three.

14        THE COURT:  And did you form any opinion about that

15  circumstance based on the article that you read?

16        PROSPECTIVE JUROR:  Not really, not at that time.

17        THE COURT:  You also say that you are -- either you are a

18  lawyer --

19        PROSPECTIVE JUROR:  I have a friend that's a lawyer.  What

20  it is, I belong to a group -- I belong to a group called Protect

21  and Defend.

22        THE COURT:  Protect and Defend.

23        PROSPECTIVE JUROR:  It's police officers, firefighters,

24  EMTs, paramedics.  Now I belong to a group called Fallen Heroes,

25  and it's military members, police officers, EMTs, firefighters,

1    and so on.

2         THE COURT:  Is that because you're a former --

3         PROSPECTIVE JUROR:  I was in the military for 21 years.

4    I'm a Level 2 nationally certified firefighter.  I was also an

5    EMT and a medic in the Navy, so --

6         THE COURT:  Do you think that there's anything about your

7    experience and your service that would make it difficult for you

8    to be fair and impartial in a case involving these kinds of

9    charges?

10        PROSPECTIVE JUROR:  I haven't dealt with anybody that was

11   charged with anything like that, so I probably could be fair, but

12   I can't say for sure, because even watching this defendant today,

13   he's arrogant.

14        THE COURT:  Oh, how can you tell?

15        PROSPECTIVE JUROR:  Just because the way he was reacting

16   to when you were talking about what he was being charged with.

17   He was more or less laughing and smiling about it, and when he

18   got up he was smiling.

19        THE COURT:  I see.

20        PROSPECTIVE JUROR:  It was like, "Okay, you should be

21   somber and taking this seriously."  He's thinking it's a game.

22        THE COURT:  So you've formed an opinion of him?

23        PROSPECTIVE JUROR:  By watching him, yeah.

24        THE COURT:  Yeah.  All right.  Ms. Hertzfeld?

25        MS. HERTZFELD:  No questions.

```
 1          MS. SLAIGHT:  No.

 2          THE COURT:  All right.  Thank you.

 3          (Prospective juror left the bench.)

 4          THE COURT:  I will strike him for cause.

 5          MS. SLAIGHT:  Move to strike.

 6          THE COURT:  So I'll finish this row whether we get two

 7  people.

 8          1227.

 9          (Prospective juror approached the bench.)

10          THE COURT:  How are you?  So you say you served as a

11  juror?

12          PROSPECTIVE JUROR:  Yes, I have.

13          THE COURT:  And let me -- I'm sorry.  People are

14  listening, so we have to have you speak right into the

15  microphone.  Where have you served, sir?

16          PROSPECTIVE JUROR:  Here in Washington, D.C.

17          THE COURT:  And in this courthouse or the one across the

18  street?

19          PROSPECTIVE JUROR:  It was the one down the street, down

20  at --

21          THE COURT:  Superior Court?

22          PROSPECTIVE JUROR:  Yes, Superior Court.  I don't know

23  which one it was.

24          THE COURT:  And what kind of case did you serve on?

25          PROSPECTIVE JUROR:  It was the same case, actually,
```

```
1   something like this.
2           THE COURT:  Same case?
3           PROSPECTIVE JUROR:  Well, not the same case, but --
4           THE COURT:  Similar.
5           PROSPECTIVE JUROR:  -- you know, child pornography, the
6   guy molested a child.  And I felt -- you know, after the case, I
7   was -- I was totally distraught.  I can --
8           THE COURT:  Well, let me -- before you go there, you don't
9   have to give us all the details, but let me ask you a few
10  questions.  How long did you serve?
11          PROSPECTIVE JUROR:  I served for the whole term.
12          THE COURT:  I mean, was it like a week, two weeks?
13          PROSPECTIVE JUROR:  It was about two weeks.
14          THE COURT:  About two weeks.  And you're saying it's
15  similar charges to the case that we have today?
16          PROSPECTIVE JUROR:  Um-hmm.
17          THE COURT:  Don't tell me what the verdict was, but did
18  you reach a verdict in the case?
19          PROSPECTIVE JUROR:  Yes, they did.
20          THE COURT:  Yes, they -- and you deliberated as one of the
21  jurors?
22          PROSPECTIVE JUROR:  Yes, I -- well, up to a certain date
23  and then they told --
24          THE COURT:  Wait.  Tell me.
25          PROSPECTIVE JUROR:  I went to certain date, and then they
```

1   told me that I had -- they said that I could leave because they

2   had -- I was an alternate on the case.

3          THE COURT:  I see.

4          PROSPECTIVE JUROR:  So they said I could leave because

5   they didn't need me.

6          THE COURT:  So you started to say you were devastated by

7   it.  Explain what --

8          PROSPECTIVE JUROR:  Yeah.  I was devastated by the images

9   that I had to look at.

10          THE COURT:  I see.

11          PROSPECTIVE JUROR:  I mean, I had to go through that for

12   months.  I had to see that in my mind, and I just couldn't do it.

13          THE COURT:  So do you think it would be difficult for you

14   to sit in a similar kind of case?

15          PROSPECTIVE JUROR:  No question about it.  I had a cat

16   that just died about a month ago, and it's still going through my

17   mind right now.

