```
            UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA


 UNITED STATES OF AMERICA      :
                               :
             Plaintiff,        :   Criminal Action
                               :   No. 16-030
 v.                            :
                               :
 CHARLES HILLIE,               :   March 30, 2018
                               :   9:30 a.m.
                               :
                               :
             Defendant.        :   Washington, D.C.
                               :
 ............................. :
```

**DAY 2 - MORNING SESSION**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE KETANJI B. JACKSON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:      **Andrea Lynn Hertzfeld, Assistant U.S. Attorney**
                            U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
                            555 Fourth Street, NW
                            Washington, DC 20530
                            (202) 252-7808
                            Fax: (202) 353-7634
                            Email: Andrea.hertzfeld@usdoj.gov

                            **Kenechukwu O. Okocha, Assistant U.S. Attorney**
                            U.S. ATTORNEY'S OFFICE-DISTRICT OF COLUMBIA
                            Sex Offense and Domestic Violence
                            555 Fourth Street, SW
                            10th Floor
                            Washington, DC 20530
                            (202) 252-6604
                            Email: Kenechukwu.okocha@usdoj.gov

APPEARANCES:  Cont.


For the Defendant:          **Joanne D. Slaight, Esq.**
                            LAW OFFICES OF JOANNE D. SLAIGHT
                            400 Seventh Street, NW
                            Suite 206
                            Washington, DC 20004
                            (202) 408-2041
                            Fax: (202) 628-0249
                            Email: Jslaight@att.net


Court Reporter:             **Scott L. Wallace, RDR, CRR**
                            Official Court Reporter
                            Room 6503, U.S. Courthouse
                            Washington, D.C. 20001
                            202.354.3196
                            scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT          34

OPENING STATEMENT ON BEHALF OF THE DEFENDANT           53

DIRECT EXAMINATION OF CHRISTOPHER SCHWARTZ             64
BY MS. HERTZFELD:
CROSS-EXAMINATION OF CHRISTOPHER SCHWARTZ              87
BY MS. SLAIGHT:
REDIRECT EXAMINATION OF CHRISTOPHER SCHWARTZ          102
BY MS. HERTZFELD:

## EXHIBITS

### DESCRIPTION

Government's Exhibit 12 admitted                       74

Government's Exhibit 12A admitted                      80

Government's Exhibit 12B admitted                      82

Defendant's Exhibit 11 admitted                        92

<u>**MORNING SESSION, MARCH 30, 2018**</u>

1

2   (9:29 a.m.)

3       THE COURTROOM CLERK:  Your Honor, this is Criminal Case

4   Number 16-030, *United States of America versus Charles Hillie.*

5       Would counsel please approach the lectern and state your

6   appearances for the record.

7       MS. HERTZFELD:  Good morning, Your Honor.  Andrea

8   Hertzfeld for the United States.

9       THE COURT:  Ms. Hertzfeld.

10      MR. OKOCHA:  Good morning, Your Honor.  Kenechukwu Okocha

11  for the United States.

12      THE COURT:  Mr. Okocha.

13      MS. SLAIGHT:  Good morning, Your Honor.  Joanne Slaight

14  for Mr. Hillie, who is also here.

15      THE COURT:  Ms. Slaight and Mr. Hillie.

16      So we had at least one pretrial matter that I think we

17  needed to discuss related to the government's presentation of the

18  video clips.

19      Is that right, Ms. Hertzfeld?

20      MS. HERTZFELD:  Yes, Your Honor.

21      THE COURT:  Well, I did receive the proposed instruction.

22  As I mentioned to you in our conference call, I intend to mention

23  to the jury that when they see a clip, it's not the evidence,

24  that they're supposed to consider these videos in their entirety.

25  And I did get the government's language, and I also received

1    Ms. Slaight's edits.  And I think that she is correct, that we

2    don't need the extra language about why it is that these clips

3    are being introduced.  We can just say the other part of your

4    instruction.

5         So I intend to say, "The United States has introduced into

6    evidence six videos -- and list the exhibit numbers -- which

7    Investigator Marsh has testified were extracted from the pink

8    laptop that is Government's Exhibit 3.  You've heard testimony

9    that clips were made from those videos and have seen the clips.

10   In your deliberations you must consider each video in its

11   entirety as the evidence in the case.  The clips were shown only

12   as an aid during witness testimony."

13        MS. HERTZFELD:  I think that's appropriate, Your Honor.

14        THE COURT:  All right.

15        MS. HERTZFELD:  And I will just let the Court know, I

16   think we've decided to resolve the issue in favor of having

17   Investigator Marsh testify to the six video clips in their

18   entirety.  We intend to play each one of those all the way

19   through for the jury through Investigator Marsh today.

20        I think what we'll have him do is authenticate the clips

21   that were made.  We won't be playing any clips through him, and

22   then that way when we have later testimony, we can just seek to

23   publish them to the jury through the witness that's going to be

24   testifying.

25        THE COURT:  I see.  So that instruction I'll give at the

1    time a clip comes in a different witness.

2         Is that what you're saying?

3         MS. HERTZFELD:  I think that's right.  He's just going to

4    authenticate the fact that they're fair and accurate clips from

5    the videos that he's extracted.

6         THE COURT:  All right.  So we'll have that in the can

7    ready to go when the clips are shown.

8         MS. HERTZFELD:  Yes, Your Honor.  Thank you.

9         THE COURT:  Okay.  Is there anything else this morning

10   that we need to address?

11        MS. HERTZFELD:  I think the only thing that we need to

12   resolve is, before any of these witnesses take the stand, we

13   talked at our pretrial conference by phone about the fact that

14   the government wanted to sort of preview what the materials would

15   be that would be used for cross-examination of any witness, so

16   that we could litigate any potential evidentiary issues before

17   the witness is on the stand.

18        Ms. Slaight has shown me this morning the photographs that

19   she intends to use that came from the search of 2323 Good Hope

20   Road.  I have no objection to the photographs that she is

21   intending to use with witnesses today.

22        My understanding is that there's some intention to

23   introduce a video that was extracted from the computer that

24   depicts the complainant's mother.  It has no depiction of the

25   defendant in it or of either of the victims or anyone other than

1    the victim's mother.  I'm not sure what the mechanism by which

2    the defense intends to introduce that evidence is or what the

3    potential purported relevance of it is, and so -- but it's been

4    told to me that that's at issue, and I think whatever issues

5    there may be with that, we want to resolve before -- I don't know

6    if it's coming through Investigator Marsh is the intent or what,

7    but I think we need to square that away before Investigator Marsh

8    takes the stand.

9         THE COURT:  All right.  So, Ms. Slaight, do you have an

10   intention to introduce any such video and through whom so that we

11   can get it all pinned down?

12        MS. SLAIGHT:  Your Honor, the government had supplied a

13   draft forensic report to the Court, and number 10 in the draft

14   forensic report that this government submitted to the Court was

15   a -- is a video -- I'm sorry -- number 9 is a video from -- that

16   the government -- that the -- that Mr. Marsh extracted, which now

17   all -- a number of these videos are videos in the bathroom, and

18   the government is claiming that these were surreptitious videos.

19        One of the videos that the government is charging, which

20   is in Count 2, is in the bathroom specifically.  It's a 29-minute

21   video.  It shows Mr. Hillie, government said, turning on the

22   video, and then there's a -- different girls in the bathroom,

23   three different girls in the bathroom.  And the mom -- the

24   mother, Joyce Asiamah, also enters the bathroom, and she gets up

25   at the end of -- that video that the government is introducing,

1    she gets up on top of the toilet and turns off the video.

2         And the video that they are not introducing -- that they

3    don't plan to introduce but was listed on this forensic report is

4    a video which is nine-and-a-half minutes.  It shows Ms. Asiamah

5    turning -- on top of the toilet, her face in there, obviously

6    turning this video on.  She's cleaning the bathroom for about

7    nine minutes, and then she gets up on top of the toilet again and

8    turns the video off.  Certainly this is relevant.  The government

9    is saying that these are -- this is a surreptitious camera that

10   the -- that the defendant used, that the videos were taken

11   surreptitiously, nobody knew about it.  I think they're going to

12   probably, possibly through the detective, say that Ms. Asiamah

13   didn't -- claimed that she didn't know anything about it.  And

14   there were other people, clearly, who had access to whatever

15   camera was being used to take the videos and were doing that, so

16   it's clearly relevant.

17        THE COURT:  So how's it coming in, though?  The mother is

18   not a witness, at least from the government's --

19        MS. SLAIGHT:  Through the -- through the -- my intent was

20   to cross-examine Detective Marsh -- or Investigator Marsh, as to

21   that video that he extracted, verbally.  I may have him describe

22   what occurred in that video.

23        And I had asked the government about identifying Joyce

24   Asiamah in their exhibit, Exhibit 4, which is -- I'm sorry, I

25   forget the exhibit number.  Anyway, the Count 2 introduce- --

1    identifying Joyce Asiamah.  Because their clips identify only the

2    girls, not the mom in that video.  It's clearly the same person

3    in the video that they're introducing as the video that I am

4    referring to with Investigator Marsh.

5         I'm -- I don't want to -- and I brought this up with the

6    government, and I thought -- and maybe I'm wrong -- that

7    Mr. Marsh would -- could identify the person in the video, in

8    both videos, as the mother.

9         I'm not trying to embarrass the -- Janika.  I know that

10   the government doesn't want to embarrass her.  They're just

11   introducing little clips.  I don't have any objection to the

12   identify -- the identification through Mr. Marsh as her as the

13   mother rather than through Janika --

14        THE COURT:  Well, let me just ask you -- I'm sorry.  So

15   you're suggesting -- obviously, the child witness can identify

16   her own mother, but you're suggesting that the government's clips

17   don't show just the mother, so there's no opportunity when she

18   testifies to say, "Who is this person" on cross-examination?

19        MS. SLAIGHT:  The clips, which are just used with Janika

20   for identification purposes, don't include any photos of the

21   mother -- any images of the mother.  That's right.  And I --

22        THE COURT:  But you could use the video --

23        MS. SLAIGHT:  -- brought this up to the government, and --

24        THE COURT:  you could use the video, right?

25        MS. SLAIGHT:  Right.  I'm trying to do this without --

1    THE COURT:  Right.

2    MS. SLAIGHT:  I don't want to embarrass her.  I agree --

3    I'm -- as a matter of fact, I had even said that Mr. Marsh could

4    introduce -- could identify the witnesses -- I didn't have any

5    objection to that -- rather than Janika.  But if they want to

6    introduce -- if they want Janika to identify them, I -- she

7    obviously can do that.  But we've got this issue where the mother

8    is not being identified, and I -- I think that it could be

9    resolved through -- through Mr. Marsh identifying him.  Certainly

10   he cannot say that the same person was in the Count 2 video as

11   the video in question.

12   THE COURT:  All right.  Well, let me hear from

13   Ms. Hertzfeld as to what, if any, objection the government has to

14   the use of this other video.

15   MS. HERTZFELD:  So, Your Honor, to clarify.  With respect

16   to Government's Exhibit 5, which is the video in the bathroom

17   that depicts the mother taking the camera down out of the vent,

18   it is the government's intention to have Investigator Marsh

19   testify as to that video, as with each video that it will

20   introduce, Exhibits 4 through 9, to -- as to what the general

21   content of the video is, that he's reviewed it, that he can

22   identify who's depicted in each video, and so he will be

23   testifying that he reviewed Government's Exhibit 5.  He's made

24   identification of each of the people that is depicted in that

25   video.  It depicts the defendant, Janika, Jaden and Kamaria, the

1    younger sister and the mother.  So there's no -- there's not

2    going to be any question that it's the mother taking the video

3    camera down at the end of Government's Exhibit 5.

4         There's also no question that with respect to each of the

5    videos that's charged, it's the defendant putting the video

6    camera there and hiding it.  And so for that purpose -- this is

7    not a question of an identify of who's recording these kids with

8    respect to the charged conduct.

9         THE COURT:  I understand, but what is the government's

10   objection to Ms. Slaight offering the other video that the

11   government is not charging?

12        MS. HERTZFELD:  Well, I think what Ms. Slaight's arguing

13   is that the government's somehow saying that nobody knew about

14   these surreptitious recording and that --

15        THE COURT:  No, but she's surely entitled to the extent

16   that there are other videos that have been extracted from this

17   laptop, that indicate that there are other people who are

18   manipulating the camera or whatever at different times, to

19   introduce that.

20        MS. HERTZFELD:  Well, I don't think that there's any

21   question that the mother, with respect to the charged videos --

22   it's not an issue in dispute that the mother removes the camera

23   with respect to Government's Exhibit 5, and I think that will

24   show some knowledge that the mother was aware that Mr. Hillie

25   recorded the conduct that's the subject of the charged counts.

1          But the question of whether or not the mother is

2     independently, you know, recording herself doing various things

3     in the bathroom, where the defendant is in no way is implicated

4     in those videos, don't bear on the defendant's criminal conduct

5     in this case.

6          THE COURT:  Yes, but it bears on the defendant's

7     contention through cross-examination that other people were

8     involved in this, and to the extent -- I mean, I hear you saying

9     that happens with respect to one of the videos, so is this a

10    cumulativeness kind of argument?

11         MS. HERTZFELD:  No, it's not.  It's a relevance argument,

12    Your Honor.  Because I think with respect to the video that the

13    mother is depicted in moving the camera, that is relevant conduct

14    on the mother -- relevant to the conduct here on the mother's

15    part, because in that video there's a -- there's a setting up of

16    the camera by the defendant, a recording of these children,

17    et cetera.

18         And I think with respect to the video Ms. Slaight is

19    talking about, it's the mother putting -- appears to be putting

20    the camera up, doing various things and then taking the camera

21    down herself.  It doesn't depict --

22         THE COURT:  Yeah.  I'm going to overrule the government's

23    objection.  That series of conduct, with respect to the mother

24    allegedly manipulating a secret camera in the bathroom, even if

25    it's only to record herself, is relevant to the defendant's

1    assertion -- again, through cross-examination -- that this was

2    not unusual conduct, that other people were involved or whatever.

3    And to the extent that the mother is shown in one of the charged

4    videos doing the same thing, at least with respect to removing

5    the camera, then a video that also was extracted from the same

6    laptop that indicates that she's putting it up at other times and

7    taking it down is relevant.  So the government's objection is

8    overruled.

9        Now, the question is to what extent is Officer Marsh going

10   to identify the mother or allow for the cross-examination to

11   occur with respect to the introduction of that video?

12       MS. HERTZFELD:  Well, he's going to identify the mother,

13   with respect to Government's Exhibit 5.  And the reason that

14   he'll be the one identifying her is she -- I mean, both of these

15   videos, she's not clothed, and the reason -- when he -- when he

16   authenticates and introduces Government's Exhibit 5, I intend to

17   ask him what's depicted in the video and who the individuals are

18   that are depicted in that same video.  And at that point he will

19   say that Joyce Asiamah is depicted at the end of the video, so

20   there's no question about that.  And I think to the extent

21   that --

22       THE COURT:  So he can recognize Joyce Asiamah, so when and

23   if Ms. Slaight puts up the other video that he extracted and

24   says, "Who is this," he'll be able to say, "This is Joyce

25   Asiamah."

1          MS. HERTZFELD:  Yes.

2          THE COURT:  All right.  I mean, I understand the

3     government's point that that is irrelevant.  The Court rules that

4     it's not, and so I'm permitting the defense to ask him questions

5     about that video.

6          MS. HERTZFELD:  Understood.  Thank you, Your Honor.

7          THE COURT:  Is there any other issue?

8          MS. HERTZFELD:  I think that's all the preliminaries from

9     the government.

10         THE COURT:  Ms. Slaight, anything from you?

11         MS. SLAIGHT:  Your Honor, I'm just noting that that is --

12    the mother is naked in the second -- in the video that we have

13    just been discussing, where she puts it up and takes it down.

