UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | Criminal Action |
| | : | No. 16-030 |
| **v.** | : | |
| | : | |
| **CHARLES HILLIE,** | : | March 30, 2018 |
| | : | 1:30 p.m. |
| | : | |
| | : | |
| **Defendant.** | : | Washington, D.C. |
| | : | |
| ............................ | : | |

**DAY 2 - AFTERNOON SESSION**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE KETANJI B. JACKSON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:     **Andrea Lynn Hertzfeld, Assistant**
                           **U.S. Attorney**
                           U.S. ATTORNEY'S OFFICE FOR THE
                           DISTRICT OF COLUMBIA
                           555 Fourth Street, NW
                           Washington, DC 20530
                           (202) 252-7808
                           Fax: (202) 353-7634
                           Email: Andrea.hertzfeld@usdoj.gov

                           **Kenechukwu O. Okocha, Assistant**
                           **U.S. Attorney**
                           U.S. ATTORNEY'S OFFICE-DISTRICT OF
                           COLUMBIA
                           Sex Offense and Domestic Violence
                           555 Fourth Street, SW
                           10th Floor
                           Washington, DC 20530
                           (202) 252-6604
                           Email: Kenechukwu.okocha@usdoj.gov

```
APPEARANCES:  Cont.


For the Defendant:          Joanne D. Slaight, Esq.
                            LAW OFFICES OF JOANNE D. SLAIGHT
                            400 Seventh Street, NW
                            Suite 206
                            Washington, DC 20004
                            (202) 408-2041
                            Fax: (202) 628-0249
                            Email: Jslaight@att.net

Court Reporter:             Scott L. Wallace, RDR, CRR
                            Official Court Reporter
                            Room 6503, U.S. Courthouse
                            Washington, D.C. 20001
                            202.354.3196
                            scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

DIRECT EXAMINATION OF EDWARD HANSOHN          5
BY MR. OKOCHA:
CROSS-EXAMINATION OF EDWARD HANSOHN          13
BY MS. SLAIGHT:
DIRECT EXAMINATION OF JOHN MARSH             16
BY MS. HERTZFELD:

## EXHIBITS

**DESCRIPTION**

Government's Exhibit 12C admitted             9

Government's Exhibit 13A admitted             11

Government's Exhibit 3 admitted               12

Government's Exhibit 17 admitted              36

Government's Exhibit 8 admitted               48

Government's Exhibit 9 admitted               51

Government's Exhibit 5 admitted               53

Government's Exhibit 6 admitted               55

Government's Exhibit 7 admitted               56

Defendant's Exhibit 10 admitted              14

**<u>AFTERNOON SESSION, MARCH 30, 2018</u>**

1

2    (1:40 p.m.)

3           THE COURT:  Are we ready?

4           MR. OKOCHA:  Yes, Your Honor.

5           THE COURT:  Mr. Hillie has to come out.

6           (Jury in at 1:42 p.m.)

7           THE COURT:  Good afternoon and welcome back.  You may be

8    seated.

9           Mr. Okocha, is the government ready to call its next

10   witness?

11          MR. OKOCHA:  Yes, Your Honor.

12          THE COURT:  You may.

13          MR. OKOCHA:  The government calls to the witness stand

14   forensic scientist Edward Hansohn.

15          THE COURT:  Mr. Hansohn, please approach.  If you would

16   come and stand right here, we'll have you sworn.  All right.

17          (Witness sworn.)

18          THE WITNESS:  I do.

19          THE COURT:  Thank you, sir.  You may sit, and we'll have

20   you speak right into the microphone so you can be heard.  All

21   right?  Thank you.

22          THE WITNESS:  Okay.  Thank you.

23          (EDWARD HANSOHN, GOVERNMENT'S WITNESS, SWORN).

24

25

<u>DIRECT EXAMINATION OF EDWARD HANSOHN</u>

<u>BY MR. OKOCHA:</u>

BY MR. OKOCHA:

**Q.**     Good afternoon.

**A.**     Good afternoon, sir.

**Q.**     Can you please state your name and spell it for the record?

**A.**     My name is Edward Hansohn.  My last name is spelled H-A-N-S-O-H-N.

**Q.**     And where are you currently employed?

**A.**     I'm currently employed with D.C.'s Department of Forensic Science.

**Q.**     What's your position there?

**A.**     I'm a forensic scientist.

**Q.**     What are some of your duties as a forensic scientist?

**A.**     We'll be called out to crime scenes, ensure that the scenes are secured, document, and -- document the scene and evidence and recover evidence.

**Q.**     Okay.  And you said recover evidence; is that right?

**A.**     Yes, sir.

**Q.**     What are some of the things you do to make sure evidence is properly recovered?  What's the process like?

**A.**     First the evidence will be documented in the location that it's found.  Depending on what kind of evidence it is, take protective measures to ensure the integrity of the evidence by

1    using gloves, and then taking the evidence back to the lab where

2    it'll be determined what location the evidence will go to next

3    for further processing.

4    **Q.**     You said document the evidence.

5           What are some of the ways that you document evidence?

6    **A.**     Taking photographs, mostly.

7    **Q.**     And when you bring your evidence back to the lab, what do

8    you normally do as your last form of dealing with the evidence?

9    **A.**     After the evidence is taken back to the lab, in most

10   cases the evidence will be photographed again.  Then the

11   evidence is packaged, turned into our Central Evidence Unit

12   where it will be stored or sent to its next location for further

13   processing.

14   **Q.**     And you said you worked for the Department of Forensic

15   Sciences.

16          How long have you been working there for?

17   **A.**     I've been employed with DFS since August of 2017.

18   **Q.**     Okay.  And what were you doing before working at the

19   Department of Forensic Sciences?

20   **A.**     Before that I was with the Metropolitan Police

21   Department.  I was assigned to the Crime Scene Investigations

22   Division.  I was employed with MPD for over 27 years before I

23   retired.

24   **Q.**     Okay.  So MPD for 27 years.

25          What was your last role with MPD again?

**A.**      I was assigned to Crime Scene Investigations Division
from 2009 to 2017.

**Q.**      And what were some of your roles and duties in that
division at MPD?

**A.**      I was a crime scene technician.

**Q.**      And as a crime scene technician, what would you normally
do?

**A.**      The role of a crime scene technician is the same role
that I do now, preserving evidence, documenting evidence and
recovering the evidence.

**Q.**      So since 2009, basically, you've been recovering evidence
in one form or another at the MPD or the DFS?

**A.**      Yes, sir.

**Q.**      Now, can you tell us how long approximately -- or how
many crime scenes would you say that you've processed either
at -- both at MPD and DFS?

**A.**      At least 2,000.

**Q.**      Now, I want to direct your attention to the date of
August 6th, 2015.  Okay?  Were you working on that day?

**A.**      Yes, sir.

**Q.**      And did you happen to respond to the address of 2323 Good
Hope Court, Apartment 203?

**A.**      Yes, sir.

**Q.**      And why did you go there?

**A.**      I went there in reference to a warrant that was being

1    served at that location.

2    Q.    Okay.  And when you arrived there, what did you do?

3    A.    I arrived at the location, made contact with an MPD

4    detective, Detective Buck.

5    Q.    And when you -- after making contact with Detective Buck,

6    what was the next step and actions that you did?

7    A.    Detective Buck asked if I would take photographs of the

8    apartment that was being searched and recover an item of

9    evidence as well.

10   Q.    And what item was that?

11   A.    It's a laptop computer.

12   Q.    And did you take photographs of the apartment?

13   A.    Yes, sir.

14   Q.    And did you recover that item of evidence, the laptop

15   computer?

16   A.    Yes, sir.

17   Q.    And where was it that you recovered the laptop computer?

18   A.    The laptop computer was in a bedroom behind a door.

19   Q.    Okay.

20         MR. OKOCHA:  I'd like to show to the witness Government's

21   Exhibit 12C.

22   BY MR. OKOCHA:

23   Q.    Now, are you able to see Government's Exhibit 12C right

24   now?

25   A.    Yes, sir.

1  **Q.**    And in looking at Government's Exhibit 12C, is that a

2  fair and accurate depiction of the bedroom in which you located

3  the laptop?

4  **A.**    Yes, sir.

5      THE COURT:  Okay.

6      MR. OKOCHA:  Your Honor, at this point the government

7  would like to move Government's Exhibit 12C into evidence.

8      THE COURT:  Any objection?

9      MS. SLAIGHT:  No, Your Honor.

10     MR. OKOCHA:  Your Honor, we'd also ask permission to

11 publish it to the jury.

12     THE COURT:  12C will be admitted, and you may publish.

13     (Government's Exhibit 12C admitted into the record.)

14 BY MR. OKOCHA:

15 **Q.**    Now, thank you.

16     Mr. Hansohn, do you see the laptop that you recovered in

17 this photograph?

18 **A.**    Yes, sir.

19 **Q.**    Can you do us a favor and please circle the area in which

20 you located the laptop?

