UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :
                             :
              Plaintiff,     :   Criminal Action
                             :   No. 16-030
v.                           :
                             :
CHARLES HILLIE,              :   April 2, 2018
                             :   1:30 p.m.
                             :
                             :
              Defendant.     :   Washington, D.C.
                             :
............................ :

DAY 3 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE KETANJI B. JACKSON,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the United States:        **Andrea Lynn Hertzfeld, Assistant
                              U.S. Attorney**
                              U.S. ATTORNEY'S OFFICE FOR THE
                              DISTRICT OF COLUMBIA
                              555 Fourth Street, NW
                              Washington, DC 20530
                              (202) 252-7808
                              Fax: (202) 353-7634
                              Email: Andrea.hertzfeld@usdoj.gov

                              **Kenechukwu O. Okocha, Assistant
                              U.S. Attorney**
                              U.S. ATTORNEY'S OFFICE-DISTRICT OF
                              COLUMBIA
                              Sex Offense and Domestic Violence
                              555 Fourth Street, SW
                              10th Floor
                              Washington, DC 20530
                              (202) 252-6604
                              Email: Kenechukwu.okocha@usdoj.gov

APPEARANCES:  Cont.


For the Defendant:          **Joanne D. Slaight, Esq.**
                            LAW OFFICES OF JOANNE D. SLAIGHT
                            400 Seventh Street, NW
                            Suite 206
                            Washington, DC 20004
                            (202) 408-2041
                            Fax: (202) 628-0249
                            Email: Jslaight@att.net


Court Reporter:             **Scott L. Wallace, RDR, CRR**
                            Official Court Reporter
                            Room 6503, U.S. Courthouse
                            Washington, D.C. 20001
                            202.354.3196
                            scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

    CONTINUED DIRECT EXAMINATION OF JADEN ASIAMAH        13
    BY MS. HERTZFELD
    CROSS-EXAMINATION OF JADEN ASIAMAH                   52
    BY MS. SLAIGHT
    REDIRECT EXAMINATION OF JADEN ASIAMAH                63
    BY MS. HERTZFELD


    DIRECT EXAMINATION OF JOSEPHINE ASIAMAH              68
    BY MR. OKOCHA
    CROSS-EXAMINATION OF JOSEPHINE ASIAMAH               88
    BY MS. SLAIGHT
    REDIRECT EXAMINATION OF JOSEPHINE ASIAMAH           100
    BY MR. OKOCHA


**DESCRIPTION**

Government's Exhibit 2A admitted                          15

Government's Exhibit 10 admitted                          18

Government's Exhibit 12L admitted                         32

Government's Exhibit 12K admitted                         33

Government's Exhibit 12M admitted                         36

Government's Exhibit 12N admitted                         43

1          **AFTERNOON SESSION, APRIL 2, 2018**

2     (1:40 P.M.)

3          THE COURT:  All right.  Before we bring the jury in, I

4     just -- wait.  Mr. Hillie has to come.

5          You may have a seat, sir.

6          Before we bring the jury in, I wanted to address something

7     that I think, hopefully, will be helpful.  I think that Jaden's

8     testimony is making me think that a slightly more nuanced ruling

9     is required regarding the defendant's hearsay objection to the

10    sister's testifying about prior statements of sexual abuse.

11         As I have ruled, when the sister who is testifying is the

12    maker of the statement in question, she says, "I told my sister

13    that Mr. Charlie touched me," this is not hearsay because the

14    Government has represented that the statement is being offered

15    not for the truth, but for the fact that the statement is made or

16    was made, which is relevant to the issue of whether or not the

17    girls told anyone that this was happening to them.

18         In addition, the sister, who is the speaker, is subject to

19    cross-examination because she'll be testifying, so I have no

20    concerns about that.

21         Slightly different scenario, I think, is when the sister

22    is the listener and she testified that, "My sister told me that

23    Mr. Charlie touched her."  This, I think, does raise a question

24    about hearsay unless the report of the abuse is being offered for

25    something other than its truth.  So this is the Detective Johnson

1   scenario where the person who is testifying says, "The other

2   person told me that they were being abused," and then the

3   question is, well, what is that being offered to show.  In the

4   Detective Johnson scenario, it was being offered to show and to

5   explain what her response was, the effect on the listener, the

6   state of the police investigation.  All of that, I think, is

7   fine, and therefore, non-hearsay.

8        In a situation like this where one sister tells us -- may

9   or may not, and I'm just putting this out here as something

10  you-all should think about, is testifying that her sister told

11  her that the sister who was talking was being abused, I think I

12  need to understand what that's being offered for in order to

13  determine whether or not it's hearsay in the particular context.

14  If it's being offered to indicate that the listening sister acted

15  in some way or did something, then I think the record should

16  reflect that, and therefore, the ruling would be -- would not be

17  hearsay under those circumstances, but I need to know what that

18  is or else we may have a hearsay problem.

19       So I don't know if either of you would like to react to

20  that, but Ms. Slaight?

21       MS. SLAIGHT:  Your Honor, I was having a little trouble

22  hearing Jaden sometimes, so -- did Jaden -- I did not hear Jaden

23  say that, "My sister told me Mr. Charles touched her."

24       Did she say that?

25       THE COURT:  I don't recall it.

1          MS. SLAIGHT:  Okay.

2          THE COURT:  This occurred to me when I went --

3          MS. SLAIGHT:  -- Thank you for --

4          THE COURT:  -- back to say to you-all, as we started

5     moving on in her testimony, to make sure that if she did say

6     something like that, we could have the necessary foundation for

7     it.

8          MS. SLAIGHT:  Okay.

9          THE COURT:  But I didn't hear it.

10         MS. SLAIGHT:  I wanted to make sure I didn't miss

11    something.

12         THE COURT:  I didn't hear it.  Let me ask Ms. Hertzfeld.

13         MS. HERTZFELD:  No, I don't think she -- I'm sorry, I

14    don't think she testified to anything like that at this point.  I

15    don't expect that Jaden is going to say anything like that other

16    than, at the end of her testimony, I think I expect to ask her

17    some questions about sort of the starts and stops, from her

18    perspective, in the investigation, and I expect what she'll say

19    is that she was interviewed in the CAC.  A big gap went by for

20    her before she went to the grand jury when the investigation kind

21    of restarted, from her perspective.  And that in the intervening

22    time right before grand jury, she got a text message from her

23    sister indicating that her sister was going to -- wanted to press

24    charges against Mr. Hillie.  Not about -- nothing specific to the

25    actual abuse, but I expect she will testify to that.

1       I think with respect to just in --

2       THE COURT:  And let me just -- so -- and why is that not

3   hearsay?

4       MS. HERTZFELD:  Because I think what it -- I mean, it

5   explains from her perspective two things.  One is that there is

6   this -- I think what was being argued by the defense essentially

7   is that there was this delayed disclosure, and so somehow that

8   indicates fabrication on the part of one or both of these

9   sisters.  And there is a case law that says that basically in a

10  case where you have a child -- a delayed report of sexual abuse,

11  that the fact of a report is admissible, just the fact of a

12  report, to rebut a claim of fabrication about something that

13  happened in the past.

14      THE COURT:  But does it come in through Jaden in these

15  circumstances, or why can't you just ask Janika about that?

16      MS. HERTZFELD:  Well, I think that -- because I think that

17  what's important in terms of -- from Jaden's perspective is to

18  the extent that, you know, there's some implication like not

19  enough was done with her reports or whatever else that she

20  attempted to make, the reports that she attempted to make, she

21  tried to tell people what was going on, and ultimately, she ends

22  up in a position -- the investigation stops, from her

23  perspective, and then it reconvenes later on when she gets this

24  information from her sister that she's decided to, quote/unquote,

25  press charges.  And I think --

1        THE COURT:  But that's just temporal, isn't it?  I mean,

2    it -- does it impact anything that Jaden does, hearing from her

3    sister in this matter?

4        MS. HERTZFELD:  Well, what ends up happening to her is she

5    ends up going into the grand jury and testifying, and she gives a

6    more -- she adopts what she said in her earlier statement in the

7    Children's Advocacy Center interview.  But she also flushes out,

8    as the investigation kind of restarts, you know, additional

9    instances of sexual abuse and some -- you know, the environmental

10   stuff and all that that was going on in the home, and I think it

11   just explains why -- you know, she has these additional

12   disclosures that get made later on that weren't --

13       THE COURT:  But why can't we just skip to that?  I'm

14   worried about the text message from Janika, or Janika, to Jaden

15   coming in through Jaden as opposed to -- obviously, Janika can

16   say, "I told my sister this."  That's consistent with what I've

17   already argued or stated about the testifier being the declarant

18   in terms of the prior statement.

19       MS. HERTZFELD:  Well, I don't think with -- in terms of

20   Jaden receiving that message, she's not testifying that, "I

21   received a message from my sister that she was going to press

22   charges" to offer up the truth to the fact that Janika pressed

23   charges.  We -- that is coming in through other evidence, and

24   Jaden's statement is not about the truth.

25       THE COURT:  So what is it being offered for?

1      MS. HERTZFELD:  I think it's being offered to explain how,

2  from Jaden's perspective, the investigation is unfolding and how

3  it came about, from her perspective, that I talked about this

4  once.  I gave an account, two years later go by, and I find

5  myself, you know, having -- going into the grand jury, now

6  adopting what I said, and also having to give greater explanation

7  than I gave before.

8      THE COURT:  I see.

9      So you're saying the knowledge of the sister now pressing

10  charges or being involved in this explains from Jaden's

11  perspective what these other things are that she has to do and is

12  doing?

13      MS. HERTZFELD:  Exactly.

14      THE COURT:  All right.  So do you intend to have Jaden

15  testify to the statements -- any statements that Janika may or

16  may not have made to her about any abuse of Janika?

17      MS. HERTZFELD:  I don't think she knows any details of any

18  abuse of her sister.  I think she -- at most, she would be able

19  to say that, "I knew that" -- like, "I knew he was doing it to

20  her, too."  The place I thought she would say that, she didn't

21  say it.  And so I think -- I don't know that it's going to --

22      THE COURT:  So we don't think there's a statement that

23  she's going to say, "Janika told me that" --

24      MS. HERTZFELD:  I don't think she's going to say that.

25      THE COURT:  All right.  So then, also, just -- can we be

1    mindful of that?  Because Janika does, I think, have such

2    testimony about Jaden, and so I need to understand, when we get

3    to this point, what it's being offered for at that time.

4         MS. HERTZFELD:  I understand.

5         THE COURT:  Do you understand what I'm saying?

6         MS. HERTZFELD:  Yes, Your Honor.

7         THE COURT:  Yeah.  All right.

8         Anything else now?  Are you ready?

9         MS. HERTZFELD:  I think so, Your Honor.

10        THE COURT:  Oh, Ms. Slaight would like to say something.

11        MS. SLAIGHT:  Your Honor, just to respond, it doesn't seem

12   like it changed Jaden's testimony at all.  I don't see how Jaden

13   was impacted by -- in her -- you know, she went to the grand jury

14   and --

15        THE COURT:  Well, I think the point is that this time, she

16   had testified, and a big period of time went by, and then

17   suddenly, the whole thing started in earnest, and I think the

18   Government is saying, "We're just going to let her explain why it

19   was, from her perspective, that all of this was starting again,"

20   and the reason says the Government is the text message that --

21   where the sister says, "I'm now in on the action in terms of the

22   prosecution."

23        MS. SLAIGHT:  I guess it's my position that it doesn't

24   really -- it doesn't really matter what her perspective is.

25   She's going to say the same thing whether Jaden is -- I mean,

1    it's not -- I don't think that they're going to argue that she's

2    changing her testimony because of Jaden being -- Janika being

3    involved.  So I don't -- I just don't see --

4        THE COURT:  So you're seeing it's not relevant to any

5    material issue?

6        MS. SLAIGHT:  Right, um-hmm.

7        THE COURT:  I mean, it's a very tough call.

8        But why is it relevant, Ms. Hertzfeld, for us to know this

9    about Jaden's perspective?

10        MS. HERTZFELD:  Well, it becomes relevant in part

11    depending on what the Defense is trying to say about Jaden's

12    disclosures.  Because I think, you know, realistically, when

13    Jaden was interviewed at the Children's Advocacy Center, she got

14    taken in as a result of the physical assault, and she was

15    interviewed, and she made some disclosures about the sexual

16    abuse.  But from -- in her CAC interview, when they asked her,

17    "Why are you here," she says, "Because of what happened with

18    Mr. Hillie hitting me," and then she goes on to explain some of

19    the sexual abuse.

20        I think what's important is that by the time Janika calls

21    her -- or texts her and says, "I want to press charges," she

22    knows that Janika is being sexually abused.  She -- I don't think

23    she can articulate exactly how she figured it all out, but she

24    knows at this point.

25        So now, when she's brought into the grand jury and she

1    knows she's there in a sexual abuse investigation involving

2    herself and her sister, she adopts what she said in the CAC, and

3    then she gives some additional incidents of sexual abuse that she

4    recounts to the grand jury.

5        Now, if the Defense is not going to make an issue out of

6    the fact that she didn't disclose every detail she ever knew in

7    the Children's Advocacy Center, then maybe it's not relevant.

8    But to the extent that they're going to make an issue out of the

9    fact that as she comes forward two years later and she tells

10   additional details that somehow that means she wasn't truthful

11   or, you know, made new stuff up or whatever else when she comes

12   back the second time, I think it does bear on what's going on for

13   her in terms of what she understands this investigation to be

14   about --

15       THE COURT:  All right.

16       MS. HERTZFELD:  -- whether she goes into the grand jury.

17       THE COURT:  All right.  I'm going to allow the Government

18   to bring it in based on that representation, that to the extent

19   that there is or may be an issue pertaining to the -- what Jaden

20   said originally versus what she says in the grand jury after she

21   knows that the sister is now also pressing charges, that this is

22   relevant to Jaden's state of mind with respect to the testimony

23   that she provides.  So I'm going to allow it.

24       MS. HERTZFELD:  Thank you, Your Honor.

25       And I think also -- I mean, if it turns out the Defense is

1    saying that that's not an issue that the Defense is putting

2    forth, then I don't need to ask her the question, if that helps

3    resolve it.  I just -- I'm --

4         THE COURT:  Yeah.  Well, I mean, we don't want to -- the

5    defendant doesn't have to explain, I guess, at this point what

6    their view of the evidence or the issue is, but I can ascertain

7    what it is that the Government is trying to do, and therefore, I

8    think it is relevant to that particular potential matter in this

9    case.

10        MS. HERTZFELD:  Thank you, Your Honor.

11        THE COURT:  All right.  Let's bring the jury in.

12        MS. HERTZFELD:  Should she come up here, Your Honor?

13        THE COURT:  Why don't she just wait right there.  Let's

14   have them come in.

15        And then you'll come forward, okay?  Thank you.

16        (Jury in at 1:54 p.m.)

17        THE COURT:  All right.  Good afternoon, ladies and

18   gentlemen.  You may have a seat.

