UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**          :
                                      :
            **Plaintiff,**            :   Criminal Action
                                      :   No. 16-030
**v.**                                :
                                      :
**CHARLES HILLIE,**                   :   April 3, 2018
                                      :   1:30 p.m.
                                      :
                                      :
            **Defendant.**            :   Washington, D.C.
                                      :
.............................. :


**AFTERNOON SESSION - DAY 4**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE KETANJI B. JACKSON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:    **Andrea Lynn Hertzfeld, Assistant**
                          **U.S. Attorney**
                          U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
                          555 Fourth Street, NW
                          Washington, DC 20530
                          (202) 252-7808
                          Fax: (202) 353-7634
                          Email: Andrea.hertzfeld@usdoj.gov

                          **Kenechukwu O. Okocha, Assistant**
                          **U.S. Attorney**
                          U.S. ATTORNEY'S OFFICE-DISTRICT OF
                          COLUMBIA
                          Sex Offense and Domestic Violence
                          555 Fourth Street, SW
                          10th Floor
                          Washington, DC 20530
                          (202) 252-6604
                          Email: Kenechukwu.okocha@usdoj.gov

```
  APPEARANCES:  Cont.


  For the Defendant:        Joanne D. Slaight, Esq.
                            LAW OFFICES OF JOANNE D. SLAIGHT
                            400 Seventh Street, NW
                            Suite 206
                            Washington, DC 20004
                            (202) 408-2041
                            Fax: (202) 628-0249
                            Email: Jslaight@att.net

  Court Reporter:           Scott L. Wallace, RDR, CRR
                            Official Court Reporter
                            Room 6503, U.S. Courthouse
                            Washington, D.C. 20001
                            202.354.3196
                            scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

# C O N T E N T S

**EXAMINATIONS**                                           **Page**

CONTINUED DIRECT EXAMINATION OF JANIKA ASIAMAH        7
BY MR. OKOCHA
CROSS-EXAMINATION OF JANIKA ASIAMAH                   9
BY MS. SLAIGHT
REDIRECT EXAMINATION OF JANIKA ASIAMAH               35
BY MR. OKOCHA


DIRECT EXAMINATION OF DONNA WRIGHT-MILLER            72
BY MS. SLAIGHT
CROSS-EXAMINATION OF DONNA WRIGHT-MILLER             76
BY MS. HERTZFELD

## EXHIBITS

**DESCRIPTION**

Government's Exhibit 25 marked                       37

Government's Exhibit 14, 15 and 16 admitted          71

<u>**AFTERNOON SESSION, APRIL 3, 2018**</u>

(1:55 p.m.)

THE COURT:  All right.  Is everybody here?  So, in preparing to evaluate the defendant's motion, which was made just before lunch, I checked the rules, and Rule 29, which is a motion for judgment of acquittal rule, clearly states that the motion is supposed to be made after the government closes its evidence or after the close of all of the evidence, and so I think I'm not going to deal with this now.

The defendant's motion is denied without prejudice as premature and can be raised at the appropriate time.  So, with that, I don't have anything else that we need to address right now.

MR. OKOCHA:  Your Honor.

THE COURT:  Mr. Okocha.

MR. OKOCHA:  We have a bit of a request.  We would request that although we requested to rest with this particular witness --

THE COURT:  You haven't rested.  The case is still -- this witness is still open.

MR. OKOCHA:  Right.

THE COURT:  You just had no further questions on direct.

MR. OKOCHA:  Right, Your Honor.  We would request that we reopen for a couple more questions that the government forgot to ask, and we would like an opportunity to ask a couple more

1    questions before Ms. Slaight cross-examines the witness.  We

2    would note that there would be no prejudice.  There has been no

3    questions asked yet on cross-examination, and we just have that

4    brief request.

5         THE COURT:  All right.  Ms. Slaight.

6         MS. SLAIGHT:  I object.  The government has completed --

7    said that it completed its direct exam, and if the government is

8    trying to get out additional information through the MJOA motion,

9    in particular, I particularly object.

10        THE COURT:  But the MJOA motion was premature, Ms.

11   Slaight --

12        MS. SLAIGHT:  -- right --

13        THE COURT:  -- so the government can always ask to

14   requestion a witness or reopen its case, even after the case is

15   closed.  I mean, there's nothing procedurally improper.  The

16   question is, you know, to what extent should the Court allow the

17   government to ask additional questions of the witness who is

18   still on the stand.

19        And so, you know, I suppose it's either allowing a few

20   more questions to be asked now or on redirect allowing the

21   government to go beyond the scope of the cross to ask the

22   questions, or closing it completely, and I don't see any reason

23   for not allowing the government to continue its direct

24   examination.  So that's going to be my ruling.  I think it will

25   be easier than having to deal with it in the sort of redirect or

```
 1    reopening the case request scenario since we haven't even had
 2    cross.  Mr. Okocha will have the witness come.  She was going to
 3    come anyway for the cross-examination.  And you'll just say, I
 4    said I had a few -- I was done, but I actually have a few
 5    additional questions.  All right.
 6            MR. OKOCHA:  Thank you, Your Honor.
 7            THE COURT:  And then you can cross.
 8            MS. SLAIGHT:  Your Honor, if I can just make an ex parte
 9    request.
10            THE COURT:  Yes.
11            (Following ex parte sidebar discussion had on the record:)
12    ████████████████████████████████████████████████████████████
13    ██████████████████████████████████████████████████████████
14    ███████████████████████████████████████████████████████
15    ████████████████████████████████████████████
16             ██████████████████████
17            ███████████████████████████████████████████████████████
18    █████████████
19            ████████████████████████████████████████████████████████████
20    ███████████████████████
21            ████████████████████████████
22            ██████████████████████████
23            (Sidebar discussion concluded.)
24            THE COURT:  I'm just trying to think procedurally whether
25    we should have her wait and be -- that's all right.  That's all
```

1    right.  Why don't you come now.  Why don't you come now.  We'll

2    just do what we've done, which is have you be in the witness

3    stand and have the jury come in.

4         We're ready.  Thank you.

5         (Jury in at 1:59 p.m.)

6         THE COURT:  Good afternoon.  You may have a seat.  The

7    government has asked for permission to ask a few more questions

8    of this witness before we go to cross-examination.  Mr. Okocha.

9         MR. OKOCHA:  Thank you, Your Honor.

10        CONTINUED DIRECT EXAMINATION OF JANIKA ASIAMAH

11   BY MR. OKOCHA:

12   Q.    Now, Janika, good afternoon.

13   A.    Good afternoon.

14   Q.    I know I said I had no further questions, but there are

15   just a couple more questions I would like to ask before I'm

16   done.

17        Now, earlier you testified that there were some instances

18   of touching with regards to Mr. Hillie touching you back at

19   the -- back at Douglas Road, and I wanted to ask if you can

20   recall if there were any other incidences of touching at Douglas

21   Road involving Mr. Hillie and, perhaps, involving any

22   conversations with the deceased friend of his.

23   A.    Yes.

24   Q.    Okay.  Now, can you tell us how that --

25        THE COURT:  The witness is shaking her head.  You wanted

1    to say more?

2         THE WITNESS:  Yes.  That was around the same incident,

3    when he came in and I said that I smelled liquor on his breath.

4    BY MR. OKOCHA:

5    **Q.**    Okay.

6    **A.**    Mmm-hmm.

7    **Q.**    That was the same incident?  That wasn't a different

8    incident?

9    **A.**    No, that wasn't a different incident, that was the same

10   incident.

11   **Q.**    Okay.  Okay.  Can you tell us more about that incident?

12   What happened during that incident?

13   **A.**    I mean, no, I just remember him playing a video of some

14   dude with like long dreads because he used to rap, and he told

15   me he got killed.

16   **Q.**    Okay.  And what specifically happened during that

17   incident?  What did Mr. Hillie do?

18   **A.**    That was the incident when he grabbed my arm.

19   **Q.**    Okay.  And what happened after that?

20   **A.**    He just -- I don't know what you're saying.

21   **Q.**    Did he touch you in a certain place?

22        MS. SLAIGHT:  Objection.

23        THE WITNESS:  Yes, that's when he touched my vagina.

24   BY MR. OKOCHA:

25   **Q.**    Okay.  And how old were you when that happened, if you

1   can recall?

2   **A.**     I don't know, like in the fifth or sixth grade, so I

3   don't really know.

4   **Q.**     Okay.  And after -- you said he touched you on the

5   vagina.  What happened specifically when he touched you on your

6   vagina?  What did he do specifically?  What was the nature of

7   the touch?  Was there anything that happened with regards to

8   that touch besides just mere touching?

9   **A.**     I said he inserted his finger inside of my vagina.

10  **Q.**     Okay.

11          MR. OKOCHA:  Your Honor, I have no further questions.

12          THE COURT:  All right.  Ms. Slaight, cross-examination.

13              CROSS-EXAMINATION OF JANIKA ASIAMAH

14  BY MS. SLAIGHT:

15  **Q.**   Good afternoon, Janika.

16  **A.**   Hello.

17  **Q.**     Now, Mr. Hillie never threatened you; is that right?

18  **A.**   No.

19  **Q.**     Okay.  And he never hit you, right?

20  **A.**   No.

21  **Q.**     Okay.  And he never tried to kiss you, right?

22  **A.**   No.

23  **Q.**     Never tried to hug you, right?  An inappropriate hug.  He

24  never tried to give you an inappropriate hug, nothing other than

25  what you've described to the jury today?

1    **A.**    No.

2    **Q.**    No other incidences.  Okay.  And he never tried to lay on

3    top of you, right?

4    **A.**    No.

5    **Q.**    Okay.  And he never said anything to you about testifying

6    or any investigation, right?

7    **A.**    No.

8    **Q.**    Okay.  Now, you don't know if he had a phone back then,

9    do you?

10   **A.**    I don't recall.

11   **Q.**    Okay.  And when he -- you said that he stayed at -- for

12   example, Good Hope Road.  When he was not around Good Hope Road,

13   he would be staying with his family on 46th Place, right?

14   **A.**    I'm sorry?

15   **Q.**    When he -- he had family -- Mr. Hillie had family on 46th

16   Place, right?

17   **A.**    Okay.

18   **Q.**    Pardon?

19   **A.**    Yes.

20   **Q.**    And he would stay with them sometimes, right?

21   **A.**    I don't know.

22   **Q.**    Now, you had testified -- you had been interviewed by the

23   police; is that right?  You had been interviewed after you

24   called the hotline?  You were interviewed by the police, right?

25   **A.**    Yes.

1    **Q.**    Okay.  And you -- and your interview at that time, you

2    said, was -- you were trying to tell them everything, right?

3    **A.**    Trying to tell who everything?

4    **Q.**    You were talking to the police, you were trying to answer

5    all their questions, right?

6    **A.**    Yes.

7    **Q.**    Okay.  And that was in 2014, just after you came back

8    from North Carolina.  Do you remember that interview with the

9    police --

10   **A.**    Yes.

11   **Q.**    -- right after you called the hotline?  Okay.  Drawing

12   your attention to Exhibit 35, Defense Exhibit 35, the

13   transcript, page 33, do you remember the detective asking, "Do

14   you know where he stays when he's not staying with your mom?

15   Does he have family, do you know?"

16        MR. OKOCHA:  Your Honor, I would object.

17        THE COURT:  Come forward.

18        (Following sidebar discussion had on the record:)

19        MR. OKOCHA:  Your Honor, I would --

20        THE COURT:  I can't hear you.

21        MR. OKOCHA:  I would object to an improper impeachment.

22   It seems she hasn't laid a foundation.

23        THE COURT:  You have to lay a foundation for this being an

24   impeachment in the sense that she doesn't understand or she's --

25        MS. SLAIGHT:  She said she didn't know where he lived,

1    where he stayed, and --

2         THE COURT:  And you're making a reference.

3         MS. SLAIGHT:  She said that he stayed on Douglas Place

4    Northeast when he wasn't staying with her.

5         THE COURT:  All right.  Well, just keep the question just

6    to that.

7         MS. SLAIGHT:  Sure.  I mean, I need -- I need to ask the

8    whole question or -- I don't have to.  I can shorten the question

9    in terms of what's in the transcript.

10        THE COURT:  The particular item that you want to impeach

11   the witness on from what she just said.

12        MS. SLAIGHT:  Right.  So you're not requiring me to repeat

13   the question?

14        THE COURT:  I'm not, but you may need to because she might

15   not remember right now.

16        MR. OKOCHA:  She needs to show her the transcript.

17        THE COURT:  You can show her the transcript and you can

18   say, Do you recall telling the police officer X, but what has to

19   be clear is that she's impeaching because it's pertaining to

20   something that she's already testified to that is different.  All

21   right.  Thank you.

22        (Sidebar discussion concluded.)

23   BY MS. SLAIGHT:

24   Q.   Now, at that time, in 2014 when you were talking to the

25   detectives, do you remember the detective asking, "Do you know

1    where he stays when he's not staying with your mom?  Does he

2    have family?  Do you know where they stay at?"  And you replied,

3    "46th Place"?

4    **A.**    I don't recall him asking me that, but I do know that he

5    has family on 46th Place.

6    **Q.**    And did he stay there sometimes, at 46th Place, to your

7    knowledge?

8    **A.**    Yes.

9    **Q.**    Pardon?

10   **A.**    Yes.

11   **Q.**    Okay.  Now, he didn't get mail at your address, right?

12   He didn't have mail addressed to Douglas Place or Good Hope

13   Road, did he?

14   **A.**    I do not know.

15   **Q.**    Okay.  Did you see any mail addressed to him at either of

16   those locations?

