UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**UNITED STATES OF AMERICA**         :
                                     :
               **Plaintiff,**        :    Criminal Action
                                     :    No. 16-030
**v.**                               :
                                     :
**CHARLES HILLIE,**                  :    April 4, 2018
                                     :    8:30 a.m.
                                     :
                                     :    Washington, D.C.
               **Defendant.**        :
                                     :
............................ :


**MORNING SESSION - DAY 5**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE KETANJI B. JACKSON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:          **Andrea Lynn Hertzfeld, Assistant**
                                **U.S. Attorney**
                                U.S. ATTORNEY'S OFFICE FOR THE
                                DISTRICT OF COLUMBIA
                                555 Fourth Street, NW
                                Washington, DC 20530
                                (202) 252-7808
                                Fax: (202) 353-7634
                                Email: Andrea.hertzfeld@usdoj.gov

                                **Kenechukwu O. Okocha, Assistant**
                                **U.S. Attorney**
                                U.S. ATTORNEY'S OFFICE-DISTRICT OF
                                COLUMBIA
                                Sex Offense and Domestic Violence
                                555 Fourth Street, SW
                                10th Floor
                                Washington, DC 20530
                                (202) 252-6604
                                Email: Kenechukwu.okocha@usdoj.gov

APPEARANCES:  Cont.


For the Defendant:          **Joanne D. Slaight, Esq.**
                            LAW OFFICES OF JOANNE D. SLAIGHT
                            400 Seventh Street, NW
                            Suite 206
                            Washington, DC 20004
                            (202) 408-2041
                            Fax: (202) 628-0249
                            Email: Jslaight@att.net

Court Reporter:             **Scott L. Wallace, RDR, CRR**
                            Official Court Reporter
                            Room 6503, U.S. Courthouse
                            Washington, D.C. 20001
                            202.354.3196
                            scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                              **Page**

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT       52

CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT        100

FINAL CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT  119

## EXHIBITS

**DESCRIPTION**                                                              **Page**

<u>**MORNING SESSION, APRIL 4, 2018**</u>

1

2    (8:56 A.M.)

3         THE COURT:  All right.  Oh, he's got to call the case and

4    get Mr. Hillie out.

5         Good morning.

6         THE COURTROOM CLERK:  Your Honor, this is Criminal Case

7    Number 16-030, the *United States of America versus Charles*

8    *Hillie*.

9         THE COURT:  Good morning to all of you.

10         Counsel, why don't you just approach for the record so

11    we're clear on who's here.

12         MS. HERTZFELD:  Thank you, Your Honor.

13         Andrea Hertzfeld for the United States.

14         MR. OKOCHA:  Kenechukwu Okocha for the United States.

15         Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MS. SLAIGHT:  Good morning, Your Honor.  Joanne Slaight

18    for Mr. Hillie who's also here.

19         THE COURT:  All right.  Thank you.

20         So this is our charging conference.  We have a few matters

21    that we needed to address outside of the jury instructions, and I

22    might start with those just to get us rolling here.

23         Ms. Slaight, you mentioned your interest in having certain

24    exhibits admitted, so maybe you can come forward and tell me

25    exactly what it is that you propose, and then I'll hear the

1   Government's position pertaining to them.

2       MS. SLAIGHT:  Your Honor, I had e-mailed the Jaden

3   exhibits the other day, because she testified the other day, but

4   I also had the exhibits, two conflicting statements for Janika.

5       THE COURT:  And you would like these -- all of which you

6   talked about with these witnesses --

7       MS. SLAIGHT:  Yeah.

8       THE COURT:  -- that you would like them to come in.

9       MS. SLAIGHT:  And I'll present them to the Court here.

10      THE COURT:  All right.  So tell me under what rule you are

11  seeking to have these admitted.

12      MS. SLAIGHT:  If I could have the Court's indulgence.

13      THE COURT:  I'm sorry?

14      MS. SLAIGHT:  If I could just have the Court's indulgence

15  to get them.

16      THE COURT:  Yes.

17      MS. SLAIGHT:  Your Honor, under Rule 613, this is a prior

18  inconsistent statement, and I confronted her with it, and these

19  two statements, I believe she said she didn't remember both --

20  either of them, but certainly, extrinsic evidence is permitted

21  for all of these statements -- to be admitted for all of these

22  statements because they were -- she was cross-examined on the

23  statements, and she was confronted with the statements.

24      THE COURT:  All right.

25      MS. SLAIGHT:  And these are prior statements -- for

1    Janika, these are prior statements under oath.  For Jaden, these

2    are prior inconsistent statements.

3           THE COURT:  So you read 613 to be an exception to the

4    hearsay principles for Jaden because, you know, under the hearsay

5    rules, you really are only supposed to be permitted prior

6    inconsistent statements under oath.

7           So is it your position that 613 somehow interacts with

8    this to allow them to come in, the Jaden statements, even though

9    they're not under oath?

10          MS. SLAIGHT:  Yes.

11          MS. HERTZFELD:  Actually, Your Honor, may I just -- I'm

12    sorry to interrupt.

13          THE COURT:  Yes.

14          MS. HERTZFELD:  I would just say one thing.  With respect

15    to the statements that were made in the CAC interview --

16          THE COURT:  Yes.

17          MS. HERTZFELD:  -- she did adopt that statement as part of

18    her grand jury, so I think they would --

19          THE COURT:  -- effectively count --

20          MS. HERTZFELD:  -- qualify as being under oath.

21          THE COURT:  Okay.  All right.  Thank you.

22          MS. SLAIGHT:  I appreciate that, because I did not get

23    that.  I did not elicit that from Jaden, but I appreciate that.

24          THE COURT:  I think on direct, someone did at one point.

25          MS. SLAIGHT:  She did.

1          THE COURT:  Yes.

2          MS. SLAIGHT:  The Government did as to Janika.

3          THE COURT:  All right.  So they got adopted into the

4    testimony for the grand jury, so they qualify as being under

5    oath, so they fit.  I think the argument is under the prior

6    inconsistent statement clause of the hearsay rule, and

7    Ms. Slaight is indicating that Rule 613 is satisfied.

8          So you would like all four of these to come in,

9    Ms. Slaight, am I --

10         MS. SLAIGHT:  Yes.

11         THE COURT:  -- accurate about that?

12         All right.  Let me ask the Government what their position

13   is on this.

14         MS. HERTZFELD:  Thank you, Your Honor.

15         So I guess going through them, with respect to Defense

16   Exhibit 40, I think this deals with the incident about the

17   shower.  I don't think this actually was a prior inconsistent

18   statement.  What the witness testified on cross, she talked about

19   two different instances in her -- one in her grand jury and one

20   in her prior recorded interview that was adopted under oath as

21   well, which is that there was a time that the defendant -- it

22   didn't come out at trial, but there was a time the defendant came

23   into the bathroom and peaked in on her when she was in the

24   shower, that he did not touch her.  That instance did not get

25   testified about at trial at all.  And that --

1      THE COURT:  The problem is that that wasn't clear, and so

2  now, we have Ms. Slaight on cross-examination asking her

3  repeatedly about the shower incident and, in this exhibit, the

4  testimony in which she said there was no touching.  And then on

5  redirect, I would have thought that the Government would have

6  made clear that we're talking about two different shower

7  incidents.

8      MS. HERTZFELD:  Well, this is part of the problem.  I

9  think with the way -- I think this is improper impeachment in the

10  first instance.  And I think part of the reason -- this is part

11  of the problem, right? -- is that the way that -- to properly

12  impeach her with her prior testimony would have been to have

13  asked her the question, elicited the denial, and then to have

14  allowed her to see her prior testimony and ask her about the

15  inconsistency in the statement.  And if she denied the fact that

16  she had said that in a prior under oath proceeding, then it would

17  be proper impeachment to say, "No, see this transcript.  Here's

18  where she actually did say that."

19      But the witness was never confronted with this transcript.

20  I mean, she didn't make a denial as to whether or not she had

21  said that before, and, in fact, what was elicited on redirect was

22  that she had given an interview to police.  She had indicated the

23  incident that she was talking about where she was touched in the

24  shower, and that she had adopted that as part of her testimony

25  under oath.

1        And so I think that, ultimately, what the witness did was

2   explain that she actually did not make an inconsistent statement.

3   That was the import of her testimony, and she was never

4   confronted with a transcript saying, "You said something

5   different" and she denied that.

6        And I will say with respect to that point, that's true for

7   every instance where Ms. Slaight attempted to impeach these

8   witnesses.  She asked the question -- with respect to the Jaden

9   testimony, Jaden said, "I don't remember saying that."  She then

10  confronted her with the transcript and said, "Well, you said here

11  in this transcript that I did not show you that your nose bleeds

12  easily."  And she said okay.  And she didn't contest whether or

13  not she had testified to those things.

14        And so I think that would be the purpose for which -- if

15  she continued to deny the truth of those prior statements that

16  she had said those things, it would be proper impeachment to

17  introduce such transcripts to say, "Yes, in fact, she has

18  previously said those things."  Here, that isn't what happened.

19        THE COURT:  I'm trying to read the rule as you're talking,

20  because I do recall that there was not an opportunity for the

21  witness to review the statement, maybe with respect to one of

22  them.

23        Ms. Slaight, did you offer any of these statements in

24  writing to the witness?

25        MS. SLAIGHT:  Your Honor, I didn't show the statements in

1    writing to the witnesses because they're only -- they were

2    children and they're still -- one of them is still a minor, and

3    the rules provide that --

4         THE COURT:  -- they can't read?

5         MS. SLAIGHT:  They can read, but it appears very

6    confrontational, then, when I show them the transcript.  But --

7    and the rule doesn't require that the actual transcript be shown.

8    It just requires that the words be used -- the reference be used

9    and the words be used, which I did use, so I told them it was the

10   transcript.  I confronted them with the words in the transcript

11   in all of the instances, and that's all that's necessary under

12   the rules.  I didn't have to show them the actual transcript.

13   There was no -- there's been no dispute from the Government that

14   that was the transcript, and, in fact, the Government, I think,

15   at one point, referenced the transcript.

16        I would note that I also asked, and I quoted again

17   exactly -- I didn't move to introduce this, this morning, but I

18   did -- and I can move to introduce it, and it looks like I

19   probably will.  But I confronted Janika saying, "So you" -- the

20   question was, "So you talked about the first time when he touched

21   you, and then you talked about the fingers incident and the

22   shower where he just looked.  Were there other times after that

23   before you moved out of Douglas that he came in and touched you?"

24   And she answered no.  So that, again, confirms that --

25        THE COURT:  Well, I have to say, this was really all done

1    in such an unfortunately confusing fashion, on both sides, quite

2    frankly.  Because it was unclear as to the various incidents that

3    were being referenced at the time that people were asking

4    questions.  You know, it was hard to understand what the girls

5    were referring to.  There were several different -- similar

6    incidents that it made it hard to really follow.

7         And so what I hear the Government now contending is that

8    there may have been incidents that were not elicited at trial

9    that are being referenced in the context of the statements that

10   you say are inconsistent, but they're only, the Government says,

11   inconsistent to the extent that you-all were talking about the

12   same incident, but, in fact, you may have been talking about

13   different incidents, and none of that was made clear either to

14   the Court or the jury by either side during the sort of process.

15        Now, I'm looking at Rule 613(a), and it does say that,

16   "When examining a witness about the witness's prior statement, a

17   party need not show it or disclose its contents to the witness."

18   What I'm wondering is whether that was properly executed with

19   respect to the questioning.  There was no circumstance under

20   which the Court thought that you were improperly questioning her

21   without showing it, but I don't know whether that goes as far as

22   to get the statement physically in unless you have shown it to

23   her and pinned her down on her denial of either having made that

24   statement previously or her explaining or acknowledging that she

25   did make it previously after seeing it so that she could confirm

1   that this particular incident that she was referencing per the

2   statement that you're talking about was, in fact, the incident

3   that she was testifying to so that we know that there's a real

4   inconsistency.

5        Having not shown it to her, it's very hard for me to

6   figure out how to evaluate the Government's position, which is

7   there's no inconsistency, because the statement you were

8   referencing where she says, "No, he never touched me in the

9   shower" was not the same statement that she was making on the

10  stand when she said, "Yes, he did touch me in the shower" because

11  there were two different incidents.  And it's hard to evaluate

12  that because she never got -- she didn't have the opportunity to

13  look at what you were saying in writing and say, "Wait a minute,

14  when I was mentioning this one, this was the other one.  This

15  wasn't the one that I was just talking about here on the stand.

16  This was another showering incident."  She didn't have that

17  chance.  So I'm worried about that now because it's hard for me

18  to know whether this really is an inconsistent statement.

19       MS. SLAIGHT:  Your Honor, I don't remember the witness

20  testifying -- and I can -- if I'm wrong, I can be corrected -- on

21  direct that there were two different shower incidents.  And the

22  only evidence we have here is that there was one shower incident,

23  and if the Government wanted to say that there were actually two

24  shower incidents and she was talking about a different one, they

25  had the opportunity to do that on redirect.

1      I certainly never had any indication in the -- from the

2  grand jury that there were two separate shower incidents, but

3  nonetheless --

4      THE COURT:  Let --

5      MS. SLAIGHT:  -- if there was any evidence that there were

6  actually two separate shower incidents and she was talking about

7  a different one, the Government could have stated that on --

8  brought that out on redirect, and they didn't do that.  And as we

9  stand now, there was one shower incident, and she did not -- and

10  whether or not the person adopts the prior inconsistent statement

11  or not doesn't -- is irrelevant in terms of whether it's

12  admitted.

13      THE COURT:  No, it's not.  It's not.  There has to be some

14  interaction between the statement and the person.  So the rule

15  that I previously read was 613(a), which is showing or disclosing

16  the statement during the examination, and that's what you did.

17  You didn't have to show it to her.  You could impeach her

18  without.

19      613(b), which is extrinsic evidence of a prior

20  inconsistent statement, and this is the admissibility provision,

21  says, "Extrinsic evidence of a witness's prior inconsistent

22  statement is admissible only if the witness is given an

23  opportunity to explain or deny the statement and an adverse party

24  is given an opportunity to examine the witness about it, or if

25  justice so requires."  And in the Advisory Committee notes, they

1   say, "The familiar foundation requirement that an impeaching

2   statement first be shown to the witness before it can be proved

3   by extrinsic evidence is preserved in the context of the rule."

4        So the standard, if you're trying to get the statement in,

5   is to establish the foundation by showing it to her, having her,

6   then, either adopt, deny, opportunity to explain, or something so

7   that we're all clear about the statement being the foundation for

8   the inconsistency that you're trying to establish.

9        What I'm worried about is that it never was clear that she

10  even knew what statement you were talking about, that you kept

11  saying, like, "Don't" -- you know, "didn't you say in the grand

12  jury X?"

13       And she would say, "I don't remember."

14       And then you would say, "But you did say X," and you'd

15  read it.

16       And she said, "Well, maybe I did."

17       But it wasn't -- she never saw the paper where you said,

18  "Here is your language."

19       And then she would have had an opportunity to say, "Well,

20  when I said that, this is what I meant," or "I guess I did say

21  that, and I'm saying something different now," at which point you

22  would have your inconsistent statement.

23       But I'm concerned, notwithstanding the hearsay, you know,

24  overcoming those situations with respect to them being adopted

25  and being under oath and all of that, I don't know we have an

1    inconsistency such that you're entitled under Rule 16(b) to get

2    this in on the paper.

3         Now, you can say in your closing, "You heard me question

4    her.  I asked her, 'Did he touch you in the shower' or whatever.

5    She said on direct he did.  I asked her, looking at her grand

6    jury testimony, 'Didn't you say he didn't?'  And you said, 'No.'"

7    You're welcome.  That's in the record.  You impeached her orally,

8    but I don't think the statement comes in because it was never

9    shown to her, so we can't really nail it down under the rules.

10        Do you understand what I -- I mean, I --

11        MS. SLAIGHT:  I see what you're saying.  I just preserve

12   my objection.

13        THE COURT:  Okay.  So I'm going to say that any of these

14   statements that were not shown to the witnesses and therefore

15   giving them an opportunity to confront this statement in any

16   meaningful sense and therefore establish the inconsistency that

17   Ms. Slaight is trying to put forward for the purpose of getting

18   them in as a physical statement, I'm going to say we're not going

19   to allow these Defense exhibits, but, again, you're free to argue

20   them, the impeachment.  So that takes care of, you know, the

21   other sort of prudential issue, which was whether we need to

22   reopen the Defendant's case in order to allow for the admission

23   in front of the jury.

24        Are there other issues with regard to evidence that

25   you-all have identified?  And then we'll move to the jury

1    instructions.

2         MS. SLAIGHT:  Your Honor, I just note that in addition to

3    my statement, what I had argued before, I would say that the

4    interest of justice -- because of the fact that these were

5    minors, I think there's flexibility in the rule, and certainly,

6    the rule talks about interest of justice.  I understand your

7    ruling, but I'm just preserving the record.

8         THE COURT:  All right.  You can preserve.  Let me just say

9    in response to that that the Court observed these witnesses, that

10   they were shown other documents, that one of them is 21, and I

11   think the other is 15 or 16.  Both of them can read, so there

12   didn't seem to be anything extraordinary about the process that

13   would indicate a rule -- a need for flexibility on the rule of

14   actually showing them the statement so that they can determine

15   what their position is relative to it, and we can have an actual

16   inconsistency for the purpose of admitting the record.

17        All right.  Let's turn to the instructions.  We e-mailed

18   you the instructions last night.  My typical process is to read

19   the instructions that I have given.  I tried -- given you.  I

20   tried to be as verbatim as possible in terms of my recitation,

21   and I will have my law clerk standing by to make any minor

22   changes, if I change "the" to "and" or whatever, to make sure

23   that the copy that goes back to the jury room is exactly what I

24   instructed on.

25        I know now that I might add a transitional sentence here

1    or there, you know, just -- some of these, we just taxed together

2    from the pattern instructions, so I don't want it to be too

3    jarring.  So I might say, "Let me start by talking about our

4    rules" or something like that, but we'll get that down and make

5    sure it's in the copy that goes to the jury.

6        I wanted to point out a couple of specific things, and

7    then I'll hear from you about whether you have any concerns based

8    on what I've given you.

9        Ms. Slaight, we did get your Defense theory of the case

10   this morning, so I intend to just plug it right in.

11       Let me ask the Government if that's -- did you get a copy

12   as well?

13       MS. HERTZFELD:  We did, Your Honor.

14       THE COURT:  Yeah.  So I'm just going to say what she has

15   put forward.

16       MS. HERTZFELD:  No objection.

17       THE COURT:  All right.  The other thing I wanted to call

18   to your attention was the interstate commerce instruction.  I had

19   mentioned before my concern about having the jury kind of bogged

20   down with what I find to be really difficult statutory language

21   in the midst of a pretty fairly straightforward issue.  And what

22   we did was we did some research into what counts for the

23   interstate commerce elements in a case of this nature, and we

24   found a Seventh Circuit case, United States versus Foley,

25   740 F.3d 1079, which is the Seventh Circuit case from 2014, and a

1    raft of other cases that reference this Foley case and that adopt

2    it from the First, Second, Fourth, Fifth, and Ninth Circuits.

3    All of whom have now held that to satisfy the interstate commerce

4    element.  The storage of pornographic images on a computer hard

5    drive for later retrieval was part of the process of producing

6    child pornography, and thus the fact that the hard drive traveled

7    in interstate commerce or foreign commerce was sufficient.  So

8    there's no question.

9         And even in Foley, they were addressing whether or not a

10   missing camera was a problem.  You know, there was no camera for

11   the production.  It's the same idea here, that we don't really

12   know what the camera was made from.

13        First, let me note for the record, that as far as the

14   Court is aware, there's no camera manufacturer in the District of

15   Columbia either, nor any manufacturers of raw materials that

16   could be used or fashioned by Mr. Hillie to have made any such

17   camera.  So in my view, the camera, too, is most likely

18   interstate commerce, but Foley tells us we don't need the camera,

19   that we have in this case the pink laptop, the hard drive, the

20   testimony about it being, you know, a Dell-manufactured product.

21   We have the testimony from the expert that no such things are

22   manufactured in the district.

23        And so what I did, to avoid confusing the jury, was to add

24   a sentence after what you had agreed to about the computer,

25   camera, the -- I'm sorry, I'm looking on Page 21, in interstate

1   or foreign commerce, "The local or intestate production of visual

2   depictions of a minor engaged in sexually explicit conduct with a

3   computer, a cell phone, or a camera that traveled in interstate

4   or foreign commerce is part of an economic class of activities

5   that substantially affect interstate or foreign commerce."

6   That's where you had stopped, and I added a sentence that I

7   believe to be the law based on our research, "The fact that a

8   computer hard drive that is used in producing child pornography

9   once traveled in interstate or foreign commerce is sufficient to

10  satisfy the commerce element."  I just don't want them getting

11  bogged down.  I believe that that is true, and so I've added it.

12          Any comment on that?

13          MS. HERTZFELD:  That seems appropriate to the Government.

14          MS. SLAIGHT:  I object.  I believe that the other circuit

15  cases are incorrect, and that the full instruction should be

16  given.

17          THE COURT:  All right.  Your objection is preserved.

18          And, again, for the record, I am looking at not only the

19  Seventh Circuit in Foley, but a Sixth Circuit case, United States

20  versus Lively, 852 F.3d 549, which is Sixth Circuit 2017 that

21  says -- cites to all the other circuits saying that there is

22  widespread consensus on this point.

