```
                                                          1
 1    UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3

 4

 5    UNITED STATES OF AMERICA,        :
                                       :
 6                 Plaintiff,          :
                                       :   CR NO. 16-030
 7    v.                               :
                                       :
 8    CHARLES HILLIE,                  :
                                       :
 9                 Defendant.          :
      ---------------------------------------------------------
10                 TRANSCRIPT OF MOTIONS HEARING

11         BEFORE THE HONORABLE KETANJI BROWN JACKSON

12               UNITED STATES DISTRICT JUDGE

13                  Thursday, August 3, 2017

14    APPEARANCES:

15      For the Plaintiff:  LINDSAY JILL SUTTENBERG, AUSA
                            KENECHUKWU O. OKOCHA, AUSA
16                          UNITED STATES ATTORNEY'S OFFICE
                            Washington, D.C.
17

18      For the Defendant:  TONY W. MILES, ESQ.
                            LOUI ITOH, ESQ.
19                          FEDERAL PUBLIC DEFENDER FOR THE
                            DISTRICT OF COLUMBIA
20                          625 Indiana Avenue, NW
                            Suite 550
21                          Washington, DC 20004

22

23

24    Proceedings reported by machine shorthand, transcript
      produced by computer-aided transcription.
25                  (202)354-3118                   Room 6509
```

2

3

P R O C E E D I N G S

1           DEPUTY CLERK:  Your Honor, this is Case No.

2   CR 16-030, United States of America v. Charles Hillie.

3   For the government we have Lindsay Suttenberg and

4   Kenechukwu Okocha.  For the defense we have Tony Miles

5   and Loui Itoh.  The defendant is present.

6           THE COURT:  Good afternoon to all of you.  We

7   are here because the Court would like to bear down on

8   getting this case ready for trial.  We've set a trial

9   date of November 13 through the 17th, I believe.  And

10  there are a number of pending motions in this matter,

11  four of which the Court plans to address in some fashion

12  today.  Whether I rule I don't know, but I set this as a

13  motion hearing to permit you-all, given the superseding

14  indictment and the arguments that counsel has put

15  forward, to provide oral argument with respect to those

16  pending motions.

17          I do want to note for the record that I am not

18  taking argument or considering all of the motions.  By

19  my count there are five other ripe motions in this

20  matter and will have to determine how to move forward on

21  those when we finish today.  There are at least two of

22  those five that the parties have asked me to hold in

23  abeyance pending trial, so I'm just trying to keep track

24  of all of the moving parts here.

4

1          But for now today I plan to hear arguments on

2     Defendant's motion to dismiss the indictment,

3     Defendant's motion to dismiss Counts I through VII and,

4     I'm sorry, the first was ECF 53.  The second is ECF 50.

5     Defendant's motion to dismiss Count III, which is ECF

6     51, and the government's motion to admit other crimes

7     evidence, which is ECF 52.  And these were motions that

8     were filed, I believe, all after the superseding

9     indictment was filed in this case.

10          So that's my understanding of what we're here

11     for.  I don't know if either party wants to say anything

12     just about the agenda.

13          MS. SUTTENBERG:  Not from the government.

14          MR. MILES:  That's my understanding.

15          THE COURT:  All right.  Good.

16          So Mr. Miles, why don't we have you come

17     forward and we will begin with your motion to dismiss

18     the indictment.

19          MR. MILES:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. MILES:  And so the Court's aware that we

22     had a, this is our second round at this.

23          THE COURT:  Yes.

24          MR. MILES:  And with a motion similar to this,

25     this is our second round.  In the interim, the

1   government has gone to the grand jury, sought a

2   superseding indictment.  The grand jury did return that

3   superseding indictment in January of this year, and we

4   filed a motion arguing that a lot of the same problems

5   with the prior indictment exists with this.

6           THE COURT:  You've argued that, but help me

7   really understand --

8           MR. MILES:  I will --

9           THE COURT:  -- why you believe that.

10          MR. MILES:  Just by way of introduction.

11          THE COURT:  All right.

12          MR. MILES:  I would say, Your Honor, in a

13  nutshell, the problems, I think I can put them in two

14  broad categories.  One problem is we still don't know

15  what factually, with regard to facts, what facts support

16  the allegations they're making against Mr. Hillie.  In

17  other words, what is he being charged with.  And that

18  there's just not enough of a factual statement in the

19  indictment for us to adequately defend against the

20  charges.

21          THE COURT:  Tell me why that is.  I mean, I

22  understood your argument obviously and had agreed with

23  you with respect to the indictment that literally just

24  parroted the words of the statute.

25          MR. MILES:  Right.

6

1          THE COURT:  But here I see more.  I understand

2     what, which particular act they're seeking to or that

3     they have charged Mr. Hillie with in each of the counts.

4     They've got at least with respect to the child

5     pornography counts file numbers pertaining to videos, so

6     we know which video we're talking about.  Is it that you

7     don't have access to that information or what?

8          MR. MILES:  Your Honor, where I've seen

9     they've made improvements are that now under the statute

10    we're a little more clear what part of the statute is

11    being violated.  For example, the statute says that the

12    defendant must employ, use, induce, entice or coerce a

13    minor.  The old indictment listed all of those ways.

14    The new indictment now tells us it's employ and use.

15         THE COURT:  Yes.

16         MR. MILES:  So I think with regard to what

17    part of the statute he's being accused of we're, we have

18    more clarity.

19         THE COURT:  Okay.

20         MR. MILES:  Also with respect to the

21    interstate commerce.  Before it listed all the different

22    ways interstate commerce is implicated.  Now it states

23    one.  But factually it does add the file name.

24         THE COURT:  And it adds language that relates

25    to the conduct.  They don't just say "employ and use."

7

1    They say "employ and use" by surreptitiously recording

2    J.A.A. in the bedroom of her residence as depicted in a

3    video file that they've given you the file name for.

4         MR. MILES:  Your Honor, our concern is we

5    don't know the way in which he -- he has to employ and

6    use the minor.  And there's just no factual indication

7    in the indictment of how Mr. Hillie employed and/or used

8    the minor.

9         THE COURT:  That's a legal argument, not a

10   factual one.  I mean, they're saying a surreptitious

11   recording of a minor in what they conceive to be

12   sexually explicit circumstances --

13        MR. MILES:  Right.

14        THE COURT:  -- qualifies for this code section

15   as a violation, and you might disagree with that, but

16   you're not unclear as to what their factual basis is,

17   are you?

18        MR. MILES:  We are, Your Honor.  We're unclear

19   with regard to how is it that they're alleging that

20   Mr. Hillie employed and used this minor.  Just recording

21   it surreptitiously does not tell us how he employed or

22   used it.  That just indicates the manner in which the

23   recording occurred.  But we don't know how he employed,

24   allegedly employed --

25        THE COURT:  Right.  Which means you disagreed

with their theory that you can employ or use a minor by

surreptitiously videotaping them for their own sexual

pleasure.  You disagree with, that that counts as

employing or using her.  What I don't understand is why

you think there's a factual piece missing from the

indictment in this way.

MR. MILES:  Your Honor, I would -- the way I

read the indictment is certainly not clear to me that

the surreptitious recording relates to how it is alleged

that Mr. Hillie employed or used as opposed to the grand

jurors just stating that this is a way in which the

recording happened.

But the indictment and the statute is clear

that Mr. Hillie must employ and use or other ways, but

they're not alleging the other ways, but here they're

saying employ and used.  And, for example, if Mr. Hillie

paid her money, you know, he employed her by paying her

money to do this or some other factual indication

indicating how he -- it doesn't have to just be money,

but I just use that as an example.

If he said if you allow me to take these

pictures -- now, of course, here it's surreptitious, but

I'm just giving you an example.  If you allow me to take

these photos, I will pay you had to do so.  Therefore,

the indictment will be more clear that he is employing

1  this person --

2          THE COURT:  But that's not what they're

3  alleging.  I mean I just feel like we -- I guess I feel

4  like we have, you and I have a disagreement about

5  whether the defect that you are articulating is a

6  factual one or a legal one.  They have put forward their

7  theory --

8          MR. MILES:  Right.

9          THE COURT:  -- in the indictment.  Before I

10  felt like their theory wasn't in the indictment.  We

11  were just parroting the words, so we had no idea what

12  their factual basis was.

13          They say, I think, in the indictment that

14  Charles Hillie violated this statute, the statute

15  requires employing or using, he violated the statute.

16  They say he employed or used her because of the

17  lascivious exhibition of her genitalia and pubic area.

18  That's new.  That wasn't in it before.

19          MR. MILES:  Right.

20          THE COURT:  By surreptitious recording of

21  J.A.A. in the bedroom of J.A.A.'s residence depicted in

22  the video file, and then that video depiction was

23  produced or transmitted, et cetera, et cetera.

24          So whereas before when we had literally no

25  idea what the facts were that they were relying on to

1    say he violated the statute, now at least we know -- you

2    may disagree -- but we know that their theory is

3    surreptitious recording of the genitalia and recording

4    of a minor in a lascivious way counts for them as

5    employing or using the minor in violation of the

6    statute.

7         I mean, their theory is not that he sold her,

8    that there was money or anything else.  So that can't be

9    in there because that's not what they're saying

10   happened.

11        MR. MILES:  I'm not arguing that that's their

12   theory.  That's clearly not their theory.  I just used

13   that as an example of the kind of facts --

14        THE COURT:  Right, but that's not a defect in

15   the indictment.  If it's a defect, you're arguing to the

16   jury that they haven't satisfied the elements of the

17   offense because their theory factually of what they say

18   happened doesn't count.

19        MR. MILES:  Your Honor, I guess with respect

20   to particularly the production of child pornography

21   offenses, there are a lot of elements here.  It's an

22   interesting kind of complicated statute.  They must show

23   that, you know, employ and use.

24        THE COURT:  Right.

25        MR. MILES:  They must show that it was for

11

1   purpose of.

2           THE COURT:  Right.

3           MR. MILES:  They must show, it fits the

4   definition of child pornography.  There is an interstate

5   commerce nexus.

6           THE COURT:  Correct.  All of which would be

7   instructed, the jury would have instructions.  These are

8   the elements of the statute.

9           MR. MILES:  Right.  Understood.

10          THE COURT:  Right.  And with the indictment in

11  hand, you understand what their theory is, and at trial

12  they present evidence related to why they believe those

13  elements are met.  And then you argue but they haven't

14  shown employ or use, members of the jury, so you can't

15  find him guilty of that, right?

16          MR. MILES:  And what I'm saying here in this

17  indictment with respect to each one of those elements,

18  maybe some but not with all, but the indictment does not

19  give us any factual indication with how, with regard to

20  how each one of those elements is met.  Employ and use

21  is one of them, I would argue.

22          I would argue the interstate nexus, it just

23  repeats the statute again.  It talks about interstate

24  commerce nexus, but it doesn't say anything about how

25  that's met.  It talks about now the sexually explicit,

12

1    there's some addition there, but the addition is not

2    factual.  It just now goes -- it picks which part of the

3    statute -- you know, the statute defines what sexually

4    explicit is.  And what they've done is they've now

5    chosen which one, which helps us.  Now we at least are

6    more clear what part of the statute they are arguing he

7    violates, but it doesn't factually tell us what is it

8    about these videos that's a lascivious exposition of

9    J.A.A.'s genitals or pubic area.

10             THE COURT:  I think you're requiring the

11   indictment to do too much.  I think the point of the

12   indictment is to reasonably give the defendant some idea

13   of the government's charges.  They don't need to put

14   every fact that relates to all of the elements, because

15   if they did we would have no trial presumably.  I can do

16   this on summary judgment or whatever.

17             MR. MILES:  The indictments would be hundreds

18   of pages.

19             THE COURT:  Exactly.  So the problem to the

20   extent there's a problem in an indictment is that we

21   really don't understand.  And what I'm saying is I'm

22   pretty clear as to what it is based on this indictment

23   at least the government is alleging in broad terms.  And

24   I don't understand your confusion.

25             MR. MILES:  Well, to be clear, Your Honor, I'm

1    certainly not saying the government has to put all of

2    its facts.  That's why it doesn't need to be a 100-page

3    indictment or we'd only have to try the case basically

4    in the indictment.  What I'm arguing is that with

5    respect to each element that there should be at least

6    some facts to --

7            THE COURT:  Do you have a case that says that,

8    that there are certain -- that all of the elements have

9    to have facts attached to them, that they can't say

10   "knowingly and intentionally," for example, if that's an

11   element they have to put the fact that indicates that

12   it's knowing and intentional or whatever?  I wasn't

13   aware of that as an indictment requirement.

14           MR. MILES:  The Court's indulgence.

15               (Pause)

16           MR. MILES:  In looking -- looking to my notes

17   and trying to find something to satisfy the Court's

18   question.  I haven't found precisely that, but this is

19   something that's helpful which goes to kind of another

20   point that I want to raise, and I'll just state the

21   quote first.

22           In *Russell v. United States*, U.S. Supreme

23   Court case, it indicates that courts are to guard

24   against situations in which a defendant could be, quote,

25   "convicted on the basis of facts not found by and

14

perhaps not even presented to the grand jury which

indicted him," end quote, and that's -- in a nutshell

there are two major problems.  I think that's starting

to move to the second problem.

The second problem is whether his right to the

grand jury, Mr. Hillie's right to the grand jury process

was violated.  And we can't -- you know, I'm concerned

that the government is going to go in at trial and start

doing just what *Russell* said you can't do.  And that's

making arguments and presenting evidence and trying to

prove its case based on facts that were never found by

the grand jury or presented to the grand jury.

With respect to each one of these elements, if

we don't know why the grand jury believed Mr. Hillie

employed and used her or what about the videos makes it

a lascivious exposition of J.A.A.'s genitals or pubic

area or how interstate commerce nexus is implicated, if

we don't know that from the grand jury, it invites the

government to make it up as it goes along.  And the jury

could convict Mr. Hillie on facts that were never even

presented to the grand jury or even found by the grand

jury.

And that's our -- and that's why we believe

the indictment, we should understand in the indictment

what facts -- not all the facts but some facts or even

15

1    one fact.

2          THE COURT:  And your suggestion is that -- I

3    mean, you know from my written opinion that I was

4    sympathetic to and understood absolutely this argument

5    in the context in which there were no facts.  None.  We

6    had no idea whether it was a taking-a-picture kind of

7    issue or it was some other kind, we had absolutely no

8    idea.

9          MR. MILES:  Right.

10         THE COURT:  The government has now clarified

11    for us what it says happened in the context of the

12    indictment.  Every fact is not in there; whether it

13    counts as employ or use is not made clear how, in your

14    vernacular how what happened qualifies as employment or

15    using, which I say is a legal argument, is not there.