18          THE COURT:  The photos that you look at?

19          PROSPECTIVE JUROR:  Yeah.  Every time I think about losing

20   my cat, it just messes with my mind because I can't even hardly

21   think about it.  Something like this would do the same thing to

22   me.  If I see those images, I'll be seeing it for months.

23          THE COURT:  All right.  Well, I think I'm going to strike

24   you because I wouldn't want you to have to deal with that again.

25          PROSPECTIVE JUROR:  I really appreciate it so much.

```
 1            THE COURT:  All right.  Thank you.

 2            PROSPECTIVE JUROR:  Thank you.  Thank you so much.

 3            (Prospective juror left the bench.)

 4            THE COURT:  Number 170.

 5            (Prospective juror approached the bench.)

 6            THE COURT:  How are you?

 7            PROSPECTIVE JUROR:  Good.  How are you?

 8            THE COURT:  Good.  Speak right into the microphone,

 9    please.

10            PROSPECTIVE JUROR:  Okay.

11            THE COURT:  So you say you recognize someone on the jury

12    panel?

13            PROSPECTIVE JUROR:  Yes, absolutely.

14            THE COURT:  Who?

15            PROSPECTIVE JUROR:  I think his number is 470.  We work

16    together.

17            THE COURT:  Where?

18            PROSPECTIVE JUROR:  D.C. Public Schools.

19            THE COURT:  And you are --

20            PROSPECTIVE JUROR:  Central office administration, we

21    worked together in the past.

22            THE COURT:  Okay.  And so you wrote on here Austin Zentz.

23    Is that his name?

24            PROSPECTIVE JUROR:  Yes.

25            THE COURT:  Austin Zentz.  Okay.  Great.
```

1          You also say that you are familiar with Good Hope Court?

2          PROSPECTIVE JUROR:  Correct, yes.

3          THE COURT:  How so?

4          PROSPECTIVE JUROR:  So I live, work and have volunteered

5     southeast D.C.

6          THE COURT:  So you know where the Good Hope Court --

7          PROSPECTIVE JUROR:  I am familiar, yes.

8          THE COURT:  Okay.  And you know someone who's a lawyer?

9          PROSPECTIVE JUROR:  Yes, I do.

10         THE COURT:  And who?

11         PROSPECTIVE JUROR:  A few friends that are lawyers in the

12    D.C. area that work for a legal form, the Kelley Drye firm.

13         THE COURT:  Okay.  Do you know if they do criminal work at

14    all?

15         PROSPECTIVE JUROR:  I don't know.  I don't know.

16         THE COURT:  And you know someone who works for the

17    Department of Corrections?

18         PROSPECTIVE JUROR:  Correct.  My aunt works for the

19    Department of Corrections in New York State.

20         THE COURT:  Your aunt?

21         PROSPECTIVE JUROR:  Yes, for over 30 years.

22         THE COURT:  And has she talked to you about her work?

23         PROSPECTIVE JUROR:  We've talked about work, yes.

24         THE COURT:  And is there anything about her experience as

25    a corrections officer that would influence your opinion in this

1    case?

2         PROSPECTIVE JUROR:  So she's more administrative than she

3    is actually in the service.

4         THE COURT:  So she's not actually dealing with the

5    prisoners?

6         PROSPECTIVE JUROR:  Right, correct.

7         THE COURT:  And you have served as a juror?

8         PROSPECTIVE JUROR:  Yes, I have.

9         THE COURT:  Where?

10        PROSPECTIVE JUROR:  For Maryland in P.G. County, and also

11   in New York State in Albany, New York.

12        THE COURT:  And were they criminal cases?

13        PROSPECTIVE JUROR:  One criminal case, which was a murder

14   case; and then the one in P.G. was a civil case, if I'm not

15   mistaken.

16        THE COURT:  And did you come to verdict in both of the

17   cases?

18        PROSPECTIVE JUROR:  Both of those cases, yes.

19        THE COURT:  And is there anything about your experience as

20   a juror in the past that would make it difficult for you to sit

21   in this case?

22        PROSPECTIVE JUROR:  I don't know.

23        THE COURT:  No?  I mean, so you had a perfectly fine jury

24   and --

25        PROSPECTIVE JUROR:  Yeah.  I survived both, so yes.

1          THE COURT:  And so have you -- you're in the front office

2     in education, but have you worked with children in the past?

3          PROSPECTIVE JUROR:  Yes.  I'm a former teacher.

4          THE COURT:  What grades?

5          PROSPECTIVE JUROR:  So middle school, students that are --

6     so special Ed, students who are classified as MR, some form of

7     retardation but can act just like all of us.  I did that for

8     about two years, and then I transitioned to work for here, for a

9     nonprofit organization called College Success Foundation, working

10    with D.C. public and D.C. public charter school students.  My

11    role primarily allows me to work in the schools but also the

12    central office as well.

13         THE COURT:  So would your work with children make it more

14    likely or less likely that you believe a child can testify?

15         PROSPECTIVE JUROR:  Probably more likely.

16         THE COURT:  More likely that you would --

17         PROSPECTIVE JUROR:  That I would believe them, yes.

18         THE COURT:  Why?

19         PROSPECTIVE JUROR:  Just because I -- when I first started

20    out as a teacher, I had students who were abused or neglected.

21         THE COURT:  Sexual abuse?

22         PROSPECTIVE JUROR:  Or neglect.  I don't know whether or

23    not it was sexual abuse.