14    And I'm planning on cross-examining him.  I don't have that

15    video.  I'm not allowed to have access to that video.  It's

16    protected.  So it has to be played through the government, and I

17    had asked the government to bring it.  I'm -- I may -- I'm

18    definitely going to cross-examine Investigator Marsh concerning

19    the video.  I may only introduce, actually, the video in the

20    defense case.  I'm not -- I don't want to embarrass him.

21         THE COURT:  All right.  I mean --

22         MS. SLAIGHT:  I'm just notifying the Court since we've

23    talked about it, and it may just -- I may just put it in, in the

24    defense case, but I don't have the video.  It has to be

25    physically, um, offered --

1          THE COURT:  Well, whenever it is that you intend to offer

2     it, I would ask that you work with the government so that we have

3     sort of a seamless presentation in getting it from them.

4          MS. SLAIGHT:  And I -- and I have.

5          THE COURT:  Okay.

6          MS. SLAIGHT:  I'm doing that.

7          THE COURT:  All right.  So are we ready to call the jury

8     in today?

9          MS. HERTZFELD:  Yes, Your Honor.  Thank you.

10          MS. SLAIGHT:  Your Honor, could I -- may I approach

11     government counsel?

12          THE COURT:  Yes.

13          (Jury in at 9:50 a.m.)

14          THE COURT:  Good morning.  You may be seated.  So you all

15     have been sworn yesterday, and I need to give you some

16     preliminary instructions regarding how this trial will work and

17     also talk to you about some of the rules, the legal rules, that

18     are important in a trial.  These remarks are not a substitute for

19     the detailed instructions that I will be giving you at the end of

20     the trial before you start your deliberations.  My instructions

21     now are just intended to give you a sense of what will be going

22     on in the courtroom and what your responsibilities are as jurors.

23          The first thing that I wanted to mention, and that I think

24     will be helpful for you, relates to the notebook and pen that you

25     had waiting for you when you took your seat.  These items are

1    there because I permit jurors to take notes during the trial if

2    they want to and to have your own notes with you during the jury

3    deliberations.

4         Now, I want to emphasize that none of you is required to

5    take notes.  In fact, you should not take notes if you think that

6    the note taking might distract from your attention, distract you

7    from the evidence or the testimony or the demeanor of the

8    witnesses in this case.

9         On the other hand, if you think that taking notes might

10   better focus your attention on the witnesses and the evidence, or

11   might better help you remember what went on during the trial, or

12   make you pay more attention during the trial, you're free to take

13   notes.  I leave the decision of whether or not to take notes up

14   to each juror individually, because different people have

15   different ways of listening, understanding and remembering what

16   they see and hear most effectively.

17        If you think the taking notes will be more of a hindrance

18   to you than a help, then just put that notebook under your chair

19   and forget it.

20        For those of you who do decide to take notes, I want to

21   explain to you a few things about the notes and the notebooks.

22   For the note takers among you, you should remember that the notes

23   are only an aid to help your memory.  Your notes are not the

24   evidence, and they should not replace your own memory of the

25   evidence.  The notes are for the note taker's own personal use in

1    refreshing his or her memory of the evidence; and those jurors

2    who do not take notes should rely on their own memory of the

3    evidence and should not be influenced by the fact that another

4    juror has taken notes.

5         Whenever there is a recess in the trial, please leave your

6    notebooks and pens in the envelope on your seat.  They will be

7    left there during short recesses when I remain on the bench and

8    when the courtroom is locked, and no one, including me, will ever

9    look at any of your notes.

10        You will not be able to take the notebooks home with you

11   overnight or at the end of the trial.  At the end of the trial,

12   after you finished your deliberations and returned to the

13   courtroom and delivered your verdict, your notebooks will be

14   collected, and your notes will be torn out and destroyed.  Again,

15   neither I nor anyone else will read the notes you've taken, so

16   you should feel free to write whatever you want.

17        You've probably also noticed that there are 14 of you

18   sitting in the jury box.  Only 12 of you will retire to

19   deliberate in this matter.  Before any of you even entered the

20   courtroom yesterday, we randomly selected the alternate seats.  I

21   will not disclose who the alternates are until the end of my

22   final instructions just before you begin your deliberations.  As

23   any seat might turn into -- turn out to be the alternate seat, it

24   is important that each of you think of yourselves as a regular

25   juror during this trial, and that you all give this case your

1   fullest and most serious attention.

2        Okay.  Now I want to talk to you generally about your

3   role, that is, who you are in this process and what you'll need

4   to thing about and do as jurors and my role in the trial process,

5   and then I'll give you some more specific information about this

6   case and how the trial will proceed.

7        I will start by addressing my role.  My responsibility is

8   to conduct this trial in an orderly, fair and efficient manner,

9   to rule on legal questions that come up in the course of the

10  trial, and to instruct you about the law that applies to this

11  case.

12       It is your sworn duty as jurors to accept and apply the

13  law as I state it to you.  Your responsibilities as jurors is to

14  determine the facts in this case.  You, and only you, are the

15  judges of the facts.  You alone determine the weight, the effect,

16  and the value of the evidence, as well as the credibility or

17  believability of the witnesses.  You must consider and weigh the

18  testimony of all witnesses who appear before you, and you alone

19  must decide the extent to which you believe any witness.  You

20  must consider and weigh the testimony of all witnesses who

21  appear, as I said.

22       To fulfill your duties you must pay very careful attention

23  to the testimony of all the witnesses because you will not have

24  any transcripts or summaries of the testimony available during

25  your deliberations.  You will have to rely only on your memory

1    and your notes, if you choose to take any.

2         During this trial, I may rule on motions and objections

3    that the lawyers make.  I may make comments to the lawyers and

4    question the witnesses, and I'll instruct you on the law at the

5    end of the case.

6         You should not take any of my statements or actions as an

7    indication of my opinion about how you should decide the facts.

8    If you think somehow that I've expressed or even hinted at any

9    opinion as to the facts of this case, you should disregard that.

10        The verdict in this case is your sole and exclusive

11   responsibility.  In carrying out that responsibility, you may

12   consider only the evidence properly admitted in this case.  That

13   evidence includes the sworn testimony of witnesses and the

14   exhibits admitted into evidence.  If the evidence includes

15   anything other than testimony and exhibits, I will instruct you

16   about these other types of evidence when they're admitted during

17   the trial.

18        In regard to witness testimony, I want to alert you that

19   you should pay careful attention to the witnesses, both what the

20   witnesses say and also who they are.  At the beginning of the

21   jury selection process, some witnesses were identified to you

22   only by name.  If at any time during this trial you suddenly

23   realized that you recognize someone or you might know a witness,

24   a lawyer, someone who is mentioned in the testimony or evidence,

25   or anyone else connected with this case in any way, you should

1    raise your hand immediately and ask to speak with me.

2         Now, let me talk about your role in relation to the

3    lawyers and the Court.  You should remember, as I said before,

4    that you determine the facts and you decide how to view and weigh

5    the evidence.  During the trial, if the Court or a lawyer makes a

6    statement or asks a question that refers to evidence and you

7    remember the evidence differently, you should rely on your memory

8    of the evidence during the deliberations.  The lawyers'

9    statements and questions are not evidence and should not be

10   treated as such.

11        The lawyers in the case may also object when the other

12   side asks a question, makes an argument, or offers evidence that

13   the objecting lawyer believes is properly -- is not properly

14   admissible.  You must not hold such objections against the lawyer

15   who makes them or the party he represents.  It is not the

16   lawyer's responsibility -- excuse me, it is the lawyer's

17   responsibility to object to evidence that they believe is not

18   admissible.

19        If I sustain an objection to a question asked by a lawyer,

20   the question must be withdrawn, and you must not guess or

21   speculate what the answer to the question would have been.

22        If a question is asked and answered and then I rule that

23   the answer should be stricken from the record, you must disregard

24   both the question and the answer in your deliberations.  You

25   should follow this same rule if exhibits are stricken.

1     You will also notice that from time to time during the

2     trial it may become necessary for me to talk with the attorneys

3     out of the hearing of the jury, either by having a conference

4     here at the bench -- similar to what we all had yesterday -- or

5     by excusing the jury, calling a recess, and talking to the

6     lawyers.  Please understand that while you are waiting, we are

7     working.  The purpose of these conferences is not to keep

8     relevant information from you, but to decide how certain evidence

9     is to be treated under the rules of evidence and to avoid

10    confusion and error.

11    Of course we will do what we can to keep the number and

12    length of these conferences to a minimum.  I may not always grant

13    an attorney's request for a conference.  Do not consider my

14    granting or denying a request as any indication of my opinion of

15    the case or what your verdict should be.

16    Now I will briefly describe some of the procedures we will

17    use and some of the rules of law that will be important.  This is

18    a criminal case that began when the grand jury returned an

19    indictment.  As I mentioned before, the indictment charges

20    Mr. Charles Hillie with 17 counts.

21    Counts 1 and 2 charge Mr. Hillie with sexual exploitation

22    of a minor in violation of 18 U.S.C. 2251(a).

23    Count 3 charges Mr. Hillie with possession of images of a

24    minor engaging in sexually explicit conduct in violation of 18

25    U.S.C. 2252(a)(4)(B).

1          Counts 4 through 7 charge Mr. Hillie with attempted sexual

2    exploitation of a minor in violation of that same -- sorry, in

3    violation of 18 U.S.C. 2251(a) and (e).

4          Count 8 charges Mr. Hillie with first degree child sexual

5    abuse with aggravating circumstances, and this is in violation of

6    D.C. code -- several sections of the D.C. code that I won't read,

7    but I will later when we talk about the actual charges.

8          Counts 9 through 11 charge Mr. Hillie with second degree

9    child sexual abuse with aggravating circumstances.

10          Count 12 charges Mr. Hillie with second degree sexual

11    abuse of a minor with aggravating circumstances.

12          And Counts 13 through 17 charge Mr. Hillie with second

13    degree child sexual abuse with aggravating circumstances.

14          You should understand clearly that these charges are in

15    the indictment, but the indictment is not evidence.  An

16    indictment is just a formal way of charging a person with a crime

17    in order to bring him to trial.  You must not think of the

18    indictment as any evidence of guilt of the defendant, nor must

19    you draw any conclusions about the guilt of the defendant just

20    because he's been indicted.

21          At the end of the trial, you will have to decide whether

22    or not the evidence presented has convinced you beyond a

23    reasonable doubt that Mr. Hillie committed the offenses with

24    which he has been charged.

25          To prove each charged offense, the government must prove

1    beyond a reasonable doubt each of the elements of that offense.

2         After you've seen all of the evidence in this case, I will

3    give you more detailed instructions about the elements of each

4    offense and your duties as jurors to consider those elements in

5    determining Mr. Hillie's guilt or innocence.

6         For now it suffices for me to give you a general overview

7    of the elements that you're looking for with respect to these 17

8    charged offenses.  The 17 offenses can be grouped into six

9    different categories.

10         First, Mr. Hillie has been charged with sexual

11    exploitation of a minor.  The elements of that offense are:  One,

12    that Charles Hillie did employ or use Janika to engage in

13    sexually explicit conduct, that is, the lascivious exhibition of

14    the genitals and pubic area of Janika, for the purpose of

15    producing a visual depiction of such conduct; second, at the time

16    Janika was a minor; and third, that the visual depiction was

17    either produced or transmitted using materials that had been

18    mailed, shipped or transported in or affecting interstate or

19    foreign commerce, including by a computer.

20         Mr. Hillie has also been charged with attempted sexual

21    exploitation of a minor.  I just told you the elements for the

22    underlying offense for the completed crime of sexual exploitation

23    of a minor; however, to prove attempt, the two elements of the

24    offense are that -- are:  One, that Mr. Hillie intended to commit

25    the crime of sexual exploitation of a minor; and two, that

1    Mr. Hillie performed one or more acts constituting a substantial

2    step toward the commission of the crime of sexual exploitation of

3    a minor.

4         Another category that is at issue here is the charge that

5    Mr. Hillie possessed images of a minor engaging in sexually

6    explicit conduct.  The elements of that offense -- there are four

7    of them -- are:  One, that Mr. Hillie knowingly possessed

8    material containing one or more visual depictions; two, that the

9    visual depiction involved the use of a minor engaged in sexually

10   explicit conduct; three, that Mr. Hillie knew that the material

11   contained such visual depictions of a minor and knew that the

12   visual depictions were of such minor engaged in sexually explicit

13   conduct; and four, that such visual depictions were produced

14   using material that had been shipped or transported in or

15   affecting interstate or foreign commerce by any means, including

16   a computer.

17        In addition, Mr. Hillie has been charged with certain sex

18   abuse counts.  He's been charged with first degree child sexual

19   abuse with aggravating circumstances.  There are four elements of

20   the offense of first degree child sexual abuse:  One, that

21   Mr. Hillie engaged in a sexual act with Janika, or caused Janika

22   to engage in a sexual act; two, at the time of the sexual act

23   Janika was under 16 years of age; three, Mr. Hillie was at least

24   four years older than Janika at the time he engaged in the sexual

25   act; and 4, when he engaged in the sexual act or caused Janika to

1    engage in the sexual act, Mr. Hillie intended to abuse or

2    humiliate Janika, or to arouse or gratify his own or another

3    person's sexual desire.  That was first degree child sexual

4    abuse.

5         Mr. Hillie has also been charge with second degree child

6    sexual abuse with aggravating circumstances.  The elements of

7    second degree child sexual abuse are:  One, that Mr. Hillie

8    engaged in sexual contact with Janika or Jaden, or caused Janika

9    or Jaden to engage in sexual conduct -- contact; two, at the time

10   of the sexual contact, Janika or Jaden was under 16 years of age;

11   three, Mr. Hillie was at least four years older than Janika or

12   Jaden at the time he engaged in the sexual contact; and four,

13   when he engaged in the sexual conduct or caused Janika or Jaden

14   to engage in the sexual conduct, Mr. Hillie intended to abuse or

15   humiliate Janika or Jaden, or to arouse or gratify his own or

16   another person's sexual desire.

17        Finally, Mr. Hillie has been charged with several counts

18   related to second degree sexual abuse of a minor with aggravating

19   circumstances.  The elements of second degree sexual abuse of a

20   minor are:  One, that Charles Hillie engaged in sexual contact

21   with Janika, or caused Janika to engage in sexual contact; two,

22   at the time of the sexual contact, Mr. Hillie was 18 years of age

23   or older; three, at the time of the sexual contact, Janika was

24   under 18 years of age; four, at the time of the sexual contact,

25   Mr. Hillie was a -- in a "significant relationship" with Janika;

1  and five, when Mr. Hillie engaged in the sexual contact with

2  Janika, or caused Janika to engage in the sexual contact,

3  Mr. Hillie intended to abuse or humiliate Janika, or to arouse or

4  gratify his own or another person's sexual desire.

5      Now, I read to you the elements of the sex abuse counts,

6  and if you were listening, you heard that for each of the titles

7  I said it was "sexual abuse with aggravating circumstances."

8  With respect to each of the sexual abuse counts -- which are

9  Counts 8 through 17 of the indictment -- the government has

10  alleged that Mr. Hillie committed the sexual abuse with

11  aggravating circumstances.

12      If you find that Mr. Hillie is not guilty of any sexual

13  abuse count, you should not consider the aggravating

14  circumstances for that count.  However, if you find Mr. Hillie is

15  guilty of any sexual abuse count, then you'll need to go on to

16  determine whether aggravating circumstances exist as the law

17  defines them.

18      In this case, you would determine:  One, whether the

19  government has also proven beyond a reasonable doubt that Janika

20  or Jaden was under 18 years of age at the time Mr. Hillie

21  committed the offense; and that Mr. Hillie had a significant

22  relationship with Janika or Jaden.  That's one aggravating

23  circumstance.