21 **A.**    Yes, sir.  (Witness complied.)

22     MR. OKOCHA:  And just for the record, the witness is

23 circling the center of the photograph where there's a pink

24 triangle located in the center of the photograph.  Let the record

25 so reflect?

1          THE COURT:  So reflected.

2          MR. OKOCHA:  Thank you, Your Honor.

3     BY MR. OKOCHA:

4     **Q.**    Now, what'd you do after you recovered this laptop?

5     **A.**    After the laptop was recovered, it was packaged and

6     transported to the Consolidated Forensic Laboratory that I

7     worked out of.  The laptop was then photographed again, then

8     packaged to be submitted as evidence.

9     **Q.**    Do you think you'd recognize a photograph of that laptop

10    if you saw it again?

11    **A.**    Yes, sir.

12         MR. OKOCHA:  Your Honor, I'd like to show the witness

13    what's marked as Government's Exhibit 13A.

14         THE COURT:  You may.

15         MR. OKOCHA:  Thank you, Your Honor.  And I'd ask the clerk

16    to clear -- I can do that myself.  Never mind.  Thank you.

17    BY MR. OKOCHA:

18    **Q.**    Now, Mr. Hansohn, can you tell us, Government's

19    Exhibit 13A, is this a fair and accurate representation of the

20    way the laptop looked when you recovered it that day in August

21    2015?

22    **A.**    Yes, sir.

23    **Q.**    And is it, in fact, the picture that you took of the

24    laptop?

25    **A.**    Yes, sir.

1    **Q.**    And where was this picture taken again?

2    **A.**    That was taken at Consolidated Forensic Laboratory.

3         MR. OKOCHA:  Your Honor, at this point I'd like to move in

4    Government's Exhibit 13A into evidence.

5         THE COURT:  Any objection?

6         MS. SLAIGHT:  No, Your Honor.

7         THE COURT:  13A will be admitted, and you have my

8    permission to publish.

9         MR. OKOCHA:  Thank you, Your Honor.

10         (Government's Exhibit 13A admitted into the record.)

11    BY MR. OKOCHA:

12    **Q.**    So after photographing this laptop, what was your next

13    step in processing it?

14    **A.**    After the laptop was photographed, the laptop was then

15    packaged and submitted to the Central Evidence Unit where we

16    drop our evidence off.

17         MR. OKOCHA:  Your Honor, at this point, I'd like to

18    approach the witness with Government's Exhibit Number 3.

19         THE COURT:  You may.

20         MR. OKOCHA:  Showing the witness what's marked as

21    Government's Exhibit 3.

22    BY MR. OKOCHA:

23    **Q.**    Will you take a look at this exhibit, and tell us what

24    Government's Exhibit 3 is?

25    **A.**    Yes, sir.

1   **Q.**    And what's Government's Exhibit Number 3?

2   **A.**    Exhibit Number 3 is a box that I packaged the laptop in

3   at Consolidated Forensic Laboratory.

4   **Q.**    And how do you know that's the box that you packaged the

5   laptop in?

6   **A.**    The box is written with my initials and the date and it

7   was sealed with tamperproof tape.

8   **Q.**    Okay.  Can you take a look at Government's Exhibit

9   Number 3 and tell us what's inside?

10  **A.**    Inside is the laptop that I recovered that day.

11  **Q.**    And is it the same laptop that you recovered?

12  **A.**    Yes, sir.

13  **Q.**    And does it have the same model number the day you

14  recovered it?

15  **A.**    Yes, sir.

16  **Q.**    Now, can you tell us --

17         MR. OKOCHA:  Actually, no further questions, Your Honor.

18         THE COURT:  So --

19         MR. OKOCHA:  Actually, Your Honor, I'd like to move

20  Government's Exhibit Number 3 into evidence.

21         THE COURT:  You may.  So admitted.

22         (Government's Exhibit 3 admitted into the record.)

23         MR. OKOCHA:  Thank you, Your Honor.  No further questions.

24         THE COURT:  Thank you.

25         Any cross-examination?

<u>CROSS-EXAMINATION OF EDWARD HANSOHN</u>

<u>BY MS. SLAIGHT:</u>

1    **Q.**    Good afternoon, Officer Hansohn.

2    **A.**    Hi.  Good afternoon, ma'am.

3    **Q.**    Now, you talked about a laptop that you recovered in August of 2015, correct?

4    **A.**    Yes, ma'am.

5    **Q.**    You showed us the laptop.

6           And you didn't try to operate the laptop, correct --

7    **A.**    That's correct.

8    **Q.**    -- you used the laptop?  Okay.

9           So you can't say when it was last used or who used it or anything about the contents of the laptop?

10   **A.**    That's correct.

11   **Q.**    Okay.  And you didn't fingerprint the laptop, did you?

12   **A.**    No, ma'am.

13   **Q.**    Now, you said that you had taken photos at the location, correct?

14   **A.**    Yes, ma'am.

15   **Q.**    Okay.  And one of the -- one of the things to look at when you're photographing an apartment is the mail matter, correct?

16   **A.**    Yes, ma'am.

17   **Q.**    And you photographed mail at the apartment, didn't you?

18   **A.**    Yes, ma'am.

1    **Q.**    And I'm going to show you what's been marked Defendant's

2    Exhibit 10.

3          Could you look at that?

4    **A.**    Yes, ma'am.

5    **Q.**    Is that a fair and accurate photograph of the exhibit --

6    or photograph that you took?

7    **A.**    Yes, ma'am.

8    **Q.**    And is it a fair and accurate depiction of what -- the

9    items in the photograph?

10   **A.**    Yes, ma'am.

11   **Q.**    Okay.  And those are two envelopes, correct?

12   **A.**    Yes, ma'am.

13         MS. SLAIGHT:  Your Honor, I would move to introduce

14   Defense Exhibit 10 and publish.

15         THE COURT:  Any objection?

16         MS. HERTZFELD:  No objection.

17         THE COURT:  Defense Exhibit 10 will be admitted, and you

18   may publish.

19         (Defendant's Exhibit 10 admitted into the record.)

20         MS. SLAIGHT:  Thank you.

21   BY MS. SLAIGHT:

22   **Q.**    Now, these envelopes are addressed to Joyce Asiamah; is

23   that right?

24   **A.**    Yes, ma'am.

25   **Q.**    Okay.  And that's at 2323 Good Hope Court Southeast on

1    Apartment 203, correct?

2    **A.**    Yes, ma'am.

3    **Q.**    Okay.  And those are the only envelopes that you took at

4    the apartment -- photographs of; is that right?

5    **A.**    I believe so, yes, ma'am.

6    **Q.**    Now, did you take any photographs of pictures or pictures

7    that were in the apartment, displayed in the apartment?

8    **A.**    It's possible.

9    **Q.**    Okay.  You don't remember if there were any -- seeing any

10   photographs of Mr. Hillie, the defendant in this case, do you?

11   **A.**    Not that I remember.

12   **Q.**    Okay.

13        MS. SLAIGHT:  I have no further questions, Your Honor.

14        THE COURT:  All right.  Any redirect?

15        MR. OKOCHA:  No, Your Honor.

16        THE COURT:  Okay.  Thank you, sir.  You may step down.

17        THE WITNESS:  Thank you, Your Honor.

18        THE COURT:  Is the government ready to call its next

19   witness?

20        MS. HERTZFELD:  Yes, Your Honor.  The United States calls

21   computer forensic examiner John Marsh.

22        THE COURT:  Mr. Marsh, please come forward, sir.  You may

23   come right to the stand, and I'll have you stand and be sworn

24   first.

25        (Witness sworn.)

1          THE WITNESS:  Yes, sir, I do.

2          THE COURT:  Have a seat, and you'll talk right into the

3    microphone so you can be heard.

4          THE WITNESS:  Yes, ma'am.  Good afternoon.

5          MS. HERTZFELD:  Good afternoon.

6              (JOHN MARSH, WITNESS IN THE CASE, SWORN)

7                  DIRECT EXAMINATION OF JOHN MARSH

8    BY MS. HERTZFELD:

9    Q.    Will you please go ahead and introduce yourself to the

10   jurors by telling them your name and how to spell it?

11   A.    Yes, ma'am.  It's Special Agent John Marsh, M-A-R-S-H.

12   Q.    And, Special Agent Marsh, where are you employed?

13   A.    I'm a member -- I work for the United States Attorney's

14   Office.  I'm a member of the Criminal Investigations Unit and

15   assigned there as a special agent.

16   Q.    All right.  And can you describe for us what it is you do

17   in that job capacity?

18   A.    I have a specialized position there.  There's ten of us.

19   I'm one of -- one of ten there that does computer forensics.  My

20   specific specialty is in analyzing seized computer evidence, so

21   it's a -- everything in the federal government seems to have an

22   acronym, so it's the seized computer evidence recovery

23   specialist program, the SCERS program, S-C-E-R-S.  It's a

24   specialized training program that I went through in 2005 to gain

25   my initial certification.  As part of that, it was a six-week

1    initial course where we were trained to properly handle and

2    process seized computer evidence.  And that includes cell

3    phones, cameras, any other matter of digital device.