19        Miss, you can come forward.  Thank you.

20        You may be seated.  You're still under oath.

21             CONTINUED DIRECT EXAMINATION OF JADEN ASIAMAH

22   BY MS. HERTZFELD:

23   Q.   Good afternoon, Jaden.  Welcome back.

24        Do you -- so when we left off -- just to kind of reorient

25   you to what we were talking about, we left off -- you had just

```
 1   got done telling us what happened to you when you lived on -- in

 2   the Douglas Road apartment, and I was about to show you, before

 3   lunch, some exhibits related to the incident you just described

 4   where Mr. Charlie touched you on your breasts and your vagina.

 5         So I want -- do you have that in mind, where we left off?

 6   A.    Yes.

 7   Q.    All right.  So I want to show you what we've marked as

 8   Government's Exhibit 2A.

 9         Is that popping up on your screen?

10   A.    Yes.

11   Q.    All right.  Do you recognize what Government's Exhibit 2A

12   is a depiction of?

13   A.    Yes.

14   Q.    And what does it depict?

15   A.    Of my old apartment.

16   Q.    Is that the apartment that -- a diagram of the apartment

17   on Douglas Road?

18   A.    Yes.

19   Q.    All right.  And is it a fair and accurate depiction of

20   approximately how the rooms were laid out in your apartment on

21   Good Hope Road?

22   A.    Yes.

23   Q.    Okay.

24         MS. HERTZFELD:  Your Honor, I would move to admit

25   Government's Exhibit 2A and to publish that to the jury.
```

1          THE COURT:  Any objection?

2          MS. SLAIGHT:  No, Your Honor.

3          THE COURT:  All right.  2A will be admitted, and you may

4    publish.

5          (Government's Exhibit 2A admitted into the record.)

6    BY MS. HERTZFELD:

7    Q.    All right.  So, Jaden, looking here at Government's

8    Exhibit 2A, you were talking about how, on the day you were just

9    describing to us, Mr. Charlie was sitting on a chair next to the

10   computer in the living room.

11         Can you show us where on this diagram by just putting an

12   X where it was that that computer and the chair that Mr. Charlie

13   was sitting at on the day that he touched you?

14   A.    (Indicating.)

15   Q.    All right.  And so for the record, you've made an X in

16   the upper right hand of the room there that's the living room?

17   A.    Yes.

18   Q.    All right.  And you also mentioned that when this all

19   started, you and Kamaria were chasing each other around the

20   table in the living room.

21         Could you just draw a little box where the table in the

22   living room would have been?

23   A.    (Indicating.)

24   Q.    All right.  And so for the record, you've made a box

25   around the word "living room."

1           Can you describe what kind of table you're talking about?

2     **A.**    Um, it's a rectangle.

3     **Q.**    Okay.  Is it like a coffee table or something else?

4     **A.**    Yes, it's a coffee table.

5     **Q.**    Okay.  And so when you were, you said, chasing Kamaria

6     around and Mr. Charlie grabbed you, can you show us kind of --

7     just draw a little line where Kamaria went, like what her path

8     was when she left the room?

9     **A.**    (Indicating.)

10    **Q.**    Okay.  And so for the record, you're showing she left

11    that room and kind of went up into the hallway, and then you

12    said she ended up in the bedroom?

13    **A.**    Yes.

14    **Q.**    All right.  And then can you point out here where that

15    bathroom was that you went to after this happened?

16    **A.**    (Indicating.)

17          Um-hmm.

18    **Q.**    Oh, you put a dot there.  Okay.  So you put a dot on the

19    little -- in the box that's marked bathroom in the upper

20    right-hand corner there.

21          Now, when you were living in this apartment on Douglas

22    Road with your mother, Janika, Kamaria, and Mr. Charlie -- I'm

23    going to clear this off of here and have you point out to the

24    jurors where it was that everybody stayed in that apartment, all

25    right?

1      So, first, can I have you point out just by making

2  another X on this diagram where it was that -- what bedroom you

3  and Kamaria and Janika shared?

4  **A.**    (Indicating.)

5  **Q.**    Okay.  So for the record, you've marked the bedroom in

6  the top center of the photograph with a blue X?

7  **A.**    Yes.

8  **Q.**    And then can you put a star in the bedroom that your

9  mother shared with Mr. Charlie?

10 **A.**    (Indicating.)

11 **Q.**    All right.  And so for the record, you put a star in the

12 bedroom in the back left-hand corner.

13     Now, you see in the upper right-hand corner there,

14 there's that bathroom.

15     Is that the only bathroom that was in your Douglas Road

16 apartment?

17 **A.**    Yes.

18 **Q.**    And did all five of you living there share that bathroom?

19 **A.**    Yes.

20 **Q.**    All right.  Let me go ahead and clear that.

21     All right.  And that place you marked where Mr. Charlie

22 was sitting in the chair at the desk, is that the place he was

23 sitting both times that he grabbed you as you were running

24 around with Kamaria?

25 **A.**    Yes.

1  **Q.**     Now, I'm also going to show you, just to help orient the

2  jury a little bit, a photograph that's marked as Government's

3  Exhibit 10.

4        Did that pop up in front of you?

5  **A.**     Yes.

6  **Q.**     Do you recognize Government's Exhibit 10?

7  **A.**     Yes.

8  **Q.**     And who is that a photograph of?

9  **A.**     Me.

10  **Q.**     All right.  And is that a fair and accurate photograph of

11  how old -- of what you looked like when you were nine or

12  10 years old back at the time that this would have happened?

13  **A.**     Yes.

14        MS. HERTZFELD:  Your Honor, I'd move to admit Government's

15  Exhibit 10 and publish it to the jury.

16        THE COURT:  Objection?

17        MS. SLAIGHT:  No.

18        THE COURT:  All right.  Ten will be admitted and

19  published.

20        MS. HERTZFELD:  Thank you, Your Honor.

21        (Government's Exhibit 10 admitted into the record.)

22  BY MS. HERTZFELD:

23  **Q.**     All right.  Janika -- don't get mad at me, Jaden.  Sorry

24  about that.

25        So you've told us now about this incident that happened

1    to you when you were living on Douglas Road, and I just want to

2    reorient you to talk about some other things now.

3         Let me go ahead and clear that.

4         In addition to what you just told us about that happened

5    on Douglas Road, were there other times that you recall where

6    Mr. Charlie similarly touched you on places on your body that

7    you didn't want him to be touching you?

8    **A.**    Yes.

9    **Q.**    All right.  And I want to start with -- I want to walk

10   you through those different times that that happened in addition

11   to what you've already told us.  So I want to start with the

12   incident that happened in your bedroom.

13        Do you know -- do you have in mind what I'm talking

14   about?

15   **A.**    Yes.

16   **Q.**    All right.  So I want to ask you about the very first

17   time that you remember something happening with Mr. Charlie

18   coming into your bedroom.

19   **A.**    Um, he touched my butt.

20   **Q.**    All right.  So we'll talk about that time.

21        So the very first time you remember Mr. Charlie coming

22   into your bedroom, tell us, what time of day was it when this

23   incident happened?

24   **A.**    It was at night.

25   **Q.**    Okay.  And do you remember at that moment in time where

```
1   you were living?

2   A.    Um, Douglas Road.

3   Q.    Okay.  And where would you have been that night?

4   A.    No, it wasn't Douglas Road, I'm sorry.  It was Good Hope

5   Court.

6   Q.    Good Hope Court.  Okay.  Thank you for correcting that.

7         And when you were at Good Hope Court, had you -- do you

8   remember, had you just moved there, had you been living there a

9   while?  Do you remember?

10  A.    Um, I believe I've been living there for a while.

11  Q.    Okay.  And was this before or after the day that

12  Mr. Charlie slapped you in the face?

13  A.    Before.

14  Q.    Okay.  And so the very first time you remember

15  Mr. Charlie coming into your room and touching you, was that the

16  very first time you had ever seen him coming into your room at

17  night?

18  A.    Um, yes.

19  Q.    Okay.  And were there other times that you remember him

20  coming into your room at night?

21  A.    Yes.

22  Q.    All right.  So we'll talk about the one you started to

23  tell us about first, the time that he touched your butt.

24        So you said you're in your bedroom, it's nighttime in the

25  Good Hope Road apartment.
```

1         Was there anybody else in the bedroom with you when this

2    happened?

3    **A.**     Yes.

4    **Q.**     And who was that?

5    **A.**     My little sister, Kamaria.

6    **Q.**     All right.  And can you tell us where were you when this

7    happened?

8    **A.**     I was asleep in bed.

9    **Q.**     Okay.  And where was Kamaria?

10   **A.**     Asleep next to me.

11   **Q.**     Okay.  And did you guys sleep in beds next to each other

12   or just in the same bed next to each other?

13   **A.**     We slept in the same bed.

14   **Q.**     Okay.  Was anybody else in the room?

15   **A.**     No.

16   **Q.**     All right.  And so tell me -- when you and Kamaria are

17   asleep, tell me what's the next thing you remember happening.

18   **A.**     I woke up because someone had -- was touching my butt.

19   **Q.**     Okay.  And can you tell us how were you laying in the bed

20   when you wake up to someone touching your butt?

21   **A.**     I was laying on my stomach.

22   **Q.**     Okay.  And were you wearing clothes or no clothes?

23   **A.**     I was wearing clothes.

24   **Q.**     Okay.  What kind of clothes?

25   **A.**     Night clothes.

 1   **Q.**    Was this the same night clothes you described before,

 2   T-shirts and shorts or pants?

 3   **A.**    Yes.

 4   **Q.**    All right.  And you were laying on your stomach.

 5         Did you have covers over top of you or no covers?

 6   **A.**    I had covers.

 7   **Q.**    All right.  And so when you wake up to feeling that hand

 8   touching you on your butt, is it on top of the covers or

 9   underneath the covers?

10   **A.**    On top.

11   **Q.**    Okay.  So what happens when you wake up and you feel

12   someone touching you on your butt?

13   **A.**    I saw Mr. Charlie leaving to go to the bathroom -- to go

14   through the bathroom door that was connected to my room.

15   **Q.**    Okay.  So when you first wake up, is his hand still on

16   your butt?

17   **A.**    No.

18   **Q.**    Okay.  So you feel it, it wakes you up, and then you see

19   him leaving?

20   **A.**    Yes.

21   **Q.**    All right.  And what's Kamaria doing during this?

22   **A.**    She's asleep.

23   **Q.**    Okay.  And so as you see Mr. Charlie leaving out of your

24   room through that bathroom door, do you remember how does he

25   look?

1    A.    No.

2    Q.    Do you remember, did he have clothes on or no clothes on?

3    A.    He had clothes on.

4    Q.    Did he say anything to you?

5    A.    No.

6    Q.    All right.  And do you know when he left out to go

7    through that bathroom door, did you say anything to him?

8    A.    No.

9    Q.    Do you know where he went?

10   A.    Well, he -- no.  He just went to the bathroom.

11   Q.    And how was he acting when he was leaving from -- after

12   he touched your butt to going through that bathroom door?

13   A.    He left in a hurried pace.

14   Q.    Okay.  And so what did you do at that point?

15   A.    Looked around.  Then I fell back to sleep.

16   Q.    Okay.  And did Kamaria stay asleep during this?

17   A.    Yes.

18   Q.    All right.  Did you say anything to anybody about what

19   happened that night at the time?

20   A.    Yes.

21   Q.    Okay.  And who did you say something to about it?

22   A.    My Aunt Jennifer.

23   Q.    Okay.  And did you tell her specifically what had

24   happened?

25   A.    Yeah.

1    **Q.**    All right.  And what was her reaction?

2    **A.**    To tell my mother.

3    **Q.**    Okay.  Did you tell your mother?

4    **A.**    Yes.

5    **Q.**    And what was her reaction?

6    **A.**    I don't remember.

7    **Q.**    Okay.  Do you remember whether you told your mother

8    immediately or sometime after?

9    **A.**    Sometime after.

10   **Q.**    And do you remember if it was weeks, months, days?

11   **A.**    I believe it was days.

12   **Q.**    Okay.  And after you told your mother, did anything

13   happen in terms of Mr. Charlie, like, did she do anything about

14   it?

15   **A.**    No.

16   **Q.**    Okay.  All right.  And you mentioned -- you said there

17   was another -- other times you remember Mr. Charlie sneaking

18   into your bedroom at night.  Tell us what you remember about

19   that.

20   **A.**    I was asleep in my bed with Kamaria and my Cousin Buck --

21   well, Simeon.

22   **Q.**    Is Simeon and Buck the same person?

23   **A.**    Yeah.  We call him Buck.

24   **Q.**    Buck is like a nickname?

25   **A.**    Yes.

**Q.**     Okay.

**A.**     And I woke up to someone touching me under my underwears on my vagina.

**Q.**     Okay.  So I want to talk to you a little bit more about that incident then.

So, that day, where are you living, on Douglas Road or Good Hope Road?

**A.**     Good Hope.

**Q.**     Okay.  And is this incident that you're talking about before or after the one you just described where Mr. Hillie was touching you on your butt?

**A.**     I don't remember if it was before or after.

**Q.**     Okay.  Do you know if it was around the same time?

**A.**     Yes.

**Q.**     Okay.  So on this particular occasion that you're talking about now, can you tell us what time of day it was?

**A.**     Um, it was someway in the morning.

**Q.**     Okay.  Like early morning hours?

**A.**     Early morning, yes.

**Q.**     Okay.  And had you -- were you still, like, in bed for the -- had you gone to bed the night before, were you still in bed?

**A.**     Yes.

**Q.**     All right.  And so you said that it's you, Kamaria, and your cousin -- should I call him Simeon or Buck?  What do you

1    call him?

2    **A.**    I'm going to call him Buck.

3    **Q.**    Buck.  Okay.

4          -- and your Cousin Buck.

5          How old is Buck at the time --

6    **A.**    Now or at the time?

7    **Q.**    -- when that happened?

8    **A.**    I don't know.  I don't remember.

9    **Q.**    Was he older than you, or was he younger than you?

10   **A.**    No, he's younger.

11   **Q.**    Okay.  Do you remember if he was older than Kamaria or

12   younger than Kamaria?

13   **A.**    He's younger than Kamaria.

14   **Q.**    All right.  So that night, when you had -- where had you

15   gone to bed that night, in your room or someplace else?

16   **A.**    My room.

17   **Q.**    Okay.  And is it just one bed in there still?

18   **A.**    Yes.

19   **Q.**    All right.  And so tell me, when you had gone to bed that

20   night, how were you situated in the bed?

21   **A.**    I was on the left, my -- Buck was in the middle, and

22   Kamaria was on the right.

23   **Q.**    Okay.  And when this incident happened, were all three of

24   you asleep?

25   **A.**    Yes.

1    Q.    All right.  So what's the very first thing you remember

2    when you wake up?  What wakes you up?

3    A.    Him touching me on my vagina.

4    Q.    And is the "him" you're talking about Mr. Charlie?

5    A.    Yes.

6    Q.    Okay.  And so when you say Mr. Charlie was touching you

7    on your vagina, how were you laying in the bed?  Do you

8    remember?