17   **A.**    I don't recall.

18   **Q.**    Okay.  So you never saw any mail addressed to him at

19   those locations?

20   **A.**    I don't recall.

21   **Q.**    Okay.  Now, on -- when you lived on Douglas Road, at

22   first it was you, Kamaria, Jaden, and your mother; is that

23   right, Joyce?

24   **A.**    No.

25   **Q.**    Okay.  And then he came along later, right?

1    **A.**    Kamaria wasn't even born yet.

2    **Q.**    I'm sorry?

3    **A.**    She wasn't even born yet.

4    **Q.**    Okay.  After Kamaria was -- was Kamaria born when you

5    lived on Douglas Road?

6    **A.**    Yes.

7    **Q.**    Okay.  So before Kamaria was born, he wasn't staying

8    there with you; is that right?

9    **A.**    He was.

10   **Q.**    Okay.  He was or wasn't?

11   **A.**    He was.

12   **Q.**    He was.  Okay.  Was there any time that you lived on

13   Douglas Road that he wasn't staying with -- that he wasn't

14   staying there?

15   **A.**    Yes.

16   **Q.**    Okay.  And how long was that, do you think?

17   **A.**    I'm not sure.

18   **Q.**    Okay.  And -- and one of the things that you objected to

19   with your mom was when he -- when Mr. Hillie was around, she

20   didn't want to do things, right?

21   **A.**    I'm sorry?

22   **Q.**    When Mr. Hillie was around, your mom didn't want to do

23   things with you kids; is that right?  She didn't do anything,

24   she just hung out; is that right?

25   **A.**    What do you mean, "she didn't do anything, she just hung

1    out"?

2    **Q.**    Okay.  When Mr. Hillie wasn't around, would she do things

3    with you?  Would she watch TV, go places with you?

4    **A.**    Sometimes.

5    **Q.**    Okay.  And when Mr. Hillie was around, would she still do

6    that?

7    **A.**    I'm sorry, I thought you just asked me when he was

8    around.

9    **Q.**    Okay.  When Mr. Hillie was not around.  I did.

10   **A.**    Yes.

11   **Q.**    First we'll say when Mr. Hillie wasn't around.  You

12   agreed that she did things with you, she went places with you,

13   right?

14   **A.**    Yes.

15   **Q.**    Okay.  When Mr. Hillie was around, was she still doing

16   that?

17   **A.**    Sometimes, just not as often.

18   **Q.**    Not as often.  Okay.  And you were on the Douglas Road

19   address from the fifth to tenth grades, right?

20   **A.**    Ninth grade going into tenth grade.  We moved in the

21   summer.

22   **Q.**    Okay.  So it was the end of ninth grade beginning of

23   tenth grade?

24   **A.**    Yes.

25   **Q.**    And now you said that there was an incident where you

1    were cooking and he touched your buttocks, right?

2    **A.**      Yes.

3    **Q.**      Okay.  And that was over the clothes; is that right?

4    **A.**      Yes.

5    **Q.**      Okay.  And the second incident was where he went -- and

6    also over the clothes, but you've said that he actually -- it

7    hurt that he touched your vagina; is that right?

8    **A.**      Yes.

9    **Q.**      And between those incidents, that was about a year; is

10   that right?

11   **A.**      I'm not sure.

12          THE COURT:  Counsel, let me have you approach.

13          (Following sidebar discussion had on the record:)

14          THE COURT:  So, I'm concerned because I hear you

15   characterizing her former testimony in a way that's inconsistent

16   with what she testified to.  The last two instances that you

17   talked about, you said that both over the clothes, and she

18   agreed, but that is not what her direct testimony said with the

19   touching of the vagina and at this point with the butt incident.

20          MS. SLAIGHT:  The first butt she said over the clothes --

21          THE COURT:  She said --

22          MS. SLAIGHT:  She said he lifted up the pants, but --

23          THE COURT:  That's not what I understood, but maybe --

24   definitely the vagina incident, she said he, in fact, penetrated

25   her with his fingers, so that was not over the clothes, and when

1    you just characterized it to her, you said the last two incidents

2    you talked about you said were both over the clothes -- okay

3    that's me.  I'm sorry.  That's me.  I think you did say you asked

4    her about the vagina incident and said over the clothes.

5          MS. SLAIGHT:  I did.

6          THE COURT:  So I just want to be careful because I don't

7    think --

8          MS. SLAIGHT:  I did, and this is where I really had a lot

9    of trouble hearing, and that's what I thought she said, so --

10         THE COURT:  All right.  Well, she said that was the

11   penetration with the finger, the vagina incident, so I just want

12   to make sure that we're -- if you have other things you want to

13   ask her to clarify, you can stop and do that, all right.  Thanks.

14         (Sidebar discussion concluded.)

15         MS. SLAIGHT:  If I could have the Court's indulgence for a

16   moment.

17   BY MS. SLAIGHT:

18   Q.    Okay.  The first incident, you said, was in the kitchen;

19   is that right?

20   A.    Yes.

21   Q.    Okay.  And it's right that you were wearing drawstring

22   pants; is that right?  You were wearing pants?

23   A.    Yes.

24   Q.    Okay.  And he touched you over your pants, didn't he?

25   A.    Yes.

1    **Q.**    Okay.  And the second incident that you talked about

2    where you said that he put his finger, used his finger in your

3    vagina; is that right?

4    **A.**    Yes.

5    **Q.**    Okay.  And that was also outside of your pants, wasn't

6    it?

7    **A.**    Yes.

8    **Q.**    Okay.  And now, between the first incident and the second

9    incident was about a year, wasn't it?

10   **A.**    I'm not sure.

11   **Q.**    Okay.  The first incident was when you were in fifth

12   grade, was that right, or no?

13   **A.**    Yes.

14   **Q.**    Pardon?

15   **A.**    Yes.

16   **Q.**    Okay.  And was the second incident in sixth or seventh

17   grade?  Was that right?

18   **A.**    I know that I said between the fifth and the sixth grade.

19   **Q.**    Pardon?

20   **A.**    I said between the fifth and the sixth grade.

21   **Q.**    All right.  And so you don't know how much time passed

22   between the two incidents?

23   **A.**    No.

24   **Q.**    Now, you didn't tell your mom about this incident with

25   the finger; is that right, where he touched outside your

1    clothes?

2    **A.**    I don't recall.

3    **Q.**    Okay.  Do you remember testifying in the Grand Jury?  You

4    testified about this -- about what happened, right, about a year

5    ago; is that right -- I'm sorry, about two years ago in October

6    of 2014?  Do you remember that?

7    **A.**    I'm sorry, that's not two years ago.

8    **Q.**    You're right.  Did you testify in October of 2014?

9    **A.**    I do.  Yes, I remember that.

10   **Q.**    Okay.  And you were under oath, right?

11   **A.**    Yes.

12   **Q.**    Okay.  And do you remember being asked about -- I'll

13   reference page 26 -- being asked if you told her about that

14   later, and you said "no"?

15   **A.**    I don't recall.

16   **Q.**    Did you -- so you don't remember at this point whether or

17   not you told her about it later, about that incident later; is

18   that right?

19   **A.**    No, I don't remember.

20   **Q.**    Okay.  And you don't remember your testimony; is that

21   right?  It was a long time ago, right?  You don't remember what

22   you said in your testimony about whether or not you told your

23   mom about the incident with the finger?

24        MR. OKOCHA:  Your Honor, I would object and ask that she

25   let the witness answer the question.

1          THE COURT:  If you know the answer, you may answer.

2          THE WITNESS:  I already told her I don't recall.

3          THE COURT:  Ms. Slaight, can you move on.  She says she

4     doesn't remember.

5          MS. SLAIGHT:  Okay.

6     BY MS. SLAIGHT:

7     Q.     Now, you told your mom about the shower incident, you

8     said; is that right?  Did you tell your mom?

9     A.     On 2645 Douglas Road?

10    Q.     Douglas Road, yes.

11    A.     Yes.

12    Q.     Okay.  And actually, he didn't touch you in the shower;

13    is that right?  He just stared at you; isn't that right?  Do you

14    remember?  It was a while ago, wasn't it?

15    A.     Yeah, it was a while ago.

16    Q.     Do you remember whether or not he touched you, he

17    actually touched you in the shower or he just stared at you?

18    A.     I remember him staring at me and touching my boob.

19    Q.     Okay.  Do you remember being asked -- Exhibit 36.

20    October 1st of 2014, you mentioned there was a time when you

21    were showering and you answered "yes," and you -- And you were

22    asked, "But did he touch you at that time?"  And you said "no"?

23    A.     Okay.  I don't recall that.

24    Q.     Okay.  And --

25         MR. OKOCHA:  Your Honor, could we get a line?

1          MS. SLAIGHT:  Page 20 -- 26 to 27, line 1.

2          THE COURT:  I'm sorry, Mr. Okocha?

3          MR. OKOCHA:  I just wanted to know the line for the --

4          THE COURT:  The line.  Thank you.

5          MS. SLAIGHT:  Page 26 to line 27, page 1 -- page 27, line

6     1.

7          THE COURT:  Okay.

8     BY MS. SLAIGHT:

9     Q.    And those two instances that we just talked about were

10    the only times, the instances where you said he touched your --

11    touched your -- over your clothes.  Both instances were the only

12    instances that he touched you at Douglas Place; is that right?

13    A.    Can you repeat that, please?

14    Q.    Pardon?

15    A.    Can you repeat that, please?

16    Q.    Sure.  We just talked about -- you said that he touched

17    you at Douglas Place -- while you were cooking -- outside of

18    your clothes; is that right?

19    A.    Yes.

20    Q.    Okay.  And you said that he touched you outside of your

21    clothes but towards your vagina --

22    A.    Not towards -- I said not towards, inside.

23    Q.    Inside your vagina.  Outside your clothes, but inside

24    your vagina on Douglas Place; is that right?

25    A.    Yes.

1    **Q.**    Okay.  And those are the only two times that he actually

2    touched you when you were in Douglas Place; is that right?

3    Isn't that what you had previously testified?  Do you remember?

4    **A.**    Well, I already told you that I didn't recall, but I know

5    I just stated that he touched me on my breasts.

6    **Q.**    Okay.

7    **A.**    So would that be considered another incident?

8    **Q.**    Okay.  Do you remember being asked, page 29, line 20, "So

9    you talked about the first time when he touched you."  That

10   would be --

11   **A.**    -- in the kitchen --

12   **Q.**    -- In the kitchen.

13        THE COURT:  What document are we referring to?

14        MS. SLAIGHT:  Pardon?

15        THE COURT:  What document?  You just said page.

16        MS. SLAIGHT:  Grand jury.

17        THE COURT:  Grand Jury testimony.

18        MS. SLAIGHT:  Yes, Exhibit 36.

19   BY MS. SLAIGHT:

20   **Q.**    So you talked about the first time when he touched you,

21   and then you talked about the fingers incident and the shower

22   where he just looked, and the question is, "Were there other

23   times after that before you moved out of Douglas that he came

24   and then touched you?" and you answered "no".

25   **A.**    Okay.

**Q.**     Do you remember saying that?

**A.**     No, I don't.

**Q.**     Okay.  That was a lot closer in time to when you actually lived on Douglas Place, isn't it, 2014, when you gave the testimony?

**A.**     Yes.

**Q.**     Okay.  Now, you said that you had seen pictures on the computer, right?

**A.**     Yes.

**Q.**     Okay.  And they were not -- you didn't recognize them as the videos; is that right?

**A.**     Yes.

**Q.**     Okay.  And you were using his -- you were using the -- you said that you were using his account, right?

**A.**     Yes.

**Q.**     Okay.  And so you had knowledge -- you could use -- anybody could use each other's accounts there; is that right, there on that laptop?

**A.**     I had my own account, but I decided to be sneaky and use his so that I could get on line longer.

**Q.**     Did you let other people -- was yours the quiet storm child account?

**A.**     No.

**Q.**     Okay.  Did you let other -- was that your mother's?

**A.**     Yes.

1    Q.    And did you put things in that quiet storm child account?

2    A.    No.

3    Q.    Okay.

4    A.    Not that I recall.

5    Q.    Did you -- but you were able to get on the other account,

6    the account where you said that was Mr. Hillie's account, right?

7    A.    Yes.

8    Q.    Okay.  Now, you said that in -- I guess it would be 2014,

9    okay, you were staying with your boyfriend and his mother at

10   some points; is that right?

11   A.    Yes.

12   Q.    And that was about a year and a half after the last --

13   maybe even two years after the last incident that you report

14   today, correct?

15   A.    I'm sorry?  Can you repeat that?

16   Q.    The incidents that you reported today all took place on

17   Douglas Road, correct?

18   A.    No.

19        MR. OKOCHA:  Objection.

20   BY MS. SLAIGHT:

21   Q.    Except for that -- the one we'll get to, okay.

22   A.    No, you asked me -- you said, Is that all that I

23   testified on today, and no, it's not.

24   Q.    Okay.  My error.  You had a number of incidents that you

25   discussed today on Douglas Road, correct?

1    **A.**    Yes.

2    **Q.**    Okay.  And when you moved to Good Hope, the Good Hope

3    apartment, you moved in 2000 -- you moved in about June or July

4    of 2012?

5    **A.**    I don't recall the year.

6    **Q.**    Okay.  When you moved to the Good Hope apartment, the

7    first six months before the incidents with Jaden, you don't say

8    that he -- you're not saying that he touched you, right?