23          All right.  Turning to the lascivious exhibition

24  instruction, what you see there in your materials, which is

25  Pages 19 and 20, is the Court's attempt to resolve a concern that

1    had been raised by the Government about making sure that the jury

2    was aware that the photograph -- that, first of all, the

3    defendant's intention could be taken into account when you're

4    talking about the creation or the production of child

5    pornography, and also making sure that there was no confusion

6    among the jurors that the minor had to be engaged in sexual

7    activity.

8           Based on this Court's own opinion, which is the 2018 --

9    January 30th, 2018 Westlaw 623828, *United States versus Hillie*,

10   and that's at Star 7 and 9, I have already dealt with, as a legal

11   matter, the issue of whether any reasonable jury could find the

12   production of child pornography under the circumstances in the

13   videos here, and it's very clear not only in my opinion but in

14   the opinions that I cite that a minor is not required to do

15   anything sexual in order for it to qualify, and so I've added

16   that sentence, which I think addresses the thrust.

17          I know the Government wanted a sentence about the

18   intention of the photographer.  I sustained Ms. Slaight's

19   objection insofar as I was concerned about shifting away from --

20   or shifting too much away from looking at the picture and

21   focusing on the intention of the photographer.  I think it's

22   appropriate to mention it as one of the *Dost* factors, and we

23   have, and I've included "intended or designed" in *Dost* Factor

24   No. 6 because that, in fact, is the language from *Dost*.  And so

25   we have -- we had a version before that didn't have "intended" in

1    it, and so I put it in there to track exactly what the *Dost*

2    factors say, but I also added the sentence on Page 19 that says,

3    backing up a little bit, "not every exposure of the genitals or

4    pubic area is a lascivious exhibition, and the fact that a minor

5    is depicted nude on its own is not enough for that visual

6    depiction to qualify as a lascivious exhibition, but for an image

7    to constitute a lascivious exhibition, the minor is not required

8    to exhibit lust, wantedness, or sexual coyness, and the image

9    need not depict overt sexual activity or behavior."

10         That is my ruling from my prior case that I have imported

11   into the instruction in order to avoid what I think may be a

12   misunderstanding of the law pertaining to lascivious exhibition.

13         Comments?

14         MS. HERTZFELD:  That satisfies the concern that the

15   Government is raising, Your Honor.  Thank you.

16         THE COURT:  Ms. Slaight?

17         MS. SLAIGHT:  Your Honor, I preserve the previous

18   objections, but I would say also, specifically as to this, it

19   really now focuses on the jury determining that they just don't

20   like the behavior that's done, rather than that it was less

21   vicious, and because the Court, in the next section, discusses

22   considering different factors but then says, "You don't need to

23   satisfy all of these factors or any single factor."

24         So you're -- it's my position that this is becoming an

25   issue of what the jury doesn't like rather than what is less

1   vicious.  Because now, the Court is saying the image --

2   particularly the image need not depict overt sexual activity or

3   behavior.  If they don't have to -- if the jury doesn't have to

4   find any of these factors --

5       THE COURT:  Well, I think that's confusing.  That's not

6   what I necessarily mean.  First of all, they don't, right?

7   Because the factors are just a guide.  I think you're right to

8   point out that "any single factor" might be ambiguous.  What I

9   intended was "any particular factor."  In other words, there's no

10  one of these factors that is more important than another, that,

11  you know, look at all these factors but make sure you focus on

12  whether or not, you know, No. 1 has been satisfied, and if you

13  don't have No. 1, you're out.  I'm trying to suggest that you

14  don't need to satisfy all of them or any particular one of them

15  in order to find that there's lascivious exhibition.

16      I ruled in *Dost* -- I mean, I ruled previously, I think, in

17  response to your prior counsel's argument that -- no, I don't

18  think -- I think he accepted, actually.  I think the Defense

19  counsel previously accepted an agreement with the Government that

20  *Dost* was applicable to this circumstance, if my memory serves, so

21  I don't know that we had a full conversation about it.  It seemed

22  like everybody agreed to *Dost* because that's the controlling

23  standard.

24      But assuming now that you are properly raising this

25  objection after prior counsel had already accepted these factors,

1    your point is that we shouldn't have them or what?

2         MS. SLAIGHT:  Well, particularly, the line that says,

3    "This list is not exhausted" on Page 20.

4         THE COURT:  Yeah.

5         MS. SLAIGHT:  "This list is not exhausted, and a visual

6    depiction not need satisfy all of these factors or any single

7    factor."  So --

8         THE COURT:  Yeah, I'm taking out "single."

9         What if I said "or any particular factor"?

10        MS. SLAIGHT:  Yeah, I think that's better.

11        THE COURT:  Okay.

12        MS. SLAIGHT:  I'm still preserving the objection as a

13   whole.

14        THE COURT:  As a whole.

15        MS. SLAIGHT:  But I think that --

16        THE COURT:  Okay.

17        MS. SLAIGHT:  -- I don't want the jury to be confused that

18   they don't have to find any of the factors.

19        THE COURT:  Yes.  Any particular one of these you don't

20   have to find is what I'm trying to articulate.

21        MS. SLAIGHT:  Yes.

22        THE COURT:  Sorry, Ms. Hertzfeld?

23        MS. HERTZFELD:  Thank you, Your Honor.

24        I will say that I do think it is a proper statement of the

25   law that they don't have to find any particular -- or any one of

1   the *Dost* factors.

2        THE COURT:  Um-hmm.

3        MS. HERTZFELD:  When the Court instructs them that the

4   *Dost* factors are meant to be a guide, they could find that with

5   respect to a particular image, none of the *Dost* factors are met,

6   but based on the overall content and their judgment, and I think

7   this is fairly within the province of the jury, and that's what

8   the issue in *Dost* was, that they can determine, based on the

9   content and what they're viewing, that it's a lascivious

10  exhibition without meeting any of those factors.

11       THE COURT:  That's true.

12       MS. HERTZFELD:  But those are factors that are commonly

13  looked at and they should keep in mind when they're looking at it

14  to make their decision.

15       THE COURT:  Does the Government object to me changing

16  "single" to "particular" to avoid -- I mean, I'm not -- I don't

17  think that's inconsistent with what you just said.

18       MS. HERTZFELD:  I --

19       THE COURT:  And I think in the context of the other

20  language, it's clear that they can decide to weight or give lack

21  of weight to any or all of them or whatever.

22       MS. HERTZFELD:  I don't object to the change.  I just want

23  the record to be clear that I think if the jury didn't find any

24  of those factors but still found lascivious exhibition --

25       THE COURT:  Right.

1    MS. HERTZFELD:  -- they would be acting properly within

2    the application of the law as they're allowed to.

3    THE COURT:  Okay.  But in general, this satisfies the

4    Government's prior concern with this definition?

5    MS. HERTZFELD:  Yes.

6    THE COURT:  All right.  So that's what I had.

7    Are there any other concerns that you would like to raise

8    at this time so that we can make the changes?

9    MS. SLAIGHT:  Your Honor, given that -- on Page 12,

10   evaluation of prior inconsistent statements, that the Government

11   acknowledges that the statements made by Jaden were under oath,

12   then we don't need to separate the --

13   THE COURT:  That's correct.

14   MS. HERTZFELD:  I think, Your Honor, it depends what

15   are -- I thought part of what the inconsistent statement was is

16   that there is the under oath issues that we were talking about,

17   but there's also -- I'm imagining that the Defense wants to argue

18   that the statements made to the CFSA and the detectives were

19   inconsistent with what were testified to, and those were not the

20   statements that were under oath.  So maybe the Defense is not

21   intending to argue the --

22   THE COURT:  I'm sorry, I'm confused now.

23   Which statement did you say that Jaden had adopted into

24   her testimony before the grand jury?

25   MS. HERTZFELD:  What she testified to is that she was

1    interviewed by the detective when she came back from North

2    Carolina after making those --

3         THE COURT:  This is Janika?

4         MS. HERTZFELD:  I'm sorry, Janika, yes.

5         THE COURT:  All right.  So Jaden -- so we were back to the

6    statements that the defendant wanted to admit?

7         MS. SLAIGHT:  Janika's -- Jaden's -- I'm sorry, Jaden's

8    prior --

9         THE COURT:  Jaden, the statements that she was looking to

10   admit were the CAC transcript of the interview of Jaden with

11   Ms. Tracy.

12        Did Jaden adopt those statements in her grand jury

13   testimony?

14        MS. HERTZFELD:  Yes, she adopted her entire CAC interview

15   into her grand jury testimony.

16        THE COURT:  Okay.

17        MS. HERTZFELD:  But I wasn't -- I'm not seeking to reraise

18   it at all.  I think this instruction is appropriate because there

19   are statements -- what I understood the Defense to be saying is

20   that there were also statements that were made by Janika, for

21   example, in the first interview with CFSA where she made denials

22   about the sexual abuse.  That is inconsistent with her testimony

23   that there was sexual abuse, and so that is not an under oath

24   statement and, I think, can't be treated --

25        THE COURT:  Because she didn't adopt that statement?  The

1    statement of the denial at her grand jury, she did not

2    incorporate into her grand jury testimony, obviously?

3          MS. HERTZFELD:  Yes, yes.

4          MS. SLAIGHT:  So I think that what has to be changed here

5    is -- the first full paragraph at the top of Page 13 refers to

6    Jaden and Janika making prior inconsistent statements under oath.

7    That's correct.

8          The second statement is -- I'm sorry.  The first one,

9    "Jaden and Janika making earlier statements not under oath" --

10          THE COURT:  When they were not under oath.

11          MS. SLAIGHT:  -- so that's correct.

12          THE COURT:  Right.

13          MS. SLAIGHT:  The second one should be "Jaden and Janika

14    making earlier statements under oath," so just add "Jaden" to the

15    "Janika."

16          MS. HERTZFELD:  No.

17          MS. SLAIGHT:  So they both made statements under oath, and

18    they both made statements that weren't under oath that are

19    inconsistent.

20          THE COURT:  Tell me the under oath statement of Jaden made

21    that is inconsistent with something she testified to.

22          MS. SLAIGHT:  Jaden testified -- oh, Jaden said that, you

23    know, she didn't have any particular problems with her nose, that

24    she didn't bleed easily.  That's one.

25          THE COURT:  And to the extent that was in her CAC, that

1  interview, that was adopted, so you're calling that an oath

2  statement?

3        MS. SLAIGHT:  Yes.

4        THE COURT:  Clearly whether it was actually inconsistent,

5  but keep going.

6        What else?

7        MS. SLAIGHT:  I would have to look.

8        THE COURT:  Yeah.

9        MS. SLAIGHT:  There were two statements that --

10        THE COURT:  Is it the two that you gave me as exhibits --

11        MS. SLAIGHT:  Right.

12        THE COURT:  -- where you say he said -- where she said

13  that, "He only touched me one time" in the CAC?

14        And do we have that same issue that Ms. -- I don't know

15  because I don't have the grand jury testimony, and this is my

16  fault, I should have asked you for it.

17        But did she say in the grand jury that she was adopting

18  the prior statement of only one time?

19        MS. HERTZFELD:  So -- no.  I think what -- she adopts her

20  interview with Ms. Tracy.  And in Ms. Tracy's interview, even the

21  portion that Ms. Slaight admitted to the Court, you can tell

22  there's some confusion between Ms. Tracy and Jaden because she's

23  already explained in the CAC that there is more than one

24  incident.  She said -- she described one incident.  The way the

25  question gets asked of her is, "You told us about two."

1          And she said, "No, just one."

2          And she said, "Oh, so there was more than one?"

3          And then she says, "Yes."

4          And then the interviewer is like, "So, wait, there's two?"

5          And she says, "No."

6          She's referring, I think if you were to read the entire

7     interview, as to what she has already said in that interview.

8     The interview then moves on, and she never gets asked about a

9     second incident, but when she testifies in the grand jury, she

10    says, "I told Ms. Tracy about one of those incidents.  There's

11    another one, and I'm going to tell it to the grand jury."  And

12    she testifies in the grand jury about the second incident.

13          So she has adopted her statement, but I don't think that

14    what she was shown -- well, what -- she wasn't shown, but what

15    was referred to her is actually an inconsistency with what she

16    says in the grand jury or with what she said on the stand.

17          THE COURT:  Um-hmm.

18          So you -- the Government is objecting to characterizing

19    Jaden as having made a statement under oath that is inconsistent

20    with what she testified here today?

21          MS. HERTZFELD:  Yes, because the totality of her under

22    oath statement is, "I said this in the CAC" --

23          THE COURT:  Right.

24          MS. HERTZFELD:  -- "and there's a second incident, and let

25    me tell you about that."

1          THE COURT:  All right.  Ms. Slaight?

2          MS. SLAIGHT:  And I think that the prior inconsistent

3     statement in the CAC is, you know, she specifically said, "I

4     didn't say he touched my" -- she said --

5          THE COURT:  No, no, no.  I read that.  I know the

6     statement in the CAC.

7          The question is -- that I don't know because I don't have

8     the grand jury testimony is, are you agreeing with the

9     Government's characterization in the oath setting of referencing

10    this statement and adding on, in which case she's gotten to two

11    in the oath setting, which is not inconsistent with what she's

12    testifying here today?

13         MS. SLAIGHT:  The Government -- I don't believe the

14    Government brought up the grand jury's testimony referencing --

15         THE COURT:  They did.  I remember them saying that.  They

16    definitely suggested through this -- that witness that in the

17    grand jury, she actually told people that there was more than

18    one, that she had remembered an additional incident.

19         MS. SLAIGHT:  I don't think that invalidates the prior

20    inconsistent statement in the CAC.

21         THE COURT:  It's not that it invalidates it.  The question

22    is, does it count as an under oath statement or not.  We get --

23    it comes in -- the first paragraph to the extent it was a not

24    under oath prior statement.

25         MS. SLAIGHT:  Right.

1    THE COURT:  I don't know that we had -- I think the

2  Government's point is, I'm not sure that we have a sufficient

3  basis for sticking "Jaden" into the second paragraph, which is

4  she, too, made an under oath statement that was now being

5  characterized as inconsistent, and the adoption theory doesn't

6  get us there says Ms. Hertzfeld because when she adopted it, she

7  then added on in the context of the oath setting so that it

8  doesn't really amount to an inconsistency to what she said today,

9  but it's still in the first paragraph.  I mean --

10    MS. SLAIGHT:  Right.  I think it's -- I think it would be

11  one thing if she said, "There's something wrong with my CAC

12  interview," but she didn't say that.  She adopted the whole

13  thing, so she's saying contradictory things in the grand jury.

14    THE COURT:  All right.  Well, I'm going to leave her out

15  because, based on the Government's representation of what was

16  said at the grand jury, there's at least -- it isn't clear that

17  there is an inconsistency with her statement made under oath such

18  that it warrants inserting her in this earlier statement under

19  oath paragraph.

20    Now, let me ask -- not including "Jaden," is the

21  Government okay with what we have here?

22    MS. HERTZFELD:  I think otherwise it's fine, Your Honor.

23    THE COURT:  All right.  Any other issues on the

24  instructions, Ms. Hertzfeld?

25    MS. HERTZFELD:  We just had one briefly, Your Honor, which

1   had to do with the other crimes instruction, which is on

2   Page 14 --

3          THE COURT:  Yes.

4          MS. HERTZFELD:  -- dealing with the physical assault.

5          The only issue, I think, is that -- what the Court has

6   here is correct, but I think with -- in Paragraph 2 where it says

7   that the jury can consider that Mr. Hillie physically assaulted

8   Jaden only for the limited purpose of deciding whether the

9   assault helps to explain how Jaden and Janika responded,

10  including whether there was one -- whether it was one reason

11  Janika denied the sexual abuse had occurred when she was first

12  questioned, I think that's accurate.

13         But I think the other purpose for which they could

14  consider it goes to this sort of the common scheme or plan kind

15  of piece of this, which is that Mr. Hillie was telling these

16  girls not to tell.  You know, he's making the shush.  He's

17  obviously someone who's sexually abusing children and is not

18  wanting them to tell what's going on.  And I think that their

19  silence on it is part of what he's trying to achieve.

20         And so him hitting her in the face when she actually does

21  disclose it goes to the fact that he's trying to not have this

22  come out, that he is sexually abusing these kids.  And so I think

23  it also goes to that, and I thought this paragraph was a little

24  bit too limiting in terms of what the jury can consider.

25         THE COURT:  So do you have language that you propose to

1   expand it?

2      MS. HERTZFELD:  I think we can insert almost like a clause

3   that just says "including whether it was one reason Janika denied

4   the sexual abuse had occurred when she was first questioned" --

5   maybe add a sentence at the end that says something along the

6   lines of, "You may also consider this evidence of the defendant's

7   intention to ensure that Jaden and Janika did not disclose the

8   sexual abuse that he was committing" or something like that.

9      THE COURT:  Ms. Slaight?

10     MS. SLAIGHT:  Your Honor, I object to that.  That's taking

11  a big leap.  The girls always -- the girls consistently said, "He

12  never threatened me.  He never tried to stop my testimony."

13  Jaden had already made her statement when he said -- what he said

14  was, "Stop lying," and I don't see how that -- I think they're

15  trying to turn this into an instruction charge when he -- she

16  actually made those statements.  It would be one thing if he

17  said -- if he had slapped her, assuming that he did, before she

18  made the statements.  But, you know, he knew that she was going

19  to be coming in.  He knew that she made the statements, so then

20  he accused her of lying about it.  So that's different than

21  trying to --

22     THE COURT:  So you see the slap as punishment for the lie

23  rather than an attempt to silence her?

24     MS. SLAIGHT:  Yes.

25     THE COURT:  The question is whether or not the jury -- the

1    Government's theory is different.

2        And so are they entitled to an instruction that at least

3    introduces that as one possibility, but inconsistent with the

4    rest of my instructions?  I would say it's up to you to decide

5    whether or not to believe it.  It's up to you to decide the

6    purpose for which it is -- I think the point of this instruction

7    is to try to keep them from using it for an illegitimate purpose,

8    right, from convicting him on the basis of the physical assault

9    as opposed to on the basis of the allegations that are being made

10   by the Government.  And so it's a limiting instruction trying to

11   prevent improper jury consideration.

12       What I hear Ms. Hertzfeld suggesting is that maybe it is

13   limited so much by the example that the jury can't consider it

14   for a legitimate purpose, consistent with the Government's theory

15   that he was trying to silence them.

16       MS. SLAIGHT:  And I would say that contradicts what Jaden

17   said.  Certainly, Janika -- neither -- both of them said, "He has

18   never threatened me."  He has never -- not to talk.  He has

19   never -- or -- and to -- or to cooperate with any investigation.

20   So that contradicts what the impression the girls got.  I mean,

21   if the Government wanted to get that from Jaden, they could have

22   tried to do that, but they did --

23       THE COURT:  Well, we do have the silence gesture in the

24   bathroom, right?  She did say that he indicated to her that she

25   wasn't supposed to say anything when he came into the bathroom

1    when she was there.

2         MS. SLAIGHT:  That means just to keep quiet.  I mean, that

3    doesn't mean don't talk to anybody about that -- this again.

4    That's just be quiet, I'm in here.

5         THE COURT:  All right.  Let me ask Ms. Hertzfeld.

6         MS. HERTZFELD:  So I think the way Ms. Slaight is talking

7    about this is if we're attempting to use this as obstruction.

8    Nobody is saying and nobody would -- is going to say in closing

9    or anything like that that the defendant is obstructing in the

10   way that Ms. Slaight is describing.  It doesn't -- it goes to his

11   motivation in his course of conduct of continually sexually

12   abusing these children, and having the opportunity to do so

13   requires, to some degree, their silence and the ability to have

14   them know that they're not supposed to say anything.

15        THE COURT:  All right.  Can we say something like --

16   instead of a whole separate sentence, would it be -- satisfy the

17   Government to say "including whether it was one reason Janika

18   denied that the sexual abuse had occurred when she first" --

19   "when she was first questioned by the authorities or whether it

20   was part of the alleged pattern of abuse in the household" or

21   something like that?

22        MS. HERTZFELD:  Yes, Your Honor.  Thank you.

23        THE COURT:  Okay.

24        MS. SLAIGHT:  Your Honor, I'm not sure.  If you could

25   repeat that.

1        THE COURT:  I said "or whether it was part" -- so, "If you

2   find that Mr. Hillie physically assaulted Jaden, you must use

3   this evidence only for the limited purpose of deciding whether

4   the assault helps to explain how Janika or" -- I'm sorry, "Jaden

5   and Janika responded, including whether it was one reason Janika

6   denied that the sexual abuse had occurred when she was first

7   questioned by authorities or whether it was part of the alleged

8   pattern of abuse in the household" or something like that.  I

9   haven't quite worked it out, but --

10       MS. SLAIGHT:  I would object to the language, first of

11  all, "part of the alleged pattern of abuse."  And I would also

12  object, and I didn't catch this earlier and I should have,

13  that -- to the language "including whether it was one reason

14  Janika denied that the sexual abuse had occurred."  She never

15  makes any claim that because he hit her, she was denying it.  She

16  never made that claim.  There was never --

17       THE COURT:  Let me tell you how that -- the inference that

18  the jury can draw, because we thought about this ahead of time,

19  that it was after the slapping incident that the authorities were

20  initially called, and Janika -- I mean, excuse me, Jaden left.