16         But we do know that the government presented

17    to the grand jury a video file, because they say here it

18    is as depicted in video file whatever, that the

19    government represented to be a surreptitious recording

20    of this child in her bedroom in her residence and a

21    lascivious exhibition of her genitalia and pubic area.

22         MR. MILES:  Uh-huh.

23         THE COURT:  And then they do the same sort of

24    thing with regard to describing the particular video,

25    and then one of them is in the bathroom, et cetera,

16

1   et cetera and the different counts.  And there are

2   different files; I checked the numbers.  So there are

3   different videos going on, right.  Whereas before we

4   didn't even know if it was one video or different.  We

5   didn't know anything.

6         MR. MILES:  Right.

7         THE COURT:  So I'm not sure what additional

8   facts or what facts outside the scope of the indictment

9   or something you're worried is going to come in at trial

10  that wasn't presented to the grand jury.  We have

11  particular videos, and the charge is production of child

12  pornography.  And so I presume the videos will be shown

13  as they were shown to the grand jury, and the government

14  will make its argument that what you see there is

15  lascivious exhibition in a manner that violates the

16  statute.

17        I'm not confused by that.  I'm not worried

18  that suddenly some other theory of child pornography

19  based on different facts that have nothing to do with

20  the bedroom or the bathroom or lascivious exhibition are

21  going to come floating in and if they do we will deal

22  with that because that's not in the indictment.

23        And you will make your argument that that's

24  not enough that, you know, ladies and gentlemen of the

25  jury, the judge will tell you what lascivious exhibition

1    means under the law and my argument is that what they've

2    shown you is not it.

3            MR. MILES:  Right.

4            THE COURT:  Fine.  But I don't understand why

5    the indictment is defective in this way.

6            MR. MILES:  And the Court's correct that I

7    anticipate we'll make those arguments and I think that's

8    a separate issue.  The issue here is that the -- we

9    can't tell from the indictment what facts.  And I

10   think -- I don't know if I have anything else to offer.

11   I'm probably just repeating myself.

12           THE COURT:  So you're saying they had to say

13   did knowingly and intentionally employ and use J.A.,

14   they say, by showing her in the bedroom.  But you think

15   they had to say by giving her money, even though that's

16   not a fact?

17           MR. MILES:  That was just an example.

18           THE COURT:  Okay.

19           MR. MILES:  That's not the case here.  I gave

20   an example.

21           THE COURT:  Yes.

22           MR. MILES:  I purposely gave an example that's

23   not related to this case because I don't want to help

24   them.

25           THE COURT:  I understand.  But without it,

1    without it you're arguing they can't ever correct the

2    indictment and my guy just goes free.  You have to give

3    me some -- if you're saying the indictment is

4    insufficient and defective, then you have to help me

5    understand what's missing.  And I have to tell you I

6    don't see it.

7              MR. MILES:  What I'm saying is that what --

8    this indictment in my opinion does not indicate what

9    facts support the grand jury's conclusion that

10   Mr. Hillie employed and used.  And the surreptitious

11   recording, I mean, that's like, that's, you know, not

12   even mentioned near the time they mention "employ and

13   use."  I don't actually connect that statement with

14   employ and use.

15             And secondly, we do not know -- I mean, I feel

16   like it should say in this count it's this, you know,

17   they describe what in the video, not -- they don't have

18   to go to all the details, but what in the video shows

19   that that video constitutes a lascivious exhibition of

20   J.A.A.'s genitalia and pubic area rather than just

21   saying it.

22             THE COURT:  You don't think showing the video

23   would be enough?  Having shown it to the grand jury,

24   showing it to the jurors?

25             MR. MILES:  Well, I think the indictment

19

1    should say, you know, because video file X shows this,

2    whatever that is, and whatever that is, that should

3    describe some lascivious -- some act that involves a

4    lascivious exhibition of J.A.A.'s genitals or pubic

5    area.

6                   THE COURT:  Have you seen the video file?

7                   MR. MILES:  I've seen them all, yes.

8                   THE COURT:  And is your concern that it shows

9    a lot of other stuff and so we're not quite sure which

10   part of it is the one that shows the genitals and pubic

11   area?

12                  MR. MILES:  It does show a lot of stuff and as

13   the Court knows, we'll get on to that.  It's our opinion

14   we think it's as a matter of law.  It doesn't show child

15   pornography.  It doesn't show --

16                  THE COURT:  Right.  I think really that's the

17   argument.  I think that's the argument that you're

18   making here in a way that it doesn't fit.  That's my

19   point.  I think your argument as a matter of law is that

20   what you've charged my guy with is not the crime that

21   you are charging.

22                  MR. MILES:  We definitely make that argument,

23   but I think this is a separate argument.  We're also

24   arguing that the jurors do not or the grand jurors do

25   not indicate to us, give us any factual indication what

20

1      about each video is it that makes you believe that it is

2      a lascivious exhibition of J.A.A.'s genitalia and pubic

3      area.

4              THE COURT:  Okay.  Let me ask Ms. Suttenberg

5      to defend the indictment in light of the -- unless, I'm

6      sorry, unless, is it Mr. Okocha?

7              MR. MILES:  I'm not going to go, you know,

8      it's been -- we, you know, have written pleadings and

9      I'm not going to go on and on here, but I do just want

10     to emphasize the other kind of part and it's the whole

11     grand jury process, and I want to make some comment.

12     This is an important process.  It's fundamental to our

13     criminal justice system; in fact, it's a constitutional

14     right, and I just am concerned that it's being

15     undermined in this case that --

16             THE COURT:  On the basis of what, Mr. Miles?

17     Yes, again, got you on the first indictment where we

18     didn't have any factual basis in there.  Now we know,

19     lascivious exhibition, says the government, look at the

20     video file, it's in her bedroom.  He took a picture

21     surreptitiously.  What are we worried about that the

22     grand jury is drawing from that's not in the indictment

23     or some other conduct that is not being adequately

24     revealed?

25             MR. MILES:  I think particularly in a case

1   where we are having a hard time finding what about each

2   video file is sexually explicit, we want to know what

3   the grand jury, what specifically about each video file

4   the grand jurors thought was sexually explicit.  And

5   there's no description of that.  We want to know why

6   this, there's an interstate commerce nexus.  We want to

7   know why it's for the purpose of.  That's another

8   element.

9         They have to show that the video was taken for

10  the purpose of creating a sexually explicit image.  What

11  factually is it about each video or each instance that

12  indicates --

13        THE COURT:  So I'm really, really concerned

14  about this argument.  Let me tell you why.  Because I

15  hear you putting sort of a burden on the government that

16  I don't think the law requires, really.  And it would

17  come up in every case, it's not this case necessarily.

18  This is speaking to the broader issue of charging

19  sexual, you know, crimes or cases involving child

20  pornography or production or distribution or whatever.

21        And I'm just a little nervous about the idea

22  that the grand jury process has to be opened up and we

23  are essentially, I guess, polling each grand juror when

24  they are being shown a video that the government says is

25  child pornography or, you know, sexually explicit

22

1    conduct or whatever, that we need to understand based on

2    each juror's own viewing of that piece of evidence what

3    they believe about the video, like we're stopping it

4    every ten seconds and saying do you think that's a

5    sexually explicit, and I don't know that that's what the

6    law requires.

7            MR. MILES:  I'm not obviously asking for that.

8    I'm just arguing that the grand jurors, at least 12 of

9    them, you know, have to find and we should know in the

10   indictment what facts supported their finding with

11   respect to each element.

12           THE COURT:  But we have the video.  I mean, I

13   don't understand.  If we didn't have the video, right,

14   we look at the video, they looked at the video and

15   presumably were instructed that they have to determine

16   that what they see on this video is sexually explicit

17   conduct.  And it's in here that 12 people looked at the

18   video, at least, and thought that this was sexually

19   explicit conduct.

20           And your argument suggests that somehow we

21   have to know more about what each video -- what each

22   grand juror believed they were seeing or how they were

23   interpreting it or whatever, and I don't understand

24   that.  I don't.

25           MR. MILES:  And, Your Honor, that's the

23

argument with respect to that.  But there are other
elements.  Like I don't see how the video, by just
putting the video file how they were giving us facts
showing how it was for the purpose of producing that
image.

THE COURT:  Well, there are other facts,
right?  And, you know, there are other facts that are in
here.  There are other facts in this case regarding the
way in which the defendant did this, allegedly.  The
relationship that this defendant had to the particular
victims in this case, et cetera.

So they didn't just say come in, everybody,
watch this video and indict this person.  I'm sure
there's other facts in the case that would have to come
out at trial in order to sustain their burden.  The
answer, I think, with respect to this motion is that
they would have to be spelled out in the indictment.

MR. MILES:  We're definitely not saying all
facts have to be spelled out.  All I'm arguing is that
with respect each element, the elements that they're
going to raise, that there should be at least one fact,
not all the facts, just one fact that supports the
element should be stated in the indictment.

THE COURT:  Isn't your argument sort of more
well taken in a world in which the facts as we know

24

1    them, based on what the government has said about its

2    investigation in the case, we have a lot of facts, point

3    to more than one way in which each of the elements could

4    be satisfied.  And so the confusion then comes because

5    we're not sure whether when the grand jurors looked at

6    this, the requisite number of them believed that there

7    was a mailing versus, you know, a shipping, whatever the

8    various, you know -- when it's possible that it could go

9    either way, then I hear you saying we don't know which

10    of these two options they picked.

11         What is troublesome is in a world in which we

12    have facts and the facts say this video was found on his

13    computer and no computers are made in the District of

14    Columbia or whatever it is, so we knew that there was

15    some, you know, interstate nexus related to the

16    production or something, right, but there isn't a choice

17    between two different ways of satisfying the element,

18    then your answer is I just disagree with the government

19    that they say that, in their argument that these facts

20    meet this element.

21         But it's not a situation, I think, in which

22    there's a defect in the indictment because we can't tell

23    which set of facts the grand jury was persuaded by.

24    That's the argument you're making, but you're not giving

25    me a basis, I think, for finding confusion over the

25

1      grand jury's choices in this world.

2            MR. MILES:  Well, Your Honor, I think the

3      interstate commerce issue you mentioned in that

4      computers are not made in the District, well, that's not

5      in the indictment.  If that was in the indictment, then

6      there is a fact that supports the allegation that

7      interstate commerce is implicated.  But that's not in

8      this indictment.  The indictment just says it was in

9      effect interstate commerce.

10           THE COURT:  I understand, but at trial they

11     couldn't just say that.  At trial they'd present

12     evidence to show that the video was on the -- at trial

13     they'd present evidence to show the video was on a

14     laptop, and right now we're not confused about where the

15     video was, right?  Because we know the facts as the

16     government understands them and it's not a situation in

17     which it could have been on their laptop but it could

18     have been somewhere else, and so the fact that it's not

19     in the indictment is going to create confusion on the

20     grand jury's part because there are two different

21     possibilities here and we don't know that we have enough

22     grand jurors finding in one way or the other.  Right?

23           In that world you're correct.  It needs to be

24     in the indictment because it's unclear without it.  But

25     we know the facts about what they're going to say

26

1       related to interstate nexus, and if they don't present

2       the facts to the jury, the case is over with regard to

3       that count.

4              MR. MILES:  I guess my concern is how do we

5       know that they presented this fact about interstate

6       commerce to this grand jury.

7              THE COURT:  Well, that's purely speculative.

8       I mean, the grand jury indicted him.  There's a

9       presumption of regularity with regard to grand jury

10      proceedings.  Unless you have some reason to believe

11      that the government's theory of the case as set forward

12      was not proceeded to the grand jury and they didn't give

13      them the evidence with regard to all of the elements,

14      you know, I don't know that I'm supposed to open grand

15      juries and just look to make sure that the government

16      has done its job.

17             MR. MILES:  Well, we do -- I mean, with

18      respect to the sexually explicit, as we've said in our

19      other motions.  And we do.  That's kind of the point of

20      our argument.

21             But with respect to the other ones, we don't

22      know what happened in the grand jury.  But that's why we

23      are arguing that if we know it when the indictment tells

24      us that because of this, for this reason that's why

25      there's an interstate commerce nexus, that's how we know

27

1    the evidence was presented to the grand jury about that

2    and they made that finding.  Without that --

3              THE COURT:  So in every case in which there's

4    an interstate commerce nexus, which is in the federal

5    system because that's where we are, the indictments are

6    defective unless the government explains why in every

7    case?  Not just this case, that comes up in every

8    criminal case in the federal system.

9              MR. MILES:  The reason I'm pausing, I didn't

10   check, but based on my recollection I'll take firearm

11   cases.  Those are frequent cases we get in this district

12   that as in almost every federal case implicates the

13   interstate commerce nexus.  I'm pretty sure in those

14   indictments they say because either this firearm or no

15   firearms are manufactured in the District of Columbia,

16   therefore it must have been transported or shipped in

17   interstate foreign commerce.

18             THE COURT:  They do.  The question is if it's

19   a fatal defect if they don't say those words.

20             MR. MILES:  I'm not saying they have to say

21   those words.  I'm arguing that if it's an element there

22   should be some fact in the indictment supporting each

23   element.

24             THE COURT:  All right.  Let me ask Mr. Okocha

25   whether he agrees, disagrees and why he thinks this

28

1    indictment is sufficient.

2              MR. OKOCHA:  Thank you, Your Honor.

3              We agree with the Court, we agree with the

4    Court's reasoning that this indictment is sufficient.

5    We believe that the defense is asking too much of the

6    government when it comes to the indictment language.  We

7    note that the previous indictment did have its issues,

8    primarily stemming from the fact that there was not a

9    lot distinguishing between the charges and the fact that

10   we followed the statute language too close, too closely.

11             But the government in this case has provided a

12   lot of additional facts with regards to each and every

13   one of the counts, with Counts I through VII.  And what

14   the defense is requiring or is requesting seems to be

15   much greater than the government's obligations.

16             THE COURT:  All right.  Well, Mr. Miles says,

17   let's start with the last point.  In firearms cases the

18   government says no firearm is ever made in the District

19   of Columbia.  Or it had to travel through because we

20   know it wasn't completely manufactured here or whatever

21   the standard language is.  And yet here you just say

22   that the visual depiction was produced or transmitted

23   using materials that had been made, mailed, shipped or

24   transported.  You don't say materials, e.g., a laptop, a

25   Sony laptop that was, you know, we've traced the serial

29

1    number back to its manufacture outside of the United

2    States or you don't even say no Sony Pictures, companies

3    exist in the District, so we know it must have come

4    somewhere else.

5            Why not, and is that a fatal defect with

6    regard to the indictment?

7            MR. OKOCHA:  Your Honor, we would say it's not

8    a fatal defect.  We would first and foremost note that

9    in this particular case it's different than a lot of the

10   firearms cases in that it was a surreptitious recording.

11   It was done multiple years prior, and the item that was

12   used, the recording device was not recovered.