24         THE COURT:  Um-hmm.  And so that experience -- would you

25    be able to set that experience aside and consider only the

1    evidence and the facts in this case as they were presented to

2    you?

3            PROSPECTIVE JUROR:  I am a firm believer that I can look

4    at the evidence and make a sound determination or a judgment;

5    however, I'm very passionate about children and their welfare, as

6    well as their care.

7            THE COURT:  Is that why you answered number 39, which is:

8    Hearing the testimony of the alleged sexual assault of a minor

9    would be difficult for you?

10           PROSPECTIVE JUROR:  It would be extremely difficult, yes.

11           THE COURT:  Ms. Hertzfeld?

12           MS. HERTZFELD:  No questions.

13           MS. SLAIGHT:  No questions.

14           THE COURT:  Thank you.

15           PROSPECTIVE JUROR:  All right.  Sure.  No problem.  Thank

16   you.

17           (Prospective juror left the bench.)

18           THE COURT:  All right.  That's the end of this row.

19           THE COURTROOM CLERK:  So you're keeping the last?

20           THE COURT:  Let's put the last at the bottom.

21           THE COURTROOM CLERK:  No, I'm just saying the 170, do you

22   want me to put --

23           THE COURT:  Yes.

24           THE COURTROOM CLERK:  Okay.  So we've qualified 33 without

25   the five people that we put --

1          MS. SLAIGHT:  But 170 is out, right?

2          THE COURTROOM CLERK:  No.

3          MS. SLAIGHT:  The one we just had?

4          THE COURTROOM CLERK:  No.

5          THE COURT:  I didn't -- did you move to strike him?

6          THE COURTROOM CLERK:  No.

7          MS. SLAIGHT:  I thought you -- I moved to strike.  He said

8    he's very passionate about kids, and he -- he would tend to -- it

9    would upset him to hear the testimony.  And I don't think that he

10   can be fair, and I don't think he could listen to the testimony.

11         THE COURT:  Ms. Hertzfeld?

12         MS. HERTZFELD:  I don't think there's anything unbiased

13   about saying he might be upset by the testimony or that he was

14   impassioned about kids.  I mean, he said he could put his

15   opinions aside and deliberate fairly.

16         THE COURT:  Yes, I agree.  I'm going to keep him.

17         THE COURTROOM CLERK:  That's 33 that we've qualified.

18         THE COURT:  Okay.  And then the five at the bottom, how

19   does that work in terms of the --

20         THE COURTROOM CLERK:  Well, what we can do is strike three

21   at the top and move them to the bottom, or you can leave them in

22   place.  The only thing that is just -- I mean, the thing that you

23   have to remember is when you're making your peremptory strikes,

24   by them being at the bottom, they could eventually end up in the

25   box if you don't leave them where we are.

1          MS. HERTZFELD:  May we -- can we just review just to make

2    sure we're all on the same page about who got moved to the

3    bottom?

4          THE COURTROOM CLERK:  Yes.  Are you ready?

5          MS. SLAIGHT:  I'm not ready.

6          THE COURTROOM CLERK:  Go to the first page.  Line 2, 0696

7    is moved to the bottom; line 5, 0712; line 11, which is 0970; and

8    then on the second page, line 32, 0952; and then we have a line

9    39, which is 0493.

10         MS. SLAIGHT:  What was that last line?  I'm sorry.

11         THE COURTROOM CLERK:  Line 39, which was 0493.

12         THE COURT:  So here's my suggestion:  My suggestion is

13   that we take those five and we in order just make them the next

14   numbers going down.  And then we'll do the peremptories, and we

15   probably won't get that far, but if we do, we can seat them in a

16   way so that you can see them and know who they are, and we'll

17   cross that bridge when we get to it.  But I say we strike them

18   out of the list right now and just move each one down and that

19   would be --

20         THE COURTROOM CLERK:  And you move them down in the order

21   they are on the jury panel sheet.

22         THE COURT:  Correct.

23         THE COURTROOM CLERK:  So the first one you move down is

24   0696.

25         MS. SLAIGHT:  0696, number 2 is moving down.

1      THE COURTROOM CLERK:  RIGHT.  The next one is 0712, which

2   is line 5; next is 0970, which is 911; next is 0952, which is

3   line 32; and the last one is 0493, which is line 39.

4      THE COURT:  All right.  So now the question is:  Can we

5   let everyone go?

6      THE COURTROOM CLERK:  Yeah, because with them you have 38

7   people qualified.

8      THE COURT:  With the people that we moved to the bottom,

9   and we have 33 without them?

10      THE COURTROOM CLERK:  Right.

11      THE COURT:  I think we should -- we only need 32 if we use

12   all of the strikes.

13      THE COURTROOM CLERK:  Yeah.

14      THE COURT:  And so even with the alternates we only need

15   32, so I say we should let the rest of these people go home.

16      THE COURTROOM CLERK:  So that would be next two rows I can

17   excuse.

18      THE COURT:  And then the rest of the people stay where

19   they are.

20      THE COURTROOM CLERK:  They can stay where they are.

21      THE COURT:  And we'll do our cross strikes.

22      THE COURTROOM CLERK:  All right.

23      THE COURT:  So I should say -- I should tell them?

24      THE COURTROOM CLERK:  Yeah.  You can let them know, and

25   I'll go out and excuse the two rows.

1          (Discussion had off the record.)