24      Another aggravating circumstance is whether the government

25  has proven beyond a reasonable doubt that Mr. Hillie is guilty of

1    committing sex offenses against two victims:  Janika and Jaden.

2        Now, one or both of those two ago aggravating

3    circumstances is charged in the indictment in connection with

4    each of the individual sex abuse counts.  When I give you more

5    detailed instructions later on, I will tell you specifically

6    which of the aggravating circumstances the government says

7    pertains to each count.

8        As you consider the evidence, please remember that every

9    defendant in a criminal case is presumed to be innocent.  This

10    presumption of innocence remains with the defendant throughout

11    the trial, unless and until he's proven guilty beyond a

12    reasonable doubt.

13        The burden is on the government to prove the defendant

14    guilty, and that burden of proof never shifts throughout the

15    trial.  The law does not require a defendant to prove his

16    innocence or to produce any evidence.

17        If you find that the government has proven beyond a

18    reasonable doubt every element of the offense with which the

19    defendant is charged, it is your duty to find him guilty of that

20    offense.

21        On the other hand, if you find that the government has

22    failed to prove any element of a particular offense beyond a

23    reasonable doubt, you must find the defendant not guilty of that

24    offense.

25        In a moment I will explain generally how this trial will

1    proceed and we will get under way.  During this explanation and

2    also during the trial itself, you'll hear me use a few terms and

3    I want to explain what I mean.

4         I will refer to the government and to the defense or the

5    defendant.  When I mention the government, I'm referring to

6    Assistant United States Attorneys, Ms. Andrea Hertzfeld and

7    Mr. -- and I always have a hard time with your first name,

8    Mr. Okocha.

9         When I mention the defendant or the defense, I'm referring

10   either to the defendant, Mr. Charles Hillie, or his attorney,

11   Ms. Joanne Slaight.

12        When I refer to counsel, this is another way of saying

13   lawyer.

14        When I sustain an objection, I'm excluding that evidence

15   from this trial for a good reason.

16        When you hear that I've overruled an objection, I am

17   permitting the evidence to be admitted.

18        When I say "admitted into evidence," or "received into

19   evidence," I mean this particular statement or exhibit may be

20   considered by you in making the decisions that you must make at

21   the end of this case.

22        The government and the defendant may also stipulate, that

23   is, they may agree to certain facts.  You should consider any

24   stipulation of facts to be undisputed evidence.

25        I may also take what is called judicial notice of public

1  acts, places, facts and events that I consider to be matters of

2  common knowledge or matters that can be determined easily through

3  undisputed sources.  If I take judicial notice of a particular

4  fact, you may, if you choose to do so, regard that fact as proven

5  evidence.  But you are the sole judges of the facts.  You are not

6  required to accept any fact that is judicially noticed.

7       As the first step in this trial, the government and the

8  defendant will have the opportunity to make opening statements.

9  The defendant may make an opening statement immediately after the

10 government's opening statement, or he may choose to wait until

11 the beginning of the defendant's case, or he may choose not to

12 make any opening statement at all.  You should understand that

13 opening statements are not evidence.  They are only intended to

14 help you understand the evidence that the lawyers expect will be

15 introduced.

16      After the opening statements or statement, the government

17 will put on what is called its case-in-chief.  This means that

18 Ms. Hertzfeld and Mr. Okocha will call witnesses to the witness

19 stand -- our witness stand is right here -- and ask them

20 questions.  This is called direct examination.  When the

21 government is finished, the defense may ask questions, and this

22 is called cross-examination.  When the defense is finished, the

23 government may have brief redirect examination, and after the

24 government presents all of its witnesses and evidence, the

25 defendant may choose to present evidence, but he is not required

1    to do so.  Again, the law does not require a defendant to prove

2    his innocence or to produce any evidence.

3          If the defense does put on evidence, Ms. Slaight will call

4    witnesses to the stand, and we'll have the same process.  She'll

5    ask questions on direct examination, Mr. Okocha or Ms. Hertzfeld

6    will cross-examine, and Ms. Slaight would give -- have the

7    opportunity for a brief redirect examination.

8          When the defense is finished, the government may offer a

9    rebuttal case, which would operate along the same lines as the

10   case-in-chief.

11         And at the end of all the evidence, the government and

12   each defendant -- and this defendant, will have the opportunity

13   to make a closing argument in support of their case.  The

14   lawyer's closing arguments, just like their opening statements,

15   are not evidence in this case.  They are only intended to help

16   you understand the evidence.

17         Finally, at the end of the evidence and after both sides

18   have finished closing argument, I will tell you in detail the

19   rules of law that you must follow when you consider what your

20   verdict should be.  Your verdict must be unanimous, that is, all

21   jurors must agree on the verdict.

22         Okay.  So now you know what to expect with respect to the

23   trial proceedings.  Let me remind you of the rules that we

24   discussed yesterday related to your conduct as jurors that you

25   must follow throughout this trial in order to ensure fairness.

1        First, you are not permitted to discuss the case with

2   anyone until the case is submitted to you for your decision at

3   the end of my final instructions.  This means you may not talk

4   about the case, even with your fellow jurors.  Again, this is

5   because we don't want you to make any decisions until you've

6   heard all the evidence and the instructions of law.  And of

7   course, you may not talk about the case with anyone else outside

8   of the court or any of the court staff or members of the legal

9   teams.  When this case is over, you may discuss any part of it

10  with anyone you wish, but until then, you may not do so.

11       Please also report directly to me if someone tries to talk

12  to you about the case.  I mentioned that yesterday.  You can

13  notify my courtroom deputies, and they will get a note to me.

14       In some cases -- although not necessarily this one --

15  there may be reports in the newspaper, on the radio, the

16  Internet, television, concerning a case while the trial is going

17  on.  If there should be such media coverage in this case, you

18  might be tempted to read, listen, watch it.  You must not listen

19  to or watch such reports.  And if you've been exposed to any

20  press coverage about the case, you must tell me about it

21  immediately by informing the marshals or the courtroom deputy

22  clerks.  Again, please don't tell any of your fellow jurors that

23  you've seen such a media report.  You should tell only me through

24  the clerks, and I will then briefly discuss it with you.

25       In the age of electronic communication that we're now

1    living in, I want to stress again that you must not use any

2    electronic devices or computers to talk about this case in any

3    form or fashion.  I have to emphasize that this includes

4    Tweeting, texting, blogging, e-mailing, posting information on a

5    Website or a chat room or any means at all.  Do not send or

6    accept messages, including e-mail and text messages, about your

7    jury service even in general.

8         You must not disclose your thoughts about your jury

9    service or ask for advice about how to decide the case while you

10   are serving on this jury.

11        And as I said yesterday, because you must decide the case

12   based on only what occurs inside the courtroom, you may not

13   conduct any independent investigation of the law or the facts in

14   this case.

15        At the end of the evidence, after I submit the case to

16   you, you may discuss it when I instruct you to do so, and only in

17   the jury room and in the presence of all of your fellow jurors.

18   Please do not break off and discuss it in small groups.  Everyone

19   must be present and listening.  And in the meantime, it's

20   important for you to keep an open mind and not to decide any

21   issue in the case until after I submit the entire case to you

22   with my final instructions.

23        Finally, let me address the particular schedule that we're

24   going to try to follow during the trial.  We had a few

25   preliminary issues that we needed to discuss this morning.  I

1    apologize for being a few minutes late in terms of getting your

2    attention, but we will start promptly at 9:30 a.m. each day.

3    Ms. Franklin may have given you instructions regarding when

4    you're supposed to be here, but you can expect that the trial

5    will start at 9:30, and we will try to end the day around

6    4:30 p.m.

7          During this time, we will have two planned recesses, about

8    15 or 20 minutes each, one in the morning and one in the

9    afternoon; and we will break for an hour for lunch in the middle

10   of the day.  We are in a schedule right now in which -- as many

11   of you know, this is sort of a holiday, so our court staff, in

12   terms of the cafeteria, may not be totally up and running, but

13   there are restaurants in the area if you can manage during the

14   hour that we have for lunch.

15         There may be additional points in time throughout the

16   court's schedule that I just talked about in which I'll need to

17   address issues with counsel, so we may have brief recesses that

18   fit outside of the schedule that I just talked to you about, but

19   in general, we will have a morning and afternoon break and also a

20   recess for lunch.

21         With that, the Court has concluded its preliminary

22   instructions.  Let me have counsel approach for one moment.

23         (Following sidebar discussion had on the record:)

24         THE COURT:  All right.  So those are my preliminary

25   instructions.  I just wanted to make sure that I said everything

1    accurately and don't need to go back and correct anything?

2           MS. SLAIGHT:  Yes.

3           MS. HERTZFELD:  No objections.

4           THE COURT:  All right.  Is there any witness in the

5    courtroom who either party would like to have excluded?  You

6    know, under Rule 615, some witnesses can be asked to step out or

7    whatever.

8           MS. HERTZFELD:  There's no witness in the courtroom.

9           MS. SLAIGHT:  I don't recognize anybody.

10          THE COURT:  All right.  Good.  So we'll start with opening

11   statements.  Government counsel will begin.

12          MS. HERTZFELD:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          (Sidebar discussion concluded.)

15          THE COURT:  All right.  At this time we will begin with

16   opening statements.  I'll ask government counsel if they're

17   prepared for opening?

18          MR. OKOCHA:  Yes, Your Honor.  Thank you.

19          THE COURT:  Thank you.

20          **OPENING STATEMENT ON BEHALF OF THE GOVERNMENT**

21          MR. OKOCHA:  Children deserve to be protected and kept

22   safe by their parents.  Children, really everyone, deserves to

23   feel safe in their own home.

24          Ladies and gentlemen of the jury, this trial is a trial

25   about two young girls, Jaden and Janika Asiamah, two sisters who

1    at the ages of 9 and 10 years old had to deal with a very

2    difficult reality, a reality that their expectations of

3    protection and safety will be dashed, dashed by that man

4    (indicating), the defendant, Charles Hillie, a man they

5    considered their stepfather, dashed because over the course of

6    multiple years, he sexually abused and sexually harassed them

7    while inside their very own home.

8          Now, ladies and gentlemen, the nature of this sexual abuse

9    spanned many different kinds of activity.  It included the

10   defendant repeatedly and continuously grabbing these girls on

11   their vagina, their buttock and their breasts over the course of

12   multiple, multiple years.

13         In addition, ladies and gentlemen, one thing that he did,

14   unbeknownst to the girls, was secretly record the oldest

15   daughter, Janika Asiamah, in one of the most private places, the

16   most private places in her home, her bedroom and her bathroom.

17   And we'll present to you during the course of this trial six of

18   the videos that the defendant took of her being secretly recorded

19   in various states of undress, including at times being partially

20   nude, totally unbeknownst to her.

21         And further, ladies and gentlemen, one of the more

22   difficult aspects of the trial for these girls is that they told

23   their biological mother who they were living with while this was

24   ongoing what was happening.  And she didn't stop the defendant

25   from what he was doing.  And, moreover, ladies and gentlemen,

1   you'll see evidence, you'll see at least one of the videos, the

2   mother recovering one of the videos indicating that she knew more

3   about what was going on than just the sexual abuse.

4       But, ladies and gentlemen, this relationship between the

5   defendant and his stepdaughters, or girls who considered him his

6   stepfather, wasn't always criminal.  In fact, it started out as a

7   very father-daughter relationship.

8       Janika Asiamah, the older of two girls, born in February

9   1997, and Jaden Asiamah, the younger of two girls, born in May of

10  2002, grew up with their biological mother, Joyce Asiamah, and

11  they grew up at 2646 Place Southeast in Washington, D.C., and

12  they didn't really have a close relationship to their biological

13  fathers.  They both had different biological fathers, and they

14  didn't get to see them that often.  They lived with their mother,

15  and as they grew up, when Janika was about 7 to 9 years old,

16  sometime in that age, and Jaden was somewhere between 2 and 4

17  years old, Joyce Asiamah brought a new man into their life, the

18  defendant.  And initially they took to the defendant and it

19  seemed to them that the defendant was taking to them.  He would

20  do things that fathers would do.  He would take them to school or

21  watch them when their mother wasn't around and even take them to

22  fun activities like going to the haunted houses, and it seemed

23  like there was a lot of love there between the defendant and

24  these two girls.

25      And as time went on, the family moved to different

1   residences.  They moved to a place called 2645 Douglas Road in

2   the spring of 2007, and they stayed there until about May, late

3   May of 2012.

4        Now, at this address, this address is where a lot of the

5   sexual abuse took place and where all of the sexually explicit

6   recordings took place, and it was here at this address where

7   actually one more good thing happened.  Charles Hillie, the

8   defendant, and Joyce Asiamah, the girls' mother, they had a

9   child, a new baby sister for the girls.  So, with this new child

10  named Kamaria and the defendant, they had two new people in their

11  lives that they could love.

12       But as time went on after they moved to this address in

13  Douglas Road, Janika Asiamah began to notice a change in the

14  defendant.  Something was different.  She couldn't put her finger

15  on exactly what it was, and she doesn't remember or even know if

16  something happened, but he did change, and one of the changes

17  that she did begin to notice was that he was being more erratic.

18       And the main issue, the main thing that she began to

19  notice was that he began to sexually abuse her.  It came like a

20  wave.  It was constant and it was repeated.  She remembers when

21  it first started.  She was in about fifth or sixth grade, and,

22  like I said, it was this constant sexual abuse, but was more than

23  sexual abuse, it was also harassing-type behavior, and it just

24  created this pattern of abuse that almost seemed to be

25  indistinguishable.  But you'll hear from Janika that there are

1   five specific incidences of sexual abuse that she just cannot

2   forget.  And five of these specific incidences will account for

3   five of the counts that you'll be asking -- or that we'll be

4   asking you to find the defendant guilty of.

5        And she remembers the first incident of sexual abuse

6   occurred when she was -- some time in fifth or sixth grade

7   between the ages of 10 and 12 years old.  It was then when she

8   was in the kitchen, she was getting ready for something --

9   getting something to eat, and the defendant came up from behind

10  her, grabbed her pants, pulled it open, and then reached his

11  hands down in there and then grabbed her butt.  This stunned

12  Janika.  She had never been touched sexually by anybody before.

13  She was 10 to 12 years old.  It was her first sexual experience

14  and it was with her -- the man she considered her stepfather.

15       But the abuse didn't end there.  She remembers a second

16  incident of sexual abuse not too long after that.  Again, she

17  believes she was in fifth or sixth grade at the time, and she was

18  in one of the common areas of the home, and the defendant came up

19  again, he grabbed her with one hand and grabbed her vagina with

20  the other hand, but he grabbed it so aggressively that when he

21  did that, he penetrated her vagina, and he -- He was so forceful,

22  that he pushed clothing that she was wearing, the pants that she

23  was wearing inside of her vagina with his fingers.

24       She remembers that, that incident quite well.  She

25  remembers a third incident of sexual abuse that occurred also at

1    the Douglas Road address.  This time she doesn't remember what

2    grade she might have been, but she remembers the discussion they

3    were having.  They were talking about -- she was consoling the

4    defendant about a deceased friend of his, a friend she remembers

5    who had dreads, and during this conversation about mourning, he

6    decides that he's going to grab her, grab her vagina and rub it

7    when she was trying to help him out through a death that he was

8    experiencing.

9        And it wasn't just sexual abuse, like I said earlier,

10   ladies and gentlemen, it was an onslaught of behavior.  She

11   remembers times when the defendant would walk up to her and tell

12   her things that made her extremely uncomfortable, like "you look

13   like your mother" while he licked his lips and stared at her

14   intently, or other times she would remember when he would tell

15   her to raise her hands and shake her chest as if putting her

16   breast on display.

17       And one time distinctly she also remembers in the middle

18   of the night waking up to the defendant just staring at her while

19   she was sleeping.