4         Since then I've taken a number of courses, more than 25,

5    both in cell phone and computer digital forensics, and have

6    processed just a ton of cell phones and computers over the

7    years.

8    **Q.**    All right.  And can you tell us a little bit about

9    what -- the specialized trainings that you've taken since 2005

10   to keep current with your current role included?  Just give us a

11   sense of what kind of things you're being trained on.

12   **A.**    Um, there's a specific computer forensic parsing, if you

13   will, programs, and sort of digital file management programs.

14   One is the EnCase -- E-N-C-A-S-E -- program, which is a digital

15   forensic suite that allows us to kind of open up compressed

16   files, manage and process -- make reports out of -- and find

17   evidence, so that's been one of the programs that I've had

18   additional training in.

19        There's -- I've done a number of the trainings, and

20   things have led -- took me to a point now where I actually teach

21   other agents and officers and classes, both the FBI, the

22   Metropolitan police and with the Secret Service, I've trained.

23   **Q.**    And what are some of the subjects that you train other

24   law enforcement on?

25   **A.**    In computer cell phone -- computers, managing the digital

1    evidence and computers and cell phones and in other digital

2    devices.

3    Q.    And do you -- have you received specialized training, and

4    do you train on extracting evidence from those cell phones,

5    computers and other digital devices?

6    A.    Yes, ma'am.

7    Q.    All right.  And you said you received that

8    certification -- your initial certification in 2005.

9         What did you do before you received your certification in

10   2005?

11   A.    Well, I came to the U.S. Attorney's Office in 2003.

12   Before that I spent 15 years with the United States Park Police,

13   left there as a detective sergeant.  I was on both the

14   helicopter unit as a rescue tech, but then also in the

15   investigative unit for about half my time there, and left as a

16   detective sergeant.  So I had some earlier investigative time

17   and then transferred to the U.S. Attorney's Office and continued

18   both, doing investigations in the computer digital recovery.

19        I went to law school here in the city as part of my, sort

20   of, bigger training and experience, and I went to high school

21   here, at Woodrow Wilson, in D.C.

22   Q.    That was going to be my next question:  What kind of

23   educational background do you have in order to be able to do the

24   job that you do?

25   A.    Yes.  Well, starting in high school, I went to Woodrow

1    Wilson High here in Northwest and grew up in the city, and then

2    left for a while to go to college in the Pacific Northwest, then

3    came back and got a law degree here at the University of

4    Washington -- American University Washington College of Law, and

5    then in-between that I've been on the police department as a

6    criminal investigator/special agent.

7    **Q.**    All right.  And you said that at the beginning of your

8    testimony that you processed tons of computers and cell phones.

9        Can you give us a sense -- I mean, I know you're not

10   going to have an exact number, but can you give us a sense of

11   approximately how many computers and cell phones you've

12   processed as a forensic analyst in your time since 2005?

13   **A.**    Yes, ma'am.  I do about 200 cell phones a year and

14   somewhere between 100 and 150 laptops.  It's kind of trending

15   more towards cell phones in the kind of more recent era, more

16   cell phones, less laptops and computer standalone boxes, but

17   somewhere in that range.

18   **Q.**    And do you have to keep your training and certifications

19   current as the technology for those computers and cell phones

20   has changed over the last 13 years or so?

21   **A.**    Yes, ma'am.

22   **Q.**    All right.

23       MS. HERTZFELD:  Your Honor, the United States would offer

24   Investigator Marsh as an expert in the processing and recovering

25   of digital evidence and in computer forensic examination.

1        THE COURT:  Any objection?

2        MS. SLAIGHT:  No, Your Honor.

3        THE COURT:  All right.  He will be so recognized.  Thank

4   you.

5        MS. HERTZFELD:  Thank you, Your Honor.

6   BY MS. HERTZFELD:

7   **Q.**    So, Special Agent Marsh, during the course of your

8   employment at the U.S. Attorney's Office, do you get cases

9   referred to you for which you're asked to -- forensically review

10  specific pieces of evidence?

11  **A.**    Yes, ma'am.

12  **Q.**    And did you have an opportunity to get involved in an

13  investigation involving a forensic analysis in a case with a

14  defendant named Charles Hillie?

15  **A.**    Yes, ma'am, I did.

16  **Q.**    And when did you come to get involved in that

17  investigation?

18  **A.**    That was in September of 2015.  I was asked to analyze a

19  computer laptop and camera.

20  **Q.**    And when that evidence -- how did you come into

21  possession of that evidence to analyze it?

22  **A.**    An MPD Detective Rosnick brought me that device, and that

23  was the 18th of September in 2015, and the -- you know, with

24  some specific -- there was a search warrant attached to it, and

25  there were some specific, I think, instructions about what to

1   do.

2   **Q.**    All right.  And I'm going to come back to that in a

3   second.  I want to focus your attention specifically on the

4   laptop that you mentioned.

5   **A.**    Yes, ma'am.

6   **Q.**    I want to show you what's been marked as Government's

7   Exhibit 3.

8        MS. HERTZFELD:  And with the Court's permission, I'll

9   approach.

10        THE COURT:  Please.

11   BY MS. HERTZFELD:

12   **Q.**    Special Agent Marsh, I just put in front of you a

13   cardboard box that's got a Government's Exhibit 3 sticker on

14   there.

15        Do you recognize that cardboard box there?

16   **A.**    I do.  It's been -- it's been in my office.  It's got

17   some of my handwriting on it, and it's got specific numbers to

18   the Metropolitan police on it, so a case number that I wrote on

19   it specific to our handling of it, and then contents inside

20   including the devices that were analyzed here.

21   **Q.**    All right.  And the numbers and information that's

22   written on the outside of the box, is that information specific

23   to the Charles Hillie investigation?

24   **A.**    Yes, ma'am.

25   **Q.**    All right.  And when you received that box, was it in the

1    condition it's in now?

2    **A.**      Yes, ma'am, except it wasn't -- it was unopened.

3    **Q.**      Okay.  And were you the person that unsealed it when you

4    received it?

5    **A.**      Yes.

6    **Q.**      All right.  And you just pulled out of the box, for the

7    record, a pink laptop computer.

8            Is that pink laptop computer the laptop you were

9    previously referring to as the one you that you analyzed in

10   connection with the Charles Hillie investigation?

11   **A.**      Yes, ma'am.

12   **Q.**      And how do you recognize it to be that computer?

13   **A.**      Um, I had at the time put my initials, JEM, on the back

14   of the device.  It's been in my possession the entire time.

15   Since that initial receipt of it I've had it, and I helped get

16   it over here today, so I know it's one in the same.  But the

17   initials on it, the unique color of it, and then the drive, the

18   hard drive -- and it actually is still removed and has that --

19   my item number and my initials unique to -- unique to this

20   processing.

21   **Q.**      All right.

22           MS. HERTZFELD:  So I'm going to ask the record to reflect

23   that you've also removed from Government's Exhibit 3 the

24   cardboard box, a plastic envelope that you pulled out of it, what

25   you refer to as a hard drive.

1   **A.**     Yes.

2   BY MS. HERTZFELD:

3   **Q.**     Did the hard drive that you pulled out of that plastic

4   envelope come in that form to you?

5   **A.**     No.  This is what we call an electrostatic bag that we

6   keep it in to try to protect the drive from outside electricity,

7   from being damaged, trying to preserve it.

8   **Q.**     When you received Government's Exhibit 3, that pink

9   laptop, was that hard drive contained inside the laptop?

10  **A.**     It was, yes, ma'am.

11  **Q.**     All right.  And so -- are you the one that removed it

12  from the laptop?

13  **A.**     Yes.

14  **Q.**     All right.  And so what did you -- what did you do with

15  it when you removed the hard drive from the laptop?

16  **A.**     I used a tool called FTK Imager, which is forensic tool

17  kit imager, to create a forensic bit-by-bit copy, an image copy

18  of the contents of the device.  So the overall process here is,

19  we don't want to damage that evidence.  And if today I brought

20  that drive back up and tried to access it again, it should have

21  the exact same drive geometry, that meaning the same contents,

22  and partitioning as it did the day I got it.

23  **Q.**     And is that a routine practice you have when you process

24  digital evidence to make a mirror copy before you work with the

25  evidence?

**A.**     Yes, ma'am.

**Q.**     And is that for the same purpose, to preserve the original evidence?

**A.**     Yes.

**Q.**     All right.  And so when you received Government's Exhibit 3, that pink laptop, and it was given to you by Detective Rosnick, did you have in mind certain information that you were going to look for when you conducted your forensic review of that laptop?

**A.**     Yes.  The initial request was to analyze for images and video, whether there was any -- whether there were any videos related to a teenage female.