9    A.    I was laying on my right side.

10   Q.    Okay.  And when you say Mr. Charlie was touching you on

11   your vagina, what was he touching you with?

12   A.    His finger.

13   Q.    Okay.  And was he touching you on top of or underneath

14   the covers?

15   A.    Underneath the covers.

16   Q.    And were you wearing night clothes?

17   A.    Yes.

18   Q.    Were you wearing the same kind of night clothes that you

19   already described?

20   A.    Yes.

21   Q.    And was he touching you on top of your night clothes or

22   underneath your night clothes?

23   A.    Underneath.

24   Q.    And when he was touching you with his finger on your

25   vagina, is it his skin on his fingers touching your bare vagina?

1    **A.**      Yes.

2    **Q.**      And can you tell us what he was doing with his finger?

3    **A.**      He was rubbing around in circles.

4    **Q.**      Rubbing circles on your vagina?

5    **A.**      Yes.

6    **Q.**      Did his fingers stay on the outside of your vagina, or

7    did they go on the inside?

8    **A.**      Outside.

9    **Q.**      And when you woke up and Mr. Charlie was rubbing his

10   fingers on the outside of your vagina, what did you do?

11   **A.**      I just woke up startled, and then he left.

12   **Q.**      So when you woke up, does that -- he left the room?

13   **A.**      Um-hmm.

14   **Q.**      Did you say anything to him?

15   **A.**      No.

16   **Q.**      Did he say anything to you?

17   **A.**      No.

18   **Q.**      Okay.  And can you describe -- when you opened your eyes,

19   like, what could you see?  What was he -- like, how did he look

20   to you?

21   **A.**      Like, he was going to leave.

22   **Q.**      Okay.  And then as soon as you opened your eyes, did he

23   go?

24   **A.**      Yeah.

25   **Q.**      And where did he go when he left the room?

1    **A.**    Out the door.

2    **Q.**    Okay.  And did he go out the door into the hallway or out

3    the door into the bathroom?

4    **A.**    Out the door in the hallway.

5    **Q.**    Okay.  And did you see where he went?

6    **A.**    No.

7    **Q.**    While this was happening, when you woke up, were Kamaria

8    and Buck still asleep?

9    **A.**    Yes.

10   **Q.**    Did they wake up during any of this?

11   **A.**    No.

12   **Q.**    So once Mr. Charlie left the room and went back out into

13   the hallway, did you see where he went?

14   **A.**    No.

15   **Q.**    And what did you do at that point?

16   **A.**    Um, I went back to sleep.

17   **Q.**    Okay.  And did Mr. Charlie say anything to you about what

18   had happened?

19   **A.**    No.

20   **Q.**    Okay.  And did you say anything to anyone about what

21   happened?

22   **A.**    No.

23   **Q.**    Okay.  Did you tell your mom about this time that -- when

24   it happened?

25   **A.**    No.

1  **Q.**    Okay.  Why not?

2  **A.**    Because nothing was done before.

3  **Q.**    Nothing was done before?

4  **A.**    No.

5  **Q.**    What did you think would happen if you told your mom?

6  **A.**    I don't know.

7  **Q.**    Okay.  You mentioned that you had previously told your

8  Aunt Jennifer.

9        Did you tell her about this incident?

10 **A.**    No.

11 **Q.**    Did you tell anybody?

12 **A.**    No.

13 **Q.**    I want to show you, just to go back through the two

14 things that you just told us about, what's been marked as

15 Government's Exhibit 12L.

16       Do you recognize what's depicted in Government's

17 Exhibit 12L?

18 **A.**    Yes.

19 **Q.**    All right.  What's that?

20 **A.**    My room.

21 **Q.**    Now, is that the room on Good Hope Road that you stayed

22 in?

23 **A.**    Yes.

24 **Q.**    Does it look the same in this picture as it looked when

25 you lived there?

1    **A.**    No.

2    **Q.**    Okay.  And in this picture, can you tell whose room it

3    is?

4    **A.**    Yes.

5    **Q.**    Whose room is it in this picture?

6    **A.**    Mine and Kamaria's.

7          THE COURT:  I'm sorry.  Let me have you speak right in.

8          Whose room?

9          THE WITNESS:  Mine and Kamaria's.

10   BY MS. HERTZFELD:

11   **Q.**    Okay.  And do you know if this picture was taken before

12   or after you moved in -- you moved out of the Good Hope Road

13   apartment to live with your dad?

14   **A.**    After.

15   **Q.**    All right.  So is this what it looked like after you

16   moved out?

17   **A.**    Yes.

18   **Q.**    All right.  Did it look a little different when you lived

19   there?

20   **A.**    Yes.

21   **Q.**    But is it, otherwise, still depicting the same room?

22   **A.**    Yes.

23   **Q.**    All right.

24         MS. HERTZFELD:  Your Honor, I'm going to move to admit

25   Government's Exhibit 12L.

1          THE COURT:  Any objections?

2          MS. SLAIGHT:  No objection.

3          THE COURT:  All right.  12L will be admitted.

4          (Government's Exhibit 12L admitted into the record.)

5   BY MS. HERTZFELD:

6   **Q.**     All right.  And I'm also going to have you take a look at

7   Government's Exhibit 12K.

8          Okay.  Do you recognize Government's Exhibit 12K?

9   **A.**     Yes.

10  **Q.**     All right.  And what does Government's Exhibit 12K

11  depict?

12  **A.**     Still my room.

13  **Q.**     Is that the room you stayed in at Good Hope Court?

14  **A.**     Yes.

15  **Q.**     All right.  And does it look exactly the same as when you

16  lived there?

17  **A.**     No.

18  **Q.**     All right.  What's different about it?

19  **A.**     Where the bed is and the table.

20  **Q.**     Okay.  And is this the room you shared with Kamaria back

21  when you lived there?

22  **A.**     Yes.

23  **Q.**     Now, is this picture taken before or after you moved out

24  to live with your dad?

25  **A.**     After.

1    **Q.**    Okay.  And do you know who stays in this room now?  Like,

2    do you know who was living in this room after you moved out?

3    **A.**    Kamaria.

4    **Q.**    Just her?

5    **A.**    Um-hmm.

6    **Q.**    All right.

7         MS. HERTZFELD:  Your Honor, I'd move to admit Government's

8    Exhibit 12K, and I'd ask to publish both that and 12L to the

9    jury.

10        THE COURT:  Objection?

11        MS. SLAIGHT:  No objection.

12        THE COURT:  All right.  12K is admitted, and you may

13   publish.

14        (Government's Exhibit 12K admitted into the record.)

15   BY MS. HERTZFELD:

16   **Q.**    All right.  So looking at Government's Exhibit 12K -- has

17   that popped up for you there?

18        All right.  So you mentioned that this bed looks a little

19   different than it did when you lived there.

20        Was the bed in the same place?

21   **A.**    No.

22   **Q.**    All right.  When you lived in this room with Kamaria,

23   where was the bed?

24   **A.**    Um, it was in the middle.

25   **Q.**    In the middle of the room?

1   **A.**      Yes.

2   **Q.**      All right.  Is this the same size bed that you and

3   Kamaria shared?

4   **A.**      Yes.

5   **Q.**      All right.  Is it the same actual bed?  Do you know?

6   **A.**      Yes.

7   **Q.**      All right.  And then you can see here in Government's

8   Exhibit 12K, there's a doorway on the left-hand side that's

9   pictured there.

10          Do you see that?

11  **A.**      Yes.

12  **Q.**      All right.  Does that -- where does that doorway lead out

13  to?

14  **A.**      To the hallway.

15  **Q.**      Okay.  So in the second time you just told us about that

16  happened in your bedroom where Mr. Hillie touched you on your

17  vagina while you were sleeping, is this the door he left out of

18  when you said he walked out into the hallway?

19  **A.**      Yes.

20  **Q.**      Okay.  And now, looking at -- and just for the record,

21  you're talking about the door on the left-hand side there that's

22  open in Government's Exhibit 12K.

23          Now, looking back at Exhibit 12L, what's the perspective

24  that this image is taken from?  Like, where would the camera be?

25  Where would the camera person be standing when they took this

1   picture?

2   **A.**     From the door connected to the bathroom.

3   **Q.**     Okay.  And so would the bed have been in the middle of

4   this room as it's pictured here?

5   **A.**     Yes.

6   **Q.**     All right.  And now, the last thing, I'm going to have

7   you take a look at Government's Exhibit 12M.

8          Do you recognize Government's Exhibit 12M?

9   **A.**     Yes.

10  **Q.**     All right.  And is that a picture of your room on Good

11  Hope Road when you lived there?

12  **A.**     Yes.

13  **Q.**     And does it look different now than it looks in that --

14  this picture?

15  **A.**     Yes.

16  **Q.**     All right.  Same question.

17         Is this picture from before or after you moved out?  Do

18  you know?

19  **A.**     After.

20  **Q.**     All right.  But did these doorways look the same when you

21  lived there as they do now?

22  **A.**     Yes.

23         MS. HERTZFELD:  Your Honor, I'd move to admit

24  Government's 12 -- Exhibit 12M and to publish this one to the

25  jury as well.

1          THE COURT:  Ms. Slaight?

2          MS. SLAIGHT:  No objection.

3          THE COURT:  All right.  12M will be admitted, and you may

4     publish.

5          (Government's Exhibit 12M admitted into the record.)

6     BY MS. HERTZFELD:

7     Q.    And, Jaden, just to give the jurors some perspective

8     here, can you point out on this photograph the doorway that goes

9     to the hallway that you just showed us on the prior exhibit?

10    Can you make an X?

11    A.    (Indicating.)

12    Q.    Perfect.  So you made an X there on the right-hand side,

13    that doorway.

14         And then you see in the middle, there's a door that

15    appears to be closed.

16         Do you see that doorway?

17    A.    Yes.

18    Q.    All right.  Where does that doorway go?

19    A.    To the bathroom.

20    Q.    All right.  And then there's some doors on the very far

21    left side of Government's Exhibit 12M.

22         Where do those go?

23    A.    To the closet.

24    Q.    All right.  Now, if you were inside this room that's

25    depicted in Government's Exhibit 12M, that door to the bathroom,

1    is that the same door that you described that you locked from

2    the bathroom side when you were saying you were on the toilet in

3    there?

4    **A.**    Yes.

5    **Q.**    And can you lock that door from the bedroom side?

6    **A.**    No.

7    **Q.**    All right.  I'm going to go ahead and clear this.

8         All right, Jaden.  All right.  So were there any other

9    instances that you recall -- you told us about two -- where

10   Mr. Charlie came into your bedroom and was touching you at

11   night?  Were there any other times that you -- that he came into

12   your bedroom, whether he touched you or not, that you are aware

13   of at night?

14   **A.**    At night, no.

15   **Q.**    Okay.  Were there other times that you ever woke up and

16   found -- saw him in there?

17        MS. SLAIGHT:  Objection, leading.

18        THE COURT:  Leading?

19        MS. SLAIGHT:  Leading.

20        THE COURT:  Sustained.

21   BY MS. HERTZFELD:

22   **Q.**    Are there any other times that you recall any encounters

23   with Mr. Charlie at night?

24   **A.**    No.

25   **Q.**    Okay.  So I want to move on to -- just to reorient you.

1         Were there any other instances that you recall where
2    Mr. Charlie touched you on your breasts?
3    **A.**    Yes.
4    **Q.**    All right.  And when did that happen?
5    **A.**    At Good Hope.
6    **Q.**    Okay.  So you were living in the Good Hope Court
7    apartment?
8    **A.**    Yes.
9    **Q.**    And do you remember about how old you were?
10   **A.**    Ten.
11   **Q.**    Okay.  And so why don't you tell us what the
12   circumstances are.
13        Where were you in the apartment this next time that
14   you're thinking of where Mr. Charlie touched you on your
15   breasts?
16   **A.**    I was on the couch.
17   **Q.**    Okay.  And what were you doing on the couch that day?
18   **A.**    Um, watching TV.
19   **Q.**    All right.  And who was home with you on the time that
20   you're thinking of that this happened besides you?
21   **A.**    Um, Mr. Charlie, my mom, and Janika.
22   **Q.**    All right.  And can you tell us, while you were sitting
23   on the couch watching TV, where was your mom?
24   **A.**    In her room.
25   **Q.**    All right.  And do you know where Janika was?

```
 1    A.      In her room.

 2    Q.      And what about Mr. Charlie, where is he?

 3    A.      On the couch next to me.

 4    Q.      Okay.  And so tell us what happened.

 5    A.      Um, we were watching TV, and then he stretched his arm

 6    out, and he touched my breast.

 7    Q.      All right.  And so tell -- was he sitting on -- was he

 8    also sitting on the couch?

 9    A.      Yes.

10    Q.      Was he on your left or your right?  Do you remember?

11    A.      No.  No.

12    Q.      All right.  So tell us what you mean when you say, "He

13    stretched his arm out."  You can show us if that's easier.

14    A.      Well, he just, like, stretched his arm out and touched

15    me.

16    Q.      All right.  And so you're making a motion like stretching

17    your arm straight out to the side?

18    A.      Yes.

19    Q.      And when you say he stretched his arm out and touched you

20    on your breast, can you describe for us what exactly he did with

21    his hand?

22    A.      He had -- like, on myself?

23    Q.      Well, just -- if you can just describe for us what he

24    did.

25    A.      He had stretched -- when he stretched his arm out, he
```

1    had, like, touched my breast over my shirt and just -- well, it

2    was just like -- he just, like, touched it.

3    **Q.**    Okay.  And you said it was over your shirt.

4         What were you wearing on top?

5    **A.**    A T-shirt.

6    **Q.**    Okay.  And was he dressed?

7    **A.**    Yes.

8    **Q.**    All right.  And so when he reached over and touched your

9    breasts, did he -- what did he do with his hand, did he leave it

10   in one place, did he move it, or something else?

11   **A.**    Leave it in one place.

12   **Q.**    Okay.  And did he say anything to you when he did that?

13   **A.**    Well, when he had moved his hand away, he said it was an

14   accident.

15   **Q.**    Okay.  And what did you think about that?

16   **A.**    That was no accident.

17        MS. SLAIGHT:  Objection.

18        THE COURT:  Approach.

19        (Following sidebar discussion had on the record:)

20        MS. SLAIGHT:  I object to her opinion about what his

21   intent -- testifying as to his intent.

22        THE COURT:  That wasn't the question.  The question was,

23   what did you think about it?

24        MS. SLAIGHT:  And she just said, "That was no accident,"

25   so it goes to what his intent --

1      THE COURT:  The objection is overruled.  She can testify

2 to what she thought.

3      (Sidebar discussion concluded.)

4 BY MS. HERTZFELD:

5 **Q.**    You can go on back up.

6      All right.  Jaden, so you said you thought it was no

7 accident?

8 **A.**    Yes.

9 **Q.**    Why did you think that?

10 **A.**    Because you don't just stretch your arm out and then just

11 accidentally just touch a person like that.