9         At Good Hope in that time, after you moved to Good Hope

10   from Douglas, he didn't touch you, right, inappropriately?

11        MR. OKOCHA:  Your Honor, I object.  I'm confused.  It's a

12   little vague, the question.

13        THE COURT:  Can you try to clarify exactly the timeframe

14   that you're addressing.

15   BY MS. SLAIGHT:

16   **Q.**    You moved from Douglas Road to Good Hope Road in about

17   July of 2012, correct?

18   **A.**    I thought it was June.  I thought it was 2013.

19   **Q.**    June 2012.  Okay.

20        THE COURT:  I'm sorry, wait.  I didn't hear her answer.

21        THE WITNESS:  I said I thought it was June and I thought

22   it was 2013.

23   BY MS. SLAIGHT:

24   **Q.**    You were thinking it's 2013?  Do you know when this

25   incident with Jaden was reported, when that occurred?

1    **A.**     No, I don't recall.

2    **Q.**     Okay.  My question to you is:  You moved -- at some point

3    you moved out of Douglas Road, correct, and moved to Good Hope?

4    **A.**     Correct.

5    **Q.**     Okay.  And then there was, between the time that you

6    moved into Good Hope and the time -- and there was a time period

7    before this incident with Jaden, right?  You didn't move into

8    Good Hope, and then there was an incident with Jaden and Mr.

9    Hillie where he's -- where you said you heard the slap?  How

10   much after you moved to Good Hope did you hear this incident

11   with the slap?

12   **A.**     I don't know.

13   **Q.**     Okay.

14   **A.**     I can't give you the time.  I can't give you the date.  I

15   can't give you that.

16   **Q.**     During that time period, whatever it was, during that

17   time period between the time that you -- between the time from

18   when you lived on Douglas until this incident with Jaden, Mr.

19   Hillie didn't touch you inappropriately; is that right?

20            MR. OKOCHA:  Your Honor, I would object again and ask for

21   some clarification on what time period we're talking about.

22            THE COURT:  Overruled.

23            THE WITNESS:  I'm just --

24   BY MS. SLAIGHT:

25   **Q.**     Pardon?

**A.**    Are you asking me, was there a period in time where there wasn't any abuse going on?

**Q.**    Where he wasn't touching you inappropriately, yes.

**A.**    Yes, there's been times that -- there's been spaced out time where he hasn't touched, yes.

**Q.**    Okay.  And in 2014, we started to talk about in 2014, you started staying with your boyfriend and your boyfriend's mother, right?

**A.**    I'm sorry, what did you say again?

**Q.**    In 2014 --

**A.**    Um-hmm.

**Q.**    In May of 2014, you started to stay with your boyfriend and your boyfriend's mom, right?

**A.**    I don't know if it was in May.  I'm not sure of the month.

**Q.**    Do you know the year?

**A.**    Yes, it was 2014.

**Q.**    Okay.  Was that at the end of the school year or the beginning of the school year, do you know?

**A.**    I'm not sure.  I just know that --

**Q.**    Do you know if it was warm out or cold out?

     THE WITNESS:  Excuse me, I was trying to answer the question thoroughly.

BY MS. SLAIGHT:

**Q.**    I'm sorry.  I apologize.

**A.**     Yes.  I said that I do not recall the month, I just know that it was my eleventh grade year.

**Q.**     Okay.  And your mom sent you down to North Carolina, right?

**A.**     Yes.

**Q.**     Okay.  And it was when you came back that -- you didn't like it down there, right?  You didn't want to be down there?  You didn't think it was fair, right?  Did you want to stay in North Carolina when you got down there?

**A.**     No, I didn't even want to go.

**Q.**     Okay.  Okay.  And it was your mother who sent you down there, right?

**A.**     Yes.

**Q.**     Okay.  And you wanted to come back, right?

**A.**     Yes.

**Q.**     Okay.  And it was right after you came back that you contacted Child and Protective Services, right?

**A.**     Yes.

**Q.**     Okay.  And in fact, it was just within a day or two of when you came back, right?

**A.**     Yes.

**Q.**     Okay.  Now, you said -- do you remember talking to social workers?  Okay, after the Jaden incident, do you remember talking to social workers in January of 2013?  Okay, after Jaden left the home, do you remember talking to social workers?

1    **A.**     I remember talking to a social worker yes.

2    **Q.**     You never talked -- you said what?

3    **A.**     I said yes.

4    **Q.**     Oh, you do remember it.  I'm sorry.  Okay.  And you

5    talked to them two times, didn't you?  You talked to one in

6    person, right?

7    **A.**     Yes.

8    **Q.**     Okay.  And you told that -- you told the social worker at

9    that time that you felt safe at the home, right?

10   **A.**     Yes.

11   **Q.**     Okay.  And then in -- a few days later you talked to

12   another social worker at the school, right, at John Marshall

13   school?

14   **A.**     I'm sorry?

15   **Q.**     Did you -- or Thurgood Marshall school.  I'm sorry.  You

16   talked to the social worker at home, right, the first time?

17   **A.**     Yes.

18   **Q.**     And you told her you felt safe.  Was your mother at home

19   when you did that?

20   **A.**     Yes.

21   **Q.**     Okay.  Did your mother -- were you asked to go to another

22   room or the same room?  Did you talk to her?

23   **A.**     No, I was asked -- I stayed in the living room.

24   **Q.**     Okay.  And where was your mother during this?

25   **A.**     In her room.

1    **Q.**    In her room?  Okay.  Was the door closed or open?

2    **A.**    I don't recall.

3    **Q.**    Pardon?

4    **A.**    I don't recall.

5    **Q.**    Okay.  And then a few days later you talked to a social

6    worker at the school, right?

7    **A.**    And I did not recall that.

8    **Q.**    Okay.  Do you remember somebody coming to your school at

9    all and talking to the person at your school?

10   **A.**    I do not recall that.

11   **Q.**    Okay.  Do you remember whether you told anybody, a social

12   worker or a police officer, that Mr. Hillie visits sometimes but

13   he doesn't reside there at your home?

14   **A.**    When was I supposed to have said this?

15   **Q.**    Pardon?

16   **A.**    When was I supposed to have said this?

17   **Q.**    Within a month or two after the Jaden incident.  Do you

18   remember talking to a social worker or police officer at the

19   Marshall school?

20   **A.**    No, I do not recall speaking to anyone at my old school.

21        MS. SLAIGHT:  Okay.  Your Honor, could we approach?

22        THE COURT:  Yes.

23        (Following sidebar discussion had on the record:)

24        MS. SLAIGHT:  Your Honor, I can go through each question

25   with her, but it seems to make more sense to just bring the

1    social worker in, and I don't want to be prohibited from going

2    into the details with the social worker if what she said -- if

3    the Court -- if the -- if the parties have an objection to me

4    just -- she said she doesn't recall it, so it seems to end it

5    right there.

6         MS. HERTZFELD:  I don't think it's proper impeachment.

7    She doesn't remember.

8         THE COURT:  No, she's asking whether when the defense has

9    its case -- is this what you're saying -- she can bring in the

10   social worker and go into the details of the discussions that she

11   has evidenced that Janika had with her, even though she will not

12   have covered it with this witness because this witness said says

13   she doesn't remember the conversation.  I don't think there's

14   anything improper about you --

15        MS. SLAIGHT:  I don't think so either, but out of an

16   abundance of caution, I don't want anybody saying that --

17        THE COURT:  No, I think it's fine.  I'm allowing her to,

18   during her direct examination of any witness that she would like

19   to bring in, go into whatever testimony that witness can offer

20   about this situation, so long as it's relevant.  And I'm not

21   precluding her from asking the witness about conversations that

22   this witness does not remember.

23        MR. OKOCHA:  Are we talking about witnesses that -- are we

24   talking about for the purpose of impeachment or inconsistency --

25        THE COURT:  No, we're talking about -- the government

1    rests and the defense decides to call the social worker, it

2    sounds as though Janika is saying she doesn't remember talking to

3    the social worker, and my read of what Ms. Slaight is asking, and

4    you can correct me if I'm wrong, is whether she's going to be

5    precluded from talking with the social worker about conversations

6    that she may have had with Jaden on the grounds -- excuse me,

7    with Janika, on the grounds that Janika didn't testify.

8         MR. OKOCHA:  On those narrow conversations?

9         THE COURT:  Yes, on the testimony that the social worker

10   can offer pertaining to this entire situation that I would assume

11   that the defense is entitled to make whatever case they want to

12   make on their direct examination during their time.

13        MR. OKOCHA:  Let me just confer.

14        (Discussion had off the record.)

15        MR. OKOCHA:  We'll reserve our objections to specific

16   questions, but we think that based on {indiscernible} --

17        THE COURT REPORTER:  I'm sorry, say that again.

18        MR. OKOCHA:  I said we'll reserve our objection for

19   specific questions that are asked regarding the witness's memory

20   of what Janika said, but as a whole we have no problem with her

21   bringing that back up.  -

22        THE COURT:  Well, I don't think that's what you're asking.

23   Are you asking to bring Janika back?

24        MS. SLAIGHT:  No, the social worker.  I don't see how they

25   can -- that's the whole point.  I'm going to ask the social

1   worker about the entire interview because she says she doesn't

2   remember it, and I can't impeach her -- I could go through every

3   single question and answer that the social worker said she said,

4   but it seems sort of silly --

5         THE COURT:  I don't think there's any problem with you

6   calling the social worker and asking her any question that you

7   think fits within her frame of knowledge.

8         MS. SLAIGHT:  Thank you.

9         THE COURT:  Thank you.

10        (Following sidebar discussion had:)

11  BY MS. SLAIGHT:

12  Q.    Okay.  You were saying that you don't remember talking to

13  a social worker at the school, right?

14  A.    I don't.

15  Q.    Okay.  Do you remember talking to a detective in April of

16  2013 at the school separately?  Do you remember that at all?

17  A.    No.

18  Q.    Okay.  So you don't remember what was -- what, if

19  anything, was asked or answered during that time?

20  A.    Because I don't recall speaking to her.

21  Q.    Now, you never saw -- let me ask you this:  Did you -- do

22  you remember telling a social worker or a police officer that

23  Jaden sometimes made things up?

24  A.    No, I don't recall that.

25  Q.    Okay.  Now, you never saw Mr. Hillie touch Jaden

1  inappropriately with your own eyes; is that right?

2  **A.**    No.

3  **Q.**    Okay.  And you didn't tell your mother about any issues

4  or possible issues with Jaden, correct?  In other words, you

5  just talked to your mother about issues that -- you said that

6  you talked to your mother about issues that you had with Mr.

7  Hillie; you didn't talk to your mom about anything that was --

8  any possible issues with Jaden, correct?

9  **A.**    I always told her to do it.

10  **Q.**    Pardon?

11  **A.**    I've always told her to do it.

12  **Q.**    Okay.  And you have no information that Kamaria was

13  touched inappropriately, correct?

14  **A.**    No.

15  **Q.**    And Mr. Hillie has never threatened you; is that right?

16  **A.**    That's correct.

17  **Q.**    Okay.  And he's never said anything about any

18  investigation or case in the last five years or ever to you; is

19  that right?

20  **A.**    Correct.

21  **Q.**    Okay.

22       MS. SLAIGHT:  No further questions.

23       THE COURT:  All right.  One more round here.  Let me ask

24  Mr. Okocha, do you have any redirect?

25       MR. OKOCHA:  Yes, Your Honor.  I ask for the Court's

1    indulgence for just one moment.

2         THE COURT:  Yes.

3         (Brief pause in proceedings.)

4         MR. OKOCHA:  Thank you, Your Honor.

5              REDIRECT EXAMINATION OF JANIKA ASIAMAH

6    BY MR. OKOCHA:

7    Q.    Now, Janika, Ms. Slaight asked you a couple of questions

8    about incidences happening at 2645 Douglas Road.

9         Specifically about instances happening in the shower at

10   2645 Douglas Road, do you recall an incident where the defendant

11   or Mr. Hillie touched you when you were in the shower?

12   A.    Yes.

13   Q.    Now, she also asked you about you testifying with regards

14   to that incident.  Do you recall her asking you that question?

15   A.    Yes, I do.

16   Q.    And she made reference to a Grand Jury transcript from

17   October 2014.

18   A.    Yes.

19   Q.    And when she was -- when you were in the Grand Jury in

20   October of 2014, did they have a request that you adopt any

21   certain statements, previous recorded statements when you were

22   in the Grand Jury?

23   A.    I'm sorry, can you rephrase that?

24   Q.    I'll rephrase the question.  In fact, I'll ask the

25   question a little bit differently.  Prior to going into the

1    Grand Jury in October of 2014, did you talk to any officers in

2    association with this case, any detectives, any social workers

3    when you came back from North Carolina?  Did you talk to any

4    officers --

5    **A.**    Yes.

6    **Q.**    -- or any social workers?  Yes, you did.  Okay.  Now,

7    when you talked to the officers and social workers, was that

8    conversation recorded?

9    **A.**    Yes.

10   **Q.**    And do you remember viewing that conversation that you

11   had that was recorded with the officer and social worker?

12   **A.**    Do I remember the conversation?

13   **Q.**    Did you see it?  After it was recorded, did you have a

14   chance to see that recording?

15   **A.**    Yes.

16   **Q.**    Okay.  And then after viewing that recording, did you

17   have an opportunity to adopt or ascent to the statements, agree

18   to the statements that you made in that recording when you went

19   into the Grand Jury and testified?