21  Jaden's father came, pulled her out of the house, she was gone.

22  And then Janika, her mother, and, I guess, Kamaria, although she

23  was too young, are in the position of now having to respond to

24  the authorities who are questioning them about the circumstances

25  that have been brought to their attention because of the slap

1    incident.  Janika did testify to her feelings pertaining to being

2    separated from her sisters, and it was the mom who started

3    saying, "If you tell" -- allegedly, "If you tell anything about

4    this, then we're all going to go to foster care and you're never

5    going to see your sisters again."

6          There was an inference that the jury could draw that not

7    only was the slap incident sort of the beginning of this series

8    of events, but also that it demonstrated for Janika, based on

9    what she said, that her sisters could be disbursed in a way that

10   was uncomfortable and therefore led to her lying about, according

11   to her, what had happened.  So it's all related to that, that the

12   slap incident means one of her sisters gets taken away.

13         And then she's asked, "Did anything really happen?" and

14   her mother saying, "Don't say anything more about this or else

15   the rest of us" -- "your whole family, we'll never see each other

16   again."  That's what she testified to, that she was concerned

17   that she would not be able to be with her sisters, and it was the

18   slap incident where one of the sisters was already removed.

19         So I think that it is fair to instruct them, in the

20   interest of trying to keep them from convicting Mr. Hillie just

21   based on the slap, that that was a bad thing and so therefore he

22   must be guilty, to try to limit it to say you heard that

23   evidence, but it's only for the purpose of how people responded

24   to the situation that was being described, including whether

25   Jaden or -- excuse me, Janika was lying about the abuse when

1    asked by the authorities, and now the Government is saying, and

2    whether or not it was indicative of some sort of a broader

3    pattern of abuse or the series of sexual abuse allegations that

4    the Government had hoped to lay out with all of these different

5    charges.  I don't know how to word it, but I guess I see their

6    point.  Maybe it has to be a separate sentence, I don't know, but

7    we can think about that and talk, you know, briefly before I give

8    it.

9            MS. SLAIGHT:  Well, I would just note that the slap

10   incident only -- nobody is alleging that Mr. Hillie hit either of

11   the girls more than one time, so it's not part of a pattern of

12   abuse, I would say.  This is one incident.  This is a onetime

13   incident, and it makes it sound like that's what he -- that he

14   is -- he had done this more than once, allegedly.

15           And I would also note that by the time Janika talked to

16   the authorities, the sexual abuse charges had already been made,

17   so -- and, in fact, the first charges were --

18           THE COURT:  Not by her, though.

19           MS. SLAIGHT:  Right.

20           THE COURT:  I mean, the question is, did she -- well, how

21   did Janika respond knowing that one of her sisters had already

22   been removed after this slap incident and the mother was saying

23   other people are -- you know, you could never see your sisters

24   again, everybody is going to foster care.  And she says that was

25   the reason why she told the authorities what she believed to be

1   untrue in this period, and the mom was saying, "He's going to" --

2   "I'm going to kick him out, he's never going to do it again, he's

3   not going to hurt any of your sisters anymore" or whatever.  That

4   was all part of the narrative that was at play for Janika,

5   allegedly, through her testimony, as she determined how she was

6   going to formulate her response to the authorities.  So I think

7   that is fairly included in this.

8        The question is whether we can find a way that satisfies

9   both sides to make clear that that's not the only limited -- you

10   know, the only purpose for which you can consider it, but what

11  I'm really trying to do is say what you can't do is take this as

12  evidence -- in and of itself, proof of the crimes for which

13  Mr. Hillie is charged.  It's admissible because it's relevant to

14  it, but finding that he slapped her is not enough to meet the

15  elements.  That's really the thrust of this.

16       Now, you know, we may have pulled it back too far, and the

17  Government is now concerned that we don't allow them to use it

18  for all the reasons that it could be used.  And so I'm trying to

19  come up with a way to accommodate that concern, but I think in

20  the main, where we're really trying to present them, as it goes

21  on to say, the law does not allow you to convict him simply

22  because you may -- you believe he may have done bad things that

23  are not specifically charged as crimes in this case.  All of that

24  is coming in.  So let me think about a sentence, and I would

25  appreciate the parties' sort of thought process with respect to

1    this as well.

2         MS. SLAIGHT:  What I'm concerned about is that this

3    wording makes it appear that Janika was going to be -- No. 1,

4    that there was a pattern of hitting and that was part of the

5    abuse pattern, which is not true, and then -- and secondly, that

6    Jaden was -- that Janika was afraid that she would be hit, and

7    that's clearly not accurate.

8         THE COURT:  All right.  Let me -- your objection is noted.

9         The -- Janika -- the language that currently exists I'm

10   ruling is fine.  Let me figure out how to accommodate the

11   Government's concern, but I probably need a moment to do so.  I

12   think what we'll do is --

13        Are there any other issues?

14        MS. HERTZFELD:  No, Your Honor.

15        THE COURT:  Oh, the verdict form, I wanted to talk about

16   the verdict form, too, sorry.

17        MS. SLAIGHT:  Your Honor, I don't know what -- I think we

18   were supposed to start at 10.  I just wanted to tell the Court

19   that I'm feeling a lot better today, but I had to leave my office

20   early yesterday so that I -- I just, you know, wasn't --

21        THE COURT:  Yes.

22        MS. SLAIGHT:  -- prepared.  So I just need a half an hour

23   before we start closing, because I had to do all of these other

24   things, and I just need to --

25        THE COURT:  I think that's fine.  I told the jury to be

1    here at 10.  It's now 10 minutes of.  If we plan to start the

2    closing at like 10:30, I'm not bent out of shape and I think

3    they'll be fine with it.

4         MS. SLAIGHT:  Okay.  Thank you.

5         THE COURT:  Ms. Slaight looks like she wants to say

6    something -- I mean, Ms. Hertzfeld.

7         MS. HERTZFELD:  So I thought Your Honor was asking if

8    there were other issues with the jury instructions.  There's not.

9    The only other thing that the Government wanted to raise is we

10   prepared two demonstrative exhibits that we intend to use in the

11   closing, one of which is a timeline that just has the dates of

12   the -- children's ages and where they were living and then the

13   dates that correspond with each count.  We've given that to

14   Ms. Slaight, and I don't know if there's any objection to us

15   referring to that in the closing, but I wanted to raise that

16   before we begin.

17        And then I've also prepared a demonstrative that has, with

18   respect to each count, a summary of the elements, just with

19   little -- like a checklist of the elements that the jury has to

20   find that I would intend to refer to during closing.  That, I

21   sent to Ms. Slaight last night.  I understand that she does

22   object to -- she has a general objection to my using this during

23   closing.

24        I would say, for the record, I took the elements out of

25   the jury instructions, and my intent would be to say to the jury

1    that, you know, the judge is going to give you detailed

2    instructions that you are to follow as you apply the law in this

3    case.  This is a summary of the elements, just the elements of

4    each offense that I'm going to talk through with them, and I'll

5    refer to it during the course of closing.  So I wanted to raise

6    that with the Court.

7         THE COURT:  So, Ms. Slaight, what is your objection, that

8    the summary is inaccurate?

9         MS. SLAIGHT:  Your Honor, I don't think it is accurate

10   because it's too abbreviated.

11        THE COURT:  All right.  I don't have a copy, so I don't

12   know.  Well, I mean, obviously, they're not going to be able to

13   spell out the entire statutory framework on a slide with all --

14   with respect to all of these counts, so -- and they're going to

15   be clearly instructed that the Court is going to give them the

16   actual law that they have to apply, and I don't have any problem

17   with this, because the Government is going to use it basically

18   just to articulate points that she is clearly entitled to make

19   regarding what the elements are and whether or not, in her view,

20   the evidence has established them, so the -- that demonstrative

21   is allowed.

22        What about the other one, did you have an objection to the

23   initial --

24        I don't have that one either, Ms. Hertzfeld.

25        MS. HERTZFELD:  I'm sorry, I'll hand that up to Your

1   Honor.

2          (Complied.)

3          THE COURT:  Yes, Ms. Slaight?

4          MS. SLAIGHT:  Your Honor, this just goes to -- maybe I'll

5   let you --

6          THE COURT:  I'm sorry?

7          MS. SLAIGHT:  I'm going to a next point so --

8          THE COURT:  Okay.  So you don't have an objection to the

9   timeline 1?

10         MS. SLAIGHT:  No.

11         THE COURT:  Okay.  So those are fine.

12         Yes, Ms. Slaight?

13         MS. SLAIGHT:  And I'm just speaking off the top of my

14  head, because I didn't -- does the -- are there instructions

15  regarding accidental touching as a defense?  If there are not,

16  there's clearly an issue about him saying an accidental --

17         THE COURT:  Well, I don't -- I didn't see any pattern

18  instructions related to it.

19         Isn't that an issue of intent?

20         MS. SLAIGHT:  Right, it is.  And I just --

21         THE COURT:  So there's --

22         MS. SLAIGHT:  -- thought of this, and I just wanted to --

23         THE COURT:  There's an --

24         MS. SLAIGHT:  -- make sure that it's covered in the

25  instructions.

1        THE COURT:  I think where you would raise it, if you

2   wanted to make it clear in that way, is to give me another

3   sentence in your theory of the case, that the Defense also

4   contends that any touching -- you know, that if you believe that

5   any touching occurred, that it was accidental or something like

6   that, and therefore, Mr. Hillie did not have the intent, because

7   it's -- the accident, I think -- and, you know, you're just

8   raising this now, too, so I haven't done any research.  But it

9   would seem to me to go to the intent element of these sex abuse

10  crimes.

11       MS. SLAIGHT:  Right.  It's clearly a defense to the

12  charge, and one of the counts -- I don't know the number off the

13  top of my head, but it was Jaden with a breast and watching TV.

14  He had said to her, you know, "I apologize," saying it was an

15  accident.

16       THE COURT:  Right.  And so if you want to say something

17  about that in the Defense theory, give me another sentence to add

18  it in.  I don't think that there's an instruction that pertains

19  to it because it's just the opposite of intent.  The Government

20  has to prove intent, and if you have facts that indicate that he

21  didn't intend to sexually abuse her in the way that is being

22  alleged, then you say that.  So that's the -- at least the way

23  I'm characterizing it.  I didn't see any accidental -- but we can

24  check before we go through this.

25       All right.  So the verdict form, we took what the

1    Government gave us, and we cleaned it up a little bit.  One thing

2    I wanted to have clear is that the Government's version had Roman

3    numerals, for example, but the indictment and the jury

4    instructions all had Arabic numbers, so we changed it so that

5    everything is consistent and the jury is not confused about the

6    different counts.  We took out Count No. 11.  There was some

7    minor things with dates and -- that didn't correspond with the

8    indictment, so we went off of the indictment making sure that all

9    the dates were correct.  So it's mostly a formatting thing.  I

10   don't think there's anything substantive that's different from

11   the way the Government had it laid out.

12         Is there any objection to the verdict form that you are

13   aware of?  Again, this is -- the substance of the Government is

14   just with these minor technical changes.

15         MS. HERTZFELD:  No objections.

16         MS. SLAIGHT:  Nothing in addition to any previous

17   objections.

18         THE COURT:  All right.  So we'll go with that as the

19   verdict form.

20         And why don't we -- so it's now four minutes to 10.  The

21   jury should be here at about 10.  I think if we plan to begin in

22   earnest at 10:30, why don't we come back at 10:25, which is a

23   half an hour from now, and I can talk to you about the one

24   potential additional sentence.

25         MS. HERTZFELD:  Thank you, Your Honor.

1          THE COURT:  All right.

2          MS. HERTZFELD:  The only other question --

3          THE COURT:  Yes.

4          MS. SLAIGHT:  -- I would have is, did the Court decide how

5    it intends to handle letting the jury know that Count 11 no

6    longer is included in the --

7          THE COURT:  In the instructions -- well, that's a good

8    point, because I instruct them afterwards.  When we get to the

9    substantive offenses, I think I just have a sentence that says

10   Count 11 has been resolved and no longer needs to be considered

11   by you or something like that, but let me just find it.

12         MS. HERTZFELD:  And, Your Honor, that -- what, I think,

13   Your Honor is referring to is on Page 17.

14         THE COURT:  On Page 17.

15         MS. HERTZFELD:  The top.

16         THE COURT:  Yes.

17         "During the course of this trial, one of the charged

18   counts was resolved and will not be presented for your

19   consideration.  I will now read the remaining 16 counts."

20         MS. HERTZFELD:  I think that's fine.  I just wondered if

21   the Court -- maybe it's sufficient to say this after the

22   closings.

23         THE COURT:  Um-hmm.

24         MS. HERTZFELD:  I just didn't want to leave the jury

25   wondering.

```
1          THE COURT:  You mean before -- whether when to say it with

2     the timing of it now?

3          MS. HERTZFELD:  Yes.  But I also think it's--

4          THE COURT:  Well, they don't have a copy of the

5     indictment.  It's not the Court's intention to give it to them,

6     and, you know, I talk about it in this way in the instructions,

7     and so the question is, is it going to be an elephant in the

8     room.  I don't think so.  I think there are so many moving parts

9     in this case that it's not like one of three dropped out and they

10    don't know what's happening.

11         MS. HERTZFELD:  All right.  I withdraw what I was --

12         THE COURT:  Okay.  All right.  So let's come back at

13    10:25.

14         (Thereupon, a recess in the proceedings occurred from

15    10:01 a.m. until 10:35 a.m.)

16         THE COURT:  All right.  We had two minor holdover matters

17    that I wanted to address, and then we'll bring in the jury for

18    opening -- or closing statements.

19         Yes?  Oh, sorry.

20         (Thereupon, the defendant entered the courtroom.)

21         THE COURT:  Okay.  We're about to begin with the closing

22    statements.  Let me just address two minor issues that are

23    holdovers from our charging conference.  The first is we did look

24    up any pattern instructions related to accident, mistake, and the

25    like.  It comports with my instinct on this, which was that the
```

1    committee decided that no general pattern instruction would be

2    available for those kinds of issues, and that instead, a Defense

3    theory instruction tailored to those facts is appropriate.

4         So, Ms. Slaight, when we're done with the closings, if you

5    want to give us that language to insert, we will put it into the

6    instructions.

7         The second is with respect to the one instruction we

8    talked about, which was the other crimes evidence pertaining to

9    the assault.  My clerk has given you what I am proposing.  I had

10   a mentor who once said when in doubt, be as general as possible

11   and try to track the language of the statute or the rules, which

12   is what I have done.  I took out some of the specifics that

13   Ms. Slaight was worried about, made it more general, and

14   essentially tracked Rule 403(b)2 language insofar as I thought

15   that the evidence that we were discussing might be probative of

16   those particular categories of information that are listed as

17   permissible uses in the statute, and so that's what I did.

18        We'll have a moment again after the closings if you want

19   to address specifically with me or if you have any thoughts about

20   them.  I know I just gave it to you right at this moment.

21        Ms. Hertzfeld, any --

22        MS. HERTZFELD:  Having just looked over it just now, Your

23   Honor, it looks fine to me.  Thank you.

24        THE COURT:  All right.  Ms. Slaight?

25        MS. SLAIGHT:  I have no additional comment.

1          Your Honor, I did notice that the charging document is

2     very specific about Count 12, the dates -- or it is specific, at

3     any rate, if not very specific.  Anyway, there's -- Count 12 was

4     in June of 2014, and I intend to argue to the jury that that's

5     what they must find, that it was in June of 2014 that this

6     alleged count was committed, and I just want to -- I would first

7     suggest to the Court that the Government didn't prove that it

8     occurred during that time, and in the event the Court does not

9     grant an MJOA on that, that that is an issue for the jury, that

10    the --

11         THE COURT:  Well, I will certainly hear your argument at

12    the appropriate time.  What I don't know is the extent to which

13    an indictment that lists a date range but also lists conduct that

14    is sufficient to meet the elements of the statute, because the

15    date range is not an element, binds the Government to

16    establishing the conduct within the date range alleged.  I'm not

17    sure about that.  I would have to look it up in order to really

18    be able to evaluate, because I hear you saying the indictment

19    lists a certain date, and that you intend to basically suggest to

20    the jury that if the Government hasn't proven that date range,

21    that they can't find him guilty, which I don't, off the top of my

22    head, feel is consistent with the law, because there are elements

23    of an offense, and that is what the Government has to prove in

24    order to determine -- to establish beyond a reasonable doubt that

25    the person is guilty of the offense.  And whether or not the

1    indictment includes additional prefacatory or explanatory

2    language I don't think makes it transform that language into an

3    element such that a person could be found not guilty if the

4    indictment's reference to things like dates and other extraneous

5    material is not proven.  I don't -- this is not a ruling.  I'm

6    just forecasting what I'm going to be researching in light of

7    your comments, but let me have the Government if they have --

8              MS. SLAIGHT:  And --

9              THE COURT:  Sorry.

10             MS. SLAIGHT:  And I would say an issue is this -- if the

11   jury -- if the grand jury indicted over concerning specifics of

12   an incident, the incident is not as alleged by the grand jury,

13   but --

14             THE COURT:  Right.

15             MS. SLAIGHT:  -- as -- if in trial it's not proven as

16   alleged in the grand jury indictment, then there's a variance

17   that is not curable.

18             THE COURT:  All right.  Ms. Hertzfeld?

19             MS. HERTZFELD:  Thank you, Your Honor.

20             Looking at Count 12, it alleges that it was between on or

21   about a date range that is a bit narrower than I think what the

22   testimony was.  The Court is going to be instructing the jury

23   consistent with the on or about -- the proof of on or about in

24   the jury instructions, that the indictment charges of that

25   offense was committed on or about that date range, and that the

1   proof doesn't have to establish with certainty the exact date of

2   that alleged offense, but that it's sufficient evidence for the

3   Government to put on, you know, beyond a reasonable doubt that

4   the offense was committed on a date range reasonably near or

5   within that date range, and I think the evidence here certainly

6   established that with respect to every count of the indictment.

7          The indictment alleges with specificity what sexual acts

8   are at issue in each count.  And so I think there's certainties

9   in terms of what the grand jury indicted on with respect to

10  Count 12 and every other count.  The conduct that's at issue and

11  a date range of on or about that is sufficiently close in time

12  for the jury to make a finding that the Government has put on

13  sufficient evidence, that the Government has proven that beyond a

14  reasonable doubt.

15         THE COURT:  All right.

16         MS. HERTZFELD:  So I don't think there's such a problem.

17         THE COURT:  All right.  I will take this issue as forecast

18  by the defendant under advisement.

19         Other than that, is there anything else we need to address

20  before we bring in the jury for closing statements?

21         MS. HERTZFELD:  Not from the Government.

22         THE COURT:  Ms. Slaight?

23         MS. SLAIGHT:  No, Your Honor.

24         THE COURT:  All right.  So I'll have them come in.

25         (Jury in at 10:45 a.m.)

1      THE COURT:  Good morning.  You may have a seat.

2      As I mentioned to you when we closed yesterday, both sides

3  have rested, which means there will be no additional presentation

4  of evidence at this point, but we have come to the point in the

5  proceedings in which the parties, the lawyers from each side,

6  will be making closing arguments to you.  So we begin with

7  Ms. Hertzfeld.

8                **CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT**

9      MS. HERTZFELD:  Thank you, Your Honor.

10      Good morning, ladies and gentlemen.

11      Jaden and Janika were very young girls, nine and 10 years

12  old, the very first time that Charles Hillie sexually abused

13  them.

14      And as such young nine- and 10-year-old girls, the very

15  first time that Charles Hillie sexually abused them, they did

16  exactly what grown-ups, parents, teachers, guidance counselors

17  for generations have been telling kids to do.  The very first

18  time that Charles Hillie molests these two girls, they go to

19  their mother, and they report to her what's happened, the very

20  first time.

21      It's a really sad fact that when they did what grown-ups

22  told them to do, they went to a trusted adult who was responsible

23  for taking care of them, they didn't get the response that they

24  wanted, but they did exactly what we told kids to do, what we

25  always tell kids to do.

1       What's amazing now is that all these years later, after

2   Janika spends years of her childhood being abused by Mr. Hillie,

3   from the time she was in the fifth grade all the way up until

4   she's in the 11th grade, and Jaden, who's been abused thankfully

5   for less time than Janika in her childhood because she has a

6   father, a biological father who lives close by and is able to

7   come and rescue her from the household where this is happening,

8   after all these years, after instance, after instance, after

9   instance of abuse, when Jaden and Janika came in here to tell you

10  what happened to them that very first time they were molested by

11  Charles Hillie, they remembered it clear as day, and they

12  remembered that they did what grown-ups told them to do, and they

13  told their mother.

14      If you remember, Janika came in, and when she was on the

15  stand, she said -- she was about 10 years old.  She was in the

16  fifth grade living on Good Hope Road.  She's living with her mom

17  and Mr. Hillie and her sister, and she told you the details of

18  standing there in the kitchen in that tiny little apartment on

19  Douglas Road.  She's cooking herself some food, and she's having

20  a conversation with Mr. Hillie, which seems like something

21  totally normal to have happening in that house, and then she

22  tells you the very first time he actually sexually abuses her.

23  He comes over as she's cooking herself some food, and he pulls

24  back the back of her pants, and he's looking down her pants, and

25  then he puts her hands -- his hands on her butt and is groping

1    her.