13           But we did make clear in the indictment in the

14   language that there was a recording device

15   circumstantially through the use of language of

16   surreptitious recording and the fact that there was a

17   video file that was there.

18           So circumstantially it's clear that there was

19   a recording device that was created.  We cannot put in

20   the language that the defendant is requesting because

21   the item was not recovered.

22           THE COURT:  So how do you know that it was

23   produced or transmitted using materials that had been

24   mailed, shipped or transported in effecting interstate

25   commerce?

30

1          MR. OKOCHA:  Again, it's circumstantially.  We

2     understand that through the fact that we have the

3     recording device that is, that was used, and we do know

4     that D.C. does not have, does not manufacture any

5     recording devices.

6          THE COURT:  That's the point, right?

7          MR. OKOCHA:  Yes.

8          THE COURT:  You didn't recover the device, so

9     you can't put it in there.  But just like firearms

10    cases, as far as the government knows, there is no such

11    manufacturer in the District of Columbia; correct?

12         MR. OKOCHA:  That's correct.

13         THE COURT:  So why don't you put that in there

14    and use the fact that you don't have that, there are no

15    video producers to the government's knowledge that would

16    have -- that are in the District of Columbia and could

17    have manufactured the items that were used in this case.

18         MR. OKOCHA:  Your Honor, we don't believe that

19    the fact that that specific statement is not in the

20    indictment is a fatal flaw.

21         THE COURT:  Okay.

22         MR. OKOCHA:  We do believe that when it comes

23    to indictment languages, specific language, specific

24    words do not necessarily need to be put in the

25    indictment language when it could be inferred

31

1    circumstantially through what was placed in the

2    indictment language, that should be sufficient.

3                    THE COURT:  Do you think at trial you have to

4    demonstrate that, that the video depiction was produced

5    or transmitted using materials that had been mailed,

6    shipped or transported?  Isn't that an element of the

7    offense?

8                    MS. SUTTENBERG:  Yes, Your Honor.

9                    THE COURT:  How would the government -- do you

10   know how the government goes about establishing the

11   interstate nexus in cases like this?

12                   MR. OKOCHA:  In this specific case we'll be

13   providing the fact that there was a recording.  The fact

14   that it was surreptitiously recorded, that there was a

15   file that was created, and there was, there's no

16   recording devices that are created in Washington, D.C.

17                   THE COURT:  So you would address that at

18   trial, the fact that -- you say here the visual

19   depiction was produced or transmitted using materials

20   that had been, et cetera.  That had been mailed, shipped

21   or transported, including by a computer.

22                   So I'm just trying to understand the extent

23   which at trial the government needs to establish the

24   interstate nexus and how you would go about doing so.

25                   MR. OKOCHA:  We would do that through

32

 1   providing the evidence that I indicated, that there was

 2   a surreptitious recording done by the defendant; that it

 3   was placed on a laptop that was recovered from that

 4   laptop; that it had a certain file name.  We would talk

 5   about how it was recovered.  There are a lot of details

 6   that we would talk about with regards to the

 7   surreptitious recording, the file name and the fact that

 8   it's not in Washington, D.C. that are not placed inside

 9   of this specific indictment.

10              THE COURT:  And that you say don't need to be.

11              MR. OKOCHA:  Exactly, Your Honor.  We can't

12   put our entire trial, all the evidence we have at trial

13   inside the specific indictment.  And, in fact, in a case

14   *Czeck*, an Eighth Circuit case from --

15              THE COURT:  Let me have you spell the case

16   name.

17              MR. OKOCHA:  Yes, Your Honor.  It's C-z-e-c-k.

18              THE COURT:  All right.

19              MR. MILES:  Can you repeat that.

20              MR. OKOCHA:  Sure.  C-z-e-c-k.

21              They have a situation where they provide

22   information about a case that requires a federal agent

23   be subjected to a certain type of harm for there to be a

24   conviction.  In the indictment language they don't say

25   that a federal agent was harmed.  They don't say that it

33

1    was an agent of a specific federal agency.  All they say

2    is special agent in the indictment language.  And the

3    defense challenged that language, and the Court found

4    that they don't have to be specific in using specific

5    words, specific information; that if the information in

6    the indictment can be allowed to be inferred, that they

7    were talking about the element, the federal agent.  That

8    was specific in the --

9           THE COURT:  All right.  So let's move to

10   "employ and use."  Because I understand Mr. Miles to be

11   arguing that when you say in the indictment -- I'm

12   looking at Count I -- that the defendant did knowingly

13   and intentionally employ and use J.A. -- J.A.A., excuse

14   me -- a female minor between 11 and 13 years of age, to

15   engage in sexually explicit conduct, Mr. Miles says not

16   sufficient to explain how, how Mr. Hillie employed and

17   used her.

18          I will say you go on to say "lascivious

19   exhibition" and "for the purpose of producing the video

20   by surreptitious recording," but Mr. Miles says "employ

21   and use" is dangling out there and it isn't clear how

22   the government is alleging Mr. Hillie employed and used

23   the minor.  Can you speak to that?

24          MR. OKOCHA:  Yes, Your Honor.  We would

25   disagree with that as well.  We would note that we state

34

1    in the language that part, that I think there's a comma

2    after "employ and used J.A.A.," and then there's another

3    comma, there's a phrase "by a female minor between 11

4    and 14 years of age," dot, dot, dot. And there was at

5    comma, "by Charles Hillie surreptitiously recording

6    J.A.A."

7              THE COURT: So you feel from this language

8    that the employing and using is linked to the

9    surreptitious recording and lascivious exhibition of her

10   genitalia and pubic area?

11             MR. OKOCHA: Yes, Your Honor. If there was a

12   period, if it was a multiple sentences in between, then

13   would be a lack of connection. But there's a comma

14   here, indicating that it's one sentence and that it's

15   sufficiently connected.

16             And moreover, Your Honor, I believe you asked

17   if there needs to be a requirement that these two be

18   close enough together for there to be, for that to be

19   the interpretation. You need to have "employ and use"

20   or you need to have any specific element right up

21   against the factual assertion. And I don't know any

22   case law where it indicates that you have to have the

23   specific element next to the factual assertion.

24             THE COURT: Maybe you can speak to what I

25   perceive to be a debate that Mr. Miles and I were having

35

1    about whether his challenge is fundamentally a question

2    of law or a question of fact.  You were here.

3                MR. OKOCHA:  Yes, Your Honor.

4                THE COURT:  You heard us talking, and my view,

5    which I'm open to being persuaded is wrong, is that to

6    the extent that his theory is that there was no sexually

7    explicit conduct being recorded, shown or anything else,

8    that that's really a legal issue.  In other words, he's

9    not challenging that your theory is that the

10   surreptitious recording in the bedroom, lasciviously

11   exhibiting her genitals as you perceive it, counts as

12   sexually explicit conduct for the purpose of this

13   statute.  He disagrees.

14                And so I see that as we're all clear on the

15   facts of what the government said happened, but the

16   defendant's argument perhaps at trial, perhaps right

17   now, I don't know, is you haven't shown enough to

18   establish the elements of the offense and the law as the

19   defendant interprets it.

20                He says no, maybe, we do have that argument,

21   we make it later, but for the purpose of the indictment

22   we feel like more, like it's confusing because there

23   aren't enough facts to establish what we think is

24   sexually explicit conduct.  So who is right about this,

25   in a way?

36

1           MR. OKOCHA:  Your Honor, you're correct.  We

2    agree with your assessment.  This is an argument not

3    having to do with facts but with the legality and

4    whether or not the government has sufficiently provided

5    evidence that meets the elements, not that the language

6    is insufficient and that it's unclear but that he

7    disagrees with the file being sufficient.  And that's

8    basically what it is, Your Honor.

9           When the government put the file name inside

10   of the indictment, it for the most part clarified to a

11   great extent its past issue with the indictment.  And it

12   pointed exactly to where we believe the child

13   pornography or the attempted child pornography occurred.

14           I think an important point that defense raised

15   is that they didn't talk about specifically what point

16   or what area of the recording showed the lascivious

17   exhibition.  We have four charges that require attempts,

18   Your Honor, that show that the defendant attempted to

19   record lascivious exhibition of genitalia.  It's

20   impossible to point to a specific point in each one of

21   those recordings that will capture an attempt,

22   Your Honor.  It's the totality of the circumstances that

23   shows the attempt.  So we cannot point to a specific

24   thing.

25           THE COURT:  All right.  Fine.  I guess for the

37

1    purpose of this count -- sorry, this motion with respect

2    to the deficiency of the indictment, the government's

3    position is that with respect to each count now it is

4    clear we're talking about separate video files, some of

5    which appear to actually show the genitalia and pubic

6    area of the victim.  Some of those don't, and I took

7    those to be your attempt, circumstances.  Am I right

8    about that?

9            MR. OKOCHA:  Don't though them in a lascivious

10   matter.

11           THE COURT:  Or don't show them in what the

12   government believes to be a lascivious manner.

13           MR. OKOCHA:  Yes, Your Honor.

14           THE COURT:  And so the issue that Mr. Miles I

15   think is arguing is that even the ones that the

16   government says does show in a lascivious manner and the

17   defense's position, they don't; right?

18           MR. OKOCHA:  Yes.

19           THE COURT:  It doesn't count as lascivious.

20   It doesn't meet the legal test for sexually explicit

21   conduct or lascivious exhibition or whatever.

22           So in what context do we engage in that

23   debate?  Is that his motion for dismissal of Counts

24   I through VII on the grounds that, assuming what you

25   alleged is true, it still doesn't rise to the level of a

38

1  crime or the crime that you have charged?  Is that where

2  we're supposed to be having this conversation?

3          MR. OKOCHA:  I think my cocounsel will --

4          THE COURT:  Will answer that.  But you're

5  saying at least it's not in this.  It's not in the

6  insufficiency-of-the-indictment argument.

7          MR. OKOCHA:  Not here, Your Honor.

8          THE COURT:  All right.  I think I understand

9  your point.  Let me see if Mr. Miles wants to respond.

10          MR. OKOCHA:  Thank you, Your Honor.

11          MR. MILES:  Your Honor, I think I just, I

12  don't think I have a lot to say in response.  I think

13  I've articulated our position.  I just kind of want to

14  generally say I think our concern again is looking at

15  what the point here, and that's how will Mr. Hillie

16  defend against this indictment.

17          And I'll say something quickly about the

18  federal charge, but I have not said anything about the

19  D.C. Code charges.  I want to say something briefly

20  about that.

21          But with respect to the federal charges, you

22  know, that is -- there are all these elements and we

23  are, we need to defend against each one.  I think based

24  on this indictment it is difficult for Mr. Hillie to go

25  to trial prepared to defend against this element.

39

1          THE COURT:  Tell me why.  You know in Count I

2    there's a video.

3          MR. MILES:  Right.

4          THE COURT:  And you know they're going to show

5    the video and they're going to say this is child

6    pornography because it shows an underaged child engaged

7    in sexual conduct that we believe is the lascivious

8    exhibition of her genitals, and Mr. Hillie took it and

9    here it is.

10         Why is that difficult -- I mean, there are

11   lots of points in that narrative that it would seem to

12   me the defendant could address and respond to.  But why,

13   why are you confused such that it's an indictment

14   problem with respect to how you respond to Count I, for

15   example?

16         MR. MILES:  Your Honor, I think it's not just

17   with respect to that element, but it is, again, how are

18   we going to defend against employ and use when we don't

19   know --

20         THE COURT:  You say they didn't make it.  You

21   say there's an element in the statute that requires

22   employ and use, and from our perspective they don't meet

23   it.  Why is that -- what do you mean, how do you defend?

24         MR. MILES:  What we mean is we don't know what

25   facts they are alleging constitute his employment and

40

1    use of the minor and how are we going to go in trial and

2    say no, he didn't employ or use her if we don't know how

3    they're claiming he employed and used her.

4           And the same thing with "for the purpose of

5    producing the child pornography."  How do, how are they

6    claiming this was his purpose as opposed to some other

7    purpose?  What is it and what facts are they relying

8    on --

9           THE COURT:  I don't see your argument at all.

10   I don't.  I just don't, I have to be honest.  They have

11   the burden of proving certain elements, and the go-to

12   defense response, as you know, is they haven't proven

13   it.

14          And it's not a matter of they haven't proven

15   it because they haven't told us how they were going to,

16   it's that they haven't done it.  The reason why they

17   haven't told you how they employ and use it is because

18   from your perspective they haven't shown that he

19   employed or used it.  Their theory is this video shows

20   that he is employing or using her.  And your answer is

21   no, it doesn't.

22          MR. MILES:  All right.

23          THE COURT:  I don't know what more you want

24   them to say about their theory factually.

25          MR. MILES:  Let me move on to the state

41

1    charges, if I may.

2         THE COURT:  All right.  So let me just say

3    that was the first motion.  It's the motion to dismiss

4    the indictment for the insufficiency of the counts.  The

5    Court is going to deny that motion.

6         MR. MILES:  Only because --

7         THE COURT:  With respect to the federal

8    charges at least.

9         MR. MILES:  Okay.

10        THE COURT:  So you're going to talk now about

11   the insufficiency --

12        MR. MILES:  Sure, fair enough.

13        THE COURT:  -- of the state charges.

14        MR. MILES:  If the Court wants to finish, go

15   ahead.

16        THE COURT:  No, no, I'm just I'm going to

17   address that piece of it and you may continue.

18        MR. MILES:  Thank you.  And I'm not going to

19   say much.

20        THE COURT:  Okay.

21        MR. MILES:  I just want to point out that we,

22   first of all, the indictment hasn't changed.

23        THE COURT:  Right.  And didn't I say in my

24   opinion the state charges were fine?

25        MR. MILES:  I don't recall.  I know you

42

1    certainly didn't dismiss.

2            THE COURT:  I didn't dismiss them because I

3    think I said they were fine.

4            MR. MILES:  I know you did not dismiss them.

5    I don't recall the Court said they're fine.  And if the

6    Court did say that, we still take the position --

7            THE COURT:  That they're not?

8            MR. MILES:  -- that they are not.

9            THE COURT:  Because?

10           MR. MILES:  Because like one example is the

11   timing issue, Your Honor.  I mean, there is a broad time

12   frame with respect to some of these charges, in some

13   case five years.  And the allegation is pretty vague,

14   you know, that he, penetration of vulva with finger in

15   Count VIII and Count IX, contact between Hillie's hand

16   and J.A.A.'s buttocks.  In Count X, contact between

17   Hillie's hand and J.A.A.'s breast.

18           I'm not going to repeat every one.  But that

19   is a, it's a limited, vague description, and Mr. Hillie

20   has to defend against an allegation that some time

21   within this broad time frame he engaged in that conduct,

22   and we think that's an issue that still --

23           THE COURT:  Tell me -- so say more.  In other

24   words, the government has expressed to you what it is

25   they are alleging happened.