2          (The following further proceedings were held in open

3     court.)

4          THE COURT:  All right.  Ladies and gentlemen, thank you

5     again for your patience.  We are at a point now in which we think

6     we have qualified enough jurors to allow the last two rows in

7     this section to be excused.  So thank you all very much for your

8     service today.  Everyone else should remain.  And we're going to

9     be continuing with our process.  You may continue to read and

10    talk quietly for a few more minutes.  Thank you.

11         (Brief pause in proceedings from 4:22 p.m. until

12    4:54 p.m.)

13         THE COURTROOM CLERK:  Ladies and gentlemen, when I call

14    your juror number, I'm going to ask that you gather up your

15    personal belongings and take a seat in the jury box.  On the

16    first row here are seats 1 through 7.  On the second row are

17    seats 8 through 14.

18         Juror number 0456, seat 1.

19         Juror 0040, seat 2.

20         Juror 0283, seat 3.

21         Juror 0683, seat 4.

22         Juror 0732, seat 5.

23         Juror 0356, seat 6.

24         And juror 0604, seat 7.

25         Starting on the second row, juror 1212, seat 8.

1          Juror 1442, seat 9.

2          Juror 0056, seat 10.

3          Juror 0093, seat 11.

4          Juror 0384, seat 12.

5          Juror 0392, seat 13.

6          And juror 0944, seat 14.

7          THE COURTROOM CLERK:  Juror 0683, you're in seat 4.

8          (Brief pause in proceedings.)

9          THE COURTROOM CLERK:  Will juror 0356 in seat 6 please

10   return to the audience; and juror 0392, in seat 13, return to the

11   audience.  Will juror number 1109 please take seat 6 in the jury

12   box; and juror 0263, please take seat 13 in the juror box.

13         THE COURT:  All right.  Thank you all very much, ladies

14   and gentlemen.  As I'm sure you have surmised, the lawyers have

15   completed the jury selection process, and those people who are

16   seated in the jury box have been selected for this trial.

17         Before anyone leaves, let me say to those of you who've

18   been selected, I want to provide a final opportunity for you to

19   let me know and the lawyers know if there is any reason why you

20   will not be able to serve on this jury.  Now is the time to speak

21   up.  You can raise your hand and come and talk to us in private.

22         All right.  Not seeing any hands, thank you.

23         For those of you who are still in the audience, thank you

24   to are your time today.  I know that some of you may still be in

25   call-in jury service, and there still may be another opportunity

1    for you to serve, but we so appreciate your being here and giving

2    us your time today.

3        Please return to the jury room on the fourth floor where

4    you will receive further instructions about what happens next.

5    Thank you again.

6        (Thereupon, the remaining jury panel venire was excused.)

7        THE COURT:  To those of you who remain, let me say welcome

8    again to my courtroom, and thank you for the service that you are

9    about to perform.

10       I will now ask you all to stand and raise your right hand

11   in order to take the oath as jurors.

12       Do each of you solemnly swear or affirm under the pain and

13   penalty of perjury that you will well and truly listen to the

14   evidence presented and the law as I direct you in this case, that

15   you will confer in good faith during deliberations, and that you

16   will render a true verdict according to the law and the evidence,

17   so help you God?

18       (Jury sworn.)

19       THE COURT:  Thank you very much.  You have now been sworn.

20   What we're going to do is have Ms. Franklin give you a few

21   administrative instructions, just so that you will know what it

22   is that you need to do.  And I need to say a few things to you

23   before we adjourn for the evening.  We went a longer than

24   expected today because it's the first day and we had a large

25   panel, so if you'll bear with us.

```
1          Let me ask Ms. Franklin:  Do you want to do the
2   administrative instructions now, or should I go on to my portion
3   and then you can talk to them briefly?
4          THE COURTROOM CLERK:  I'll talk to them after you're done.
5          THE COURT:  All right.  So why don't you have a seat, and
6   let me just tell you where we are.
7          We're going to recess now, and before I give you
8   preliminary instructions.  So we'll start tomorrow morning with a
9   set of instructions so that you will be prepared for what it is
10  you're going to hear.  I want you to be fresh and ready to listen
11  to the lawyers and the evidence.
12         But before we adjourn, I need to instruct you about your
13  conduct during this recess and during all other breaks and
14  recesses in this trial.  These instructions are important for you
15  to follow whenever the Court is in recess.  And until I submit
16  this case to you for your deliberations at the end, you must not
17  discuss it with anyone, not with other jurors, the parties, the
18  witnesses, attorneys, anyone involved in the trial, your family
19  or friends, or anyone else.
20         Do not permit any other person to discuss the case in your
21  presence.  If anyone attempts to discuss the case with you, tell
22  them not to talk with you.  If anyone attempts to discuss the
23  case with you or you overhear any discussion of the case, please
24  move away and report that fact to me as soon as you can.
25         To advise me of such matters, you may contact Ms. Franklin
```

1    or Mr. Douyon.  All right?  You should let me know if you hear

2    any discussion of the case.