20       And she also remembers multiple incidences where she would

21   be in her room sometimes just fresh out of the shower where he

22   would just burst in, no rhyme, no reason, not looking for

23   anything, not asking her for anything, but burst into her room.

24   Other times she remembers sitting in the room and -- or going to

25   her room and finding the defendant just sitting there staring at

1    her, again no rhyme, no reason, no explanation.

2         Now, in addition to that, she does remember a fourth

3    incident of sexual abuse that occurred, again with the defendant

4    bursting in on her.  One time when she was in the shower -- in

5    fact, multiple times when she was in the shower she remembers him

6    bursting in on her.  But this particular time she remembers she

7    was in the shower, he bursts in, grabs the shower curtain, pulls

8    it open, and then grabs her breast.

9         Now, Janika from a very young age had talked to her mother

10   frequently, and her mother had told her a couple of different

11   things.  She told her "what happens in the house, stays in the

12   house."  That's one thing she told her.

13        Her mother Joyce also told her that if anything bad were

14   to happen to her, she should come and tell her, and she did.

15   Almost immediately when the sexual abuse started happening,

16   Janika came and told her.  And actually, before I forget about

17   one more very important, very difficult act of sexual abuse, I

18   want to make sure we touch on that.

19        There was one other incident of sexual abuse that Janika

20   remembers quite clearly.  She remembers -- and I guess not really

21   sexual abuse, but I guess one other instance of disturbing

22   behavior that she remembers quite clearly, one of the most

23   disturbing.  She remembers one time she was on the family laptop,

24   a pink laptop in the home, and on the laptop she was -- she was

25   downloading music -- You see, the family had certain

1   restrictions, right.  It had certain restrictions on who could

2   access what.  So there were different profiles that she could use

3   and the kids' profile she couldn't use to download the music

4   because there was all these restrictions.  So she used Charles

5   Hillie's profile to download her music.  And when she used

6   Charles Hillie's profile, while she was waiting for the music to

7   upload, she went to see what was in his photos, some family

8   photos that she saw initially.  But then as she scrolled through

9   some more of the photos, she saw one of the most discomforting

10  things.  She saw pictures of herself.  She didn't know where they

11  came from.  She had not given Charles Hillie permission to take

12  pictures of her.  And even worse, there were pictures of herself

13  nude.

14       She confronted the defendant about this and asked him,

15  What are you doing, why are you doing this to me?  And you know

16  what he told her?  He said because you're not my seed, meaning

17  you're not my child.

18       So, like I was saying before, Janika went and told her

19  mother about what was happening when it started.  She told her

20  about the sexual abuse, and Janika was given a very disappointing

21  response by her mom.  Her mom told her -- in fact, her mom nearly

22  interrogated her about what was going on the first time she told

23  her about the sexual abuse, asking her, "Well, where did it

24  happen, how did it happen, what are you talking about?"  And

25  ending up doing little to nothing about the defendant's actions.

1          And she remembers multiple incidences where she would tell

2     her mother about the sexual abuse or the harassing behavior and

3     very little would come out of it.  Sometimes she would relay an

4     apology from the defendant.  Sometimes she would have an

5     explanation about what might have been happening, some sort of

6     mistake, and sometimes she would even go and kick him out, but it

7     would be short-lived and he'd be back in the house in a couple of

8     days or a couple of weeks.

9          So, Janika was getting distraught over what was happening

10    and trying to figure out the best way to deal with this.  She

11    thought maybe, you know, it's her own fault, started blaming

12    herself and trying to take matters in her own hands, so she

13    changed the way she dressed, wore more baggy clothing.  And

14    actually, after a short amount of time, there began this lull in

15    the activity.  When it first started, it was happening

16    frequently, and then later on, especially after the family moved

17    out of the Douglas Road address, it became less and less

18    frequent.

19         But as the defendant was sexually abusing and harassing

20    Janika Asiamah less, he switched his focus to another little girl

21    in that house, Janika's little sister, and began sexually

22    harassing and abusing her as well.

23         Now, Jaden Asiamah remembers the first time Charles Hillie

24    touched her, the first time he grabbed her in her most private

25    areas.  She remembers she was about nine years old when it

1    happened.  She remembers they were at Douglas Road when it

2    happened and that she was playing with her little sister Kamaria,

3    and the defendant came up to her and grabbed her aggressively

4    right on the breast.  She remembers many incidences of sexual

5    abuse occurring at the hands of the defendant.  In fact, she

6    remembers five distinct instances similar to her sister, the

7    first one being when she was nine years old at Douglas Road on

8    her breast.

9        She remembers that during that incident she tried to get

10   away from the defendant, and in response he reached into his

11   pants, pulled out his penis and showed it to her, saying "touch

12   it, touch it."  And then after that, grabbed her, put her on his

13   lap and began to rub her vagina, the second incident of sexual

14   abuse that she remembers.

15       She remembers a third incident, and this time the

16   defendant did not constrain himself to one of the common areas.

17   She remembers that she was sleeping in her bedroom and the

18   defendant came in -- Again, she's about nine years old on Douglas

19   Road -- and she remembers feeling something on her butt, waking

20   up and seeing the defendant retreating from her and shrinking out

21   of her room seeing his silhouette, a third incident of sexual

22   abuse she remembers.

23       She remembers another incident of sexual abuse occurring,

24   this time at Good Hope Court when she was about ten years old.

25   She was trying to sit and watch television, just have a normal

1   day of safety in her home, but the defendant dashed those

2   expectations when he reached over and grabbed her on her breast

3   when she was just sitting there trying to watch TV.

4        She remembers a fifth incident of sexual abuse, again in

5   her bedroom, again at Good Hope Court where the family had moved

6   to after Douglas Road.

7        She was sleeping with a bunch of her little cousins hoping

8   that might keep her safe, and the defendant goes into her bedroom

9   and grabs her and rubs her vagina.

10       Now, with Jaden Asiamah, this behavior rattled her.  She

11  didn't know how to handle it.  At first one thing she tried to do

12  was start to sleep in Janika Asiamah's room hoping at least at

13  night she could be safe from the defendant.  She slept on the

14  floor next to her sister Janika.  Janika began to notice this and

15  asked her questions.  What's going on?  What's happening?  And

16  eventually Jaden told her that she was being sexually abused by

17  their step dad, the defendant.

18       Now, Janika went and said "You should tell mom."  Jaden

19  told mom, but with similar results.  Kicked out for a day or two

20  but back shortly thereafter.

21       Now, Jaden also remembers that the defendant did a number

22  of other type of activities, barging in on her as well in the

23  bathroom.

24       She remembers in November or in the fall, wintertime of

25  2012 the defendant barging in on her in the bathroom, but you

1    see, ladies and gentlemen, this time would be the last time that

2    the defendant would do any type of abusive or uncomfortable or

3    harassing behavior to Jaden Asiamah, because after this incident,

4    Jaden would find a parent, a protector and would find a home

5    where she could be safe.

6         You see, after this incident, Jaden reported to her mother

7    what happened, but after she reported it, or while she was

8    reporting it, the defendant slinked in, overheard what she was

9    saying, became upset, and slapped her in the face, slapped his

10   ten-year old daughter of his girlfriend in the face, slapped her

11   with such force that she bled from her face, bled from her nose

12   and was knocked to the ground.

13        Now, lucky for Jaden Asiamah, she had some of her child-

14   aged relatives in the home.  They rushed to help her.  Janika

15   Asiamah, who was also there, called her biological father.  He

16   came and he picked her up.  They also called another adult,

17   Josephine Asiamah, the maternal aunt of the children, the sister

18   of Joyce Asiamah, their mother.  She came down as well to help

19   with the children.  And after this incident, Jaden told her

20   father about what was happening and they reported it to the

21   police who started an investigation in the winter -- in January,

22   approximately, of 2013.

23        But unfortunately, ladies and gentlemen, this

24   investigation would end up to be doomed.  It would be doomed

25   because Joyce Asiamah had a conversation with Janika Asiamah.

1    The mother of the kids had a conversation with the older

2    daughter, and she told her, in addition to "What happens in this

3    house, stays in this house," that if the authorities were to get

4    involved with what's happening in the home, some bad things would

5    happen.  The little sister that you love, Kamaria Asiamah, who

6    you take to class and who you wash and take care of and who you

7    love very much, she'd no longer be in the home.  She'd go off to

8    foster care, if you were to tell these people about what was

9    happening in the home.  You, yourself, Janika, would no longer be

10   in the home.  You'd go off to foster care and wouldn't be able to

11   see any of your close relatives.

12        Now, Janika hated what Charles Hillie was doing, but she

13   also didn't want to be separated from her family, and so when

14   Joyce Asiamah, her mother, made a promise to her that this would

15   be the last time that the defendant would do this, that she would

16   make sure that he stayed out of the home, she believed it.

17        She told herself she believed to make sure that nothing

18   like this would split the family apart.  So when the authorities

19   came around and when Child and Family Services Agency and the

20   police came around to investigate the situation, despite Jaden

21   Asiamah telling the detectives involved what happened with regard

22   to the sexual abuse, it was doomed, and also through the help of

23   Joyce Asiamah making sure that she did not corroborate anything

24   with regard to Jaden, it was doomed.

25        Now, Jaden was out of the house, she was living with her

1   biological father, so she was okay, but with Janika, she was

2   hoping that it would stop, but it continued.  And she recalls the

3   last time, the fifth incident of sexual abuse for her, the last

4   time she let the defendant grab her.  She was in 11th grade this

5   time at Good Hope Court.  The harassing behavior had been less

6   frequent, but she was in the kitchen preparing a meal when the

7   defendant came up from behind her and grabbed her on the butt

8   again.  This was after Janika had lied, after Janika had hoped to

9   keep the family together and listened to her mother who told her

10  that she would protect her and keep her safe, the defendant

11  grabbed her on the butt.  She couldn't handle it.  She noticed

12  that there was -- there had been a change in her since this all

13  started in the beginning, that she couldn't focus, that she was

14  on her second time or she was going to be on her second time

15  going through 11th grade, and her demeanor was changing.  This

16  was affecting her.

17       She went to her mother and she begged her mother, "You

18  have to kick this guy out of the house, this is the last time,"

19  and initially she did, but the cycle repeated itself and he came

20  back a couple of days later.  She couldn't handle it.  She left.

21  She went to live with her boyfriend, and she called her mom a

22  couple of days later, she told him -- told her mother, this is

23  it, I'm calling the authorities, I'm letting them know what's

24  happening in our house.  Her mother's response:  She shipped her

25  down to North Carolina to live with her biological father, a man

1    she barely saw, barely new, away from the people she was trying

2    to stay with, from Kamaria and the rest of her relatives.  That

3    was her response.  And Janika, she knew she couldn't let this go.

4    She knew Kamaria was growing older.  She knew what the defendant

5    had done to her, and she knew she had to put an end to this so he

6    couldn't do it to anybody else.  So, after the summer was done in

7    North Carolina, she resolves herself to make a report to the

8    police, and she does.  She reports to the police what happens in

9    August of 2014.

10        Now, ladies and gentlemen, in about August 2015, officers

11   from the Metropolitan Police Department and deputy U.S. Marshals

12   from the Marshal Service execute an arrest warrant for the

13   defendant, Charles Hillie, and a search warrant for the pink

14   laptop that Janika Asiamah said she saw naked images of herself

15   on at 2323 Good Hope Court.

16        Now, this was over a year after Janika had begged her

17   mother to kick the defendant out of her home.

18        Now, during the execution of this warrant, officers

19   knocked and announced their presence to let them know that

20   they're outside.  Meanwhile inside is Joyce Asiamah, Kamaria, and

21   the defendant, over a year and a half later, still living with

22   Joyce Asiamah.  And what does Joyce do when the police arrive and

23   tell her that they have an arrest warrant for the defendant?  She

24   doesn't point him out and say, there he is, there's the guy

25   that's been sexually abusing my daughters.  No.  She refuses to

1    let them in first off, and then when they have to force entry and
2    get inside, she blocks their path, all the while yelling and
3    screaming and causing a scene.  While this is going on, the
4    defendant's in the back bedroom underneath piles of clothes
5    hiding from the police.  The police are able to find him after
6    they move Joyce Asiamah out of the way and detain her and search
7    the rest of the residence.  They find that pink laptop, and the
8    pink laptop ends up with a criminal investigator from the U.S.
9    Attorney's Office by the name of John Marsh.
10            And John Marsh has certain forensic tools that allow him
11   to search this laptop, and he does, and he recovers a number of
12   videos, including six videos, six relevant videos for your
13   consideration.
14            Now, these videos that John Marsh found on the laptop, all
15   show the defendant, Charles Hillie, that man, clearly placing
16   recording devices in the most private areas of the home at
17   Douglas Road in the bathroom and in the bedroom and also the
18   defendant recording Janika Asiamah in various forms of undress,
19   nude and partially nude.
20            And ladies and gentlemen, those videos showing -- excuse
21   me, those videos occurring in the most private areas in the
22   bathroom and the bedroom, none of them were in the kitchen, none
23   of them were in the living room, were all recorded by the
24   defendant, and we know this because the recording device requires
25   it.  In order for him to set up the recording, he had to press

1    some sort of button, and it captured his face, so while he was

2    recording or trying to really hide these devices, his face is

3    captured, and you'll see in the videos themselves, six different

4    videos, three in the bedroom, three in the bathroom, you'll see,

5    especially in one in particular, you'll see him try to hide where

6    he's putting it, and you'll see his face in full view while he's

7    trying to hide the video.  You'll see him place it underneath the

8    bed of the younger daughter, Jaden Asiamah, and capture the bed

9    of Janika Asiamah.  And you'll see in this particular video

10   Janika Asiamah walking right after the shower, not knowing that

11   Charles Hillie had set up this video -- he exited the room by

12   then -- and undressing fully nude.

13        Now, not every single one of the videos are of Janika

14   Asiamah.  Some will have other individuals in it.  And you'll see

15   in one video, a separate video, the mother that these girls had

16   said -- or looked to for protection and safety.  At the end of

17   the video where it captures the girls and Janika partially nude,

18   you'll see her observe the video camera device and take it down.

19   She knew.

20        Now, ladies and gentlemen of the jury, like I said, when

21   it's all said and done, you'll see these videos, these six videos

22   in their entirety.  You'll also hear from the girls, Janika

23   Asiamah and Jaden Asiamah, as they provide testimony in detail

24   about everything that they had to go through during those

25   multiple years of sexual abuse, during that onslaught of

1    harassment.  You'll hear from other witnesses as well, deputy

2    U.S. Marshals, detectives who will talk about their

3    investigation, the execution of the warrant.  You will hear from

4    a family member, Josephine Asiamah, who interacted with the kids,

5    especially on the day that there was the physical assault with

6    Jaden, and spoke to their mother about what was happening in the

7    home, and you'll hear that all of the evidence put together will

8    prove beyond a reasonable doubt that the defendant is guilty of

9    all seven charges with which he's charged.  But before I end

10   today, I want to just briefly touch on those charges.

11        Now, the first two charges of the indictment charged the

12   defendant with creating -- or sexually exploiting a minor.

13        Now, let he me rephrase that.  The first two charges

14   charge the defendant of sexual exploitation of a minor, and those

15   two charges are commonly referred to as production of child

16   pornography.

17        The third charge charges the defendant with possession of

18   sexually explicit images of a child.  And the next four charges

19   charge the defendant with attempted sexual exploitation of a

20   minor, attempted production of child pornography.

21        Now, those seven counts deal with the six videos recovered

22   from the pink laptop.  The first two counts deal with two videos.

23        In order to prove sexual exploitation of a minor or

24   production of child pornography, the government must show that

25   the defendant used a child for the purpose of creating what's

1       called a lascivious exhibition of her genitalia or pubic area.

2              Now, in two of the four videos the defendant captures the

3       genitalia and pubic area of the older daughter, Janika, so in two

4       of those videos he's charged in the first two counts of sexual

5       exploitation of a minor.