**Q.**     All right.  And did you have a sense of what kind of videos you were looking for?

**A.**     There was, I believe, a question of whether there was some recording, some files that would be child pornography, specific to the child or the teenage girl being recorded.

**Q.**     Okay.  Now, at the moment that the request was made of you to forensically analyze that computer pursuant to the warrant you had, did you know anything about who Charles Hillie is?

**A.**     No, ma'am.

**Q.**     And did you know anything about the specific facts of the investigation surrounding Charles Hillie, other than what you just told us?

1    **A.**    I don't remember now specifically whether I reviewed --

2    normally I would review the search warrant that came along with

3    it.  I didn't know the case in intimate detail.  I was not

4    involved in the case, other than to be the person to

5    forensically review it.

6    **Q.**    And is that standard in your practice?

7    **A.**    Yes.

8    **Q.**    All right.  And so, once you -- you said you created an

9    image of that hard drive that you would work from to do your

10   forensic analysis.

11        What did you do with the image of the hard drive that you

12   created?

13   **A.**    Um, the image copy is then loaded into a forensic tool.

14   Here we use a couple of different tools to try to manage that

15   evidence and see what -- the first case is to load it into

16   EnCase to verify that the copy of the image that we actually

17   took, there's a verification process that we'll get a hash value

18   that'll tell us that, in fact, that thing that we took has the

19   same set of numbers, has the same hash value.  So you have a

20   digital fingerprint when you create a hash value that's a 1 in

21   about 340 million chance that this thing could get changed.  If

22   I ran that digital hash against it today, it would run that same

23   number.  That's what we're looking for.  So that's part of our

24   process of verifying and ensuring that we don't have either

25   damage or tampered with evidence.

1          It gets loaded into the forensic parsing tool, the EnCase

2    tool.  Then we go in and by category look at the contents of

3    things, and here I recovered -- I knew right away from viewing

4    the thumbnail images some of the -- a computer will generate a

5    lot of thumbnail and other sort of derivative artifacts of the

6    computer's use, and, you know, we'll -- my training of, you

7    know, ten years plus of doing this tells me where to look for

8    where those artifacts are and where it might point you -- you

9    know, for me I'm trying to do this usually as expeditiously as I

10   can, and I want to get in and find the user areas that are going

11   to be pertinent.  So I take an overview of the drive.  There

12   were multiple accounts, user accounts, on that hard drive.  And

13   I kind of sized up what was there and got into an area that I

14   knew was likely to contain the items we were looking for.

15   Q.    All right.  And so I want to go back to some of the

16   things you just said.  First you mentioned that when you looked

17   at the hard drive overall, there were multiple user accounts.

18         Can you tell us a little bit about what you were able to

19   ascertain about what those user accounts were, based on your

20   forensic analysis of the computer?

21   A.    Yes, ma'am.  There's about seven accounts on this device.

22   When you install a standard -- this was a Windows 7 package.

23   When you install Windows 7, you'll get, I believe, four user

24   accounts that are automatically created.  One of them you don't

25   see, but you have to have an administrator account to be able to

1    access it for it to run right.  You get a network, you get a

2    guest user.  So those are kind of what we would refer to as the

3    built-in accounts.  And here the built-in accounts get set up

4    automatically first, and you can see that those accounts kind of

5    correlate with when that operating system was installed.

6        And then on top of that, there were three specific user

7    accounts that were -- when I say "specific user," being ones

8    that were user-generated.  So Microsoft, when it sends you

9    Windows 7, doesn't send you any specific accounts until you

10   create them.  So we can go in a lot of times and look at whether

11   accounts have been deleted, -- what was initially created, what

12   might have been deleted, and what accounts are active there now

13   and I did that.

14   Q.    Okay.  So beyond those four accounts that kind of came,

15   what you calling, the built-in accounts, can you tell us what

16   the additional user accounts that were sort of added on by the

17   users looked like and what -- what they -- how they were

18   identified on the computer?

19   A.    Yes.  There was one that was a capital O, capital G, so

20   OG; another that was capital O, capital G, underscore 2, the

21   number 2; and then there was one that was Quiet Mind Child, I

22   believe, as the third.  So these were specific user-generated

23   accounts for the device.

24   Q.    And when you say "user-generated accounts," does that

25   mean that the person who's actually trying to log into the

1   computer has to create that account themselves?

2   **A.**     Yes.

3   **Q.**     All right.  And for the three accounts that you just

4   named, OG, OG2 -- underscore 2, and the -- I think you said

5   quiet --

6   **A.**     Quiet Mind Child.

7   **Q.**     -- Quiet Mind Child account, were those user accounts

8   password protected?

9   **A.**     They were.

10  **Q.**     Okay.  And so, could you tell from your forensic review

11  of what was contained within each one of those three

12  user-generated accounts, who the user of each account appeared

13  to be?

14  **A.**     Broadly speaking, yes.

15  **Q.**     All right.  And were you able to tell, from your view of

16  those accounts, whether any particular of the accounts you just

17  named were primarily used by Charles Hillie?

18  **A.**     Yes, ma'am.

19  **Q.**     And how were you able to tell -- well, first of all, what

20  accounts could you identify, based on your forensic review, were

21  primarily associated with the user Charles Hillie?

22  **A.**     The OG and the OG underscore 2, and the -- largely the OG

23  underscore 2 account.

24  **Q.**     Okay.  And how -- what kind of things -- how could you

25  identify that those were accounts associated with Charles

1   Hillie?

2   **A.**    Some of the individual artifacts, the user, there's a

3   number of images, video that Mr. Hillie had created that were

4   there that I could play live and see that were his.  There were

5   just a number of artifacts that indicated it was a computer

6   being used -- or that account was being used by him.

7   **Q.**    All right.  And the OG2 account that you're talking

8   about, were there other documents and other things associated

9   with Charles Hillie located within that account?

10  **A.**    Yes, ma'am.

11  **Q.**    All right.  And then the third account you identified,

12  could you tell who a primary or primary users of that account

13  might be?

14  **A.**    It looked more like a family account.  There were some

15  web browsing history of kids having used it.  It looked more

16  like the kid -- the children in the family and maybe a mom had

17  used that account.

18  **Q.**    All right.  And as you were looking at the material that

19  you could forensically extract from that computer, were you able

20  to recover items that had been -- that appeared to have been

21  deleted off of that computer?

22  **A.**    Yes, ma'am.

23  **Q.**    And is that a common -- or a feature that is normally

24  available using the forensic tools that you use?

25  **A.**    To be able to recover deleted items?

1   **Q.**     Yes.

2   **A.**     Yes.

3   **Q.**     All right.  And can you tell us a little bit about what

4   kind of forensic tools you use in order to recover deleted

5   items?

6   **A.**     The EnCase tool on its own has a recovery feature.

7   There's also an advanced tool that we use that's a device --

8   it's a DOD tool.  It's actually a military sort of issued and

9   device that I've gotten -- or software tool, I should say, not

10  device, but a tool I use that's a steganography detection tool.

11      And steganography is the art of -- I guess steganography

12  actually is a science, but some people call it an art, but it's

13  hiding images within images.  And some of the real advanced sort

14  of file -- file sharing that goes on, people will hide a file.

15  It may look like one thing.  It looks like a picture of Picasso,

16  but inside of that there's actually child pornography.  And you

17  open up another part of it through a password, and you get the

18  other image.  So they've developed a tool that allows us to go

19  in and look at sector by sector, rather than just overall the

20  way the programs -- like I say, EnCase, the way it'll typically

21  recover deleted files is it'll take a look at the headers and

22  the footers and try to put things back together as much as it

23  can.

24      But the steganography tool will actually go in and

25  compare at the sector level the items in each sector of the --

1   of the hard drive of its spinning platter space and put things

2   back together for us.  And so we do it -- it's kind of an

3   advanced dive, sort of, if you will, deeper recovery.

4        Some of the things I got with the EnCase tool, some of

5   the recovered deleted items.  And some of the things we're going

6   to talk about were ones that -- they were actually in the

7   recycle bin of the computer, so if you -- if the users -- if the

8   user of OG underscore 2 had gone in and selected the recycle

9   bin, they would see those files there in the recycle bin.

10  **Q.**    All right.  Let me stop you there and kind of back you up

11  a little bit.

12       So you indicated already that you ran this EnCase

13  software on the computer in order to recover forensic material;

14  is that correct?

15  **A.**    Yes.

16  **Q.**    All right.  And then, so you -- did you go ahead and run

17  this DOD StegCarver that you're talking about for the deeper

18  dive, did you run this on that Government's Exhibit 3, that pink

19  laptop?

20  **A.**    I did.  It was -- it was slightly after -- it was later

21  than the initial EnCase process.

22  **Q.**    All right.  And so, through the running of those two

23  forensic tools on that laptop, were you able to recover evidence

24  along the lines of what you told us you were looking for related

25  to the Charles Hillie case?