12 **Q.**    All right.  And after that happened, did you say anything

13 to him about what he did?

14 **A.**    No.

15 **Q.**    And what about your mom, did you tell your mom?

16 **A.**    Yes.

17 **Q.**    And how did she react when you told her?

18 **A.**    Nothing.

19 **Q.**    Okay.  Did you know whether -- do you know whether she

20 said anything to him?

21 **A.**    No.

22 **Q.**    Did anything happen after you told your mom about it?

23 **A.**    Um, I just went into Janika's room, and then he came in

24 and said, "Don't lie on me again."

25 **Q.**    Can you say that again a little bit louder?

1    **A.**     I said I went into Janika's room, and he came in and said

2    "Don't lie on me again."

3    **Q.**     Don't lie on me again?

4    **A.**     Um-hmm.

5    **Q.**     And how did you react to that?

6    **A.**     Nothing.

7    **Q.**     Did anything come of it after that?

8    **A.**     No.

9    **Q.**     All right.  And did you tell Janika what had happened?

10   **A.**     Yeah.

11   **Q.**     And was Janika there in the room when he came in and

12   said, "Don't lie on me again"?

13   **A.**     Yes.

14   **Q.**     How did she react to that?

15   **A.**     I don't --

16   **Q.**     Okay.  I'm going to go ahead and show you another

17   exhibit.  This one is Government's Exhibit 12N.

18        Do you recognize what's there in Government's Exhibit 12N

19   in that picture?

20   **A.**     Yes.

21   **Q.**     All right.  And what's that a picture of?

22   **A.**     My living room.

23   **Q.**     Okay.  And is that a fair and accurate picture of kind of

24   what the living room looks like when you lived on Good Hope

25   Court?

1    **A.**    Yeah.

2    **Q.**    All right.

3          MS. HERTZFELD:  Your Honor, I would move to admit

4    Government's Exhibit 12N and to publish it to the jury.

5          THE COURT:  Any objection?

6          MS. SLAIGHT:  No objection.

7          THE COURT:  All right.  Twelve -- this is N?

8          MS. HERTZFELD:  N.

9          THE COURT:  As in Nancy?

10          MS. HERTZFELD:  Nancy, yes, Your Honor.

11          THE COURT:  It will be admitted, and you may publish.

12          (Government's Exhibit 12N admitted into the record.)

13   BY MS. HERTZFELD:

14   **Q.**    And, Jaden, does that show the couch that you were

15   sitting on when you -- when that incident you just described

16   happened?

17   **A.**    Yes.

18   **Q.**    All right.  And was all that stuff on there?

19   **A.**    No.

20   **Q.**    Okay.  Can you point out to us just by making an X on the

21   picture there where you would have been sitting when this --

22   what you just described happened?

23   **A.**    (Indicating.)

24   **Q.**    All right.  And so for the record, you've made an X on

25   the right-hand side of the L-shaped couch that's in Government's

1    Exhibit 12N.

2         And can you see on that picture where it would have been

3    that Mr. Charlie was sitting when he reached over and touched

4    your breasts?  Can you just put a little star?

5    **A.**    (Indicating.)

6    **Q.**    All right.  And so for the record, you've drawn a star

7    right in the center of the couch there that's depicted in

8    Government's Exhibit 12N.

9         And then if you were sitting in this place, you were

10   where that X is in Government's Exhibit 12N, where would the TV

11   be relative to where you were?

12   **A.**    Across hanging -- it's across on the TV stand.

13        THE COURT:  I'm sorry.  Speak right into the --

14        THE WITNESS:  Oh, it's -- I'm sorry.  It's across on the

15   TV stand.

16   BY MS. HERTZFELD:

17   **Q.**    All right.  So I'm going to go ahead and clear this,

18   what's on Government's Exhibit 12N.

19        Now, Jaden, were there any other times that anything

20   happened in this same place involving Mr. Charlie when you were

21   living on the Good Hope Court apartment?

22   **A.**    No.

23   **Q.**    All right.  So I'm going to go ahead and take down

24   Government's Exhibit 12N.

25        All right.  So you testified earlier before the lunch

1    break about the incident on Good Hope Road in which you said

2    that Mr. Charlie had grabbed your breasts, and he had rubbed

3    your vagina, and then you testified about him exposing his penis

4    to you.

5          Do you remember that testimony before lunch?

6    **A.**    That was on Douglas Road.

7    **Q.**    On Douglas Road.

8          Did I say Good Hope?

9    **A.**    Yes.

10   **Q.**    I'm sorry.  Thank you for correcting me.  On Douglas

11   Road.

12         Was there any other time that Mr. Charlie exposed his

13   penis to you?

14   **A.**    Yes.

15   **Q.**    Can you tell the jury about that?

16   **A.**    When I -- when he came to the room on the same day when

17   he touched me, when he came into the room and told me, "It won't

18   happen again," when I was walking out with him, he had pulled it

19   out and was saying, "Did you want to touch it?"  And I said no.

20   **Q.**    Okay.  So he said that when he had his penis exposed that

21   day on Douglas Road?

22   **A.**    Yes.

23   **Q.**    All right.  So maybe just explain that, because -- I just

24   want you to explain to the jury when in the context of

25   everything that happened that day he made those statements to

1  you.

2       So you said he exposed his penis to you, you said, after

3  he touched you on your vagina that day?

4  **A.**     Uh-huh, yes.

5  **Q.**     And that was while he was sitting in that chair by the

6  computer?

7  **A.**     Yes.

8  **Q.**     All right.  So when -- did he say -- what you just

9  described, when did he say those statements to you?

10 **A.**     Um, after -- um, when I ran away to the bathroom, then

11 when I went into my room and then he came to tell me that it

12 won't happen again, so when we was walking out, that's when he

13 took it out again and said, "Do you want to touch it?"

14 **Q.**     All right.  And how did you respond to that?

15 **A.**     I shook my head no.

16 **Q.**     Okay.  And how did he react to you shaking your head no?

17 **A.**     He left and put it away.

18 **Q.**     Okay.  Were there any other times besides that time that

19 he exposed his penis to you?

20 **A.**     No.

21 **Q.**     All right.  Were there -- at the Douglas apartment?

22 **A.**     Yes.

23 **Q.**     Were there any times at the Good Hope Road apartment

24 where Mr. Charlie exposed his penis to you?

25 **A.**     No.

1   Q.    All right.  Now, you testified that it was -- when you --

2   it was in the -- it was the two -- when you were -- I'm sorry.

3   When you were 10 years old, you went to live with your father

4   on -- in the place that you currently live?

5   A.    Yes.

6   Q.    All right.  And do you remember what time of year it was

7   when you went to move in with your father?

8   A.    Um, November or December of 2012.

9   Q.    And do you remember -- why do you remember that date?

10  Was it around any holidays or occasions or anything like that

11  that you remember?

12  A.    Um, I just know it was after Mr. Charlie's birthday.

13  Q.    And tell us again when his birthday is.

14  A.    November 9th.

15  Q.    All right.  And then do you remember whether -- you

16  indicated after you moved in with your father, that that was the

17  day that Mr. Charlie slapped you in the face.

18        Do you remember how -- you said you went and reported

19  that to the police that night?

20  A.    Yes.

21  Q.    Do you remember whether you were interviewed at the

22  Children's Advocacy Center about what had happened to you that

23  day and about Mr. Charlie touching you?

24  A.    Yes.

25  Q.    Okay.  And do you remember what date it was when you were

1  interviewed at Children's Advocacy Center?

2  **A.**    September 30th -- oh, no, wait a minute.  I do not

3  remember.

4  **Q.**    Okay.  Do you remember, was it close in time to when you

5  made that report to the police?

6  **A.**    Um, I do not remember.

7  **Q.**    Okay.  And after you gave that interview -- do you

8  remember how old you were when you were interviewed?

9  **A.**    In the interview, I believe I was, I want to say, 13.

10  I'm not very sure.

11  **Q.**    All right.  So I'm talking about the interview that

12  you -- do you remember what the Children's Advocacy Center is?

13  **A.**    Oh, I was 11 -- no, 10, going on 11.

14  **Q.**    You were 10 going on 11?

15  **A.**    Yes.

16  **Q.**    Okay.  And do you remember what the Children's Advocacy

17  Center was like, like, the actual surroundings around you when

18  you went for that interview?

19  **A.**    Yes.

20  **Q.**    All right.  Can you tell us what the room was like you

21  got interviewed in?

22  **A.**    Well, the door is closed.  I was at a table with

23  Ms. Tracy, and I was coloring.  I was told there was a camera in

24  the room.  That's really all I remember.

25  **Q.**    And do you remember who took you to the Children's

1    Advocacy Center that day that you were interviewed?

2    **A.**    My dad.

3    **Q.**    All right.  And after you gave that interview at the

4    Children's Advocacy Center, did anything happen in terms of, you

5    know, the police coming to talk to you again or anything like

6    that?

7    **A.**    No.

8    **Q.**    Okay.  Did there come a day later when you remember going

9    in to testify in front of a grand jury?

10   **A.**    Yes.

11   **Q.**    And do you remember what the date that was?

12   **A.**    That one, I believe, was September 30th.

13   **Q.**    All right.  And I'm just going to show you briefly --

14   well, you said that was September 30th.

15          Do you remember what year it was?

16   **A.**    No.

17   **Q.**    All right.

18          MS. HERTZFELD:  Your Honor, may I approach just to show

19   her Government's Exhibit 22, which is a copy of her grand jury

20   transcript, just to refresh her recollection on that day?

21          THE COURT:  Yes.

22   BY MS. HERTZFELD:

23   **Q.**    Okay.  Government's Exhibit 22, do you recognize what

24   that is?

25   **A.**    Yes.

**Q.**      What is it?

**A.**      My grand jury testimony.

**Q.**      All right.  And does that tell -- if you take a look at that, does that help remind you what year it was when you were interviewed in the grand jury?

**A.**      Yes.

**Q.**      And what year was it?

**A.**      2014.

**Q.**      And do you know, Jaden, what happened in between the time that you were first interviewed in the Children's Advocacy Center back when you were 10 and September 30th, 2014 that caused you to, then, go into the grand jury?

**A.**      Um, my sister sent me a text and said she was going to press charges against Mr. Charlie.

**Q.**      And when you got that information, how did you react?

**A.**      I texted her back why.

**Q.**      Okay.  And how did you feel about getting that text from her?

**A.**      Um, I was like, "Why now, why not back then when it was -- when everything was still going on?"

**Q.**      Okay.  And do you know why back -- not back then?

        MS. SLAIGHT:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  Um, back then, no.

BY MS. HERTZFELD:

1    Q.    Okay.  And when you found out that -- when you got that

2    message that Janika wanted to press charges against Mr. Hillie

3    at that point, did you have any conversations about that with

4    your mom?

5    A.    Yes.

6    Q.    Okay.  And what was the nature of your conversations with

7    your mom?

8    A.    Um, of that particular conversation or just

9    conversations, period?

10   Q.    About -- how did she react when she found out that that

11   was going to happen?

12   A.    Um, well, she -- well, um, she wasn't, like, mad, but she

13   was like -- she just wished Janika did it a little later

14   while -- so she could get some things situated.

15   Q.    What do you mean "get some things situated"?

16   A.    She just said so she could get some things situated.

17   Q.    Do you know what she was worried about?

18   A.    Um, no.

19   Q.    Okay.  At the time when you got that text message from

20   Janika, did you know where she was?

21   A.    Um, I do not know.

22   Q.    Okay.  Do you know if she stayed living with your mom

23   from the time after you moved out?  Do you know -- when you

24   moved out, was she still living with your mom?

25   A.    Yes.

1    **Q.**     Did there come a time where she moved someplace else?

2    **A.**     She didn't move.  But for the summer, she went to go stay

3    with her father.

4    **Q.**     And where was that?

5    **A.**     North Carolina.

6    **Q.**     All right.  And when you got that text message, do you

7    know whether it was before or after she moved down -- went down

8    to North Carolina?

9    **A.**     It was after.

10         MS. SLAIGHT:  Objection.

11         THE COURT:  Overruled.

12   BY MS. HERTZFELD:

13   **Q.**     You can answer.

14         THE COURT:  You can answer.

15         THE WITNESS:  It was after.

16         MS. HERTZFELD:  Court's indulgence, please.

17   BY MS. HERTZFELD:

18   **Q.**     I don't have any further questions, Jaden.  Thank you.

19         THE COURT:  Will there be any cross-examination,

20   Ms. Slaight?

21              CROSS-EXAMINATION OF JADEN ASIAMAH

22   BY MS. SLAIGHT:

23   **Q.**     Good afternoon, Jaden.

24   **A.**     Good afternoon.

25   **Q.**     Now, you talked about the incident in November of 2011

```
 1    where you said Mr. Charlie had slapped you.

 2           Do you remember talking about that?

 3    A.     Um --

 4    Q.     That was 2012, I'm sorry.

 5    A.     Yes.

 6    Q.     Okay.  And on that day, there were a lot of people in the

 7    apartment, right, on that night?

 8    A.     Yes.

 9    Q.     Okay.  So there was Janika, who was 15; is that right?

10    A.     Yes.

11    Q.     Okay.  Jazmine was 15; is that right?

12    A.     Yes.

13    Q.     Okay.  There was you.

14           You were 10, right?

15    A.     Yes.

16    Q.     Okay.  Kamaria was five, right?

17    A.     Yes.

18    Q.     Okay.  And so you, Kamaria, and Janika were living

19    together at that time, right?

20    A.     Yes.

21    Q.     Okay.  And there was also at the apartment, we talked

22    about, Jazmine, who was 15, right?  The same age as Janika --

23    A.     Yes.

24    Q.     -- right?

25           And she lived with Aunt Josephine?
```

1   **A.**      Yes.

2   **Q.**      Okay.  And Jennifer was 14, right?

3   **A.**      Yes.

4   **Q.**      She also lived with Aunt Josephine, right?

5   **A.**      Yes.

6   **Q.**      Okay.  Jordan -- and Jordan was 10?

7   **A.**      Yes.

8   **Q.**      Okay.  And she lived -- is that a girl?

9   **A.**      Yes.

10  **Q.**      Pardon?

11  **A.**      I said yes.

12  **Q.**      Pardon?

13  **A.**      Yes.

14  **Q.**      No?

15  **A.**      Yes.

16  **Q.**      I'm sorry.  I'm having a little trouble hearing.

17          Okay.  Jordan is a girl, and she lived with

18  Aunt Josephine, also, right?

19  **A.**      Yes.

20  **Q.**      Thank you.

21          And then there was Yemme or Semia?

22  **A.**      Simeon.

23  **Q.**      Simeon.

24          And that's a boy, right?

25  **A.**      Yes.

1    Q.    Okay.  And he is -- he was five at the time, right?

2    A.    Yes.

3    Q.    Okay.  So four of Aunt Josephine's kids or relatives were

4    there, right?  Four people who lived with Aunt Josephine were

5    there, right?