20   **A.**    I don't recall.

21   **Q.**    All right.  Do you remember in the Grand Jury --

22   Actually, let me see if the Grand Jury transcript might refresh

23   your recollection.  I'm going to go to a specific page.

24        Court's indulgence.  I'm going to ask for you to review

25   page 17 of the October 1st, 2014 transcript.  Read from the

1    beginning of page 17, maybe to page 18, and see if it refreshes

2    your recollection if you were able to adopt a certain recording

3    when you were in the Grand Jury, okay.

4    **A.**    Okay.

5    **Q.**    Go ahead and take your time and read page 17 all the way

6    up to the beginning of page 18, and when you're done, you can

7    look up.

8            MR. OKOCHA:  And just for the record, I'm going to have

9    her -- I'm going to mark this as Government's Exhibit 25.

10           THE COURT:  It will be so marked.

11           (Government's Exhibit 25 marked.)

12   BY MR. OKOCHA:

13   **Q.**    Okay.  Does that refresh your recollection?

14   **A.**    Yes.

15   **Q.**    I'll take Government's Exhibit Number 25 back.  So, in

16   the Grand Jury, did you adopt the recorded statement that you

17   made to the detectives as part of your testimony in the Grand

18   Jury?

19   **A.**    Yes.

20   **Q.**    Okay.  Now, when you spoke with the detectives when you

21   came back -- prior to coming into the Grand Jury -- from North

22   Carolina, do you remember the conversation you had about what

23   Mr. Hillie did to you when you were in the shower?

24           MS. SLAIGHT:  May we approach, Your Honor.

25           (Following sidebar discussion had on the record:)

1      MS. SLAIGHT:  Your Honor, a prior consistent statement can

2 only be used to rebut a charge of recent fabrication, and that's

3 not what's happening here.

4      MR. OKOCHA:  I would disagree.  I think she spent a long

5 time on cross-examination trying to make it seem like the witness

6 was being untruthful when she said that the defendant touched her

7 breasts in the shower.  She was saying previously that she

8 testified in the Grand Jury that there was no touch.

9      THE COURT:  That is correct.  There was an indication from

10 the defense in the context of cross-examination that she was not

11 being truthful here today about her testimony related to the

12 touching based on her prior statement.

13      MS. SLAIGHT:  She could just be wrong.  I mean, it doesn't

14 necessarily mean she's being untruthful, and the same motive

15 existed, to fabricate existed in the police testimony as the

16 Grand Jury because both of them occurred after she was -- she

17 said she had, you know, decided to come forward and say

18 everything.

19      THE COURT:  I guess I don't understand the objection.  She

20 previously testified before the Grand Jury, according to your --

21 the testimony that you brought out, that she had not been

22 touched, and now Mr. Okocha is trying to bring in a statement

23 that was prior to that --

24      MR. OKOCHA:  Yes, Your Honor.

25      THE COURT:  -- indicating that she had been touched.  So

1    we do have an inconsistent statement and he should be allowed to

2    make that clear to the jury.

3         MS. SLAIGHT:  No, Your Honor, because the time period, she

4    had the same motive at the time of the Grand Jury statement and

5    the time that she gave the interview.  So her prior consistent

6    statement doesn't enlighten --

7         THE COURT:  You mean that the statement, the Grand Jury

8    statement is not inconsistent with what she said in the Grand

9    Jury and what she's saying today?  In other words, the relevant

10   timeframe is what she testified to today and whether she had

11   previously made a statement that is consistent with that, and

12   so -- and whether there's been a question, not whether her

13   testimony today is truthful, which you have raised in the context

14   of pointing out her Grand Jury testimony.  So I'm going to allow

15   Mr. Okocha to bring in a prior statement of hers that is

16   consistent with what she's saying here today and that is

17   different from what you brought out on cross-examination.  You

18   can proceed.

19        (Sidebar discussion concluded.)

20   BY MR. OKOCHA:

21   Q.   Janika, we were talking about the interview that you had

22   with the detective and the social worker or the agent from CFSA.

23   And during the interview, do you recall talking at all about

24   what the defendant, what Mr. Hillie did to you when you were in

25   the shower?  Did you share that with them?

1    **A.**    I don't recall off the top of my head, no.

2    **Q.**    That's fine.

3         MR. OKOCHA:  I have what's marked as Government's Exhibit

4    Number 26, and I'd like to approach the witness to see if that

5    exhibit, which is the recorded statement transcript, would

6    refresh her recollection, Your Honor.  May I?

7         MS. SLAIGHT:  May I have the page reference, please?

8         MR. OKOCHA:  Yes.  It should be page 11.

9         THE COURT:  Of government's 26?

10        MR. OKOCHA:  That's correct, Your Honor.

11        THE COURT:  Yes.

12   BY MR. OKOCHA:

13   **Q.**    I'm showing you what's marked as Government's Exhibit 26.

14   Can you read page 11 all the way through to the next page on

15   page 12 and see if it refreshes your recollection of whether or

16   not you discussed what happened in the shower?

17        (Brief pause in proceedings.)

18   **A.**    I have a question.

19        (Discussion had off the record.)

20        THE COURT:  The witness can't ask any questions other than

21   just clarifying where you want her to read.

22        MR. OKOCHA:  You have to just read it, and if it's

23   unclear, just keep reading.

24        (Discussion had off the record.)

25        THE WITNESS:  Okay.

1          (Brief pause in proceedings.)

2          MR. OKOCHA:  Your Honor, we have Government's Exhibit

3     number 26.

4     BY MR. OCHOA:

5     Q.    Did reading Government's Exhibit Number 26 help refresh

6     your recollection as to whether or not you told the

7     investigators back then when you came back from North Carolina

8     about the touching of your breasts in the shower?

9     A.    Yes.

10    Q.    And did you, indeed, tell the investigators back then

11    that Charlie, Mr. Charlie touched you on your breasts in the

12    shower?

13    A.    Yes.

14    Q.    Okay.  Now, there's one more thing I wanted to clarify.

15    Defense counsel asked you questions about the amounts and types

16    of touchings that happened when you were on Douglas Road.

17         Now, I wanted to make sure I understood clearly when it

18    comes to the amounts and types of touchings.  You had indicated

19    previously that there was a touching that had occurred to you

20    when Mr. Hillie was intoxicated and you had tried to leave; is

21    that correct?

22    A.    Yes.

23    Q.    And during that touching, you were in the dining room

24    area; is that right?

25         MS. SLAIGHT:  I'm sorry, I cannot hear the --

```
 1            THE WITNESS:  Yes.
 2            THE COURT:  Yes, make sure you're talking right into --
 3            THE WITNESS:  I put it in.
 4            MS. SLAIGHT:  Actually, I'm sorry, it's not the witness,
 5   it's the prosecutor I can't hear.
 6            THE COURT:  Push the microphone up and reask the question,
 7   please.
 8   BY MR. OKOCHA:
 9   Q.    Is it correct that when you spoke about this earlier,
10   this touching that happened to you when the defendant or Mr.
11   Hillie was intoxicated, you said you were in the dining room;
12   was that correct?
13   A.    Yes.
14   Q.    And can you tell us a little bit about what you did when
15   you noticed him coming in?
16            MS. SLAIGHT:  Objection.
17            THE COURT:  Overruled.
18   BY MR. OKOCHA:
19   Q.    What did you do when you noticed him coming into the
20   dining room?
21   A.    I just remember counting down.
22            THE COURT:  I'm sorry, you just --
23            THE WITNESS:  I just remember counting down, like watching
24   the microwave waiting for my noodles to stop, and then I tried
25   to, like, hurry up and get them and go in the room.
```

1   BY MR. OKOCHA:

2   **Q.**     You tried to hurry up and get up and go in the room?

3   **A.**     (Nodded head affirmatively.)

4   **Q.**     And what happened during the course of that touching?

5   What did he do?

6   **A.**     Oh, this is when he grabbed my arm.

7   **Q.**     And what part of your body did he touch?

8   **A.**     He touched my vagina.

9   **Q.**     Okay.  And you also talked about a conversation you had

10  with the defendant when he was showing you videos.  Do you

11  remember you were talking about that?

12  **A.**     Yes.

13  **Q.**     And where was he showing you those videos?

14  **A.**     In the living room.

15         MS. SLAIGHT:  Objection.

16         THE WITNESS:  Like, the TV.

17         MS. SLAIGHT:  Beyond the scope.

18  BY MR. OKOCHA:

19  **Q.**     I'm trying to just clarify the touchings.

20         (Following sidebar discussion had on the record:)

21         THE COURT:  We have so many incidents here that we're

22  trying to keep track of.

23         Ms. Slaight, what is your objection?

24         MS. SLAIGHT:  It's over the scope of the

25  cross-examination, and it's already been covered in direct.  He's

1    just repeating what he's already asked her, but it's definitely

2    over the scope of my cross.

3         MR. OKOCHA:  May I just say that she narrowed in on

4    certain specific numbers of touchings that happened.  She said

5    that it only happened twice on Douglas Road and it happened two

6    times on Douglas Road, and I think it's --

7         THE COURT:  Right, but you haven't really clarified that

8    you're talking about a particular place right now, so you mean

9    the videos on Douglas Road?

10        MR. OKOCHA:  Yes, Your Honor, I'll clarify.

11        THE COURT:  And how many times, is it the government's

12   position, that there were touchings on Douglas Road?

13        MR. OKOCHA:  That there were four touchings on Douglas

14   Road, and she said two.

15        THE COURT:  She did say two.

16        MR. OKOCHA:  The shower was one.

17        MS. SLAIGHT:  The Grand Jury testimony was two.  I

18   repeated and read back to her the Grand Jury.

19        THE COURT:  Understood, but then we have the shower one

20   that it is clear that is on the table now given the testimony

21   that's been presented.  So what is the fourth?  Is it this video

22   one?

23        MR. OKOCHA:  That's the --

24        THE COURT:  Did you ask her about the video one during

25   your examination?

1          MR. OKOCHA:  I did, Your Honor, I did.

2          THE COURT:  And did she testify to it in terms of a

3    touching?

4          MR. OKOCHA:  She said there was a touching that occurred

5    during that --

6          THE COURT:  Okay.  I'm going to allow it because the

7    cross-examination did try to clarify the number of touchings, and

8    to the extent that the government counsel is going over that

9    issue of how much touchings happened in this location, it's

10   within the scope.

11         (Sidebar discussion concluded.)

12   BY MR. OKOCHA:

13   Q.    Now, Jaden, we talked about what happened with the soup

14   and the -- I'm sorry, the noodles in the kitchen and trying to

15   leave when the defendant approached.

16   A.    The dining room.

17   Q.    I'm sorry?

18   A.    The dining room.

19   Q.    The dining room when Mr. Charlie approached you and you

20   tried to leave.  And then you talked about talking to him about

21   watching a video; is that right?

22   A.    Um-hmm.

23   Q.    And where did that occur?

24   A.    In the living room.

25   Q.    And who was in that video?

1   **A.**     A friend of his.

2   **Q.**     And what happened during that incident?

3   **A.**     During what incident when he was telling me about his

4   friend?

5   **Q.**     Yes.

6   **A.**     It wasn't in that moment.

7   **Q.**     Okay.  It happened later?

8   **A.**     No.  When he first came in and, you know -- he was

9   drinking and he was talking, and when he first initially came

10  in, he was already talking about a friend that had passed away.

11  **Q.**     Okay.

12  **A.**     And he went, turned the video on.  I was clicking, like

13  just waiting for my noodles to hurry up.  By then he came over

14  there near the dining room as I'm trying to hurry up and walk

15  off, he grabs my arm, pulls me back, starts rubbing on my

16  vagina, and then that's when he stuck his finger in.

17  **Q.**     Okay.

18  **A.**     I just didn't go in depth and in detail when you first

19  asked me.

20  **Q.**     Okay.

21          MR. OKOCHA:  No further questions, Your Honor.  Well,

22  actually, one second.  No further questions, Your Honor.

23          THE COURT:  All right.  You may step down.  Thank you.

24          THE WITNESS:  Thank you.

25          THE COURT:  All right, ladies and gentlemen.  I think this

1    would be a good time for us to take our break.  I'm going to have

2    us break for just about ten minutes so I can go over some matters

3    with the attorneys.

4            (Jury out at 2:56 p.m.)

5            THE COURT:  All right.  Let's use this time just to sort

6    of take stock of where we are.  The first thing is that I was

7    going to give them my standard limiting instruction with respect

8    to statements that Janika testified to that other people made to

9    her, and I did not do so.  That was inadvertent.  I will give

10   them that instruction when the jury returns.  With respect to

11   where we are, does the government have any additional witnesses?

12           MS. HERTZFELD:  No, Your Honor.  I think all that remains

13   at this stage is -- there's been a stipulation entered into by

14   the parties regarding the authenticity of the birth certificates

15   of each, Jaden and Janika, as well as the birth certificate of

16   the defendant.  And so at this point the government would just

17   ask the opportunity to move the stipulation into evidence in

18   front of the jury, as well as the three birth certificates that

19   were the subject of that stipulation, and I think at that point

20   the government intends to rest.

21           THE COURT:  All right.  Ms. Slaight, the birth

22   certificates, you don't have a problem with those.  You entered a

23   stipulation.

24           MS. SLAIGHT:  Right.

25           THE COURT:  And the birth certificates will come in as

1    well.  All right.  And then the government will rest, and I'm

2    trying -- I have a plea hearing at 3:30.  I'm trying to determine

3    the extent to which, Ms. Slaight, you have witnesses that you

4    would like to put on this afternoon or how we're going to chart

5    our course in the limited time that we have.