2          And what does Janika do that very first time?  She tells

3    you, "I went and I told my mother."  I told my mother that

4    Mr. Charlie, which is what both of the girls called him, had

5    groped her on her butt, and she remembered with equal clarity

6    what her mother's response to that was.  She told you, "My mom

7    asked me a bunch of questions.  She got kind of mad, and then she

8    went and she talked to Mr. Charlie.  I heard her yelling at him,

9    and she came back to me and she said, 'He's sorry for what he

10   did, and that's not going to happen to you again.  I promise.'"

11   And Janika told you that her mother didn't keep that promise to

12   her.  That -- instead, it continued to happen.

13         Jaden came in here, and she took the witness stand, and

14   she told you with equal clarity that similarly, when she got

15   older, when she turned nine years old, for the very first time

16   Mr. Charlie sexually abuses her.  And she tells you she

17   remembered she's in the house, same house on Douglas Road in that

18   apartment, the tiny little apartment that she shared with her

19   family, and she's playing with her baby sister, Kamaria, and she

20   said, "I was chasing Kamaria around that table in the living

21   room, and I remember Mr. Charlie grabbing me by my stomach,

22   pulling me towards him," and she says, "He reaches around me, and

23   he starts groping my breasts with his hands."  And she's

24   nine years old.

25         Now, she manages to get away from Mr. Charlie, and she

1    runs into the other room.  And how much does this sound like

2    something a kid would do?  She said, "I just started playing with

3    my sister again."  She started chasing her sister back around

4    that table.  She goes back into the living room.  She's home

5    there by herself with Mr. Charlie in charge of watching her, in

6    charge of taking care of her, and left there to take care of her

7    by her mother.  And what did he do?  He grabs her again, grabs

8    her by her stomach, pulls her over next to him.  This time, when

9    he gropes her breasts with his hands, he goes up underneath her

10   shirt, and he's feeling her bare breasts at nine years old.  And

11   then she says he doesn't stop there.  Then he puts his hands down

12   her pants, down inside her pants, underneath her pants,

13   underneath her underwear, and he's feeling -- he's rubbing around

14   on her vagina with his hand.  And she tells you she remembers

15   being nine and he doesn't stop there.  Then he pulls out his

16   penis, and she says, "At that point, he pulls his penis out of

17   his pants and I ran away."  She runs for safety to the bathroom.

18        And then ultimately, goes back into her bedroom, and what

19   does Mr. Charlie do?  He comes in the room, and he says to her,

20   "I'm sorry, that's never going to happen again."  Except for in

21   that same moment, he takes her in the hallway away from where her

22   baby sister is, shows her his penis again and says, "Touch it,

23   touch it."  And as a nine-year-old, she doesn't touch it.

24        And later, when she has the opportunity, she said a couple

25   of weeks later, she gets up her courage, and what does she do?

1   Exactly what we would want her to do, she tells her mother.  She

2   tells her mother, "Mr. Charlie did this to me.  Mr. Charlie is

3   abusing me."  And the same thing for Jaden as happened to Janika,

4   she gets a really disappointing response.  It's a sad truth of

5   these children's lives that when they did what they were supposed

6   to do, they went and reported that Charles Hillie was sexually

7   abusing them, their mother didn't protect them.  What they were

8   asking, what they wanted, they both told you, was they wanted

9   their mother to just kick Mr. Charlie out of the house.  "This is

10  the guy who's abusing us, and we want him gone."

11       And it's a sad truth that their mother didn't do that, and

12  that the result was that Charles Hillie was able to stay in that

13  house, and he was able to abuse them again and again and again

14  over years.  He was able to stay in that house and abuse them as

15  his sexual objects, to gratify his sexual interests again and

16  again and again.

17       He was able to stay in that apartment and sneak around and

18  creep up on them.  He was able to have access to them to hide a

19  camera in Janika's bedroom, in the bathroom, to capture these

20  videos of this object of his sexual interest, a child he's got a

21  sexual interest in he's able to stay in that home to capture

22  videos of, that you got to sit here and watch last week, because

23  their mom didn't do what they wanted and get him out of the

24  house.

25       So the result to these girls, to Jaden and Janika, you

1    heard their Aunt Josephine describe it as they went into

2    protection mode.  Protection mode.  They're living in a house

3    with a man who over and over and over again is sexually abusing

4    them, who's creating this atmosphere where they are -- they

5    constantly feel uncomfortable and scared of him.  Janika told you

6    that she didn't -- there was not a day in her house that she felt

7    comfortable.  She said, "I felt uncomfortable every day in my own

8    house."

9         You heard Jaden tell you that that day that Charles Hillie

10   walked into the bathroom when she was on Good Hope Road, the day

11   when this finally all came to a head and her father finds out and

12   takes her out of that house, the day that Mr. Hillie strikes her

13   for telling her mother what's going on, that day leading up to

14   all of that's happening, she's in the bathroom, she's on the

15   toilet, and when Mr. Hillie barges in the doorway of that

16   bathroom and he's "shhhh", he's signalling her to be quiet and

17   he's walking towards her, she said, "I felt afraid."  She felt

18   afraid in her own house, in her own bathroom.  And she said the

19   reason she felt afraid was because she knew what was going to

20   happen.  How did she know it was going to happen?  She said, "I

21   thought the same thing that was going to happen as what always

22   happened."  She was going to be abused.

23        These are two kids who lived in a house where every day

24   they had to be scared and afraid of being abused by Charles

25   Hillie.  It kind of reminds me of like a kid who's, you know,

1    going to school, imagine, and every day, that child, when they're

2    going to school, they get picked on by a bully, right?  And so

3    they go and they tell somebody, which is what we tell kids to do,

4    "Hey, I'm being picked on by a bully," and nobody does anything.

5    Think about what that kid does to protect themselves.  They might

6    start wearing different clothes to school so they don't get

7    picked on or not carrying their lunch money so it can't be

8    stolen.  Maybe they start not going out to recess with the other

9    kids because that's what they have to do to protect themselves

10   from this bully.  Maybe they start walking a different way home

11   so they don't run into this person.  They go into protection

12   mode.

13        And that's exactly what Aunt Josephine told you that

14   Janika and Jaden did.  And you heard evidence of that.  You heard

15   that when Janika was around and Aunt Josephine could observe her,

16   she would become hypervigilant about locking doors.  She said

17   sometimes she would put furniture in front of the door so that

18   somebody couldn't come in.

19        You heard testimony that Jaden, when they moved into that

20   Good Hope Road apartment and she was now sharing a bedroom with

21   Kamaria, because the defendant kept sneaking into her bedroom and

22   is sexually abusing her in the middle of the night, what does she

23   do?  She goes into protection mode, and she goes and she starts

24   sleeping in her older sister's room hoping that maybe that's a

25   place that she can be safe, maybe that's a place where Charles

1    Hillie can't come in and abuse her.

2        You heard Janika say that what she did is she started

3    doing things where she wear baggier clothes.  Maybe that would

4    make her seem less appealing to this grown man over here, Charles

5    Hillie.  Maybe this child should start wearing baggier clothes.

6    She sat on the stand and she broke down on that witness stand

7    talking about how she thought maybe that's what she should do

8    because this is her fault.  Maybe that young child, maybe it was

9    her fault.  Maybe she'd done something to make him think he

10   should do this to her.  So she changed what she did.  She went

11   into protection mode.  Imagine this young girl having to worry

12   about whether it's her fault that this grown man comes into her

13   room and abuses her.

14       Now, ladies and gentlemen, I submit to you that some of

15   what you saw when Jaden and Janika came in here and took the

16   witness stand and had to tell you about what was going on in that

17   home is a product of what they went through with Charles Hillie

18   and the fact that they spent these portions of their childhood in

19   protection mode.

20       You saw Jaden come in here.  She's 15 years old now.  By

21   all accounts, she's doing pretty well.  She likes school.  She's

22   a published poet.  She's taken this bad thing that happened to

23   her and she started writing about it, and she turned it into

24   something in her life that's become positive, but nonetheless,

25   when she came in here and she got up on that witness stand, you

1    could see in her how subdued and shy and quiet she became.

2    Didn't it seem to you like she just wanted to get this over with?

3    She answered the questions she was asked.  But you could see, she

4    didn't want to look at him, not when he's looking at her.  She

5    gave the answers that she needed to give to get through this.

6    You could see her shrink down when she had to talk about the way

7    that Charles Hillie was abusing her as a nine- and 10-year old,

8    how she shrunk down in her seat when she had to say the word

9    "vagina" in front of all of you.

10        And I submit to you that you could see in Janika when she

11   came on and got on the witness stand the results of all of those

12   years of abuse and being in protection mode.  She got on the

13   witness stand, and you could see exactly how she told you she

14   felt angry.  You could see that anger in her.  You could see the

15   fact that she was in protection mode.  Even when Mr. Okocha was

16   asking her questions, you could see that in her, to have to get

17   up there and answer those questions in front of all of you.

18        Ladies and gentlemen, when those girls went to their

19   mother, they didn't get protection, they didn't get it, and the

20   results of that are part of what you could see and that you can

21   take into account their demeanor when they came in here and they

22   talked to you.  They didn't want to have to go through what they

23   went through, coming in here and talking to you.  What they

24   wanted was their mother to throw Mr. Hillie out of the house.  Do

25   you think they wanted everything else that had to happen to make

1  that stop?  Do you think they wanted Child and Family Services to

2  come into their home?  Do you think they wanted to have to talk

3  to the police?

4      You heard Janika say she was a kid who loved her mother.

5  She still loves her mother.  She was a kid who tried to obey her

6  mother, who tried to do what her mother asked.  When her mother

7  told her, "You're going down to North Carolina to live with your

8  dad," who she hadn't seen since she was 12 at the age of 17, when

9  Mr. Okocha asked her, "Well, you didn't want to go.  Why did you

10  go?"

11      She said, "Because my mom told me to."

12      This is a girl who's trying to do the right thing, to try

13  to listen to her mother when her mother told her, "Don't tell the

14  authorities what's happening in this house because it will split

15  us all up."  She did what her mother told her to do.  She's torn

16  up by the fact that she loves her mother and she's trying to obey

17  her.

18      Do you think she wanted to come in here and sit up on the

19  witness stand and tell you about all that stuff that happened to

20  her, to talk about these really humiliating, private,

21  embarrassing moments?  Do you think that's what these girls

22  wanted?  Of course not.  What they wanted was their mother to do

23  something about this.  They wanted their mother to hold Charles

24  Hillie responsible for sexually abusing them.  When they were

25  little girls, that's what they wanted from their mother, and she

1    didn't do it.

2         And, ladies and gentlemen, now that they're older, I don't

3    know where it came from, but they had the courage to walk in

4    here, get up on the witness stand, and tell you the things they

5    told their mother, to tell you about the abuse they told their

6    mother about and more.  They gave up telling their mother

7    eventually.  Jaden told you, "Why would I tell her anymore?  It

8    wasn't doing any good."  You heard Janika say, "She acts like she

9    didn't care."  They gave up telling their mother, but they had

10   the courage to come in here under these kinds of circumstances

11   and to tell you.

12        And so now, you, as the grown-ups in their lives, have the

13   opportunity to hold Mr. Hillie responsible for the crimes that he

14   committed against those girls.  You have the opportunity to hold

15   him responsible for sexually abusing Jaden and Janika.  You have

16   the opportunity to hold him accountable for the fact that he

17   snuck around that house and he videotaped the most private

18   moments.  The fact that he videotaped Janika to get videos of her

19   vagina, that he snuck around and hid a camera in her bedroom, in

20   her bathroom to get videos for his own sexual gratification, you

21   have an opportunity to hold him accountable for that, even if

22   their mother didn't.

23        Now, I want to talk to you a little bit about how you go

24   about doing that, because when I'm done talking and Ms. Slaight

25   is done talking, you're going to get a very long series of

1    instructions, a detailed set of instructions from the judge about

2    the law that you're supposed to apply to all the evidence that

3    you heard in this case, that you heard over days and days in this

4    case.

5         And when you get back in the back, you're going to have a

6    verdict form that's pages and pages long that you have to fill

7    out.  You have to evaluate the evidence.  You have to apply the

8    instructions that the judge is going to read to you.  They're

9    long, too.  And I want to walk you through how to apply these

10   instructions to the facts that you heard and then go about

11   completing that verdict form, and I want to go through each of

12   the counts of the indictment that you're going to be deciding,

13   element by element, and I want to go through sort of a timeline

14   of how all the facts you've heard fits together so that you can

15   fill out that verdict form and you can understand how the

16   evidence fits with the various counts that you've heard about.

17        So I'm going to start out by showing you -- it should pop

18   up on your screens there -- a little checklist of the elements

19   for Counts 1 and 2 of the indictment.

20        Do you guys have that on your screen?  All right.

21        So for Counts 1 and 2 of the indictment, the defendant is

22   charged with sexual exploitation of a minor, what we're calling

23   production of child pornography.  The evidence that's -- the

24   primary evidence that you're going to be thinking about with

25   respect to these two counts are Government's Exhibits 4 and 5.

1    Those are those videos that you saw where the defendant goes into

2    the bedroom and sets up a video camera under Janika's bed, makes

3    sure it's just right, and then records her when she comes in out

4    of the shower and captures images of her vagina and her pubic

5    area.

6         Exhibit 5 is that video where you see the defendant hiding

7    the camera up in the vents in the bathroom and he captures the

8    video of Janika in there.  She takes off her pants, and she gets

9    out a washcloth, and she's scrubbing at her vagina.  She's up in

10   the corner of that video, and you can see her doing that for a

11   significant period of time.

12        Those are the two videos that are the subjects of Counts 1

13   and 2.

14        Now, I'm going to have Mr. Okocha play for you a little

15   bit of Government's Exhibit 4 and 5, and the reason I'm going to

16   have him do that is because they go to this first element.

17        MS. SLAIGHT:  Objection, objection, objection.

18        THE COURT:  Approach.

19        (Following sidebar discussion had on the record:)

20        MS. SLAIGHT:  Your Honor, I object to her selecting out

21   parts of the video.  Because it unnecessarily emphasizes -- it

22   doesn't leave -- the video, as a whole, is what the Government is

23   charged with.

24        THE COURT:  And I will instruct them as such.  These

25   videos, as a whole, are in evidence.  The jury is not going to be

1    getting the clips, but the Government can reference portions of

2    the video in their discussions and say to the jury, "When you

3    view the video as a whole, to keep this portion in mind."

4    There's nothing inappropriate about that.  The only thing the

5    jury will receive as evidence is the entire video, but in the

6    closing, the Government can argue its -- make its argument with

7    regard to whatever portion of the video they would like to.

8            MS. SLAIGHT:  Okay.  Keep my objection for the record.

9            THE COURT:  All right.

10           (Sidebar discussion concluded.)

11           MS. HERTZFELD:  All right.  So, ladies and gentlemen, with

12    respect to elements for Counts 1 and 2, the first element here is

13    that Charles Hillie employed or used Janika to engage in sexually

14    explicit conduct.  Here, the sexually explicit conduct we're

15    talking about is the lascivious exhibition of Janika's genitals

16    and pubic area for the purpose of producing a visual depiction of

17    such conduct.

18           All right.  So you're going to get a bunch of instructions

19    about what all those words mean.  But what you're going to hear

20    is that using or employing Janika means that she's the subject of

21    this video that the defendant is shooting.  The defendant is

22    using or employing her.  He's making her the subject of the video

23    that he's trying to capture.  So that part is easy.

24           And he's using it for the purpose of creating a visual

25    depiction.  Visual depiction here is the video itself.  That's

1       what we're talking about, and I want you to take a look at

2       Government's Exhibits 4 and 5, because we're going to talk more

3       about the sexually explicit conduct or the lascivious exhibition

4       of Janika's genitals that's depicted here, and we're just going

5       to play a portion of Government's Exhibit 4 first, and I'm just

6       directing you to the portion of the video that I really want you

7       to focus on when you go back into the jury room and you take a

8       look at the lascivious exhibition of Janika's genitalia.

9               (Videotape played.)

10              MS. HERTZFELD:  All right.  That's just a little sample

11      that's taken from Government's Exhibit 4, and when you go back

12      there, I want you to look at Government's Exhibit 4 again.  I

13      know you saw it on Friday, but I want you to look at it again and

14      see, that's one example of a place in which, based on how the

15      defendant has captured this video, you can see the lascivious

16      exhibition of Janika's genitalia.  It happens over and over and

17      over in the video.  There's multiple times where you see her

18      vagina, you see her pubic area, and that's the area we're talking

19      about being captured for purposes of this lascivious exhibition.

20              Now, I'm going to have you take a look at Government's

21      Exhibit 5, just a little clip out of that video as well just to

22      kind of direct you to the place to look on this video.

23              (Videotape played.)

24              MS. HERTZFELD:  I'm going to stop it there.

25              So, ladies and gentlemen, and this happens again in this

1   video, but when you go in the back, go ahead and take a look at

2   that part of the video.  That's where you can see the depiction

3   that the defendant manages to capture of Janika's genitalia.

4   That's the subject of the production of child pornography that's

5   Government's Exhibit 5 that's captured in Count 2.

6          So with respect to the lascivious exhibition of Janika's

7   genitals, I'm going to have this come back on the screen here,

8   the elements that are on the ELMO.

9          Do you have those on your screen?  All right.

10          So you'll see there's -- you're going to hear from the

11   judge there's a lot of things you can consider, that you can look

12   at to decide if, with respect to Counts 1 and 2, what the

13   defendant has done is captured this lewd and lascivious

14   exhibition of Janika's genitalia.

15          Now, the number one thing you're going to look at is the

16   content of the video itself.  You just had a chance to see that.

17   It is a depiction of her genitals and pubic area, which is what

18   the elements of the offense include.  That's what the lascivious

19   exhibition depicts.

20          Now, let's remember -- you didn't see this part again

21   today, but I want you to think back to Friday how you remember

22   those videos starting, right?  Both of those videos begin with

23   the defendant carrying his recording device, that you'd see his

24   face.

25          In Government's Exhibit 4, you see him going over to that

1    bed that Janika identified and hiding that camera and adjusting

2    it just right and, you know, stepping back to make sure, did he

3    get it, did he get what he wanted, is it at the right angle.  You

4    see him go back over and over and adjust that camera to make sure

5    it's hidden just right so that Janika doesn't see it and that he

6    captures the images that he wants to capture.

7          You see him in that bathroom video doing the same thing.

8    He's got the camera above his face up in what Janika thought was

9    the vent above the toilet.  And if you look at the video, that's

10   consistent with what you can see in the video.  He's adjusting

11   that video camera, making sure it's just right, taking his time.

12   So the defendant is the one who's placing the camera there in

13   order to be able to capture these depictions.

14          Think about where he's putting this camera, right?  Where

15   is he putting it?  He's putting it in the places he knows that

16   he's likely to get Janika coming in, taking off her clothes, and

17   being able to see her genitals and pubic area.

18          And when does he put the camera there?  He puts it -- in

19   every one of those videos, Government's 4 and 5 and also the

20   attempt videos that we're going to talk about in a minute that

21   are Government's Exhibit 6 through 9, those videos as well, you'd

22   see him as he's placing that camera every single time, he puts

23   the camera in the bathroom or in Janika's bedroom right as she's

24   coming out of the shower or she's coming in about to engage in

25   activities where she's going to take off her pants.  Look at all

1    those bedroom videos.  Every single one of them, he goes in,

2    you'd see him set up the camera, try to hide it, make sure it's

3    not someplace she's going to see.  And every time, within

4    minutes, in comes Janika in a towel or, in Government's

5    Exhibit 4, in that little towel skirt she was describing that she

6    wears out of the shower, she comes in and undresses.  Because

7    Charles Hillie knew when he was planting those cameras to be able

8    to record her, that he was going to get her taking off her

9    clothes.  He's trying to capture lascivious exhibition of her

10   genitalia, and in Government's Exhibit 4 and 5, he's a success.

11       Now, I want you to think about the fact that every time he

12   captures these videos of Janika, he puts it strategically.

13   That's another thing that you can consider.  The very fact that

14   he's being surreptitious about it suggests that he's trying to

15   capture a lascivious exhibition of her genitalia.  He's not

16   walking into her room with a camcorder, if anybody even has a

17   camcorder, or a recording device and saying, you know, "Hey,

18   honey," to his stepdaughter, "smile for the camera.  I want

19   to" -- "I'm going to record something now."  He's going in and

20   he's hiding it so she doesn't know what he's capturing.  Why?

21   Because what he wants to capture is a lascivious exhibition of

22   her genitalia.  He doesn't want her to know he's doing that.

23       I want you to think about what Janika told you happened

24   when she found on Charles Hillie's account the picture of

25   herself -- she didn't know it was taken -- from a hidden camera

1    in the OG2 account that you heard from John Marsh belonged to

2    Charles Hillie when she comes across that picture of herself in

3    his account as she's looking through family photos, and there she

4    is, a picture of her in his account without her underwear on,

5    putting her underwear on.  A picture she doesn't know was taken.

6         What's her reaction to seeing a picture like that, a

7    hidden camera picture of her genitals exposed?  What is her

8    reaction to that?  She told you, she's horrified.  She goes to

9    Charles Hillie upset and horrified, and she says, "What is this?"

10   Why is she horrified?  Because he's captured a lascivious

11   exhibition of her genitals that she doesn't know was taken.