43

1          MR. MILES:  Right.

2          THE COURT:  And at trial they're going to have

3   to have a witness or some evidence relating to the

4   conduct that they say occurred.  What is hard for

5   Mr. Hillie under those circumstances to defend against?

6          MR. MILES:  Well, the time period.  I mean,

7   there could be moments when he wasn't in the residence.

8   There could be -- and that could be his defense.  I

9   mean, when they have a time period of in some cases five

10  years when something so vague happened, I mean --

11         THE COURT:  What I'm confused about, though,

12  is although it's something vague in the general sense,

13  it's pretty specific insofar as it's unlawful sexual

14  conduct.  And so I'm trying to understand what you mean

15  that a child sex abuse victim, allegedly, has to be more

16  specific about the time and the circumstances under

17  which this happened.

18         MR. MILES:  And I guess pleading from

19  Mr. Hillie's perspective is how is he going to be able

20  to say, Oh, that's the time they're talking about with

21  this indictment?

22         THE COURT:  I would think Mr. Hillie's defense

23  is I don't know what they're talking about, but it

24  didn't happen.  So the timing is irrelevant, right?

25         MR. MILES:  I hear what you' saying.  There

44

1    are different defenses.  That could be one defense.

2             THE COURT:  Right.  In which case he has a

3    defense.  His defense is regardless of the time frame,

4    this did not occur.

5             MR. MILES:  But other defenses may be, Oh,

6    that time I know what they're talking about and that's

7    not what happened.  I didn't --

8             THE COURT:  Right.  But if he's making that

9    defense, it's because the witness put the time on it.

10   Do you see what I'm saying?  He can only make that

11   defense insofar as they have got her on the stand or

12   someone on the stand and they're narrowing down the time

13   frame and they say This is the time and then he says,

14   No, it's not.  I wasn't there, I was out or whatever.

15   So you still have your defense because that's in a world

16   where we have a time.

17            We don't have a time in the indictment.  His

18   defense, I would think, is none of these things

19   happened, so I don't understand why the broad time frame

20   is a fatal defect.  They tell you the conduct.  The

21   thing that makes it a fatal defect and that maybe other

22   charges in my last opinion, that fatal defect, is

23   because we didn't know the conduct of Mr. Hillie that

24   they were alleging violated the law.  It could have been

25   anything.

45

1          Here we have some specifics related to

2     particular sexual acts, albeit not timed, so we know

3     what they think he did in each one of these counts, and

4     I think that that's all the law requires in the

5     indictment, in the indictment as opposed to at trial.

6          MR. MILES:  Understood.  And just briefly, you

7     know, I think there are issues.  The indictment with

8     respect to the state offenses allege that Mr. Hillie did

9     this with the intent to abuse, humiliate, harass,

10    degrade or arouse or gratify the sexual desire of

11    Mr. Hillie or the minor.  And, again, there's no facts

12    to support that.

13         And the final point I'll make is there is

14    this, I think to get the aggravating factor, it says

15    that Mr. Hillie is or has been found guilty of

16    committing sex offenses against two or more victims.

17    And we don't know, is this something in the past they're

18    saying?

19         THE COURT:  I'm sorry.  Which one are you

20    looking at now?

21         MR. MILES:  All counts.  VIII through XVII

22    have the language I just mentioned.

23         THE COURT:  VIII through XVII has -- sorry.  I

24    see the intent to after the conduct and then -- you

25    means the ones with aggravating circumstances?

46

1            MR. MILES:  Yes, and I think that's all of

2    them as well.  VIII through XVII.

3            THE COURT:  Wait.  XIII is not aggravating

4    circumstances.

5            MR. MILES:  Sorry.

6            THE COURT:  Maybe it is.  I don't know.  Hold

7    on.  I see.  Is or has been found guilty of committing

8    sex offenses against two or more victims.

9            MR. MILES:  Frankly I have no idea what

10   they're talking about.  I don't know if they're talking

11   about something in the past, I don't know if they are

12   talking about something related to the conduct.

13           THE COURT:  All right.  That's a fair point,

14   and I will ask them about that.

15           MR. MILES:  Thank you.

16           THE COURT:  Thank you.  Mr. Okocha.  We are

17   now focusing in on the state sex abuse charges.  Can we

18   start where Mr. Miles left off, which is the meaning of

19   the found guilty of committing sex offenses against two

20   or more victims that is being used as an aggravating

21   circumstance in each of these?

22           MR. OKOCHA:  Yes, Your Honor.  In this case

23   the two complainants, J.A. and J.A.A., are the two

24   victims that are referenced in the aggravating

25   circumstance, two or more victims.

47

1           We would note that, according to the D.C.

2     statute, you're allowed to charge for two or more if two

3     or more victims are within the same offense.  We'd also

4     further note that there was a District Court case here,

5     *Bowden*, 770 F. Supp. 2d 145, where they make note that

6     in an indictment you are to consider all the facts

7     asserted as truthful.  And you are to consider the

8     entire indictment when you are considering whether or

9     not an element has been met.

10          THE COURT:  All right.  But let me -- giving

11    Mr. Miles credit on this point, what is confusing about

12    that particular sentence is this notion of "or has been

13    found guilty."  So that it raises the kind of concern

14    that I mentioned when I was talking with him about what

15    do you mean.  We have two different possibilities.  Are

16    you saying Mr. Hillie is guilty of committing sex

17    offenses against two or more victims, and by that we

18    mean the charges here today that we're making against

19    two or more victims, or are you saying he has a prior

20    set or series of sex offenses against two or more

21    victims, in which case -- I don't know what you'd be

22    referring to there.  It sounds to me like it's the

23    former, but your indictment insofar as it has that "or

24    has been found" language in it suggests that you might

25    be talking about a prior conviction in some way.

48

1          MR. OKOCHA:  That was not our intent.  It

2     is --

3          THE COURT:  Can we clarify this with jury

4     instructions, or do we need to strike the indictment on

5     this basis?

6          MR. OKOCHA:  I don't believe that the

7     indictment needs to be stricken on this basis.  I don't

8     believe that simply the matter of having an alternative

9     language is a constitutional violation of the

10    defendant's rights.

11          I think that any lack of clarity in this case

12    in this situation can be remedied by a bill of

13    particulars where we note, and we have noted, that we're

14    referring to only the two complainants referenced in the

15    indictment.

16          THE COURT:  All right.  So there is a bill of

17    particulars, because there was a point at which there

18    was no bill of particulars in this case.  So now we have

19    a bill of particulars, yes?

20          MR. OKOCHA:  Yes, Your Honor.

21          THE COURT:  And it indicates that this

22    aggravating sentence relates only to the two victims in

23    this situation.

24          MR. OKOCHA:  Now, I have to double check if

25    that's specifically referenced.

49

1          THE COURT:  All right.

2          MR. OKOCHA:  I do note that we can do that to

3    clarify any issues with regards to what is meant by "is

4    or has been."

5          THE COURT:  And there is no circumstance under

6    which -- and this is important because it gets to my

7    concerns about confusion, there's -- no circumstance

8    under which the grand jury in this case was presented

9    with information of Mr. Hillie's prior conviction or

10   prior guilt with respect to other victims so that we

11   could have some grand jurors who thought, Oh, he was

12   found guilty related to those cases and some grand

13   jurors who thought he is guilty with respect to these

14   victims.  Do you see what I'm saying?  That's the

15   problem.

16         MR. OKOCHA:  And, Your Honor, that's not

17   possible, because Mr. Hillie does not have a prior

18   conviction.

19         THE COURT:  There was no other possible

20   "guilty of committing sex offenses against two or more

21   victims scenario" other than the two people in this

22   indictment?

23         MR. OKOCHA:  That's correct, Your Honor.

24         THE COURT:  All right.

25         MR. OKOCHA:  With regard to the other

50

arguments made by defense counsel, we do note that the
Court had previously ruled in its memorandum opinion
that with regards to the state court charges the
government had shown an ability to clarify and
distinguish the charges in each count consistent with
Hillie's constitutional rights, which we've interpreted
to mean that we were, appropriate language was used in
Counts VIII through XVII of the indictment language.

Further that we would note in the case called
*Valentine*, 395 F.3d 636 (2005), Sixth Circuit case, they
note that when it comes to timing in situations where
there are children involved who are sexual assault
victims over an enduring amount of time, where they live
with the perpetrator, in those situations the Court
should give greater latitude to timing in the indictment
language.

And this is exactly what we have here:  A
situation where we have two complainants who live with
the perpetrator and have an extended amount of time of
child sexual abuse that occurred to them.  So there
should be greater latitude in this case given to the
timing in the indictment language.

THE COURT:  All right.  Thank you.

Mr. Miles, I don't know if you want to say
anything else.  You might speak specifically to the

51

1    suggestion that a bill of particulars would address the

2    aggravating circumstances language issue.

3            MR. MILES:  Your Honor, I just simply argue

4    not.  I just think this is the type of defect that

5    warrants dismissal of Counts VIII through XVII.

6            THE COURT:  All right.  I'm going to deny the

7    motion to dismiss the indictment.  This is that first

8    motion that we have been discussing.

9            With respect to the federal counts, I think

10   that the government has sufficiently cured the problems

11   that the Court indicated in its written opinion related

12   to the indictment insofar as the government has narrowed

13   down the various statutory elements that the government

14   believes are applicable in this case and has explained

15   through the addition of "lascivious exhibition of

16   J.A.A.'s genitalia and pubic area" and the language "by

17   surreptitious recording of J.A.A. in the bedroom of the

18   residence" and the specific references to particular

19   video files.  The government has cured the defects that

20   were existent because each count references a different

21   video.  There is information provided as to the

22   government's view of why that particular video violates

23   the statute.

24           And insofar as the defendant disagrees with

25   that view, then we'll have our argument on the law as to

52

1    whether or not what the government says happens counts.

2           With respect to the state law, counts, the

3    Court was initially satisfied and indicated as much in

4    its prior written opinion that we didn't have the issue

5    of lack of clarity related to the conduct of the

6    defendant, because each count references particular

7    sexual acts.  The government -- I mean, the Court

8    understands Defendant's position with respect to the

9    wide latitude, but it adopts and accepts the

10   government's arguments related to latitude being given

11   to child sex abuse victims who live with the perpetrator

12   and does not find that an indictment needs to be

13   narrowed in terms of a very small date range when the

14   acts at issue are sufficiently described and delineated.

15          With respect to the aggravating circumstances

16   language that the defendant points out, the Court does

17   see and understand the defendant's point about the

18   alternative phrase; that is, "The grand jury further

19   charges that Charles Hillie is or has been found guilty

20   of committing sex offenses against two or more victims."

21   But based on the government's representations that there

22   is no evidence in this case related to a prior

23   conviction of guilt arising from sex offenses against

24   two or more victims, the Court finds there's no

25   confusion on the part of the grand jury as to the basis

53

1    for the aggravation clause that the government has cited

2    here.

3              The Court does note that the government will

4    be required to provide its proof with regard to all of

5    the elements of all of the crimes that the government

6    has been charging against this defendant.  And to the

7    extent that there is no evidence related to the elements

8    of the offense, the Court will certainly take that into

9    account in the context of the trial in directing a

10   verdict.

11             However, at this point it is the Court's

12   opinion that the indictment as set forward is sufficient

13   and certainly not defective in a manner that would

14   warrant its being stricken, and therefore the

15   Defendant's motion to dismiss the indictment -- and this

16   is, just to be clear because we have so many motions,

17   this is ECF No. 53 -- will be denied.

18             Now, let's turn to the motion to dismiss

19   Counts I to VII.  Mr. Miles.

20             MR. MILES:  Your Honor, I think, I think I

21   want to present this in a way where I'll be brief.

22             THE COURT:  Okay.

23             MR. MILES:  Court may have a lot of questions

24   that may change my mind.

25             THE COURT:  Yes.

54

1          MR. MILES:  I think in our view the argument

2     essentially is the grand jurors we believe were not

3     properly instructed.  The only way we'll know that is if

4     we have the grand jury transcript.  I think coming here

5     in court and trying to argue about what we think the

6     images show or the videos show and whether it fits the

7     definition I just don't think is the correct way to go

8     about it.

9          THE COURT:  Let me just ask you because I'm

10    trying to understand where you are.

11         MR. MILES:  Okay.

12         THE COURT:  All right.  Is this really about

13    what the grand jurors were told and so we need to find

14    that out?  That was part of your first argument, you

15    were saying that they weren't instructed properly, you

16    thought, because of the confusion.

17         Or are you making a legal argument that

18    notwithstanding whatever the grand jurors were told,

19    let's assume that the indictment states the government's

20    position, the bill of particulars fleshes it out, we

21    know that the government believes that these videos

22    qualify as production or an attempted production and

23    possession of child pornography and the defendant says

24    as a matter of law that is not so.

25         MR. MILES:  And, Your Honor, you're correct.

55

1    I am mistaken.  What I just articulated is the second

2    part of our motion.

3              THE COURT:  Of your first theory, okay.

4              MR. MILES:  We are making the argument that as

5    a matter of law.

6              THE COURT:  As a matter of law.  So then this

7    requires me to understand what it means to be sexually

8    explicit in the law, right, what lascivious exhibition

9    is.  Tell me why you think -- are you denying, for

10   example, that the *Dost* factors that other courts have

11   used to figure out whether or not we have sexually

12   explicit conduct apply in this situation?  You think

13   they do apply.

14             MR. MILES:  The *Dost* factors, it's a District

15   Court case, I don't have any problems with applying it.

16   This Circuit hasn't decided or the Supreme Court whether

17   they should apply or not.

18             THE COURT:  All right.  So I'm looking at

19   those factors, and we have the focal point is on the

20   child's genitalia or pubic area.  That's one.  We've got

21   that in this case, right?

22             MR. MILES:  I would disagree with the focal

23   point.

24             THE COURT:  All right.

25             MR. MILES:  I think that's the key point.  Do

56

the, on some of these videos is the pubic area shown,

yes.  Genitalia I'm not so clear, but for sake of

argument I'm going to along with the government's claim

that it is.

THE COURT:  Does it matter that he's not

holding the camera but that he's placed the camera

surreptitiously in a certain place?  Doesn't that kind

of cut against really focusing too heavily on where the

camera is pointed because he's not holding it, right?

MR. MILES:  Correct.  That is correct.  I

guess one could argue like where is it placed.  Is it

placed in a way where one could assume that that will be

the focal point.

THE COURT:  Well, let's assume it's placed in

the bathroom.  We have at least one of these.  We have a

government alleging careful placement surreptitiously in

the bathroom prior to J.A.A.'s coming in to use the

bathroom.