3         You should not discuss the case with any of your fellow

4    jurors, and nor should you tell them the facts that you may have

5    heard a discussion.  Just come directly to bring it to the

6    Court's attention.

7         You should also not talk to any of the parties or their

8    attorneys or any witnesses in this case during the time that you

9    serve on the jury.  You should take a good look now at the people

10   who are involved in this case, so that you know if you see them

11   in the cafeteria or in the hallways, you're not to talk to them

12   about the case.  Although it is a natural human tendency to talk

13   to people, if you encounter anyone connected with this case

14   outside the courtroom, you should avoid having any conversation

15   with them or overhearing their conversations or having any

16   contact with them at all.

17        Along these same lines, please let me know that if you see

18   any attorney or witness involved in this case, and they turn and

19   walk away from you, they're not being rude.  They're merely

20   trying to avoid any contact with you as I have instructed them.

21        Also, because you have to decide this case based on what

22   occurs in this courtroom, you may not conduct any independent

23   investigation of the law or the facts of the case.  This means

24   that you can't -- cannot conduct any research in books or

25   newspapers or visit the scene of the alleged offense.

1          It means you can't conduct any other kind of research, for

2     example, researching an issue on the Internet, asking any

3     questions of anybody about these matters by e-mail or text, or

4     otherwise communicating about or investigating this case.

5          You can't use the Internet to do research about the facts

6     or the law or the people involved in the case.  Research includes

7     something even as simple or as harmless as using the Internet to

8     look up a legal term or to view a satellite photo of the scene,

9     or anything.  All right?

10          It should go without saying that you also may not -- until

11     you've delivered your verdict and the case is over, you may not

12     discuss the case electronically through social media, a blog

13     posting, a text or any other kind of communication.

14          Let me explain to you the reasons why you should not

15     conduct your own investigation.  All parties have a right to have

16     the case decided only on the evidence and the legal rules that

17     they know about and have had a chance to respond to.  Relying on

18     information that you get outside of the courtroom is unfair

19     because the parties would not have a chance to refute, correct,

20     or explain it.

21          Unfortunately, information that we get over the Internet

22     or from other sources can be incomplete or misleading or just

23     wrong.  So it's up to you to decide whether to credit any

24     evidence presented in court and only the evidence presented in

25     court may be considered.  If evidence or legal information that

1    has not been presented in court comes to your attention, you

2    cannot rely on it.

3         Moreover, if any of you do your own research about the

4    facts or the law, this could result in different jurors basing

5    their decisions on different information.  Each juror must make

6    his or her decision based on the same evidence under the same

7    rules.

8         Finally, you are reminded to keep an open mind until all

9    of the evidence has been received and you've heard the arguments

10   of counsel and the instructions of the Court and the views of

11   your fellow jurors.  I may not repeat these instructions to you

12   before every break that we take, but with you need to keep them

13   in mind throughout the trial because they apply during the entire

14   trial process.  You will have a chance at the end to deliberate

15   and to discuss the case amongst yourselves, but before we get to

16   that point, please do not discuss the case with anyone.  All

17   right?  Is that clear?  Okay.

18        So that's all I have for today.  Ms. Franklin will show

19   you our jury room, which will be where you will be when you're

20   not in the courtroom, and she'll give you information about how

21   we move forward.  Thank you again.

22        (Jury out at 5:19 p.m.)

23        THE COURT:  All right.  You may sit down.  I didn't know

24   if we have any particular issues to discuss today.  Just as a

25   procedural matter, we will make it a practice to stand when the

1    jury enters and leaves to show respect for them and their

2    service.

3         Ms. Slaight, you mentioned an issue.  I don't know if you

4    wanted to talk about it today or in the morning?

5         MS. SLAIGHT:  Your Honor, the issue was --

6         THE COURT:  I need to have you come --

7         MS. SLAIGHT:  Right.

8         THE COURT:  -- just so we can hear you.

9         MS. SLAIGHT:  On the pretrial conference, we had -- the

10   government had asked to introduce evidence as to -- through

11   the -- through a detective, I believe, as to why the government

12   didn't initially arrest Mr. Hillie.  And the Court at that time

13   said that the government could introduce evidence -- evidence,

14   and the government said that the evidence would be they -- that

15   they basically -- because the mom obstructed, although, but

16   basically what the statements were, and the --

17        THE COURT:  Wait, I'm sorry.  I need to be clear.  Which

18   pretrial conference and what exactly are you --

19        MS. SLAIGHT:  I think it was a phone conference.

20        THE COURT:  During the phone conference we had last night?

21        MS. SLAIGHT:  No.

22        THE COURT:  No?

23        MS. SLAIGHT:  It was a week ago, I believe, or it may have

24   been in court.  I'm sorry.

25        THE COURT:  Okay.  So in court, I had understood them to

1    say that they wanted a detective to testify as to why it is --

2    the way in which the investigation proceeded, in other words,

3    that there was an original complaint, but then it didn't come to

4    fruition until some time later.  That was my understanding.  And

5    at that time I had not appreciated any contention by the

6    government that it was because of the mother.

7         MS. SLAIGHT:  I thought that the government said -- and

8    I'm -- and if I'm wrong about this, I am wrong.  I thought the

9    government had said it was because the mother obstructed the

10   investigation, and I had said that the -- I had replied to that.

11   And the Court, I believe, ruled that the government could get --

12   and if I'm wrong about this, please correct me -- that the

13   government could get -- could admit testimony as to the -- what

14   the mother did in relation to the investigation, saying that's

15   what held it up.