6              The third count, Count 3, possession of sexually explicit

7       material or sexually explicit images of a child deals with the

8       first two videos, because not only did he create them, but he

9       possessed them as well.

10             The next four counts, Counts 4, 5, 6, and 7 are all

11      charged as attempted production of child pornography or attempted

12      sexual exploitation of a minor.  They deal with the remaining

13      four videos, because in those videos, although he captures Janika

14      partially nude or sometimes fully nude, the lighting isn't

15      correct or the angle is a little bit off or her back is to some

16      of the videos, so he doesn't successfully capture her groin area,

17      her vagina area or her pubic area.  He's unsuccessful in his

18      attempt.

19             Now, the remaining ten counts of the indictment deal with

20      sexual abuse, and when I spoke earlier I told you that Janika

21      recalls five incidents of sexual abuse and Jaden recalls five

22      incidents of sexual abuse.  Now, those two victims' reports of

23      five and five equal the ten remaining counts of sexual abuse in

24      the indictment.

25             Now, when it's all said and done and the witnesses

1    testify, we're going to ask you to return a verdict, the only

2    verdict that's consistent with the evidence, the only verdict

3    that's consistent with the reports and the accounts of the two

4    girls and the videos that you will see, a verdict of guilty on

5    all 17 counts.  Thank you.

6         THE COURT:  Ms. Slaight.

7              **OPENING STATEMENT ON BEHALF OF THE DEFENDANT**

8         MS. SLAIGHT:  Your Honor.

9         THE COURT:  Ms. Slaight, let me have you get the

10   microphone so you can be heard.

11        MS. SLAIGHT:  I don't have any pockets, so I'll put this

12   right here since I don't have any pockets.

13        Good morning, ladies and gentlemen, Your Honor, Counsel.

14   I represent Charles Hillie.  Now, he is charged and charged only.

15   He's charged with, as the government had said, production of

16   child pornography or attempted production.  He is not -- first of

17   all, I'd like to point out, he is not charged with putting

18   these -- and you will see videos in this case.  He is not charged

19   with putting anything on the Internet.  He is not -- these videos

20   on the Internet.  He is not charged with selling them or anything

21   like that.  The government's evidence that they will try to show

22   is limited to these videos being on the computer.

23        And he's also charged with child abuse.  Now, these --

24   there are a number of different charges, and every single count

25   that the government listed has to be considered individually.

1    And you know we picked the jury very carefully and asked a lot of

2    questions of the jury to make sure that you will do that, that

3    you will not lump things together, that you will look at every

4    count individually and consider every one separately.

5         And first I would like to talk about the counts related to

6    pornography.  Now, the charges of child pornography are very

7    specific.  You will look at these videos.  And the two videos

8    that are alleged child pornography are long.  One of them is 29

9    minutes long, and it has people going into the bathroom, out of

10   the bathroom, three kids, an adult -- which is Joyce Asiamah --

11   plus all the kids.  So it's a long video, ladies and gentlemen.

12        And the other video is 12 minutes long.  And there are

13   four -- as the government says, there are four other videos that

14   you'll look at.

15        Now, the issue with these videos, ladies and gentlemen, is

16   not are they inappropriate.  That's not the issue.  It's not if

17   you think that it's immoral.  That's not the issue, ladies and

18   gentlemen.  It's not are they coarse.  None of that is the issue.

19   The issue is whether they violated the laws that are charged.

20   The issue is not whether you think that they were wrong or, as I

21   said, they were inappropriate.  The issue is whether they

22   violated the law that is charged here today, and not some other

23   law that you think should be passed.  The law -- the laws that

24   you -- that are charged in this case.  They are very specific

25   laws.

1          The issue of -- the statute relating to child pornography

2     is very specific.  And first, the -- the government would have to

3     prove in this case that it was the intent of Mr. Hillie to

4     produce child pornography.  They have to prove that -- not just

5     that he put pictures up or he put a video up, that he took

6     videos.  They have to prove that his intent was to produce child

7     pornography.

8          Now, what does that mean?  Well, that means -- the

9     definition of child pornography, again, is very specific.  It has

10    to be sexually explicit conduct.  It has to be indecent exposure

11    of the genitals or the vag- -- or the pubic area, so that would

12    be the vagina or pubic area.  That's very specific, ladies and

13    gentlemen.  It's not about other areas of the body.  It's about

14    that specific location.  And that's the only -- that is the -- to

15    be convicted of child pornography, it would -- they -- it would

16    have to meet that definition of indecent exposure of a genital or

17    pubic area, and it's not enough.  It's not about the person that

18    is being depicted in the video being nude.  That's not what it's

19    about, even if those areas of the body are shown.

20         It's about an intent to -- the -- the person at issue has

21    to have an intent to produce sexually explicit conduct,

22    lascivious.  And you'll be given further detail about this by the

23    Judge, but it's not an issue of, you don't look at this and say,

24    "Is it inappropriate," or "Is the person naked," or even, "Is the

25    pubic area shown."  It has to be this lascivious intent.

1      The government doesn't decide this, ladies and gentlemen.

2  The investigators don't side this.  The prosecutors don't decide

3  this.  You in the jury will decide this issue, ladies and

4  gentlemen.

5      The -- Mr. Hillie is charged with child abuse, and you've

6  heard about specific counts, and you've heard about the

7  government has said, "Well, things went -- things went -- there

8  were a lot of things going on."  But he is charged with specific

9  counts.  That's what he's charged with.  He's not charged with

10 looking at somebody and staring at them.  He is charged with

11 specific counts of touching, and that's what you have to decide,

12 ladies and gentlemen, not whether he looked at somebody

13 inappropriately, in that person's opinion, and/or he smeared at

14 somebody or he said something.  It is those specific charges of

15 child sexual abuse, which would be unlawful touching and unlawful

16 touching at specific locations.

17     Now, in terms of the child abuse counts, what we do know

18 is that -- and what you will -- you will find in this case, is

19 that the only person who will testify to the allegations that

20 Janika, the one girl in this case, was touched sexually by

21 Mr. Hillie, is Janika.  There will be no other witnesses who come

22 in and say they saw Janika touched inappropriately.  They saw

23 here -- more important, they saw her touched in a sexual -- as an

24 aspect of sexual abuse.  Because the fact is, inappropriate

25 touching is not the issue.  Touching at all is not the issue.

1    It's whether it was -- it met the definition of child sexual

2    abuse.

3         Now, the same is true with Jaden.  You will not hear

4    testimony from one other person in this trial that they saw

5    Jaden -- either Janika or Jaden being touched inappropriately.

6    And, in fact, Janika will not say that she saw Jaden being

7    touched inappropriately.  Jaden will not say that she saw Janika

8    being touched inappropriately.  It is -- there is no witness.

9    There's no other witness to this activity that the government is

10   alleging.

11        Now, this allegedly took over a period of time this took

12   place, and yet the government will not have any other witnesses

13   who say that they saw this inappropriate touching.

14        Now, is that required by law?  No, it is not required by

15   law.  But you have to look at it in relation to all the factors

16   of the case, the time period, the people who were around, and the

17   fact that there's no -- you're not going to hear any physical

18   evidence in this case.  There are no medical exams.  There are no

19   photographs where Mr. Hillie is supposed to be touching in a

20   sexually abusing way these -- either of these girls.  So you will

21   not hear any other evidence of somebody saying that they saw any

22   touching or that there's any physical evidence of that.

23        You're relying on the testimony of Jaden saying that she

24   was touched or Janika saying that she was touched.  The problem

25   here is that you will hear that there are many inconsistencies in

1    these statements, and you will listen to that and you will -- you

2    will -- evaluate -- you have to evaluate it.  It's your job to

3    evaluate that in light of the inconsistencies.  And the

4    inconsistencies to you are problematic here.

5         And the -- with Janika, Janika actually said to

6    investigators, she said to other people, she -- not once, but

7    more than once on more than one occasion, she said adamantly

8    that, "I feel safe," that, "Mr. Hillie has not touched me

9    inappropriately, and in addition, Jaden lies."

10        So the government's saying, "Well, she just said that, she

11   was lying then."  Well, ladies and gentlemen, the problem is, at

12   some point, if she says one thing one time and something opposite

13   the other time, she's definitely lying at some point, ladies and

14   gentlemen, and how credible is she?  These are two teenage girls,

15   and they have obviously their own issues, their own motivations,

16   and you have to consider all of that when you hear the testimony,

17   and you have to consider that Janika had lied not just to one

18   person but to multiple people, ladies and gentlemen, according to

19   the government.

20        But the question is:  When did she lie?  Which version was

21   a lie?  Which version was the truth, ladies and gentlemen?  And

22   if you cannot find beyond a reasonable doubt that the latest

23   version that she's telling -- which I assume will be in court --

24   that she was touched, is the truth, then you have to acquit

25   Mr. Hillie.

1       Now, you are duty-bound, as you heard, to presume that

2   Mr. Hillie is innocent in this case.  He has a presumption of

3   innocence.  He had a presumption of innocence during the voir

4   dire questions, the extensive voir dire that you did.  He has a

5   presumption of innocence right now during the opening statements.

6   He has a presumption of innocence all through the trial and when

7   you go back into that jury room.  He has a presumption of

8   innocence.  He cannot be found guilty unless the government

9   proves beyond a reasonable doubt that he committed each and every

10  one of all the elements for any of the offenses.

11      And, ladies and gentlemen, I ask you to give him the same

12  respect that you would give him, because of this presumption of

13  innocence, that you would give him to any citizen in this city,

14  regardless of what the charges are, because he does have a

15  presumption of innocence, and that is the only way that you can

16  fairly consider the case.

17      Now, the government has the burden of proof in this case.

18  Mr. Hillie doesn't have to prove anything.  I didn't have to have

19  an opening here.  We don't have to present witnesses.  We don't

20  have to cross-examine.  The government has the burden of proving

21  it in this case, and again, cannot -- you cannot convict in this

22  case unless you find guilt beyond a reasonable doubt.

23      What does that mean?  That means if you hesitate, if you

24  pause, if you consider the evidence and you're -- and you have a

25  doubt that makes you hesitate or pause, you must acquit

1   Mr. Hillie.

2          Ladies and gentlemen, when you look at all the evidence in

3   the case, you will see, number one, that this case was -- there

4   was no child pornography here.  It just doesn't -- it just didn't

5   exist, ladies and gentlemen.

6          And number two, Mr. Hillie did not touch illegally either

7   Jaden or Janika.  And for that reason, ladies and gentlemen, it

8   will be your duty to acquit Mr. Hillie in this case.  Thank you.

9          MS. HERTZFELD:  I have an objection I'd like to raise at

10  the bench.

11         THE COURT:  Yes.

12         (Following sidebar discussion had on the record:)

13         MS. HERTZFELD:  Thank you, Your Honor.  I would object to

14  some of the statements of the law that Ms. Slaight used in her

15  opening statements, specifically with respect to what the jury

16  would have to find in order to find that the defendant produced

17  or possessed child pornography.

18         I think it's a misstatement of the law to say that the

19  jury has to find that he intended to produce child pornography.

20  That's not the way the jury's instructed by Your Honor.  They

21  have to find that he knowingly used a child for the purpose of

22  creating a visual depiction that would lead to speculation.  But

23  to say -- I think the way Ms. Slaight left it with the jury was

24  that this defendant does not have a specific intent, that he was

25  producing child pornography.  I didn't think that's an accurate

1    statement to the jurors.

2        There's also a couple of places where she indicated that

3    they had to find a lascivious intent, and I think that just left

4    a very confusing impression with what the state of the law is.  I

5    think it contradicts what Your Honor's instruction will

6    ultimately be to them.

7        I also think that it's a misstatement of the law to tell

8    them that they have a presumption of innocence and that remains

9    with them even once they go back into the jury room to review the

10   evidence.  That's certainly not true.  The presumption of

11   innocence is at the beginning of trial and -- I'm sorry -- and

12   throughout the presentation of the evidence.  At the close of the

13   evidence, they're not required to go back into the jury room any

14   longer with that presumption.

15       What I would ask Your Honor is to give some corrective

16   instruction now to the jury that any statements of the law that

17   were given by counsel, to the extent that they conflict with Your

18   Honor's statement of the law as you will instruct the jury before

19   the deliberations, are not to be considered.  That they are to

20   follow the law as you instruct them at the close of the trial.

21       THE COURT:  Ms. Slaight.

22       MS. SLAIGHT:  Your Honor, the -- none of the statements

23   that I made were incorrect.  He does have to have intent.  The

24   intent to produce a pornographic image.  And the -- there is a

25   presumption of innocence, and I can't remember the third issue

1    that the government --

2          THE COURT:  Well, I don't see anything wrong with the

3    government's suggestion that I just remind them that the

4    arguments that were made in -- or the statements that were made

5    by either side in opening statements, with respect to the law or

6    otherwise, are not evidence.

7          And then as far as the law is concerned, that I will be

8    instructing them, you know, about the law, and that to the extent

9    that anything they've heard about the law conflicts with my

10   instructions, that my instructions will govern.

11         MS. SLAIGHT:  Well, Your Honor, I would ask to make it

12   specific because I did not -- my position is I did not make a

13   misstatement of the law.

14         THE COURT:  I understand --

15         MS. SLAIGHT:  It refers to both --

16         THE COURT:  -- but I am not -- I'm not going to point out

17   any particular issues because I don't want to draw attention to

18   them.  I just want to make clear that, to the extent that

19   statements regarding the law have been made in the opening

20   statements, if you find that those statements conflict with what

21   I say the law is, my instruction to you governs.  And it will be

22   up to them to decide whether what you say is consistent or not,

23   but they need to know that my statement is the controlling

24   statement of law.  I don't see that there's anything wrong with

25   that, and I don't think it highlights any statement of your in

1    particular in any way that would prejudice the defense.  All

2    right?  That's what I intend to do, and then we'll take a recess.

3            MS. HERTZFELD:  Thank you, Your Honor.

4            (Sidebar discussion concluded.)

5            THE COURT:  Thank you for your patience, ladies and

6    gentlemen.  That concludes the opening statements.  Let me remind

7    you that the statements of the counsel are not evidence in this

8    case, that you'll be hearing the evidence, and you will be

9    getting an instruction on the law from the Court.  To the extent

10   that you've heard anything about the law that conflicts with what

11   I say the law is, please remember that my statement of the law to

12   you is what controls.  All right.

13           So we're going to take a recess now.  Please do not

14   discuss the case, even amongst yourselves.  We'll be breaking for

15   about 15, maybe 18 minutes.  We'll be back at 11:30.  Thank you.

16   You can leave your notebooks right there on the seat.

17           (Jury out at 11:16 a.m.)

18           THE COURT:  So we'll break.  The government will be ready

19   with their first witness when we come back, and you'll have about

20   an hour or so, maybe an hour and 15 minutes before we break for

21   lunch.

22           MS. HERTZFELD:  Thank you.

23           THE COURT:  All right.

24           (Thereupon, a break was had from 11:17 a.m. until

25   11:45 a.m.)

```
 1              (Jury in at 11:45 a.m.)

 2              THE COURT:  Be seated.

 3              (Brief pause in proceedings.)

 4              THE COURT:  All right.  Ms. Hertzfeld, are you ready for

 5       the government to call its first witness?

 6              MS. HERTZFELD:  We are, Your Honor.  Thank you.

 7              THE COURT:  You may do so.

 8              MS. HERTZFELD:  The United States calls Supervisory Deputy

 9       United States Marshal Christopher Schwartz.

10              THE COURT:  Good morning, Mr. Schwartz -- Deputy Schwartz.

11       You may come right up here, sir.

12              THE WITNESS:  Good morning, Your Honor.

13              THE COURT:  You're going to stand first and raise your

14       right hand.  You may step up and have a seat, and we're going to

15       have you speak right into the microphone so you can be heard.

16       All right.

17              (CHRISTOPHER SCHWARTZ, GOVERNMENT'S WITNESS, SWORN)

18                   DIRECT EXAMINATION OF CHRISTOPHER SCHWARTZ

19       BY MS. HERTZFELD:

20       Q.     Good morning, sir.

21       A.     Good morning, ma'am.

22       Q.     Will you go ahead and introduce yourself to the ladies

23       and gentlemen of the jury and to the courtroom by telling us

24       your first and last name and how to spell each.

25       A.     My first name is Christopher, C-H-R-I-S-T-O-P-H-E-R, last
```

1    name Schwartz, S-C-H-W-A-R-T-Z.