1    **A.**     Yes, ma'am.

2    **Q.**     All right.  And specifically what did you recover that

3    was relevant to what you were looking for in the Charles Hillie

4    case?

5    **A.**     There -- there were a number of video files that I

6    recovered.

7    **Q.**     All right.  And you started to tell us that some of those

8    video files were recovered in the recycle bin on the OG

9    underscore 2 account?

10   **A.**     Yes, ma'am.

11   **Q.**     Tell us a little bit about how you would come to

12   forensically locate those videos.

13   **A.**     The -- the recycle bin is typically one of the early

14   places that we look to see if there would be things that the

15   user -- how does a user run their machine?  Did they always

16   empty out their recycle bin?  Sometimes users will bypass the

17   recycle bin by hitting shift delete, which will bypass recycle

18   bin and send things direct to -- out to an allocated space to

19   get rid of them.

20   **Q.**     And what's an allocated space?

21   **A.**     Allocated would be anything that the computer's drive can

22   still put back together, including things in the -- in the

23   recycle bin.  Unallocated would be, it's disassociated from the

24   hard drive's operating system.  It doesn't really know it's out

25   there anymore.  Some advanced forensic tools can go out there

1    and get them and bring them back.  They're not deleted from the

2    machine, they're still on the hard drive, but they're just no

3    longer there associated with the operating system, so --

4    **Q.**    Is the StegCarver software that you're talking about one

5    of the pieces of -- one of the forensic tools to do what you

6    just described, pulling -- deleted material back from the

7    unallocated space?

8    **A.**    Well, it does both.  It does the whole drive, so it

9    really goes out there and looks at everything across the whole

10   drive at the very deep sector level.

11   **Q.**    All right.  So with respect to the evidence in this case,

12   what -- what did you recover specifically from the OG

13   underscore 2 recycle bin that you were describing?

14   **A.**    There were video files, and there were, I believe, four

15   specific videos that were there in the -- in the recycle bin.

16   One of them was -- really three unique.  One was renamed.

17   **Q.**    All right.  And with respect to other places on this hard

18   drive, were you able to recover other videos that were relevant

19   to this case?

20   **A.**    Yes, ma'am.

21   **Q.**    And where were those located on the machine?

22   **A.**    The additional were in the unallocated space.

23   **Q.**    Okay.  And were those recovered using the StegCarver

24   tool?

25   **A.**    Yes, ma'am.

1    Q.    All right.  When you -- so in total, how many videos did

2    you recover that were relevant to the allegations in this case?

3    A.    Um, I think -- well, there's at least ten, but I think we

4    had talked about seven of them.

5    Q.    All right.  And did you -- did you craft a report that

6    included the information about those videos that you recovered

7    that were relevant to this case?

8    A.    Yes, ma'am.

9    Q.    All right.  And I'm going to show you what I've marked

10   for identification as Government's Exhibit 18 -- I'm sorry.

11   It's Government's Exhibit 19.

12        MS. HERTZFELD:  Your Honor, may I approach?

13        THE COURT:  You may.

14        MS. HERTZFELD:  And I'm just showing Government's

15   Exhibit 19 to defense counsel.

16   BY MS. HERTZFELD:

17   Q.    I'm going to go ahead and have you take a look at

18   Government's Exhibit 19.

19   A.    (Witness complied.)

20   Q.    Are you familiar with that document?

21   A.    Yes, ma'am.

22   Q.    And can you tell the jury what Government's Exhibit 19

23   is?

24   A.    Um, it's a report that I generated to list out the video

25   as it was -- as it was listed and recovered, the things that

1    were found to be relevant.

2    **Q.**    All right.  And so you're the author of this report

3    that's marked as Government's 19?

4    **A.**    Yes, ma'am.

5    **Q.**    All right.  And I'm going to show you -- and this is

6    going to pop up on the screen right there in front of you --

7    what's marked as Government's Exhibit 17.

8         MS. HERTZFELD:  And I'll show that to Ms. Slaight as well.

9         And, Your Honor, we'll be marking Government's Exhibits 17

10   and 19 just for identification purposes.

11        THE COURT:  All right.

12   BY MS. HERTZFELD:

13   **Q.**    Have you had an opportunity to look at Government's

14   Exhibit 17?

15   **A.**    Yes, ma'am.

16   **Q.**    All right.  And does Government's Exhibit 17 provide an

17   accurate sort of summary of the contents of the report that you

18   drafted that is Government's Exhibit 19?

19   **A.**    Yes, it does.

20   **Q.**    All right.

21        MS. HERTZFELD:  And, Your Honor, I'd ask to be permitted

22   to publish Government's Exhibit 17 to the jury so that the

23   witness might refer to it during his testimony.

24        THE COURT:  Any objection?

25        MS. SLAIGHT:  No, Your Honor.

1          THE COURT:  All right.  You may publish.  And it's

2     admitted, to the extent that you're asking for its admission.

3          MS. HERTZFELD:  Thank you.

4          (Government's Exhibit 17 admitted into the record.)

5          MS. SLAIGHT:  Your Honor.

6          THE COURT:  Yes.

7          MS. SLAIGHT:  Can we approach?

8          THE COURT:  Yes.

9          (Following sidebar discussion had on the record:)

10          MS. SLAIGHT:  Your Honor, I just wanted to know, we -- I

11     don't object to admission as an demonstrative exhibit, not to go

12     back to the jury.

13          MS. HERTZFELD:  No objection.  It's just to show the --

14          THE COURT:  Thank you.

15          (Sidebar discussion concluded.)

16          THE COURT:  Let me just make sure that the record is

17     clear, that the Exhibit 17 will be a demonstrative exhibit.

18          MS. HERTZFELD:  Thank you, Your Honor.

19          Has that shown on the jurors' screens?

20          JURY PANEL:  (Nodded head affirmatively.)

21          MS. HERTZFELD:  All right.

22     BY MS. HERTZFELD:

23     Q.    All right.  So, Investigator Marsh, I want to walk you

24     through a few questions related to these materials that are

25     listed here on Government's Exhibit 17, which list out -- as you

1    can see -- exhibit numbers here for six items, Exhibits 4, 5, 6,

2    7, 8 and 9.

3    **A.**    Yes, ma'am.

4    **Q.**    So have you had an opportunity -- you can see there next

5    to each exhibit number, so Exhibit 4, there's a video title

6    that's a series of numbers listed there.  And there's such a

7    series of numbers for each exhibit that's listed.

8         Do you see that?

9    **A.**    Yes, ma'am.

10   **Q.**    Have you had an opportunity to review the exhibits,

11   Government's Exhibits 4 through 9, that are listed here to

12   observe whether or not they correspond with these video numbers?

13   **A.**    Yes, ma'am.

14   **Q.**    And where do those video title numbers come from?

15   **A.**    It depends on the -- so we have to work our way down.

16   The first Exhibit 4, 5 and 7 is a computer-generated number that

17   is -- that's derived from the steganography tool.  The

18   Exhibit 6, the J.3GP, that's a user-generated name.  So then

19   dropping down to Exhibit Number 8, the vid underscore 20111012

20   underscore and then some seconds, is a timestamp, actually.  And

21   that's -- that's also a computer-generated stamp, so -- that has

22   some metadata to the right there, that you'll notice.  And then

23   the last one is Exhibit 9, which is 065.3GP, is also a

24   user-generated name.

25   **Q.**    All right.  So those -- what's listed there as the video

1  titles you were just referring to, were those titles sort of

2  original to the files that you were able to extract off the

3  computer?  Is that the way they showed up to you when you pulled

4  them off the computer with your forensic tool?

5  **A.**    Yeah, correct.  Just to be clear, I haven't changed any

6  names of anything.  I don't -- I don't rename anything as it

7  comes off.

8  **Q.**    All right.  And looking here at the chart there, you can

9  see there's a -- the fourth column over says "location on the

10  laptop."

11       Do you see that column?

12  **A.**    Yes.

13  **Q.**    Can you explain to the jurors what -- what is indicated

14  here, in terms of where each of these exhibits came from in

15  terms of location on that Government's Exhibit 3 laptop that you

16  have in front of you?

17  **A.**    Yes.  Getting back to our discussion of the steganography

18  tool, any of the ones that have the longer, obviously,

19  computer-generated names, where it says carved from the hard

20  drive, those are ones using the steganography tool.  So it's

21  going to -- it's going to -- it's going to label those with some

22  science, but to us looking at it here, fairly randomly.  But you

23  get a long -- they're all -- they're all 3GP, so it was all the

24  same video convention.  There's a type of -- you have .AVI.  You

25  have all the different types of potential video you might have.

1    They're all 3GP, so that's unique about them, but then you kind

2    of get some differences.

3            So the location, the card from the hard drive, are all

4    the steganography tool.  Then the others where it says OG

5    underscore 2, and then recycle bin, those are the four three

6    unique.  So there's four total.  One of those is renamed, but

7    it's really the same video in -- largely in content are the ones

8    that come from the recycle bin.