6    A.    Yes.

7    Q.    Okay.  And the three of you, right?  So there were seven

8    kids there altogether, right?

9    A.    Yes.

10   Q.    Okay.  And that occurred in the evening, right, that you

11   were talking about what happened?

12   A.    Yes.

13   Q.    They were planning on staying over?

14   A.    Yes.

15   Q.    And it was just your mom, Joyce, who's named Joyce,

16   right?

17   A.    Yes.

18   Q.    And Mr. Charlie, right, were the only adults?

19   A.    Yes.

20   Q.    Okay.  Now, did you go to the doctor when that happened?

21   A.    No.

22   Q.    Okay.  And you bleed -- your nose bleeds pretty easily,

23   right?  You have a -- you're sensitive?

24         MS. HERTZFELD:  Objection.

25         THE COURT:  Overruled.

1          THE WITNESS:  Um, it -- it's like -- it --

2     BY MS. SLAIGHT:

3     **Q.**     It seems like it's the same as everybody's noses?

4     **A.**     Yes.

5     **Q.**     Okay.  And back in -- you said that you talked to

6     somebody in January of 2013, right?  You talked to people?  You

7     had an interview with somebody?

8     **A.**     Yes.

9     **Q.**     And Ms. Tracy was there?

10    **A.**     Oh, yes.

11    **Q.**     Okay.  And did you tell Ms. Tracy that Mr. Charlie hit

12    your nose; is that right?

13    **A.**     Yes.

14    **Q.**     Okay.  And your nose is very sensitive, so it bleeds

15    easily.

16         Do you remember saying that or -- it was --

17    **A.**     I don't.

18    **Q.**     Okay.  All right.  And that's --

19         MS. SLAIGHT:  Your Honor, I'm referencing Defense

20    Exhibit 30, transcript on January 22nd, Page 24.

21    BY MS. SLAIGHT:

22    **Q.**     Now, on that date in January, when you talked to

23    Ms. Tracy, that was a long conversation, right, it seemed like a

24    long conversation?

25    **A.**     Yes.

1    **Q.**    Okay.  And she asked a lot of questions, right?

2    **A.**    Yes.

3    **Q.**    Pardon?

4    **A.**    Yes.

5    **Q.**    Okay.  She wanted to find out everything that you said

6    happened to you, correct?

7    **A.**    Yes.

8    **Q.**    And you were trying to cooperate with her, right?

9    **A.**    Yes.

10   **Q.**    And that was back in 2012, so it was a lot closer to what

11   had happened, is that right, in time?

12   **A.**    Yes.

13   **Q.**    Okay.  And do you remember telling her -- and you

14   referred back then to -- when you were talking about touching

15   your vagina, you referred to it as your coo-coo; is that right?

16   **A.**    Yes.

17   **Q.**    Okay.  And did you tell her that he touched you one time?

18   Do you remember that?

19   **A.**    Was it --

20   **Q.**    Okay.  Referring to Defense Exhibit 30, Page 46, do you

21   remember Ms. Tracy asking you, "So teach me about the second

22   time he touched your coo-coo."

23          And you're saying, "I didn't say he touched my coo-coo

24   again."

25          And Ms. Tracy said, "I thought you said he touched it two

```
 1   times."
 2         And you answered, "No."
 3         That was a long time ago, right?
 4   A.    Well, yeah.
 5   Q.    Okay.  And Ms. Tracy said, "So he touched your coo-coo
 6   one time, and that one time is what you taught me about?"
 7         And you said, "Uh-huh."
 8         Do you remember that, or is that too long ago?
 9   A.    Um --
10         THE COURT:  For that, I need for you to answer "yes" or
11   "no."
12         THE WITNESS:  Um, it was too long ago.  I don't know what
13   I said.  I thought I told her twice.
14   BY MS. SLAIGHT:
15   Q.    So you don't remember what exactly you told her?
16   A.    No.
17   Q.    Okay.  Now, back then, it was closer in time.
18         This is, what, five years later; is that right?
19   A.    Yes.
20   Q.    That's a while later.  Okay.
21         And you said that you also went back -- you also talked
22   to people again in September of 2014, right?  A long time
23   stretched -- there was a long period of time between when you
24   talked to Ms. Tracy and you talked to people again, correct?
25   A.    Yes.
```

1   **Q.**    Okay.  And that was back -- that was in September of

2   2014, right?

3   **A.**    Yes.

4   **Q.**    Okay.  And now, you talked about -- you hadn't -- you

5   talked about that -- the incident that you were saying about the

6   couch, right?

7   **A.**    Yes.

8   **Q.**    Okay.  And you hadn't told Ms. Tracy about that incident,

9   right?

10  **A.**    Right.

11  **Q.**    Okay.  And he -- you were saying that he stretched his

12  both hands out, right?  Did he stretch both arms out?

13  **A.**    I said -- now or --

14  **Q.**    Back then at that -- when he -- when you said that he

15  touched you on the couch, when he was stretching his arm -- was

16  he stretching out both arms or one out -- or one arm out, or

17  what was he doing?  Do you remember?

18  **A.**    No.

19  **Q.**    And -- but that was over the clothes, right?

20  **A.**    Yes.

21  **Q.**    Okay.  And it was very brief, right?

22  **A.**    Yes.

23  **Q.**    And he did say it was an accident, right?

24  **A.**    Yes.

25  **Q.**    He didn't -- huh?

```
1    A.     I said yes.

2    Q.     Okay.  And you actually didn't tell anybody about that,

3    did you?

4    A.     Tell anybody like family?

5    Q.     Sorry?

6    A.     I said, tell anybody like family?

7    Q.     Yeah.

8    A.     Yeah, no.

9    Q.     Pardon?

10   A.     No, I didn't tell anyone.

11   Q.     Okay.  Now, you also talked about the -- there was an

12   incident at -- in the bed, right, when you were sleeping, you

13   were talking about, right?

14   A.     Yes.

15   Q.     Okay.  And there were -- let's talk about the incident

16   where -- there was an incident where there were three of you in

17   the bed, you said, right?

18   A.     Yes.

19   Q.     Okay.  And your cousin's name is Simeon?

20   A.     Simeon.

21   Q.     Simeon.  I'm sorry.

22          And Simeon was staying over, right?

23   A.     Yes.

24   Q.     Okay.  Did Simeon stay over a lot or --

25   A.     Sometimes.
```

1    **Q.**    Okay.  And that was on Good Hope, right?

2    **A.**    Yes.

3    **Q.**    Okay.  And Simeon is the son of Aunt Josephine, right?

4    He's five -- he was five at the time.  He's a lot older now,

5    right?

6    **A.**    Yes.

7    **Q.**    Okay.  And so there were actually three kids in that bed,

8    right --

9    **A.**    Yes.

10   **Q.**    -- at that night?  Okay.

11            And it's a twin bed, right?

12   **A.**    Yes.

13   **Q.**    Okay.  And so that would have been after you moved to

14   Good Hope, right?

15   **A.**    Yes.

16   **Q.**    Okay.  And you were saying that you didn't -- nobody else

17   woke up, correct?

18   **A.**    Yes.

19   **Q.**    Okay.  And you didn't yell or anything like that, right?

20   **A.**    No.

21   **Q.**    Okay.  And you hadn't told the -- you hadn't told

22   Ms. Tracy about that earlier, had you?

23   **A.**    No.

24   **Q.**    Okay.  And the other incident that you were talking about

25   with the bed, that was over the covers, right?

1   **A.**     Yes.

2   **Q.**     Okay.  And that was at night, also, right?

3   **A.**     Yes.

4   **Q.**     And Kamaria was in the bed with you, correct?

5   **A.**     Yes.

6   **Q.**     And you didn't tell your mom about that, did you?

7   **A.**     No.

8   **Q.**     Okay.  Now, your dad came and picked you up after

9   the slapping, right?  After the slapping incident with

10  Mr. Charlie, your dad came and picked you up?

11  **A.**     Yes.

12  **Q.**     Okay.  And your mom and dad weren't getting along too

13  well; is that right?

14  **A.**     I never said that.

15  **Q.**     Is that wrong?

16  **A.**     Yes.

17  **Q.**     Okay.  How did your mom and dad get along?

18  **A.**     They were -- they just got along.

19  **Q.**     Okay.  They weren't living together anymore, were they?

20  **A.**     No.

21  **Q.**     Okay.  And now, you didn't -- you called Mr. Hillie,

22  Mr. Charlie, right?

23  **A.**     Yes.

24  **Q.**     Okay.  Your dad was your dad, Mr. Short; is that right?

25  That's who you call Dad, Mr. Short?

1    **A.**    No.  My dad is my dad.

2    **Q.**    And what's his name?

3    **A.**    Garrick.

4    **Q.**    Okay.  And what's his last name?

5    **A.**    Short.

6    **Q.**    Okay.  So his name is Garrick Short?

7    **A.**    Yes.

8    **Q.**    Okay.  Thank you.

9          Now, after you moved out, did you see Mr. Hillie at all?

10   **A.**    Yes.

11   **Q.**    Okay.  Did he ever touch you or do anything after you

12   moved out?

13   **A.**    No.

14   **Q.**    Okay.  Did he ever tell you not to talk to the police?

15   **A.**    No.

16   **Q.**    Or threaten you?

17   **A.**    No.

18   **Q.**    Okay.

19         MS. SLAIGHT:  I have no further questions, Your Honor.

20         THE COURT:  All right.  Any redirect?

21         MS. HERTZFELD:  Just very briefly.

22              REDIRECT EXAMINATION OF JADEN ASIAMAH

23   BY MS. HERTZFELD:

24   **Q.**    So, Jaden, you indicated that you went to the CAC, and

25   you were interviewed by Ms. Tracy after this incident happened

1    in 2013, and then you -- I'm sorry, 2012, and then you went into

2    the grand jury in 2014.

3           Do you remember that part of your testimony?

4    **A.**    Yes.

5    **Q.**    All right.  And when you went into the grand jury, did

6    you adopt what you said in the CAC interview as part of your

7    grand jury testimony?

8    **A.**    Yes.

9    **Q.**    All right.  And so were all the things that you said in

10   the CAC interview, did you tell the grand jury those were all

11   true?

12   **A.**    Yes.

13   **Q.**    All right.  And when you got asked -- did you get asked

14   in the grand jury was there anything else that had happened that

15   you, then, remembered that you wanted to tell the grand jury?

16   **A.**    Yes.

17   **Q.**    And did you tell them additional incidents that happened

18   with Mr. Hillie touching you that you had not previously

19   mentioned in your CAC interview?

20   **A.**    Yes.

21          MS. HERTZFELD:  I have no further questions.

22          THE COURT:  All right.  Thank you very much.  You may step

23   down.

24          So I think this would be a good time for us to take our

25   afternoon break.  You should not speak to anyone about the case,

1    and we will be back at 3:15.  All right.

2          MS. HERTZFELD:  Thank you.

3          (Jury out at 2:51 p.m.)

4          THE COURT:  So we appear to have gone quicker than we

5    thought --

6          MS. HERTZFELD:  Yes.

7          THE COURT:  -- with respect to the witnesses we have

8    available.

9          Oh, please leave him.

10         MS. HERTZFELD:  Yes, Your Honor.  And I think, you know,

11   we had, I think, agreed at the outset of the trial we would try

12   to stay away from calling either child to start in the afternoon

13   and then go over into the next day.  So Janika will be available

14   to testify starting first thing tomorrow.  Josephine, who is

15   expected to be our last witness, is here today.  So we -- the

16   Government is amenable to calling her for the afternoon time that

17   we have remaining just a little bit out of order so we can still

18   use the time if the Court thinks that makes sense.

19         THE COURT:  Do you -- would she be able to wrap over if we

20   didn't have enough time for her?

21         MS. HERTZFELD:  Court's indulgence.

22         So I think we expect that she would -- we would probably

23   finish her today depending on cross, but if she needed to testify

24   into tomorrow, that would be fine.

25         THE COURT:  That would be fine so we wouldn't have a gap?

1        MS. HERTZFELD:  Yes, Your Honor.

2        THE COURT:  All right.  Ms. Slaight, do you object to

3    that?  This is slightly different than the order that the

4    Government indicated, but pursuant to our agreement that the

5    children would not wrap over.

6        MS. SLAIGHT:  Right.  The issue is impeachment in terms of

7    what somebody says, somebody else says.  And if the girls -- if

8    she testifies after the girls, I don't know what -- I don't know

9    what she's going to say -- or what Janika is going to say in

10   terms of what, if anything, she told Josephine.

11       THE COURT:  She can be recalled if there's an issue, but I

12   don't know that that's really a concern.

13       MS. HERTZFELD:  I don't think it's a concern, but we will

14   agree to keep all of our witnesses available to be recalled.

15       THE COURT:  Yes.  So if there's some issue that you need

16   to explore with her again, she can come back after.  All right.

17   So -- I just don't want to lose the time since we have the jury

18   and a few more hours this afternoon.  All right.  So let's break.

19   We'll come back at 3:15 with this witness.

20       MS. HERTZFELD:  Thank you, Your Honor.

21       MS. SLAIGHT:  Thank you.

22       (Thereupon, a break was had from 2:54 p.m. until

23   3:19 p.m.)

24       THE COURT:  All right.  Just a couple of things before I

25   forget them.

1    One, Ms. Slaight, it would be helpful if you had a list of

2    your exhibits.  I never got a Defense exhibit list, so when you

3    say "one," I'm not -- I'm always a little flustered.

4        MS. SLAIGHT:  I'll send it over.  I have a copy, and I'll

5    send it over to you.

6        THE COURT:  All right.  Thank you.

7        The other thing is that, to the extent that our next

8    witness is going to talk about what the girls reported to her, I

9    intend to have the same sort of limiting instruction that I gave

10   with respect to Detective Johnson at the conclusion of her

11   testimony.  Perhaps on direct, we'll see how it goes in terms of

12   the -- of where, but the same thing I said about, you know, the

13   statement was being provided to -- not to -- as proof of what was

14   stated was true, but the fact that it was actually made, if you

15   believed that it was made.  You understand what I mean?  It was

16   the same statement that -- I'll try to phrase it in a similar way

17   as I did to avoid any confusion by the jury into believing it as

18   proof in contrary to the hearsay rules.

19       MS. HERTZFELD:  Yes.

20       THE COURT:  All right.  Anything?

21       Okay.  We'll bring them in.

22       (Jury in at 3:22 p.m.)

23       THE COURT:  Thank you.  You may be seated.

24       Mr. Okocha, would the Government like to call its next

25   witness?

1        MR. OKOCHA:  Yes, Your Honor.  The United States calls to

2   the witness stand Josephine Asiamah.

3        THE COURT:  Okay.  You may come forward, and you can step

4   right up, and before you're seated, I'll have you sworn, all

5   right?

6        THE WITNESS:  All right.

7        (JOSEPHINE ASIAMAH, GOVERNMENT'S WITNESS, SWORN.)

8        THE COURT:  All right.  You can have a seat.  And if you

9   would try to speak right into the microphone so that you can be

10  heard, that would be helpful.