6         MS. SLAIGHT:  Your Honor, I have two witnesses, a social

7    worker and the detective concerning the prior inconsistent

8    statements.

9         THE COURT:  So how long do you think they'll be?

10        MS. SLAIGHT:  I don't think they'll be more than ten

11   minutes each.

12        THE COURT:  Each?

13        MS. SLAIGHT:  Maybe.  I don't know.  I don't know if the

14   government is going to ask a lot of questions.

15        MS. HERTZFELD:  It might help to clarify.  I understand

16   what the social worker will be called to testify with respect to,

17   but with respect to Detective Johnson, who the defense is

18   intending to recall, I don't know what the matter of impeachment

19   would be at this time because she's already, sort of in advance

20   of Janika's testimony, testified to the fact that -- what I think

21   would be the impeachment fact, which is that she interviewed her,

22   Janika, at her school, and that Janika indicated that nothing had

23   happened and that she wasn't abused.

24        So, I had expected that that testimony, which we elicited

25   in Detective Johnson's testimony in the government's case, is

1   already -- exists, so I don't know what the additional need is

2   for that witness.

3        THE COURT:  Let me ask.  Ms. Slaight, what else do you

4   need to --

5        MS. SLAIGHT:  Well, at the time it was presented, the

6   Court said I could -- it could be presented for its effect on the

7   listener.  Now it can be presented -- now I think it's a prior

8   inconsistent statement, so, if the I could argue that --

9        THE COURT:  I'm sorry, what?  First of all, what is the

10  it?

11       MS. SLAIGHT:  The testimony of Detective Johnson about

12  statements that she made to Detective Johnson saying that she

13  wasn't abused, nothing happened in the home --

14       THE COURT:  But didn't Detective Johnson testify to that

15  already?

16       MS. SLAIGHT:  Yes.

17       THE COURT:  So it's in the record.

18       MS. SLAIGHT:  Yes, and I -- and at that time the reason I

19  was being cautious is because at that time I thought the Court

20  said it was only to be admitted for its effect on the listener,

21  Detective Johnson.  Now it's clearly impeachment, so if I can use

22  that as impeachment in closing, I don't probably need to recall

23  her.

24       THE COURT:  Well, let me just say, whether or not you

25  can -- you don't get to recall her to get the statement in.  The

1     statement is already in.  So, if the only point is I'm going to

2     say it's a different kind of evidence now, then she definitely

3     doesn't need to be recalled.

4          MS. SLAIGHT:  All right.

5          THE COURT:  I don't know the answer as to whether or not

6     you can say it's a different kind of evidence now, but it doesn't

7     matter because the statement is already in, and so -- calling her

8     back is not going to make you be able to use the statement from

9     one way or the other.  So, from the standpoint of calling her

10    back to get that statement, it's in the record.

11         The question now, as a legal matter, is to what extent can

12    you refer to the statement as something other than effect on the

13    listener.  I'm going to ask the government's opinion, but I think

14    that if you're saying you would like to argue that Detective

15    Johnson testified that Janika told her nothing had happened and

16    you want to use that to impeach Janika's testimony that something

17    happened here today, I don't know why that's improper because,

18    again, it's still the statement being made and not the substance

19    of the statement that's at issue in either case.  So, I think

20    Detective Johnson is not required for the purposes that you're

21    indicating.

22         The social worker who we haven't heard from we've already

23    said is able to be called.  I'm just trying to figure out whether

24    or not -- I mean, I'm willing to push off my plea hearing for a

25    bit if we think we can finish the social work in the next half

1   hour to 45 minutes.  I don't know if we can.

2       MS. HERTZFELD:  I don't imagine -- I don't know what she's

3   going to say exactly, but if that's what we expect --

4       THE COURT:  We're sort of in the scope of it.

5       MS. HERTZFELD:  Yes, Your Honor.

6       THE COURT:  And then once we have her testimony -- well,

7   let's -- let me first ask about any motions that the defense

8   might want to make now given the government having closed their

9   case.

10      MS. SLAIGHT:  If I can get my notes, Your Honor.

11      THE COURT:  Yes.

12      MS. HERTZFELD:  And, Your Honor, just for the record, we

13  won't officially rest our case until after we've entered the

14  stipulation and the birth certificates into evidence.

15      THE COURT:  Oh, I see.  I see, yes, that's true, but I

16  don't have time for the jury to come and go.

17      MS. HERTZFELD:  I understand, but for the record I want to

18  be clear.

19      THE COURT:  But the government has no further witnesses to

20  offer, and it just intends for its case to be closed with the

21  stipulation and the birth certificates; is that correct?

22      MS. HERTZFELD:  Yes, Your Honor.

23      THE COURT:  All right.  So I'm going to treat us as

24  effectively closed for purposes of witnesses, if the defendant

25  would like to make a motion so I don't have to bring the jury in

1    for two minutes and send them out again.

2            MS. SLAIGHT:  All right.

3            THE COURT:  All right.

4            MS. SLAIGHT:  As to Count 1, which is the production count

5    in the bedroom, we submit that the jury could not find evidence

6    of -- there's no evidence beyond a reasonable doubt that Mr.

7    Hillie intended to make a video with sexually explicit conduct.

8    The video was -- one moment.

9            THE COURT:  Can you tell me which exhibit we're talking

10   about at this point?

11           MS. SLAIGHT:  Count 1.

12           THE COURT:  Count 1 is exhibit what?

13           MS. SLAIGHT:  Four, Count 1 is Exhibit 4.

14           THE COURT:  All right.

15           MS. SLAIGHT:  That exhibit was 29 minutes long.  If you

16   blinked your eyes, you would miss the -- any vaginal nudity in

17   the video, and there's certainly nothing in it to indicate that

18   that was his intent or anything that happened later to indicate

19   that his intent was to make a sexually explicit video.

20           And the same is true for Exhibit 5, which is Count 2.

21   That was 12 minutes and 25 seconds.  That was in the bathroom.

22   There were a number of people in the bathroom.  He didn't even

23   turn the video off in that instance.  And there's -- if you

24   blink, you missed any vaginal showing in there, and there's just

25   not evidence by which a jury could find beyond a reasonable doubt

1    that the -- that Mr. Hillie is guilty of these two counts.  And I

2    can go through the other four videos.  Some of them are very

3    difficult to see, and -- at least two of them were very difficult

4    to see, and the government concedes that there isn't any

5    lascivious content in those four videos, and there certainly is

6    no indication of why they were being made, because you can't even

7    see what's in the video, so -- in some instances.

8          The video did not stay on the computer.  There's no

9    indication that the videos were reviewed or looked at afterwards.

10   They were deleted years -- well, they were deleted at the time of

11   the search warrant, and one of them was deleted years earlier,

12   so --

13         THE COURT:  So you're moving for judgment of acquittal?

14         MS. SLAIGHT:  Yes.

15         THE COURT:  On all of the video counts?

16         MS. SLAIGHT:  Yes, yes.

17         THE COURT:  All right.  Any other motions?

18         MS. SLAIGHT:  As to Count 8, which is the penetration with

19   a finger of the vulva, the witness was inconsistent in that

20   instance.  She said apparently on the stand today that he did

21   this under her clothes, whereas she eventually -- she had an

22   inconsistent statement saying that it was over her outer clothes,

23   and then I think she said -- she ended up saying today that it

24   was over her clothes.

25         THE COURT:  Let me correct the record.  While I was

1    talking to you about that, we went back to the original

2    testimony, and although it wasn't entirely clear, she did suggest

3    that the clothes went in as well, and so I think you were correct

4    in your sort of original assessment of what she previously

5    testified to and that I was mistaken in suggesting that there had

6    been skin to skin contact with that incident.  So, I apologize

7    for that.

8         MS. SLAIGHT:  Okay.  Given that she's making a statement

9    that it was over actually two sets of clothes, which she, I

10   think, testified on cross-examination were her underwear and her

11   outfit, it's difficult to -- it is difficult to comprehend how

12   someone could know whether or not it actually penetrated her

13   vagina or not, if it's through two sets of clothes or even one

14   set of clothes, so I would say to the Court that the government

15   has not proven beyond a reasonable doubt that there was

16   penetration in this case.

17        THE COURT:  All right.

18        MS. SLAIGHT:  As to Count 9, the hand to the buttocks,

19   that's where she was allegedly cooking over the stove.  And,

20   again, it was his hand -- his hand was on top of the buttocks,

21   and given that it was outside the pants, I would suggest to the

22   Court that it is not --

23        THE COURT:  Do you have case law that indicates that you

24   can't have a sexual abuse count that involves the touching

25   through clothing?

1          MS. SLAIGHT:  No, I don't, but I think in these

2     circumstances it would not meet the requirement.

3          THE COURT:  All right.

4          MS. SLAIGHT:  The third -- Count 10, is the hand to the

5     breast charge, and her testimony has been very inconsistent on

6     that, and I think that --

7          THE COURT:  Why doesn't that go to the weight of it?  The

8     jury can determine whether or not -- who's right about the breast

9     count.

10         MS. SLAIGHT:  Because she ultimately said -- Well, it was

11    her -- it was her testimony the whole time, so it's not that

12    somebody else said she touched it; she said she didn't touch it.

13    I think her -- she ultimately said on cross-examination that he

14    didn't touch it, but I was going back and forth, so --

15         THE COURT:  No, there was different testimony being

16    referred to, both the Grand Jury testimony and the statement she

17    made here today, and a statement that she previously made to an

18    investigator, and there was some inconsistency there, but the

19    question for the jury is which time was she telling the truth.

20         MS. SLAIGHT:  And I would submit that, given her

21    inconsistencies, the jury could not find beyond a reasonable

22    doubt that the actual -- that her -- any testimony that he

23    touched her is what actually happened.

24         THE COURT:  All right.  That was 10.  What about 11?

25         MS. SLAIGHT:  11 is a count that I would say to the Court

1   she acknowledged in her Grand Jury testimony had not -- she said

2   in her Grand Jury testimony he only touched her twice on Good

3   Hope -- I'm sorry, on Douglas Road, and given the timeframe

4   involved here, 7-1-07 to 5-31-12, in relation to the lease

5   agreement, if he only touched her two times, at most he would

6   have touched her on Counts 8 and 9.  Count 11 just didn't occur.

7   So it is inconsistent with prior sworn testimony.

8           THE COURT:  All right.  12?

9           MS. SLAIGHT:  And Count 12, I would say there's, based on

10  her motivations and the fact that this alleged incident occurred

11  about two years after the most recent previous one, that there

12  it's not believable.

13          THE COURT:  Any other motions pertaining to the

14  indictment?

15          MS. SLAIGHT:  Janika, no.  Those are all the motions in

16  relation to Janika.

17          THE COURT:  All right.

18          MS. SLAIGHT:  Okay.  As to Jaden, Jaden -- I'll go to the

19  last two counts first.  Count 16 and 17, she admitted that she

20  had not informed the interviewer at an earlier time about these

21  two incidents, both of which I believe -- let's see -- one of

22  which happened when she was sleeping, and --

23          THE COURT:  Let me just ask you, Ms. Slaight, isn't the

24  standard whether or not there was testimony from which a

25  reasonable jury could find?  I understand that you disagree that

1   you may find inconsistencies with what she testified to here

2   today and what she may have said previously, but I don't think

3   any of those scenarios actually implicate the standard, which is,

4   based on what we heard here from these witnesses now that the

5   government has closed its case, is there sufficient evidence for

6   the jury to find guilt?  And so, any arguments that are

7   pertaining to inconsistencies between what we heard here today

8   and previous testimony were explored by defense counsel in the

9   context of cross-examination, or should have been, and so now the

10  question is just based on what the jury has heard, is there a

11  basis for guilt with respect to each of these counts?  So, with

12  that standard, tell me about the Jaden counts.

13       MS. SLAIGHT:  Well, it's my position that there are

14  instances where the inconsistencies alone are so great that

15  they -- that no juror could find beyond a reasonable doubt that

16  the offense occurred.

17       THE COURT:  All right.  Well, I don't agree with that

18  argument.  I think that it was up to defense counsel to point out

19  the inconsistencies and ultimately make the argument that today's

20  testimony should not be believed and that it was the previous

21  statement -- that that was the one that the jury should go with,

22  but I don't find on that basis that the counts that rely on that

23  basis that you've discussed are insufficient.

24       Let me hear from the government.  Is that the argument

25  with respect to all of them or is there any --

1          MS. SLAIGHT:  Well, in terms of Count 16 --

2          THE COURT:  -- yes --

3          MS. SLAIGHT:  -- Count 16 was the incident on the couch

4     where he was stretching -- where Mr. Hillie was stretching out

5     his arms, according to Jaden.  It was a very quick -- it was

6     outside the clothing.  He said it was an accident, and there's

7     certainly no indication of intent to do anything other than,

8     particularly in light of the other alleged acts -- to do

9     anything -- the intent to purposely touch her rather than an

10    accidental touching, which is what he told her when it occurred.

11         THE COURT:  All right.

12         MS. SLAIGHT:  And that's -- I have no additional argument.

13         THE COURT:  All right.  Let me have the government quickly

14    address -- To the extent that the argument was made pertaining to

15    inconsistencies, I'm not going to grant the defendant's motion on

16    that basis, so you don't really need to get into that argument.

17         MS. HERTZFELD:  With Your Honor's permission, I'll address

18    the child pornography, and Mr. Okocha will address the sexual

19    abuse charges.