12        And how does Charles Hillie react?  You can consider that

13   as well.  His reaction is to tell her, "You're not my seed.

14   You're not my seed."  That itself indicates that Charles Hillie

15   is attempting to and does, in fact, in Government's Exhibits 4

16   and 5, capture these lascivious exhibitions of this child, and he

17   thinks it's okay because she's not his.

18        When you're considering whether this is a lascivious

19   exhibition of the genitalia, I want you to think about who it is

20   he's recording.  Think about what he has done to the girl that he

21   is recording in these videos.  This is a child that Charles

22   Hillie has a sexual interest in.  How do you know?  Because he's

23   sexually abusing her.  How do you know he's interested in looking

24   at her vagina?  How do you know that when the lascivious

25   exhibition, as will be defined to you by the Court, is -- it's a

1   depiction that's intended to incite lust?  How do you know he

2   lusts for Janika's vagina?  Because he's touching it.  Because

3   he's sneaking around, coming up to her in the house, using her as

4   a sexual object and abusing her.  And he wants to get a recording

5   of the same girl that he's sexually interested in that he's

6   actually molesting, and you can consider that.

7        And when you consider all those things, ladies and

8   gentlemen, you can check the box here that Charles Hillie has

9   used or employed that child for the purpose of capturing a

10  lascivious exhibition of her genitalia, so I'm going to check

11  that one.

12       Now, at the time that the defendant captures this

13  lascivious exhibition of her genitalia, she's a minor.  And we

14  created a little timeline for you to help put together the

15  testimony you heard about when these kids were living on Good

16  Hope Road, how old they were, what grade they were in to kind of

17  simplify and put it all together for you.  So I'm going to have

18  Mr. Okocha turn this around.

19       And you can see that with respect to all these child

20  pornography related counts, if you look on this timeline, we

21  started down here in 2007 and we go up to 2012, this is the time

22  when the family is living on Douglas Road.  You heard every

23  single one of these videos is recorded in the bedroom or the

24  bathroom on Douglas Road.  So these are the years you've heard

25  from that leasing agent, the property manager, that that -- these

1   are the dates that they lived on Douglas Road.

2          And we got up here on the top what grade Janika is, and I

3   don't know -- the smaller writing, if you can't see it, it's how

4   old she actually is.  During the time that these various

5   incidents occur on Douglas Road, and we'll get to these later,

6   but here's Jaden's age.  You can see when the family moves to

7   Good Hope.

8          Now, we know all these recordings are made on -- when the

9   family is living on Douglas Road, in this apartment.  So you know

10  they all happen in this time frame.  And in this time frame, in

11  every single one of them, Janika is between 10 years old in the

12  fifth grade, and when they move out of Douglas Road, she's going

13  into the tenth grade, so she's between 10 and 15 years old this

14  entire time they're living on Douglas Road when every single

15  count in Counts 1 through 7, all of the production of child

16  pornography videos are being recorded and attempted production.

17  They all happen in this time period.  So in every single one of

18  them, you know that she's under 15, she's between 10 and 15 years

19  old.

20         So with respect to the fact that she's a minor when these

21  videos are being recorded, the judge is going to hear -- you're

22  going to hear the judge say that means she's under 18, you can

23  check that box.

24         Now, the last element in order for you to find Charles

25  Hillie guilty of producing child pornography is this -- well, it

1   sounds kind of complicated but -- "The visual depiction was

2   produced or transmitted using materials that have been mailed,

3   shipped, or transported to interstate or foreign commerce

4   including by computer."  Okay.  So we're going to call this the

5   interstate commerce prong.

6          And essentially, this is why you heard testimony from John

7   Marsh that whatever this recording device was that Charles Hillie

8   used, we don't know.  He said he thought it was -- it looked

9   like, from the file name, it's an Android phone, but whatever

10  device you see Mr. Hillie's face and that he is using to record

11  Janika, it's not manufactured in the District of Columbia.

12         And that pink laptop computer that John Marsh was able to

13  extract those videos off of, out of that Recycle Bin and out of

14  the carved space, that laptop computer also is not manufactured

15  in the District of Columbia, which means that in order to produce

16  child pornography, Charles Hillie had to use materials that have

17  been transported or shipped in interstate commerce to get them

18  into the District of Columbia.  So we can check that box.

19         So, ladies and gentlemen, with respect to Counts 1 and 2,

20  if you checked all these boxes as I just have, looking at the

21  evidence that the Government has put in front of you, and you

22  find that the Government has proved everything I have said beyond

23  a reasonable doubt, then you can find the defendant guilty of

24  Counts 1 and 2, production of child pornography.

25         So now, I'm going to put up here for you Count 3.

1        Now, Count 3 has a lot of elements, and they sound

2    complicated, but this is the possession of child pornography, and

3    it's actually pretty intuitive given what we just did with

4    Counts 1 and 2.  The defendant produced child pornography.  John

5    Marsh was able to find that child pornography, the same child

6    pornography that Janika saw the image of that she -- that sort of

7    tripped her off and -- knowing that these had been recorded.  And

8    he finds them on the computer in the OG2 Recycle Bin as files of

9    Charles Hillie.  He finds three of them in the card files.  How

10   do we know they're videos that Charles Hillie possessed?  Because

11   he made them.  You see him making those videos on his recording

12   device with his face in front of the camera on every single one

13   of those videos, and so you know they're his.  These are videos

14   that he possessed, he produced.

15       With respect to the elements here, you have to find that

16   Charles Hillie knowingly possess the material containing one or

17   more visual depictions.  That's the video.  As I said, you know

18   I -- he possess them.  You, actually, in a lot of those videos,

19   saw him possessing them in his hand as he walked away having

20   captured the material that he wanted.  So we can go ahead and

21   check that box.

22       The second element you have to find with respect to

23   Count 3 is the visual depiction involving the use of a minor

24   engaged in sexually explicit conduct.  This is the lascivious

25   exhibition of Janika's genitalia.  We already talked about that

1  with respect to Counts 1 and 2.  It's the same visual depiction,

2  the video, so you can go ahead and check that box.

3      The third element is that Charles Hillie knew that the

4  material contained those visual depictions, and he knew that they

5  of a minor engaged in sexually explicit conduct.  Of course, he

6  knew that, he produced them.  He captured exactly what he wanted.

7  So you can go ahead and check that box.

8      And the last element here is that the visual depictions

9  were produced using materials that were shipped or transported by

10  any means including by a computer in interstate commerce.  This

11  is the same thing we just talked about with respect to John

12  Marsh's testimony.  You heard that testimony.  That's not in

13  dispute.  I think you can go ahead and check that box.

14      Now, one little hitch with respect to Count 3 that you'll

15  see on the verdict form when you go in the back is that when you

16  check those boxes, that you heard evidence beyond a reasonable

17  doubt, that Charles Hillie possessed those two videos of child

18  pornography, you're going to see on the verdict form two places

19  where you have to indicate which videos he possessed.  One of

20  them is the Government's Exhibit 4.  One of them is Government's

21  Exhibit 5, and there's a place for you to find he possessed 4 and

22  he possessed 5 because they're both included as the child

23  pornography he possessed for purposes of Count 3.

24      So with those boxes checked, you've got evidence beyond a

25  reasonable doubt that Charles Hillie possessed child pornography.

1        I'm going to talk to you a little bit about Counts 4

2   through 7.  These are, you'll see, labeled on the verdict form in

3   the indictment as attempted sexual exploitation of a minor.  This

4   is the attempted production of child pornography.

5        This is all the other videos you saw in their entirety.

6   This is Government's Exhibit 6 through 9.  These are the videos

7   where you'd see Charles Hillie doing the same thing, going into

8   the same places, the same bedroom, the same bathroom, you'd see

9   his face, planting a camera, trying to capture the images he

10   wants of this child that he's abusing, trying to capture the

11   images of her vagina, and he doesn't get it.

12        You could see some of those bedroom videos, the lighting's

13   off.  He's not a professional cameraman, so a couple of times, he

14   sets the camera up and there's a light source right where she's

15   standing, you can see her takes off her towel and she's nude, but

16   you can't actually see her vagina because the video is too dark,

17   the lighting is off.  You can see that she's got her little girl

18   underwear on with the hearts on them.  But when she moves over

19   and takes them off, she's right in front of that light and you

20   can't see her vagina.  He tried.  He attempted to capture that,

21   but he wasn't successful.  Those are the remaining videos that

22   you had an opportunity to watch.  You won't see the lascivious

23   exhibition because he wasn't successful in capturing it.  That's

24   Counts 4 through 7.

25        So with respect to Counts 4 through 7, what you have to

1    find is that he intended to capture the same kind of thing he

2    captured in Government's Exhibits 4 and 5.  He tried to capture a

3    lascivious exhibition of her genitalia, but it didn't go right

4    for him.  He didn't get what he wanted.  So you can go ahead and

5    check that box.  He intended it.

6         And then you have to find that he performed substantial

7    steps, one or more substantial steps to try to commit that crime.

8    He's -- a substantial step that shows that he's trying to capture

9    child pornography.  Now, you have evidence of that.  First of

10   all, because you know he was able to do it twice, and here, he

11   goes about doing the exact same thing, hiding the camera,

12   surreptitiously sneaking into her room when she's about to take

13   her clothes off so he can get the images he wants.  Going in

14   there, hiding that camera is the substantial step that he took

15   trying to record what he wanted to capture.  So because he took

16   that substantial step, you can check that box.

17        Now, with those boxes checked, you have the evidence you

18   need to find Charles Hillie guilty of attempted production of

19   child pornography.

20        Now, the rest of the counts of the indictment and the

21   verdict form that you're going to be looking at involve the

22   actual sexual abuse of Jaden and Janika.  So we'll walk

23   through -- they look very similar in terms of the charged -- the

24   way that the statutory language reads, the way that the jury

25   instructions are going to be read to you, and I'm going to

1   explain where they're similar and where they're different so you

2   know what you have to find with respect to each count.

3   　　　　Ms. Slaight sat up here in opening and told you that with

4   respect to every one of these, you have to find separately every

5   count, you can't mush them together, you have to find each one

6   separately, and that is true.  And the Government has given you

7   evidence of each one separately, and I want to walk you through

8   that evidence so you know how it applies to each one of these

9   counts of the indictment as you have to find.

10  　　　　So, with respect to Count 8, it's the first count alleging

11  actual sexual abuse, and in this one we're talking about Janika.

12  Count 8 is first-degree child sexual abuse with aggravating

13  circumstances.

14  　　　　Now, you're going to hear all of these sexual abuse counts

15  have aggravating circumstances at the end.  So I'm going to put

16  that aside for a minute because we'll talk about that, because

17  once you make findings as to that, you can apply what you need to

18  know across all of these counts.  So I'm going to put aside the

19  aggravating circumstance.  So we're going to talk first just

20  about first-degree child sexual abuse.

21  　　　　So what makes this different than the other counts of

22  sexual abuse, you'll see the difference in the language.

23  First-degree sexual abuse of a child requires a sexual act.

24  That's the first element.  Now, a sexual act is defined, you're

25  going to hear the judge say, penetration of the vulva, however

1  slight, however slight.  Penetration of the child's vulva.

2      In this case, what's alleged is that incident that happens

3  where Janika told you she's making herself the noodles and the

4  defendant comes in and he shows her the video of the deceased

5  friend and she's making noodles and she says she sees him coming

6  and she wants to get out of there as fast as she can because she

7  knows what's about to happen.  She wants -- she's watching the

8  countdown on her noodles, waiting to get out of there, and here

9  he comes, and he grabs her by the arm, and she testified, in the

10  course of this incident, he puts his fingers up into her vagina

11  including pushing her clothes up inside of her to feel her

12  vagina.

13      Now, he puts his fingers up inside of her, and that is

14  penetration of her vulva, and so that is a sexual act.  So that's

15  what you need to find for the first element here, that Charles

16  Hillie engaged in a sexual act.  That's the penetration of her

17  vagina with his fingers.  So you can go ahead and check that one.

18      Now, for first-degree child sexual abuse, you have to

19  find, at the time, that Janika was under 16 years old.  Now, this

20  again is where it helps to think back to this timeline of how old

21  these kids are during each one of these events.

22      So right now, we're talking about Count 8, and you'll

23  remember when she was describing that incident, she's talking

24  about making her noodles in the little dining room by the

25  microwave.  She was talking about when she lived here on Douglas

1    Road.  And she said that when that incident happened, she was

2    fifth, maybe going into the sixth grade.

3         So you have that here when she's fifth, going into the

4    sixth grade, she's between 10 and 12 years old at that time,

5    living in this Douglas Road apartment.  This is Count 8.  So

6    based on that testimony, you can find that she's under 16 years

7    old, and the Government has met that element, so you can check

8    that box.

9         Now, at the time that Charles Hillie penetrated her vagina

10   with his finger, he was at least four years older than Janika.

11   He's a grown-up.  You can see he was her -- essentially her

12   stepfather.  You've got the birth certificates that the parties

13   agreed to in terms of their dates of birth.  He's obviously more

14   than four years older than her, so that one, you can check that

15   box.

16        And then the last element is that Charles Hillie intended

17   to abuse or humiliate Janika or to arouse or gratify his own or

18   another person's sexual desire.  Now, Charles Hillie has embarked

19   on a course of sexually abusing these children over and over and

20   over.  He's abusing them, and it's clear he's humiliating them.

21   They told you all about that, and he's arousing his own or

22   another person's sexual desire, his own.  These girls didn't want

23   that to happen.  He's doing it to arouse his own sexual desires.

24   The same reason he's touching them, it's the same reasons he's

25   making recordings of Janika, so you can check that box.

1      So with each one of these boxes checked, you've got the

2   evidence beyond a reasonable doubt that Charles Hillie committed

3   the offense of first-degree child sexual abuse involving Janika

4   that day he penetrated her vagina with his fingers.

5      So now, I want to talk to you about the bulk of the

6   remaining counts of child sexual abuse.  These are Counts 9

7   through 10 and 13 through 17.  Each one of those counts charges

8   Charles Hillie with second-degree child sexual abuse with

9   aggravating circumstances.  And on this one again, I'm going to

10   come back to the aggravating circumstances piece at the end and

11   how -- what you need to find that.

12      But with respect to second-degree child sexual abuse, in

13   each one of these -- unlike Count 8 where you have to find a

14   sexual act, with respect to each one of these counts, 9 through

15   10 and 13 through 17, you have to find sexual contact, and that's

16   defined a little bit differently, and the judge is going to give

17   you a definition of that, but essentially, what sexual contact

18   means is a touching.  In every one of these counts, it's Charles

19   Hillie's hand to some part of the child's body: breast, buttocks,

20   or vagina.

21      Okay.  So each one of these is contact.  It's not

22   penetration of the vulva, it's touching with his hand.  So that's

23   the difference between the contact and the act.  And it can be

24   her vulva, her breasts, or her buttocks.  It can be clothed or

25   unclothed, the judge will instruct you.  Over the clothes, under

1    the clothes, doesn't matter for purposes of second-degree child

2    sexual abuse.

3          So in each one of these, you can see at the bottom, I've

4    listed the sexual contact that's alleged for each count.  All

5    right.  With respect to Count 9, we're talking about Charles

6    Hillie's hands making contact with Janika's buttocks.  Now, this,

7    Count 9, refers to that very first instance of sexual abuse that

8    I already described to you in some detail when I started.  So

9    this is that instance, the very first time when she's in the

10   kitchen and she's cooking and he comes up to her and he looks

11   down her pants and he touches her on her butt and he's groping

12   her.  That's contact between Charles Hillie's hands, Janika's

13   buttocks.  That's the sexual act alleged in Count 9.

14         In Count 10, the allegation is Charles Hillie's hand in

15   contact with Janika's breast.  Now, with respect to Count 10,

16   this is that instance that Janika told you about that happened

17   where she's in the shower and the defendant comes and he pulls

18   back the shower curtain and he starts fondling her chest while

19   she's in the shower and she calls for her mother.  That's contact

20   between his hand and her breast.  That's Count 10.

21         Now, these are the second-degree counts that apply to

22   Janika, 9 and 10, and you can see, going back over here to the

23   timeline, I put them on here for you, that Count 9, when she --

24   that very first instance where he pulls back her pants and then

25   touches her butt with his hands, that happens when she's living

1    here on Douglas Road, she told you.  The very first time, she

2    told you she's in the fifth grade.  So you know her age here is

3    10 or 11 years old.  That's Count 9.

4         With respect to Count 10, she says again she can't -- she

5    doesn't have a very clear recollection of exactly when it was,

6    but she told you it was while she lived on Douglas Road.  And you

7    know that she lived on Douglas Road all the way up until she was

8    15 years old.  So at some point when she was on Douglas Road in

9    the shower there, he comes and he opens up that shower curtain

10   and he grabs her by her breasts.  That's Count 10, while she's

11   living on Douglas Road.

12        With respect to the both of those, she's under 16 years

13   old.

14        Now, with respect to Counts 13 through 17, these are

15   instances of second-degree child sexual abuse involving Jaden.

16   Each one of these, again, is sexual contact.  The very first one,

17   Counts 13 and 14, those I've already talked to you about in some

18   detail when I started.  Those are the very first time that

19   Charles Hillie molests Jaden.

20        So that's the time that he's sitting at the desk with the

21   computer, she's chasing Kamaria around the table and he grabs her

22   and he's, you know, groping her breasts.  And then when she gets

23   away, he drags her back by her stomach and he reaches his hands

24   down his pants and he's rubbing her on her vagina.  That's

25   Count 14.  That's his hand to her vagina.

1       So with respect to those, you can look up here on this

2   timeline and they're on here.  When Janika -- or, I'm sorry, when

3   Jaden told you she was nine years old, she's still living here on

4   Douglas Road.  She's nine years old, the very first time this

5   happens, and those are the two ways he abuses her.  He puts his

6   hand to her breasts and his hand to her vulva, so that's

7   Counts 13 and 14.  Those are the sexual contacts.

8       Now, you'll see here, with respect to Count 15, the

9   contact is Charles Hillie's hand to Jaden's buttocks.  Now, this

10  is the instance where she tells you that she's asleep in her bed

11  on Good Hope Road with her little sister, Kamaria, the

12  defendant's daughter, who she shares a bedroom with.  The

13  defendant sneaks into her room in the middle of the night, and

14  she wakes up to a hand groping her buttocks.  She's laying right

15  on top of the covers, he's groping her buttocks.  That's the

16  sexual contact that Charles Hillie engaged in with respect to

17  Count 15.

18      Now, you know, you can go back over here and see that with

19  respect to Count 15, this happens when Jaden says she's 10 years

20  old.  It's before the physical assault where Charles Hillie slaps

21  her in the face that causes her to move to her dad's house.  Now,

22  she moves to her dad's house not long after they move into that

23  apartment.  She told you -- the leasing agent told you they moved

24  to Good Hope -- they moved out of Douglas Road in May of 2012,

25  and they moved to this Good Hope Road apartment.  It's November

1  of 2012 that Jaden told you her father comes and gets her and she

2  gets rescued out of this situation.  And she remembers that

3  because she said November 9th was the defendant's birthday, and

4  it happened right around that time when she's still 10 years old.

5  So Count 15 happens here when she's 10 years old and she's moved

6  into the Good Hope Road apartment when he -- and when he gropes

7  her buttocks in the middle of the night.

8       Now, Count 16 also pertains to Jaden, as does Count 17.

9  Count 16 is sexual contact between the defendant's hand and

10  Jaden's breasts.  This is the incident she told you about where

11  you saw the picture of that couch in the Good Hope Road apartment

12  and she said, "I'm sitting on the couch, I'm watching TV, the

13  defendant comes in, he sits down next to me, and he reaches out

14  his hand" and he gropes her breasts as she's watching TV.  That's

15  Count 16.  You know that happened in the Good Hope Road apartment

16  in the same time frame as Count 15 before her dad comes and

17  rescues her out of that house and she never has to go back to

18  being abused by Charles Hillie, same time period here, when she's

19  10.

20       And then the last count is Count 16 of second-degree child

21  sexual abuse -- I'm sorry, Count 17.  This is the contact between

22  Charles Hillie's hand and Jaden's vulva.  This, again, is one of

23  those middle of the night times when the defendant sneaks into

24  her room and sexually abuses her.  This is the incident where she

25  told you she's in bed, she's got her Cousin Buck or Yemme laying

1   in bed with her, Buck is his nickname, and her sister Kamaria.

2   She wakes up in the middle of the night to feeling the

3   defendant's hand inside her underwear rubbing her on her vagina.

4   And when she wakes up, the defendant, she says, runs out of the

5   bedroom into the hallway.

6        That incident is Count 17.  Again, she told you that

7   happened in her bedroom on Good Hope Road after she moved with

8   her family.  And she was staying in the bedroom with Kamaria

9   here, same time frame as Counts 15 and 16 when she's 10 years

10  old.

11       Each one of those separate sexual contacts between Charles

12  Hillie and Janika and Jaden's buttocks, breasts, and vulva is a

13  separate count of second-degree child sexual abuse when you look

14  at that verdict form.  And you've heard facts from each of these

15  girls testifying beyond a reasonable -- to establish beyond a

16  reasonable doubt that he committed those sexual acts against

17  them, so you can go ahead and check that box.