MR. MILES:  Correct.  Now, with respect to

that, the placement means a lot.  It's up above the, you

know, in the ceiling.  And so that is clearly not going

to focus on someone's genitalia or pubic area when it's

placed high in the ceiling above somebody.  And

certainly she's not the focal point.

THE COURT:  I mean, does it matter that it

57

1      couldn't be surreptitious unless it was in the ceiling?

2      I mean --

3               MR. MILES:  In the bathroom -- I laugh because

4      that's an argument I'm making with this under-the-bed

5      place is that the government makes a big deal about one

6      of the placements in the bedroom is under the bed, and I

7      would make the argument the Court just made that in

8      order for it to be surreptitious, under the bed is

9      probably the best place to put it.

10              THE COURT:  Uh-huh.

11              MR. MILES:  So the Court, that probably is the

12     best place in the bathroom to put it.  I don't know the

13     bathroom, there may be some other little compartments,

14     but the bottom line is the focal point --

15              THE COURT:  I guess I'm worried a little bit,

16     and we've done a tiny bit of research sort of looking

17     ahead, and found that we haven't a D.C. Circuit opinion

18     that tell us the *Dost* factors need to be apply in this

19     situation.  Apparently it doesn't come up very often in

20     this Circuit because not a lot of other District judges

21     have even cited on it or focused on it.

22              And I'm wondering whether they really even map

23     on to these circumstances in a meaningful way.  You

24     know, I mean, I don't know.  How many other

25     "surreptitious placement in the bathroom" cases -- I've

58

1    seen a couple under different law, state law at one

2    point, but maybe trying to shoehorn this into the *Dost*

3    factors is really not what we're supposed to be doing.

4    I don't know.

5              MR. MILES:  I don't know either.  That's why I

6    was very --

7              THE COURT:  Yeah, hesitant to make a legal

8    argument.

9              MR. MILES:  Exactly.  Hard to say I agree with

10   *Dost*.  It was a District Court case, the Circuit hasn't

11   indicated whether it adopts the *Dost* factors.  I'm happy

12   to analyze this case under those factors.  I think the

13   *Dost* factors when we do so would show that this is not

14   child pornography.

15             THE COURT:  Okay.  But the *Dost* factors

16   exactly exist to an end, which is to illuminate the

17   statutory definitions, there are statutory definitions,

18   right.  The visual content must depict "sexually

19   explicit conduct," which is defined as the "lascivious

20   exhibition of the genitals or pubic area of any person."

21   And the *Dost* factors is going to help us figure out if

22   that is happening.

23             But why don't you give your best argument as

24   to why surreptitious placement of a camera in the

25   bathroom and in the bedroom, private personal quarters,

59

at times in which the facts indicate that the defendant
knew that these minors were coming in to take a shower
or do whatever is not -- and then capturing them in the
process of washing and undressing and dressing does not
qualify as the lascivious exhibition of genitals and
pubic area.

MR. MILES:  Sure, and I guess I'm pausing
because I guess in some ways I wonder if whether the
assessment is different because we have some where they
claim it's actual child pornography where there is the
production based on the attempt.  So I guess looking
at -- so the question the Court asked seem to be little
more addressed to the attempt.

THE COURT:  No.  I'm just trying to understand
your -- so I suppose there's a world in which the
defense in its case like this is My guy didn't do this.
All right.  And so fine, what you're saying is child
pornography, it was possessed -- I'm just making this
up -- on a family laptop and we have no idea whose it
was, and it wasn't my guy, right.

MR. MILES:  Right.

THE COURT:  Or you found these videos, there's
no indication that I made them, so that's my defense.

MR. MILES:  Right.

THE COURT:  I understand that's not

60

1    necessarily, or maybe it's part of your defense, but you

2    seem to be making another argument which is --

3                MR. MILES:  So even if --

4                THE COURT:  -- even if it was me, it was me, I

5    was putting the camera in the ceiling, I downloaded it

6    onto the laptop, what I did, you say, is not a violation

7    of the statute.

8                MR. MILES:  Right.

9                THE COURT:  And so I guess when I reason in

10   this way I start out by trying to understand well, what

11   is a violation, what is -- what does this statute cover,

12   and then I try to figure out whether what you're talking

13   about is in that universe or not.

14               MR. MILES:  What I think is captured in pretty

15   much all the videos, whether it's attempt or not, is a

16   camera is placed somewhere in the bedroom or in the

17   bathroom.  It captures in the relevant cases either

18   J.A. -- no, J.A.A. going into either the bathroom or --

19   well, I'll speak with the bedroom first.  Going into the

20   bedroom, I think usually perhaps after taking,

21   apparently taking a shower, her towel is on, and she

22   takes off her towel and does something, the things

23   somebody would do when they're removing their towel,

24   perhaps putting lotion on and then putting their clothes

25   on.

61

1          THE COURT:  So you're saying that's what is

2     shown in these videos.

3          MR. MILES:  Correct.

4          THE COURT:  Now, why do you think that doesn't

5     meet the statutory test of lascivious exhibition and

6     sexually explicit conduct?

7          MR. MILES:  Right.  Because there are -- first

8     of all, they're relying on the lascivious exhibition of

9     the genitals or pubic area.  So looking at the ones

10    where that area is shown, it's just not displayed in a

11    lascivious manner.  And I think that's the key term we

12    have to deal with is lascivious.

13         When you have somebody taking off a towel,

14    putting on their clothing, putting on lotion or doing

15    whatever grooming things a person would do, there are

16    some times, I guess, where there's music and a person

17    is, I don't know if they're dancing or not.  Maybe

18    perhaps dancing.  It's not lascivious.

19         THE COURT:  That's interesting.  So your

20    argument seems to be that it doesn't really matter the

21    intention of the person who is taking the video, right?

22         MR. MILES:  I think with the attempt, the

23    intention is --

24         THE COURT:  No, no, no.  I mean without the

25    attempt.  Full-blown he's got the genital, it's all

62

1    there.  Okay.  But it sounds to me like you're saying it

2    doesn't matter, she was just coming out of the shower.

3    She was not doing anything sexual and that only a

4    depiction of a child doing, engaged in sexual conduct

5    counts for the purpose of the statute.

6              MR. MILES:  Coyness, you know, if the person,

7    you know, if they're moving their body in a provocative

8    manner.

9              THE COURT:  I get what you're saying.  So in

10   your world it doesn't matter that the person who took

11   the picture, because the government's allegation is that

12   Mr. Hillie only hid the camera in the ceiling in the

13   bathroom because he wanted to capture images of the

14   naked child that were sexually gratifying to him.

15             MR. MILES:  Right.

16             THE COURT:  You say irrelevant if what she was

17   doing was just coming out of the shower and putting a

18   towel on and putting lotion on or doing what people

19   normally do, doesn't count.  And I'm trying to

20   understand the discounting of the intent of the

21   defendant and whether it's relevant to whether or not I

22   can say this counts as sexually explicit conduct or not.

23             MR. MILES:  I'm being careful here.  With

24   respect to intent, I'm not sure I would discount the

25   intent of the defendant because it's what he attempted

63

1    to do.  And if he attempted --

2            THE COURT:  You can't only count on when it

3    helps you and not when it hurts you.  What I'm saying is

4    setting aside attempt, not attempt, let's hypothesize a

5    world in which there is no attempt.  They have seven

6    clean videos.

7            MR. MILES:  Okay, sure.

8            THE COURT:  All right.  It captures

9    everything.

10           MR. MILES:  Right.

11           THE COURT:  In that world are you still saying

12   or does it matter that the reason why he's photographing

13   her coming out of the shower is his own sexual nature or

14   interest?  That's irrelevant.  It has to be the conduct

15   that she's engaged in that drives the statutory

16   provision.

17           MR. MILES:  It's irrelevant for this element.

18   Now for the purpose of element it is, but that's not

19   what we're talking about.

20           THE COURT:  Right.

21           MR. MILES:  But for this element I'd say it's

22   not relevant when we're talking about, you know, an

23   actual production of child pornography offense.  The

24   image captured has to constitute child pornography, and

25   this did not.

64

1          THE COURT:  Now, the one thing that's

2     happening, though, is that that is No. 6 of the *Dost*

3     factors.  So to the extent I'm looking at the *Dost*

4     factors, at least someone has figured out or at least

5     believes that when trying to determine lascivious

6     exhibition or sexually explicit conduct, No. 6 says the

7     video depiction is intended or designed to elicit a

8     sexual response in the viewer.

9          So there is some notion of the intent or

10    design of the capturing of this image in the *Dost*

11    factors.  Now, that may or may not be relevant to your

12    theory as to why this is not a sexually explicit thing.

13    But I guess there's at least a world in which it matters

14    that the reason why we're capturing this is some sort of

15    attempt to elicit a sexual response.  But I think I hear

16    you saying, and it's very interesting -- I don't know

17    the answer to this one, by the way.  I felt pretty

18    strongly about the previous one, but I'm not necessarily

19    prepared to rule on this.

20          Your theory is that child pornography, the way

21    that it is listed in the statute, 18 U.S.C. 2256.2(a)(5)

22    or whatever, the lascivious exhibition has to be of

23    sexual in nature, the conduct that is being captured on

24    the video.

25          MR. MILES:  I would say yes.  Sexual doesn't

65

1    have to be in a sex act.

2              THE COURT:  Right.

3              MR. MILES:  Some of the things they talk about

4    here, sexual coyness.

5              THE COURT:  Right.

6              MR. MILES:  But yes.  And in this case there's

7    just none of that.  It's just somebody dressing or

8    undressing or going to the bathroom, about to get into

9    the shower.  Doing nothing sexually suggestive.

10             THE COURT:  All right.  Let me hear then from

11   the government, because you've heard our lead-up here.

12             MS. SUTTENBERG:  Yes, Your Honor.

13             THE COURT:  Why does this count?

14             MS. SUTTENBERG:  I think I'd like to first

15   start with the cases that the government talks about in

16   our motion.  Those cases are all surreptitious cases

17   that all involved filming of an unknown individual in

18   various stages of undress in a bedroom or showering or

19   going through a bathroom routine.

20             And in those cases the Court made clear

21   because the defense argument was this isn't a lascivious

22   exhibition of the genitals because there was no sort of

23   sexual conduct, sexual act.  And in each one of those

24   cases the Court made clear that there doesn't have to be

25   an overt sexual act for the lascivious exhibition of the

66

1    genitalia and pubic area.  It's enough that it was

2    displayed in this video or in this image.  And I also

3    think that defense counsel is --

4         THE COURT:  Wait, I'm sorry.  Before you leave

5    that because, I mean, obviously the words in the statute

6    have to mean something, right?

7         MS. SUTTENBERG:  Correct.

8         THE COURT:  And so to the extent we have a

9    statute that requires that a video constituting child

10   pornography be one in which the visual conduct depicts

11   sexually explicit conduct and then goes on to define

12   that, at least partly --

13        MS. SUTTENBERG:  Correct.

14        THE COURT:  -- as lascivious exhibition of the

15   genitals and pubic area, I understand courts saying you

16   don't have to have a sex act in order to meet that test.

17   But I would also assume that the worry is when you're

18   talking about children and you're talking about videos

19   and you're talking about, you know, the cute video of

20   the dog pulling down the baby's diaper as he walks away

21   and all of those, right, I mean, there are going to be

22   videos, you're changing diapers, you're doing whatever.

23   And the worry is that without some lasciviousness in the

24   definition and in its application, you're suddenly

25   sweeping in all kinds of things.  Am I right to be

67

1    concerned about that?

2          MS. SUTTENBERG:  I understand where the Court

3    is coming from.  I think the *Dost* factors in a lot of

4    the circuits and the district courts use the *Dost*

5    factors to determine whether or not an image or a video

6    is lascivious.  The courts who don't use the *Dost*

7    factors use the ordinary common sense, I guess, meaning

8    of what lascivious is.

9          In light of the fact that the D.C. Circuit has

10   not ruled on the *Dost* factors, I'm in agreement with

11   defense counsel that we certainly can use the *Dost*

12   factors when analyzing whether or not these videos

13   depict the lascivious exhibition of the genitals.

14         THE COURT:  All right.  So given that both of

15   you think it's possible to use them, you must disagree

16   that they either apply or don't apply in the

17   circumstance.  In other words, in other words, sometimes

18   people argue about the test and they say, one person

19   says Don't apply this test and the reason is because if

20   you applied it, they would lose.  Another person says

21   Apply it, apply it, apply it.  So both of you are saying

22   Fine, use the *Dost* factors, and it must be because each

23   of you think when I look at those factors it comes out

24   your way.

25         MS. SUTTENBERG:  One of us is clearly wrong.

68

1      THE COURT:  So tell me why you're right, why

2  in looking at the *Dost* factors do you think this case

3  meets it.

4      MS. SUTTENBERG:  I would say if you look at

5  the *Dost* factors as they relate to the two counts where

6  the government charged the sexual exploitation of a

7  minor, that's Count I and Count II, when you apply the

8  *Dost* factors to each one of those counts it's clear that

9  this is a lascivious exhibition of the genitals.

10      First and foremost, the Court was talking to

11  defense counsel about the first element of the *Dost*

12  factor, which is the focal point of genitalia or pubic

13  area.  I would say, you know, defense counsel sort of

14  stood up here and said that these videos portray J.A.A.

15  dancing or changing and while yes, that's true, you have

16  to look at the full context of these videos.  The focal

17  point in Count I is the device is secreted underneath

18  the bed angled upward.

19      THE COURT:  I'm sorry, was that Count I?

20  Count I is the bedroom?

21      MS. SUTTENBERG:  Correct.

22      THE COURT:  Okay.

23      MS. SUTTENBERG:  And in fact, the defendant

24  takes about a minute and a half to make sure that the

25  angle is entirely perfect.  You can see him kind of

69

1    putting the camera down and stepping away and looking at

2    it and coming back and then repositioning the angle more

3    upward and then taking another look.  This goes on for

4    about a minute and a half until he finally leaves.

5           And when J.A.A. walks in, she walks in and she

6    goes directly across from where that camera is and sits

7    on the bed.  The top of her face is barely visible.

8    It's focused primarily on her torso and her legs and

9    where her pubic area would be if she had turned a

10   certain way.  Certainly when she stands up and she is

11   sort of walking around the room where the device is

12   hidden, it's her pubic area and her buttocks that are in

13   clear view, obviously also with her legs as well.  And

14   specifically when she bends over, she's standing

15   directly in front of the recording device, her genitalia

16   is framed, and the government would argue it's the focal

17   point of this depiction.

18           THE COURT:  Is that the case in every one of

19   the actual completion videos?

20           MS. SUTTENBERG:  So in the second one, in the

21   second count, which is the bathroom video, in that one

22   the defense counsel is correct.  The video was

23   positioned up in a ceiling vent in the bathroom.  The

24   government would note that in this, there's three

25   different bathroom videos.  This video had a different

70

1   view of the bathroom.