16        And I would want to renew my objection in this case

17   because the -- this is really a backdoor way to get in the

18   mother's statement that they wouldn't otherwise get in and the

19   belief about the mother's statements.  Really, the case wasn't

20   charged for over two years, from January of 2013 to August of

21   2015.  The mother's statements never changed, and yet they

22   prosecuted the case in August of 2015.

23        In July of two thousand -- I'm sorry, in the beginning of

24   August 2014, Janika, the other sister, said -- changed her

25   position and said, "He abused me."  Still they didn't prosecute

1    the case.  I think that all of the -- and the government really

2    has no reason for not prosecuting the case -- for not issuing an

3    arrest warrant between August of 2014 and August of 2015, and now

4    we're in 2017.

5         I think all of this issue about the government's

6    charging -- the timing at which the government charged the case

7    is really not relevant, and I think it brings into play a little

8    mini-trial about, "Well, why did they do it?  Did they do it

9    because of the mother?  Did they do it because Janika is changing

10   her statement?"

11        I would submit that I would be able to get -- if the

12   government started making, really, what I would consider excuses

13   for not charging the case earlier -- and I don't know why they

14   would.  I don't know why they need to, and certainly in other

15   cases this is not an issue and it's not relevant.  It's not

16   relevant that it's been in court for two years and going on three

17   years and hasn't been tried.  That's not relevant, so I don't

18   know why the arrest would be relevant.

19        If the government were to get that in, I would submit that

20   I should be able to admit the testimony that the Child and Family

21   Services Agency didn't decline to go forward with the case

22   because of the inconsistency of Jaden's statements when she

23   talked to the Child and Family Services people and the

24   prosecutors.

25        THE COURT:  All right.  Well, before I let Ms. Hertzfeld

1    respond, I have no independent memory of this issue being raised

2    at the pretrial conference.  What I thought we were talking about

3    then is whether or not there was going to be an issue pertaining

4    to the investigation not starting right away because of the

5    girl's prior reports.  In other words, I thought the government

6    was asking me to make sure that they could talk about the fact

7    that there were prior reports of the sexual abuse alleged.  And

8    then I ruled at the telephone conference that -- do you remember

9    I said --

10          MS. SLAIGHT:  Right.

11          THE COURT:  -- I don't know, I'd have to look into it,

12   whether or not there are prior reports?

13          MS. SLAIGHT:  Right.

14          THE COURT:  And you argued that they were hearsay.  I

15   didn't realize that there was any sort of issue being made of the

16   timing of his arrest vis-à-vis any charges that were made.  I

17   never heard that as an issue.

18          MS. SLAIGHT:  Maybe I completely misinterpreted.

19          THE COURT:  So, Ms. Hertzfeld, maybe you can give us some

20   clarity here.

21          MS. SLAIGHT:  Apparently I'll apologize then.

22          THE COURT:  Yeah.

23          MS. HERTZFELD:  Yeah, I think so.  I think there's some

24   misunderstanding.  So there's two issues that are going on here

25   in terms of what happens with these reports to -- prior reports

1    by these kids, and what the role of their mother is kind of going

2    on in the background.  So, and I think it's always an issue in a

3    child sex abuse case where there's a delayed investigation, what

4    looks like a delayed report, to be able to explain whether or not

5    a child has come forward and indicated child sexual abuse.

6         And so the relevance of the detective's testimony, Doretha

7    Johnson, is to make clear to the jury that there was a report

8    made of child sexual abuse, and that and once that report got

9    made -- and this interplays in some ways with the issue of Janika

10   not telling the truth to CFSA at some point about that initial

11   investigation.

12        The report was made.  Jaden makes -- there was a report

13   that Jaden was being sexually abused, and when -- in the early

14   stages.  And this is when Detective Doretha Johnson gets involved

15   and starts trying to investigate this.

16        Janika, in the course of that initial investigation, at

17   one point did, and she will testify when she's on the stand that

18   she denied the sex abuse, although it was ongoing.  And a lot of

19   the reason for that is because she was receiving pressure from

20   her family to not disclose that abuse to CFSA because she feared

21   -- and it was told to her, and she was afraid herself -- that her

22   sisters would be removed from the house, the children would all

23   go to foster care.

24        And, essentially, over the course of time between this

25   initial report and the time when Janika eventually re-reports

1    years later, what's going on from the girls' perspective is that

2    these children are going to their mother and they're telling her

3    that Mr. Hillie is sexually abusing them.  They've made a report

4    that is attempted to be investigated by Doretha Johnson, who then

5    attempts to contact the mother repeatedly.  And it's not an

6    argument that the mother obstructed as much as it is that the

7    children reporting leads to no result, because the mother does

8    not allow any further interview -- Doretha Johnson will say, "I

9    tried to contact the family over and over and over again to be

10   able to speak to these kids, to be able to investigate this.  I

11   received no response from this mother.  She wouldn't call me

12   back.  She wouldn't answer the door when I came to her house.  I

13   tried and tried and tried, and I couldn't move that forward."

14        And I think all of that goes to what's going on with these

15   children who are going to their mother saying, "We're being

16   sexually abused," and nothing's happening.

17        THE COURT:  So let me ask you:  When she's tried to

18   contact the mother, is that before the re-report or after the

19   re-report?