2    **Q.**    And where is it that you're employed?

3    **A.**    Ma'am, I'm employed by the U.S. Marshals Service, Capital

4    Area Regional Fugitive Task Force.

5    **Q.**    All right.  And what's your rank at the U.S. Marshals

6    Service?

7    **A.**    Supervisory deputy, U.S. marshal.

8    **Q.**    All right.  And how long have you been a deputy -- a

9    supervisory deputy U.S. Marshal?

10   **A.**    23 years.

11   **Q.**    All right.  And how long have you been with the U.S.

12   Marshals Service?

13   **A.**    I've been with the Marshals Service -- excuse me -- 23

14   years.  I've been a supervisory deputy marshal for nine years.

15   **Q.**    Thank you.  And you said you were with the U.S. Capital

16   Fugitive Task Force.

17          Can you tell us a little bit about what your

18   responsibilities as a supervisory deputy U.S. marshal on that

19   Task Force are?

20   **A.**    Yeah.  I'm responsible for a 16-man squad, and we end up

21   doing -- we execute fugitive arrest warrants.

22   **Q.**    All right.  And has that been your responsibility

23   since -- for the last nine years since you've been supervising?

24   **A.**    Just the last three years, I transferred to the Capital

25   Area Regional Fugitive Task Force.

1    **Q.**    All right.  And in the course of your 23 years at the

2    U.S. Marshals Service, have you participated in the execution of

3    arrest and search warrants?

4    **A.**    Over 500.

5    **Q.**    All right.  And about how many of that -- those 500 have

6    you been the supervisor for?

7    **A.**    At least half of those.

8    **Q.**    All right.  And were you in the position that you have

9    now on August 6th of 2015?

10   **A.**    Yes.

11   **Q.**    All right.  And on that date, did you -- or in advance of

12   that date, did you come to be involved in an investigation that

13   called for the arrest of an individual by the name of Charles

14   Hillie?

15   **A.**    Yes.

16   **Q.**    And how did you get involved in that?

17   **A.**    We were asked by the Metropolitan Police Department Youth

18   Division to execute an arrest warrant for a fugitive named

19   Charles Hillie and execute a search warrant in conjunction with

20   the arrest warrant.

21   **Q.**    Is that --

22        MS. SLAIGHT:  Your Honor, objection.

23        THE COURT:  Approach.

24        (Following sidebar discussion had on the record:)

25        MS. SLAIGHT:  Your Honor, he's not a fugitive.  He wasn't

1    a fugitive.  There was an arrest warrant.  It seems like he was

2    on the run.  That's not true.  It was an arrest warrant.  Maybe

3    the government can clear that up.

4         THE COURT:  Can the government clarify?

5         MS. HERTZFELD:  Sure.

6         THE COURT:  Thank you.

7         (Sidebar discussion concluded.)

8         THE COURT:  Sir, you may return.

9         Ms. Hertzfeld, you can continue.

10        MS. HERTZFELD:  Thank you, Your Honor.

11   BY MS. HERTZFELD:

12   Q.    So to identify, when you said you obtained -- you had an

13   arrest warrant for a fugitive named Charles Hillie, was this

14   someone that you actually knew to be on the run from an arrest

15   warrant or anything like that, or was it someone you were just

16   told to make an arrest of?

17   A.    It was an arrest affidavit --

18   Q.    All right.

19   A.    -- sworn out by a detective.

20   Q.    Okay.  And that was brought to you then?

21   A.    Correct.

22   Q.    All right.  And is that typical of how you receive sort

23   of responsibility to make an arrest?

24   A.    Yes.

25   Q.    All right.  And so when you receive responsibility to

1    make an arrest, for example, in this instance, from Youth

2    Division, is there a typical protocol you follow in order to

3    make the arrangements to go out and make an arrest pursuant to

4    that warrant?

5    **A.**    Yes.  Prior to actually affecting an arrest, we'll meet

6    at a location --

7    **Q.**    And who's the -- who's the "we" that you're talking about

8    there?  Sorry to interrupt you.

9    **A.**    It'd be myself as the team leader and several members of

10   the team.

11   **Q.**    And where do those members of the team come from?

12   **A.**    They're assigned to the Capital Area Regional Fugitive

13   Task Force or Metropolitan Police.

14   **Q.**    All right.  And so you have a meeting, you said, and then

15   how does that proceed?

16   **A.**    We have an operational briefing where we show a picture

17   of the target that we're intending to go on, the location, the

18   last known address that we're going to hit.  We do a team

19   assignment briefing.  And then we do a medical briefing where we

20   assign a driver to a vehicle, which vehicle, the driver, and the

21   nearest hospital in case something were to happen to a team

22   member, that we would respond.

23   **Q.**    And what kind of -- what are you planning for when you

24   have this operational plan meeting?  What kind of -- like, what

25   are the objectives of the operational plan that you're forming?

1   **A.**     We're trying to -- me, as the supervisor, I'm trying to

2   mitigate the risk to the general public and to the team members.

3   **Q.**     All right.  And the risk of making the arrest?

4   **A.**     Correct.

5   **Q.**     All right.  And so is that the procedure that you

6   followed when you were asked to make the arrest of Charles

7   Hillie on August 6th, 2015?

8   **A.**     Yes, ma'am.

9   **Q.**     All right.  And with respect to the team that you put

10  together to make that arrest, what was your role on that team?

11  **A.**     I was the assigned team leader, and I also had the dual

12  responsibility of being less than lethal hands.

13  **Q.**     And can you explain to the jury what you mean when you

14  say that?

15  **A.**     Being responsible for anything less than deadly force.

16  Like, I would have an operational taser or baton, and I would be

17  the individual that would handcuff and search.

18  **Q.**     And is it typical when the U.S. Marshals Service puts a

19  team together to go out and make an arrest, that they assign

20  that kind of a function to somebody?

21  **A.**     Yes --

22  **Q.**     All right.

23  **A.**     -- along with others.

24  **Q.**     And what are the other functions people might be assigned

25  as part of the arrest team?

1    **A.**     We would have what we call a long arm or a rifle.  We

2    have a ballistic shield, and then we'd have a ram officer in

3    case we had to force entry.

4    **Q.**     All right.  And is that something that's typical whenever

5    the U.S. Marshals go out to make an arrest?

6    **A.**     Yes, ma'am.

7    **Q.**     All right.  And why is it that you take those pieces of

8    equipment that you just described?

9    **A.**     Well, we need to have them on-scene in case we need them.

10   We can't run back to the cars to get those, so we have to --

11   like, as a team leader supervisor, I need to make sure that

12   whatever risk that we may encounter, that we have all the

13   necessary tools to the door.

14   **Q.**     All right.  And is there a person on the team assigned to

15   each one of those pieces of equipment?

16   **A.**     Yes.  I designate somebody to each.

17   **Q.**     All right.  And is that the procedure you follow when you

18   went to execute the arrest of Mr. Hillie?

19   **A.**     Yes.

20   **Q.**     All right.  Is that the procedure that you followed when

21   you went to arrest Mr. Hillie on August 6th, 2015?

22   **A.**     Yes.

23   **Q.**     All right.  And so you indicated that one of the things

24   that you do during the making of your operational plan is to --

25   you get a picture of the person that you're intending to arrest.

1        Did you get a picture of Mr. -- of the person who was

2   identified to you as Mr. Hillie to arrest on August 6th?

3   **A.**     Yes.

4   **Q.**     All right.  And you also indicated that you get

5   information about where you're supposed to go to make that

6   arrest; is that correct?

7   **A.**     Yes.

8   **Q.**     All right.  And with respect to the arrest of Mr. Hillie

9   on August 6th, 2015, did you receive information about where you

10  were to go to make the arrest of Mr. Hillie?

11  **A.**     Yes.  We had a known address for Mr. Hillie where he

12  should be at.

13  **Q.**     Okay.  And what was the known address you were given

14  where you expected to find Mr. Hillie?

15  **A.**     2323 Good Hope Court, Apartment 203.

16  **Q.**     All right.  And on August 6th, 2015, did you, in fact, go

17  with an arrest team to make the arrest of Charles Hillie?

18  **A.**     Yes, I did.

19  **Q.**     All right.  And can you tell us what happened when you

20  arrived at 2323 Good Hope Court?

21  **A.**     As we approach the door, we do what we call a stat.  Each

22  member of the team falls behind the other member of the team.

23  The first two individuals would be the ballistic shield and the

24  long arm.  And then as the team leader, I would listen to the

25  door, and see if we hear anything behind the door.  At first we

1    didn't hear anything.

2    Q.    All right.  And so when you -- did you go to the door of

3    Apartment 203?

4    A.    Yes.

5    Q.    All right.  And so what's the very first thing that you

6    did when you got to the door of Apartment 203 on Good Hope

7    Court?

8    A.    It's my responsibility to verify the address, if it's the

9    correct address that we have that we're going to.

10   Q.    All right.  And then what did you do next?

11   A.    After we listened and didn't hear anything, we knock and

12   announce.

13   Q.    And when you say you knock and announce, tell the jurors

14   what is it that you announce.

15   A.    We knock rather loudly on the door.  We announce, "Police

16   with a warrant."

17   Q.    All right.  And when you announced that on August 6th,

18   2015, did you get a response?

19   A.    No, but I heard scurrying on the other side of the door.

20   Q.    Okay.  Did anybody respond that there was somebody

21   inside?

22   A.    No verbal.

23   Q.    Okay.  And when you heard the scurrying on the inside,

24   what did you do next?

25   A.    We knocked several more times to see if we could get

1    somebody to answer.

2    Q.    All right.  And did you again announce who it was that

3    was outside the door?

4    A.    Each time we knocked we announced, "Police with a

5    warrant."

6    Q.    All right.  And what happened the subsequent times that

7    you announced "Police with a warrant"?

8    A.    After the third time, the last one we gave, we knocked on

9    the door, "Police with a warrant, and the door's coming down."

10   Q.    All right.  And did you get a response from inside the

11   apartment?

12   A.    No.

13   Q.    So what did you do next?

14   A.    I authorized the use of the ram to force entry to the

15   door.

16   Q.    All right.  And did you, in fact, use -- the did team use

17   the ram to force entry into Apartment 203?

18   A.    Yes, we did.

19   Q.    All right.  I'm going to show you what's marked as

20   Government's Exhibit 12.  And for now it's going to pop up just

21   on your screen there.

22         Do you recognize Government's Exhibit 12?

23   A.    Yes.  That would be the front door to Apartment 203.

24   Q.    All right.  And is that a fair and accurate depiction of

25   how the door to Apartment 203 looked on August 6th of 2015 when

1    you went to arrest Charles Hillie?

2    **A.**    Originally it was closed, and this is after we forced

3    entry.

4    **Q.**    This is how it appeared after you used the ram to open

5    the door?

6    **A.**    Yes, ma'am.

7    **Q.**    All right.

8          MS. HERTZFELD:  Your Honor, I'd move to admit Government's

9    Exhibit 12, and I would ask permission to publish it to the jury.

10         THE COURT:  Any objection?

11         MS. SLAIGHT:  No, Your Honor.

12         THE COURT:  All right.  Exhibit 12 will be admitted.

13         (Government's Exhibit 12 admitted into the record.)

14         MS. HERTZFELD:  All right.

15         THE COURT:  Let me ask:  Ladies and gentlemen, do you see?

16         MS. HERTZFELD:  It's coming.

17         THE COURT:  Now you see.  All right.  Thank you.

18   BY MS. HERTZFELD:

19   **Q.**    So, Deputy Schwartz, when you're looking there at

20   Government's Exhibit 12, I think if everything's working right,

21   you're going to be able to draw right on your screen.

22         Can you show where it is that you actually used the ram

23   on the door here?

24   **A.**    It would be around the vicinity right here (indicating).

25   **Q.**    Okay.  And so when you used the ram that you described,

1    it would have struck the door right there where you made that

2    blue circle?

3    **A.**    Yes, ma'am.

4    **Q.**    All right.

5         MS. HERTZFELD:  And so I'd like the record to reflect that

6    the witness has drawn a circle around the doorknob and lock area

7    in the center of the door that's depicted and marked 203 on

8    Government's Exhibit 12.

9         THE COURT:  It so reflects.

10   BY MS. HERTZFELD:

11   **Q.**    Deputy Schwartz, you indicated that when you used the ram

12   this is what it looked like afterwards.

13        This is what the door looked like?

14   **A.**    Yes, ma'am.

15   **Q.**    Looking into the -- this picture here, is that what the

16   inside of Apartment 203 looked like from your vantage point once

17   you opened -- you forced open that door?

18   **A.**    Yes.

19   **Q.**    All right.  And when you forced open the door, can you

20   tell us:  What did you first encounter when that door came open?

21   **A.**    A hysterical woman standing there screaming.  She

22   wanted -- she was yelling, "They're robbing me, they're raping

23   me," and she wanted to see a copy of the warrant.

24   **Q.**    Okay.  And did you provide a copy of the warrant to this

25   person?

1    **A.**     Not at first.

2    **Q.**     And why not?

3    **A.**     Because it's my job to mitigate the risk that we needed

4    to secure the apartment and make sure there was no other people

5    in the apartment or the fugitive that we were looking for.

6    **Q.**     All right.  And can you point out in Government's

7    Exhibit 12, where was this woman?  Just put a little X where she

8    would have been, if you see it depicted on Government's

9    Exhibit 12.

10   **A.**     (Witness complied.)

11   **Q.**     Okay.

12          MS. HERTZFELD:  And so for the record, the witness has

13   made an X almost dead center in the middle of the photograph

14   there where the linoleum meets the carpeting.

15          THE COURT:  So reflected.

16          MS. HERTZFELD:  Thank you.

17   BY MS. HERTZFELD:

18   **Q.**     And so, when this woman was standing there, from where

19   you were with the rest of the arrest team, could you see

20   anything beyond that into the apartment?

21   **A.**     Other than that open door to the left and that open

22   bedroom door further behind her.

23   **Q.**     You could not?

24   **A.**     I could not see anything else.

25   **Q.**     All right.  And so what did you do when you encountered

1   this woman who was, you said, shouting and yelling all these

2   things?

3   **A.**    I gave her numerous verbal commands to get on the ground,

4   get on the floor.

5   **Q.**    And did she comply with your commands?

6   **A.**    No.

7   **Q.**    All right.  Did you identify at any point who this woman

8   was?

9   **A.**    It was later to be known to me, it was the defendant's

10  girlfriend, Joyce.

11  **Q.**    All right.  And do you know whether she was an

12  occupant that occupied that apartment as well?

13  **A.**    Yes.

14  **Q.**    All right.  And so when you gave her those verbal

15  commands to get on the ground and she didn't comply, what did

16  you do?

17  **A.**    I actually holstered my firearm and drew my, less than

18  lethal device, taser out.

19  **Q.**    Okay.  And what did you do with the taser?

20  **A.**    I activated a taser, which puts a red dot laser onto her

21  chest, and gave her verbal commands.

22  **Q.**    And does that mean you actually tased her?

23  **A.**    No.

24  **Q.**    All right.  What did she do when you put the red dot on

25  her chest?

1   A.    Once I put the red dot on her, she calmed down and got on

2   the floor.

3   Q.    Okay.  And what did you and the rest of the team do once

4   this woman you identified as Joyce was down on the floor?