9    Q.    All right.  So in the recycle bin, you mentioned earlier,

10   there were four videos.  So the one that's labeled here

11   Government's Exhibit 8, that's the one that there were

12   essentially two copies of named different titles in the recycle

13   bin?

14   A.    That's correct.

15   Q.    All right.  Now I'm going to direct your attention to

16   Government's Exhibit 4, and you can see here -- well, actually,

17   let me back up one minute.  I forgot to ask you about the last

18   column there, which says metadata with a question mark.

19           And you touched on this for a second, about there's one

20   video that has metadata associated with it, and that's

21   Government's Exhibit 8?

22   A.    Yes.

23   Q.    Can you explain to the jurors, first, what is metadata?

24   A.    Metadata is the information behind the information.

25   That's one way of looking at it.  It's -- there's some different

1    types of metadata, so here the metadata related to that

2    Exhibit 8 video is that there's specific usable -- and kind of

3    useful metadata that you can -- you can look at the name of

4    itself -- the name of the file itself, "vid underscore," tells

5    you that a machine that used a date stamp, so some kind of

6    camera that uses a date stamp, rather than an indexing number.

7            If I were teaching a class right now, I'd ask you all to

8    raise your hands and tell me how many people have iPhones, how

9    many people have Android?  And I know I can't talk to the jury

10   that way, so I'm not going to do that.  But if I did that, it'd

11   be about half and half or maybe more Apples today, but if you

12   got looking at your phone, you'd know that that Apple iPhone

13   that you're taking pictures with, it indexes by a 001 dot

14   underscore IMG, et cetera, so it indexes the pictures as they

15   go.

16           A lot of the Android phones will use the device's

17   timestamps for creating the file name, until the user changes

18   it.  Now, a user can go into the Android phone -- it doesn't

19   mean all Android phones have this, and it doesn't mean that one

20   that by default does that doesn't have a user go change it and

21   give me the indexing instead.  I don't want that time stamping.

22   I want indexing.

23           But just as a short explanation, that's how you kind of

24   get some metadata on video that you a lot of times don't get.

25   Now, metadata generally, metadata on images was a thing that was

1    created to imbed some timestamp information into the picture.

2    So there's a lot of times with a picture you'll say, well,

3    what's the -- there's a thing called EXIF data, which is very

4    interesting.  It's so fascinating to me I could talk about it

5    all day.  I'm not going to, but --

6    **Q.**    We'll have to bring you back to --

7    **A.**    -- back here, this metadata that's really interesting is

8    like imbedded in the picture itself.  That stuff, you don't see

9    it, but it's there when we forensically look at it.  You hover

10   over something, sometimes you'll use your mouse on your computer

11   or on your phone, you'll hover over and you get this little

12   balloon that pops up that tells you something about the

13   metadata.  So that's the kind of stuff when we're talking about

14   metadata.  It's a little different for pictures.

15        It's a little less of a convention that's used for video.

16   So when video -- when we're talking about video, we're looking a

17   lot of times for whether the file stamp itself had something

18   there that's usable to us.  This one does.

19   **Q.**    All right.  So with respect to Government's Exhibit 4

20   through 9, was Exhibit 8 the only one that had metadata

21   associated with the video?

22   **A.**    Yes, ma'am.

23   **Q.**    All right.  Thank you.

24        And what could you tell from the metadata that was

25   associated with Government's Exhibit 8?

1    **A.**     Well, that -- this video's created on October 12th of

2    2011.  And then looking at some information in the recycle bin

3    about it, it also told us that it -- on November 30th of 2011,

4    there was a deletion of it and then it was renamed to another

5    file name.

6    **Q.**     And is that explanatory of why there's two files --

7    identical files with the same -- with different names located in

8    that same location?

9    **A.**     Yes, ma'am.

10   **Q.**     All right.  So now I want to take you through these

11   exhibits, Government's Exhibit 4 through 9.  And we're going to

12   go a little bit out of the order that they're listed here.

13   **A.**     Okay.

14   **Q.**     So first I want to have you focus your attention on

15   Government's Exhibit 4.

16        MS. HERTZFELD:  And I'm just going to state for the

17   record, that's video file number 602521600_9876483076.gp.

18   BY MS. HERTZFELD:

19   **Q.**     And if you need to refer during the course of your

20   testimony back to Government's Exhibit 19, your forensic report,

21   in order to assist you, given all the numbers, you can feel free

22   to do that.

23   **A.**     Okay.  Thank you.

24   **Q.**     So with respect to Government's Exhibit 4, which is -- I

25   think correlates to number 5 on your draft report, did you have

1    an opportunity to review that video file I just named in its

2    entirety that was taken off Government's Exhibit 3?

3    **A.**    Yes, ma'am.

4    **Q.**    All right.  And is Government's Exhibit 4 a fair and

5    accurate copy of the video file that I just named that you

6    retrieved off of Government's Exhibit 3?

7    **A.**    Yes, ma'am.

8    **Q.**    All right.  And could you just give the ladies and

9    gentlemen of the jury a very brief description of the content of

10   Government's Exhibit 4 before you play it for them?

11   **A.**    Um, it's a -- it's a video.  It's about a 29-plus minute

12   video that is that of a -- it's a -- it's a black male subject

13   who places a camera underneath a bed, and then as the video

14   plays, there's -- the black male subject places the camera, is

15   checking on its alignment --

16          MS. SLAIGHT:  Objection.

17          THE COURT:  Approach.

18          (Following sidebar discussion had on the record:)

19          MS. SLAIGHT:  Your Honor, the video speaks for itself.

20   The -- the witness should not be focusing people or narrating and

21   explaining what's important and what's not.  I thought he was

22   just going to say it's 29 minutes of a video and not get into a

23   big description of what he thinks somebody's doing with the

24   video, you know, with the camera and --

25          THE COURT:  Ms. Hertzfeld.

1     MS. HERTZFELD:  I don't expect he's going to say much

2  other than he sees the person placing the camera.  A teenage girl

3  walks into the room.  Part of the reason I'm doing this is to set

4  up the identification of the individual, if he can identify it.

5     THE COURT:  Can he identify it after the fact, if you're

6  going to show the video to the jury?

7     MS. HERTZFELD:  Well, he can.  He can.  I also just wanted

8  to orient the jury a little bit to what they're expecting to see.

9     THE COURT:  I think I'll have to sustain the objection.

10  You've already indicated that he took this video off, and they

11  can see what is happening, and then afterwards you can have him

12  identify whatever people you'd like him to identify.

13     MS. HERTZFELD:  All right.  Thank you.

14     (Sidebar discussion concluded.)

15  BY MS. HERTZFELD:

16  **Q.**    All right.  So just directing your attention back to

17  Government's Exhibit 4, so you have indicated it's a video of

18  approximately 29 minutes and change in duration.

19     MS. HERTZFELD:  And I'm just going to ask the Court's

20  permission to admit Government's Exhibit 4 and to publish that

21  video to the jury.  And then I'm going to come back to you,

22  Investigator Marsh, with some additional questions.

23     THE COURT:  Any objections?

24     MS. SLAIGHT:  Conditionally, yes.

25     THE COURT:  All right.  The Exhibit 4 will be admitted,

1    and it will be published to the jury.

2         MS. HERTZFELD:  To the jury.  And, yes, Your Honor, I'd

3    like to just request that the monitor facing the gallery be

4    turned off for purposes of this.  I think it is.

5         (Discussion had off the record.)

6         THE COURT:  Ladies and gentlemen in the gallery, for

7    sensitivity purposes, we're going to have that monitor turned

8    off.  The jury will be able to review.

9         (Discussion had off the record.)

10        MS. HERTZFELD:  Thank you.  And for the record, we'll

11   publish Government's Exhibit 4.

12        (Videotape played.)

13        MS. HERTZFELD:  Your Honor, I'm going to ask to just pause

14   it briefly because it sound like the sound is only coming from

15   one --

16        THE COURT:  Yes.  Can you pause momentarily?

17        (Discussion had off the record.)

18        (Brief pause in proceedings.)

19        (Videotape played.)

20        MS. HERTZFELD:  Thank you, Your Honor.

21   BY MS. HERTZFELD:

22   **Q.**    Investigator Marsh, did you have an opportunity to

23   identify the person that's seen putting -- placing that camera

24   and retrieving it?

25   **A.**    Yes, ma'am.

1    **Q.**    And who is that individual?

2    **A.**    The defendant, Charles Hillie.

3    **Q.**    And do you see that person sitting in the courtroom

4    today?

5    **A.**    Yes.  He's at the defense table, to the right of defense

6    counsel, wearing a dark suit and a lighter colored tie.

7            MS. HERTZFELD:  And, Your Honor, may the record reflect an

8    in-court identification of the defendant.