11        THE WITNESS:  Okay.

12        THE COURT:  All right.

13              DIRECT EXAMINATION OF JOSEPHINE ASIAMAH

14  BY MR. OKOCHA:

15  **Q.**    Good afternoon.

16  **A.**    Good afternoon.

17  **Q.**    Can you please state your name and spell it for the

18  record?

19  **A.**    Sure.

20        My name is Josephine Asiamah.  It's spelled

21  J-O-S-E-P-H-I-N-E.  Asiamah is spelled A-S-I-A-M-A-H.

22  **Q.**    And, Ms. Asiamah, how old are you?

23  **A.**    Forty.

24  **Q.**    And are you currently employed?

25  **A.**    Yes, I am.

1    **Q.**    Where do you work?

2    **A.**    At the American Psychological Association.

3    **Q.**    And what's your position at the American Psychological

4    Association?

5    **A.**    I'm an account representative.

6    **Q.**    And what are some of your duties as an account

7    representative?

8    **A.**    I sell electronic databases for my job to hospitals and

9    universities.

10   **Q.**    And how long have you been employed with the American

11   Psychological Association?

12   **A.**    For about 14 years.

13   **Q.**    Okay.  Ms. Asiamah, I want to talk a little bit about

14   your family.

15          Can you tell me, do you have any children?

16   **A.**    Yes, I do.

17   **Q.**    How many children do you have?

18   **A.**    I have three.

19   **Q.**    What are their names and ages?

20   **A.**    I have a -- my first daughter is Jazmine.  She's 21.  I

21   have a 15-year-old, Jordan, and I have a ten-year-old, Simeon.

22   **Q.**    Okay.  And how about any siblings, do you have any

23   siblings?

24   **A.**    Yes, I do.

25   **Q.**    What are their names and ages as well?

1   **A.**     I have a sister Joyce.  She's 39.  And I have a sister

2   Jennifer, who's 19.

3   **Q.**     Okay.  And are you familiar with Joyce's children?

4   **A.**     Yes, I am.

5   **Q.**     Can you tell them -- tell us their names?

6   **A.**     Sure.

7          It's Janika, Kamaria, and Jaden.

8   **Q.**     And how would you describe your relationship with Joyce's

9   children: Janika, Jaden, and Kamaria?

10  **A.**     We're close.

11  **Q.**     Okay.  And how would you describe your relationship with

12  Joyce?

13  **A.**     We're close as well.

14  **Q.**     Okay.  And have you always been close?

15  **A.**     Yes.

16  **Q.**     Had there come a point in time when your relationship

17  strained a little bit?

18  **A.**     Um, I guess after this incident.

19  **Q.**     Okay.  And this incident -- can you tell me, are you

20  familiar with any of Joyce's most recent romantic partners?

21  **A.**     Yes.  She was -- her last boyfriend is Kamaria's

22  father --

23  **Q.**     Okay.

24  **A.**     -- Charles Hillie.

25  **Q.**     Do you see him in the courtroom today?

1   **A.**      Yes, I do.

2   **Q.**      Can you please point him out and describe what he's

3   wearing?

4   **A.**      Has on a black jacket.

5   **Q.**      Okay.  And you said that the relationship with you and

6   Joyce was strained over these issues.

7          Can you tell me a little bit more by what you mean by

8   that?

9   **A.**      First, with the incident where the girls, my nieces,

10  Jaden and Janika, were telling me where -- the occasions where

11  he inappropriately touched them, and then the other incident

12  where he punched my niece in the face.

13  **Q.**      Let's talk about the first of those incidences.

14         Do you recall the first time you heard about any abuse

15  happening against your nieces by Mr. Hillie?

16  **A.**      Yes.  It was a while ago, a few years back, a few years

17  back when they were a lot younger.  My mom mentioned it to me,

18  and my mom and myself tried to, like, do an intervention with my

19  sister to let her know what the girls were --

20  **Q.**      Before we talk about what happened with your sister, do

21  you mind if I ask you, did you ever talk with Janika about --

22  you said this incident, this first time, did you ever talk to

23  Janika about your concern -- excuse me, your concerns regarding

24  Mr. Hillie?

25  **A.**      Yes.

1    **Q.**    And how did that conversation go?

2    **A.**    Before the CPS case opened?

3    **Q.**    The earliest incident that you can remember.

4    **A.**    Um, she mentioned that she thought there were some

5    inappropriate touching.  At first, she thought it was probably

6    an accident, but then she just said it kept happening.

7    **Q.**    And what was your response after Janika told you this?

8    **A.**    I brought it to my sister's attention.  I told Janika

9    I'll talk to her mom about it.

10   **Q.**    And when you talked to -- "her mom," this is Joyce?

11   **A.**    Joyce, yes.

12   **Q.**    When you talked to Joyce about it, how did that

13   conversation go?

14           MS. SLAIGHT:  May we approach?

15           THE WITNESS:  We mentioned it to her.

16           THE COURT:  I'm sorry?

17           MS. SLAIGHT:  May we approach?

18           THE COURT:  Yes.

19           (Following sidebar discussion had on the record:)

20           MS. SLAIGHT:  Your Honor, now, we're into third person

21   hearsay.  This is not the person who even saw the actions, and

22   she kept saying what she's telling another person.  So -- and I

23   don't understand what -- I thought that the reactions -- it was

24   only about the -- what the witnesses were allowed to relay was

25   only about what they told someone else that they saw or heard,

1  and now, we're having a third -- what she's telling -- hears from

2  somebody else, and then that other person's reaction, so I object

3  to that.  That's all -- there's no -- it's hearsay about what the

4  other person told her and the reactions of the -- of Joyce or --

5  this witness can't say what Joyce was thinking or is relating

6  hearsay in terms of what Joyce had to say.

7       THE COURT:  Mr. Okocha?

8       MR. OKOCHA:  Your Honor, I would say that the Government

9  does not intend to elicit hearsay with regards to the

10  conversation that happened with Joyce and Josephine, only to talk

11  about the fact that there was a report made, and I will say this

12  is exactly akin to the conversations -- the testimony of

13  Detective Johnson, in that she received information that there

14  was abuse happening, and she tried to talk about that further

15  with their mother, and during the conversation with their mother,

16  although there was this conversation that was happening, there

17  was no change in what happened at the home so --

18       THE COURT:  Well, one thing, you know, I would like you to

19  be a little cautious in terms of getting into the details of a

20  conversation and statements back and forth between the mother.

21  The objection is overruled insofar as she can testify to

22  receiving the reports from the girls and how they affected her

23  own actions, which I hear you saying was then to turn around and

24  tell the mother.

25       MR. OKOCHA:  She did.

1        THE COURT:  But that's about as far as I think we need to

2    go in terms of the discussions she's having with the --

3        MR. OKOCHA:  Can we ask questions without eliciting

4    hearsay about the mother's reactions?

5        THE COURT:  What she observed, but not what the mother

6    told her.

7        MR. OKOCHA:  That's fine.

8        MS. SLAIGHT:  Your Honor, the prosecutor asked about

9    statements -- I think the difference between police reports is

10   that it explains how the police interacted.  The prosecutor asked

11   about -- said that this witness heard from her mother also what

12   happened, so now, we have the witness saying, "I heard from

13   Janika" -- "somebody told the mother who told me."  One time she

14   said, "The girl told me."  But another time, she said just now,

15   "The girl told the mother who told me."  So now, we're --

16       THE COURT:  And why can't she testify to the mother

17   telling her?  I think maybe she's --

18       MS. SLAIGHT:  Because now, I can't cross-examine the

19   mother.  She's dead.

20       THE COURT:  Right.  No, no, no.  What I'm saying is it's

21   still hearsay.  It's an out-of-court statement.  And what the

22   question is, when she -- the question is whether or not the

23   statement of the mother to this witness had an effect on this

24   witness in terms of what she did.

25       MS. SLAIGHT:  But it's in their -- it's inevitable that

1       the jury is going to think that -- the jury is going to use it

2       for the truth, and it's very prejudicial because I can't -- the

3       prejudice is more than the probative value because I can't

4       cross-examine the mother on what exactly happened.

5               THE COURT:  But you can cross-examine this witness on what

6       she heard and what her mother told her.  So I'm going to overrule

7       the objection.  I will try to cure it with a limiting statement

8       in terms of explaining that they're not taken for the truth of

9       whether -- any prejudicial claim, but to address or as a proof of

10      what this particular witness said she did once she heard the

11      statement from her mother.  But I will limit the Government in

12      terms of the -- getting into the discussions that this particular

13      witness then went on to have with the girls' mother, except just

14      to note that that occurred.

15              MR. OKOCHA:  Okay.  And just to clarify, the witness can

16      say that she reported it to the mother and that there was a

17      discussion without getting into the details.

18              THE COURT:  Correct, correct.

19              MR. OKOCHA:  Yes, Your Honor.

20              THE COURT:  All right.

21              (Sidebar discussion concluded.)

22      BY MR. OKOCHA:

23      Q.      Now, Ms. Asiamah, without telling us exactly what was

24      said, did you, in fact, discuss or have a conversation with your

25      sister Joyce about what Janika had reported to you?

1    **A.**     Yes, yes.

2    **Q.**     Okay.  And after you had that conversation with Joyce,

3    did you -- what was her reaction?

4          MS. SLAIGHT:  Objection.

5    BY MR. OKOCHA:

6    **Q.**     Without telling us what she said.

7          THE COURT:  Objection is sustained.

8          Can you answer exactly what he's asking you now?

9          Why don't you repeat the question.

10         MR. OKOCHA:  Yes.

11   BY MR. OKOCHA:

12   **Q.**     Can you tell us her reaction, Joyce's reaction without

13   telling us what she said?

14   **A.**     Um-hmm.  She had no reaction.  Her -- she had a calm

15   demeanor.  That's it.

16   **Q.**     Okay.  And were you aware if she contacted the

17   authorities after you had that conversation?

18   **A.**     No.

19   **Q.**     Now, you mentioned that this was the first time that you

20   had a conversation with Joyce about what was happening in the

21   home.

22         Were you alerted to any other instances of abuse in the

23   home after that conversation?

24   **A.**     Yes.

25   **Q.**     Now, can you tell us when that was, approximately?

1    A.    Um, I can't recall the exact date.

2    Q.    Can you tell us what the nature of the abuse was that you

3    were alerted to?

4    A.    I received a phone call from my daughter.  My daughter

5    spent the night over Joyce's house, and I received a phone call

6    from my oldest daughter saying that --

7    Q.    And without telling us what your oldest daughter said,

8    what did you do after you received that phone call?

9    A.    I rushed over to my sister's home.

10   Q.    And when you were at the home, what did you observe with

11   regards to the individuals that were there?  How many people

12   were there?

13   A.    My three and two -- it was five kids in the home.

14   Q.    Okay.  All children?

15   A.    Yes.

16   Q.    Any adults?

17   A.    No.

18   Q.    And do you recall the names of the children that were in

19   the home?

20   A.    Yes.

21   Q.    Who was in the home?

22   A.    Jazmine, Jordan, Simeon, Kamaria, Janika.

23   Q.    So your children and Joyce's children?

24   A.    Yes.

25   Q.    And what was Jaden's status?  How did she appear there?

1    **A.**      Jaden wasn't there.

2    **Q.**      Okay.  Did you notice anything inside of the bathroom of

3    the residence?

4    **A.**      Yes.  There was a lot of blood on the floor.

5    **Q.**      And which address was this that you went to, if you can

6    recall?

7    **A.**      I'm not too sure of the address, but it's the Washington

8    View Apartment.

9    **Q.**      And do you know the road that the Washington View

10   Apartments are on?

11   **A.**      Good Hope Road.

12   **Q.**      Okay.  Now, when you were there and you noticed all of

13   this commotion, without telling us what the individual said, did

14   you speak to the children?

15   **A.**      Yes.

16   **Q.**      Okay.  Did you speak at all to Janika?

17   **A.**      Yes.

18   **Q.**      And what did Janika report to you?

19   **A.**      She reported that Jaden had --

20          MS. SLAIGHT:  Objection.

21          THE COURT:  Overruled.

22          You may answer.

23          THE WITNESS:  She reported that Jaden had went to try to

24   tell my sister something, and Charlie had struck her.

25   BY MR. OKOCHA:

1   **Q.**    Okay.  And what did you do after that?

2   **A.**    I gathered all the kids, got their things, and took them

3   home with me.

4   **Q.**    Did you speak to your sister at all about what you were

5   told?

6   **A.**    Yes.

7   **Q.**    And when did you speak to your sister?

8   **A.**    The following day.

9   **Q.**    And when you spoke to your sister, without telling us

10  specifically what you said, did you talk about what Janika had

11  told you?

12  **A.**    I'm sorry, can you repeat it?

13  **Q.**    Sure.

14        Without telling us specifically what you said to your

15  sister, did the conversation evolve around what Janika had told

16  you about what Mr. Hillie had done?

17  **A.**    Yeah.

18  **Q.**    And what was Joyce's reaction?

19  **A.**    She was nonchalant, no emotion, just kind of laying

20  there.

21  **Q.**    And how was your demeanor during the conversation?

22  **A.**    I was yelling, screaming.  I was a little upset.

23  **Q.**    Now, after that conversation with Joyce or after that

24  incident with Joyce, do you recall an additional time when her

25  children reported to you about anything happening in the home?

1    A.    Yes.  After CPS was called, Janika disclosed to me some

2    things that, you know, Charlie had done to her.

3    Q.    And actually, can I go back a little bit?  I want to talk

4    a little bit more about the incident where you saw blood in the

5    home.

6    A.    Um-hmm.

7    Q.    After you saw blood in the home, did you have a

8    conversation at all with CPS?

9    A.    Yes.  CPS called a few days later, called my cell phone

10   to ask me about the incident.  I reported what had happened, but

11   that was it.  I didn't get a phone call back.

12   Q.    Okay.  And during the conversation with CPS, how long was

13   that?

14   A.    No more than like 20 minutes of me just kind of answering

15   their questions.

16   Q.    Okay.  And did you tell them that you were there when it

17   happened?

18   A.    No.  They asked was I there when the incident had

19   occurred, and I told them no.

20   Q.    Okay.  So you told them that you didn't observe what

21   happened?

22   A.    Right.

23   Q.    Okay.  Now, with regards to the next incident, did you

24   ever talk to Janika at all again about any abuse happening in

25   the home?

1    **A.**    Yes.

2    **Q.**    Okay.  And do you recall the next time that was?

3    **A.**    Um, while she was still in North -- when she went to

4    North Carolina to visit her father for the summer.

5    **Q.**    Okay.  So Janika is in North Carolina.

6    Can you tell us what she told you about the abuse when

7    she was in North Carolina?

8    **A.**    She mentioned that Charlie touched her area -- her below,

9    down below.

10    **Q.**    And just to clarify, down below -- did she say "down

11    below," or did she use some other terms?

12    **A.**    Yeah, she didn't -- she wasn't real specific, I guess,

13    because I'm her aunt and she didn't want to say it.  But she

14    said he touched her in her private area.