20         THE COURT:  All right.

21         MS. HERTZFELD:  I think with respect to the production of

22    child pornography counts, which are Counts 1 and 2, I don't even

23    think there's a dispute about the evidence in the sense that the

24    defendant used or employed the child, and the child being Janika,

25    for the purpose of creating a visual depiction.  It sounded to

1    me -- the visual depiction being the videos.  I think, to me, it

2    sounded as though all Ms. Slaight's arguments go to the question

3    of whether or not there's sufficient evidence for a reasonable

4    jury at this stage to find that those visual depictions depicted

5    lascivious exhibition of the genitalia, and I think certainly,

6    based on the evidence that the jury has heard at this stage, both

7    in terms of the content itself of the videos and the surrounding

8    facts and circumstances by which the defendant created those

9    videos, that there is sufficient evidence that he used a child

10   for the purpose of creating lascivious exhibition.

11        As Your Honor pointed out in the opinion that has already

12   been issued by this Court, the very fact that the defendant is

13   surreptitiously hiding this camera in the child's bedroom and in

14   the bathroom, which is two places you would expect to be most

15   likely to capture the child's genitalia, he's doing it in a place

16   he knows she's going to be undressing; he's doing it at times

17   you're expecting a person would be undressing, when she's coming

18   and going from the shower in her bedroom.  All of the videos have

19   that kind of content.  Based on the positioning of the camera,

20   based on the fact that, you know, he's sneaking into the room and

21   putting this camera there, and based on the fact that the jury

22   has already heard that he has a sexual interest in this child,

23   which is evidenced by the fact that he's actually sexually

24   abusing her contemporaneously to the time that he's recording

25   these videos, there's certainly sufficient evidence that the jury

1    could find that he is using this child for the purpose of

2    creating a depiction of lascivious exhibition.

3          The Court's going to instruct the jury as to the factors

4    it can consider, and I think, as it goes through those factors,

5    as the Court indicated -- or will indicate in the instructions,

6    there is evidence that those factors were met.  There's certainly

7    evidence that goes to the defendant's intent, and that's really

8    what's being evaluated.

9          And so I think that, with respect to Government's Exhibits

10   4 and 5, they, in fact, do capture the child's genitalia, and

11   with respect to the other counts, I think given the facts and

12   circumstances --

13         THE COURT:  I'm sorry, Counts 1 and 2 do capture.

14         MS. HERTZFELD:  I'm sorry, yes, Government's Exhibit 4 and

15   5.

16         THE COURT:  Exhibits 4 and 5, which is Counts 1 and 2.

17   All right.

18         MS. HERTZFELD:  I think they do capture the child's

19   genitalia and pubic area.  In the first one multiple times.

20         And with respect to the others, because they're planted --

21   the camera is planted and being used in a similar way in an

22   attempt to capture similar content, I think the evidence is

23   certainly sufficient for the jury to find that the -- that it

24   does, in fact -- the defendant did, in fact, create a lascivious

25   exhibition of Janika's genitalia, and at this stage I believe it

1      would be appropriate for the Court to deny the motion.

2            THE COURT:  All right.  Mr. Okocha.

3            MR. OKOCHA:  Your Honor, with regards to the sexual abuse

4      counts, I'll start off with the ones that happened with regards

5      to Janika.  The first five counts talk about sexual abuse counts

6      that deal with Janika.

7            If you look at Count Number 8, it refers to a first degree

8      sexual abuse which requires a penetration, and Janika talked

9      about the act of penetration that occurred when the -- when the

10     pants were also brought up into her vulva.

11           Count 9 deals with the first incidents of sexual abuse

12     that she can recall.  She talked about how the defendant opened

13     up her -- the rear of her pants and then put his hand behind her

14     on her butt.  So that's Count 9.

15           And with regards to Count 10, this also deals -- this was

16     with the touching of the breasts which Janika testified to with

17     regards to it occurring in the shower.

18           Count 11 deals with also the touch of her vulva occurring

19     on Douglas Road.

20           THE COURT:  Yes, but is that a different incident?  I

21     heard only one count with respect to touching her vulva.

22           MR. OKOCHA:  Right.  This is an -- I don't want to call it

23     an alternative incident, but this is an association with the

24     first count, Count 8.  In association with Count 8 is Count 11.

25           THE COURT:  But you can't split them out like that.  The

1    D.C. Circuit just issued an opinion on multiplicity in which they

2    were very clear that you can't take a single incident and break

3    it up into a bunch of pieces.

4            MR. OKOCHA:  Well, Your Honor, we would claim that it's

5    not multiplicity because there's two separate acts, Your Honor.

6    There's the touch of the vagina and the penetration of the vagina

7    are two separate act.

8            THE COURT:  So, tell me how Count 8 differs from Count 11.

9            MR. OKOCHA:  Count 11 requires a penetration -- I mean,

10   Count 8 requires a penetration of the complainant's vulva,

11   requires a full on penetration.  It has to be a different sexual

12   act.  It requires that the fingers must go inside of the vagina.

13   That's a sexual act.  That's what Count 8 is.  So Count 8

14   requires the sexual act with the defendant engaging in a sexual

15   act with the child.  Count 11 requires sexual contact.  Those are

16   two different --

17           THE COURT:  Yes, but they have two different timeframes,

18   Mr. Okocha.  The suggestion is, from this indictment, and you

19   know from my original opinion, that I look at indictments very

20   carefully --

21           MR. OKOCHA:  Yes, Your Honor.

22           THE COURT:  -- that these are two different incidents.

23   You have a timeframe in the first between 2007 and 2010, and you

24   have a timeframe in the second between 2007 and 2012, so it

25   doesn't even suggest that the government is talking about the

1    same incident when you are bringing these two separate counts up,

2    number 1.  Number 2, there's no case law that I'm aware of that

3    would permit the government to charge one incident of touching as

4    two separate counts based on the touch of the outside on the way

5    to going inside and have those broken up as separate counts.

6    It's one incident, one event, and I heard her very clearly

7    several times indicate that the only time in which he touched her

8    genitals in this way was the noodles and the grabbing of the arm

9    in that one incident.

10        So I'm inclined to agree with the defense that there's no

11   evidence with respect to -- I guess it would be Count 11, if you

12   say that Count 8 covers the circumstances that you heard her

13   testify to.  Is that Count 8, what she testified to, you intend

14   to -- is that the one that's being charged at Count 8?

15        MR. OKOCHA:  Yes, Your Honor.

16        THE COURT:  All right.  So, what else do you have with

17   respect to the remaining child abuse accounts?

18        MR. OKOCHA:  I believe the only argument that was made by

19   defense counsel, other than claiming that there was

20   inconsistencies that she wanted to highlight, was with regards to

21   Count 16, and I'll address that.

22        She indicated that the testimony was insufficient with

23   regard to the touching of the breast of Jaden Asiamah, the

24   younger child, and, Your Honor, we would argue that the testimony

25   of Jaden Asiamah indicated that there was no accident.  She said

1    it herself, and that the touching was, according to her

2    assessment, intentional.  There's no evidence and no testimony

3    that there was a purpose for the defendant's hand being close to

4    her breast, not reaching out to touch anything, not looking to

5    grab any items.  And the contact, according to Jaden Asiamah, was

6    entirely intentional.

7         In addition, defense counsel indicated that it should be

8    looked at by itself, but I think the context by which the touch

9    took place is important.  Rule 413 and 414(a) allow the Court to

10   consider other acts of child molestation, and when you put those

11   other acts of child molestation that are in the indictment and

12   testified to by other witnesses, including Janika Asiamah, it

13   would indicate that the touching that the defendant did was not

14   an accident and was intentional.

15        THE COURT:  All right.  I've heard the parties' arguments,

16   and I'm ready to rule on the defendant's motion for judgment of

17   acquittal at this time.

18        The defendant has sought to have the Court rule in his

19   favor on all 16 counts of the indictment with respect to

20   acquittal.  The Court will deny the motion by and in large, and

21   I'll explain that in a minute, but I'm going to grant it with

22   respect to Count 11 of the indictment.

23        With respect to the remainder of the counts, and let me

24   start with the child pornography counts, the Court finds that the

25   government has presented, when viewed in a light most favorable

1 to the government, evidence that is sufficient for a rational

2 jury to find guilt beyond a reasonable doubt on Counts 1, 2, 3,

3 and 4 through 7.  The various pieces of evidence that pertain to

4 those counts and the reason the Court is ruling in this way

5 relate to the content of the videos, the facts and circumstances

6 in which they were manufactured, the sexual evidence with respect

7 to the defendant's alleged sexual interest in the child, the fact

8 that the defendant is featured on the videos, even with respect

9 to the videos that are too dark or grainy to actually capture the

10 genitals -- and those are the attempt counts -- there was

11 testimony that it was still the defendant who was placing the

12 camera, and so the Court agrees with the government's argument,

13 and, in light of the Court's prior opinion regarding the law

14 pertaining to lascivious exhibition and the extent to which a

15 jury could find that these circumstances count, I'm going to deny

16 the motion with respect to Counts 1 through 7.

17    I'm also going to deny the motion with respect to Counts

18 8, 9, 10, and 12 through 17.  As I said, to the extent that the

19 defendant's motion is based on defendant's argument that there

20 was inconsistencies between the testimony the jury heard here

21 today and prior statements of the people who testified, that was

22 up to the defense to point out on cross-examination, and it is

23 certainly not a basis for a determination that no reasonable jury

24 could credit the testimony today, and there was testimony that

25 was provided with respect to each of those incidents that I

1    mentioned.  The defendant offers no case that suggests that any

2    either penetration or touching has to be inside of the clothes,

3    and so with respect to the JAA or Janika charges, the Court is

4    not going to grant the motion because of the fact that she

5    testified that these touchings, at least three of them, were

6    happening over the clothes.

7         The jury, with respect to Count 10, can decide to credit

8    or not her testimony today that there was touching of her breasts

9    in the shower.

10        With respect to Count 11, the Court finds that, based on

11   the testimony here today, no reasonable jury could determine that

12   there was a separate incident of touching of Janika's vulva in a

13   way that would permit them to find him guilty on both Count 8 and

14   Count 11, and so, as a result, Count 11 is multiplicitous and

15   needs to be removed from the indictment, and I will grant the

16   defendant's motion with respect to that count.

17        For the counts pertaining to Jaden, the Court finds that

18   there was evidence presented by Jaden, testimony here in court,

19   with respect to each of the incidents alleged, and that it's up

20   to the jury to determine whether the touching that she indicated

21   was sufficient to evidence Mr. Hillie's intent to touch her in a

22   sexual manner, which she did testify was her understanding, even

23   though he at the time articulated that it was an accident.

24        So, for those reasons, I'm going to deny in part and grant

25   in part the judgment.  This creates a little bit of -- the

1    judgment -- excuse me, the motion for judgment of acquittal --

2    creates a little bit of a tricky circumstance because I'm not

3    exactly sure how to address the jury with respect to a count

4    having been resolved.  I think I'll probably just say it's been

5    resolved, and so they don't have to deal with that one, but I'm

6    open to suggestions.  We can talk about that during our charging

7    conference.

8         All right.  So, we are now at 3:26.  Let me try to assess

9    whether -- I'm a little worried about half an hour worth of

10   social worker testimony, but what do you think?

11        MS. SLAIGHT:  I actually think less than that.  I mean,

12   I'm just going to go through the statements that she -- that

13   Janika made to her --

14        THE COURT:  All right.

15        MS. SLAIGHT:  -- and I just don't think it will take a

16   long time.

17        THE COURT:  All right.  So I'm going to hold my plea.

18   We'll just tell them to wait a little bit.  Hopefully, we'll be

19   done by 4.  I'm going to give the limiting instruction -- I'm

20   going to give the limiting instruction when the jury returns,

21   which is going to be now, allow the government to give their

22   stipulation information and close, call Ms. Slaight for any

23   defendant evidence, and then we will close for the evening, have

24   the jury go home.

25        Let me ask the counsel if you are up for doing our

1    charging conference later this evening or do you want to do it in

2    the morning and have the jury come in late?

3        MS. HERTZFELD:  Your Honor, I think it might make sense to

4    do it this evening, if that's agreeable to the Court, just

5    because it will give us -- it might give some information to the

6    parties in terms of closing arguments, of how to do it.

7        THE COURT:  Ms. Slaight, are you feeling up to it?

8        MS. SLAIGHT:  I was just going to say, I really didn't get

9    a chance to look at the materials the way I should have, the jury

10   instructions, because I wasn't feeling well last night and this

11   morning, and I thought I would do -- I just left my office early

12   and I couldn't do anything before, so I would -- if we get here

13   at 9 or 9:15, I would ask that we do it then.

14       THE COURT:  Well, can we get here earlier?  Can we start

15   it at 8:30 so I'm not telling the jury to -- and we'll,

16   hopefully, still be starting closer to 9:30?

17       MS. SLAIGHT:  Right.

18       THE COURT:  And what we can -- I think we're not going to

19   deviate too much from where we are, frankly, so that's what we'll

20   do.  We'll start -- we will be convening at 8:30.  I'll still

21   tell the jury to come when they normally come because we usually

22   start at 9:30 for them anyway.

23       What I think I will do is we will e-mail you tonight a

24   copy of the Court's sort of final word on the instructions so

25   that in the morning you'll be able to come in with any final

1    changes.  How about that?