18       And you've just seen, based on the timing that they

19  testified to, they can't remember exact dates, of course, when

20  each of these happen, but they told you their age, where they

21  lived.  You can put it all together like this and see that each

22  one of those incidents of sexual abuse happened when they were

23  under 16 years old, so you can check that box.

24       Now, again, this next one is easy.  Charles Hillie is at

25  least four years older than Jaden and Janika.  We've already

1    talked about that, so I'm going to check that box.

2          And then the last element, again, is the same as in the

3    prior charge, which is that Charles Hillie intended to abuse or

4    humiliate Janika or Jaden to arouse or gratify his own or another

5    person's sexual desire.  We've already covered that.  I don't

6    think I need to restate it.  I'm going to go ahead and check that

7    box.

8          With that box checked, with all of these four boxes

9    checked, that is the evidence that is required to meet the

10   elements of second-degree child sexual abuse with respect to each

11   of Counts 9 through 10 and 13 through 17 and for you to find

12   Charles Hillie guilty of second-degree child sexual abuse.

13         Now, this one is a little out of order because it's a

14   different charge but it's Count 12.  And Count 12 is

15   second-degree sexual abuse of a minor.  Now, this is slightly

16   different than second-degree child sexual abuse, which I've just

17   explained to you, because it's of a minor.  And the reason it's

18   of a minor and not a child is because when this incident of

19   Charles Hillie molesting Janika happened, she's older than 16 but

20   she's younger than 18.  So a child is under 16, minor is between

21   16 and 18, and it just slightly changes the elements that you

22   have to find in order to convict him of second-degree child --

23   sexual abuse of a minor.

24         Second-degree child -- or sexual abuse of a minor like a

25   child requires sexual contact, not a sexual act.  The contact

1   here that we're talking about is -- again, it involves Charles

2   Hillie's hand.  And in this case, again, it's contact with

3   Janika's buttocks.

4        Now, which incident is this?  This is the time that she

5   tells you that it's the final straw.  She's older now.  She's

6   living in Good Hope Road.  You can see Count 12 is over here on

7   the timeline.  This is after Jaden's father has come and taken

8   her out of this house.  It's after the CFSA initially starts its

9   investigation.

10       After her mother promises this is never going to happen

11  again, but Charles Hillie is still living in the house, this is

12  when she's in the kitchen.  She's cooking herself the chicken

13  patties and the mac and cheese.  And she's cooking.  And Charles

14  Hillie comes up to her and, again, he gropes her on her buttocks,

15  his hand to her buttocks.  This is Count 12.  This is what

16  happens right before she tells her mom that she's going to make a

17  report.  It's the final straw.  And her mom sends her down to

18  North Carolina.  Now, we know this happens here in this time

19  frame when she said she was in the 11th grade, and that it's

20  right before she gets sent away to North Carolina.

21       So with respect to that one, she's over 16 years old but

22  she's under 18 still, and so that's why it's sexual abuse of a

23  minor, not of a child.

24       So with respect to Count 12, we have the sexual contact,

25  hand to buttocks that Janika testified to.  We have that Janika

1    was under 18 years old.  We know that Charles Hillie was 18 years

2    or older, because you've got his birth certificate and obviously

3    being her pseudo stepfather.  He's over 18 years of age at the

4    time.

5        Now, I'm going to talk to you a little bit about this next

6    element which is that he was in a significant relationship with

7    Janika at the time of this offense.

8        With respect to being in a significant relationship,

9    you're going to hear a definition of that from the judge.  And

10   it's relevant both to Count 12 as an element, and it's also

11   relevant to the aggravating circumstances that attached to those

12   second-degree child sexual abuse charges that I told you we come

13   back to and the first-degree child sex abuse.  So I'm going to

14   hold that for a second and we'll come back to it.  It's an

15   aggravating circumstance for those other counts of sexual abuse

16   that Charles Hillie had a significant relationship with these

17   children.  It's an element with respect to Count 12.  So you have

18   to find it with respect to each count of sexual abuse.

19       Now, significant relationship has a very specific

20   statutory definition.  A significant relationship is defined as a

21   couple of things that apply in this case.  And on the verdict

22   form, you have an opportunity to find that each one of these

23   applies.

24       One way you can be in a significant relationship with a

25   child is to be the paramour of the person who's charged with

1    taking care of that child, the safety, welfare, health of that

2    child.  So in this case, it's their mother, their mother is the

3    person who's in charge of taking care of them and Charles Hillie

4    is her paramour or boyfriend.  So that's one way in which he have

5    a significant relationship with Janika and Jaden.

6         The other way that he has a significant relationship with

7    them is that it qualifies if he lives intermittently or

8    permanently in the same dwelling as Janika and Jaden and is more

9    than four years older than them.

10        So you heard the testimony from the girls that he lived in

11   their house, he took care of them, he was in charge of watching

12   them, he lives in the residence with them at Douglas Road and at

13   Good Hope Road.  And so he has a significant relationship with

14   them based on both of those things, his mom's boyfriend, and he

15   lives in their house.  And he's more than four years older.  So

16   with respect to the significant relationship with Janika, you can

17   check that box.

18        And then, again, we've talked about this one already.  He

19   intended to abuse, humiliate -- or humiliate Janika or to arouse

20   or gratify his own or another person's sexual desire, so we can

21   check that box.

22        Ladies and gentlemen, with every one of those boxes

23   checked, again, you can find Charles Hillie guilty of

24   second-degree sexual abuse of a minor.

25        Now, I told you I would come back briefly to this

1    aggravating circumstances.  And I'm going to put this up here.

2    So we've just talked about significant relationship.  But Charles

3    Hillie lived intermittently or permanently in the same house and

4    was more than four years older.  Both of the girls testified to

5    this, both of them testified that he lived in the house, he took

6    care of them, he watched them when their mother wasn't there, et

7    cetera, so that's one that you can check.

8         And then at the time, Charles Hillie was the paramour of

9    their caretaker, which is their mother.  There's not even a

10   dispute that Charles Hillie is their mother's boyfriend during

11   all the relevant times when this sexual abuse is occurring, so

12   you can check that.

13        So that's one aggravating circumstance you're going to see

14   on the verdict form for each of the counts of second-degree child

15   sexual abuse and first-degree child sexual abuse.  So you've

16   checked the elements, you find him guilty of those offenses, you

17   go on to find on the verdict form he's in a significant

18   relationship, and so you can check the box for that aggravating

19   factor.

20        It's also an aggravating factor for first and

21   second-degree child abuse that Charles Hillie had more than one

22   victim.  He had two.  You heard from them both.  He has Jaden and

23   Janika, both his victims.

24        Now, you don't have to find that he committed every act of

25   sexual abuse against both victims.  What you need to find to find

1    this aggravator is he committed at least one act of sexual abuse

2    against Janika and at least one act of sexual abuse involving

3    Jaden.   If he committed at least one act of sexual abuse

4    involving these victims, each victim, then you go ahead and check

5    this box that he's got two or more victims.

6         Those, ladies and gentlemen, are the elements for the

7    aggravating circumstances.

8         When you go back in that jury room and you think about the

9    evidence that's been presented to you in this case and you go

10   through these lists of elements, for each and every offense

11   that's charged in the indictment, when you go through the

12   elements that you saw on these charts and you think about the

13   evidence that we just talked about here and that you heard during

14   this trial, you check every one of these boxes, every element of

15   every offense you've heard evidence that Charles Hillie committed

16   beyond a reasonable doubt.

17        When you go in the back, you go through these elements and

18   you check all these boxes, the judge is going to tell you that if

19   you find the Government has proved all these elements beyond a

20   reasonable doubt, you have a duty to find Charles Hillie guilty

21   of each one of these offenses charged in the indictment.   You

22   have a duty.

23        Ladies and gentlemen, I submit to you that the evidence

24   that we've just talked about, the evidence that you've heard over

25   the last few days, proves beyond a reasonable doubt that you can

1    check each one of these boxes.  And that gives you the

2    opportunity to have now heard what happened to these girls and to

3    be the grown-ups that find that he committed these offenses and

4    to hold Charles Hillie responsible for every one of the acts

5    that's charged in that indictment.  Thank you.

6         THE COURT:  All right.  I think this would be -- let me

7    have the counsel come up.

8         (Following sidebar discussion had on the record:)

9         THE COURT:  I think that would be good to let them break

10   for 10 minutes before we start with you, and I just wanted to get

11   your opinion about that.

12        MS. SLAIGHT:  Yes.  And, Your Honor, I had -- I'm going to

13   ask that the Government make a clip --

14        THE COURT:  I'm sorry, Ms. Slaight.

15        MS. SLAIGHT:  Mark the clips that they -- they showed

16   clips in their closing and I would ask that the Government mark

17   them and make them exhibits so that, you know, in case of appeal,

18   those are presented to the --

19        THE COURT:  They can be a part of the record whether

20   they're exhibits or not.

21        MS. HERTZFELD:  What might make sense would be for us

22   to -- after the jury is excused, just to read it for the record

23   the portions -- the time stamps.

24        MS. SLAIGHT:  The time stamps.

25        THE COURT:  That's fine.

1          MS. SLAIGHT:  And there are two points that I wanted to

2     make concerning the Government's closing is that -- one is that

3     the Government essentially asked itself -- the Government

4     essentially asked the jurors to be in the position of becoming

5     the mother of the -- these girls, in other words, take the

6     mother's place to do what the mother didn't do and that's

7     improper.  And I object --

8          THE COURT:  Why is that improper?

9          MS. SLAIGHT:  Because they're not supposed to have -- the

10    mother is in an emotional position.  They're supposed to be

11    jurors deciding without -- they're not supposed to be their

12    mothers.  And they're supposed to be jurors deciding whether or

13    not an offense has been committed, not their mothers to be their

14    guardians.

15         THE COURT:  Ms. Hertzfeld.

16         MS. HERTZFELD:  Your Honor, I wouldn't ask them to be

17    their guardian or their mothers.  I was asking -- I was very

18    specific what I was asking them to do, which is to hold him

19    responsible for the counts -- the criminal acts with which he's

20    charged and that's totally appropriate to be asking a jury to do.

21         THE COURT:  All right.  What's the other objection?

22         MS. SLAIGHT:  And the other -- she said to hold them

23    accountable, which the mother didn't do.  And the other one is

24    that the Government said that the pictures of the -- that Janika

25    allegedly saw of herself in her underwear were lascivious

```
1    exhibitions and there's just no evidence that that's true.  In

2    fact, if they were -- if she was in her underwear, then it

3    wouldn't be lascivious exhibition.

4         THE COURT:  So your second objection is overruled

5    because --

6         MS. SLAIGHT:  My position is she's misstating -- the

7    Government is misstating the law on that and misstated the law by

8    saying that.

9         THE COURT:  All right.  Any error that was made, I didn't

10   hear exactly what you said was heard, but it would be harmless

11   under the circumstances because the Government has not charged

12   the pictures that Janika saw as any count in this indictment, so

13   it's not as though based on any sort of misstatement that the

14   Government may have made.  The jury actually acts with respect to

15   it.  There is no count in this indictment pertaining to the

16   pictures that you're talking about, though.

17        MS. SLAIGHT:  The problem is that the Government -- that

18   the jurors can look at the pictures now and the video showing

19   the -- Janika in her underwear and say, "That's enough."

20        THE COURT:  Yeah.  They're not going to be able to see

21   that because the Court is going to instruct them exactly what the

22   law is pertaining to the videos that they see.  The pictures to

23   which the Government was referring are not in the record, and

24   they were never recovered, and so they can't misapply the law

25   with respect to those pictures and what they did receive and will
```

1    receive as evidence in this case.  The Court will properly

2    instruct them on the law pertaining to that.

3         So your second objection I find not to be supported.  The

4    first is a little closer, but I think that, at least as I

5    understand the law, the improper jury argument is one that asks

6    the Government to put -- I'm sorry, asks the jurors to put

7    themselves in the place of the victim and, you know, hold the

8    defendant accountable for the crime as though they had -- it had

9    been committed upon them.  I understand your point, but I think

10   that what was articulated was a theory of the case that involved

11   the mother's absence and not protecting these girls, and that

12   finally, through this process, the girls will receive the

13   accountability at least from the Government's perspective that

14   they didn't receive coming through the process.

15        So I didn't hear necessarily the argument being made that

16   they should be standing in the shoes of the mother, more so, I

17   think the interpretation was that here is the mother not doing

18   what she was supposed to do from the girl's perspective, that

19   Mr. Hillie has never been held accountable for this crime, and so

20   that's what this criminal process is about.

21        So I'm going to overrule as well, although your objection

22   is one that I do understand.  All right.

23        MS. SLAIGHT:  Thank you.

24        THE COURT:  So I think I'm going to break.  Okay.

25        (Thereupon, the sidebar discussion concluded.)

1          THE COURT:  Thank you for being patient, ladies and

2     gentlemen.  We're going to take our break, and then afterwards,

3     we will have the Defense closing argument.  Let's say 15 minutes.

4          (Jury out at 11:54 a.m.)

5          THE COURT:  All right.  Fifteen minutes.  Thank you.

6          (Thereupon, a break was had from 11:55 a.m. until

7     12:12 p.m.)

8          THE COURT:  Ms. Slaight, about how long do you think you

9     have?  Do you have an estimate?

10          MS. SLAIGHT:  No.  I never know although I can --

11          THE COURT:  You don't know?

12          MS. SLAIGHT:  -- I probably -- it wouldn't be more than a

13     half an hour.

14          THE COURT:  Okay.  Fine.

15          MS. SLAIGHT:  Famous last words but -- can we approach?

16          THE COURT:  Yes.

17          (Following sidebar discussion had on the record:)

18          MS. SLAIGHT:  If it goes over a half an hour, I would be

19     surprised, but I'm really bad at estimates.  So I just wanted to

20     warn you.

21          THE COURT:  That's all right.

22          MS. SLAIGHT:  I'm just a little concerned, because I

23     went -- right after we broke, I went to use the restroom and

24     Jaden was using the same one, so I went to another restroom, and

25     I saw a juror then go down the hall towards that restroom, and

1    then I -- so I went to another restroom and then when I left that

2    restroom, the juror had come -- had gone into my restroom.  And

3    she was waiting to go into my restroom.  And I'm just a little

4    concerned.  I don't know if there was some sort of interaction

5    between them when she left or --

6         THE COURT:  So let me be clear for the record.  You didn't

7    see them in the same space at the same time, you saw one of the

8    jurors going toward the bathroom and that Jaden was in?

9         MS. SLAIGHT:  Right.  And she wouldn't have known that

10   Jaden was in that bathroom because, you know, she had already

11   gone in.  I got out before --

12        THE COURT:  Right.

13        MS. SLAIGHT:  -- she did, so she was making a way in

14   there.  And, you know, she would have discovered Jaden in there.

15        THE COURT:  So do you think we have to have a follow-up

16   question about whether they had any interaction?

17        MS. SLAIGHT:  Um.

18        MS. HERTZFELD:  I would just say one thing just for the

19   record in advance of this trial starting the first day that Jaden

20   was here.  I did tell her that the hallway were communal and that

21   the restrooms may be used by jurors as well.  And that if she was

22   in the hallway or in the restroom, just not to speak to anyone,

23   even when she's going to the bathroom, but I have told her she's

24   not to speak to anyone.  When she goes in the restroom, she

25   shouldn't be speaking at all.  She's just to go in and come out.

1    So she's aware of the issue.

2         MS. SLAIGHT:  You know, I think maybe just a reminder that

3    if -- you know, that there's not to be any interactions or a

4    reminder that if there is any discussion with a juror, a juror

5    has any discussion with any witnesses, to notify the Court.

6         THE COURT:  All right.  I mean, the question is whether I

7    should do that now or we just go to the closings, and I'll say

8    that when we break for lunch to make sure.

9         MS. SLAIGHT:  I think when we break for lunch.

10         THE COURT:  Yeah.  That's right.

11         MS. SLAIGHT:  I don't want to point it out too much.

12         THE COURT:  I think that's right.  So I will add that to

13    my list of reminders before we break, and then -- yeah, I think

14    that will cover it.  I will say for the record, we can see the

15    jurors coming and going through our camera, because they buzz

16    when they have to come back.  And my clerks and I have been

17    noting how seriously they're taking my instructions at least not

18    to communicate with one another.  Because it is becoming a pain

19    in chambers because one will buzz and it's like the other is

20    waiting not to be standing next to that one, so it's like every

21    five seconds a new juror will buzz.  So I think, in general,

22    they've been pretty mindful.

23         MS. SLAIGHT:  I thought there was a restroom back there.

24    There is no restroom back there?

25         THE COURT:  There's a restroom in their area.  But what

1    it's tending to happen is when we have breaks, like, when I go

2    out, I see one or two of them will straggle out into the hall to

3    make a phone call or do whatever, I assume.  And so they go out

4    and then they have to be let back in, and they're doing so

5    seriatim in a way that's, you know, painful for chambers, but I

6    think mindful of the Court's instructions.  All right.  Thank

7    you.

8            (Sidebar discussion concluded.)

9            (Jury in at 12:16 p.m.)

10           THE COURT:  All right.  You may have a seat.

11           Ms. Slaight.

12

13           **<u>CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT</u>**

14           MS. SLAIGHT:  Thank you, Your Honor.

15           Good afternoon, Your Honor.

16           THE COURT:  Maybe you can move it up.  Yes.  That might be

17   better.

18           MS. SLAIGHT:  Now, at the beginning of the trial, I asked

19   you to keep an open mind and keep the presumption of innocence in

20   mind in this case and the burden of proof that the Government has

21   in this case.  And if you do keep that open mind and if you keep

22   that open mind going into the jury room and while you're

23   deliberating, ladies and gentlemen, it will be your duty to find

24   Mr. Hillie not guilty of every single count in this indictment.

25           First, I'd like to address these videos, these images that

1    were taken.  And the first thing that I will say to you is that

2    they were gross.  That's not a legal term.  Anybody can look at

3    those videos and say this is an invasion of privacy, this is

4    voyeurism, this is a lot of things, it shouldn't have been, but

5    what your issue is is to get all of that aside, all of the

6    nonlegal issues aside, and say, "Is this child pornography?"

7    That is your issue, not whether you didn't like it, not whether

8    it's an invasion of privacy, or any of these other things because

9    that is not the issue that you're facing today.  The issue is,

10   was this child pornography, and the answer is no, it was not.

11        Now -- and it would be just as unjust to convict

12   Mr. Hillie or anybody else of a charge that they didn't commit.

13   And it was completely unjust to do that.  So it's your duty to

14   look at the charges here and not about your personal opinion, was

15   this moral or was this unfair, or any of those other issues.  The

16   issue is, was there a legal violation here, was there a criminal

17   legal violation, and that's what you need to be deciding.  And

18   the answer is no, this was not pornography.

19        Now, the Government has went through the elements of the

20   charges, and they just checked off things very quickly.  And I'll

21   give you an example.  And I'm only going to do it for one

22   because -- one item.

23        Can the jurors see this?

24        The first charge was the child pornography.  It says,

25   "Charles Hillie employed or used Janika to engage in sexually

1    explicit conduct," in parenthesis, "lascivious exhibition of

2    Janika's genitals and pubic area for the purpose of producing a

3    visual depiction of such conduct."  That's very involved.  And,

4    in fact, when you get the instructions, that one element will

5    cover five pages of the instructions.  It's complicated.  Nobody

6    is here to say it's easy, and the answer is not that you check it

7    off.  It is not true.

8         So, ladies and gentlemen, you're not here to do what's

9    easy.  You're here to follow the instructions and look at all of

10    them, and when you look at them, in light of the instructions to

11    make a decision.

12         Now, one of the factors that the Court is going to talk to

13    you about in the instructions that you're going to be given is,

14    is there exposure of the genitalia or vagina.  Nudeness alone is

15    not enough.  And, in fact, you'll see examples, because the --

16    some counts of the indictment, Counts 4 through 7, the Government

17    hasn't even charged pornography, actual pornography in those

18    counts.  They've charged attempt pornography because there isn't

19    that -- no even arguable lascivious exhibition in those counts.

20    Janika may have been in her underwear, other things, but there is

21    no lascivious exhibition.  So you can see right then and there

22    that is not pornography in those counts.

23         And as for Count 1, Count 1 is the scene in the bedroom.

24    It's Government's Exhibit 4.  It's 29 minutes long, ladies and

25    gentlemen.  And the Government just showed you a clip from that

1    video, and it's extremely short.  If you blink, you would have

2    missed it, and you may not have even seen it when you were

3    looking at the video to see, was it really showing Janika's

4    genitalia or vagina, that it was not certainly the focus of that

5    video, ladies and gentlemen.  There's just no way it was the

6    focus of the video.

7         Count 2 in the bathroom, ladies and gentlemen, that was, I

8    believe, 12 minutes, may have been more or less, maybe up to

9    19 minutes, but in that video, as you remember, Mr. Hillie didn't

10   turn off the video.

11        Now, they didn't point that out to you, the Defense

12   pointed that out.  But the fact is, Mr. Hillie didn't even turn

13   that video off.  And, in fact, there was probably more time on

14   the video with Joyce Asiamah than any of the girls, and it wasn't

15   just one girl.  I mean, to suggest that the focus of that video

16   was Janika is absolutely ridiculous, much less Janika's genitalia

17   or vagina.  It's ridiculous because there were four people in the

18   video.  And if any -- if there was an extended period for one

19   person, it was the mother.  It wasn't her.  So this does not meet

20   the definition of pornography.