2          This video actually had a very expansive view.

3   It included the shower, the toilet and the sink as

4   opposed to the other two bathroom videos which only

5   depicted the toilet and the shower.  So this one it was

6   more expansive.

7          And that's important because with Count II

8   J.A.A. is at the sink and she is washing herself.  The

9   way that she's positioned while she's grooming and

10  washing her vagina is that she's actually facing the

11  recording device, and this is in view for over 20

12  seconds.  It really is the focal point as the camera is

13  positioned directly on her and the acts that she's

14  doing.

15         And so the government does believe that

16  whether the defendant, you know --

17         THE COURT:  So you're saying it doesn't -- I'm

18  struggling to understand how focal point can really

19  drive this in a surreptitious camera scenario anyway.

20  But --

21         MS. SUTTENBERG:  And I will is that I one of

22  the cases which is *United States v. Helton*, H-e-l-t-o-n,

23  it's the Tenth Circuit case from 2008 which dealt with a

24  surreptitious recording, actually held that the *Dost*

25  factors are hard to apply in a surreptitious case and

71

1 that specifically they held that generally the *Dost*

2 factors such as unnatural pose and sexually suggestive

3 conduct are rare in surreptitious recordings because of

4 the very nature that it's a surreptitious recording.

5    But I also want to make clear that for the

6 government we don't have to prove every single *Dost*

7 factor to show that a recording was lascivious.  The

8 case law, I think, has generally made clear that there

9 has to be two.  I think there was one case that said one

10 was sufficient, but I think most of the cases, and the

11 courts all agree that there should be a minimum of two.

12 I think as you go through the *Dost* factors, and I don't

13 know if the court wants me to continue past --

14    THE COURT:  This is in your brief.  We don't

15 necessarily need to belabor the point, but you think

16 that there are at least two pieces here that or two

17 factors that point in the direction of lasciviousness in

18 this case, notwithstanding the fact that it's just, from

19 her perspective she was just getting out of the shower.

20    MS. SUTTENBERG:  Correct.  Although as it

21 relates to the two counts that are charged sexual

22 exploitation of a minor, the first count, she hasn't

23 gotten out of the shower.  She's in the bedroom, she's

24 changing clothing and she's rubbing her body with

25 Vaseline and as I indicated in our motion, touching her

1    body in what would to a pedophile appear to be a

2    sexually suggestive way.

3            And in the second video for Count II she's not

4    getting into the shower but she is, she's undressed from

5    the waist down and she's washing herself.

6            THE COURT:  Okay.  So from your view in terms

7    of the statutory requirement that we have lascivious

8    exhibition, it is met per the *Dost* factors or even the

9    more broader consideration of the statutory definition.

10           MS. SUTTENBERG:  That's correct, Your Honor.

11           THE COURT:  Okay.

12           Mr. Miles.  First you might speak to whether

13   or not all of the *Dost* factors have to be shown or just

14   some of them.

15           MR. MILES:  Certainly not one, I agree with

16   the government on that.  More than one.  It does appear,

17   I think, from *Dost* that they do not all have to apply.

18           THE COURT:  All right.  So don't we at least

19   have six, the visual depiction is intended or designed

20   to elicit a sexual response in the viewer?  We have at

21   least that one, don't we?

22           MR. MILES:  Bear with me.

23           THE COURT:  Yes.

24           MR. MILES:  I mean, I would not concede that.

25   I mean, I don't know --

73

1          THE COURT:  Why else did he put a camera

2    allegedly in the bedroom and the bathroom?

3          MR. MILES:  And that's obviously a possible

4    reason, but there could be other reasons, and I honestly

5    don't want to -- I don't want to say too much because I

6    don't want to --

7          THE COURT:  Yes, I understand.

8          MR. MILES:  -- talk about the possible

9    defenses.

10         THE COURT:  I understand.  Assuming that six

11   is there, you say none of the others are sufficient.

12   Isn't the child fully or partially clothed?

13         MR. MILES:  That one applies, I agree.

14         THE COURT:  That one applies.

15         MR. MILES:  I don't think any others apply.

16         THE COURT:  None of the others?

17         MR. MILES:  No.  Focal point, as I said, no.

18   Sexually suggestive, no.  Whether the pose is unnatural

19   considering the child's age, no.

20         THE COURT:  You don't think the setting in a

21   bathroom is sexually suggestive?

22         MR. MILES:  I do not think so, no.  I think

23   it's just somebody doing, people doing what they do in a

24   bathroom.

25         THE COURT:  Uh-huh.  All right.

74

1          MR. MILES:  Sexual coyness, no.

2          THE COURT:  Uh-huh.  So I think I understand

3   your argument.

4          MR. MILES:  Just kind of quickly, you know --

5          THE COURT:  Yes.

6          MR. MILES:  Keeping in mind, this is a 15-year

7   mandatory minimum.  My point is that clearly that the

8   intent is to punish -- it distinguishes it from crimes

9   like voyeurism.  There are other crimes that deal with

10  people --

11         THE COURT:  I know that to be so, but the

12  underlying charge is the production of child

13  pornography.

14         MR. MILES:  Right.

15         THE COURT:  And we have pretty severe

16  mandatory minimums in a world of distribution of child

17  pornography or receipt of child pornography where the

18  defendant doesn't even know any of the victims in the

19  videos.

20         MR. MILES:  But those penalties, they are not

21  nearly severe as 15-year mandatory minimum.  My point

22  here is that that's the point, this lascivious has to

23  really mean something.  That's why there's a 15-year

24  mandatory minimum because it has to be lascivious, and

25  that's the key word here that is missing in these

75

1    videos.

2            THE COURT:  All right.  Well, I will take --

3    I'm sorry.  Before you leave, Mr. Miles, I'm trying to

4    understand whether my ruling on this needs to require my

5    viewing these videos in any way.  In other words, is

6    there a dispute about what the videos show?

7            MR. MILES:  I would ask the Court to view

8    them.  I mean, I think the government over its -- they

9    have an advantage.  I've seen them, but I have to go

10   over there. I haven't seen them as often as I assume

11   they've seen them.

12           THE COURT:  Yes.

13           MR. MILES:  And I don't agree necessarily with

14   how they characterize them, for example.  The prosecutor

15   said here that the one in the bathroom shows the person

16   doing something with her vagina for about 20 seconds or

17   more.  I don't remember.  I don't remember how it was

18   characterized.

19           THE COURT:  You're not conceding --

20           MR. MILES:  I'm not conceding that, and I

21   believe that video, the entire video was probably five

22   or ten minutes.  And so that's relevant to whether it's

23   the focal point.

24           THE COURT:  All right.

25           MR. MILES:  How long the entire video is.  And

76

1    I think for that reason I think the Court should see

2    them.

3                THE COURT:  Ms. Suttenberg, what do you say

4    about my seeing the videos?

5                MS. SUTTENBERG:  I think for Your Honor to

6    make an intelligent ruling you do need to see the

7    videos.  And, in fact, we do have them here today in

8    court if Your Honor would like to have --

9                THE COURT:  Do you have a copy that I can

10   borrow or have or whatever?

11               MS. SUTTENBERG:  I'm going to write "obscene"

12   on it.

13               THE COURT:  Yes, thank you.  I typically try

14   not to if I don't have to, but it sounds like we might

15   have a dispute of fact about what they show and the

16   degree to which things are happening that I may have to

17   address in the context of this motion.

18               MS. SUTTENBERG:  Correct.

19               THE COURT:  So I will accept that evidence.

20   Mr. Miles says he has seen them.

21               MR. MILES:  I have.

22               THE COURT:  Are they marked in the same way as

23   depicted in the indictment so that I know which file is

24   which?

25               MS. SUTTENBERG:  If my memory serves correct,

77

1    the forensic analyst who did the disk for us actually

2    put Count I and then the disk, the video is in Count I.

3                 THE COURT:  I see.

4                 MS. SUTTENBERG:  And then for Count III which

5    is the possession, I believe he put both Count I and

6    Count II videos in Count III.

7                 THE COURT:  I see.  Again so that we have the

8    same --

9                 MS. SUTTENBERG:  Correct.

10                THE COURT:  All right.  Mr. Miles, do you

11   object to me receiving this?

12                MR. MILES:  I don't.

13                THE COURT:  So if you can hand it to the

14   courtroom deputy.  Thank you very much.  All right.  So

15   I will hold in abeyance my ruling with respect to the

16   that motion.

17                Let's move quickly to the duplicity of Count

18   III arguments.  Mr. Miles.

19                MR. MILES:  The Court's indulgence.

20                So I'm trying to figure if I -- I'll just

21   generally say we have two separate video files that are

22   charged in Count III that were, as I understand it,

23   recovered from the deleted file section on a laptop

24   computer that is shared by multiple members of a family.

25   So it doesn't appear that they were recovered from a

78

space that is tied to any particular individual but from a deleted space on a shared computer.

I want to jump to I think the key probably issue here, because there are cases that the government cites where the courts say particularly because the statute says one or more that in one count there could be multiple files of child pornography that could be in one count.  If they are found in some cases, some of the cases they could be on separate computers actually.

But I think the key thing that I noticed with all those cases is that they were simultaneously possessed.  And that's the key term, "simultaneously possessed."  Here I think the issue is that it's about where these files are recovered.  They're in the deleted files, which would --

THE COURT:  They were simultaneously in the deleted files, correct?

MR. MILES:  They were, but I would argue that if they're deleted, they've been abandoned.  They are not possessed by somebody.  There was no --

THE COURT:  That's not a duplicity argument. That's just a "my guy didn't do it maybe."

MR. MILES:  What I'm following is, what I'm arguing is the -- there's a question about whether they were simultaneously possessed, because before they were

79

deleted presumably they were possessed in some way on
that computer.  Like, for example, one could have been
possessed on the computer in 2011, deleted, so that
means somebody abandoned it.  That means they no longer
intended to exercise dominion and control over that
file.  It was deleted and then a year later possessed
the second image.

THE COURT:  So we have no forensic evidence
related to when the deletion occurred, is that what
you're arguing?

MR. MILES:  That's my understanding unless the
government corrects me, but I'm not aware that that's
understood.

THE COURT:  That's even assuming that it
matters.  So help me to understand.  So are you assuming
or suggesting that the deleted files cache of a computer
can't count as possession?

MR. MILES:  I'm arguing that, yeah, I would
argue that because they were in the deleted files that
somebody abandoned them and that they were no longer
possessing them.  They no longer intended to exercise
dominion and control over that image, over that file.

THE COURT:  So let's just sort of go to the
standard child pornography possession case.  In a world
in which, one of your clients, not Mr. Hillie, another

80

1    client --

2              MR. MILES:  Right.

3              THE COURT:  -- has some child pornography

4    files on his hard drive and some are in the deleted

5    files trash, your argument would be that the deleted

6    files trash one can't count toward number of images

7    because he didn't really possess them anymore?

8              MR. MILES:  At one time they were possessed.

9    I think that's evidence that the defendant possessed

10   those images at one time.

11             THE COURT:  Okay.  So help me to get to

12   understand why that matters for duplicity in regard to

13   this particular count.

14             MR. MILES:  Because I believe the bottom line

15   to our argument here is that I don't believe the

16   government can show that these two separate files were

17   possessed simultaneously.  In other words, prior to --

18             THE COURT:  And that's a requirement?  You

19   can't put in the count -- well, assuming that possession

20   extends only to live files, the government can prove

21   that they were both in the deleted files at the same

22   time because they found them.

23             MR. MILES:  Exactly.

24             THE COURT:  So you lose on this point if being

25   in the deleted files cache is enough for possession.

81

1          MR. MILES:  I agree.

2          THE COURT:  Okay.  So assuming that only those

3    actually on the hard drive and not in deleted files

4    count as possession, I think I hear you saying the

5    government can't show when they were moved from the hard

6    drive and it's possible that that wasn't at the same

7    time.  So that one was inbounds in the possession and

8    one was in the trash at the same time.

9          MR. MILES:  Not necessarily at the same time.

10   Even if they were deleted at different times but the

11   possession overlapped, I would argue that they've shown

12   simultaneous possession.  But here they can't --

13         THE COURT:  Do you think one could have been

14   made and then deleted and then another made and then

15   deleted?

16         MR. MILES:  Correct.

17         THE COURT:  And the effect of all of that is

18   that we have to have two separate counts related to

19   them, or what's the effect of all of that?

20         MR. MILES:  The effect of all that is that I

21   think based on the facts here as I understand it

22   charging these two files in one count is duplicitous

23   because there was two separate offenses because they

24   can't show that they were possessed simultaneously, as

25   is the case in --

82

1          THE COURT:  But doesn't your argument fall

2     apart on the initial premise, because aren't you just

3     arguing that things in deleted files can't count as

4     being possessed?  Because if they can, then they

5     obviously were possessed at the same time because they

6     were in deleted files.

7          MR. MILES:  I think what I'm arguing is

8     that --

9          THE COURT:  And if it doesn't matter that they

10    were in deleted files, they can be possessed in either

11    world, then they did possess them at the same time no

12    matter when they moved them; right?

13         MR. MILES:  What I'm arguing is to me the

14    evidence with deleted files suggests that these images

15    were possessed at some time by somebody.  So it is

16    evidence of possession at some previous moment.  And I

17    think the problem with this case is that prior moment,

18    the government can't show that that prior moment was,

19    with respect to each file, was simultaneous.  Because as

20    I indicated, one could have been possessed, deleted,

21    then a year later the other one is possessed and

22    deleted.

23         THE COURT:  Okay.  Let me hear from the

24    government.

25         MS. SUTTENBERG:  What defense argued in its

83

1    motion was that there need to be two units of

2    prosecution for the possession of child pornography

3    count.  And I think the case law, defense counsel

4    doesn't cite any case law to support his position either

5    in his motion or here today that is persuasive.

6           When you actually look at the cases that

7    consider possession of child pornography and how many

8    units of prosecution would be warranted, there's two

9    separate approaches, and under each approach the

10   government charged this case correctly.

11          The first approach many courts have held that

12   just based on the clear language of the statute which

13   says if someone possesses material of one or more visual

14   depictions of a minor engaged in sexually explicit

15   conduct, but the plain language saying one or more, it's

16   clear that Congress intended there to be only one unit

17   of prosecution as it relates to possession of child

18   pornography.  The government --

19          THE COURT:  So you're saying it's absolutely

20   irrelevant whether, where it was possessed, whether it

21   was in the deleted files or the regular files or

22   whatever.

23          MS. SUTTENBERG:  That is the government's

24   position, and I also think if you were to take a look

25   at -- it's 18 United States Code 2252(c)(1), which

84

1    provides an affirmative defense.  For defendants who are

2    charged with possession of child pornography, if the

3    defendant possessed less than three matters containing

4    the prohibited images, it would seem clear that Congress

5    necessarily contemplated that certainly a person who

6    possessed two images or videos of child pornography that

7    it would be charged within the same count.