20        MS. HERTZFELD:  It's before the re-report, so it's in

21   connection with the initial report.

22        THE COURT:  Okay.

23        MS. HERTZFELD:  Certainly the government does not intend

24   to introduce any evidence about why -- what happened in terms of

25   the U.S. Attorney's Office prosecuting that case or the delay in

1  the investigation or anything like that.  I don't think that's

2  what's relevant for the jury's consideration.

3       I think what is relevant, though, in terms of the

4  credibility of these kids, is that they reported.  There was a

5  moment that Janika will admit that she was under tremendous

6  pressure not to say anything to CFSA for fear of removal of her

7  siblings, but the abuse continued, despite these kids complaining

8  to their mother, despite them trying to, you know, find some

9  avenue to make it stop.  And then eventually when she becomes

10 older and she has some agency to do so, she re-reports what

11 happened and here we are.  That's what ultimately resulted in the

12 arrest of Mr. Hillie, was that second report and the

13 investigation that ensued at that time.

14      THE COURT:  All right.  So, Ms. Slaight, given that

15 representation of what it is that the government intends to

16 elicit from Detective Johnson in the testimony, does that

17 implicate the concern that you're talking about?

18      MS. SLAIGHT:  Well, according to the records that I have,

19 that I'm looking at right now -- or a chronology, because I don't

20 have the exact record in front of me, on February 18th -- on

21 February 8th of 2013, she denied -- Joyce, the mother, denied

22 that there was abuse.  So it wasn't that she wouldn't talk to the

23 police, it was that she disagreed with the police's theory, and

24 that's really different.

25      THE COURT:  So what record are you talking about?

1          MS. SLAIGHT:  And I -- I have a chronology, so I didn't

2     know that this issue was going to come up.

3          THE COURT:  That you made or that you got through

4     discovery from the government?

5          MS. SLAIGHT:  I have a chronology that I'm looking at

6     based on the records in the case, so I'd have to look tonight to

7     see where I got that from.  But my records indicate that she

8     talked to the police on February 8th of 2013 or, you know, it may

9     have been Child and Family Services Agency, but she denied the

10    abuse in February 8th of 2013.

11         THE COURT:  All right.

12         MS. SLAIGHT:  So it's not that she --

13         THE COURT:  I'm struggling to --

14         MS. SLAIGHT:  She talked to them and she had an

15    interview -- she had a video interview in either -- she had a

16    video interview in August 13th of 2014.

17         THE COURT:  All right.  So, I'm sorry.  What -- it sounds

18    like we have a dispute of fact over whether or not the mother was

19    absent with respect to this investigation or whether she was

20    questioned and denied it.

21         What is the issue that you would like for the Court to

22    consider resolving or --

23         MS. SLAIGHT:  I don't -- I think it's -- I think that the

24    detective should not be allowed to testify that the mother --

25    that the investigation couldn't -- if this is what the government

1    intends, that the mother -- that the government should not be

2    permitted to testify as to the mother's statements or that the

3    mother -- they made appointments with the mother and the problem

4    was.  And what I got from our last hearing was that it slowed

5    down the case because the mother refused to -- and what I -- the

6    indication is today, the mother would not meet with the police,

7    and I think -- and Child and Family Services Agency.  And I

8    just -- I don't think that's the case, and I don't think that

9    it's really relevant.  It gets in --

10          THE COURT:  Well, it's certainly relevant.  The question

11   is:  To what extent can you cross-examine the decorative with the

12   information that you say you have that contradicts any testimony

13   of hers about how the mother reacted?

14          I mean, it's certainly relevant that when the detective

15   began to investigate this case, from her own perspective as she

16   undertook this investigation, she believed that the mother was

17   not allowing her to get the information that she needed to

18   proceed with the investigation.  You may disagree.  As a matter

19   of fact, you may have facts that contradict that, but why

20   wouldn't you just cross-examine her about that?

21          MS. SLAIGHT:  I don't think that -- it's my position that

22   the detective's opinion about the mother's truthfulness should

23   not -- is not admissible to the jury.  And the detective's

24   opinion about whether -- number one, the statements are hearsay;

25   and number 2 that the mother made, and number 2, the detective's

1    opinion is not -- should not be admitted to the jury.  The jury

2    decides --

3         THE COURT:  Well, we're doing this all in a hypothetical

4    world.  I didn't hear Ms. Hertzfeld rely on any particular

5    statements of the mother, right?  And surely the detective can

6    rely on her own perspective and perception of information.  So

7    she can say, "Here's what I did in response to this

8    investigation, here's what" -- in fact, they're non-hearsay for

9    the same reason I discussed.  "Here's what people said that made

10   me do the next thing or not do the next thing."

11        What I don't understand is why you think they can't be

12   admitted, as opposed to just contradicted by any evidence that

13   you have that suggests that the detective is wrong about that?

14        MS. SLAIGHT:  I don't -- my position is that the

15   detective's opinion about whether or not the mother was stalling

16   the investigation or not telling the truth is -- should not be

17   admitted to the jury, because the jury decides whether -- the

18   issue here is whether these -- not whether the detective wanted

19   to go forward, but whether the girls are telling the truth.  It's

20   not about the detective.  It's not.  The detective's opinion --

21        THE COURT:  So let me ask you a question:  Do you believe

22   that the detective's actions in responding to the reports are

23   relevant to the charges that are made in this case, what she did

24   to investigate this matter?