5   A.    We pushed passed her.  I handcuffed her, and I slid her

6   back to the members behind me.

7   Q.    Okay.  And what was the reason that you did that?

8   A.    For them to -- she was a female, so I had a female in the

9   stack, so we pushed her behind me so the female deputy could

10  continue to search her, although I secured her with handcuffs.

11  Q.    Okay.  And so once you had moved this woman out of the

12  way, what did you and the rest of the marshal team do?

13  A.    We pushed past -- I had the first two members push past

14  the open door to the left, and I had what they call a long

15  cover.  I had them cover the other open door to the other

16  bedroom, and myself and another member of the team flooded into

17  that bedroom.

18  Q.    And is that the standard procedure when you enter into a

19  residence to make an arrest?

20  A.    Yes.

21  Q.    And what's the reason that you enter in that manner?

22  A.    We go in hot like that just -- we don't know what -- the

23  unknown, we don't know what's going to happen, so we try to have

24  the element of surprise.

25  Q.    All right.  And so when you got inside of the apartment,

1    did you see anybody else there in the apartment?

2    **A.**     Initially no, just the adult female.

3    **Q.**     All right.  And did you go about trying to execute the

4    arrest warrant and the search warrant of that apartment?

5    **A.**     Yes, as I stated, when we first flooded into that first

6    bedroom to the left.

7    **Q.**     All right.  And where'd you go?

8    **A.**     To the first bedroom to the left.

9    **Q.**     And did other members of the team go other places in that

10   apartment?

11   **A.**     I had -- I had everybody else hold until I actually

12   searched that bedroom.

13   **Q.**     Okay.  And what happened when you got inside that first

14   bedroom?

15   **A.**     Myself and the team member that went in with me, we

16   searched.  And originally we didn't see anything, and as we

17   called the secondary searches, I noticed there was a forearm and

18   a hand sticking out under a pile of clothing.

19   **Q.**     And where was that pile of clothing you saw the hand and

20   forearm sticking out?

21   **A.**     It was to the left in the closet.

22   **Q.**     All right.

23          MS. HERTZFELD:  And I'm going to ask the deputy clerk to

24   clear the monitor.  I think it's -- maybe I can do it.  I don't

25   know.  I did it.  Okay.  Thank you.

1    And I'd ask to show the witness what's been marked as

2  Government's Exhibit 12A.

3  BY MS. HERTZFELD:

4  **Q.**    Did Government's Exhibit 12A pop up there on that screen?

5  **A.**    Yes, ma'am.

6  **Q.**    All right.  Do you recognize what's depicted in

7  Government's Exhibit 12A?

8  **A.**    Yeah.  It appears to be the closet with all the clothes

9  from that bedroom.

10  **Q.**    All right.  And is it a fair and accurate depiction of

11  how the closet with all the clothes you described appeared on

12  August 6th, 2015?

13  **A.**    Yes, ma'am.

14    MS. HERTZFELD:  Your Honor, I'd move to admit Government's

15  Exhibit A and publish it to the jury.

16    THE COURT:  Any objection?

17    MS. SLAIGHT:  No, Your Honor.

18    THE COURT:  The exhibit will be admitted, and you may

19  publish.

20    (Government's Exhibit 12A admitted into the record.)

21    MS. HERTZFELD:  Okay.  Thank you.

22  BY MS. HERTZFELD:

23  **Q.**    Deputy Schwartz, can you point out -- well, first let me

24  ask you this:  Is this the bedroom that you were just describing

25  in which that closet was located?

1    **A.**     Yes, ma'am.

2    **Q.**     All right.  And can you sort of point out just -- put an

3    X on the door to that closet there?

4    **A.**     Say that again.

5    **Q.**     Put an X on the door to the closet there.

6    **A.**     (Witness complied.)

7    **Q.**     All right.

8         MS. HERTZFELD:  And so the witness has made an X on the

9    door to the right of the closet space that's in the center of the

10   photograph.

11   BY MS. HERTZFELD:

12   **Q.**     And can you see from this image about where it would have

13   been that you saw that hand and forearm sticking out?

14   **A.**     It'd be halfway in that stack of pile of clothes on the

15   floor.

16   **Q.**     All right.

17        MS. HERTZFELD:  And I'm going to ask the deputy clerk to

18   show the witness -- the witness only Government's Exhibit 12B.

19   BY MS. HERTZFELD:

20   **Q.**     Do you recognize Government's Exhibit 12B?

21   **A.**     It's a close-up of the same closet.

22   **Q.**     All right.  It's a fair and accurate depiction of how

23   that closet appeared on August 6th, 2015?

24   **A.**     Yes, ma'am.

25        MS. HERTZFELD:  Your Honor, I'd move to admit Government's

1   Exhibit 12B, and to publish that to the injury as well.

2        THE COURT:  Any objection?

3        MS. SLAIGHT:  No, Your Honor.

4        THE COURT:  The photograph will be admitted, and you may

5   publish.

6        (Government's Exhibit 12B admitted into the record.)

7   BY MS. HERTZFELD:

8   Q.   All right.  And can you, looking at Government's

9   Exhibit 12B, just put a small X kind of marking where you could

10  see the hand and the foreman sticking out there?

11  A.   (Witness complied.)

12  Q.   All right.

13       MS. HERTZFELD:  And so, for the record, the witness has

14  put an X almost dead center in the middle of the photograph in a

15  pile of clothing and materials there.

16  BY MS. HERTZFELD:

17  Q.   And so when you encountered that hand and forearm

18  sticking out from that pile there in Government's Exhibit 12B,

19  could you tell whether it appeared to be a male or a female?

20  A.   No.

21  Q.   And what did you do when you saw the hand and forearm

22  sticking out?

23  A.   I gave numerous commands to, "Let me see your hands."

24  Q.   And did the person that was in that pile comply with

25  those commands?

1  A.    No, ma'am.

2  Q.    All right.  What response did you get?

3  A.    Nothing.

4  Q.    So what did you do at that point?

5  A.    I holstered my firearm.  I had the -- my, what they call,

6  cover officer move up to cover me, and then I grabbed the

7  forearm and hand.

8  Q.    All right.  And what did you do next?

9  A.    I yanked rather hardly the forearm, and an individual

10 came out from under the clothes pile.

11 Q.    All right.  And when that person emerged from the clothes

12 pile, could you tell whether or not -- who that person was?

13 A.    I could tell from the picture from the briefing that

14 morning that it was the defendant, Charles Hillie.

15 Q.    All right.  And do you see the person that you pulled out

16 of that pile of clothes and from that debriefing that morning

17 sitting in the courtroom today?

18 A.    Yes.

19 Q.    Could you point him out to the ladies and gentlemen of

20 the jury, based on his position in the courtroom and where --

21 and something that he's wearing?

22 A.    He's the gentleman in the dark colored suit sitting next

23 left side of defense counsel.

24      MS. HERTZFELD:  And, Your Honor, may the record reflect an

25 in-court identification of the defendant, Charles Hillie.

1          THE COURT:  So reflects.

2          MS. HERTZFELD:  Thank you.

3     BY MS. HERTZFELD:

4     Q.     And, Deputy Schwartz, when you pulled Charles Hillie out

5     of that pile of clothes at that point, what was his demeanor

6     like?

7     A.     He was actively passively resisting.  He didn't try to

8     give me his hands to be handcuffed.  He was kind of flailing his

9     arms about.

10    Q.     All right.  And what did you do in response to that?

11    A.     I slammed onto the bed -- onto his stomach onto the bed,

12    and I handcuffed him.

13    Q.     All right.  And did you try to make an identification by

14    asking him who he was?

15    A.     Yes.

16         MS. SLAIGHT:  Objection.

17         THE COURT:  Basis?

18         MS. SLAIGHT:  May we approach?

19         THE COURT:  Yes.

20         (Following sidebar discussion had on the record:)

21         MS. SLAIGHT:  At this point he's clearly under arrest.

22    The government said they weren't going to use any statements of

23    Mr. Hillie.

24         MS. HERTZFELD:  I think the government can ask him if he

25    identified himself by name.

1          THE COURT:  Are you trying to get the whole statement in?

2          MS. HERTZFELD:  No, just whether or not he provided his

3     information to the --

4          THE COURT:  I don't think that that violates the

5     government's -- to give his name -- the controversial statements

6     that we were worried about earlier were I'm sure, I think, other

7     statements that the defendant of who he was.

8          MS. SLAIGHT:  I just preserve my objection.

9          MS. HERTZFELD:  And I'd also just say for the record, to

10    ask him what would fall in the category of a routine booking

11    question or a statement of identification about a person, even if

12    they are under arrest, doesn't violate any sort of --

13         THE COURT:  I agree.

14         MS. HERTZFELD:  -- issue.

15         (Sidebar discussion concluded.)

16         THE WITNESS:  May I come back?

17         THE COURT:  Yes.  Please return.

18         Ms. Hertzfeld.

19         MS. HERTZFELD:  Thank you.

20    BY MS. HERTZFELD:

21    Q.    Sir, I don't know if you still have any question in mind,

22    but what I was asking you is:  Did the person -- did Mr. Hillie

23    provide you his identifying information when you asked?

24    A.    No.  He gave me the name of Jesus Christ.

25    Q.    All right.  And at any point did he provide you his true

1    identity?

2    **A.**    No.

3    **Q.**    All right.  And what did you do once you had

4    Mr. Hillie -- you said you put handcuffs on him.

5         What did you do once you put handcuffs on him?

6    **A.**    I searched him.

7    **Q.**    All right.  And then what did you do after that?

8    **A.**    We ended up taking him outside the bedroom, eventually

9    down to a scout car that transported him.

10   **Q.**    All right.  And were you able to then go back and secure

11   the apartment to execute a search warrant?

12   **A.**    Yes.

13   **Q.**    All right.  And during the course of the time that you

14   were securing the apartment to execute the search warrant, did

15   you encounter anybody else in the apartment?

16   **A.**    Yeah, a small female child approximately the age of

17   seven.

18   **Q.**    I'm sorry?

19   **A.**    Maybe about the age of seven.

20   **Q.**    All right.  And did you ascertain what the relationship

21   of that small child was to the defendant?

22   **A.**    He said it was his daughter.

23   **Q.**    All right.  And once -- once you secured the premises to

24   execute the search warrant, were you personally involved in the

25   search warrant of that apartment?

1    **A.**    No.

2    **Q.**    And once the defendant was taken down and placed into the

3    van in order to be transported, did you have any further

4    involvement in the case?

5    **A.**    No.

6         MS. HERTZFELD:  No further questions, Your Honor.

7         THE COURT:  All right.  Any cross-examination?

8         CROSS-EXAMINATION OF CHRISTOPHER SCHWARTZ

9    BY MS. SLAIGHT:

10   **Q.**    Good afternoon, Officer Schwartz.

11   **A.**    Good afternoon, ma'am.

12   **Q.**    Now, you said that warrant was executed.  You had an

13   arrest warrant, is that right, for Charles Hillie on -- for --

14   that you executed on August 6th of 2015; is that right?

15   **A.**    No, ma'am.  I had an arrest warrant and a search warrant.

16   **Q.**    Well, I'm going to get to that.

17        Did you have an arrest warrant for Mr. Hillie?

18   **A.**    Yes.

19   **Q.**    Okay.  Did you also have a search warrant?

20   **A.**    Yes.

21   **Q.**    For that apartment?

22   **A.**    Yes.

23   **Q.**    So the search warrant is not for the person, it's for a

24   place, right?

25   **A.**    It could be for a person, but the one I had was for that

1    address.

2    **Q.**    Right, that apartment.  Okay.

3          You did not -- now, that -- you said that someone was in

4    the apartment screaming; is that right?  You said there was

5    somebody in the apartment when you got in there screaming; is

6    that right?

7    **A.**    Yes.  An adult female.

8    **Q.**    Okay.  And you learned that her name was Joyce Asiamah;

9    is that right?

10   **A.**    Yes.

11   **Q.**    Okay.  You did not have an arrest warrant for her, did

12   you?

13   **A.**    No.

14   **Q.**    Okay.  Now, you arrived at that location, 2323 Good Hope,

15   at about 6 a.m., right?

16   **A.**    Probably.

17   **Q.**    Okay.

18   **A.**    I couldn't say for sure.

19   **Q.**    Pardon?

20   **A.**    I wasn't exactly sure.  We had our briefing prior to,

21   yes.

22   **Q.**    It was early in the morning?

23   **A.**    Yes.

24   **Q.**    Okay.  And the earliest you can do a daytime warrant is

25   6 a.m., right?

1   **A.**      Yes.  A search warrant.

2   **Q.**      A search warrant.

3           And how many officers were there?

4   **A.**      I believe there was a team of eight to ten of us and two

5   youth division detectives from the Metropolitan Police

6   Department.

7   **Q.**      And all of -- did all of those officers go up to the --

8   now, that apartment is on the second floor, right?

9   **A.**      Yes, ma'am.

10  **Q.**      Did all of the officers go up there, all those eight to

11  ten officers?

12  **A.**      Except for two that I had cover the escape routes.

13  **Q.**      Okay.  So eight officers went up to the apartment, right?

14  **A.**      Eight officers and two detectives.

15  **Q.**      Went up to the second floor?

16  **A.**      Yes.

17  **Q.**      Okay.  But that -- now, Apartment 203 was not the first

18  apartment you knocked on, was it?

19  **A.**      That morning?

20  **Q.**      Yes.

21  **A.**      No.

22  **Q.**      You went to another apartment first, is that right,

23  Apartment 201 at that building, correct?

24  **A.**      Yes.

25  **Q.**      And you knocked on the apartment -- that's the apartment

1    next to 203, right?

2    **A.**    Yes.

3    **Q.**    Now, you didn't have a warrant for Apartment 201, did

4    you?

5    **A.**    No.

6    **Q.**    But you knocked on the door, right?

7    **A.**    Yes.

8    **Q.**    Were all of those -- you eight officers were out there,

9    right?

10   **A.**    Yes, ma'am.

11   **Q.**    You yelled, "Police," right?

12   **A.**    Yes.

13   **Q.**    And you heard a noise in the unit, right?

14   **A.**    What unit are you referring to?

15   **Q.**    When you knocked on 201, did you hear some noises?

16   **A.**    Yes.

17   **Q.**    Were you the -- were you the officer in that unit, 201,

18   who was off -- who had the authority to breach the apartment?

19   **A.**    Yes, ma'am.  As a supervisor, it's my responsibility,

20   yes.

21   **Q.**    Okay.  And did you hear any noises?

22   **A.**    When?

23   **Q.**    But did you -- you broke into that -- you authorized the

24   breaking into the apartment of 201, right?

25   **A.**    The use of the -- to force the door, yes, ma'am.

1    **Q.**    Yes.  Wasn't the apartment that you had the search

2    warrant for, right?

3    **A.**    We weren't there at that apartment for a search warrant.

4    **Q.**    Pardon?

5    **A.**    I wasn't at that apartment in reference to a search

6    warrant.

7    **Q.**    Okay.  You weren't there -- the apartment that you had

8    the authorization for the search warrant was Apartment 203, and

9    that's -- that's the same apartment that you were supposed to

10   look for Mr. Hillie; is that right?

11   **A.**    Yes.

12   **Q.**    Okay.  But you knocked on 201, the apartment next door

13   at, about 6 a.m. in the morning instead, correct?

14   **A.**    Yes.

15   **Q.**    Okay.  Now, I'm going to show you what's marked

16   Defendant's Exhibit 11.

17   **A.**    Does it come up on the screen?

18   **Q.**    MS. SLAIGHT:  I'm sorry.  I --

19   **A.**    Okay.

20   **Q.**    -- Don't have a technical assistant with me, so we're

21   going to have to go old school.

22   **A.**    Okay.

23   **Q.**    Is that -- is that a fair and accurate viewing of the

24   apartment door?