9            THE COURT:  It will so reflect.

10   BY MS. HERTZFELD:

11   **Q.**    Investigator Marsh, did you have an opportunity to

12   identify who the girl that's depicted in that video is?

13   **A.**    Yes.  Her -- the first name is Janika.  The last name

14   spelling, I think I get wrong -- or pronunciation.  It's --

15           MS. SLAIGHT:  Your Honor.  Your Honor, I believe it's just

16   by the first name.

17           THE COURT:  I'm sorry.  I can't hear you.  Would you like

18   to --

19           MS. SLAIGHT:  I believe the identification is by the first

20   name only.

21           THE COURT:  All right.  Can you just move on then?

22           MS. HERTZFELD:  We can move on.

23           THE COURT:  Yes.

24   BY MS. HERTZFELD:

25   **Q.**    Go ahead.

1    **A.**    I know it to be Janika.

2    **Q.**    All right.  Thank you.

3         Did you -- when you observed the videos that are

4    Government's Exhibits 4 through 9, were there other videos that

5    were taken depicting that same location involving that same

6    girl?

7    **A.**    Yes, ma'am.

8    **Q.**    All right.  I'm going to ask you:  Did you have an

9    opportunity to observe Government's Exhibit 7?

10   **A.**    Yes, ma'am.

11   **Q.**    And -- I'm sorry, excuse me, Government's Exhibit 8?

12   **A.**    Yes, ma'am.

13   **Q.**    All right.

14        MS. HERTZFELD:  And for the record, that is on

15   Government's Exhibit 17, listed as video file

16   20111012_170649.3GP, and that's the one you explained had been

17   renamed another file name, which is 720.32GP.

18   BY MS. HERTZFELD:

19   **Q.**    And it's identified on your draft report if you need to

20   refer to it as item number 1.

21   **A.**    Yes, ma'am.

22   **Q.**    Was Government's Exhibit 8 a fair and accurate copy of

23   the video file that I just named, extracted from Government's

24   Exhibit 3 in your forensic review?

25   **A.**    Yes, ma'am.

1   **Q.**    All right.  And can you tell us how long is Government's

2   Exhibit 8?

3   **A.**    It's 8 minutes and 21 seconds.

4   **Q.**    All right.

5        MS. HERTZFELD:  And, Your Honor, I'd ask to admit

6   Government's Exhibit 8, and be permitted to publish it to the

7   jury.

8        THE COURT:  Any objection?

9        MS. SLAIGHT:  None conditionally.

10        THE COURT:  All right.  It will be admitted.  We'll

11   publish it, and then that might be a good time for us to take our

12   break.

13        MS. HERTZFELD:  Yes, Your Honor.  Thank you.

14        (Government's Exhibit 8 admitted into the record.)

15        (Videotape played.)

16        MS. HERTZFELD:  May I just ask Investigator Marsh just two

17   quick follow-up questions before we take our break?

18        THE COURT:  Yes.

19   BY MS. HERTZFELD:

20   **Q.**    Did you have an opportunity to identify the individual

21   that's seen setting up and retrieving the camera in that video?

22   **A.**    Yes, ma'am.

23   **Q.**    And who's that?

24   **A.**    The defendant.

25   **Q.**    And did you have an opportunity to identify the girl

1    that's depicted in that video?

2    **A.**     Yeah.  That was also Janika.

3         MS. HERTZFELD:  We can take our break now, if it's okay

4    with the Court.

5         THE COURT:  All right.  Officer, you may step down.

6    Please don't discuss your testimony.

7         Ladies and gentlemen, we are going to be taking a

8    15-minute break.  Thank you.

9         (Jury out at 3:16 p.m.)

10        THE COURT:  All right.  We'll be back at 3:30.  Thank you.

11        MS. HERTZFELD:  Thank you.

12        (Thereupon, a break was had from 3:17 p.m. until

13   3:36 p.m.)

14        THE COURT:  All right.  I just wanted to mention that one

15   of the jurors indicated that she recognized somebody who came

16   into the courtroom, who she thinks works for DOJ, but she didn't

17   tell us who it was.  And I don't think it has any connection.  I

18   think it's because I instructed them to say if you know anybody,

19   let me know.  So she just said someone came in that she

20   recognized, but that was it.  So I don't think there's anything

21   more to be done with it.

22        Ms. Slaight?

23        MS. SLAIGHT:  Um, I guess -- I'm wondering, is that the

24   person who is -- and I don't know whether she was actually

25   selected as a juror, the person who says that she comes to the

1    courtroom next door sometimes for AT&T case?

2         THE COURT:  I don't think she was selected as a juror --

3         MS. SLAIGHT:  Okay.  Yeah, I just --

4         THE COURT:  -- that particular person, yeah.

5         MS. SLAIGHT:  I'm trying to think of who it could be.

6         THE COURT:  I think it's because I say to the jurors

7    multiple times, "If there's anybody you recognize, let me know,"

8    and so she just mentioned to one of our court staff that she

9    recognized someone who walked in and sat in the public gallery,

10   so --

11        MS. SLAIGHT:  Thank you.

12        THE COURT:  All right.  We can bring them back.  Thank

13   you.

14        (Jury in at 3:39 p.m.)

15        THE COURT:  All right.  You may be seated.

16        Special Agent Marsh, you can come back.

17        Ms. Hertzfeld, you may resume.

18        MS. HERTZFELD:  Thank you, Your Honor.

19   BY MS. HERTZFELD:

20   Q.   Special Agent Marsh, I think where we left off, we just

21   completed showing the jury Government's Exhibit 8, so I'm going

22   to move on now and direct your attention to Government's

23   Exhibit 9 that's listed there on Government's Exhibit 17 that

24   should be on the screen in front of you.

25   A.   Yes, ma'am.

1          MS. HERTZFELD:  And so, for the record, that Government's

2     Exhibit 9 is associated with a video title extracted from a

3     computer that's Government's Exhibit 3, and that title is 05 --

4     065.3GP.

5     BY MS. HERTZFELD:

6     Q.    And that should be associated with number 3 on your draft

7     report.

8     A.    Yes, ma'am.

9     Q.    Did you have an opportunity before you came in here today

10    to review Government's Exhibit 9?

11    A.    Yes, I did.

12    Q.    Is that a fair and accurate depiction of a video, 065.3,

13    that was extracted from Government's Exhibit 3, pursuant to your

14    forensic review of that evidence?

15    A.    Yes, ma'am.

16         MS. HERTZFELD:  Your Honor, I'd move to admit Government's

17    Exhibit 9, and move to have it published to the jury.

18         THE COURT:  Ms. Slaight, subject to the same?

19         MS. SLAIGHT:  Subject to the same conditions.

20         THE COURT:  All right.  The Exhibit 9 will be admitted and

21    published.

22         MS. HERTZFELD:  Thank you, Your Honor.

23         (Government's Exhibit 9 admitted into the record.)

24         (Videotape played.)

25    BY MS. HERTZFELD:

1    **Q.**    Special Agent Marsh, did you have an opportunity to

2    identify who it was that was depicted there in setting up the

3    camera in Government's Exhibit 9?

4    **A.**    Yes, ma'am.  It was the defendant, Mr. Hillie.

5    **Q.**    All right.  And who was the girl that was pictured in the

6    video?

7    **A.**    That's Janika.

8    **Q.**    All right.  I'm going to now direct your attention to

9    Government's Exhibit 5.

10        MS. HERTZFELD:  And for the record, that's the video file

11    that's numbered 846651392_1015183410.3.

12    BY MS. HERTZFELD:

13    **Q.**    And that's number 8, file number 8 on your draft report.

14    **A.**    Yes, ma'am.

15    **Q.**    Did you have an opportunity to take a look at

16    Government's Exhibit 5 --

17    **A.**    Yes, ma'am.

18    **Q.**    -- prior to coming in here?

19    **A.**    Yes.

20    **Q.**    And is it a fair and accurate copy of a video file that I

21    just described -- that I just named, taken from Government's

22    Exhibit 3 in the course of your forensic review of that

23    evidence?

24    **A.**    Yes, ma'am.

25        MS. HERTZFELD:  Your Honor, I'd ask permission to --

1    first, I'd ask to admit Government's Exhibit 5, and I'd ask

2    permission to publish that to the jury as well.

3         MS. SLAIGHT:  No objection.

4         THE COURT:  All right.  Exhibit 5 will be admitted, and

5    you may publish.

6         (Government's Exhibit 5 admitted into the record.)

7         (Videotape played.)

8    BY MS. HERTZFELD:

9    **Q.**    Special Agent Marsh, with regards to Government's

10   Exhibit 5, did you have an opportunity to identify the person

11   that's seen at the beginning of that video putting up the

12   camera?

13   **A.**    Yes, ma'am.  It was -- it was the defendant, Mr. Hillie.

14   **Q.**    All right.  And then you see a portion where there's

15   three individuals in the bathroom.

16        Did you have an opportunity to observe the girl wearing

17   the white tank top who was using the wash rag to wash her

18   vagina?