15    **Q.**    Okay.  And do you recall approximately when it was that

16    you had this conversation with Janika?

17    **A.**    Before she graduated, so I believe in 2014.

18    **Q.**    During that summer?

19    **A.**    Yes.

20    **Q.**    And when you spoke to her, could you describe her

21    demeanor?

22    **A.**    She was upset, crying, just a little -- just out of it.

23    **Q.**    And did you talk to Joyce at all about the conversation

24    you had with her daughter Janika?

25    **A.**    Yes.

1    Q.    And how did that -- well, without telling us specifically

2    what was said, what was Joyce's reaction?

3    A.    Her whole reaction is that, I'll take care of it.  Like,

4    she just did not -- her demeanor was just -- she didn't care, I

5    guess.  I don't know how to say it.

6    Q.    Okay.  And after that conversation, was there an

7    additional time that you spoke with any of the children and --

8    any children of Joyce about any sexual abuse that was happening

9    in the home?

10   A.    Um, no.  One other time I was taking Jaden, taking her to

11   her dad's job, and she didn't mention sexual abuse.  She was

12   just upset that everything was happening, and she thought it was

13   all her fault and she should never said anything.

14   Q.    And this was after she had reported it?

15   A.    Yes.

16   Q.    Do you recall approximately when this was that you had

17   this conversation with Jaden?

18   A.    I'm sorry, I can't recall the exact time.

19   Q.    Do you remember where she was living at the time?

20   A.    Um, she was living with her father.  I believe maybe

21   Marbury Plaza.  It's a high-rise off of Good Hope Road.

22   Q.    Okay.  And do you recall if you spoke to Joyce at all

23   about what Jaden had told you after this happened?

24   A.    After that incident happened, I don't believe I had.

25   Q.    Okay.  Now, during the time period of 2010, 2014 time

1    period, did you notice any changes in Janika?

2    **A.**    Yeah, just her demeanor.  She just became more angry,

3    just distant, always in protection mode.

4    **Q.**    You said "protection mode."

5        What do you mean by that?

6    **A.**    Just always have her guard up, I guess.  She puts on a

7    good facade, like, you know, her facial features.  She's not

8    warming or welcoming if you -- when you meet her.

9    **Q.**    And prior to that, was she putting up a facade and not

10   welcoming or was she different?

11   **A.**    Oh, she was way different prior to --

12   **Q.**    How was she before that?

13   **A.**    Oh, she used to sing all the time.  She was just a happy

14   person.

15   **Q.**    And then you also said "protection mode."

16       Did she do anything with doors that was different than

17   what she was doing before?

18   **A.**    Yeah.  Like, I noticed whenever she would, like, spend

19   the night at my house, she would lock the door.  I have a

20   no-door-locked policy in my home.  So I noticed that whenever I

21   would go in the room or -- she would always have the door

22   locked.  You can have the bathroom door locked, but she had

23   bedroom -- every -- any place she went, she always made sure the

24   door was locked behind her.

25   **Q.**    And anything else the door besides locking it?  Anything

1  in addition to that?

2  **A.**    Oh, she may have put a chair.  I would notice the dining

3  room chair, one would be missing.

4  **Q.**    And now, after Janika came back from her father's home in

5  the summer of 2014, did she talk to you at all again about

6  sexual abuse?

7  **A.**    She mentioned to me about the sexual abuse --

8         MS. SLAIGHT:  Objection.

9         THE COURT:  Can you repeat the question?  Let me ask -- I

10  didn't hear the question.

11         MS. SLAIGHT:  {Unintelligible.}

12         THE COURT:  All right.  Hold on in a second.

13         Overruled.

14         You may answer.

15         THE WITNESS:  Okay.  I'm sorry --

16  BY MR. OKOCHA:

17  **Q.**    Do you want me to repeat the question?

18  **A.**    Yes, please.

19  **Q.**    So after Janika returned from the summer at her father's

20  home in 2014, did she talk to you again about any sexual abuse?

21  **A.**    Yes.

22  **Q.**    And can you tell us what she told you?

23  **A.**    She mentioned -- so she mentioned that Charlie would

24  just, I guess, keep messing with her.  She didn't -- so they

25  don't -- the girls, I guess they don't feel comfortable in

1    telling me --

2         MS. SLAIGHT:  Objection.

3         THE COURT:  Sustained.

4    BY MR. OKOCHA:

5    **Q.**    Can you just focus on what she said without telling us

6    more about the girls' comforts and feelings?

7    **A.**    Um-hmm.

8         So just tell you what she said?

9    **Q.**    About the sexual abuse.

10   **A.**    She just said that he would just keep messing with her,

11   just keep touching her.

12   **Q.**    And did you encourage her to do anything after she told

13   you this?

14   **A.**    Yeah.  She mentioned to me that she wanted to contact

15   CPS.  I told her I would be behind her 100 percent if she did.

16   **Q.**    And approximately when did this conversation occur?

17   **A.**    Um, August 8th.

18   **Q.**    Okay.  And after that conversation occurred, did you have

19   any conversations with Joyce about an investigation or about

20   Charles Hillie, about the sexual abuse occurring to her in the

21   home?

22   **A.**    Yes.  When CPS was called, I had to go to CPS to -- I

23   wanted to pick her up.  But they would not release her to me

24   unless she had a parental consent.  We couldn't get in contact

25   with her father.  I tried reaching out to Joyce numerous times,

1    and she wouldn't call back or answer my text messages.

2    **Q.**    Okay.  Now, since that time in August 2014 -- or I should

3    say shortly after that time, August 2014, when Janika indicated

4    she wanted to call CPS and CPS wouldn't release her, what was

5    your relationship like with your sister Joyce?

6    **A.**    At that point, it became very strained.

7    **Q.**    And can you tell me a little bit more about how it became

8    strained?  What was the conversations like between the two of

9    you, if they existed?

10   **A.**    Um, I was just more upset that this whole situation was

11   continuing happening.  I went to her and basically asked her, "I

12   thought you were taking care of everything like you mentioned."

13   She just wouldn't -- she shut down, wouldn't talk to me.

14   **Q.**    Okay.  And how about with the children, how was the

15   effect on her children after this incident occurred, after all

16   of this in August 2014?

17        MS. SLAIGHT:  Objection.

18        THE COURT:  To the extent that you know.

19        THE WITNESS:  To the extent that I know, they were sad.

20   They didn't --

21        MS. SLAIGHT:  Objection as to the question in terms of the

22   children.

23        Who was --

24        THE COURT:  Can you rephrase --

25        MR. OKOCHA:  I'll be more specific.

1        THE COURT:  -- Mr. Okocha?

2   BY MR. OKOCHA:

3   Q.    With regards to Jaden, Janika, and Kamaria, after Janika

4   made that report in August 8th, 2014, what was the demeanors

5   like of the children after that?

6   A.    They were upset.

7        MS. SLAIGHT:  Objection to the answer.

8        THE COURT:  To the extent that you know.

9        THE WITNESS:  To the extent that I know?

10        MR. OKOCHA:  That you observed personally.

11        THE COURT:  That you observed personally, their reactions.

12        THE WITNESS:  Their reaction?

13        THE COURT:  Um-hmm.

14        MS. SLAIGHT:  Your Honor, I object to the characterization

15   of multiple persons and one response.

16        THE COURT:  All right.

17        MR. OKOCHA:  I can break it down.

18        THE COURT:  Break it out, Mr. Okocha.

19   BY MR. OKOCHA:

20   Q.    So specifically with regards to Jaden Asiamah, were you

21   able to observe how Janika's report on August 8th, 2014 had

22   affected her and her demeanor?

23   A.    She -- I don't know what else to say besides she was

24   just -- her demeanor, she was just really upset.  She didn't

25   want to do anything.  She didn't want to -- after a while, she

1    didn't want to continue with the case.  She was scared.  She

2    didn't want her mom to get in trouble.  She didn't want the

3    family to be broken up.  Her and Jaden thought that it was their

4    fault, and they didn't want to do anything else.  They just

5    wanted to take it all back.

6         MR. OKOCHA:  Your Honor, no further questions.

7         THE COURT:  All right.  Ms. Slaight?

8              CROSS-EXAMINATION OF JOSEPHINE ASIAMAH

9    BY MS. SLAIGHT:

10   Q.    Good afternoon, Mrs. Asiamah.

11   A.    Good afternoon.

12   Q.    Now, I'm going to draw your attention to November of

13   2012.

14         And you talked about coming over to Joyce Asiamah's

15   apartment, right?

16   A.    Um-hmm.

17   Q.    Okay.  Now, you talked about the number of kids that were

18   there that night, correct?

19   A.    Yes.

20   Q.    And there were actually -- it was your understanding

21   there were seven kids there that night, right?  There was

22   Jazmine, right?

23   A.    Um-hmm.

24   Q.    Jennifer?

25   A.    Oh, yes, Jennifer, my sister.  I do apologize.

1    **Q.**    Jordan?

2    **A.**    Um-hmm.

3    **Q.**    Simeon [sic]?

4    **A.**    Yes.

5    **A.**    Janika?

6    **A.**    Yes.

7    **Q.**    Jaden?

8    **A.**    Jaden wasn't there when I got there.

9    **Q.**    It was your understanding that she was there that night,

10   though, right?

11   **A.**    Oh, yes, she was.

12   **Q.**    Okay.  And Kamaria --

13   **A.**    Yes.

14   **Q.**    -- right?

15          And you had said -- and you had -- now, Jazmine,

16   Jennifer, Jordan, and Simeon were under your guardianship,

17   right, either you were the parents, or they were living to

18   the --

19   **A.**    Yes.

20   **Q.**    Okay.  And you had -- they were over, with your

21   permission, at that apartment; is that right?

22   **A.**    Yes.

23   **Q.**    And it was for the night, right?

24   **A.**    Right.

25   **Q.**    Okay.  And so you heard -- you got a call; is that right?

1    **A.**    Yes.

2    **Q.**    And everybody has been upset, correct?

3    **A.**    Yes.

4    **Q.**    And you came over --

5    **A.**    Yes.

6    **Q.**    -- right?

7          And you were -- now, you didn't see -- you looked in the

8    apartment for blood; is that right?  Because you had heard that

9    Jordan was bleeding; is that right?

10   **A.**    Jaden, yes.

11   **Q.**    Jaden, I'm sorry.

12         And you didn't see Jaden, though, that night, did you?

13   **A.**    No.

14   **Q.**    Okay.  So you can't say what her face looked like; is

15   that right?

16   **A.**    Yes.  There was a picture.  I had my daughter taken -- I

17   told my daughter to take a picture of her and send it to me, and

18   I instructed her not to clean up the blood that was on the

19   floor.

20   **Q.**    Well, did you ever see the picture?

21   **A.**    Yes, I did.

22   **Q.**    Did you ever give the picture to anybody?

23   **A.**    No.

24         Who was I supposed to give it to?

25   **Q.**    Well, you said that you made a police report, right?

1    **A.**    No.  The police wouldn't talk to me.  I called 911.  The

2    police officers would not talk to me.  They mentioned that --

3    because I wasn't there to witness it and the fact that

4    Mr. Hillie, probably, could have been just disciplining Jaden,

5    so I couldn't make that -- it had to be a parent to call.

6    **Q.**    Well, you were subsequently notified -- you were

7    subsequently interviewed by a social worker from Child -- Family

8    and Child Services; is that right?

9    **A.**    After the incident that occurred?

10   **Q.**    Yes.

11   **A.**    Yes.

12   **Q.**    Okay.  And did you give the picture to that person?

13   **A.**    They didn't ask for it.  They mentioned -- they took my

14   statement, and that was it.

15   **Q.**    Well, the whole point of having a picture is to show it

16   to verify --

17         MR. OKOCHA:  Objection, argumentative.

18   BY MS. SLAIGHT:

19   **Q.**    -- what happened, right?

20         THE COURT:  I can't hear the objection.

21         MR. OKOCHA:  That's argumentative, Your Honor, the whole

22   point to having a picture is to --

23         THE COURT:  Overruled.

24   BY MS. SLAIGHT:

25   **Q.**    The reason that you asked the picture be taken, you're

1    saying, is so that there would be a photograph of Jaden's

2    injuries, right?

3    **A.**    Correct.

4    **Q.**    Okay.  And when you talked to the social worker, the

5    social worker asked you about whether there was -- you saw any

6    blood, right?

7    **A.**    No, they didn't ask me about did I see any blood.  They

8    asked me did I witness the incident that occurred.

9    **Q.**    Well, didn't you tell the -- you talked to a social

10   worker on February 11th of 2013, didn't you, or about that time?

11   **A.**    Yes.

12   **Q.**    Okay.  And didn't you tell the social worker that you

13   didn't see any blood on the floor in the apartment?

14   **A.**    No.

15   **Q.**    You never said that to the social worker?

16   **A.**    No.  It was in a bathroom floor.  I told my sister --

17   don't know -- when I got back to my sister's home the next day

18   after the incident happened, there was no blood on the floor.

19   So that made me assume my sister had to clean it up, which I

20   wanted her to do.

21   **Q.**    So you're saying that you met with the social worker, you

22   didn't show her a picture -- this -- the picture of Jaden --

23   **A.**    I didn't have the picture anymore.  By the time I met

24   with the social worker, I no longer had my phone anymore.

25   **Q.**    What about your daughter's phone?

1    **A.**    My daughter, she's a freshman in high school.  She left

2    her phone on the lunch table.  When she realized it after that,

3    she dumped her tray, she came back, and the phone was gone.

4    **Q.**    And what happened to your phone?

5    **A.**    My phone fell down in the elevator shaft at my job.

6    **Q.**    Okay.  So neither pictures were available then?

7    **A.**    Exactly.

8    **Q.**    It wasn't because the social worker didn't ask for them?

9    **A.**    The social worker never asked for them.

10   **Q.**    But you -- but the reason that you didn't give them to

11   the social worker is because you didn't have pictures; is that

12   right?

13   **A.**    Well, I didn't have any pictures, exactly.

14   **Q.**    Okay.  And so you're saying it's not true that you told

15   the social worker that you didn't see any blood on the floor?

16   **A.**    There wasn't any blood when I came back.

17         MR. OKOCHA:  Your Honor, objection.

18         THE COURT:  I'm sorry, I have to hear the objection.

19         MR. OKOCHA:  I'm sorry.  I believe it was asked and

20   answered.

21         THE COURT:  Overruled.

22         THE WITNESS:  I'm sorry.

23         THE COURT:  Can you ask the question again --

24         THE WITNESS:  Okay.  Thank you.

25         THE COURT:  -- Ms. Slaight?

1    BY MS. SLAIGHT:

2    **Q.**    Did you tell the social worker that you didn't see any

3    blood on the floor?

4    **A.**    The next day, yes.

5    **Q.**    What about that night?

6    **A.**    That night, yes, it was blood on the floor.

7    **Q.**    Did you tell that to the social worker?

8    **A.**    I hope I did.

9    **Q.**    Okay.  Now, you talked about Janika going to North

10   Carolina, right?

11   **A.**    Yes.