2        MS. SLAIGHT:  All right.  And then by -- between the time

3    that we discuss it and the jury -- the closings start, we'll get

4    a new printout, if necessary?

5        THE COURT:  Yes, we'll have printouts for you in the

6    morning.

7        MS. SLAIGHT:  Does the Court do instructions first?

8        THE COURT:  Before closings?  No, no, so in the morning,

9    after we have our charging conference, we'll take a little --

10   we'll take a little break.  Maybe we won't have the jury come in

11   until closer to 9:45 or 10:00, and then you do your closings, and

12   then I do the charge.  All right?  All right.

13       MS. SLAIGHT:  Thank you.  Your Honor, can I -- I'm going

14   to at least inform Detective Johnson and let Ms. Miller-Wright

15   [sic] know that.

16       THE COURT:  That we're going forward.

17       MS. SLAIGHT:  Yes.

18       (Jury in at 3:35 p.m.)

19       THE COURT:  All right.  Thank you.  You may be seated.

20   The first thing I want to do at this time is direct your

21   attention to the testimony that you just heard.  You heard

22   testimony about statements that other people may have made in

23   conversations with Janika.  This evidence has been offered and

24   admitted only as proof that the statements were made and had an

25   effect on Janika, not that what was being said in the statement

1    was true.  If you believed the testimony, you must only consider

2    it as proof that the statements were made.  All right.

3    Ms. Hertzfeld.

4         MS. HERTZFELD:  Thank you, Your Honor.  At this time the

5    government would move to admit Government's Exhibit 18, which is

6    a stipulation that's been reached by the parties.

7         THE COURT:  Yes.

8         MS. HERTZFELD:  And I would also ask the Court's

9    permission to publish that to the jury so I may read it into the

10   record.

11        THE COURT:  Yes, you may.

12        MS. HERTZFELD:  All right.  Thank you, Your Honor.  This

13   is a stipulation with regard to birth certificates of various

14   individuals at issue in this case, and the stipulation reads as

15   follows:  The parties in this case, the United States of America

16   and the defendant, Charles Hillie, hereby agree and stipulate as

17   follows:  The records kept by the District of Columbia Department

18   of Human Services documenting the dates of live birth of the

19   defendant, Charlie Hillie, which is Government's Exhibit 16,

20   Jaden Asiamah, Government's Exhibit 15, and Janika Asiamah,

21   Government's Exhibit 14, are certified true and accurate business

22   records reflecting the accurate dates of birth of each

23   individual, and the stipulation is signed by myself, the

24   defendant, and counsel for the defendant.

25        And with respect to Government's Exhibit 18, the

1    government, pursuant to it, would move to admit Government's

2    Exhibits 14, 15 and 16, which are the certificates themselves,

3    and would ask permission to just publish those to the jury as

4    well.

5          THE COURT:  Ms. Slaight, any objection?

6          MS. SLAIGHT:  No, Your Honor.

7          THE COURT:  All right.  You may publish and they are

8    admitted.

9          (Government's Exhibit 14, 15 and 16 admitted into the

10   record.)

11         MS. HERTZFELD:  And for the record, showing now is

12   Government's Exhibit 14, which is the date of -- the certificate

13   of live birth of Janika.  I'll show Government's Exhibit 15,

14   which is the certificate of live birth of Jaden, and Government's

15   Exhibit 16, which is the certificate of live birth of the

16   defendant, Charles Hillie, each of which reflects the birth date

17   of that individual.  And with that, Your Honor, the government

18   rests.

19         THE COURT:  All right.  Thank you.

20         Ms. Slaight, does the defense wish to call any witnesses?

21         MS. SLAIGHT:  Yes, Your Honor.  The defense will call

22   Ms. Donna Wright-Miller.

23         THE COURT:  All right.  We'll have Ms. Miller come.

24   Ms. Wright-Miller, you may come right up to the stand.  And let

25   me just ask you before you're sworn -- come on.  If you could sit

1    right at that chair over there, and let me talk to counsel for

2    one second before we begin your testimony.

3          (Following sidebar discussion had on the record:)

4          THE COURT:  One thing I forgot to do was question Mr.

5    Hillie about his right to testify, but I propose, because I

6    didn't want the jury to come popping in and out, to go ahead and

7    do Ms. Wright-Miller's testimony, and then I'll excuse them, I'll

8    do that part, and then we'll bring them back in to do close --

9    not to do closings, but to close for the day, all right.

10         MS. SLAIGHT:  All right.

11         THE COURT:  Thank you.

12         (Sidebar discussion concluded.)

13         THE COURT:  All right.  Ms. Wright-Miller, you may stand.

14   Let me have you stand and be sworn before you're seated.

15         (DONNA WRIGHT-MILLER, DEFENDANT'S WITNESS, SWORN)

16         THE COURT:  You may be seated.

17              DIRECT EXAMINATION OF DONNA WRIGHT-MILLER

18   BY MS. SLAIGHT:

19   Q.   Good afternoon, Ms. Wright-Miller.

20   A.   Good afternoon.

21   Q.   Could you state your full name for the record?

22   A.   Donna Wright-Miller.

23   Q.   And is that with a hyphen between Wright and Miller?

24   A.   Yes.

25   Q.   What is your occupation?

1    **A.**    I'm a social worker.

2    **Q.**    And how long have you been a social worker?

3    **A.**    Eighteen years.

4    **Q.**    And is that as a licensed social worker?

5    **A.**    Yes.

6    **Q.**    Okay.  Where do you work?

7    **A.**    I currently work at Catholic Charities.

8    **Q.**    And how long have you worked there?

9    **A.**    Since 2015.

10   **Q.**    In 2013, where were you working?

11   **A.**    Child and Family Services Agency.

12   **Q.**    And that's the D.C. agency?

13   **A.**    Yes.

14   **Q.**    Okay.  And how long did you work there?

15   **A.**    I worked there since 2000.

16   **Q.**    Okay.  And was part of your job interviewing witnesses or

17   other people for investigations?

18   **A.**    Yes.

19   **Q.**    Okay.  And I'm going to draw your attention to January

20   9th of 2013.  Did you interview somebody named Janika on that

21   date?

22   **A.**    Yes.

23   **Q.**    Okay.  And where did you interview her?

24   **A.**    It was at Thurgood Marshall Public Charter School.

25   **Q.**    Now, did you interview her in a room with other people or

1    by herself?

2    **A.**      She was by herself.

3    **Q.**      Okay.  And so her -- no family members were present?

4    **A.**      No.

5    **Q.**      And no other persons were present?

6    **A.**      No.

7    **Q.**      Okay.  And did you ask who her -- Now, in January of 2013

8    when you did this, conducted this interview, did you ask her who

9    she lives with?

10   **A.**      Yes.

11   **Q.**      And who did she say she lives with?

12   **A.**      Her mom and sister.

13   **Q.**      Okay.  And did you ask her if Mr. Hillie lives with them?

14   **A.**      Yes.

15   **Q.**      And what was her response?

16   **A.**      She said he visited the home, but he did not live with

17   them.

18   **Q.**      And how often did she say he visited?

19   **A.**      Sometimes.

20   **Q.**      Okay.  And did you talk to her about her sister Jaden?

21   **A.**      Yes.

22   **Q.**      And did you ask her if her sister Jaden ever reported to

23   Janika being touched by Mr. Hillie?

24   **A.**      Yes.

25   **Q.**      And what was her response?

1    **A.**    She said no.

2    **Q.**    Okay.  Did she -- did you ask her if she overheard any

3    arguments?

4    **A.**    Yes.

5    **Q.**    And what argument did she overhear?

6    **A.**    She heard Jaden's father and her mother arguing, and he

7    was saying that he was going to call the hotline.

8    **Q.**    Okay.  Did you ask her if she felt safe at the home?

9    **A.**    Yes.

10   **Q.**    Okay.  And what did she say?

11   **A.**    She said she felt safe.

12   **Q.**    And did you ask her if she had ever been touched

13   inappropriately by anyone --

14   **A.**    Yes, I did.

15   **Q.**    -- at the home?  And what did she say to that?

16   **A.**    She said no.

17   **Q.**    Did you observe any safety issues or concerns during your

18   interview?

19   **A.**    No.

20         MS. SLAIGHT:  Okay.  I have no further questions.

21         THE COURT:  Does the government have any

22   cross-examination.

23         MS. HERTZFELD:  Just briefly.

24

25

1          CROSS-EXAMINATION OF DONNA WRIGHT-MILLER

2    BY MS. HERTZFELD:

3    Q.    Good afternoon.

4    A.    Good afternoon.

5    Q.    So, you, based on your interview with Janika, determined

6    that with respect to Janika, there was no safety issues or

7    concerns; is that correct?

8    A.    That's correct.

9    Q.    All right.  And then that same day you also interviewed

10   Jaden -- I'm sorry, Janika's sister Jaden; is that right?

11   A.    Yes.

12   Q.    All right.  And you interviewed Jaden about the question

13   of whether or not --

14         MS. SLAIGHT:  Objection.

15   BY MS. HERTZFELD:

16   Q.    -- Mr. Hillie --

17         THE COURT:  Basis?

18         MS. SLAIGHT:  If we could approach.

19         THE COURT:  Yes.

20         (Following sidebar discussion had on the record:)

21         MS. SLAIGHT:  This is hearsay as to Jaden.

22         THE COURT:  I don't know what you mean.  You just went

23   through a whole series of questions.

24         MS. SLAIGHT:  Of Janika as a prior inconsistent statement.

25   As to Jaden, it's hearsay.

```
1        MS. HERTZFELD:  So, I think there's two issues.  One is
2   that I think the jury was left with the impression that the
3   entire investigation was that she found no safety issues in the
4   home, and I don't think that's an accurate reflection of what
5   actually happened with respect to the investigation.
6        THE COURT:  Can you ask her that without eliciting any
7   particular statements?
8        MS. HERTZFELD:  Well, I think -- I'm not going to ask her
9   the specifics, but I think she -- I would be entitled to ask her
10  if Jaden herself disclosed sexual abuse.  It does go to the
11  question of whether or not Janika admitted that she didn't tell
12  the truth to this person.  She did testify, and I think what the
13  defense is arguing, is that she wasn't truthful with the fact
14  that Jaden was being sexually abused and she was aware of that,
15  and I think the fact of Jaden disclosing this sexual abuse
16  undermines those pieces of impeachment evidence that somehow the
17  entire thing is not true because she told the -- because Janika
18  told the social worker about it at the time.
19       THE COURT:  I'm going to allow it.
20       (Sidebar discussion concluded.)
21  BY MS. HERTZFELD:
22  Q.   Ms. Wright-Miller, so I think what I was just asking you,
23  you also interviewed Jaden, you indicated, on the same day?
24  A.   Yes.
25  Q.   And you indicated that you also interviewed her with
```

1   respect to sexual abuse in the home by Charles Hillie?

2   **A.**    Yes.

3   **Q.**    All right.  And when you interviewed Jaden about sexual

4   abuse in the home with respect to Charles Hillie, she disclosed

5   to you that Charles Hillie had been sexually abusing her; is

6   that correct?

7         MS. SLAIGHT:  Objection.

8         THE WITNESS:  I don't have the paper in front of me, so

9   I --

10         THE COURT:  I'll overrule the objection.

11         THE WITNESS:  I would have to look.  I can't speak on that

12   right now.

13   BY MS. HERTZFELD:

14   **Q.**    Let me show you -- Court's indulgence -- what I'm going

15   to mark here as Government's Exhibit 27.

16         MS. HERTZFELD:  And, Your Honor, may I approach the

17   witness?

18         THE COURT:  You may.

19   BY MS. HERTZFELD:

20   **Q.**    Do you recognize, Ms. Wright-Miller, what's marked here

21   as Government's Exhibit 27?

22   **A.**    Yes.

23   **Q.**    And can you tell us what the document is that you're

24   looking at?

25   **A.**    This is an investigation that was done, that I did some

1    of it at CFSA.

2    **Q.**    All right.  And I'm going to direct your attention to the

3    bottom of the page there on Government's Exhibit 27 where

4    there's an entry regarding an interview of Jaden on January 9th,

5    2013, and I would ask you to go ahead and read that entry and

6    see if that helps refresh your recollection as to what Jaden

7    told you in the course of your investigation.

8    **A.**    Okay.

9    **Q.**    And I'm going to come back and take that document.

10   **A.**    You can.

11   **Q.**    Thank you.

12   **A.**    You're welcome.

13   **Q.**    You did have an opportunity to review Government's

14   Exhibit 27 to help refresh your recollection?

15   **A.**    Yes.

16   **Q.**    And do you still have my question in mind?

17   **A.**    If you could ask it again.

18   **Q.**    Sure.

19   **A.**    Please.

20   **Q.**    In the course of your investigation, when you interviewed

21   Jaden Asiamah on the 9th of January, 2013, she did disclose to

22   you that Mr. Hillie was sexually abusing her in the home, didn't

23   she?

24   **A.**    She did.

25            MS. HERTZFELD:  No further questions.

1          THE COURT:  Any redirect?

2          MS. SLAIGHT:  No further questions, Your Honor.

3          THE COURT:  All right.  Thank you.  You may step down.

4          THE WITNESS:  Thank you.

5          THE COURT:  All right, ladies and gentlemen, we've come to

6     a point in the case in which I need you to step out one more

7     time, and then we should be able to close for today, all right.

8     We'll have you come back once more.  Thank you.

9          (Jury out at 3:49 p.m.)