21        And you can also note that -- now, we had no verification

22   of this, we had no corroboration, but Janika claimed that she saw

23   a picture of herself in her underwear.  Well, ladies and

24   gentlemen, if that was the point, to take a picture of -- to get

25   video of somebody in their underwear, that's not pornography.

1   That was a still that was taken out of any video.  It's not

2   pornography.  You may not like it and you would be right to not

3   like it, but that's not the issue.  Separate out these parts that

4   aren't about the law in this case, because the parts that aren't

5   about this count, the parts about this -- that aren't about this

6   legal violation are not for your consideration, ladies and

7   gentlemen.  This is about, was this pornography?

8          Now, as I said, you remember in that second count,

9   Count 2, which is Exhibit 5 -- in the Government's Exhibit 5, I

10  believe, in the bathroom, it was Joyce who turned off the video,

11  not Mr. Hillie.  And you remember, the Defense pointed this out,

12  the Government didn't point it out, she made her own videotape.

13  And what was the point?  What was the point of these videotapes?

14  Who knows?  But not pornography, ladies and gentlemen.

15  Weirdness, something you wouldn't do?  Sure.  But not

16  pornography.

17         And in the attempt counts, they're not almost really worth

18  discussing because the Government concedes those are not

19  pornography counts.  What the attempt was, who knows, ladies and

20  gentlemen?  What was going on there, who knows?  What the mother

21  did in her videos, who knows?  In her video, I should say, who

22  knows?  Turning off the video, who knows?

23         Now, as to the -- and so it's pretty -- if you look at the

24  instructions, ladies and gentlemen, and if you look at the facts

25  of this case, this is not pornography.  And those

1  pornography-related counts, you must find an acquittal on those

2  counts.

3        Now, there are other counts, as you know, counts relating

4  to the girls, and they are separate counts.  You were asked about

5  in jury selection questions about if you thought that somebody

6  was involved in visual pornographic depictions, they would also

7  have -- be involved in sexual abuse, and you had to answer those

8  questions, you had to -- because you have to keep an independent

9  judgment about each count.  That's why we asked those questions.

10  You have to look independently at each count, ladies and

11  gentlemen, and decide on the evidence of each count whether it

12  was committed.

13        And when you look at these other counts, okay, they --

14  this all came into being, all these allegations all started when

15  there were seven kids, seven minors at this apartment.  The only

16  adults there were, according to the testimony, Mr. Hillie and

17  Joyce Asiamah, and there were seven minors.  Two 15-year-olds, a

18  14-year-old, two 10-year-olds, and a five-year old.  And the one

19  girl, Jaden, gets a bloody nose.

20        You can imagine all hell breaks loose.  You've got all

21  these kids running around and somebody gets a bloody nose.  The

22  issue is not how she got it.  The issue is -- and the judge will

23  speak about how you can consider, number 1, whether Mr. Hillie

24  assaulted her and how you can consider it, but, ladies and

25  gentlemen, I would suggest to you that this is where this all

1    started.  Jaden was, of course, upset when this happened.

2    Nobody's saying other than Jaden that they saw how this happened.

3    But she got very upset.  Her dad has called.  She comes.

4         Now, then Josephine comes to the house.  Josephine, ladies

5    and gentlemen, left four minors with -- again, four minors,

6    including three female minors at the house overnight, so

7    obviously, she didn't have any concerns that there was any

8    improper conduct going on there.  There's no way she had any

9    concerns.  So anything that she says now is Monday morning

10   quarterbacking.  This is 20/20 hindsight.  She left those four

11   kids there without any -- because she didn't have any concerns.

12        And when she got to the house, Mr. Hillie wasn't there,

13   according to her.  Joyce wasn't there.  Actually, Jaden wasn't

14   there.  Jaden's dad wasn't there.  Although she says now that she

15   saw blood on the floor.  Actually, she didn't -- she told social

16   workers she didn't see any -- she admitted that she told social

17   workers she didn't see any blood on the floor.  And then she

18   said, "Well, you know, it's the next day."  Well, that's not

19   really -- what are you talking about?  She had a number of

20   excuses about what she had said and what she did and not having

21   the photographs, but, ladies and gentlemen, they are just

22   excuses, and it is about Monday morning quarterbacking, about

23   20/20 hindsight.

24        Now, in addition -- Janika is the focus of several counts

25   of the indictment as to the child sexual abuse counts.  And

1    Janika gave conflicting statements.

2         And let's talk about the statements that she gave close to

3    the events, okay, much closer to the events than when she -- two

4    years later when she was arguing with her mom and tried to move

5    into her boyfriend's -- with her boyfriend but her mother sent

6    her down to North Carolina.

7         She told the social worker in January that Mr. Hillie

8    doesn't live at that address -- didn't live at that address with

9    them, and he doesn't reside at the home.  And, in fact, if you

10   look at the photographs, there's no indication of any mail coming

11   to Mr. Hillie, and there's no indication of any male clothing

12   there.  Because the Government would be throwing those pictures

13   out if there were.

14        You see the pictures of the closet.  There's no indication

15   of any male clothing there.  And she also said, just different

16   than she said later, that her sister Jaden never told her about

17   any touching by Mr. Hillie, that she heard an argument between

18   Jaden's dad and Joyce, the mom.  And after that -- and during

19   that argument, at the end of that argument, Jaden's dad said he

20   was going to call the hotline.  And she said she wasn't touched

21   by anybody in the home.

22        And also, importantly, this person who has been a social

23   worker for 20 years said that she didn't have any concerns

24   regarding her safety, regarding Janika's safety.  And the

25   Government pointed out that this was the same person who had

1    interviewed Jaden that day, but she left the meeting with Janika

2    not feeling concerns about her and that's significant.

3           Again, later, in April, Janika gave conflicting statements

4    to what she said in court today.  And it was conflicting what she

5    said in court but it wasn't conflicting with what she had told

6    the social worker.  She said that Jaden never said anything to

7    her about -- this is Janika's statement, the older girl, said

8    that Jaden never said anything to Janika about being touched

9    inappropriately.  And she was sure.  She didn't just say that.

10   She said she was sure that if Jaden was harmed in any way, she

11   will definitely tell Janika.

12          She was also asked by the detective, "Did Mr. Hillie ever

13   touch himself or expose himself to her?"

14          She said, "No.  Not even.  Maybe not.  I don't know.

15   Maybe it was an accident.  No."

16          And significantly, she said that Jaden sometimes makes

17   things up to get attention.  Well, Jaden was just a little girl,

18   and little girls can do that sometimes.  That's part of being a

19   child sometimes, that kids make things up.  And she said

20   sometimes -- several times Jaden said stories that -- about

21   things that happened that actually didn't happen and she said it

22   to get attention.  That would not be the first person to say

23   that, for that -- for a child to do that.  And she said, in

24   addition, that she confronted Jaden about that because she knew

25   it's something -- she said Jaden was not telling the truth and

1    she confronted her about it, and Jaden was silent.

2          Significantly, Janika gave the phone number of one of her

3    cousins who had been there that night to the detective.  Now, if

4    she was trying to hide things, protect people, any of that, she

5    wouldn't have done that.  She wouldn't have given that phone

6    number, but she did.  She gave the phone number of her Cousin

7    Jazmine who had been there that night.  She wasn't trying to hide

8    anything.  She was cooperative.  She answered her questions.

9          But what is significant now is that these two times Janika

10   gave different inconsistent responses than she did on the stand

11   today.  Now, she doesn't remember talking to these people.  How

12   could that be?  If your mother has asked you to lie or you were

13   on your own have decided you're going to lie to people in

14   authority on two different occasions, you would think -- and this

15   is -- and in detail.  I mean, saying about how the problems that

16   had occurred with Jaden, you would remember that.  She was

17   separate on those occasions from her mother.  Both occasions was

18   at the school.  And then she did admit that she didn't remember

19   talking to the social worker January 7th.  So there was actually

20   a third time but that was very short and that was at the home.

21   And she said she felt safe.  But she didn't remember these two

22   significant times when she had long interviews with these people,

23   and she claims that she was put up to lie.

24         Ladies and gentlemen, that really doesn't make sense.

25   Now -- so you have to look at the allegations about -- that both

1    Janika and Jaden have made in relation to these prior statements

2    that they've made.

3         Now, Count 8 -- and this is a lot of counts and they get a

4    little confusing, but there's a count that says that the

5    first-degree sexual abuse.  That's the only first-degree sexual

6    abuse count.  And it requires penetration of the vulva for that

7    that's why it's considered first-degree sexual abuse.

8         And what did Janika say about that?  Well, for one thing,

9    she said she added -- she said "I believe" on the stand

10   yesterday.  She said that she had told her mother about that, but

11   she said under oath on another occasion back in -- much closer to

12   the event back in 2014, she said that she had not told her mother

13   about that.  I'm sorry, it was 2015.  She said that she had not

14   told her mother about that.  The fact is that she's alleging that

15   she was 10 years old when this occurred and that it was through

16   her clothing.  And what did she say how she felt?  It was

17   uncomfortable.

18        Ladies and gentlemen, if this had happened, if there had

19   been penetration, if this had occurred, it would have been a lot

20   more than uncomfortable, and it just -- is not -- was not, in

21   fact, a penetration of the vulva, ladies and gentlemen.  Whatever

22   she -- she said she was cooking and she was 10.  And whatever may

23   or may not have happened, ladies and gentlemen, the issue for

24   you -- we don't even have to get to the issue of did this happen

25   at all.  The issue for you is, was there penetration of the

1   vulva?  Was there first-degree sexual abuse?  And, ladies and

2   gentlemen, I submit to you that the evidence that she presented

3   shows that that did not happen.

4       Now, she had -- she also said that Mr. Hillie came into

5   the shower one day, and that's Count 10, and he said -- and that

6   he looked at her in the shower and she said that he -- on the

7   stand yesterday, she said that he touched her breasts.  And then

8   previously, though, she had testified much closer in time to the

9   occasion that he had not touched her breasts.  She had testified

10  under oath and had actually specifically said when asked, "Did he

11  touch you in the shower?"

12      She said "No," under oath, ladies and gentlemen.  So she's

13  all over the place on that count.

14      If there's no touching, there is no second-degree child

15  abuse.  It may be something else, it's not right, but you don't

16  have to get into that.  You don't have to decide, did somebody

17  look in on her at the shower?  Was it accidental?  Was it

18  purposeful?  All those issues.  You don't have to decide.

19  Because if there was -- there was certainly much doubt about

20  whether, in fact, this offense was committed by her own words,

21  her words herself back and forth, did he touch me?  What do we

22  do, toss a coin?  Did he touch her?  Didn't he touch her?  If

23  you're going to -- even if you're going to believe what she said,

24  that's a 50/50.  And I would suggest the weight is more that he

25  didn't touch her.  That's not beyond a reasonable doubt.  Why

1  would the weight be more than he didn't touch her?  Because

2  earlier in time, closer to the event, she said he didn't.  So

3  that's a clear not guilty on that count.

4        Now, there's another count, Count 9 -- again, all of this

5  was recorded years after she said the event occurred.  It was

6  another count, again, where she said Count 9 in the kitchen where

7  she said he touched her buttocks.  And I would suggest -- and it

8  was over pants.  And I would suggest that there's just not enough

9  evidence.  There's no corroboration.  There's just not enough

10 evidence to show that that occurred particularly in light of what

11 she had said earlier to both the detective and the social worker.

12        And finally, there's a Count 12, and that was, according

13 to the -- now, you'll get the verdict form and you'll see that

14 that was supposed to have occurred between June 1st and June 30th

15 of 2014.  That was right around the time that she was actually

16 living with her boyfriend.  And, you know, the Government has

17 really criticized Joyce Asiamah and there's a lot to criticize

18 about her behavior.

19        But the fact is she was a 17-year-old living with her

20 boyfriend.  And it's very reasonable to say you can't do that

21 anymore, that you have to go, and if you're not going to behave

22 properly in the District of Columbia, you're going to the North

23 Carolina to live with your dad.  That is very reasonable

24 behavior, but she didn't want to do that.  She didn't want to do

25 that.  And the only way -- you have to ask yourself.  She knew

1   what was -- what had -- what was going on, the allegations with

2   Jaden, and you have to ask yourself if this was a way for her to

3   get herself back.

4         And by the time she is up here and by the time she's

5   testifying years later, she's built up a lot of animosity to

6   Mr. Hillie, and he's a vicious figure and all of these things are

7   happening.  Suddenly, he's touching her in -- you know, he's not

8   just looking at her.  He's touching her.  And he's giving her

9   inappropriate looks and all these things.  That happens.  People

10  exaggerate as time goes on, and that's what happened in her case,

11  ladies and gentlemen.

12        The counts as to Janika, when you look at every single

13  count, because you have to look at them all individually, each

14  one -- each count has problems with credibility and problems with

15  what Janika is saying particularly in light of what she had said

16  earlier.

17        Now, the next count, the next charges are concerning

18  Jaden.  And as we -- as you all heard, this all started when

19  Jaden got a bloody nose.  There's no verification as to --

20  there's no corroboration other than Jaden -- and to any of these

21  counts.  There's no person saying that they saw Janika being

22  sexually assaulted.  There's no other person saying they saw

23  Janika being sexually assaulted.  And, in fact, they don't say

24  they saw each other being sexually assaulted.  They acknowledged

25  that they didn't see this going on.  There's no corroboration.

1       As we -- as I mentioned a little earlier, seven minors,

2   somebody gets a bloody nose, all hell breaks loose.  Everybody's

3   upset.  Understandably, the dad comes.  And initially, the report

4   was not of sexual abuse.  The initial report was only of physical

5   abuse of the slapping.  That was the initial report.

6       And now, ladies and gentlemen, even if you assume that

7   Mr. Hillie improperly slapped her, did something he wasn't

8   supposed to do, he wasn't supposed to do that.  It doesn't matter

9   whether he was upset or angry or justified or not justified.

10  There's no excuse for that.  But that's not what he's charged

11  with.  He does not have a count here of simple assault.  That's

12  not what he's charged with here, ladies and gentlemen, so that is

13  not for you to decide.  The charges here are of sexual abuse.

14      Now, what does Jaden say?  Well, the first two charges

15  were on the same day, 13 and 14.  And she says that they were

16  playing with Kamaria, they were all playing, and Mr. Hillie

17  touched her inappropriately.  And she also added that he exposed

18  himself, ladies and gentlemen, but she says that she didn't tell

19  her mom until a couple of weeks later.  And the Government has

20  put a lot of emphasis on what these girls were supposed to have

21  told their mom.  But the fact is, there's no verification for

22  that, number 1.  And number 2, in the instance of this particular

23  event, okay, that Jaden's alleging, even she said she didn't tell

24  her mother for a while after it happened, and it just doesn't

25  make sense, ladies and gentlemen.

1          The next incident that Jaden alleges is when she was

2     sleeping.  Now, she slept in a twin bed with Kamaria.  And

3     sometimes the other kids would stay over, sometimes Simeon, the

4     five-year-old, would stay over and who else knows.  But anyway,

5     it was crowded in there.  It wasn't easy.  And she says it was

6     nighttime and she was sleeping.  And I would suggest to you,

7     ladies and gentlemen, that really what actually happened, who

8     knows what really happened.  I mean, she was sleeping.  Whether

9     it was, you know, Kamaria really nudging her or what really

10    happened, there's -- without any corroboration on this, without

11    anybody saying that they saw anything untoward, ladies and

12    gentlemen, that's just -- and in light of what Janika had said

13    about her sister, that's just not credible beyond a reasonable

14    doubt.  And it was -- and that was over the covers, supposedly.

15         The next incident she says was on the couch.  And she says

16    that she and Kamaria and Mr. Hillie were sitting on the couch

17    watching TV.  Well, that's -- nothing wrong with that, and that

18    he stretched out his arms and he hit her breasts and he said he

19    apologized.  That was clearly an accidental touching, even as she

20    described it.  That should not even be in this indictment at all.

21         Under her own description, ladies and gentlemen, that

22    would be an accidental touching.  And she talks about other times

23    and other things that happened and people talk about what

24    Mr. Hillie allegedly said, but in this particular incident,

25    according to her, even he said -- according to her, he said that

1  it was accidental and there's nothing to show or indicate that it

2  was anything else, even if it occurred, ladies and gentlemen.

3  And this was an instance where she did not tell originally to the

4  Child Protective Services people who interviewed her.  And she

5  agreed she had a long interview with them and was trying to tell

6  everything.  She didn't tell them.

7       This was a classic incident because she didn't think of

8  it -- it's a classic incident of, you know, you started out with

9  innocent actions and you don't think anything's wrong with it.

10  And then suddenly, after people start giving you ideas about what

11  has been happening, all of a sudden, everything seems sinister.

12  The most innocent actions are now sinister.  That's what happened

13  in this case.

14       She also didn't tell about -- the investigators originally

15  about the last allegation, Count 17, where she said there were

16  three kids in the bed.  That's really a lot.  And that he touched

17  her under the covers, her vagina.

18       Now, that's really, I suggest to you, ladies and

19  gentlemen, disturbing that she wouldn't tell the investigators

20  originally.  And, in fact, it's particularly disturbing in light

21  of the questioning that the investigator did.  You'll remember I

22  said -- I asked her about the investigator, and I quoted her what

23  the investigator said, you know, if she used the term "coo-coo,"

24  how many times did he touch your coo-coo, and she said one time.

25  And the investigator said, "I thought" -- "oh, I thought it was

1    two times."

2         And she said, "No.  One time."  And she said, "Thank you

3    for correcting me.  He touched your coo-coo one time."

4         So specifically, it wasn't an issue of her just not

5    thinking to add it or something to her -- to what she was saying.

6    She's specifically said no.  This is how many times this has

7    happened.

8         So, ladies and gentlemen, in light of that, on that

9    Count 17, there should be no question that Mr. Hillie should be

10   acquitted of that count.

11        Now, all of these -- all of the testimony you've heard is

12   to be considered, not only in terms of the element, but in terms

13   of the -- in terms of the burden that is on the Government to

14   prove the case beyond a reasonable doubt and the presumption of

15   innocence.  And if you have a doubt, if you have a reasonable

16   doubt that makes you pause and hesitate, then you must acquit

17   Mr. Hillie.

18        And, ladies and gentlemen, the doubts in this case are,

19   number 1 -- and this isn't a doubt.  This is just a fact.  This

20   was not lascivious pornography.  This was not child pornography.

21   You look at it, it's pretty clear it's not child pornography.

22   And I also note the items were deleted in this case.  We don't

23   even know how long they were there.  They were deleted.  The

24   Government doesn't have any information about how long they were

25   deleted.  There was -- he was not the only person who was seen

1   turning a video on or off in this case.

2        The purpose of the video, who knows?  The only purpose

3   that you're concerned about is, does it show video -- excuse me,

4   do these videos show that he was trying to make child

5   pornography?  And they certainly do not.  They certainly do not.

6        As far as the child abuse cases, the reasonable doubts

7   are -- include the fact that the initial report was only for the

8   hitting, it was not for any child sexual abuse, that there's a

9   lot of conflicting statements here, not only about the

10  credibility of the witnesses, but also the -- but their own

11  credibility because they have said -- or particularly Janika was

12  saying that Jaden wasn't credible, but they had been internally

13  inconsistent themselves.

14        And they have -- and there are motives -- and children

15  have reasons for -- they were different people eight years ago

16  when this was alleged to have occurred.  They have children's

17  motives that are different than adults.  And what they were

18  thinking at that time is hard to imagine now that you see them as

19  adults, but the fact is that at that time, there were some issues

20  about them with credibility.

21        And when you think about that in terms of what happens as

22  the years go by, as I said, and you know how you have these

23  issues of telephone and how the fish gets bigger and what started

24  off as a somebody slapping somebody else turns into -- well,

25  then, there was one thing happened and then another happened, you

1  know, allegations get exaggerated, and they get, according to

2  Janika, in fact, fabricated.

3        If you look at it in those terms, ladies and gentlemen --

4  and most importantly, the fact that there's no corroboration for

5  any of these child sexual abuse charges.  There's no

6  corroboration that Mr. Hillie ever intentionally touched

7  inappropriately either of these girls without the corroboration,

8  given -- particularly given the inconsistencies, you must find

9  Mr. Hillie -- look at every single count, look at every count

10  individually, and find Mr. Hillie not guilty of each of these

11  counts.

12        THE COURT:  Thank you.

13        If I could have the parties approach.

14        (Following sidebar discussion had on the record:)

15        THE COURT:  So I'm going to -- under the rules, the

16  prosecution is entitled to rebuttal of the closing.  And I don't

17  know whether you intend to just briefly.

18        MS. HERTZFELD:  (Shook head positively.)

19        THE COURT:  All right.  And then we'll break for lunch.

20        (Sidebar discussion concluded.)

21        THE COURT:  Ms. Hertzfeld, any rebuttal?

22        MS. HERTZFELD:  Yes, Your Honor.

23

24        **FINAL CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT**

25        MS. HERTZFELD:  I'm going to start at the second part of

1    that, what you just heard, starting with what Ms. Slaight said to

2    you about you can't believe these allegations of these children

3    because they're not credible or because they have fabricated the

4    allegations of sexual abuse against Mr. Hillie.  Because you

5    heard that this sexual abuse happened years ago and that they, as

6    I started out the morning by saying, they went and they told.

7    They've been interviewed by Child and Family Services by

8    detectives.  They -- you've heard that they've adopted

9    statements.  They've been in the grand jury.  And all these years

10    later, Jaden and Janika came into court and told you about their

11    sexual abuse.