8          THE COURT:  I have to say this is a peculiar

9    argument.  So you said there were two reasons, sorry.

10         MS. SUTTENBERG:  Correct.  So that's -- I did.

11   So there's two different approaches.  So multiple courts

12   have held it's one unit of prosecution no matter what in

13   terms of possession of child pornography.  But other

14   courts have held that it could be multiple units of

15   prosecution for possession of child pornography when

16   there's more than one image.

17         Specifically look at whether or not the images

18   or videos were stored on multiple mediums.  So say there

19   was, you know, five videos on a Dell laptop and six

20   videos on a Sony laptop.  Then there could be two

21   separate units of prosecution for the videos that were

22   found on the Sony laptop and the videos that were found

23   on the Dell laptop.

24         THE COURT:  Did they say why?  I mean, that

25   makes sense to me but tell me why, what's the basis for

1    calling that two separate units of prosecution.  Is it

2    because those are two different --

3                   MS. SUTTENBERG:  It's two different -- the

4    language that the courts used was that it's two

5    different matters.

6                   THE COURT:  Yes.

7                   MS. SUTTENBERG:  So there's, as opposed to all

8    the video files or images being on one specific matter,

9    say a laptop, in the cases where the courts have decided

10   that it's multiple units of prosecution, it's because

11   there's multiple mediums or matters that the images are

12   being stored on.

13                  THE COURT:  Presumably it relates to the,

14   could relate to a defense, right, that that laptop was

15   mine but that one was not or something like that.  And

16   so the ones that were on that medium are not related to

17   me or don't come from me.

18                  MS. SUTTENBERG:  Correct.

19                  THE COURT:  Et cetera.

20                  MS. SUTTENBERG:  And I think the Court can

21   also -- obviously in this case we have two videos, but

22   there are certainly many cases that we have in this

23   courthouse where there's in excess of 500 videos or

24   recordings in any given case.  And I think that the

25   defense would have a very different argument if I was

1    standing here today and I had charged a defendant with

2    500 individual counts of possession of child

3    pornography.  So I do think that the Court has to

4    examine the two approaches that are used when --

5              THE COURT:  Yes.  Mr. Miles is advocating for

6    a third approach, and I'm trying to understand whether

7    it makes any sense, right.  He says we have one medium,

8    but we've got to really delve down and figure out where

9    within that medium these things were stored, somehow

10   having to do with the timing of it and the extent to

11   which they were all together in one place at one time

12   within the medium.

13             MS. SUTTENBERG:  I would say that the courts

14   who have considered that issue have never gone into that

15   specific level of detail.  The courts who have

16   determined multiple levels of prosecution are

17   appropriate in certain cases never looked to see the

18   dates and the times that these recordings and devices

19   were created, modified or --

20             THE COURT:  Does the government have that

21   information in this case?

22             MS. SUTTENBERG:  In this case we didn't --

23   because the files were deleted, we don't have any meta

24   data associated with them as it relates to Count I and

25   Count II video files.  So we don't know when the files

87

1    specifically were deleted or when they were specifically

2    possessed on the computer except for a broad date range.

3            But whether or not Defendant possessed one

4    video in the month of June and then deleted it and

5    possessed the next video in the month of July, according

6    to the line of cases, it doesn't matter if it's all

7    within the same, whether it's all on the same medium.

8    In this case it is, it's all on the same laptop.

9            THE COURT:  All right.  Thank you.

10            MS. SUTTENBERG:  You're welcome.

11            THE COURT:  Mr. Miles, do you have any cases

12    that indicate that this kind of thing matters?

13            MR. MILES:  And, Your Honor, I guess no, but I

14    want to -- I think I just want to make my argument a

15    little bit more clear.

16            THE COURT:  Yes.

17            MR. MILES:  I think from the cases, and I'm

18    not sure that Ms. Suttenberg and I agree on the law and

19    that is that the law says, the cases say I think

20    essentially if they're in the same location and the

21    location -- that's where some of the cases disagree

22    about what "location" is -- but in the same location at

23    the same time.

24            So most of the cases, multiple images are on

25    one computer.  Most of the cases have held that's the

88

same location.  So with regard to location, I'm not

really making an argument about location, although I

note the facts of our case are perhaps a little

different when we have different users, you know, people

sharing laptops.

THE COURT:  Yes.  But I understand we have a

password-protected issue here.

MR. MILES:  But these files were in the

deleted file section, so they weren't in the

password-protected part.  They were not found in the

password-protected part of the computer.

THE COURT:  Okay.

MR. MILES:  Only thing I think maybe the image

in Count VI perhaps was.  I'm not sure.  I'm not even

sure that was, but at most that image was.

So what I'm saying, I'm to some degree making

a location argument only because our case is

distinguishable when we have people sharing the

computer, but I'm primarily dealing with the issue of

time, at the same location at the same time.  These

other cases that hold that --

THE COURT:  But you're splicing time in a way

that's a little peculiar.

MR. MILES:  It is.

THE COURT:  And it relates to location.

1    Because you, I think, have just conceded that if the

2    location of the files in the deleted files matters or it

3    counts is enough to qualify as possession even though

4    they've been deleted, then they were at the same time

5    because they were both in deleted files when the

6    government found them.  Right?

7              MR. MILES:  They were, but our argument deals

8    with -- and I think what complicates this case is

9    because they were in the deleted files.  And our

10   argument goes to when they were possessed.  And I'm

11   arguing that when they are deleted they're not

12   possessed.  The person abandoned them.  They no longer

13   intended to exercise dominion and control over those

14   files.  And in this case there really is no evidence

15   that --

16             THE COURT:  You're not arguing that in this

17   context.  With respect to this motion, you're not saying

18   dismiss because the government doesn't have evidence of

19   possession.

20             MR. MILES:  No.

21             THE COURT:  You're making this other argument,

22   it's duplicitous or whatever; right?

23             MR. MILES:  In other words, I'm not, I do

24   not -- I would have a more difficult argument arguing

25   that this indictment was duplicitous if they are

90

1    possessed at the same time and in the same location.

2    And a lot of cases say on the same computer is the same

3    location.  So I'm, you know, conceding that.  But what

4    I'm saying is I think the same-time issue here is

5    something we have to delve further in our case

6    because --

7            THE COURT:  I'm going to think about it, but

8    I've got to tell you I feel like you're making a harder

9    argument than you have to.  Maybe this happened in your

10   first thing too.  I don't understand why you've said

11   several times that this same-time argument relies on the

12   contention that deleted files doesn't count as

13   possession.  That to me seems to be your argument.  I

14   have no possession, the government, this should be

15   dismissed because the government's evidence doesn't

16   demonstrate possession.  That's a straightforward

17   argument.  You're assuming that in your same-time

18   argument in a much more convoluted way.

19           MR. MILES:  I think that that is an argument

20   that they were deleted.  They weren't possessed.  But I

21   think files being in deleted files does show that

22   someone possessed them at some time.

23           THE COURT:  Okay.

24           MR. MILES:  I'm trying to address that

25   argument as well.

91

1          THE COURT:  All right.  So I will, I'm going

2     to take it under advisement.  Let me have Ms., whoever

3     is arguing 404(b) come forward.  I don't know whether

4     you want to say anything more on that point, but I'm

5     mindful of the time.

6          MS. SUTTENBERG:  Yes, Your Honor.  And in

7     light of the time, I don't have much more to add that

8     wasn't already submitted in the government's filing.  I

9     don't know if Your Honor has any specific question.

10          THE COURT:  Let me see, let me see, let me

11     see.  All right.  So you want to admit three pieces of

12     evidence:  the exposure to J.A., the physical assault

13     against J.A., alleged, and the sexually explicit

14     Internet search terms.  Let me focus you on the third

15     piece of this, which is the search terms.

16          MS. SUTTENBERG:  Yes, Your Honor.

17          THE COURT:  I guess I am confused as to why

18     you think those are relevant to anything in this case.

19          MS. SUTTENBERG:  So one of the defense

20     arguments is most likely going to be as it relates to

21     the production of child pornography and the attempted

22     production of child pornography counts.  The defendant

23     if he did, in fact, place these recordings that his

24     purpose in placing these recordings was not to attempt

25     to capture sexually explicit conduct.  And the

92

1    government believes that the sexually explicit search

2    terms during the time frame where these videos were

3    being surreptitiously taken is relevant to show the

4    defendant's motive and purpose.

5            Courts have held that unlike issues of

6    knowledge and intent, where the defendant's motive is at

7    issue or the defendant's purpose here, an explanation as

8    to why the defendant would engage in a charged conduct

9    becomes highly relevant when the defendant argues that

10   he did not commit the crime.

11           I think when you specifically look at the

12   timing of one of the search terms which included a --

13           THE COURT:  I'm sorry.  I don't understand.

14   When the defendant says he doesn't commit the crime, how

15   is it that his motive is at issue?  He's saying I didn't

16   do it, not that I didn't do it because of X; right?

17           MS. SUTTENBERG:  My under -- and again, this

18   is sort of -- believing what defense counsel is going to

19   argue as a defense is that the defendant placed the

20   recording devices in these two rooms but that his

21   purpose wasn't to capture sexually explicit conduct.  It

22   was to -- his purpose was for X, Y and Z.  It had

23   nothing to do with trying to capture sexually explicit

24   conduct.

25           So the fact that within the same time period

93

1      the defendant is searching sexually explicit terms on

2      the Internet to try to receive these sexually explicit

3      imagery, it tends to refute the defense argument that

4      this, these videos were set up for a totally innocent

5      purpose.

6                  THE COURT:  All right.  But don't I need to

7      hear the defendant's theory in order to make that call?

8      I can't do this in a vacuum.

9                  MS. SUTTENBERG:  That's correct.  And it might

10     be that in terms of the sexually explicit search terms

11     we might have to wait to see how defense opens or what

12     types of arguments and cross-examination he makes.

13                 I have talked with defense counsel, so I think

14     that I might know a little bit sort of where he might be

15     headed in terms of the defense for the child pornography

16     counts, but I would agree with Your Honor that I guess

17     in terms of the Internet search terms it might be

18     something that we'd have to wait.

19                 THE COURT:  And you say motive and purpose,

20     not knowledge.  Like, you know, I don't even know what

21     child pornography looks like.  Perhaps if he said that I

22     understand, sure you do, look at all the search terms.

23     But your motive and purpose is what you're really

24     focused on here.

25                 MS. SUTTENBERG:  Correct, and I think it's

94

1    because if you take a look at what he was searching for

2    in August of 2011, he was specifically searching for

3    teen porn, and then we have a video from, that we know

4    was created in October 2011, so just two months after he

5    was searching the Internet for teen porn we have a

6    defendant attempting to capture sexually explicit

7    conduct of J.A.A. who was a teenaged girl at the time.

8    So I do think that the search term --

9              THE COURT:  Does it matter that he was

10   searching for "teen" as opposed to "child"?

11             MS. SUTTENBERG:  No.  Child pornography

12   includes children, toddlers, infants and teenagers.

13   Child pornography is -- in terms of child pornography a

14   minor is defined as an individual who is under the age

15   of 18.

16             In this case when the defendant was recording

17   J.A.A., she was, in fact, a teenage girl.  She was the

18   exact words that the defendant was searching for on the

19   Internet to try to find sexually explicit conduct.

20             THE COURT:  Okay.  Thank you.  Mr. Miles.

21             MR. MILES:  Ms. Itoh.

22             THE COURT:  Oh, Ms. Itoh.  Thank you.  In the

23   interest of time unless you have something specific

24   maybe you want to say about the other two pieces of

25   this, let's focus in on the search terms.

1          MS. ITOH:  I do want to say a little bit about

2     all three of the categories of evidence they're seeking

3     to admit.

4          THE COURT:  Okay.

5          MS. ITOH:  So I wanted to start with the

6     framework.  We cited the framework from the *Roux* case

7     which the government appears to not contest.  So under

8     that framework, they need to show not only that the

9     evidence they're seeking to admit is relevant but also

10    necessary.  And necessary is a higher standard than just

11    mere relevance.  And it also has to be reliable.

12          In addition to that, there is the regular

13    balancing under 403 where the probative value cannot be

14    substantially outweighed by the danger of unfair

15    prejudice; and in addition to that there's a requirement

16    under *Huddleston* that they have to show by a

17    preponderance of the evidence that the proposed bad act

18    that they're seeking to admit actually occurred.  So

19    there's really five distinct requirements.  And

20    analyzing each of the pieces of evidence --

21          THE COURT:  Well, the actually occurred, can

22    that happen in the context of trial, or do they have to

23    do that now?

24          MS. ITOH:  I would say now because we're

25    trying to decide should this even go in front of the

1    jury.

2           THE COURT:  Well, can't you cure for the

3    government not having established things through jury

4    instructions and the like?

5           MS. ITOH:  I think that possibility is present

6    with any question of should whether something be

7    admitted, but 404(b), you know, puts a requirement that

8    the Court should make an initial assessment, should this

9    even go in front of the jury.  And we submit that it

10   shouldn't.

11          So Your Honor started with the search terms.

12   So our position is, you know, regardless of what

13   Mr. Hillie's defense is that they're seeking to admit

14   this because they think that this is indicative of his

15   mental state.  And we've made the argument detailed in

16   our filings where we say, well, you know, the word

17   "young," that could be a number of things.  That can

18   mean someone in their twenties or their thirties.

19   That's not necessarily indicative of an interest in

20   child pornography.  With teen they haven't addressed the

21   fact that teen includes 18- and 19-year-olds.  And if

22   he's looking for something involving --

23          THE COURT:  But their theory -- so first of

24   all, as you heard our discussion, this is defensive

25   evidence from the government's perspective.  She says,

97

1    We're not introducing this unless and until the

2    defendant's theory becomes clear, and his theory is I

3    put the thing under the bed not because I was interested

4    in any sort of sexually explicit lascivious behavior or

5    whatever but because for whatever other reason, my

6    motive is being questioned here.

7            Why isn't looking for whether it's a teen,

8    whether it's a, you know, he did put in "teen black

9    girls" or whatever it was, which is exactly what we have

10   in J.A.A.  So why is that not a relevant piece of

11   evidence to rebut the defense theory that his motive in

12   putting the camera there was not to capture her in a

13   sexually explicit way?

14           MS. ITOH:  Because it's, it's ambiguous what

15   he was looking for.  We can't infer his mental state

16   just based on what was typed into the computer.  And I

17   understand they rely on the *Blank* case from Maryland.