25        MS. SLAIGHT:  In terms of she -- in terms of interviewing

1    background information, in terms of interviewing the children,

2    she can certainly say that she did that.  The Court has already

3    ruled that she did that.  But her opinion of -- and her

4    interviews of other people and her opinion of other people are --

5    should -- are not admissible.

6         THE COURT:  All right.  Well, I'm overruling your

7    objection to the extent that you're suggesting that the -- one of

8    the investigating officers can't testify to what she did to

9    investigate this case, who she talked to, you know, to the extent

10   that it affected how she went about investigating, what they said

11   to her.

12        I didn't hear Ms. Hertzfeld saying she was going to get

13   into all of that, so I think this may be not even an issue, but

14   to the extent that the detective is talking about receiving the

15   initial report, and then what she attempted to do or did as a

16   result of that initial report, I see no problem with that as an

17   evidentiary matter.  I think it is relevant to the charges, and I

18   think to the extent that you have information that indicates what

19   her testimony is wrong, that she did hear from the mother, for

20   example, if she testifies that she didn't, then you have every

21   right to cross-examine her about that.

22        I don't understand.  And then the jury would decide

23   whether she -- her testimony is accurate and credible about what

24   happened, or whether the information that you are eliciting

25   through cross-examination is what should be believed.

1          But I do think that all of that information is relevant to

2    how this case has come together and the allegations that were

3    being made by the children and what happened.

4          MS. SLAIGHT:  Well, it's just my position that how the

5    case came together is not...

6          THE COURT:  Do you have any cases that suggest that in a

7    child sex abuse case it's improper for the Court to allow

8    witnesses, investigating officers, et cetera, to testify about

9    the investigation?

10         MS. SLAIGHT:  I think in a limited manner they can testify

11   about the investigation, but the -- the essence of the trial is

12   not -- the issue for the jury is not what the detectives did and

13   what -- how the detectives proceeded, it's what occurred at that

14   time -- at the time of the offense.

15         THE COURT:  All right.

16         MS. SLAIGHT:  Now, if there's -- to the extent that the

17   witnesses come in and say --

18         THE COURT:  The detective is a witness.  She's a witness.

19         MS. SLAIGHT:  The complainants come in, the complainants

20   say, "I" -- which I fully expect them to do, the one

21   complainant -- to say, "I changed my" -- "I gave the" -- "said

22   that I wasn't abused because my mother convinced me to do that,"

23   if that's certainly admissible.  What the detective has to do

24   with that is not admissible.

25         THE COURT:  All right.  I -- you've made your record.  I

1    overrule the objection.  Detective Johnson can talk about how she

2    got involved in this investigation, the report that she initially

3    received, and what she did in terms of trying to investigate it

4    afterwards, and she'll be a witness who can be cross-examined

5    about the scope of her investigation.

6         Ms. Hertzfeld, do you have anything more to add to this?

7         MS. HERTZFELD:  Not to this issue, Your Honor.

8         THE COURT:  All right.  Do you have any other issue?

9         MS. HERTZFELD:  The only other issue, I think, that we --

10   and I don't know if we need to address it tonight versus tomorrow

11   morning, but I do expect John Marsh will testify tomorrow, and he

12   will be among the first witnesses.  And I think because he's

13   going to be testifying about the videos, and that's the witness

14   through which we intend to admit the videos in their entirety, as

15   well as just to introduce and offer into evidence any clips the

16   government is permitted to use based on the Court's ruling

17   yesterday.

18        I don't expect we'd publish any clips to the jury through

19   him necessarily, maybe one, but I think we just need to resolve

20   this issue about if we would -- that would be permitted and what

21   the instruction would be, if any, to limit the jury's

22   consideration of the clips.

23        THE COURT:  Let me talk to you in the morning.  We'll

24   have -- at 9:15 we'll meet before the jury convenience.  I'm

25   still working out the language, which I did receive what the

1    government submitted and Ms. Slaight's edits to that language.

2    And we -- you know, I will give an instruction, and we'll talk in

3    the morning about what you expect to show.

4        MS. HERTZFELD:  Yes, Your Honor.

5        THE COURT:  And I'll give you what I expect to tell the

6    jury related to those videos.

7        MS. HERTZFELD:  Thank you.

8        MS. SLAIGHT:  Your Honor, I do have one additional point.

9    I want to thank Ms. Franklin and all the staff who helped get

10   clothes today, because they really went above and beyond the call

11   of duty.  CSOSA, Agent Moschella, the marshals, the federal

12   defender, and we really appreciate it.

13       THE COURT:  Well, thank you for that appreciation.  And

14   hopefully Mr. Hillie will be outfitted now for the remainder of

15   the trial.

16       MS. SLAIGHT:  He will.

17       THE COURT:  Due to their good work that you're

18   recognizing.  All right.  So I will see you in the morning at

19   9:15.  Thank you.

20       (Proceedings adjourned at 5:41 p.m.)

21

22

23

24

25

1

2

## **C E R T I F I C A T E**

3

4          I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6

/s/ Scott L. Wallace                    7/26/19

7   ----------------------------        ----------------
    **Scott L. Wallace, RDR, CRR              Date**

8      **Official Court Reporter**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25