25   **A.**    To Apartment 203.

1   **Q.**     Right.  Okay.

2          And the number is right on the door; is that right?

3   **A.**     Yes.

4   **Q.**     Okay.

5          MS. SLAIGHT:  Your Honor, I would move to admit this

6   exhibit, Defense Exhibit 11.

7          THE COURT:  Do I have a list of your exhibits?

8          MS. SLAIGHT:  No, Your Honor.

9          THE COURT:  Is this one of the -- all right.  So you're

10  going to mark it as 11?

11         MS. SLAIGHT:  Yes.  It's marked as 11 and I will move to

12  admit it.

13         THE COURT:  Okay.  Any objection?

14         MS. SLAIGHT:  I would ask to --

15         THE COURT:  Any objection?

16         MS. HERTZFELD:  No, Your Honor.

17         THE COURT:  All right.

18         MS. SLAIGHT:  I'd ask to publish the exhibit.

19         THE COURT:  Yes.  It's admitted and you may publish.

20         (Defendant's Exhibit 11 admitted into the record.)

21  BY MS. SLAIGHT:

22  **Q.**     Now, that shows the number on the door, 203; is that

23  right?

24  **A.**     Yes.

25  **Q.**     And number -- every apartment had a number on the door,

1    didn't it?

2    **A.**    Yes.

3    **Q.**    So 201 would be just like 203, in terms of a number on

4    the door?

5    **A.**    I assume so.

6    **Q.**    Right.  Okay.

7         And you went, broke down the door in Apartment 201, which

8    had a number 201 on the door; is that right?

9    **A.**    Ma'am, I didn't break the door down.

10   **Q.**    You breached the door?

11   **A.**    Yes, ma'am.

12   **Q.**    You broke --

13   **A.**    The door did not fall down.

14   **Q.**    Okay.  You used a ram to get in the door?

15   **A.**    To force entry, yes.

16   **Q.**    Okay.  There wasn't any key?

17   **A.**    No.

18   **Q.**    How big is the ram?

19   **A.**    Probably 50 pounds.

20   **Q.**    And how many officers were involved in using that ram to

21   break in the door?

22   **A.**    One.

23   **Q.**    Okay.  And after you looked in the door, a female peeked

24   out of the door, is that right, the bedroom; is that right?

25   **A.**    There were several people that peeked out, yes.

1    **Q.**    Okay.  And some kids, some children, right?  Do you

2    remember how old they were?

3    **A.**    They were young children.

4    **Q.**    Okay.  And you made them get out of -- out of the

5    apartment, right?

6    **A.**    Initially.

7    **Q.**    And it wasn't until after they were out of the

8    apartment -- and they were -- they were in their night clothes,

9    weren't they?

10   **A.**    Yes.

11   **Q.**    And this is right next door to Apartment 203, right?

12   **A.**    Yes.

13   **Q.**    Okay.  So you made them get out of the apartment, and it

14   wasn't until after they were already out of the apartment, this

15   woman and kids, that -- how did people realize that they had the

16   wrong apartment?

17   **A.**    As soon as we interviewed the female, we realized we were

18   at the wrong unit.

19   **Q.**    Okay.  And so then did you let the female and these

20   little children go back -- in their pajamas, back to their

21   apartment?

22   **A.**    After we showed the photo and she said that it was her

23   next door neighbor of Charles Hillie, yes.

24   **Q.**    Okay.  Well, you had the apartment number, right?

25   **A.**    Which apartment number?

1    **Q.**    203.  The warrant listed the apartment number, right?

2    **A.**    The arrest warrant for Charles Hillie did not list a

3    apartment number.

4    **Q.**    The search warrant listed the apartment number, didn't

5    it?

6    **A.**    Yes, the search warrant did.

7    **Q.**    Okay.  So you didn't have to -- you -- you went to the

8    wrong apartment, is what happened, right?

9    **A.**    You could say that.

10   **Q.**    Okay.  And after you let her -- after you let these --

11   the mom and the kids in the pajamas go back into the apartment,

12   what did -- you went over to 203, correct?

13   **A.**    Yes.

14   **Q.**    Which is the apartment that you actually had the search

15   warrant for, correct?

16   **A.**    The search warrant.

17   **Q.**    Okay.  And now, how long did all of that take, going into

18   the wrong apartment?

19   **A.**    Probably five to ten minutes.

20   **Q.**    Okay.  So by this time it's maybe 6:10 in the morning,

21   right?

22   **A.**    We can assume.

23   **Q.**    And there's been a lot of noise, right?

24   **A.**    What made a lot of noise.

25   **Q.**    Well, there's a ram going through the door.  People

1    aren't happy; is that right --

2    **A.**    Yes.

3    **Q.**    -- in that apartment?

4          Okay.  And so all eight of you went to the next

5    apartment, 203, correct?

6    **A.**    Yes.

7    **Q.**    Okay.  And you knocked on that door, right?

8    **A.**    Yes.

9    **Q.**    Okay.  And you heard noises in the unit, correct?

10   **A.**    People scurrying around, yes.

11   **Q.**    Okay.  And somebody said, "I have to get dressed," right?

12   "I don't have clothes on," right?

13   **A.**    I didn't hear that.

14   **Q.**    Okay.  Well, you heard the -- you heard noises in there,

15   correct?

16   **A.**    Yes, people scurrying around.

17   **Q.**    Okay.  And were you at that point closest to the door or

18   no?

19   **A.**    Yes.

20   **Q.**    Okay.  Now, then you broke in that door, correct?  After

21   breaking in one door, you used a ram on the next door; is that

22   right?

23   **A.**    I didn't break into any door.

24   **Q.**    Okay.  You used a ram to breach the door.

25         Is that what you call it, breaching?

1   **A.**     I used my legal authority to force entry into that door.

2   **Q.**     Okay.  You got into the apartment through a 50-pound ram;

3   is that right?

4   **A.**     Yes.

5   **Q.**     And the person in there, Ms. Asiamah, was hysterical,

6   right?

7   **A.**     Yes.

8   **Q.**     Okay.  She was yelling and screaming and -- now, by that

9   time had the Metropolitan police arrived, D.C. police arrived by

10  that time?

11  **A.**     I'm not sure who you're referring to, but I had two of

12  them with me.

13  **Q.**     D.C. Police Department -- had any other people from the

14  D.C. Metropolitan Police Department arrive by that time?

15  **A.**     Not that I'm aware of.

16  **Q.**     Okay.  They eventually --

17  **A.**     I didn't call them.

18  **Q.**     They eventually arrived, members of the Metropolitan

19  Police Department, right?

20  **A.**     Yes.

21  **Q.**     And you told her to lie on the floor; is that right?

22  **A.**     Yes.

23  **Q.**     Now, she was not the subject of an arrest warrant,

24  correct?

25  **A.**     Correct.

1    **Q.**    Okay.  But you told her to lie on the floor, right?

2    **A.**    Yes.

3    **Q.**    Okay.  And she was refusing, right, and she was asking

4    for a warrant, correct?

5    **A.**    Among other things, yes.

6    **Q.**    Okay.  Now, you had just broken into the apartment next

7    door, which was -- you didn't have authorization for, right?

8    **A.**    I want to correct you again, ma'am.  I didn't break into

9    a door.  I used my legal authority to force entry.

10   **Q.**    Well, in fact, you didn't have legal authority to get

11   into Apartment 201, did you?

12   **A.**    Yes.

13   **Q.**    Well, the warrant, the search warrant, said 203, didn't

14   it?

15   **A.**    It wasn't affecting a search warrant, ma'am.  It was in

16   reference to an arrest warrant for your defendant, Charles

17   Hillie.

18   **Q.**    You had no information that Mr. Hillie was in Apartment

19   201, did you?

20   **A.**    I did not have information in reference to that.

21   **Q.**    Okay.  And, in fact, a supervisor apologized to the woman

22   in 201 that they had gone in the wrong apartment, correct?

23   **A.**    Yes, ma'am.

24   **Q.**    Okay.  So she asked for a warrant, correct?

25   **A.**    She, who, ma'am?

1   **Q.**   She -- I'm sorry, Ms. Asiamah.

2   **A.**   Yes.

3   **Q.**   Okay.  And you didn't -- you wouldn't give her warrant,

4   right?  You wouldn't give her a copy of the warrant, right?

5   **A.**   Not until I had the apartment secured.

6   **Q.**   Okay.  And you actually activated a taser light on her,

7   right?

8   **A.**   Yes.

9   **Q.**   Okay.  Now, you didn't taser her, in that you --

10  **A.**   I did not pull the taser.

11  **Q.**   Okay.  But you activated the light, right?

12  **A.**   Yes, ma'am.

13  **Q.**   Okay.  And she -- and then after she was down, you

14  handcuffed her, right?

15  **A.**   Yes.

16  **Q.**   And how long did you have her in handcuffs?

17  **A.**   I didn't have -- I don't know how long she was in

18  handcuffs.

19  **Q.**   As long as you were in that apartment, she was in

20  handcuffs, right?

21  **A.**   Yes.

22  **Q.**   Okay.  And she's -- she was yelling and screaming that

23  she was being raped and robbed and to call 9-1-1; is that right?

24  **A.**   Yes.

25  **Q.**   It was very chaotic, right?

1    **A.**     No.  It was controlled, ma'am.  That was my job, is to

2    control --

3    **Q.**     Well, you --

4    **A.**     Control the environment and mitigate any risk to anybody,

5    the general public or members of my team.

6    **Q.**     Well, that was not part of the plan, to have her yelling

7    and screaming; is that right?

8    **A.**     We plan for every scenario.

9    **Q.**     Okay.  And you yourself -- after you got on the ground,

10   you yourself pulled on her arms, correct, to get a -- to get her

11   out of the way, didn't you?

12   **A.**     Yes.

13   **Q.**     Okay.  And now, there's -- at that point, you learned --

14   when did you find -- see that there was a child there?

15   **A.**     After I brought the defendant out of the bedroom.

16   **Q.**     Okay.  So -- and the child was -- this child was in the

17   back bedroom, right?

18   **A.**     Yes.

19   **Q.**     Okay.  And things were very noisy, correct?

20   **A.**     I'm not sure exactly what you mean by noisy.

21   **Q.**     Um, there was a lot of noise.

22          You know what noise means, right?

23   **A.**     What type of noise, ma'am?  I'm not sure what you're

24   referring to.

25   **Q.**     Was there any kind of noise or was it silent there?

1    **A.**     Other than the female screaming, no.

2    **Q.**     Okay.  That's noise, right?

3    **A.**     Yes.

4    **Q.**     Okay.  Now, there -- on -- the 2323 Good Hope is a

5    garden -- let's call it a garden apartment building; is that

6    right?

7    **A.**     Yes.

8    **Q.**     Okay.  So there are only four units on a floor, correct?

9    **A.**     Yes.

10   **Q.**     And the -- actually, the stairway is outside the

11   building -- is exposed to the exterior, correct?

12   **A.**     It separates the apartments.

13   **Q.**     Pardon?

14   **A.**     It separates the apartments.

15   **Q.**     It's what?

16   **A.**     It separates the apartments.

17   **Q.**     The apartments.

18          So the stairway is exposed to the outside?

19   **A.**     Yes.

20   **Q.**     And only four -- so there's 201, 202, 203 and 204.

21          Those were the only apartments on that floor, right?

22   **A.**     Yes.

23   **Q.**     Okay.  And they were -- and they were outside the

24   building -- I'm sorry.

25          The stairway was on the exterior of the building?

1      **A.**     Yes.

2      **Q.**     Okay.

3             MS. SLAIGHT:  I have no further questions.

4             THE COURT:  Any redirect?

5             MS. HERTZFELD:  Just very briefly.

6                REDIRECT EXAMINATION OF CHRISTOPHER SCHWARTZ

7      BY MS. HERTZFELD:

8      **Q.**     Deputy Schwartz, so just to clarify a couple of things.

9             So you had -- you mentioned you had an arrest warrant for

10     the person named Charles Hillie?

11     **A.**     Yes.

12     **Q.**     And then did you have a separate search warrant for

13     Apartment 203?

14     **A.**     Yes.

15     **Q.**     So in the end, did the Apartment 201 have anything to do

16     with what you needed to do at Good Hope Court that morning?

17     **A.**     No.

18     **Q.**     All right.  So was that a mistake to open the -- you

19     know, breach the door to Apartment 201?

20     **A.**     Yes, ma'am.

21     **Q.**     And when you got inside of Apartment 201, you had

22     mentioned that you encountered a female who gave you information

23     that Charles Hillie was actually in the next apartment?

24     **A.**     Correct.  We never actually entered the Apartment 201.

25     We actually called the occupants out.

1   **Q.**   All right.  And did that -- did that female there

2   cooperate with you?

3   **A.**   Yes.

4   **Q.**   Did anybody in Apartment 201 hide from you?

5   **A.**   No.

6   **Q.**   All right.  And once you learned that you had opened the

7   wrong door, did you go in -- was that the time when you went and

8   knocked and announced --

9        MS. SLAIGHT:  Objection.

10       THE COURT:  Overruled.

11  BY MS. HERTZFELD:

12  **Q.**   -- at Apartment 203?

13  **A.**   Could you restate your question, please?

14  **Q.**   So after you made this mistake with Apartment 201 and the

15  woman inside said that Mr. Hillie was next door, was your

16  knocking and announcing and everything you described regarding

17  203 after that?

18  **A.**   Yes.

19  **Q.**   And how were you and your team dressed when you showed up

20  that morning to execute that warrant?

21  **A.**   We have markings, a ballistic vest that says "Police U.S.

22  Marshal."

23  **Q.**   Was everybody dressed that way --

24  **A.**   Yes.

25  **Q.**   -- identified as a U.S. Marshal?

1    A.    Other than the two detectives that were in -- they had

2    raid jackets that said "Metropolitan Police, MPD."

3    Q.    All right.  And you mentioned that you -- you secured

4    Joyce Asiamah on the floor before you actually showed her the

5    warrant.

6         Why did you do that?

7    A.    We actually waited until we had Mr. Hillie and the

8    apartment was searched.  Then they showed her the search warrant

9    afterwards.

10   Q.    And why did you secure her on the floor first?

11   A.    Just so we could visibly see the rest of the apartment.

12   She was actively refusing for us to go any further than that

13   open door.

14        MS. HERTZFELD:  No further questions.

15        THE COURT:  All right.  Sir, you may step down.  I think

16   this is a good moment for us to take our lunch break.  Again,

17   ladies and gentlemen of the jury, please don't discuss the case.

18   We're going to have about an hour.  I'll say we'll be back at

19   1:30.  It's a little bit over an hour.  Enjoy your lunch.

20        (Jury out at 12:25 p.m.)

21        THE COURT:  I just want to make sure we're all set.  Is

22   there anything we need to discuss at this moment?

23        MS. HERTZFELD:  Not for the government.

24        MS. SLAIGHT:  I just have one ex parte matter.

25        THE COURT:  Yes.  On the record.

1            (Following sidebar discussion had on the record:)

2            MS. SLAIGHT:  I would like to request just the opening

3    transcript -- opening argument from the government overnight.

4            THE COURT:  Overnight?  I think you'll just work with --

5            MS. SLAIGHT:  I think I need permission from the Court.

6            THE REPORTER:  We have to have authorized payment.  That

7    was -- she has to request that you have an authorized payment.

8    And I can do it, but I -- she has to ask you to approve it.

9            THE COURT:  Yes, I approve.  Is there a form or something?

10           MS. SLAIGHT:  I'll submit it electronically later, but I

11   wanted to get the approval.

12           THE COURT:  That's fine.  Yes.

13           (Sidebar discussion concluded.)

14           THE COURT:  Okay.  We'll be back in an hour.

15           (Thereupon, a luncheon recess was had beginning at

16   12:27 p.m.)

17

18

19

20

21

22

23

24

25