19   **A.**    Yes, ma'am.

20   **Q.**    And who was that?

21   **A.**    That's Janika.

22   **Q.**    And who are the other two young girls that are depicted

23   in that video?

24   **A.**    A younger sibling, a possibly a ten-year old and a

25   three-year old.

1    **Q.**    All right.  And the person that's seen at the end of the

2    video there that pulls the camera down, did you have an

3    opportunity to identify who that is?

4    **A.**    I believe that's the mother.

5    **Q.**    The mother of Janika?

6    **A.**    Yes, ma'am.

7    **Q.**    All right.  I'm going to now direct your attention to

8    what's marked as Government's Exhibit 6.

9        And for the record, that's a video, you can see there on

10    Government's Exhibit 17 that is entitled J.3GP.

11    **A.**    Yes, ma'am.

12    **Q.**    And that's number 2 on your draft report.

13        Did you have an opportunity to review Government's

14    Exhibit 6 before you came in here today?

15    **A.**    Yes, ma'am, I did.

16    **Q.**    And was it a fair and accurate depiction of the video,

17    J.3, that you extracted from Government's Exhibit 3, that pink

18    laptop?

19    **A.**    Yes, ma'am.

20        MS. HERTZFELD:  Your Honor, I'd move to do a admit

21    Government's Exhibit 6, and I would ask the Court's permission to

22    publish that to the jury as well.

23        THE COURT:  Ms. Slaight?

24        MS. SLAIGHT:  No objection.

25        THE COURT:  Same.  I'm sorry.  This is Government's

1     Exhibit 6 will be admitted, and you may publish.

2         MS. HERTZFELD:  Thank you, Your Honor.

3         (Government's Exhibit 6 admitted into the record.)

4         (Videotape played.)

5     BY MS. HERTZFELD:

6     Q.    Investigator Marsh, did you have an opportunity to view

7     Government's Exhibit 7 [sic] to identify who the individual seen

8     there setting up the camera in that recording is?

9     A.    Yes, I did.

10    Q.    And who is it?

11    A.    It was the defendant, Mr. Hillie.

12    Q.    And did you --

13        THE COURT:  Excuse me.  Let me just be clear.  Is it 6

14    or 7?

15        MS. HERTZFELD:  Oh, I'm sorry.  This is 6.

16        THE COURT:  6.  All right.

17        MS. HERTZFELD:  I misspoke, Your Honor.  Thank you.

18        THE COURT:  6.

19    BY MS. HERTZFELD:

20    Q.    With respect to Government's Exhibit 6, same question?

21    A.    Yes, ma'am.  It was the defendant, Mr. Hillie.

22    Q.    Thank you.  And who is the girl that's depicted in that

23    video?

24    A.    That's Janika.

25    Q.    All right.

1          MS. HERTZFELD:  And so this is the last one, so I'm going

2     to direct your attention to Government's Exhibit 7 now, which for

3     the record, is the video with the video number

4     738738176_828114484.3GP.

5     BY MS. HERTZFELD:

6     Q.     And for you it's number 7 on your draft report.

7          Did you have an opportunity to view the video by that

8     file name that I just identified?

9     A.     Yes, ma'am, I did.

10    Q.     And was it a fair and accurate copy of that video file

11    that was extracted from Government's Exhibit 3, that pink

12    laptop?

13    A.     Yes ma'am.

14         MS. HERTZFELD:  Your Honor, I'd ask for the record to

15    admit Government's Exhibit 7, and to publish it for the jury.

16         THE COURT:  Yes, on the same conditions as before, we will

17    publish, and it will be admitted.

18         MS. HERTZFELD:  Thank you, Your Honor.

19         (Government's Exhibit 7 admitted into the record.)

20         (Videotape played.)

21    BY MS. HERTZFELD:

22    Q.     Special Agent Marsh, did you in your investigation have

23    an opportunity to identify who it is that's placing the camera

24    and removing it in that video?

25    A.     Yes, ma'am.  It was the defendant, Mr. Hillie.

1    **Q.**    All right.  And you see in that video one girl get into

2    the shower.  She's got a black and white striped shirt on.

3         Did you identify that girl?

4    **A.**    Yes.  That's Janika.

5    **Q.**    And who's the other girl that comes in the bathroom?

6    **A.**    Her younger sister.

7    **Q.**    All right.  Investigator Marsh, are you aware of -- did

8    you have an opportunity to observe Government's Exhibits 4A

9    through D, 5A through E, 6A, 7A through B, 8A through B, and 9A

10   through B, which are clips from those videos?

11   **A.**    Yes, ma'am.

12   **Q.**    And were the clips that were made that I just named there

13   fair and accurate clips taken from what you've already seen as

14   Government's Exhibits 4 through 9?

15   **A.**    Yes, ma'am.  They're a subset of the overall larger

16   videos.

17        MS. HERTZFELD:  And, Your Honor, I would move to admit,

18   just for demonstrative purposes at some time potentially later in

19   the trial, those exhibits I just named.

20        THE COURT:  Ms. Slaight?

21        MS. SLAIGHT:  Your Honor, I would ask to reserve.

22        THE COURT:  I'm sorry?

23        MS. SLAIGHT:  Reserve.

24        THE COURT:  Yes.  I think what we will do is, when you

25   seek to admit them, I will -- for demonstrative purposes, I'll do

1    it for each one.

2         MS. HERTZFELD:  Yes, Your Honor.  Thank you.

3    BY MS. HERTZFELD:

4    Q.    And, Investigator Marsh, were you able to determine,

5    through your forensic review of those videos that were extracted

6    from Government's Exhibit 3, specifically what recording device

7    they came from?

8    A.    No, ma'am.

9    Q.    All right.  Could you tell what type of recording device?

10   A.    It -- it appears to be some type of a cell phone, likely

11   to be an Android, given that date timestamp.

12   Q.    All right.  And are you aware through your experience as

13   a forensic examiner whether any such devices you've just

14   described is manufactured in the District of Columbia?

15   A.    It would not be.

16   Q.    And what about the pink laptop that's Government's

17   Exhibit 3, would that device be manufactured in the District of

18   Columbia?

19   A.    No, ma'am.

20        MS. HERTZFELD:  Court's indulgence.  I have no further

21   questions, Your Honor.  Thank you.

22        THE COURT:  All right.  I think this might be a good time

23   for us to break.  We said we were going until 4:30 each day, and

24   that's right about now.  We are going to stop for the day and

25   recess until Monday.

1      I need to remind you of the instructions that I gave you

2  earlier.  I hope I'm not turning into a broken record, but it's

3  important for me to make sure that I instruct you properly each

4  session.  During this recess, please don't discuss this case with

5  anyone, including the fellow jurors, other people involved in the

6  trial, members of your family, friends or anyone else.  Don't

7  speak with any of the parties, witnesses, or attorneys, and don't

8  permit anyone to speak about the case with you.

9      I don't know if there's news coverage, but please don't

10  look at anything if you happen to see it.  Don't use the Internet

11  to do any research.

12      And remember, please keep an open mind.  Do not make your

13  mind up about the verdict until you have heard all of the

14  evidence and I have given you the final instructions about the

15  law at the end of the trial and you've discussed the case with

16  your fellow jurors during your deliberations.

17      I hope you have a wonderful weekend, and we will see you

18  give here on Monday morning.  Thank you.

19      (Jury out at 4:35 p.m.)

20  THE COURT:  All right.  Let me just clarify my last

21  evidentiary point just so that we're clear.  When you undertake

22  to introduce the clips, you can do so by just referencing the

23  agents' identification of them and then asking this set of -- you

24  know, subset of clips that you're about to show, and then,

25  subject to Ms. Slaight's previous objection, they will be

1    admitted.  All right?

2         MS. HERTZFELD:  Thank you, Your Honor, yes.

3         THE COURT:  Anything else we need to address right now?

4         MS. HERTZFELD:  Not from the government.

5         MS. SLAIGHT:  No, Your Honor.

6         THE COURT:  My intention is to give to you on Monday a

7    couple of minor revisions to the jury instructions so that you

8    can take a look, and we should have a better sense by Monday of

9    how much more testimony we're likely to have, and we can plan

10   when our charging conference is going to be.  But by giving you

11   those, you can take a look at them and then be prepared for the

12   charging conference.  All right?  Have a great weekend.

13        MS. HERTZFELD:  Thank you.

14        THE COURT:  Thank you.

15        (Proceedings adjourned at 4:37 p.m.)

16                   **C E R T I F I C A T E**

17

18             I, Scott L. Wallace, RDR-CRR, certify that
          the foregoing is a correct transcript from the record of
19        proceedings in the above-entitled matter.

20

          /s/ Scott L. Wallace              7/26/19
21        ----------------------------    ----------------
          **Scott L. Wallace, RDR, CRR        Date**
22          **Official Court Reporter**

23

24

25