12   **Q.**    Okay.  And her mom sent her to North Carolina, right?

13   **A.**    Correct.

14   **Q.**    Because -- and she was -- because Janika was living with

15   her boyfriend and her boyfriend's mom; is that right?

16   **A.**    No.

17   **Q.**    Well, weren't they -- didn't you -- isn't it true that

18   she was living with her boyfriend and her boyfriend's mom before

19   Joyce sent her to North Carolina?

20   **A.**    Yes.  Because Charlie was -- she wasn't living with them.

21   She would spend the night from time to time.

22   **Q.**    Okay.  She was staying with her boyfriend --

23   **A.**    Yes.

24   **Q.**    -- and her boyfriend's mom in North Carolina?

25   **A.**    Yes.

1    **Q.**    Okay.  And Joyce sent her down to North Carolina with her

2    father; is that right?

3    **A.**    Correct.

4    **Q.**    Okay.  And when Janika was in North Carolina, she was

5    accusing her mom, Joyce, of caring more about Kamaria and

6    Mr. Hillie than she cared about her; is that right?

7    **A.**    No, not necessarily.

8    **Q.**    Well --

9    **A.**    She was more so just concerned that she sent her away

10   just so Charlie can still be in the home.

11   **Q.**    Well, isn't it true that she was upset that Janika was

12   living with -- was staying with her boyfriend and her

13   boyfriend's mom and she was 17 years old?

14   **A.**    Who was upset?

15   **Q.**    Joyce.

16        MR. OKOCHA:  Your Honor, I would object.  This answer

17   calls for hearsay.

18        THE COURT:  Approach.

19        (Following sidebar discussion had on the record:)

20        MR. OKOCHA:  Your Honor, throughout the Government's

21   direct examination, we were unable to get into the conversations

22   that Josephine and Joyce had regarding any of the abuse we

23   produced to the reports.  And now, Defense counsel is asking

24   questions about tangential issues not regarding the sexual abuse,

25   regarding whether or not she knows about why Janika moved out or

1    why Janika was staying with her boyfriend and eliciting things

2    that would have to be hearsay for her to understand the reasoning

3    behind why Joyce decided why she shouldn't --

4         THE COURT:  So what is the basis of this?  I'm not -- I

5    don't know what this is --

6         MS. SLAIGHT:  Well, the Government is implying that she

7    went down there on her own, she went down there because of Joyce

8    sending her down there.  And it wasn't because of abuse

9    allegations.  It was about the boyfriend.

10        THE COURT:  Did you elicit questions about why she went

11   to -- with her --

12        MR. OKOCHA:  I don't believe that I did that with this

13   witness.

14        THE COURT:  I didn't hear anything in this witness about

15   the reasons for going down to North Carolina that I can recall.

16   So I'm not sure that this is even within the scope of the

17   examination, really.

18        But can we wrap up this area and not get into much further

19   discussion of it?

20        MS. SLAIGHT:  (Nodded head affirmatively.)

21        Okay.  At my questioning was for the reason -- that she

22   went down there, sure.

23        THE COURT:  All right.  I mean, I don't recall this

24   witness being asked specific questions about why it was that

25   Janika went down.  I think it was the point to just have a

1   conversation about whether when she was down there did she

2   report, and that was what I recall from his direct, and so let's

3   try to keep it within the scope.

4           MS. SLAIGHT:  Well, the last question was, did she say

5   that she cared more about Mr. Charlie and Kamaria than she did

6   about Janika, and I think that's a fair question.

7           THE COURT:  I think that's fair.

8           MR. OKOCHA:  And that was already answered when she said

9   "not necessarily," and she said that Charles Hillie -- she was

10  worried that Charles Hillie was going to be in the home, and she

11  was kicking her out so that he could stay in the home.  If I

12  recall, that was the answer of Josephine --

13          THE COURT:  Right.  And I think all of that is fine, but

14  then we started getting into why was she down there, was she

15  living with the boyfriend, so let's curb that, but you have on

16  the record the statement that you just made.

17          MS. SLAIGHT:  All right.

18          THE COURT:  All right.  Thank you.

19          (Sidebar discussion concluded.)

20  BY MS. SLAIGHT:

21  Q.    Now, you said that Janika had mentioned to you some

22  interaction with Mr. Hillie that -- a few years earlier -- a few

23  years before November of 2012, right?

24  A.    Yes.

25  Q.    And that she thought it was an accident; is that right?

1    **A.**     Correct.

2    **Q.**     Okay.  And before she moved in with you, Janika had not

3    disclosed -- she said to you -- and that she moved in -- Janika

4    moved in with you in August of 2014, right?

5    **A.**     Yes.

6    **Q.**     After she came back from North Carolina, correct?

7    **A.**     Yes.

8    **Q.**     Okay.  And before that time, she hadn't said anything --

9    before she moved in with you, she didn't disclose any other

10   alleged incidents with Mr. Hillie; is that right?

11   **A.**     Correct.

12   **Q.**     Okay.  And Jaden never told you directly about any

13   incidents, correct?

14   **A.**     Correct.

15   **Q.**     Okay.  Now, after -- now -- and the incident that Janika

16   allegedly told you about, she -- you didn't call the police

17   after that, right?

18   **A.**     Correct.

19   **Q.**     You didn't call Child and Protective Services, right?

20   **A.**     Correct.

21   **Q.**     Okay.  And you didn't hear anything about any incidents

22   for the next few years, right?

23   **A.**     Correct.

24   **Q.**     Okay.  And you continued to have the kids over, your kids

25   over, right?

1   **A.**      Over to my home?

2   **Q.**      Over to -- you continued to have your kids over to

3   Joyce's home, the apartment; is that right?

4   **A.**      Yes.

5   **Q.**      Okay.  And you didn't see any inappropriate touching by

6   Mr. Hillie, correct?

7   **A.**      No.

8   **Q.**      Okay.  And you didn't report any inappropriate actions;

9   is that right?

10  **A.**      To authorities?

11  **Q.**      Up until the November of 2012, you didn't report any

12  inappropriate actions, correct, just to the police or to --

13  **A.**      No.  Just to my sister.

14  **Q.**      -- Child Protective Services?

15  **A.**      Just to my sister.

16  **Q.**      Okay.  And it was only that one incident, which may have

17  been an accident, right, that you knew about?

18  **A.**      Just that one time.

19  **Q.**      Okay.  And you came over to the apartment on a regular

20  basis, didn't you?

21  **A.**      Sometimes, yes.

22  **Q.**      And sometimes unannounced even, right?

23  **A.**      Yes.

24  **Q.**      Okay.  And you didn't see anything?

25  **A.**      Yes.

1   **Q.**    Okay.

2       MS. SLAIGHT:  I have no further questions.

3       THE COURT:  Any redirect?

4       MR. OKOCHA:  Yes, briefly, Your Honor.

5        REDIRECT EXAMINATION OF JOSEPHINE ASIAMAH

6   BY MR. OKOCHA:

7   **Q.**   Now, Ms. Asiamah, when it comes to you reporting all

8   these incidents to your sister, why did you decide to report

9   these incidents just directly to your sister?

10  **A.**   Well, one, I guess I didn't feel the need to bring the

11  police involved if I go to my sister with these incidences

12  that's going on, and she says that she'll take care of it, and

13  me thinking she'll take care of it either Charlie is out of the

14  home or it just kind of -- it stopped altogether.  If the girls

15  would come to me to talk about anything and I disclosed that

16  information to my sister --

17       MS. SLAIGHT:  Objection, nonresponsive.

18       THE COURT:  Overruled.

19       You can continue.

20       MR. OKOCHA:  You may continue.

21       THE WITNESS:  Okay.  If I mentioned anything to my sister,

22  the girls are not allowed to come over my house.  I won't be able

23  to see them.  They don't have cell phones.  I can't get in

24  contact with them.  She lives in a gated community.  I can't go

25  over there.

1    BY MR. OKOCHA:

2    **Q.**     So you wouldn't be able to see your nieces?

3    **A.**     Exactly.

4    **Q.**     Were you worried about what would happen if you were to

5    report -- if you were to have somebody else take care of this

6    except the police?

7    **A.**     Not necessarily just so much worried about it.  I really

8    thought that she would take care of it like she said.  If she

9    said she was going to take care of something, my sister is about

10   her word, I wouldn't believe that she wouldn't.

11   **Q.**     And what happened to the family when CPS did get

12   involved?

13   **A.**     The family became strained.  I tried to keep the family

14   together.  The girls are in foster care.  I removed my feelings

15   out of it and still continued to show love to my sister so she

16   can still come over to see the girls.  She won't feel a certain

17   way about me being guardianship.  Like, we've never dealt with

18   this before, so it was just hard.

19            MR. OKOCHA:  Your Honor, no further questions.

20            THE COURT:  Thank you.  You may step down.

21            Ladies and gentlemen, as a part of the last witness's

22   testimony, you heard her testify that Janika disclosed or

23   reported sexual abuse to her.  This evidence has been offered

24   only as proof that the reports were made and not as proof that

25   what was being asserted was true.  If you believe the testimony

1  that was made, you must consider it only for the limited purpose

2  of showing that the statement was made and to understand the

3  effect of the statement on the listener and not as proof that

4  what was stated was true, all right?

5       Is there -- at this time, do we think we can close for the

6  evening?

7       MS. HERTZFELD:  Yes, Your Honor, given the state of the

8  witness, I think this makes -- it makes sense to break for the

9  day.

10       THE COURT:  All right.  So we're going to close for the

11  evening a little early tonight.  We will see how the testimony

12  goes tomorrow.  But we may also end up leaving a little early

13  tomorrow.  We'll see.  I'm sure nobody is upset about that.

14       Please let me remind you of the various cautionary

15  instructions that I have given you before, that you are not to

16  discuss this matter with anyone, the jurors, parties, witnesses,

17  attorneys, your family, your friends, anyone overnight.  Do not

18  permit people to discuss this in your presence.  Do not tell

19  anyone -- if you hear anything about the case, report it directly

20  to me, and don't read or investigate this case in any way.

21       And, again, you need to keep an open mind, because we're

22  still accepting evidence, and you have to hear it all and the

23  arguments of counsel and the instructions of the Court and the

24  views of your fellow jurors before you reach a verdict in this

25  matter, all right?

 1          Let me just make sure that's all I have to say.  It is.  I

 2     hope you have a good night.  Thank you.

 3          (Jury out at 4:06 p.m.)

 4          THE COURT:  All right.  Let's see if there's anything

 5     more.  We'll have to think a little bit about the schedule in

 6     light of where we are in the process.

 7          Let me ask, Government counsel, it looks to me from your

 8     list that you have one more witness; is that correct?

 9          MS. HERTZFELD:  That's correct, Your Honor.

10          THE COURT:  Do you expect that she'll take pretty much the

11     whole day tomorrow?

12          MS. HERTZFELD:  I think she'll take at least the morning

13     part of the day --

14          THE COURT:  Okay.

15          MS. HERTZFELD:  -- depending on the length of cross,

16     et cetera.  We went a little quicker today than expected.

17          THE COURT:  Right.

18          MS. HERTZFELD:  But I think if it goes like today, she'll

19     probably take the morning tomorrow.

20          THE COURT:  All right.  So Defense counsel should be

21     prepared.  If you have witnesses, to have them available for

22     tomorrow.

23          MS. HERTZFELD:  And, Your Honor, I misspoke about one

24     thing.  We actually -- we have one more substantive witness.  I

25     forgot.  We didn't reach a stipulation on the dates for the --

1    that the family lived in the Douglas Street apartment.

2          THE COURT:  All right.

3          MS. HERTZFELD:  And we had talked about that, so I think

4    we are going to have to call the records custodian.

5          THE COURT:  At the end?  Do you want to do it --

6          MS. HERTZFELD:  She'll be here at 9:30 tomorrow, so we may

7    actually call her first so she can go, and then we'll call Janika

8    right after.  I suspect she'll be very short.

9          THE COURT:  Okay.  So it could be two, but one really

10   short.  Got it.

11         Yes, Ms. Slaight?

12         MS. SLAIGHT:  And I know I asked the Government to just

13   make Ms. Johnson -- former Detective Johnson available in the

14   case.  She'll be called tomorrow.

15         THE COURT:  In case she has to be recalled?

16         MS. SLAIGHT:  Right.

17         THE COURT:  Yes.

18         And I guess Josephine, right?

19         MR. OKOCHA:  Okay.

20         THE COURT:  In case she --

21         MS. SLAIGHT:  Yes.

22         THE COURT:  Because you wanted to -- since she was taken

23   out of order --

24         MS. SLAIGHT:  Right.

25         THE COURT:  -- I understood you want maybe to bring her --

1        MS. SLAIGHT:  Right.  I'll look over her testimony tonight
2    and see if there's anything that I would want to recall her for.
3        THE COURT:  All right.  Okay.
4        MS. HERTZFELD:  If she's needed, we'll make her available
5    as well.
6        THE COURT:  Great.
7        And then, Ms. Slaight, I'm going to get from you Defense
8    exhibits.
9        MS. SLAIGHT:  Yes.
10       THE COURT:  And then before the Defense case, to the
11   extent you wish to put one on, it would be helpful to have a list
12   of the witnesses that you intend to call, if you decide to put on
13   a case.
14       MS. SLAIGHT:  Your Honor, I don't believe that we will
15   have more than two witnesses.
16       THE COURT:  Okay.  And you --
17       MS. SLAIGHT:  So I would fully expect it won't take -- it
18   wouldn't take more than half an hour or an hour at the absolute
19   maximum.
20       THE COURT:  All right.  And you'll just let the Government
21   know and the Court know who they are at the time that you're
22   deciding to put them on?
23       MS. SLAIGHT:  Yes.  Thank you.
24       THE COURT:  Okay.  Great.
25       Anything else we need to discuss tonight?

1        I'm thinking that we might, given these representations of

2   where we are, end up doing our charging conference in the late

3   afternoon tomorrow, you know, assuming that we have the

4   substantive witness for most of the morning, if not all of the

5   morning.  Given Ms. Slaight's representations that if the

6   defendant puts on a case, it's likely not to be very long, we may

7   have our charging conference tomorrow afternoon.

8        Again, I have to do a plea hearing at 3:30.  If it turns

9   out that we have to do it after that, we can come back at 4:30,

10  and break from the end of the trial evidence presentation.  Let

11  the jury go home, and then we will come back after my plea.

12  That's sort of how I see it potentially breaking down, but it

13  could be before the plea.  We'll just see how it goes.

14       All right.  Anything else?

15       MS. HERTZFELD:  No, Your Honor.

16       THE COURT:  Okay.  Thank you.

17       (Proceedings adjourned at 4:11 p.m.)

18                   **C E R T I F I C A T E**

19

20            I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
21      proceedings in the above-entitled matter.

22

        /s/ Scott L. Wallace                 7/26/19
23      ----------------------------     ---------------
        **Scott L. Wallace, RDR, CRR**         **Date**
24         **Official Court Reporter**

25