10         THE COURT:  All right.  At this point, I will need for Mr.

11    Hillie to approach, please, with Ms. Slaight.

12         As I mentioned to counsel at sidebar, I need to inquire

13    into whether or not Mr. Hillie is aware of his right to testify.

14         Sir, you do have a right to either testify or not to

15    testify during this trial.  Are you aware of that right?

16         THE DEFENDANT:  Yes.

17         THE COURT:  And are you also aware that if you choose not

18    to testify, the fact that you decide not to testify will not be

19    used against you?  Do you know that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Do you understand that this right is

22    unconditional and Constitutional; that means the right to

23    testify, you have that ability?  Do you understand that?

24         THE DEFENDANT:  Yes.

25         THE COURT:  And do you know that it's up to you?  You

1    control the decision.

2         THE DEFENDANT:  Yes.

3         THE COURT:  And have you had adequate time to discuss this

4    decision with your counsel?

5         THE DEFENDANT:  Yes.

6         THE COURT:  And have you made a decision pertaining to

7    this?

8         THE DEFENDANT:  Yes.

9         THE COURT:  Before I ask you what your decision is, are

10   you aware that if you do testify, any prior evidence of any

11   criminal activity might be introduced for impeachment purposes?

12   Do you know that?

13        THE DEFENDANT:  Yes.

14        THE COURT:  So, have you made a decision about whether you

15   wish to testify?

16        THE DEFENDANT:  Yes.

17        THE COURT:  And what would you like to do?

18        THE DEFENDANT:  I do not want to testify.

19        THE COURT:  All right.  You may have a seat.  Thank you.

20   Let me ask if the defense has any additional witnesses, just for

21   planning purposes, before I bring the jury back in?

22        MS. SLAIGHT:  No, Your Honor.

23        THE COURT:  Or any --

24        MS. SLAIGHT:  I'm sorry, did I mishear that?

25        THE COURT:  No, no, no.  I'm asking -- I just want to

1  know, before I bring the jury back in, are you going to formally

2  rest when they return?

3       MS. SLAIGHT:  Yes.

4       THE COURT:  Okay.

5       MS. SLAIGHT:  Should I rest in front of the jury?

6       THE COURT:  I don't know.  What do you think?  I think you

7  should since the government has rested in front of the jury.  And

8  then does the government intend to bring any rebuttal?

9       MS. HERTZFELD:  No, Your Honor.

10      THE COURT:  So, then, we will be finished once the defense

11  makes that announcement, and I will give the jury their final

12  instructions and let them go, all right.  We can bring them in.

13      (Jury in at 3:52 p.m.)

14      THE COURT:  Thank you.  You may be seated.  Let me

15  instruct you once again, consistent with what I have done with

16  other witnesses, that any statements made by this past witness

17  about statements that were made to her were offered as proof that

18  the statements were made and not as proof that the statements

19  were true.  All right.  Ms. Slaight.

20      MS. SLAIGHT:  Your Honor, the defense rests.

21      THE COURT:  All right.  So, at this time, we have

22  concluded the presentation of evidence in this case.  What I

23  propose that we do -- and because I'm the Court I get to

24  decide -- is break for the evening.  We will return tomorrow

25  morning in which you will hear both of the counsels' closing

1    arguments and also instructions from the Court on the law that

2    you will need to apply to the evidence that you have heard.

3    Because the counsel and I need to do some discussions in the

4    morning, I'd like for you to prepare to begin tomorrow at 10 a.m.

5         So, to the extent that you would ordinarily get here at

6    9:15 or 9:30, you can come at 9:45 for 10 tomorrow, all right.

7    And consistent with what I have previously indicated to you,

8    we're still not at the point where you can discuss this matter

9    with anyone, not other jurors, not the lawyers, not any witnesses

10   you might see as you leave the courthouse today, or anyone on the

11   court staff or anyone at home.  We're going to wait until all of

12   the arguments and instructions are in, and then after that point

13   tomorrow you will retire to the jury room to actually discuss the

14   matter and deliberate.

15        In the meantime, no research, no social media related to

16   any of this, and if you hear anything that you feel violates any

17   of the instructions that I've given you, please let me know, all

18   right.  Have a good night.

19        (Jury out at 3:54 p.m.)

20        THE COURT:  All right.  So, we will be e-mailing to

21   counsel copies of the instructions, as I have them now.  We need

22   a few minutes to go through them based on what the evidence has

23   been, making sure that everything is filled in properly, and so

24   we will e-mail them to you.  And as we discussed, we'll have a

25   charging conference in the morning beginning at 8:30.  The

1   parties should also be aware of whatever was marked into evidence

2   and received into evidence.  You'll be coordinating with my

3   courtroom deputy staff to make sure that the jury sees only what

4   has been received and, consistent with ordinary practice, copies

5   of my instructions will actually go to the jury as well.  So we

6   have to make sure that during our charging conference we get

7   everything pinned down.  Is there anything else that we need to

8   discuss?  Ms. Slaight?

9        Okay -- I'm sorry, Ms. Hertzfeld.

10       MS. HERTZFELD:  I just have a brief question, which is

11   that the government submitted last night by e-mail a proposed --

12   an amendment to the proposed verdict form, just a new version.

13       THE COURT:  Yes.

14       MS. HERTZFELD:  It both addresses -- was intended to

15   address the Court's concerns regarding Count 12 and the

16   aggravating circumstances, and we also just reformatted it a bit

17   to make it a little simpler.  It was becoming -- having been

18   revised many times, and I wanted to make sure the Court received

19   that.

20       THE COURT:  Yes, I did receive that.  My intention is to

21   tack this on to the end of our discussion when we talk about our

22   jury instructions tomorrow.  It may be -- do we have it in Word?

23       MS. HERTZFELD:  Yes.

24       THE COURT:  Because we're going to excise the count that I

25   have entered in the defendant's favor already.

1        MS. HERTZFELD:  Understood.

2        MS. SLAIGHT:  I just want to let the Court know that last

3   night I e-mailed exhibits regarding prior inconsistent statements

4   for Jaden, and I'll e-mail or submit to the Court early tomorrow

5   morning prior inconsistent statements and substantive evidence

6   where it was stated under oath for Jaden.

7        THE COURT:  All right.

8        MS. SLAIGHT:  For Janika, I'm sorry.

9        THE COURT:  Tell me what your expectation is with respect

10   to those items?  Are you trying to get them in as evidence or did

11   you just want me to know what it was that you were referring to?

12        MS. SLAIGHT:  Submit them as evidence as prior

13   inconsistent statements that can go back to the jury or where

14   they are -- where they are under oath, substantive evidence.

15        THE COURT:  When I say admitted evidence, I mean

16   substantive evidence, so I'm a little confused.

17        MS. SLAIGHT:  Well, in other words, what I'm saying is my

18   usual practice is to submit -- I admit -- there's two different

19   instructions, one as substantive evidence, one as prior

20   inconsistent statements, so that, at a minimum, as I remember,

21   the statements that -- the prior inconsistent statements that

22   Jordan made were not under oath to my memory, so they would get

23   the instruction about prior inconsistent statements, and those

24   statements go back to the jury.

25        THE COURT:  Why do they go back if they're -- First of

1    all, I thought only going back are the things that are actually

2    admitted into evidence, and so at the time that you were

3    cross-examining both of these witnesses with regard to prior

4    inconsistent statements, I just thought you were impeaching them

5    using the document, which is a normal course of affairs, but I

6    had no inkling that your intention was to actually physically

7    admit the statements, because they were not moved into evidence

8    at the time.

9         That's -- the practice is, if you want something to be

10    evidence for the purpose of the jury having a physical document

11    with a statement on it, then it has to be admitted into evidence

12    and moved for that purpose.

13         MS. SLAIGHT:  Well, as a practical matter, I -- for

14    example, when Janika said I don't remember what was stated, I

15    can't -- you know, I can't submit -- I have to submit the prior

16    inconsistent statement or the statement under oath later.  I

17    mean, it's my practice -- I did say that I was closing, but my --

18    the usual practice, I think, is to -- that is evidence, even if

19    it's a prior inconsistent statement, that's admitted to the jury.

20         THE COURT:  Not the actual document, though.  I mean, it's

21    admitted insofar as she was on the stand and testified to it

22    today, so in your closing argument you can say you heard me ask

23    Janika X, and she said Y, and that was inconsistent, and that's

24    evidence for the jury to consider.  What I'm not sure about, but

25    I think I'm sure, is that at the time when you said, I'm

1    referring to defense exhibit whatever, that was never requested

2    to be moved into evidence as a piece of paper that goes back to

3    the jury room, that the testimonial event of her making a prior

4    inconsistent statement in this courtroom today is evidence that

5    you can refer to in your closings, that you can talk about, but

6    the only documents that come in are the ones that you said, "Your

7    Honor, I move," and there were a couple early on that -- a copy

8    of the envelope or whatever, comes in as evidence.

9         Now, I don't even know whether you're allowed to move in

10   a -- the part of the transcript, but in any event, you didn't

11   during the time when you were impeaching, so --

12        MS. SLAIGHT:  Your Honor, it's my -- I referenced it, I

13   marked it, I referred to the line numbers so that the particular

14   impeachment is known and, as a practical matter, it has to be

15   cut, and -- For example, the impeachment that I supplied last

16   night, it literally -- it has to be cut to the impeaching

17   document, so I couldn't do that as a practical matter in the

18   courtroom.  I couldn't admit --

19        THE COURT:  I understand, but you never even indicated to

20   me that you wanted to.  I didn't hear you suggest that at any

21   point the physical document where the testimony was, was going to

22   be -- we were going to request that it be admitted into evidence.

23   There's a practice that allows you to do exactly what you did

24   right now without having that document come in, and the

25   impeachment is still evidence that you can refer to and talk

1   about, but I had no idea that the document -- and we received

2   your e-mail last nice.  We were wondering, what is this?  I have

3   no idea.  And I'm glad you're raising it because I was going to

4   talk to you about it because I didn't know what it was because it

5   had not been presented to me as though you intended to introduce

6   that for the purpose of the jury taking it back with them.

7        Now, this is not a total loss from your perspective

8   because the jury heard this testimony.  That is evidence.  You're

9   welcome to refer to it at your closing, to point out you heard me

10  ask her X and this is what she answered, and you heard me -- and

11  you're going to get a transcript, so everything is there for you

12  to use for closing argument purposes, but at this time, those

13  physical pieces of paper have not been moved into evidence, and I

14  don't even know whether they can be, really.  I would have to go

15  back and look at the rules of evidence in order to determine the

16  circumstances under which you questioned her about them and

17  whether or not they can come in.

18       MS. SLAIGHT:  It's my position that, having done this many

19  times before, that they can come in, and they are admitted at the

20  end of the trial.

21       THE COURT:  All right.  Well, let me just hear quickly

22  from Ms. Hertzfeld or Mr. Okocha on whether or not, if Ms.

23  Slaight is intending to ask to reopen the defendant's case for

24  the purpose of admitting those particular statements, the

25  government has an objection.

1        MS. HERTZFELD:  We would, Your Honor.  I don't think the

2   transcripts were used in such a way as part of the impeachment

3   for the transcript themselves to be admissible as evidence to

4   submit to the jury.

5        I think -- they were, number one, neither shown to the

6   witness in order to confront the witness with the prior

7   statement -- I think Ms. Slaight did discuss what was previously

8   said, but to use a document itself as an impeachment -- as a

9   piece of prior under oath testimony, I think that Ms. Slaight

10  would have had to confront the witness about the statement being

11  made now, what was said precisely in that prior statement, and

12  have a denial about that testimony in order to use it as

13  impeachment, and that's not what happened.

14       THE COURT:  You mean impeachment -- physical paper

15  going --

16       MS. HERTZFELD:  -- physical --

17       THE COURT:  Do you object to what we did just orally here?

18       MS. HERTZFELD:  No, and I think Ms. Slaight can rely on,

19  exactly as Your Honor said, "I asked you this and you said this

20  this time and here's what you said previously."  I don't think

21  there's any problem with referring to the testimony that way, but

22  I think for purposes of -- the exhibits to be sent to the jury, I

23  think -- I agree with Your Honor, it wasn't admitted.  But in

24  addition, I don't think it would be properly admitted.

25       THE COURT:  All right.  Well, let's all think about that.

1    I hear Ms. Slaight asking that, notwithstanding the fact that it

2    wasn't properly admitted at the time, that, almost like your

3    stipulation, she would like to reopen for the purpose of

4    admitting them, and I don't know the answer right now.  So, we

5    may have to -- but, you know, nonetheless, Ms. Slaight can talk

6    about the testimony that occurred here today in the context of

7    her closing.  So, it's not going to be that big a deal in terms

8    of your preparation, but during our charging conference, let's

9    have a moment to discuss whether or not those documents in

10   particular can be admitted under the rules.

11          MS. HERTZFELD:  Yes, Your Honor.

12          THE COURT:  All right.  Okay.  Anything else in this case

13   tonight?

14          MS. HERTZFELD:  Not from the government.

15          THE COURT:  All right.  You'll hear from us by e-mail with

16   my instructions, and we'll reconvene at 8:30.  Thank you.

17          (Proceedings adjourned at 4:05 p.m.)

18
                    **C E R T I F I C A T E**
19

20               I, Scott L. Wallace, RDR-CRR, certify that
            the foregoing is a correct transcript from the record of
21          proceedings in the above-entitled matter.

22
            /s/ Scott L. Wallace              7/26/19
23          ---------------------------    ---------------
            **Scott L. Wallace, RDR, CRR          Date**
24              **Official Court Reporter**

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25