12            And now, you hear Ms. Slaight saying, "It didn't happen.

13    They made it up."  And I hope the question that is going through

14    every single one of your minds as you hear that is, Why?  Why on

15    earth would these two kids make up when they were children that

16    Mr. Hillie was sexually abusing them if he wasn't?  Why on earth

17    would they make up these detailed accounts of the things that

18    Mr. Hillie did to them, the ways he touched their body, the

19    embarrassing and humiliating things they came in here and told

20    you?  Why on earth when they were nine and 10 years old would

21    they have made that up?

22            Do you believe that, that they made that up?  The mac and

23    cheese and the chicken patties and the noodles and the -- him

24    sitting in his chair at the computer and chasing her sister

25    around the table.  All these daily moments in their lives that

1    get interrupted by Charles Hillie sexually abusing them in the

2    ways that they told you in detail that he did, do you believe

3    they made that up?  Why would they do that?

4         It's true, their motivations, what's happened to them, the

5    people that they are, then and now are different.  You saw that

6    picture of Jaden when she was nine years old.  You saw the video

7    recordings of them that Mr. Hillie surreptitiously took when they

8    were younger.  And you can see Jaden sitting here today.  It's

9    true, she's a different person now than she was when that

10   happened.  And through all that, all that's changed in her life,

11   she came in here a couple of days ago, got on the witness stand,

12   and told you again all the things that she's been saying since

13   she was nine years old about how Mr. Hillie abused her.

14        You can and should assume that she's changed as a person,

15   that she has gotten older, grown, that her sister has gotten

16   older, grown up, and they are still saying the same things to you

17   that they said to their mother and that they said to the

18   investigators all these years about how Mr. Hillie abused them.

19   Why would they make that up?  What are they getting out of making

20   this up?

21        They get the pleasure of having Child and Family Services

22   show up at their family's door and interview them about the inner

23   workings of their family and what goes on in their home and

24   having everything about their family be aired?  They get to talk

25   to some police officers and detectives about these humiliating

1   embarrassing moments in her childhood when Mr. Hillie has his

2   fingers down their pants?  They get to come in here in court and

3   sit in front of all of you, and more importantly, sit in front of

4   the man that abused them and recount to you the details of every

5   moment of that?  What would they get out of that?  In fact,

6   there's no doubt that what you've heard about this investigation

7   and the way that it unfolded, I don't think anybody's challenging

8   how it unfolded.  I think we all agree.

9         At the moment when it happened, when this becomes

10  uncovered because Jaden does get hit in the face, as the

11  defendant's trying to cover up what he's done and stop her from

12  telling any more about it, assaulting her as she's telling her

13  mother about the abuse in front of him, when that happens, and

14  this starts to come into light what Mr. Hillie is doing, when

15  that happens, their mother tells them, "Don't talk to the

16  authorities."  Janika told you, "My mom said to me, 'Don't tell

17  the authorities what's going on, because if you do, think of the

18  terrible consequences.  You'll be taken out of this house.

19  You'll be separated from your siblings.  You'll end up in foster

20  care.  You won't get to see one another.'"

21        Those are terrible things to have happen to these two

22  girls who told you, "I love my mom.  I was close to my sisters."

23  Why would they want that?  Why would they make this up and have

24  those consequences happen to them?  And look what did happen.

25        When they told them what Mr. Hillie was doing to them,

1   Jaden ends up living in a different house with her sisters that

2   she loves with her father.  Janika ends up doing what her mom

3   asked.  Nobody disputes that.  Did she previously say this didn't

4   happen?  Yes, she did.  And there's not one thing that's not

5   understandable about exactly why she did it, because the terrible

6   consequences, consequences she ultimately ended up facing when

7   she told you, "Now, I don't talk to my sister Kamaria anymore."

8   When she got choked up about that, it's because those are

9   terrible consequences for her.  She doesn't live with her sister

10  Jaden anymore.  You heard her talk about the tension between her

11  Aunt Josephine and her mother that came about because she was

12  disclosing what Mr. Hillie was doing to her.  You heard Josephine

13  talk about the strained relationship, always had a close

14  relationship with her sister Joyce.  And when this comes out in

15  this family, it tears them apart.

16      Josephine got up there and told you her relationship with

17  her sister was strained over there.  She finds it out.  She wants

18  her sister to do the right thing.  The consequences to these kids

19  of telling what happened are enormous.  They see what happened in

20  their entire childhood, where they live, what relatives they see.

21  And Ms. Slaight wants you to think that they made this up?  Why

22  would they do that?  What did they get out of this?

23      Ladies and gentlemen, if you think that Jaden and Janika

24  made this up, you should go back in the back and find him not

25  guilty.  You should.  But I don't think, as you sit here and

1   you've heard the evidence, that you believe that, because

2   Ms. Slaight has asked you probably half a dozen times, "Who

3   knows?"  The question "Who knows?" got told to you half a dozen

4   times.  And the answer is you know because you have heard the

5   evidence.  And Ms. Slaight may tell you there's no corroboration

6   for all of this.  Oh, there's corroboration.  You're going to

7   hear from the judge this doesn't have to be.  The testimony of a

8   child victim enough -- itself is enough.  The judge is going to

9   start with "that is enough itself" to convict Mr. Hillie for the

10  charges -- for the offenses for which he's charged.  You don't

11  need the corroboration for a child witness.  Who cares?

12      Here, you have tons of corroboration.  You know because

13  you heard the evidence and you heard the corroboration.

14  Number 1, you heard from both of these kids.  They're the

15  corroboration of each other.  Now, it's totally, of course, true,

16  that Jaden didn't witness Janika getting sexually abused and

17  Janika didn't witness Jaden getting sexually abused.  Who

18  sexually abuses children in front of witnesses?  Of course,

19  there's no eyewitnesses to Mr. Hillie sexually abusing these

20  kids, but their testimony is the corroboration of each other.

21  They're both being abused.  Did they both make this up?

22      They're both being abused and you hear the testimony of

23  each sister about how it affected the other.  You hear Janika

24  saying, "Jaden came in my room and started sleeping with me to

25  stay safe."  They are the corroboration of each other.

1        Even more, you've got corroboration of this sexual abuse.

2   And what Mr. Hillie is doing to these kids provided to you

3   compliments of Mr. Hillie because he was the one who decided he

4   was going to video record one of the victims of his sexual abuse.

5   He -- this child that he has made his sexual object, he's going

6   to go make a video in order to capture this lascivious exhibition

7   of her genitals.  And we're going to go back to that in a second

8   because Ms. Slaight and I have to address that as well but -- so

9   we'll go back to that.

10       But the corroboration of this abuse that's going on and

11  what Mr. Hillie is doing is provided to you by him.  And the

12  video recording that he made, these hidden recordings of Janika,

13  that's the corroboration.  When Josephine got on the stand and

14  told you, "These kids are telling me" and "I'm talking to my

15  sister about this," that's the corroboration.

16       All of these pieces, who knows, you do because you've

17  heard all of this evidence.  And there's no doubt that Mr. Hillie

18  is sexually abusing these girls in exactly the ways that they

19  described to you.  You got to hear them say -- when Jaden was on

20  the stand, Ms. Slaight was referring to this incident where

21  Mr. Hillie reaches out and grabs her breasts as she's watching TV

22  and, oh, this is just an accident.  What's the evidence that it's

23  not an accident?  It's not something that happened to her one

24  time.  He is abusing her over and over and over in the same way

25  she gets to sit on the witness stand and say to you that was no

1    accident.  How do you know?  Because of everything he had done.

2    It's the same way you know.  Who knows is you.  Because you heard

3    all this testimony.

4        There's no doubt that these girls experienced the abuse

5    that they did and told you, told the investigators, told their

6    mother.  And for Ms. Slaight to say, "I stood here and I tried to

7    read to them from some documents," well, maybe, you said this

8    before.  You saw how they answered those questions.  This

9    happened years ago.  They were trying their best.  You could see

10   them trying their best to give it to you and to explain to you

11   what happened.  They're not looking at what Ms. Slaight is

12   looking at, but they're saying, "I don't know if I did that or

13   not, but I'm telling you.  He pulled back the shower curtain and

14   he groped my breasts."  That's the evidence.  That's how you

15   know.

16       And the part about you can't believe Janika because when

17   she talked to Child and Family Services, she said something

18   different, she's come a long way, hasn't she?  And remember, it's

19   not like Child and Family Services knocked back up on her door

20   after she moved to North Carolina and said, "Hey, we just want to

21   follow up with you."

22       And said, "Oh, I'll" -- you know, "I'll change what I have

23   to say."

24       She grew up.  She moved out of her mother's house.  She's

25   17 years old when she comes forward and finally makes the report

1    of everything that had happened to her.  She doesn't live in the

2    house with Mr. Hillie anymore.  What does she have to gain by

3    making it up?  What they wanted their mother to do was to get rid

4    of Mr. Hillie and she didn't do it.  What does she have to gain

5    when she's 17 years old and after instance, after instance, after

6    instance of abuse, she finally says, "I'm not doing this

7    anymore"?

8          And do you remember what she said her breaking point was?

9    Now, tell me if you think this is something that she would have

10   made up.  She said her breaking point was after he molested her

11   the last time in the kitchen when she's cooking the mac and

12   cheese and the chicken patties, after he gropes her butt, when

13   she's now an older girl, right before she gets shipped off to

14   North Carolina.  She said, "My mother said it was going to stop.

15   She promised me it would stop.  Jaden's out of the house now.  My

16   mother promised me it would stop."  And her breaking point when

17   she finally said, "I'm going to report this."

18         Is it after her mom throws Mr. Hillie out and he comes

19   back to the house and he's going to get his things and take a

20   shower and be on his way?  She said, "I realized that wasn't true

21   because my mom made him breakfast.  And here he is, staying back

22   in our house again."  And she decides, "That's it.  I'm going to

23   make this report."  Think about that memory she has.  Does that

24   sound like something made up to you?  Come on.

25         Now, I want to talk to you a little bit about what

1  Ms. Slaight had to say about those videos and about the

2  production of child pornography.  And she put up my elements

3  chart up here and drew the red X through here and said, "This is

4  wrong."

5       Now, we didn't hear exactly what's wrong about this, but I

6  will tell you this.  We know that it's not wrong.  We know that

7  it is true that Mr. Hillie employed and used Janika to create

8  this visual depiction.  That part is obvious.  She's in the

9  video.  The judge is going to instruct you that he used and

10 employed her -- that you can use -- using and employing means

11 making a video of someone.  That part's not untrue, so we know

12 that.

13      And we know that he was doing it for the purpose of making

14 a visual depiction.  Nobody is sitting here thinking, Was

15 Mr. Hillie trying to make a video?  Abundantly clear.  So you

16 can't put a red X through that and say it's not true.  And so the

17 question -- the only question that seems to remain, is he doing

18 it for the purpose of creating a visual depiction that shows

19 sexual conduct?  In here, the sexual conduct you've heard is a

20 lascivious exhibition of her genital.  And you heard Ms. Slaight

21 say other things, "Oh, this is not a lascivious exhibition

22 because there's all these minutes of the video and it's not the

23 focal point."

24      I want to be clear what we're talking about when somebody

25 is producing child pornography.  The production of child

1    pornography is about what does he, Charles Hillie, intend to

2    capture when he's creating this video.  What Charles Hillie

3    intends to capture when he's creating this video using Janika is

4    an exhibition of her genitalia.

5         The judge is going to read you an instruction about what

6    lascivious exhibition means.  And the first thing she's going to

7    tell you is a lascivious exhibition means indecent exposure of

8    the genitals or pubic area usually to incite lust.

9         Now, that's not about what Janika is doing in the video,

10   that's about what does he want to get.  What does he want to get

11   a depiction of her genitalia for?  To incite lust.  It's about

12   his sexual interest in this child.  It's about him wanting to

13   capture that sexual interest in this child by capturing an image

14   of her genitalia.

15        Now, the whole video doesn't have to be a depiction of her

16   genitalia.  In fact, you wouldn't expect that when you're hiding

17   a camera to be able to get it.  It's not like he's saying,

18   "Janika, come here.  Pose for a second.  Let me focus on what I

19   want to capture."  He's going in and he's hiding a camera in her

20   bedroom and her bathroom so he can get what he wants to get.

21        Think about that, where that camera is planted in the

22   bedroom, shooting up from underneath the bed.  So you get the

23   shot you see of her bending over and exposing her vagina, and you

24   see it over and over in that video.  It's not a blink and you

25   miss it.  You see that.  You see over and over in that same video

1    her in that room nude.  And it's true, the judge will instruct

2    you that nudity is not enough.

3         Nudity of a child in a picture is not enough to constitute

4    lascivious exhibition.  That's why you're allowed to take a

5    picture of your child taking a bubble bath when they're, you

6    know, two years old.  That would not be a lascivious exhibition

7    even if you could see the genitalia because it's not only about

8    seeing the vagina, it's about the surrounding facts and

9    circumstances of how that image is captured, what's depicted,

10   what is the intent of this producer in capturing it.  It's to

11   incite lust.  It's about his sexual interest in this child.

12        It is true the nudity is not enough.  And you can take the

13   picture of your kid in the bathtub, but you can't do this.  It's

14   not just wrong or gross or immoral or any of the things that

15   Ms. Slaight said.  It's all of those.  But it's not just those,

16   it's also illegal.  And that's why you can't put a red X through

17   this box.  It is true.

18        And when you check those boxes, it is your duty to find

19   him guilty of committing that crime.  You know, there was some

20   discussion had about the meaning of Janika finding that picture

21   of herself on the computer.  The meaning of it is, she's not --

22   what she said she saw two pictures of herself.  One is a still

23   shot where she doesn't have her underwear on.  She's about to put

24   them on.  And one where she does.  And the importance of that

25   evidence is the corroboration of the fact that saved in the

1    defendant's computer in his profile is these depictions of the

2    child he is sexually abusing.

3          These depictions of her vagina that when she saw, she

4    knows, these aren't me in the bathtub, as a three-year-old

5    getting a bubble bath.  This is a lascivious depiction of me.  I

6    know it because I am the person who doesn't know this is being

7    taken.  It's hidden.  The hiddenness, the surreptitiousness of

8    it.  He knows he can't be taking that video, but his intent is to

9    capture something that's illegal.  That's the relevance of it.

10   It's true it's not child pornography if she's just standing there

11   in her underwear.  That's not what makes this child pornography.

12   What makes this child pornography is the purpose he's using this

13   child for to get that image.  That's what makes it child

14   pornography.

15         Now, you heard that the Government, you can just -- forget

16   about Counts 4 through 7 because those are the counts.  We don't

17   really have to bother with those.  The difference between

18   Counts 4 through 7 and Counts 1 and 2 is that we do know what

19   child pornography is.  It does have a specific definition.  It's

20   not just nudity.  And that is why Counts 4 through 7 are not

21   charged as production of child pornography.  They're charged as

22   the attempt because there is a legal distinction here.

23         And in Counts 1 and 2 where he captures this lascivious

24   exhibition, he's been charged with producing child pornography.

25   Because you can look at the totality of the content in those

1    videos and see that he has captured images that fit the

2    definition of what the Court is going to instruct you.

3    Ms. Slaight is right.  He didn't get it in Counts 4 through 7,

4    and that's why he's not charged with producing child pornography

5    there.  He tried.  He did -- he engaged in the same conduct.  And

6    that's what you're evaluating, his conduct, what is he trying to

7    do.  He tried.  He didn't get it.  He didn't get the depiction of

8    the genitalia that he was hoping for, that he was trying to get.

9         So it's true.  He's not charged with production of child

10   pornography there.  He's charged with the attempt because you

11   don't have the same -- he doesn't meet the same legal elements.

12   That careful work that you have to do is how you sort those

13   charges out.  The facts are different and that's why there is a

14   different charge associated with that conduct.

15        Now, there was some mention made of this video that the

16   Defense introduced to you about Joyce putting that camera up and

17   then recording herself cleaning the bathroom and then taking it

18   down.

19        Ms. Slaight says, "Who knows what's going on there?"  That

20   is true.  Who knows?  There's one place we don't know.  She said,

21   "Who knows what's going on with those attempt videos as well?"

22   No, no, no.  With respect to the attempt videos, you know what's

23   going on because you heard evidence about those.  You saw

24   evidence about those.  You heard explanation of what's going on.

25   You can tie it to the rest of the evidence in this case and

1    understand what's going on in those videos.  That video of Joyce,

2    who knows?  You didn't hear any evidence about that video or

3    about what's going on there.  We don't know.  Maybe she knows

4    what's going on.  She obviously knew about the sexual abuse.

5    Maybe she understands what's going on with these recordings.  She

6    put -- you saw in the video, she, like, flips the camera off,

7    and, you know, who knows?

8         You're not entitled to speculate about what's going on

9    there.  It's not relevant to the charged conduct.  Mr. Hillie is

10   not charged with anything related to that.  Who knows what's

11   going on there?  And the answer is, you don't get to speculate

12   about it.  In fact, you're going to be told by the judge that

13   you're not supposed to go in the back and speculate about that.

14   Speculation is not part of your job.  You are supposed to look at

15   the evidence in this case and assess the conduct with which

16   Mr. Hillie is charged.  And when you go back and look at that

17   evidence, there is ample evidence for you to find beyond a

18   reasonable doubt that he's guilty of these charges.

19        Now, one other thing Ms. Slaight said that I wanted to

20   touch on briefly is that, she said, "You have to look at all

21   these charges individually."  And that's true.  You do have to

22   evaluate each charge and find guilt or innocence with respect to

23   each charge, but it is not the case that the evidence in these

24   charges doesn't relate.  It's true you can't find him guilty of

25   production of child pornography just because he sexually abused

1     these kids.  And you can't find that he sexually abused the kids

2     just because he produced child pornography.  But the evidence

3     relates.

4          When you're considering what his intent was when he's

5     planting the camera in Janika's bedroom, when you're considering

6     that, what was his intent?  What was he trying to capture?  What

7     purpose was he using her for?  When you're asking yourself those

8     questions, you can consider that he was sexually abusing her.

9     You are entitled to consider that evidence to determine his

10    intent and his purpose in producing those videos.

11         Ladies and gentlemen, all of that evidence works together

12    to prove to you that he committed these offenses, each and every

13    one of them.  When you evaluate it separately, he committed that

14    offense.  And the Government has given you evidence that he

15    committed it beyond a reasonable doubt.  And the evidence in its

16    totality bears on that.  You know.  That's who knows.  You know

17    that with respect to each one of those counts, you have seen

18    evidence sufficient to convict him.  You have been -- it's been

19    proven to you beyond a reasonable doubt based on the testimony

20    that is corroborated by those children, based on the videos that

21    you have an opportunity to look at, you have more than enough

22    evidence to find beyond a reasonable doubt that he committed each

23    one of those offenses, and I would ask that you find him guilty

24    of each one.  Thank you.

25         THE COURT:  All right.  We're going to take our lunch

1    break, and when we return, we'll be at a point in which I give

2    you your instructions and release you for deliberation.

3         During this lunch recess, as in all other recesses, please

4    do not discuss this case with anyone, including your fellow

5    jurors, anyone involved in the trial, members of your -- friends,

6    family, anyone else.  Also, because we're all occupying the same

7    space, please do not speak at all with any of the parties,

8    witnesses, or attorneys if you should see them out in the area.

9    Don't permit anyone to discuss this case with you.  And if anyone

10   approaches you and tries to talk to you, please report that to

11   me.  All right.  We're going to come back at a little bit -- why

12   don't we say 2:15.  That gives us a little over an hour.

13        All right.  Thank you.

14        (Jury out at 1:20 p.m.)

15        THE COURT:  All right.  I know of at least one outstanding

16   item, which is, Ms. Slaight, you were going to give us an

17   additional sentence for --

18        MS. SLAIGHT:  Yes.

19        THE COURT:  -- the Defense theory of the case, which we'll

20   put in the instructions.

21        Is there anything else that we need to deal with?

22        MS. SLAIGHT:  Your Honor --

23        THE COURT:  Yes.

24        MS. SLAIGHT:  -- I would object to the Government's

25   closing and as to the elements for the pornography that the

1   emphasis on -- the intent of Mr. Hillie to the exclusion of the

2   actual video depiction was a misstatement of the law.

3       THE COURT:  All right.  Your objection is noted.  It's

4   overruled.  The Court did not perceive the Government's argument

5   to focus on intent to the exclusion of what was depicted in the

6   video.  The Government referenced Mr. Hillie's intent in light of

7   the Court's prior ruling that -- consistent with the *Dost* factors

8   intent is one of the considerations that the jurors can look at

9   when they're making this determination.

10      Anything else?

11      MS. HERTZFELD:  No, Your Honor.

12      THE COURT:  All right.  We'll be back at 2:15.

13      (Thereupon, a luncheon recess was had beginning at

14   1:22 p.m.)

15                 **C E R T I F I C A T E**

16

17         I, Scott L. Wallace, RDR-CRR, certify that
     the foregoing is a correct transcript from the record of

18   proceedings in the above-entitled matter.

19

     /s/ Scott L. Wallace           7/26/19

20    -----------------------------   ----------------
     **Scott L. Wallace, RDR, CRR**     **Date**

21     **Official Court Reporter**

22

23

24

25