18   As far as I'm aware, that's the only case where the

19   Court admitted just search terms.  In all the other

20   cases they cited it's, you know, there's actual

21   photographs or there's stories about children engaging

22   in sexual behavior.  There's something more than just

23   these mere words that have multiple meanings where it's

24   very difficult to infer --

25           THE COURT:  I'm not going to say for the

1    record the search terms, but I got to tell you there's

2    not a lot of multiple meanings happening here with

3    respect to what it is he's looking for.

4           Now, you know, the thing that's confusing

5    about your argument and that I think would be better

6    stated in a world in which they perhaps had just found

7    some pictures of various things on his is that we have

8    search terms that are indicative of what a defendant is

9    saying he wants to find on the Internet.

10          So that seems to me to be even stronger

11   evidence of his intent than having found some pictures

12   of, to some extent.  We know what he's looking for

13   insofar as he says it in the search term, right?

14          MS. ITOH:  Even if we accept that he's looking

15   for something sexual, we just don't think that the words

16   "young" or "teen" or "girl" narrow that universe of

17   sexual things to child pornography.

18          THE COURT:  All right.  I understand what

19   you're saying.  Let me direct your attention to the

20   other pieces that we didn't discuss.

21          MS. ITOH:  Okay.

22          THE COURT:  We have in this case -- and I

23   don't know whether these arguments are tied to the prior

24   arguments that Mr. Miles made about parts of the

25   indictment going away -- but assuming that we have a

99

1    full indictment with sexual abuse charges that relate to

2    the particular individuals at issue, what is the

3    defense's argument that exposure, of Mr. Hillie exposing

4    himself and requiring or asking one of the victims to

5    touch him and physically assaulting one of the victims

6    in a circumstance in which it was allegedly because she

7    was going to reveal the sexual conduct, why do you say

8    that those things are not relevant to the charges in

9    this case?

10         MS. ITOH:  So with the physical things, I

11   think it's extremely clear.  They're saying that it's

12   relevant because, you know, they were scared and that's

13   why there's a delay of reporting abuse and why one of

14   the victims initially denied it and later recanted.

15         So if we look at the timeline, it becomes to

16   us very clear that that's, that can't possibly be the

17   case.  Taking J.A. first, the indictment alleges five

18   instances of abuse in the time span of May 2011 through

19   December 2012.  Okay.  And so during that time period

20   she doesn't report he allegedly -- sorry.  Before -- he

21   allegedly hit her in November 2012.  So at the tail end

22   of that window of time.  So she doesn't report it

23   May 2011 until November 2012.

24         And according to the Court's opinion, she told

25   her father about the abuse in December 2012.  So a month

1   after she was allegedly hit.  And he filed a report with

2   the police, and she was interviewed in January 2013 and

3   she disclosed the sexual abuse.  So we don't see how

4   it's possibly the case that they are seeking to admit --

5           THE COURT:  Why isn't this an argument you

6   make to the jury?  It doesn't make it irrelevant for the

7   purpose of the Court dismissing it.

8           MS. ITOH:  It also needs to be necessary, and

9   necessary is a higher standard than just mere relevance.

10          THE COURT:  It's necessary to the extent that

11  the defendant's argument is they weren't afraid of him,

12  they lied about so many things.  I guess I don't

13  understand what you mean.  In other words, it has to be

14  the only evidence?  I don't know that it has to be --

15  that they need it in the sense they have no other

16  evidence related to this.  What does "necessary" mean in

17  your view?

18          MS. ITOH:  Necessary means it's somehow -- so

19  according to the legal definition, it's an essential

20  part of the crimes on trial or it furnishes a part of

21  the context of the crime.  So it somehow helps to prove

22  their case.  And we don't see how this is the case.

23  They have to be admitting it for some purpose.  And the

24  purpose they're proposing is that it helps to explain

25  the delay, and it doesn't.  It simply doesn't.

101

1          THE COURT:  So you're saying because it

2    happened in November and --

3          MS. ITOH:  She reported it a month later.

4          THE COURT:  So which delay, I'm sorry?  It

5    started in May, apparently.  The sexual abuse allegedly

6    started in May.  This hitting allegedly happened in

7    November.

8          MS. ITOH:  Of the following year.

9          THE COURT:  Of the following year.  And

10   then -- so which delay do you say it does not pertain

11   to?

12         MS. ITOH:  Doesn't pertain to -- well, they're

13   saying with regard to both victims it explains the

14   delay.

15         THE COURT:  Which delay?  The one from the

16   beginning of the abuse to when it happened, or the delay

17   between when she was allegedly hit and she told her

18   father?

19         MS. ITOH:  I defer to them on which delay that

20   they think it helps to explain.  That's their theory,

21   but I would say it doesn't help to explain the delay

22   between when the abuse allegedly occurred, which is

23   May 2011, so she doesn't report it from May 2011, and

24   then we get to November 2012 and then she reports it a

25   month later.

1          THE COURT:  You don't think that their theory

2    is that it's a part of the climate living in this house,

3    it's indicative of the threats that he was making all

4    along?

5          MS. ITOH:  That's not what they say.  That's

6    not what they say.

7          THE COURT:  All right.

8          MS. ITOH:  And then with regard to the other

9    victim, J.A.A., there's seven instances of abuse,

10   starting in July 2008, and with a lot of the instances

11   there is a time window so it's really hard to pinpoint

12   exactly when it happened.  But it starts July 2008 and

13   they end May 31, 2012.  So well before the alleged

14   physical abuse happened, so there's no reporting in that

15   four-year time period.  Abuse ends May 31, 2012.

16   Physical abuse happened six months later, November 2012.

17          THE COURT:  Okay.  I think I get your

18   argument.  What about the exposure?

19          MS. ITOH:  May I make one more point?

20          THE COURT:  Sure.

21          MS. ITOH:  So the big issue in this case is

22   whether the victims are telling the truth.  And I've

23   read the cases cited by the government.  There's cases

24   saying, you know, admitting testimony from let's say,

25   you know, a third victim saying He abused me in this

1    way, and that can help to bolster the testimony of the

2    victims whose reliability is an issue, but that's not

3    what we have here in this case.  You have more of the

4    same from the same victims that we're saying are

5    unreliable.

6              THE COURT:  In what universe is more of the

7    same from the victim of an alleged sexual abuse not

8    admitted as evidence probative of whether or not she's

9    telling the truth about the sexual abuse that she is

10   alleging?

11             MS. ITOH:  We don't think it's probative.  You

12   know, the issue is the credibility of that witness.  And

13   if that witness tells more lies, does that make it more

14   likely --

15             THE COURT:  It's up to you to explain to the

16   jury that she's telling more lies.  I don't understand

17   the argument that she can't tell about additional

18   instances that for whatever reason the government chose

19   not to charge.

20             MS. ITOH:  Well, I think, again, it goes back

21   to arguing that it has to be not only relevant, but it

22   has to be necessary to prove the charged offenses.

23             THE COURT:  And the government has to have

24   some evidence of it, right?  It could be their

25   testimony.

1          MS. ITOH:  It has to be reliable.

2          THE COURT:  Right.

3          MS. ITOH:  They have to be able to prove by a

4   preponderance that this actually happened.  And here the

5   only testimony, the only evidence they have of the

6   physical abuse is potentially testimony from the same

7   two witnesses who we are saying are unreliable.  One of

8   the witnesses says the other one makes things up, you

9   know, and says things are true when they're not.  And

10  then the witness that said that gave contradictory

11  statements.

12         THE COURT:  Let's just be clear.  I'm sorry.

13  The standards that you're reading, is that from the 413

14  and 414 world?  In other words, they're asking for

15  admission under 404(b) --

16         MS. ITOH:  I'm sorry.  Right now I'm focused

17  on the 404(b) and the physical abuse.  I believe they're

18  only trying to admit under 404(b).

19         THE COURT:  Under 404(b).  Thank you.

20         MS. ITOH:  And they say that the physical

21  abuse happened in front of the mother.  They're not

22  according the testimony of the mother that this actually

23  occurred.  They're not offering medical records,

24  testimony from someone at a clinic or even admission at

25  a clinic, you know, to treat the wounds.  Nothing, just

105

the testimony of the witnesses.

So we think it fails under -- it fails to meet all three requirements of the *Roux* test.  It's not relevant, it's not necessary, it's not reliable.

And with regard to the penis exposures, I'll first address the arguments under 404(b).

THE COURT:  Uh-huh.

MS. ITOH:  So I just want to point out one thing.  In the filings there appears to be some dispute as to whether he demanded or our position is if this occurred the evidence shows at most that he asked J.A. to touch his penis, not demanded.  And the evidence for that comes from the affidavit in support of the search warrant, which is available at ECF 22-1.  And on.

Page 4 this is their detective writing that Mr. Hillie exposed his penis while asking the victim to touch it.  So I think it's very clear if it happened it's asking, not demanding.

So, again, we have the same concerns about reliability, it's coming from the same victims who we say -- sorry.  This is only coming from the one victim who her older sister says makes things up.  She's nine or ten years old at the time.  And I guess it's going back to the same argument I made earlier.  It's more of the same from the same source that we're saying is

1    unreliable.  It's not as if it's a third victim coming

2    and saying --

3              THE COURT:  All right.  Let me just talk to

4    the government about one thing, thank you.

5              And that is the extent to which the Court has

6    to make a decision about the reliability, which is so

7    much of what the defense counsel was pointing to ahead

8    of time in the context of ruling on this motion.  Does

9    the government need to establish the, that these prior

10   incidents occurred in some way prior to trial?

11             MS. SUTTENBERG:  No.  There's a really low

12   threshold for the government to have these types of

13   offenses admitted.

14             I would also point out that obviously there's

15   a discrepancy in terms of defense counsel saying that

16   J.A. is not credible and the government saying she is

17   credible.  I would point out the fact that the argument

18   the defense rests on is the fact that J.A. reports to

19   her father in December of 2012 and then there's the

20   police investigation that's initiated in January of

21   2013.  At that time J.A. is no longer living in the home

22   with the defendant.

23             THE COURT:  Yes.  I understand, I understand

24   the facts.  I get their argument.  What I'm trying to

25   understand procedurally is that whether between now and

1   the trial I have to have some sort of evidentiary

2   hearing --

3                THE COURT:  -- in which I hear from J.A. and

4                MS. SUTTENBERG:  No.

5   J.A.A. and try to establish, at least from the Court's

6   perspective, that they're sufficiently reliable in order

7   to allow you to use this other information that you're

8   trying to bring in.

9                MS. SUTTENBERG:  No.  The case law is clear

10  that we don't have to have a mini-trial and bring in the

11  two victims ahead of time for the Court to make an

12  assessment as to whether or not this evidence would be

13  admissible.  I don't have the case number front of me,

14  but I want to say that it's *Huddleston*.

15               THE COURT:  All right.

16               MS. SUTTENBERG:  H-u-d --

17               THE COURT:  I think it's cited here.  You've

18  cited this case, so I can look it up.  And I will ponder

19  that.

20               I think I understand the issue that, the

21  defense counsel's argument with respect to its

22  reliability.  I just need to know whether I need to

23  decide that based on evidence that you bring in prior to

24  trial or not.

25               MS. SUTTENBERG:  Because I think otherwise

1    every time the government files a 404(b) notice, the

2    defense would demand a mini-trial in advance, and I

3    think the Court would be backlogged with these

4    mini-trials before the actual trial.  So I think the

5    Court, the cases have made clear that there does not

6    have to be such a mini-trial.

7           THE COURT:  Thank you.  I'm going to hold on

8    that, and it's very possible that this motion will have

9    to play itself out in the context of the trial because

10   at the very least I heard with respect to the search

11   terms the government indicating that they would seek to

12   admit that evidence in context based on what the defense

13   argues.  And it may well be the case with respect to the

14   other two items as well, given the government's

15   responsibility to ensure that they're not admitting

16   improper character evidence but are falling within the

17   rules with respect to 404(b).  So I can't rule on it

18   today, and it's possible I might not be able to rule on

19   it until sort of we see the evidence come in.

20           Let me just -- we're running out of time here.

21   I want to say that we have had the hearing with respect

22   to those motions, that we have the other motions that

23   are still pending.  From the Court's perspective the

24   Speedy Trial clock continues to be tolled in light of

25   the other motions.  The question is whether or not the

1   parties wants to be heard orally on any of the other

2   motions or whether I should rule on the papers with

3   respect to them.  Ms. Suttenberg.

4           MS. SUTTENBERG:  Government does not have to

5   argue again.  We're happy to just rest on the prior

6   testimony arguments and the paperwork.

7           THE COURT:  Okay.  Mr. Miles.

8           MR. MILES:  There are two motions we would

9   like to be heard on.

10          THE COURT:  Okay.  Which ones?

11          MR. MILES:  Let's see.  Let me make sure.

12  Defendant's motion to suppress tangible and electronic

13  evidence.

14          THE COURT:  Okay.

15          MR. MILES:  And I don't have the ECF number, I

16  apologize.

17          THE COURT:  That's all right.  I have it here.

18  Twenty-two.

19          MR. MILES:  And the Defendant's motion to

20  sever counts.

21          THE COURT:  That's 17.

22          MR. MILES:  Thank you.

23          THE COURT:  All right.  So let's take out our

24  calendars and figure out what we're doing.  We have

25  November 13 through the 17 is the trial date, so we do

110

1    have some time.  Would the parties be available in sort

2    of late September for this argument and perhaps the

3    Court's oral ruling with regard to some of the motions

4    that we are in right now?  I'm looking at September 21,

5    which is a Thursday.  Ms. Suttenberg.

6         MS. SUTTENBERG:  The government is available

7    on September 21.  If I could ask for the afternoon.

8         THE COURT:  Mr. Miles?

9         MR. MILES:  We're available in the afternoon,

10   Your Honor.

11        THE COURT:  All right.  So let me schedule

12   this for 2:30 in the afternoon on September 21.  The

13   purpose will be to hear the two motions that Mr. Miles

14   indicated the defendant would like to be heard on.  That

15   is, No. 17 and No. 22 on the ECF, and to the extent that

16   the Court is ready to rule on some of these motions we

17   talked about today, I may do so orally at that time.

18        The pretrial statement, as you know, is

19   currently due September 29, and we have the initial

20   pretrial conference on October 17, the final pretrial

21   conference on November 9 and the trial is on

22   November 13.

23        Is there anything else we need address at this

24   time?

25        MS. SUTTENBERG:  Not from the government,

111

1   Your Honor.

2           MR. MILES:  Not from the defense, Your Honor.

3           THE COURT:  Thank you for being patient with

4   me.  And I will see you next time.

5                   (Proceedings adjourned at 4:59 p.m.)

6               * * * * * * * * * * * * * * * * * * *

112

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Barbara DeVico, certify that the foregoing is a

4        correct transcript from the record of proceedings in the

5        above-entitled matter.

6

7

8

9

10

11        _____            8-12-19

12        SIGNATURE OF COURT REPORTER                   DATE

13

14

15

16

17

18

19

20

21

22

23

24

25